1

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Patrick J. Foley (Bar No. 180391)

2
  E-Mail:  Patrick.Foley@lewisbrisbois.com
633 West Fifth Street, Suite 4000

3
Los Angeles, CA  90071
Tel:  213.250.1800  // Fax:  213.250.7900

4

**PHILLIPS LYTLE LLP**

5
Joel Blanchet (*Pro Hac Vice*)
  E-Mail:  jblanchet@phillipslytle.com

6
Tristan D. Hujer (*Pro Hac Vice*)
  E-Mail:  thujer@phillipslytle.com

7
Myles K. Bartley (*Pro Hac Vice*)
  E-Mail:  mbartley@phillipslytle.com

8
One Canalside
125 Main Street

9
Buffalo, NY  14203-288
Tel:  716.847-7050 // Fax:  (716) 852-6100

10

Attorneys for Defendant The Dow Chemical Company

11

[Additional Counsel Listed on Next Page]

12

13
**UNITED STATES DISTRICT COURT**

14
**CENTRAL DISTRICT OF CALIFORNIA**

15
**WESTERN DIVISION**

16

17
MDR HOTELS, LLC, a Delaware limited liability company,

18
                    Plaintiff,

19
        vs.

20
MARATHON OIL COMPANY, an Ohio corporation; THE DOW

21
CHEMICAL COMPANY, a Delaware corporation, and DOES 1 through 50,

22
inclusive,

23
                    Defendants.

24

25

26

27

28
/ / /

Case No. 2:20-CV-08008-FLA-JPR

Honorable Fernando L. Aenlle-Rocha

**DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

[*Filed Concurrently with Notice of Motion; Memorandum of Points and Authorities; Declaration of Tristan D. Hujer with Exhibits; Appendix of Evidence; and* [*Proposed*] *Order*]

Hearing:
Date:        April 14, 2023
Time:        1:30 p.m.
Location:    Courtroom 6B

Trial Date:  None Set

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

**LATHAM & WATKINS LLP**
Mary Rose Alexander (Bar No. 143899)
  E-Mail: *mary.rose.alexander@lw.com*
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: 312.876.7700 // Fax: 312.993.9767

2

3

4

Shannon D. Lankenau (Bar No. 294263)
  E-Mail: *shannon.lankenau@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: 415.391.0600 // Fax: 415.395.8095

5

6

7

Michael A. Hale (Bar No. 319056)
  E-Mail: *michael.hale@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Tel: 213.485.1234 // Fax: 213.891.8763

8

9

10

Attorneys for Defendant Marathon Oil Company

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT

Pursuant to L.R. 56-1 and Section 7(d)(i) of the Court's Initial Standing Order, Defendants Marathon Oil Company ("Marathon") and The Dow Chemical Company ("Dow," and collectively with Marathon, "Defendants") submit the following Statement of Uncontroverted Facts and Conclusions of Law in Support of their Motion for Summary Judgment.

| Undisputed Fact | Evidence |
|---|---|
| **Marathon Drilled, Operated, and Partially Abandoned The Well** | |
| 1. In 1929, Recreation Gun Club ("RGC") executed a lease with A.A. Curtice authorizing "the sole and exclusive right to the [l]essee to explore, mine and operate, take, store, remove and dispose of oil, gas, casing-head gas and other hydrocarbon substances" on a parcel known as 4360 Via Marina in Marina Del Rey, California (the "Property") for a period of twenty (20) years. | Hujer Decl. Ex. 1 (Oil and Gas Lease) at 1; Underkuffler Decl. Ex. B (Underkuffler Report) at 3; Hujer Decl. Ex. 52 (Jordan Initial Report) at 9. |
| 2. In January 1930, A.A. Curtice assigned the lease and "all rights, title, and interest" to Ohio Oil Company. | Hujer Decl. Ex. 2 (Assignment) at 1-2. |
| 3. Ohio Oil Company is Marathon's predecessor.[1] | ECF No. 1-2 at ¶ 3. |
| 4. Oil and gas already existed at the Property before Marathon leased the premises. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083202-03. |
| 5. In 1931, Marathon notified the California Department of Natural Resources Division of Oil and Gas of its intention to drill a well from the Property (the "Well"). | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083211. |
| 6. The California Department of Natural Resources Division of Oil and Gas later became the Division of Oil, Gas, and Geothermal | Dudak Decl. Ex. A (Dudak Initial Report) at 5-6; Hujer Decl. Ex. 52 (Jordan Initial Report) at 7. |

---

[1] Ohio Oil will be referred to as Marathon from this point forward.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| Undisputed Fact | Evidence |
|---|---|
| Resources ("DOGGR"), which then became the California Geologic Energy Management Division.[2] | |
| 7. DOGGR is the state entity responsible for ensuring compliance with California's laws and regulations regarding the drilling, operation, and closure of oil and gas wells in California. | Hujer Decl. Ex. 39 (Phillips Tr.) at 21:8-13; *see also* Dudak Decl. Ex. A (Dudak Initial Report) at 9; Hujer Decl. Ex. 40 (Jordan Tr.) at 183:10-16. |
| 8. An approval by DOGGR means that DOGGR "determined that an operator of a well was compliant with all existing statutes and regulations of the State of California regarding the drilling, completion, reworking, injection, operation, plugging, and abandonment of its oil, gas, or geothermal well that were in effect at the time the work was permitted or performed." | Dudak Decl. Ex. A (Dudak Initial Report) at 9. |
| 9. DOGGR approved of Marathon's proposal to drill the Well. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083210; Dudak Decl. Ex. A (Dudak Initial Report) at 10. |
| 10. In 1931, Marathon began to "explore, mine, and operate, take, store, remove and dispose of oil [and] gas" by "[d]rill[ing]," "ream[ing]," "[c]ement[ing]," "coring," and "[s]wabb[ing]" the Well. | ECF No. 1-2 at ¶ 3; Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083201-07; *see also* Hujer Decl. Ex. 52 (Jordan Initial Report) at 9. |
| 11. Marathon logged its drilling, casing, cementing, and perforation history, and its production history, and DOGGR approved of these activities. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083201-07; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 25. |
| 12. Marathon provided notice and DOGGR approved of Marathon's water shut-off test. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083208-09; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 25. |
| 13. Marathon extracted oil and | Arthur Decl. Ex. A (Arthur Initial |

---

[2] The entities are one and the same and will be referred to as DOGGR henceforth.

