# EXHIBIT 53

# Rebuttal Expert Report of Jeff S. Jordan, P.E.

## to Expert Reports of

## J. Daniel Arthur, dated November 22, 2022

## and

## Daniel Dudak, dated November 22, 2022

## In the Matter of

## MDR Hotels, LLC (Plaintiffs) vs. Marathon Oil Company and the Dow Chemical Corporation (Defendants)

## United States District Court, Central District of California – Western Division

## Case No. 2:20-cv-08008

**Jeff S. Jordan, P.E.**

**January 19, 2023**

**CONFIDENTIAL**



# Table of Contents

List of Figures Cited in This Report (see Appendix I) .................................................................. 3

Nomenclature ................................................................................................................................. 4

Chapter 1 – Introduction ................................................................................................................ 6

Chapter 2 - Rebuttal to Expert Report of J. Daniel Arthur ........................................................... 8

Chapter 3 - Rebuttal to Expert Report of Daniel Dudak ............................................................. 23

Chapter 4 – Summary of Rebuttal to Defendants Experts' Opinions .......................................... 32

Additional References .................................................................................................................. 33

Appendix I – Figures ................................................................................................................... 34

## List of Figures Cited in This Report (see Appendix I)

Figure 1:    Imagery from Google Earth showing actual location of the Dow RGC #10 well and distance from DOGGR's and Subsurface Survey's incorrect well locations.

Figure 2:    Figure 5-12 of Jordan's Expert Report: Junk tubing stuck on mill, recovered at 848 ft from Dow RGC #10 in December 2018.

# Nomenclature

| | |
|---|---|
| ' | symbol for feet |
| " | symbol for inches |
| # | symbol for number; also symbol for pounds (lbs) as in lbs/ft |
| #/ft | pounds per foot |
| 2M | two thousand (lbs per square inch pressure) |
| 3M | three thousand (lbs per square inch pressure) |
| API | American Petroleum Institute |
| API RP | American Petroleum Institute recommended practice |
| bbl | barrels |
| BFW | base of fresh water (depth of) |
| BOP | blowout preventers |
| BOPE | blowout prevention equipment |
| BOPD | barrels of oil per day |
| BWPD | barrels of water per day |
| CalGEM | California Geologic Energy Management Division (formerly known as DOGGR) |
| CT | coiled tubing |
| CT BOPs | coiled tubing blowout preventers |
| CV | curriculum vitae |
| CWS | California Well Services, LLC (workover rig supplier) |
| DOGGR | California Division of Oil, Gas & Geothermal Resources |
| Dow | Dow Chemical Company |
| ETOC | estimated top of cement |
| Exponent | Exponent Failure Analysis Associates, Inc |
| FOSV | full opening safety valve |
| ft | feet |
| IBOP | inside blowout preventer |
| ID | inside diameter |
| InterAct | InterAct PMTI (consulting company) |
| LA | Los Angeles |
| lbs | pounds (mass) |
| LCM | lost circulation material |
| LIH | lost in hole |
| Marathon | Marathon Oil Company (formerly known as Ohio Oil Company) |
| MCFD | thousand cubic feet of gas per day |
| MDR | MDR Hotels, LLC |
| MLLW | mean low level water (depth of) |
| NOI | Notice of Intent form required by DOGGR to perform certain operations on a well |
| OD | outside diameter |
| P&A | plug and abandon |
| PDR0 | upper sealing shale geologic interval in Playa Del Rey field |
| PDR1 | sealing shale geologic interval below PDR0 in Playa Del Rey field |