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| operated the Well for several years. | Report) at 2. |
| 14. In January 1939, RGC extended Marathon's initial lease "for a term of thirteen (13) years from and after February 5, 1929." | Hujer Decl. Ex. 4 (Lease Extension) at 2. |
| 15. On November 12, 1940, Marathon notified and received approval from DOGGR to abandon the Well. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083199-200. |
| 16. On January 3, 1941, Marathon notified DOGGR that it had plugged the oil-producing zone at approximately 3,400 feet below ground surface and that this activity had been "witnessed by R.S.M.B." | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083197-98. |
| 17. On January 3, 1941, Marathon advised that Dow would take control of the Well to develop saltwater production. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083197-98. |
| 18. On January 9, 1941, DOGGR witnessed and approved Marathon's abandonment and plugging of the Well's oil-producing zone. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083196-98; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 25. |
| 19. Marathon's completion, operation, and abandonment of the Well adhered to common industry practices at the time in California and more specifically in the Playa del Rey oilfield. | Arthur Decl. Ex. B (Arthur Rebuttal Report) at 25; Hujer Decl. Ex. 40 (Jordan Tr.) at 35:24-36:21 ("Q. Doesn't that article and your report, note that stove pipe was commonly used during the 1930s? … A: In the 1930's, sir.  I would say it was common in the Playa Del Rey field in the early 1930's."); *id.* at 29:22-30:4 ("Q. So it seems to be that Marathon's conduct was completely in line with the overwhelming majority of industry participants in the time, that's what your research and report seems to state. Is that correct?  A. I said it was similar, yes."); Hujer Decl. Ex. 53 (Jordan Rebuttal Report) at 9 ("I agree with Mr. Arthur that the well construction practices Marathon used in 1931 were typical of the oil industry in that era in the Playa Del Rey field."). |
| 20. The Well's casing was typical for its time period and commonly used | Hujer Decl. Ex. 52 (Jordan Initial Report) at 27. |