| | |
|---|---|
| ppg | pound per gallon (fluid density) |
| PRC | California Public Resource Code |
| psi | pounds per square inch (pressure) |
| RCA | root cause analysis |
| RGC | Recreational Gun Club (the lease name on which the Dow RGC #10 well is located) |
| RST | reservoir saturation tool (wireline logging) |
| S.P. | Stovepipe (stove pipe) |
| SP | spontaneous potential (wireline logging) |
| SPE | Society of Petroleum Engineers |
| spud | the initiation of drilling of a well |
| SW | saltwater |
| sx | sacks (of cement or drilling/completion fluid additives) |
| TD | total depth |
| TIH | trip in hole (install pipe into wellbore by single joints or multiple joints) |
| TIW | full opening safety valve (original version manufactured by Texas Iron Works) |
| TOOH | trip out of hole (remove pipe from wellbore by single joints or multiple joints) |
| USDW | underground source of drinking water (depth of) |
| Wild Well Control | Wild Well Control, Inc. (well control service company) |
| WSO | water shutoff (perforations or a test) |
| WWC | Wild Well Control, Inc. (well control service company) |

> *encountered, the depth and character of same, and **whether all water overlying and underlying such oil-bearing strata was successfully and permanently shut off**...*"

Marathon did not document whether all water overlying and underlying oil-bearing strata were shut off as required by the California statutes.

- o   1931 California Statute Chapter 790, Section 15:

    > *"The owner and operator of any well now drilled or drilling, or that hereafter be drilled or drilling, in the State of California on lands producing or reasonably presumed to contain petroleum or gas shall properly case such well or wells with water-tight and adequate metal casing, and in accordance with methods approved by the supervisor and under his direction, **shut off all water overlying and underlying oil-bearing or gas-bearing strata. Such owner or operator shall likewise use every effort and endeavor to shut out from strata containing water suitable for irrigation or domestic purposes and from surface water suitable for such purposes, substances detrimental thereto, and to prevent the infiltration of such substances into the strata containing water suitable for irrigation or domestic purposes and into such surface water**"*

    This statute applies to any well previously drilled or drilling or to be drilled in the future. Again, Marathon did not protect any underground water suitable for irrigation from infiltration of any detrimental substances because it did not isolate the hydrocarbon-bearing zones or the shallow fresh water zones with cement behind steel casing when it constructed the well.

I agree with Mr. Arthur that the well construction practices Marathon used in 1931 were typical of the oil industry in that era in the Playa Del Rey field. However, this does not excuse Marathon's violation of California statutes in effect at the time of well construction in 1931.

- In contrast to Mr. Arthur's Opinion #2 stating that Marathon and Dow adhered to all applicable laws during the well producing and plugging operations, including the 1956 P&A of the Dow RGC #10 well, it is my opinion that Marathon violated California State Statutes during the operation as a producing oil well and the plugging of the oil zone from 1931-1941, and Dow violated California Statutes and the Public Resource Code (PRC) regarding well abandonments that were in effect during its 1956 P&A attempt. Marathon violated the 1931 California Statute Chapter 790, Section 15 statute as discussed above by not shutting off and isolating hydrocarbon-bearing zones from shallow fresh water zones during the oil producing life of the well from 1931-1941, nor during its plugging of the perforations in the oil zone.

- Opinion #4 h. of Mr. Arthur's report states that the disposition of the well remains disapproved by DOGGR. It is true that the DOGGR disapproved of the P&A by MDR because it did not meet the stipulations that required plugging off the open perforations left by Dow from 3,076 ft to 3,341 ft and setting a plug across the shallow gas zone at approximately 2,200 ft (zones left open by Dow and Marathon). However, MDR proposed an alternative P&A procedure **which DOGGR approved.** MDR then executed that procedure and DOGGR acknowledged in a letter dated March 11, 2020 that "*the well is compliant with the alternative plugging program as mentioned above, and MDR Hotels, LLC (MDR) has taken steps necessary to keep the well accessible should it have to be re-entered in the future.*"