3

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| in the region. | |
| 21. There is no evidence that RGC or A.A. Curtice demanded the Property back, terminated the lease, or asserted any breaches of the lease. | Hujer Decl. Ex. 49 (Welch Tr.) at 32:19-33:1; *id.* at 162:13-22 (offering testimony regarding Marathon's effort to locate documents related to the lease through a title search company). |
| 22. On July 10, 1941, Marathon executed a "Partial Release" to A.A. Curtice that "cancelled, surrendered, annulled, and held for naught" its lease assignment for the Property, including specifically the Well and the surrounding land. | Hujer Decl. Ex. 5 (Partial Release) at 1. |
| 23. On July 10, 1941, Marathon and A.A. Curtice "release[d], surrender[ed], quitclaim[ed], and relinquish[ed] unto" RGC "all rights and titles whatsoever acquired or held by them" in the Well and the Property. | Hujer Decl. Ex. 5 (Partial Release) at 1. |
| 24. In the July 10, 1941 partial release, Marathon made no covenant, representation, or warranty of the Property's condition to RGC. | Hujer Decl. Ex. 5 (Partial Release) at 1. |
| 25. RGC took Marathon and A.A. Curtice's interest in the Property. | Hujer Decl. Ex. 5 (Partial Release) at 1. |
| 26. On November 24, 1958, Marathon "remise[d], release[d], and forever quitclaim[ed] to COUNTY OF LOS ANGELES, a body politic and corporate, all its right, title, and interest" in the Property. | Hujer Decl. Ex. 6 (Quitclaim Deed) at 1. |
| 27. In the November 24, 1958 quitclaim deed, Marathon conveyed the Property with no covenant, representation, or warranty as to the Property's condition to the County of Los Angeles (the "County"). | Hujer Decl. Ex. 6 (Quitclaim Deed) at 1. |
| 28. In 1958, the County took any remaining interest Marathon had in the Property. | Hujer Decl. Ex. 6 (Quitclaim Deed) at 1. |
| **Dow Modified, Operated, and Abandoned the Well** | |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| **Undisputed Fact** | **Evidence** |
|---|---|
| 29. On or about July 15, 1941, Dow entered into a lease with RGC and acquired the rights to the Well to produce iodine from saltwater. | Hujer Decl. Ex. 7 (Oil and Gas Lease). |
| 30. Dow's July 1941 lease with RGC authorized it to "produc[e] oil, gas, other hydrocarbon substances, waste salt water and iodine, and tak[e], stor[e], remov[e] and dispos[e] of [the] same." | Hujer Decl. Ex. 7 (Oil and Gas Lease) at 1; *see also* Underkuffler Decl. Ex. A (Underkuffler Report) at 5. |
| 31. The lease also allowed Dow to remove any improvements and to "pull all casing[s]" from the Well. | Hujer Decl. Ex. 7 (Oil and Gas Lease) at 2. |
| 32. The lease provided Dow may quitclaim the lease in its entirety and, once so quitclaimed, Dow "shall be released from all further obligations[.]" | Hujer Decl. Ex. 7 (Oil and Gas Lease) at 6. |
| 33. On November 24, 1941, Marathon transferred its Well rights to Dow so Dow could modify the Well for brine extraction and iodine production. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083197-98. |
| 34. Dow notified DOGGR of its plan to perforate the Well, DOGGR approved the plan, and Dow subsequently completed the perforations. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083192-95. |
| 35. In 1956, Dow plugged and abandoned the Well following DOGGR's approval. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083190-91. |
| 36. During the Well's abandonment, on March 12, 1956, the Well blew out, resulting in gas, saltwater, and sand blowing-out to the surface. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083186-89. |
| 37. The 1956 blowout eventually "bridged off" and the abandonment operations continued. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083187. |
| 38. In 1956, Dow notified DOGGR of the blowout, and DOGGR observed and approved of Dow's actions to address it. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083185-MDR0083189. |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| 39. Upon Dow's completion of its reabandonment in 1956, DOGGR concluded Dow's actions "fulfilled" the "requirements of this Division." | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083185. |
| 40. Dow informed DOGGR of its "[p]erforat[ing]," "plug[ging]," "cement[ing]," and "test[ing]" for saltwater production. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083188-95; Dudak Decl. Ex. A (Dudak Initial Report) at 11. |
| 41. Dow later informed DOGGR of its abandonment, water shut-off tests, and transfer of the Well to the County, and DOGGR witnessed and approved of these activities. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083185-88. |
| 42. Dow's filings with DOGGR show it recorded shots and plugs. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083185-96. |
| 43. Dow's notice to abandon, dated February 15, 1956, described the condition of the Well. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083190-91. |
| 44. In 1961, Dow "REMISE[D], RELEASE[D], AND QUITCLAIM[ED]" its interest in the Well and the Property to the County. | Hujer Decl. Ex. 9 (Corporation Quitclaim Deed) at 1. |
| 45. In 1961, Dow conveyed the Property with no covenant, representation, or warranty as to the Property's condition to the County. | Hujer Decl. Ex. 9 (Corporation Quitclaim Deed) 1-3. |
| 46. The County took Dow's interest in the Property. | Hujer Decl. Ex. 9 (Corporation Quitclaim Deed) at 4. |
| 47. Within the oil and gas industry, a lessee's surrender of an oil and gas lease by quitclaim deed releases the executing lessee from any further involvement in or responsibility for the condition of the property. | Underkuffler Decl. Ex. A (Underkuffler Report) at 9. |
| 48. Standard practice dictates that an assessment of the parties' compliance with their leases is conducted at the time a quitclaim deed is accepted. | Underkuffler Decl. Ex. A (Underkuffler Report) at 5. |
| 49. Unless a breach was asserted by the | Underkuffler Decl. Ex. A |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| Undisputed Fact | Evidence |
|---|---|
| lessor, acceptance of a quitclaim deed accomplishes conveyance of title and possession of the property to the lessor in an "as-is" condition. | (Underkuffler Report) at 11. |
| 50. A quitclaim transfer in the oil and gas industry is understood to be an "as-is" transfer, with no representations made about the condition of the property, including the leasing operations and activities performed thereon. | Underkuffler Decl. Ex. A (Underkuffler Report) at 9-10. |
| 51. A subsequent lessee inherits no rights or obligations established by oil and gas leases that were previously surrendered by quitclaim deeds. | Underkuffler Decl. Ex. A (Underkuffler Report) at 14. |
| **LA County Reabandoned the Well With DOGGR Approval** | |
| 52. On December 1, 1958, RGC conveyed the Property, and all related rights, title, and interest therein, to the County. | Hujer Decl. Ex. 10 (Quitclaim Deed). |
| 53. On December 4, 1958, Dow transferred ownership of the Well to the County. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083183. |
| 54. The County filed a Notice of Intention to Abandon Well with DOGGR, which was approved on January 2, 1959. | ECF No. 1-2 at ¶ 4; Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083181-84. |
| 55. On April 7, 1959, the County reabandoned the Well. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083180. |
| 56. DOGGR witnessed and approved the County's reabandonment, finding the County fulfilled DOGGR's requirements of the division at that time. | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083178-79. |
| 57. At the time of the 1959 reabandonment, there was "no mention of leakage [] identified." | Dudak Decl. Ex. B (Dudak Rebuttal Report) at 23. |
| 58. The County has owned the Property since 1958. | ECF No. 1-2 at ¶ 2. |
| **The Historical Facts Are Fully Set Forth in Public Records** | |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| 59. The publicly available Well file describes the Well's history. | Hujer Decl. Ex. 3 (Historical Well Records); Hujer Decl. Ex. 39 (Phillips Tr.) at 42:9-15. |
| 60. The Well file details Marathon's, Dow's, and the County's Well-related actions, DOGGR's approvals and observations of those actions, and the Well's condition and status from 1931 to 1959. | Hujer Decl. Ex. 3 (Historical Well Records). |
| 61. The Well did not blow out and there were no reports of issues of structural integrity issues after the County reabandoned it in 1959 and before MDR began its work. | Hujer Decl. Ex. 40 (Jordan Tr.) at 39:2-18; *id.* at 152:3-19; *id.* at 174:17-21: *id.* at 194:15-19; *see* Hujer Decl. Ex. 52 (Jordan Initial Report) at 15. |
| **MDR Leased the Property "As Is" Despite Known Conditions** | |
| 62. In 1997, the County issued a request for proposal to develop the Property. | Hujer Decl. Ex. 42 (Hardage Tr.) at 47:2-7. |
| 63. MDR Hotels, LLC ("MDR"), a private real estate developer, won a bid to develop the Property. | Hujer Decl. Ex. 42 (Hardage Tr.) at 36:6-12; *id.* at 47:8-10. |
| 64. In October 2013, MDR submitted a Development Plan that explicitly acknowledged an abandoned oil well's presence and the need to address methane gas on the Property. | Hujer Decl. Ex. 11 (Lease Agreement) at § 5.1, Exhibit B to the Lease at B3. |
| 65. MDR was informed, from Phase I and Phase II reports and correspondence from its contractors, that the Well would need to be "reabandoned," or brought into compliance with current statutes and regulations, before MDR developed the Property. | Hujer Decl. Ex. 14 (Phase I Environmental Site Assessment Report 2006) at E-3; *id.* at §§ 3.3, 4.4,; Hujer Decl. Ex. 12 (Proposed Items to Discuss with Beaches and Harbors, sent on March 2, 2012 from Bill Pangelinan) at 3; Hujer Decl. Ex. 41 (Pangelinan Tr.) at 82:13-82:23; *id.* at 91:20-24.; Hujer Decl. Ex. 20 (May 3, 2008 letter from Methane Specialists, addressed to Mark Rousseau) at 1. |
| 66. These reports also warned of soil contamination on the Property due to the County's prior dredging of the marina and use of contaminated hydraulic fill to create Marina Del Rey. | Hujer Decl. Ex. 13 (Phase I Site Assessment 1996) at 4-7; Hujer Decl. Ex. 14 (Phase I Environmental Site Assessment Report 2006) at E-3; *id.* at §§ 3.3, 4.4; Hujer Decl. Ex. 16 (Geotechnical Design Report by |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| **Undisputed Fact** | **Evidence** |
|---|---|
| | Shannon & Wilson) at § 7.2; Hujer Decl. Ex. 17 (Subsurface Investigation Report) at §§ 2.2, 4.2. |
| 67. MDR also commissioned surveys of the Property to assess for potential methane issues, which confirmed the presence of methane gas and hydrocarbon impacted soil on the Property. | Hujer Decl. Ex. 13 (Phase I Site Assessment 1996) at 1-7; Hujer Decl. Ex. 35 (Phase II Site Assessment 1996) at 1-9; Hujer Decl. Ex. 14 (Phase I Environmental Site Assessment Report 2006) at E-3; *id.* at §§ 3.3, 4.4; Hujer Decl. Ex. 41 (Pangelinan Tr.) at 82:24-83:10; *id.* at 87:5-13; *id.* at 91:24-92:10; Hujer Decl. Ex. 20 (May 3, 2008 letter from Methane Specialists, addressed to Mark Rousseau) at 1; Hujer Decl. Ex. 18 (Methane Site Assessment Report); *see also* Hujer Decl. Ex. 51 (Conahan Tr.) at 32:23-33:15 (identifying Methane Site Assessment Report). |
| 68. Bill Pangelinan was a consultant hired by MDR to oversee the project during three separate intervals of time from 2011 to 2021. | Hujer Decl. Ex. 41 (Pangelinan Tr.) at 37:7-11; *id.* at 45:4-46:6. |
| 69. Bill Pangelinan considered the Property a "known dirty site." | Hujer Decl. Ex. 15 (September 13, 2012 Email from Bill Pangelinan to Sam Hardage). |
| 70. MDR leased the Property from the County "as is." | Hujer Decl. Ex. 11 (Lease Agreement) §§ 1.2.1 and 15.4.1 |
| 71. When MDR leased the Property, MDR was aware of reports indicating the Property's historical use as an oil field and the County's placement of contaminated hydraulic fill from the neighboring lagoon on the Property. | Hujer Decl. Ex. 12 (Proposed Items to Discuss with Beaches and Harbors, sent on March 2, 2012 from Bill Pangelinan) at 3; Hujer Decl. Ex. 41 (Pangelinan Tr.) at 186:24-187:3 ("And MDR entered into this provision knowing that petroleum hydrocarbons had been detected in the hydraulic fill on the property? [Objection] A. Yes."). |
| 72. As of December 23, 2013, MDR acknowledged that it was "responsible for all costs of any necessary environmental site remediation." | Hujer Decl. Ex. 36 (Summary of Terms) at 4. |
| 73. MDR obtained a $10 million rent credit to cover "extras," such as any costs MDR incurred to address | Hujer Decl. Ex. 37 (September 2, 2014 Email from Bruce Leidenberger to Sam Hardage); Hujer Decl. Ex. 38 |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| problems on the Property. | (Spreadsheet titled "Marina Del Rey," dated September 2, 2014); Hujer Decl. Ex. 41 (Pangelinan Tr.) at 187:24-192:10. |
| **MDR Failed to Properly Plan to Reabandon The Well** | |
| 74. MDR began construction on the Property around September 2017. | Hujer Decl. Ex. 52 (Jordan Initial Report) at 9. |
| 75. In fall 2017 MDR claims it "discovered" the Well was within the footprint of its planned building and assessed that it was leaking methane. | ECF No. 1-2 at ¶¶ 5, 6. |
| 76. In April 2018, MDR then submitted a proposal to reabandon the Well to the County and DOGGR. | ECF No. 1-2 at ¶ 10; Hujer Decl. Ex. 32 (June 5, 2018 Letter from DOGGR to MDR) at 1. |
| 77. On April 27, 2018, DOGGR approved MDR's notice of intention to reabandon provided that certain conditions were met. | ECF No. 1-2 at ¶ 10; Hujer Decl. Ex. 32 (June 5, 2018 Letter from DOGGR to MDR) at 1-4. |
| 78. DOGGR required MDR to "isolate the following zones: (a) "The Base of Freshwater at 700'±"; (b) "The USDW [Underground Source of Drinking Water] at 1512'±"; (c) "Top of the upper most hydrocarbon zone at 2200'±; and (d) "Top of the Upper zone at 3300'±." | Hujer Decl. Ex. 32 (June 5, 2018 Letter from DOGGR to MDR) at 3; *see also* Hujer Decl. Ex. 52 (Jordan Initial Report) at 15, 42. |