- In section 4.1.2 of Mr. Arthur's report, he states that MDR should have run a downhole camera to identify the casing damage at 308 ft before running the 7" casing as a solution to get past this damage. It must be noted that to run a camera in a well and get pictures or video that are clear and definitive is very difficult in an old oil well such as the Dow RGC #10 where a fluid column is necessary for well control. I have run cameras on many types of wells in different situations including in California in both cased hole and open hole. Any particles in the wellbore fluid reflect the camera's light and serve to obstruct a clear view of the objective be it casing damage or junk/fish in the hole. Old oil wells typically have remnants of hydrocarbons on the inside of the casing wall which can not only come loose and reflect light but have a tendency to attach to the camera lens and block the view. Additionally, most old casings have rust or scale covering the inside of the casing wall and particles of this come loose while circulating or running camera into the wellbore with tubing or wireline. Even using a clear, filtered fluid such as fresh water will not result in a clear picture if the inside of the casing is not completely clean. I know this due to my experience at the wellsite supervising the running of cameras into oil and gas wells. It is easy to say MDR should have run a camera and obtained a perfect picture, but this is easier said than done, especially in an old oil well, even at shallow depths. Furthermore, it is not as if MDR did not consider downhole cameras on this job. MDR ran one on December 14, 2018 to try to determine the obstruction in the wellbore at 850 ft. The pictures and video obtained are grainy and barely distinguishable although it is possible to determine that the camera was in cased hole and not in open hole as discussed earlier.

  The running of a camera requires the clearest fluid possible in order to obtain definitive pictures. This would have been fresh water, filtered to a low micron level at 8.34 ppg. However, Mr. Arthur repeatedly stresses in his report that the well was in an underbalanced state and MDR should have used a higher mud weight. But running a camera and achieving a clear picture requires filtered fresh water. Mr. Arthur is not consistent in stressing higher mud weight is needed but wanting to run a camera that requires 8.34 ppg fresh water so that clear pictures may be obtained.

- o 1939 California Statute Chapter 93, Division III Oil and Gas, Chapter 1, Oil and Gas Conservation Article 4, Regulations of Operations, Public Resource Code 3501:

  *"3501. Any person, firm, corporation, or association who digs, drills, excavates, constructs, or owns, or controls a well from which natural gas flows shall, **<u>upon the abandonment of the well, cap or otherwise close the mouth of or entrance to the well in such a manner as to prevent the unnecessary or wasteful escape of natural gas into the atmosphere</u>**…"*

  Dow violated this statute by failing to leave competent barriers in and/or outside the wellbore to prevent natural gas from breaching the surface and escaping to the atmosphere creating a serious public safety hazard.

- In contrast to Mr. Dudak's Opinion #2 listed in Section II 10., there was no way that MDR could have known the severity of the compromised well integrity of the Dow RGC #10 until they tried to re-enter the wellbore past approximately 300 ft depth. Based on the DOGGR records available (the only source of information specific to the well that could be acquired by MDR), the well was supposed to have been safely plugged and abandoned with access to the plugged back total depth of 3,376 ft easily accomplished by drilling out a few cement plugs. What was eventually discovered about the well was that its surface casing was uncemented, flimsy riveted stovepipe with no pressure integrity and the 11-3/4" production casing had existing perforations, cuts, tears, and corrosion holes, and ineffective cement plugs, which allowed pressurized hydrocarbons access to surface from inside and outside the wellbore. In addition, undocumented metal junk was left in the well. Most of this damage to the integrity of the well was caused by a botched P&A attempt by Dow in 1956 but Marathon is also at fault for not constructing the well to ensure isolation of hydrocarbon-bearing zones and shallow permeable water zones and not protecting the casings from corrosion.

- Regarding Mr. Dudak's Opinion #4 listed in Section II 10., I agree that MDR was unable to comply with all the stipulations on the plug and abandonment permit originally issued by the DOGGR in 2018. However, it is my opinion that MDR was unable to comply with all the stipulations because it was impossible due to the wrecked condition of the wellbore that had severely compromised integrity and significant metal junk in the hole. This wrecked condition of the wellbore was due to Marathon when it drilled the well in 1931, and when Dow P&A'd it in 1956.

- In Section III of Mr. Dudak's report, he attempts to explain that California statutes and DOGGR policy were based on protecting the oil and gas resources and not concerned with protecting fresh water sources. He states that only in 1972 were limited steps taken to protect freshwater sources from oil and gas operations and that policies were only implemented to protect such waters in 1983. Thus, he implies

26