| 79. DOGGR stated that "[f]ailure to achieve zonal isolation may have a negative impact on current and future operations." | Hujer Decl. Ex. 32 (June 5, 2018 Letter from DOGGR to MDR) at 3. |
| 80. MDR had no experience reabandoning a decades-old well. | Hujer Decl. Ex. 42 (Hardage Tr.) at 203:10-12 ("I'm not an oil expert. I never had to deal with an oil well before."); Hujer Decl. Ex. 50 (Madsen Tr.) at 70:15-20 (Q: "Do you know whether MDR had ever developed a property with an abandoned oil well?" A: "Not that I'm aware of, no." Q: "Do you know whether MDR had ever developed a property on an old oil field before?" A: "Not that I'm aware of, no."). |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| **Undisputed Fact** | **Evidence** |
|---|---|
| 81. MDR failed to consult a well-abandonment specialist or a contractor with experience reabandoning a nearly 90-year-old well during the planning phases of its project. | Hujer Decl. Ex. 41 (Pangelinan Tr.) at 105:10-14; *id.* at 130:13-16; Hujer Decl. Ex. 21 (February 22, 2018 Email between Methane Specialists and DOGGR) at CALGEM00011970. |
| 82. MDR hired a well reabandonment contractor without familiarity or experience with California's oil well abandonment standards and was ill-suited to provide correct advice on reabandoning the Well during the planning phase. | Hujer Decl. Ex. 21 (February 22, 2018 Email between Methane Specialists and DOGGR) at CALGEM00011968; Hujer Decl. Ex. 43 (Dudak Tr.) at 74:6-10. |
| 83. After starting reabandonment, MDR's contractor proceeded with the project despite signs of a potential. | ECF No. 1-2 at ¶¶ 11-14; Arthur Decl. Ex. A (Arthur Initial Report) at 23-27. |
| 84. During the reabandonment, the Well sustained multiple gas kicks and surface breaches—all indications of potential well integrity issues—before blowing out on December 25, 2018, and again, on January 11, 2019. | ECF No. 1-2 at ¶ 14; Hujer Decl. Ex. 52 (Jordan Initial Report) at 9, 15; Arthur Decl. Ex. A (Arthur Initial Report) at 23-27. |
| 85. The two blowouts that occurred while MDR was operating and reabandoning the Well were the only two blowouts that occurred in the Well since 1959. | Hujer Decl. Ex. 52 (Jordan Initial Report) at 15 ("[T]here is no record of leakage definitively attributable to the Well between 1959 and 2017."); Dudak Decl. Ex. A (Dudak Initial Report) at 12 ("MDR was the legal operator in control of the Well at the time the Well blew out in December 2018 and January 2019."). |
| 86. On January 18, 2019, DOGGR issued an Emergency Order No. 1143 requiring MDR to take certain measures to complete the reabandonment. | Hujer Decl. Ex. 22 (DOGGR Emergency Order). |
| 87. Following the January 2019 blowout, MDR represented that "fish" became stuck in the well at approximately 1,450 to 1,550 feet. | Hujer Decl. Ex. 23 (February 2019 Presentation) at 1; Hujer Decl. Ex. 44 (Scheet Tr.) at 65:9-67:7; Hujer Decl. Ex. 40 (Jordan Tr.) at 90:13-21. |
| 88. MDR claimed the "fish" prevented its contractors from reaching the top of the upper-most hydrocarbon zone at approximately 2,200 feet in | Hujer Decl. Ex. 45 (Lerma Tr.) at 112:4-8 (Q: "The bottom line is InterAct was never able to remove the fish from the well; is that right? A: |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| compliance with DOGGR requirements. | Not completely, correct."); *id.* at 200:11-201:11 ("In order to comply with DOGGR current regulations, we would have to remove the fish from the wellbore, which we were unable to do."); Hujer Decl. Ex. 46 (Hale Tr.) at 113:8-114:1 ("once the tools were identified that they could not be removed from the well, there – there was, you know, not many options left to abandon that well, from what I understood"); Hujer Decl. Ex. 47 (Geisinger Tr.) at 95:22-96:3 (MDR took the position that the Well could not be fully abandoned to the full depth of the well because "[t]here was a[n] object stuck in the well that they were not able to retrieve"); Hujer Decl. Ex. 40 (Jordan Tr.) at 92:16-21 ("A. MDR was unable to comply with the stipulations on the permit DOGGR issued to plug and abandon the well. Q. Because of the junk in the well? A. Yes."). |
| 89. MDR's contractors and experts testified it would have been impossible or too risky to isolate the upper hydrocarbon gas zone by drilling the Well beyond the stuck "fish." | Hujer Decl. 44 (Scheet Tr.) at 265:8-26 (testifying "if operations wanted to . . . continue and go deeper after fish recovery, I think that's when Wild Well would have drawn a line" and "would not want to be on location during the degradation of that event"); *id.* at 185:12-23 (testifying that "continuing deeper into the well with fishing operations had a higher degree of operational risk than abandoning at or [] around the current depth"); *id.* at 137:1-15 (testifying that "Wild Well would not want to be on location or associated with the project if they felt that what they were doing would have a high likelihood of leading to a blowout" and abandoning at deeper depths "was a very high risk with very little reward"); *id.* at 130:20-131:8 (one of MDR's well abandonment contractors testifying continued drilling could have affected wellbore integrity and led to another blowout); *id.* at 185:12-23 (testifying that "continuing deeper into the well with fishing operations had a higher degree of operational risk than abandoning at or |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| | [] around the current depth"); Hujer Decl. Ex. 41 (Pangelinan Tr.) at 221:19-222:10 ("I was told that if we go down any further or continued to go down any further, that it would be a much higher risk[.]"); Hujer Decl. Ex. 24 (February 14, 2019 InterAct Letter) at 4 (stating "[a]ny other methods of fishing are considered high risk, possibly resulting in additional pipe being left in the hole and reducing the effectiveness of an abandonment from the current depth or inadvertently sidetracking the well"); Hujer Decl. Ex. 25 (February 17, 2019 Email Chain) at MDR0070103-04 (stating the same); Hujer Decl. Ex. 26 (March 13, 2019 Presentation Outline from Interact) at LACDBH0021034 (proposing halting reabandonment efforts at 1617' because "[o]nly high risk fishing options remain" and the proposed abandonment at 1617' was "[t]he best and only viable option for this well bore."); Hujer Decl. Ex. 53 (Jordan Rebuttal Report) at 26 ("MDR was unable to comply . . . because it was impossible due to the wrecked condition of the wellbore that had severely compromised integrity and significant metal junk in the hole."). |
| 90. MDR left "fish" in the Well, leaving it without "the ability to isolate anything below" and "allow[ing] gas to migrate up wherever the gas was coming in." | Hujer Decl. Ex. 39 (Phillips Tr.) at 194:21-195:3; Hujer Decl. Ex. 27 (Root Cause Analysis) at MDR0003866. |
| 91. MDR claims to have abandoned the Well at a depth of approximately 2,027 ft. | Hujer Decl. Ex. 52 (Jordan Initial Report) at 48. |
| **MDR's Incomplete Reabandonment Did Not Comply with Applicable Regulations and the Well Remains Unsafe and at an Elevated Risk for Future Gas Releases** | |
| 92. DOGGR found MDR's plugging and reabandonment failed to comply with numerous regulations, including California Public Resources Code ("PRC") §§ 3208 and 3228, and California Code of Regulations §§ 1723(a) and | Hujer Decl. Ex. 33 (March 11, 2020 Letter from DOGGR) at 1-3; Hujer Decl. Ex. 53 (Jordan Rebuttal Report) at 19 ("It is true that the DOGGR disapproved of the P&A by MDR because it did not meet the stipulations that required plugging . . . from 3,076 |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| 1723.1(b), because MDR failed to place cement plugs across the following zones as required by its own June 5, 2018 permit: (1) upper hydrocarbon (gas) zone at 2,200'±; (2) saltwater zone located between 3,076' and 3,341'; and (3) "upper zone" (oil) located at 3,330'±. | ft to 3,341 ft and setting a plug across the shallow gas zone at approximately 2,200 ft."); *see also* Hujer Decl. Ex. 40 (Jordan Tr.) at 182:8-17 ("Q. You acknowledge that MDR did not abandon the well to current DOGGR standards? A. Yes. Q. Is it also your opinion that MDR was unable to completely isolate the upper hydrocarbons zone from 1,500 to 2,500 feet? A. Outside the casing, yes."). |
| 93. DOGGR found that "MDR left junk (drill bit and drill collars) in the well from 1302' to 1577'± preventing proper plugging and abandonment of hydrocarbon zones." | Hujer Decl. 33 (March 11, 2020 Letter from DOGGR) at 2; Hujer Decl. Ex. 40 (Jordan Tr.) at 92:6-10 ("Q. After MDR left the junk in the well during its reabandonment operations in 2019, was MDR able to plug all the lower hydrocarbons zones in the well as required by its permit and state regulations?  A. No."). |
| 94. DOGGR concluded that "the [W]ell is not plugged and abandoned to usual current standards, has a history of uncontrolled gas releases including the blowout that occurred during the most recent plugging and abandonment attempt,  and remains an elevated risk for future gas releases." | Hujer Decl. Ex. 31 (June 13, 2019 DOGGR Letter) at 2. |
| 95. In 2022, DOGGR stated it "continues to be DOGGR's position that the [W]ell remains at an elevated risk for future gas releases" and the still-unsealed gas pathways present a "future risk" that the Well could "begin leaking gas or other liquid in the future." | Hujer Decl. Ex. 48 (Vasconcellos Tr.) at 139:9-13; *id.* at 132:10-19. |
| 96. The Los Angeles County Department of Public Health stated MDR's well abandonment was "non-compliant with state standards" and "gas migration pathways at depth were not sealed[.]" | Hujer Decl. Ex. 28 (April 11, 2019 Email) at MDR0071334. |
| 97. DOGGR had "serious concerns about development of structures in proximity to th[e] Well" and | Hujer Decl. Ex. 48  (Vasconcellos Tr.) at 132:10-19; Hujer Decl. Ex. 34 (January 30, 2019 DOGGR Letter) at |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| "strongly recommend[ed]" no structures be built atop or in proximity of the Well, noting "[t]his is especially true with respect to well 'Dow R.G.C.' 10, considering the gas blowout history of the well, the failure to seal the [W]ell at the upper hydrocarbon gas zone, and the [W]ell's proximity to sensitive receptors, including the public." | 2; Hujer Decl. Ex. 39 (Phillips Tr.) at 201:18-22 (Q: "So DOGGR had previously informed MDR and its contractors that it strongly recommended against placing any structure atop a well or preventing access to the well?  Do you remember that?"  A:  "That is correct."). |
| 98. DOGGR "perceive[d] a future risk that the [W]ell could begin leaking gas or other liquid in the future" or "that there was [] or could be a problem in the future." | Hujer Decl. Ex. 48 (Vasconcellos Tr.) at 132:16-19; Hujer Decl. Ex. 46 (Hale Tr.) at 144:19-25. |
| 99. Despite DOGGR's recommendations, MDR proceeded with its plan to build a parking structure on top of the Well. | Hujer Decl. Ex. 33 (March 11, 2020 DOGGR Letter) at 3. |
| 100.  DOGGR required MDR to "install[] a casing riser on the [W]ell to allow access to the [W]ell in the event remedial operations become necessary in the future" and "develop a monitoring program for the [W]ell to detect future leakage." | Hujer Decl. Ex. 33 (March 11, 2020 DOGGR Letter) at 3. |
| 101.  DOGGR instructed MDR that the casing riser was necessary "to allow access to the [W]ell to remedy a currently perceived future problem" because "the [Well] is not plugged and abandoned to usual current standards, has a history of uncontrolled gas releases including the blowout that occurred during the most recent plugging and abandonment attempt, and remains an elevated risk for future gas releases." | Hujer Decl. Ex. 31 (June 13, 2019 DOGGR Letter) at 2. |
| 102.  As a result of DOGGR's recommendations, MDR agreed to install the casing riser and develop a permanent monitoring program. | Hujer Decl. Ex. 33 (March 11, 2020 DOGGR Letter) at 3 ("Although construction on the parking structure and hotel was not complete at the date of this letter, based on information provided to CalGEM, MDR and Hartage has installed a casing riser on |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| Undisputed Fact | Evidence |
|---|---|
| | the well to allow access to the well in the event remedial operations become necessary in the future. CalGEM further recommends MDR\Har[d]age\ County of Los Angeles, Department of Beaches and Harbors, develop a monitoring program for the well to detect future leakage."); Hujer Decl. Ex. 42 (Hardage Tr.) at 176:1-4 ("Well, the hotel's built. The document says CalGEM recommends that we develop a monitoring program for the well to detect future leakage, so we did that."); *id.* at 229:12-14 (Q: "What are you still doing regarding work on the well?" A: "The well is going to be monitored forever."); Hujer Decl. Ex. 50 (Madsen Tr.) at 140:23-141:1 ("And then after that, through the whole process, ultimately we ended up with a different type of oil well riser and different stack of how to - - how to mitigate - - or a different plan. Not altogether, but a different plan and different details for that methane mitigation."); Hujer Decl. Ex. 39 (Phillips Tr.) at 139:23-140:2; *id.* at 201:18-22. |
| 103.  MDR's principal, Samuel Hardage, stated, "the [W]ell is going to be monitored forever" to detect leakage of methane gas from the Well. | Hujer Decl. Ex. 42 (Hardage Tr.) at 229:14. |
| 104.  The Los Angeles County Department of Public Health agreed a post-abandonment methane gas monitoring plan was "critical" because gas migration pathways were not sealed. | Hujer Decl. Ex. 28 (April 11, 2019 Email) at MDR0071334. |
| 105.  Wells not approved to the State's current standards pose a higher risk of leaking and potential damage to life, health, property, and natural resources than those abandoned to current standards. | Dudak Decl. Ex. A (Dudak Initial Report) at 23. |
| 106.  Wells in which access is impeded, and are not abandoned to current standards, pose an even higher risk to life, health, property, | Dudak Decl. Ex. A (Dudak Initial Report) at 23. |

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| and natural resources, due to their immediate proximity to structures and the time, cost, and complexity of tearing down impediments to the wells and rigging up well servicing equipment to remediate the wells should they begin leaking. | |
| **MDR Filed This Action Against Marathon and Dow** ||
| 107.  In its July 31, 2020 complaint ("Complaint"), MDR alleges causes of action for negligence, continuing public nuisance, continuing private nuisance, permanent public nuisance, permanent private nuisance, and trespass. | ECF No. 1-2 at 6-11. |
| 108.  The Complaint alleges Defendants negligently "[i]nstall[ed] a stove pipe casing," "[f]ail[ed] to install concrete around the surface casing to ground level" and "around the production casing throughout and above the hydrocarbon production zone," "[f]ail[ed] to cement the well above the salt water zone," "[f]ail[ed] to install cement into the annulus of the casing at and above the 2,200 foot level, which provided further paths for gas to migrate," and "fail[ed] to account for the porous nature of the riveted stovepipe . . . which caused and/or contributed to surface migration of gasses and blowouts." | ECF No. 1-2 at ¶ 17. |
| 109.  MDR has admitted that the Well presents a heightened risk for future gas release. | ECF No. 38 at 25. |
| 110.  MDR has argued that the Well is a nuisance and a trespass, and that the Well is a "structure." | Hujer Decl. Ex. 29 (MDR First Interrog. Resp.) at Responses 4-5; ECF No. 38 at 13, 21. |
| 111.  MDR has agreed that "[t]here was no evidence of the defects prior to MDR coming to the Property." | ECF No. 38 at 9. |
| 112.  MDR claims its damages were | *See* ECF No. 1-2 at ¶ 17; Hujer Decl. |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

| **Undisputed Fact** | **Evidence** |
|---|---|
| caused by defects in the Well's construction, and in subsequent construction work to abandon the Well, specifically by perforating the production casing, failing to isolate oil- and gas-bearing zones and salt water zones, fracturing and breaching the casing, and failing to place cement in the casing's annulus. | Ex. 30 (MDR Third Interrog. Resp.) at Responses 15-16. |
| 113.  MDR has asserted Defendants violated various Public Resource Code Provisions, including: for Marathon, ch. 535, §§ 3 & 16 (1929), and ch. 791 §§ 15 & 18 (1931); for Dow, ch. 93, §§ 3213, 3228, 3229, and 3501 (1939). | Hujer Decl. Ex. 52 (Jordan Initial Report) at 8-11; Hujer Decl. Ex. 30 (MDR Third Interrog. Resp.) at Responses 15-16. |
| **The Court Dismissed MDR's Negligence and Permanent Nuisance Claims** | |
| 114.  On November 2, 2020, Defendants moved to dismiss MDR's Complaint on several grounds. | ECF No. 36. |
| 115.  The Court dismissed MDR's negligence and permanent nuisance claims because such claims are barred by the statute of limitations, finding "the County [] knew or had reason to suspect Plaintiff's claims regarding the alleged 'improper construction, use, maintenance and abandonment of the [W]ell" at least as of 1959." | ECF No. 54 at 9. |
| 116.  The Court has taken judicial notice that Dow informed DOGGR that it was perforating the Well and that DOGGR knew that. | ECF No. 54 at 5. |

## PROPOSED CONCLUSIONS OF LAW

### Legal Standard for Summary Judgment

1.     "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

1    2.    "The moving party bears the initial burden of demonstrating the

2 absence of a genuine issue of material fact for trial, but it need not disprove the other

3 party's case." *Agendia, Inc. v. Azar*, 420 F. Supp. 3d 985, 990 (C.D. Cal. 2019

4 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

5    3.    "Once the moving party meets its burden, the burden shifts to the

6 opposing party to set out specific material facts showing a genuine issue for trial."

7 *Agendia*, 420 F. Supp. 3d at 990 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242,

8 248-49 (1986)).

9    4.    The opposing party cannot "rest upon the mere allegations or denials of

10 [the moving party's] pleading but must instead produce evidence that sets forth

11 specific facts showing that there is a genuine issue for trial." *Estate of Tucker ex rel.

12 Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal

13 quotations omitted).

14    **The Statute of Repose Precludes MDR's Claims**

15    5.    "No action may be brought to recover damages from any person . . .

16 who . . . develops real property or performs . . . construction of an improvement to

17 real property more than 10 years after the substantial completion of the development

18 or improvement for . . . [a]ny latent deficiency in the design, specification, surveying,

19 planning, supervision, or observation of construction or construction of an

20 improvement . . . ." Cal. Civ. Proc. Code § 337.15(a).

21    6.    "[N]o action shall be brought to recover damages from any person

22 performing or furnishing . . . construction of an improvement to real property more

23 than four years after the substantial completion of such improvement for . . . [a]ny

24 patent deficiency in the design, specifications, surveying, planning, supervision or

25 observation of construction or construction of an improvement . . . ." Cal. Civ. Proc.

26 Code § 337.1(a).

27    7.    These statutes of repose control for nuisance and trespass claims.

28 *Chevron U.S.A. Inc. v. Super. Ct.*, 44 Cal. App. 4th 1009, 1017-18 (1994); *see also*



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

91664967.1                                   19                    Case No. 2:20-CV-08008-FLA-JPR

DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT

1  *San Diego Unified Sch. Dist. v. Cnty. of San Diego*, 170 Cal. App. 4th 288, 303

2  (2009); *Gaggero v. Cnty. of San Diego*, 124 Cal. App. 4th 609, 618 (2004);

3  *Mattingly v. Anthony Indus., Inc.*, 109 Cal. App. 3d 506, 509 (1980).

4       8.    An "improvement" is any "change or addition to land, property, etc., to

5  make it more valuable."  *Gaggero*, 124 Cal. App. 4th at 616-17.

6       9.    The California legislature has defined "work of improvement" to

7  include "the construction, alteration, addition to, or repair, in whole or in part, of any

8  . . . well."  Cal. Civil Code § 8050(a).

9       10.   Defendants' construction activities on the Well, including their work to

10  abandon the Well, qualify as construction of an improvement to real property.  *See*

11  *Grange Debris Box & Wrecking Co. v. Super. Ct.*, 16 Cal. App. 4th 1349, 1353

12  (1993), *disapproved of on other grounds by Lantzy v. Centex Homes*, 31 Cal. 4th 363

13  (2003), *as modified* (Aug. 27, 2003); *Gaggero*, 124 Cal. App. 4th at 617-18; *Gitlin v.*

14  *Howard*, 2014 WL 6488216, at *6 (Cal. Ct. App. Nov. 20, 2014).

15       11.   The date of final completion of Defendants' work on the Well

16  improvements was no later than 1957.  *See* Cal. Civ. Proc. Code § 337.15(g)(4).

17       12.   The defects alleged by MDR are latent deficiencies because they were

18  not apparent by reasonable inspection.  Cal. Civ. Proc. Code § 337.15(b).

19  Accordingly, MDR's claims are untimely because they were filed more than ten

20  years after substantial completion.  Cal. Civ. Proc. Code § 337.15(a).

21       13.   Even if the defects are considered patent, MDR's claims would be

22  untimely because they were filed more than four years after substantial completion.

23  Cal. Civ. Proc. Code § 337.1(a).

24       **MDR's Well Claims Are Barred By The Statute of Limitations Because The**

25                     **Alleged Nuisance Is Permanent**

26       14.   A three-year limitations period governs claims for trespass upon or

27  injury to real property.  Cal. Civ. Proc. Code § 338(b).

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

15.   "[W]here a private citizen sues for damage from a permanent nuisance, the statute of limitations begins to run upon creation of the nuisance." *Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125, 1144 (1991) ("*Mangini I*").

16.   "A nuisance is regarded as continuing if 'the nuisance can be remedied at a reasonable cost by reasonable means,'" otherwise the nuisance is permanent. *McCoy v. Gustafson*, 180 Cal. App. 4th 56, 63 (2009) (quoting *Mangini v. Aerojet-Gen. Corp.*, 12 Cal. 4th 1087, 1103 (1996) ("*Mangini II*").

17.   The plaintiff bears the burden to "present substantial evidence that the . . . condition is one that is both subject to [abatement] . . . and that the cost of [abatement] is 'reasonable.'" *Keegan v. Viviani*, No. G048609, 2015 WL 3633602, at *13 (Cal. Ct. App. June 11, 2015) (citing *Mangini II*, 12 Cal. 4th at 1090).

18.   To the extent MDR claims that the Well is a nuisance, the Well must be considered a permanent one because MDR could not reabandon the Well in accordance with current DOGGR regulations and the Well remains at a heightened risk for future gas releases.

19.   Furthermore, "solid structures" that cannot be removed at reasonable cost present claims for permanent rather than continuing nuisance and trespass. *Capogeannis v. Super. Ct.*, 12 Cal. App. 4th 668, 682-83 (1993); *see Bookout v. State of Cal. ex rel. Dep't of Transp.*, 186 Cal. App. 4th 1478, 1489 (2010); *Field-Escandon v. Demann*, 204 Cal. App. 3d 228, 233-34 (1988); *Castelletto v. Bendon*, 193 Cal. App. 2d 64, 67 (1961).

20.   To the extent MDR claims that the existence of the Well itself is a nuisance and trespass, it must be considered permanent because the Well is a solid structure that cannot be removed at a reasonable cost.

21.   MDR's nuisance and trespass claims are untimely because they were filed more than three years after accrual. Cal. Civ. Proc. Code § 338(b).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

91664967.1                                            21                    Case No. 2:20-CV-08008-FLA-JPR
DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**Defendants Are Entitled To Judgment As A Matter of Law on MDR's Trespass and Nuisance Claims Because Defendants Had Consent To Construct, Operate, and Abandon the Well**

22.    "[L]ack of consent is an element of [a] plaintiff's prima facie case for nuisance and trespass." *Rev 973 LLC v. Mouren-Laurens*, 2009 WL 1096278, at *8 (C.D. Cal. Apr. 22, 2009); *see also Wicker v. Walmart, Inc.*, 533 F. Supp. 3d 944, 948 (C.D. Cal. 2021); *Gucci Shops, Inc. v. Conrad*, 1987 WL 47298, at *6 (N.D. Cal. Dec. 17, 1987).

23.    There is no evidence that either Defendant acted without the consent of the Property owner in constructing, operating, or abandoning the Well.  The uncontroverted evidence demonstrates that Defendants' activities were authorized by their leases.

24.     The California Supreme Court has not imposed a lawfulness requirement as to the consent defense.  *See, e.g.*, *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 241 n.19 (1998), *as modified on denial of reh'g* (July 29, 1998); *Cal. S. R. Co. v. S. Pac. R. Co.*, 67 Cal. 59, 62 (1885).

25.    Even if lawfulness were required, MDR has not shown that Defendants acted unlawfully in constructing, operating, or abandoning the Well.  The undisputed evidence demonstrates that DOGGR witnessed and approved of the Defendants' activities related to the Well.

26.    Accordingly, MDR's nuisance and trespass claims fail as a matter of law.  *See, e.g.*, *Ash v. Bank of Am. N.A.*, 2014 WL 301027, at *5 (E.D. Cal. Jan. 28, 2014); *Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F. Supp. 2d 888, 901 (N.D. Cal. 2011).

**Civil Code Section 3482 Dictates That The Well Is Not a Nuisance**

27.    "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."  Cal. Civ. Code § 3482.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

28.     This statute "include[s] regulations and other express government approvals," *Williams v. Moulton Niguel Water Dist.*, 22 Cal. App. 5th 1198, 1205 (2018), *as modified* (May 18, 2018), including permits issued pursuant to statutory authority.  *See e.g.*, *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 888 (9th Cir. 2001); *Wheeler v. Gregg*, 90 Cal. App. 2d 348, 370 (1949).

29.     The uncontroverted facts demonstrate Defendants' actions in constructing and abandoning the Well were taken with the express authorization of DOGGR and thereafter inspected and approved by DOGGR.

30.     Section 3482 thus bars Plaintiff's nuisance claims because Defendants' conduct was expressly authorized by the statutes in effect at the time and as interpreted and applied by DOGGR.

### To the Extent a Nuisance Arose, MDR Caused It

31.     MDR has not produced evidence indicating that the Well was injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property prior to MDR beginning its operations and  excavation activities on the Property.  Cal. Civ. Code § 3479.

32.     Because the Well posed no risk to the public or to MDR if it remained undistributed and MDR caused any nuisance which allegedly exists, its nuisance claims fail.  *See Beck*, 44 Cal. App. 4th at 1210-11.

### MDR's Trespass Claim Fails Because Neither Defendant Caused Any Detrimental Substance to Enter the Property

33.     Trespass can occur only if a toxic substance enters the plaintiff's property *from the property of another*.  *See* Miller and Starr, Cal. Real Estate 4th ed., Hazardous Substances, § 39.70; Cal. Civ. Prac. Enviro. Lit. § 2:7.

34.     A "failure to remove from land in possession of another a thing which he has tortiously . . . placed on the land constitutes a continuing trespass for the entire time during which the thing is on the land." *MDR Hotels, LLC*, 2021 WL 3519861, at *5-6 (quoting *Mangini I*, 230 Cal. App. 3d at 1148-49).

35.     A failure to remove theory of trespass requires the transportation of foreign matter from outside the property onto the property.  *Mangini I*, 230 Cal. App. 3d at 1132; *Capogeannis*, 12 Cal. App. 4th at 672, 674.

36.     Because MDR has failed to produce evidence that Defendants placed oil and gas onto the Property, its trespass claim fails as a matter of law.

### Defendants' Quitclaim Deeds Extinguished MDR's Claims

37.     Within the oil and gas industry, a quit-claim deed releases the executing lessee from any further involvement in or responsibility for the condition of the property.  Underkuffler Decl. Ex. A (Underkuffler Report) at 9.

38.     A quitclaim transfer in this specific context and industry is understood to be an "as-is" transfer, with no representations made about the condition of the property, including the leasing operations and activities performed thereon. Underkuffler Decl. Ex. A (Underkuffler Report) at 9-10.

39.     By executing these quitclaim deeds, Defendants were released of any and all obligations related to the Property and the Well, including the conditions of and operations on the Property and with respect to the Well.

Dated: March 10, 2023

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By:    */s/ Patrick J. Foley*
Patrick J. Foley
Attorneys for Defendant
*The Dow Chemical Company*

**PHILLIPS LYTLE LLP**

By:    */s/ Tristan D. Hujer*
Joel A. Blanchet (*Pro Hac Vice*)
Tristan D. Hujer (*Pro Hac Vice*)
Myles K. Bartley (*Pro Hac Vice*)
Attorneys for Defendant
*The Dow Chemical Company*



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LATHAM & WATKINS LLP**

By:   */s/ Mary rose Alexander*
Mary Rose Alexander
Shannon D. Lankenau
Michael A. Hale
Attorneys for Defendant
*Marathon Oil Company*



DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## <u>ATTESTATION</u>

Pursuant to Local Rule 5-4.3.4(a)(2)(I), I, Tristan D. Hujer, attest under penalty of perjury that I have obtained concurrence and authorization from the other signatories to affix their electronic signatures to this filing.

Dated: March 10, 2023                    **PHILLIPS LYTLE LLP**


By ***/s/ Tristan D. Hujer***
                                          Tristan D. Hujer

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**CERTIFICATION OF CONCURRENCE FROM SIGNATORY**

I, Patrick J. Foley, am the ECF user whose ID and password are being used to file this **DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**.  In compliance with C.D. Cal. Civ. L.R. 5-4.3.4(a)(2)(i), I hereby attest that I have obtained the concurrence of the signatory to this document, who is also an ECF user.

*/s/ Patrick J. Foley*
Atty signature

