# EXHIBIT A

# Expert Report of J. Daniel Arthur P.E., SPEC

## MDR Hotels, LLC, Plantiff

## Vs.

## Marathon Oil Company, The Dow Chemical Company, and Does 1 through 50, inclusive, Defendants

## Case No. 2:20-cv-08008



11/22/2022

11/22/2022

**Prepared for**

Phillips Lytle LLP and Latham & Watkins LLP

**Prepared by**

J. Daniel Arthur, P.E., SPEC
ALL Consulting, LLC
1718 S. Cheyenne Ave.
Tulsa, OK 74120



**November 22, 2022**

Expert Report of J. Daniel Arthur P.E., SPEC

# Table of Contents

1   QUALIFICATIONS ................................................................................................................ 1

2   FACTUAL BACKGROUND, DESCRIPTION OF ASSIGNMENT, METHODOLOGY, AND SUMMARY OF OPINIONS ......................................................................................................................... 2

2.1   FACTUAL BACKGROUND ................................................................................................... 2

2.2   DESCRIPTION OF ASSIGNMENT ......................................................................................... 3

2.3   METHODOLOGY .............................................................................................................. 3

2.4   SUMMARY OF OPINIONS .................................................................................................. 4

3   BASIS OF OPINIONS .......................................................................................................... 8

3.1   THE PLAYA DEL REY OILFIELD .......................................................................................... 8

3.2   RGC #10 .................................................................................................................... 9

3.3   THE OHIO OIL COMPANY PLUGS AND ABANDONS THE OIL PRODUCING ZONE IN RGC #10 ............. 9

3.4   DOW LEASES RGC #10, AND RGC #10 BLOWS OUT DURING DOW'S ABANDONMENT ................... 9

3.5   THE DRILLING, COMPLETION, AND ABANDONMENT OF NEARBY WELLS (IN THE PLAYA DEL RAY OILFIELD) DEMONSTRATE THAT THE DRILLING, COMPLETION, AND ABANDONMENT OF RGC #10 ADHERED TO STANDARD INDUSTRY PRACTICES AT THE TIME ......... 10

3.6   LOS ANGELES COUNTY'S ACQUISITION AND PLUGGING OF RGC #10 WAS UNRELATED TO ANY PURPORTED PROBLEM WITH THE WELL 11

3.7   MDR'S RE-ABANDONMENT AND BLOWOUT ...................................................................... 11

4   ANALYSIS AND OPINIONS ................................................................................................ 21

4.1   FAILURE TO PLAN AND REACT ........................................................................................ 21

4.2   INADEQUATE MUD WEIGHT .......................................................................................... 27

4.3   MDR'S WELL SWABBING IN AN UNDERBALANCED ENVIRONMENT CONTRIBUTED TO THE BLOWOUT ......... 30

4.4   MDR'S WELL CONTROL WAS INADEQUATE ...................................................................... 31

4.5   SAFETY WAS NOT A PRIORITY FOR MDR .......................................................................... 32

4.6   MDR IGNORED SHALLOW GAS PRESENCE ........................................................................ 33

4.7   MDR FAILED TO UTILIZE ITS STOP WORK AUTHORITY ......................................................... 34

4.8   DOGGR DISAPPROVED OF MDR'S RE-ABANDONMENT OF THE RGC #10 WELL ....................... 36

GLOSSARY OF OILFIELD TERMS ............................................................................................ 37

# List of Figures

Figure 1:  Aerial Photo Showing Town Lot Development in the Playa Del Rey Field .................... 8

Figure 2:  Modified Geotechnical Borings Map .................................................................. 14

Figure 3:  Geotechnical Boring 3 ................................................................................... 15

Figure 4:  The Incomplete Notice of Intention to Abandon / Re-Abandon Well. ...................... 17

# List of Appendices

Appendix A: Curriculum Vitae of J. Daniel Arthur, P.E., SPEC

Appendix B: List of Expert Testimony Given by J. Daniel Arthur, P.E., SPEC (2013-2022)

Appendix C: List of Information Considered for Analysis

Appendix D: RGC #10 CalGEM Historical Well Records

Appendix E: Summary Table – 78 Playa Del Rey Oilfield Well Details

Appendix F: List of Plugging Records and Details for 18 RGC wells Plugged by Los Angeles County

Appendix G: Other Consulted Materials

Expert Report of J. Daniel Arthur P.E., SPEC

# 1   Qualifications

My name is J. Daniel Arthur, P.E., SPEC.  I am a Registered Professional Engineer in 34 States, including the State of California.  I am also a Certified Professional Petroleum Engineer ("SPEC") through the Society of Petroleum Engineers ("SPE").  I have 40 years of experience in the Energy and Environmental Industries, including work with Halliburton Services, an Independent Oil & Gas Company, the U.S. Environmental Protection Agency, and a large international consulting firm.  For the last 23 years, I have worked with ALL Consulting, LLC, which is a specialized professional engineering and technical services firm.  My experience includes all aspects of well planning, design, permitting, drilling and completion operations, well maintenance, well remedial activities, well testing and evaluation, well and industry history, plugging and abandonment operations, site environmental remediation and/or restoration, regulatory research and interaction, and risk analysis, management, and planning.  Additionally, I am familiar from an engineering perspective with current and historical laws, rules, and regulations applicable to the operation, abandonment, and plugging of oil wells in California.  I have been the Engineer of Record and/or managed a variety of projects, ranging from well-site planning to emergency response.

Presently, I serve as the President and Chief Engineer at ALL Consulting.  In this role, I manage projects throughout the United States and abroad.  My experience includes designing and overseeing well plugging operations, locating historic oil and gas wells, responding to environmental concerns related to oil and gas development, and performing an array of research work for the U.S. Department of Energy and other organizations.  In 2016, I was appointed to serve on a Steering Committee pertaining to Natural Gas Storage for the California Council on Science and Technology following a gas storage well blowout in Aliso Canyon, California.  I was also appointed as a Sub-Group Leader for the National Petroleum Council ("NPC") Study on North American Resource Development.  I have also served as a testifying and/or consulting expert on a broad variety of issues that range from basic engineering to catastrophic incidents.

I am an active member in several professional organizations, including the National Association of Forensic Engineers, Society of Petroleum Engineers, American Association of Petroleum Geologists, and the Petroleum Historical Institute.  I have presented on multiple occasions on the subject of finding and plugging historic wells using an array of equipment, tools, methods, regulations, and historic practices in the energy sector from historic wells drilled as early as the mid-1800s.

Provided in **Appendix A** is my Curriculum Vitae, which outlines my education, training, and experience, as well as a list of my publications, including those from the last four years.  Provided in **Appendix B** is a list of my expert testimony from the previous 10-years.  I am being compensated at $450 per hour for my services.  My fees are not contingent upon the outcome of this matter.

Expert Report of J. Daniel Arthur P.E., SPEC

## 2   Factual Background, Description of Assignment, Methodology, and Summary of Opinions

### 2.1   Factual Background

In March of 1931, the Ohio Oil Company, predecessor of defendant Marathon Oil Company ("Marathon"), originally drilled and completed the Recreation Gun Club ("RGC") #10 well ("RGC #10 well" or "RGC #10"), located in the Playa del Rey oilfield.  The RGC #10 well was drilled and completed in accordance with all applicable state laws, regulations, and standard industry practices for the time.

In January 1941, after approximately 10 years as a producing oil well, the Ohio Oil Company partially plugged the RGC #10 well by abandoning the oil-producing zone.  Plugging operations conducted by Ohio Oil Company were accomplished in accordance with state laws, regulations, and standard practices for the time.  The plugging plan was approved by the California Division of Oil, Gas, and Geothermal Resources ("DOGGR") and DOGGR witnessed and approved the plug operations on the producing formation.[1]

On or about July 15, 1941, The Dow Chemical Company ("Dow" and together with Marathon, "Defendants") began operating three oil wells, the RGC #7, RGC #9, and RGC #10.  So RGC #10 could recover iodine from saltwater located just above the former producing oil zone, Dow recompleted the well–a process that included converting the well from a plugged oil well to a brine producing well by making the overlying geologic formation that contains salt water accessible.

In 1956, following approval of its plan by DOGGR, Dow plugged and abandoned the RGC #10 well.  During the abandonment, on March 12, 1956, the RGC #10 well unloaded to the surface (referred to in the industry as a blowout) resulting in gas, saltwater, and sand blowing-out to surface at an undetermined rate from the 11-3/4" casing.[2]  The blowout eventually "bridged off" (i.e., stopped-up or plugged-up the wellbore)[3] with unconsolidated sand from the formation, and the abandonment operations continued after the sand was washed out of the wellbore.  Dow successfully completed the plugging and abandonment, and did so in accordance with state laws, regulations, and standard practices for the time.  DOGGR witnessed and approved the plugging and abandonment on April 19, 1956.

On April 7, 1959, the County of Los Angeles (the "County"), which by then had control of RGC #10, re-abandoned and re-plugged the well as part of their construction of the marina and harbor.  DOGGR witnessed and approved the County's re-abandonment and re-plugging operations.

Decades later, in 2017, MDR Hotels, LLC ("MDR") leased the property on which the well is located from the County with the intent of building multiple hotels on the property.  During the construction process,

---

[1] The name of the state agency responsible for regulating California's oil and gas industry has changed over time, and it is now currently referred to as CalGEM.  To avoid confusion, this report will refer to that agency as DOGGR despite later name changes.

[2] California Division of Oil and Gas, Special Report on Operations Witnessed, prepared by G.L. Graham on April 15, 1956, (Bates Number MDR0083187).

[3] This refers to the accumulation or buildup of material, such as sand, fill, or scale, within a wellbore, to the extent that the flow of fluids or passage of tools or downhole equipment is severely obstructed.  In extreme cases, the wellbore can become completely plugged or bridged off, requiring some remedial action before normal circulation or production can be resumed.

DOGGR required MDR to bring the RGC #10 well up to modern plugging and abandonment standards. MDR obtained a plugging permit from DOGGR setting forth the abandonment requirements.

MDR's re-plugging and abandonment operation took place in 2018-2019 and was performed by contractors it hired or caused to be hired.  Methane Specialists was the contractor that oversaw MDR's re-abandonment of the RGC #10 well.  On MDR's behalf, Methane Specialists contracted with InterAct PMTI ("InterAct") to prepare the well abandonment plan and execute the plugging and abandonment operations of the RGC #10 well.  InterAct in turn contracted with California Well Services ("CWS") for the rig and well service work.

During this 2018-2019 plugging and abandonment operation by MDR, multiple surface breaches and a blowout occurred at the RGC #10 well, including but not limited to surface breaches on (i) December 18, 2018, (ii) December 20, 2018, (iii) December 25, 2018, and (iv) January 2, 2019, and then (v) a blowout on January 11, 2019.  On January 11, 2019, once the blowout had occurred, MDR's contractors stated that they had been, "*[u]nable to stab TIW [("Texas Iron Works")] valve to close well in, had to drop drill string down hole to close the blind rams[.]*"[4,5]  Although MDR's lost tubing work-string was partially recovered at a later date, its drill collars and a drill bit became irretrievably stuck in the wellbore.  As a result, MDR was unable to complete the cement plugs below the depth of approximately 1,500 feet, as required by its DOGGR permit, and MDR accepted DOGGR's disapproval of the condition of the RGC #10 well.

## 2.2   Description of Assignment

It is my understanding that MDR has filed a complaint against Marathon and Dow alleging that their historical activities related to the RGC #10 well, including drilling, completion, and plugging, and abandonment, caused the surface breaches and blowout of the RGC #10 well in 2018 and 2019.  I was asked to consider and opine on these allegations.

## 2.3   Methodology

This report sets forth my expert opinions based on the information available to me as of the date of this report.  The information I considered in my analysis is identified in **Appendix C**.  The opinions that I set forth in this report are based on my review of this information as well as my knowledge, education, experience, and training.  The information I relied upon in forming my opinions is consistent with the materials and information I review in my normal course of business.  In performing my analysis, I also compared the work performed by Defendants in the drilling, completion, and abandonment of RGC #10 with similar work performed by other entities regarding comparable wells.  I also consulted textbooks, published standards for well drilling, completion, and abandonment, and technical documents regarding drilling, completion, and abandonment (**Appendix G**).  If additional documents and/or other information are made available to me, I will review such documents and/or information if directed and may incorporate additional information learned about the facts and circumstances into my analyses, conclusions, and/or opinions.  I reserve the right to update, supplement, and amend my opinions as

---

[4] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, InterAct Daily Workover / Completion Report, January 11, 2019, page 90 of 210, MDR0003946).

[5] Blind rams are the ram sections in a BOP that are used to close against each other and isolate the well when no pipe is in the well.

Expert Report of J. Daniel Arthur P.E., SPEC

additional information becomes available, and to provide additional information and opinions regarding this matter.

This report has been prepared in accordance with professional standards of care, skill, and diligence that require:

• the use of records with established provenance by way of date and source;
• the use of data relevant to the analyses, including historical data and information;
• evaluation of the appropriateness of the procedures used by the parties involved and their other experts in the performance of their work;
• the use of deductive reasoning; and
• internal quality control checks of the findings and of the report.

## 2.4   Summary of Opinions

After carefully reviewing the information made available to me in this proceeding, and based on my knowledge, education, and many years of training and experience working in the oil and gas industry, I have reached the following opinions and conclusions to a reasonable degree of engineering certainty:

1. The Ohio Oil Company, during its drilling and completion of the RCG #10 well, adhered to all applicable state laws, rules, and regulations that were effective at the time.  Furthermore, the drilling and completion practices used to construct the RGC #10 well were typical of that era and consistent with widespread industry practice.

2. The Ohio Oil Company and Dow, during their operation, plugging, and abandonment of the RGC #10 well, adhered to all applicable laws, rules, and regulations that were effective at that time. Furthermore, the operating, plugging, and abandonment practices that Ohio Oil Company and Dow used with respect to the RGC #10 well were typical of that era and consistent with widespread industry practice.

3. In 2008, an initial geophysical investigation was conducted by SubSurface Surveys & Associates, Inc. for Methane Specialists to locate any old oil wells within the parcel at issue here, Parcel 9U. Three findings were identified with a magnetometer.  The precise location of the RGC #10 well was confirmed by SubSurface Surveys & Associates with a second geophysical investigation using a magnetometer in 2017 to an accuracy of +/- four feet.  MDR knew or should have known based on publicly available records and based on its own studies that the well was located within the blueprint of its planned project and within the blueprint of a particular building.

4. The causes of the multiple surface breaches and blowouts associated with MDR's re-abandonment of the RGC #10 well in 2018 and 2019 include, without limitation, MDR's loss of well control during its plugging and abandonment operations, and MDR's failure to maintain both a primary barrier (i.e., hydrostatic pressure produced by the drilling mud) and a secondary barrier (i.e., via a full opening safety valve on the drill pipe or check valve).  Such causal factors (of which there were multiple) occurred throughout MDR's planning, plugging, and abandonment operations, and include the following more specifically:

   a. **MDR's failure to plan and react appropriately led to the blowout.**  Before plugging and abandonment operations commenced, MDR failed to properly identify well integrity issues pertaining to the 18" stove pipe well casing that were plainly evident from the historical

Expert Report of J. Daniel Arthur P.E., SPEC

record, and from the initial excavation of the well and the leak test performed by Methane Specialists on September 18, 2017.  Well re-abandonment operations, especially those of vintage wells like this one with a blowout history, are inherently dangerous.  If MDR had properly identified these issues, as it should have, it would have modified its generic re-plugging plan to account for these well integrity issues.  Indeed, InterAct, the subcontractor to Methane Specialists, proposed only one day of work to review the well files and records, and generate an existing wellbore diagram.

Further, once operations began, MDR ignored early warning signs observed and documented during the second excavation of the well, further attesting that the RGC #10 well had well integrity issues at the surface.  Similarly, in August 2018, during excavation and prior to re-entry, InterAct observed gas escaping from the well at the surface.  On September 19, 2018, during excavation and dewatering work, water appeared to be coming from the 18" stove pipe.  Then on October 4, 2018, water was flowing up from the outside of the 18" stove pipe at the surface, which showed loss of well integrity prior to any commencement of actual plugging operations.  It was at this point at the latest that revisions to the re-plugging plan should have been addressed, but MDR failed to adjust the re-abandonment and re-plugging operations notwithstanding these serious observable and documented warning signs.

MDR also failed to properly react to observable and documented warning signs after October 2018.  As but one example, on November 26, 2018, MDR and its contractors ran 7" casing into the wellbore to maneuver around the off-centered 11-3/4" casing at approximately 308 feet.  At that time, MDR should have decided to cement the 7" casing in place so that at least one string of casing in the RGC #10 well would have integrity.  If MDR, through InterAct, had made this decision and acted accordingly when the 7" casing was run, it would have prevented the surface breaches that occurred in December 2018 and the blowout that occurred on January 11, 2019.

b. **MDR's use of inadequate mud weight caused the loss of the primary barrier.**  InterAct's reduction of the mud weight from 9.0 pound per gallon ("ppg") to 8.4 ppg in the days before the January 11, 2019 blowout undermined the primary barrier (i.e., hydrostatic pressure), creating an unsafe situation by causing an inadvertent and uncontrolled release of fluids and natural gas to the surface, which elevated the risk of injury and increased chances of a fire or explosion.  MDR ignored the risks associated with reducing mud weight and with failing to address lost circulation zones.  If MDR had properly recognized these risks, it should have directed its contractors to address the lost circulation zones and then used a properly weighted mud.  MDR's failure to use a properly weighted mud caused underbalanced drilling operations (i.e., drilling operations in which the wellbore pressure is below the formation pressure so that formation fluids are brought to the surface).  Underbalanced operations occurred without critical planning, equipment, skills, or procedures, which weakened the primary barrier allowed for gas and water influx into the wellbore likely resulting in the blowout.

Expert Report of J. Daniel Arthur P.E., SPEC

c. **MDR's withdrawal of the tubing workstring while in an underbalanced environment, swabbed-in the gas kick.** MDR pulled its tubing work string up to 1,492 feet from 1,617 feet in the well in an "underbalanced environment," which refers to an environment in which the pressure exerted by the column of fluid in the wellbore is less than the pore pressure in the formation. This type of operation in an over 80-year-old well, with known prior surface breaches and a previous blowout, and in a locality with other nearby wells with known (or knowable via public record searches) histories of blowouts was overly dangerous and technically unsound. MDR's withdrawal of the tubing work string "swabbed-in," or allowed-in, a large amount of gas, water, and unconsolidated sand into the well, which caused a significant blowout at the surface on January 11, 2019.

d. **MDR's inadequate well control contributed to the blowout.** MDR pulled up the tubing work string in the underbalanced well, with no full opening safety valve or check valve in place in the tubing, the lack of which further contributed to the blowout. When tripping the tubing work string from a well (i.e., pulling pipe from the well), it is important that the rig crew replace the displaced volume of pipe removed from the well with mud. Properly replacing the pipe displacement volume with mud maintains the level of mud in the well, which maintains the hydrostatic pressure. MDR should have filled the annular space with weighted mud while tripping out to maintain hydrostatic pressure. Had they done so, the chances of the January 11, 2019 blowout occurring would have been eliminated or at least greatly reduced.

e. **The safety management system established by MDR was not effective for managing rig operations.** The CWS rig supervisor, rig operator, and a rig hand who worked on the RGC #10 well plugging and abandonment operation during the period October 23, 2018 through January 13, 2019 had no evidence of or had expired well control course certifications. In one case, the certification had expired as early as July 21, 2013. Furthermore, there is no evidence the rig crew was trained to perform or was equipped for these types of complex well control activities under conditions involving dangers that would have been apparent to any skilled professional having experience applicable to these operations. In addition, neither CWS nor InterAct had a written risk assessment or a well control plan in place prior to beginning work on the RGC #10 well and did not prepare such assessments or plans until after the January 11, 2019 blowout. In addition, it does not appear that either of MDR's contractors performed any relevant training or safety drills, including training and drills regarding well control or blowout prevention. These inadequacies suggest that safety was not a priority. The absence of any written risk assessment or well control plan and the absence of relevant training and safety drills contributed to MDR's failure to recognize the wellbore conditions and warning signs of a potential blowout, and its further failure to act properly once the January 11, 2019 blowout occurred.

f. **MDR ignored the presence of shallow gas, adding to the loss of well control and unsafe work environment.** The RGC #10 well re-plugging and re-abandonment operation involved shallow gas pockets, kicks, and lost circulation of drilling mud. Gas pockets and gas kicks were routinely circulated-out and work continued without any concerns for loss of well control or safety. It does not appear that MDR accounted for necessary barriers for assuring safe operations. If the shallow gas presence had been acknowledged, then proper planning

Expert Report of J. Daniel Arthur P.E., SPEC

could have taken place.  MDR's failures to account for and address shallow gas pockets, kicks, and lost circulation contributed to the January 11, 2019 blowout.

g. **MDR failed to utilize stop work authority and reassess and develop alternatives.**  MDR and its contractors chose not to exercise stop work authority ("SWA") once the situation was out of their control.  MDR could have shut-in the well and then approached alternative contractors with appropriate well control expertise.  Additionally, if SWA had been utilized, the plugging contractors could have pursued further discussions with DOGGR in an effort to develop an alternative plan appropriate to the circumstances, such as a snubbing unit or coiled tubing unit.  Yet, it appears that even communication with DOGGR was not a priority, which further suggests that MDR failed to hire contractors who were adequately experienced with basic state agency protocols.

h. **The disposition of RGC #10 remains disapproved by DOGGR.**  MRD failed to comply with the conditions and standards required by DOGGR in the re-plugging and abandonment of RGC #10.  This failure resulted in DOGGR disapproving the re-plugging and re-abandonment of RGC #10.  Given that there is no plan to perform any further work on RGC #10 in the future, the re-plugged condition of RGC #10 will remain indefinitely.  The RGC #10 well, however, would not have been in this condition had MDR proceeded with the re-abandonment process in a manner so as to avoid or address the causal factors identified above.

Expert Report of J. Daniel Arthur P.E., SPEC

## 3   Basis of Opinions

### 3.1   The Playa Del Rey Oilfield

The Playa del Rey oilfield, located in Los Angeles County, California, was founded initially with the
completion of the discovery well, Ohio Oil Company's RGC #1 well, on December 23, 1929.  Initial
expansion of this oilfield, with the drilling of 17 further wells on the RGC property, continued until the
mid-1930s.

By the late 1950s, most of the oilfield production was in decline.  **Figure 1** shows the intensive town lot
development of the Playa del Rey oilfield by 1938.[6]  On December 4, 1958, the County of Los Angeles
acquired all 18 wells on the RGC property from Ohio Oil Company.  All these RGC wells were then
plugged or re-plugged in April and May of 1959 by the County with all plugging operations witnessed
and approved by DOGGR.[7]



**Figure 1:  Aerial Photo Showing Town Lot Development in the Playa Del Rey Field**

---

[6] Marina Del Rey Historical Society. 1938. Early Aerial Photos.
https://www.marinadelreyhistoricalsociety.org/photos-early-aerials/ (Accessed September 22, 2022).
[7] RGC Well files #1 - #18 requested from CalGEM via Well Finder GIS online data April 2022.
https://maps.conservation.ca.gov/doggr/wellfinder/#openModal.

Expert Report of J. Daniel Arthur P.E., SPEC

## 3.2   RGC #10

### 3.2.1   The Ohio Oil Company Drills and Completes RGC #10

According to well records (**Appendix D**), on March 17, 1931, the Ohio Oil Company commenced drilling RGC #10 with a rotary drilling rig following a DOGGR approved drilling and completion plan.[8]  By April 1, 1931, the borehole was drilled and reamed to an approximate depth of 3,426 feet.  Once drilling and reaming was completed, the threaded casing was cemented in place.

From April 9 to April 13, 1931, the borehole was completed with 3,906 feet being the final depth of RGC #10.  A slotted liner, packer, and tubing string was installed and RGC #10 commenced production operations

## 3.3   The Ohio Oil Company Plugs and Abandons the Oil Producing Zone in RGC #10

After nearly nine years as an oil production well, the production zone of RGC #10 was partially plugged and abandoned by the Ohio Oil Company.  On December 20-21, 1940, according to a Special Report on Operations Witnessed form prepared by a DOGGR deputy inspector, the hole was cleaned out to 3,906 feet and 90 sacks of Victor construction cement was dumped in the hole from 3,906 to 3,376 feet and allowed to cure.[9]  The location and hardness of the cement plug at 3,376 feet was approved by a DOGGR representative who witnessed and recorded the results.  The oil horizon was completely plugged with cement with the top of cement being 48 feet above the oil-producing zone and the top perforation in the production liner.

## 3.4   Dow Leases RGC #10, and RGC #10 Blows Out During Dow's Abandonment

Following the plugging of the oil producing zone in RGC #10 by Ohio Oil Company, Dow, in 1942, leased RGC #10 for the purpose of saltwater production as a source for iodine.  To that end, Dow used a Midway knife perforator to perforate 657 holes in the 11-3/4" casing from 3,076 feet to 3,341 feet.  The publicly available well records indicate that the conditions of RGC #10 were unchanged from 1942 to 1956.

On February 15, 1956, Dow submitted a Notice of Intention to Abandon Well, which was approved by DOGGR on February 21, 1956.  On March 12, 1956, while abandoning the well, the well blew-out marsh gas, salt water, and unconsolidated sand at an undetermined rate through the 11-3/4" casing.  The records also state that gas was coming from behind the 11-3/4" casing at 1,800 feet.  On March 14, 1956, the well had bridged itself off with sand, and a MacClatchie cementing head and pressure gauge were able to be installed.  The abandonment then continued.  The abandonment operations were approved and observed by DOGGR.

---

[8] DOW RGC 10 Well Files.pdf page 33 of 35, (MDR0083210).
[9] DOW RGC 10 Well Files.pdf page 19 of 35, (MDR0083196).

November 2022

Expert Report of J. Daniel Arthur P.E., SPEC

### 3.5  The Drilling, Completion, and Abandonment of Nearby Wells (in the Playa Del Ray Oilfield) Demonstrate that the Drilling, Completion, and Abandonment of RGC #10 Adhered to Standard Industry Practices at the Time

As part of my work in this matter, I downloaded and reviewed well files for 78 nearby wells from the CalGEM WellStar database, which is publicly accessible and was available to MDR and its contractors prior to their work on RGC #10.  A table summarizing the collected well detail is provided in **Appendix E**.

A comparison of RGC #10's history of drilling and plugging operations with that of these 78 other producing oil wells in the Playa Del Rey oilfield reveals that the drilling, completion, and plugging methods utilized at RGC #10 were consistent with (i) other producing wells in the area drilled during that time period and (ii) DOGGR requirements.  Additionally, the similarities of plugging efforts across all RGC wells by the County in 1959 demonstrates that the county re-plugged the RGC #10 in 1959 as part of a widespread marina and harbor development effort and such re-plugging was not indicative of problems or complications specific to the RGC #10.  For the 78 nearby wells reviewed, and like RGC #10:

1. 62 of 78 (85%) wells utilized stove pipe surface casing.
2. 77 of 78 (99%) wells did not cement the surface casing "completely" to ground level.
3. 73 of 78 (94%) wells were completed open hole with a slotted liner across the hydrocarbon producing zone.  The production casing was set above the hydrocarbon zone and cemented in to ensure isolation of the producing zones in these wells.
4. 64 of 78 (82%) wells cut casing during abandonment operations.
5. 6 of 78 (8%) wells experienced a blowout.  Of these, two wells experienced multiple blowouts.
6. 78 of 78 (100%) wells did not plug off the saltwater zone that was perforated in RGC #10 during plugging and abandonment.

Based on my education, knowledge, training, and experience, these records demonstrate that the drilling, completion, and abandonment of RGC #10 adhered to the common industry practices at the time in California and more specifically in the Playa Del Rey oilfield.  Furthermore, DOGGR approved of the Ohio Oil Company's drilling, completion, and partial abandonment of RGC #10, and approved of Dow's plugging and abandonment of RGC #10.  Moreover, operations were witnessed and approved by DOGGR superintendents and engineers, which indicates that DOGGR determined Ohio Oil Company and Dow's actions were compliant with applicable regulations and law.  Based on my review of the well record of RGC #10 and nearby well records and based on my experience in the oil and gas industry with wells of this age, it is my opinion, to a reasonable degree of engineering certainty, that Ohio Oil Company followed industry best practices and applicable regulations and law in its drilling, completion, and partial abandonment of RGC #10, and Ohio Oil Company and Dow followed industry best practices and applicable regulations and law in their plugging and abandonment of RGC #10.[10]

---

[10] It is my understanding that MDR asserts that the Ohio Oil Company and Dow failed to comply with California PRC §§ 3219, 3220, and 3228.  As an initial matter, these statutes were not enacted until 1939, so they were not in effect at the time the Ohio Oil Company drilled, completed, and plugged RGC #10.  Even if these statutes were applicable, as discussed above, the drilling, completion, plugging, and abandonment of RGC #10 at the time was in accordance with industry standards and was witnessed and approved of by DOGGR.  Indeed, in my experience, DOGGR would not have approved of these activities if they were not in compliance with applicable regulations and law.

Expert Report of J. Daniel Arthur P.E., SPEC

## 3.6   Los Angeles County's Acquisition and Plugging of RGC #10 Was Unrelated to Any Purported Problem with the Well

In the mid-1950s, the County sought to develop this geographic area into a commercial marina and harbor.[11]   During this development, the County purchased and then plugged or re-plugged all 18 of the RGC wells in March through May 1959, including RGC #10 as part of the marina and harbor development plans.   **Appendix F** contains a List of well files with plugging details, for the 18 RGC wells plugged or re-plugged by the County.   A summary table of the plugging details for each of these wells is also included in **Appendix E**.   Geotechnical reports indicate that the marina was created by using materials and soils dredged from the harbor.[12]   Soil sample testing of the soil material present on the property has indicated that this material is corrosive to ferrous metals such as iron.[13]   The casing strings within RGC #10 are composed of iron.   The use of this dredged material by the County in the mid-1950s to create the harbor could have contributed to the corrosion of the casing strings.

The records concerning the County's plugging of all RGC wells in 1959 demonstrate that the County's re-abandonment of RGC #10 in 1959 was not due to any issue(s) that developed since the time that Dow abandoned RGC #10 (in fact the records do not identify or suggest the existence of any such issue(s)), but rather was simply part of the uniform protocol of plugging or re-plugging all RGC wells as part of the County's marina development efforts.

## 3.7   MDR's Re-abandonment and Blowout

In 1998, The Hardage Group, a related company to MDR, was awarded the right to negotiate the lease option for a 3.7-acre parcel known as Parcel 9U in Marina Del Rey.

### 3.7.1   MDR Ignored Early Indications of Soil Contamination and Well Integrity Issues

In August 2006, Methane Specialists completed a draft Methane Site Assessment Report of Parcel 9U for an MDR affiliate.[14]   The report details data collected from soil gas probes indicating readings of 100% methane were found on some portions of the parcel.

The report further notes that *"the source of the high methane concentration readings is believed to be caused by oil wells on and nearby the subject site."*   Due to the presence of methane, a substantial number of preventive measures were recommended as added features in the building design, including: a sub-slab venting system, an impervious membrane system installed below the building foundation, and an active ventilation system.   This report also states that a cursory search of DOGGR records identified the well as RGC #10.   The report also recommended, due to conflicting location data, that the exact location of the well be confirmed.   This task was accomplished by SubSurface Surveys & Associates, Inc. in 2008 and 2017 with magnetometer surveys.

On November 30, 2006, Leighton Consulting, Inc. ("Leighton") submitted a Phase I Environmental Assessment Report (**Exhibit 328**) for the site to the County.   The Phase I Environmental Site Assessment ("ESA") Investigation identifies an abandoned well on-site and notes hydrocarbon impacted soil and then lists multiple environmental conditions of concern including:

---

[11] http://file.lacounty.gov/SDSInter/dbh/docs/149901_MDRHistory.pdf (Accessed October 5, 2022).

[12] Shannon & Wilson, Inc., Geotechnical Design Report, July 28, 2016 (MDR0264053).

[13] Dep. Ex. 316 (Methane Specialist, Methane Site Assessment Report, August 23, 2006).

[14] Dep. Ex. 316 (Methane Specialist, Methane Site Assessment Report, August 23, 2006).

Expert Report of J. Daniel Arthur P.E., SPEC

1. Previous oil field activities occurred on the site and in the site vicinity from 1931 until approximately 1961.
2. One abandoned oil well exists in the southern portion of the property.
3. Soils were reported to contain low concentrations of Total Petroleum Hydrocarbons as diesel (TPH-d) and Total Recoverable Petroleum Hydrocarbons (TRPH).
4. It was recommended that a methane survey be completed, and the abandoned well should be located, leak tested, and re-abandoned in accordance with DOGGR requirements based upon the results of the leak testing.
5. The report notes that from 1931 to 1961 the land was utilized for oil field activities, but was classified as "vacant, undeveloped land" from 1961 to 2006.

Leighton described previous Phase I and Phase II ESA reports which had been prepared by the County Department of Public Works in 1996.  As part of the 1996 Phase I ESA effort, a soils investigation completed by Leroy Crandall and Associates in 1982 found oil saturated soil at 8 feet below ground surface.  A February 3, 2012 email **(Case Exhibit 409**) states that MDR Hotels, LLC was in possession of the Phase I Environmental Assessment Report and aware of its contents pertaining to the abandoned well on-site and notes hydrocarbon impacted soil.

An October 12, 2012 email exchange (**Case Exhibit 417 and 418**) reflects that DOGGR provided MDR representatives all of the historical well files available for RGC #10.  Upon inspection of these documents as included in this email exchange, it appears that these are the same publicly available well files acquired and reviewed for this expert report, including, without limitation, the History of Oil and Gas Well Form for RGC #10, the Report of Well Abandonment, and the Special Report on Operations Witnessed.

A Summary of Terms for Lease Option dated December 23, 2013 (**Case Exhibit 437**) describes the arrangement that MDR entered into with the County.  Specifically, in Board Policy Item 1 Development Work, Term (i) Site Remediation (PANGEL00042983), MDR acknowledges acceptance and responsibility for all costs of any necessary environmental remediation.  MDR entered into Item 1, Term (i) while it knew or should have known that the Phase I Environmental Assessment Report prepared by Leighton Consultants recommended that the well be located, leak-tested, and re-abandoned in accordance with DOGGR requirements.  Similarly, MDR knew or should have known that 100% methane had been detected by soil probes in the 2006 Methane Site Assessment Report.  Further, MDR knew or should have known that oil saturated soil had been observed on the property down to 8 feet below ground surface in the Phase I Environmental Assessment Report for the site for the County.  All of this information was set forth in documents prepared for or obtained by MDR, the same documents acquired and reviewed for this expert report.

A June 17, 2014 Financing Request prepared by MDR for a dual brand Marriott Courtyard and Marriott Residence Inn Hotel (together the "Hotels") (**Case Exhibit 406**) noted that "[a] substantial portion of time during the initial development phase will focus on the site.  Site work will begin with the remediation of the site, which will include the recapping of an abandoned oil well."

Expert Report of J. Daniel Arthur P.E., SPEC

### 3.7.2   Shannon and Wilson Geotechnical Design Report Also Identified Contamination on the Site

On July 28, 2016, Shannon and Wilson, Inc., a geotechnical and environmental consulting firm, provided MDR with a Geotechnical Design Report for the Hotels.[15]  The report references a 2006 geotechnical report prepared by Van Beveren & Butelo, Inc.,[16] now known as Shannon and Wilson, for a proposed 19-story hotel, three- to four-story conference center, and a five-level parking garage at the same site (which was never constructed).  The 2016 report also references another firm's work, stating that, "LeRoy Crandall and Associates explored the site for an apartment project in 1962 and again in 1982 for a hotel project.  Neither of these projects was ever constructed."

Shannon and Wilson's report also describes the results of previously conducted geotechnical borings on the property.  According to the report, in 1962 and 1982, LeRoy Crandall and Associates collected eight (8) borings drilled to depths of 20 to 90 feet.  Van Beveren & Butelo performed five geotechnical borings at the site in 2006 to depths of 50 to 75 feet below the existing grade.  Shannon and Wilson did not perform any additional geotechnical borings for the 2016 report.  **Figures 2 and 3** depict geotechnical boring 3 (LC-3) collected by LeRoy Crandall and Associates in 1982, which showed oil saturated soil with petroleum odor and pieces of asphalt near ground level.

Importantly, the 2016 Shannon & Wilson Geotechnical Design Report states that three soil samples were submitted to Conseco/Matcor Engineering, Inc. for corrosive potential evaluation.  The results of the corrosion studies indicated that the hydraulic fill was mildly corrosive to ferrous metals with negligible potential for concrete corrosion.  They also note, however, that coastal estuary deposits are typically very corrosive to ferrous metals and severely corrosive to concrete.  RGC #10 is comprised of steel casing and concrete both of which are susceptible over time to the corrosive environment created by the hydraulic fill and the surrounding costal estuary deposits at Parcel 9U.

The 2016 report also noted that "according to maps prepared by the State of California Department of Conservation, Division of Oil, Gas and Geothermal Resources, the site is located within the Playa Del Rey Field.  A plugged and abandoned oil well identified as *'County of Los Angeles c/o R. A. Del Gu, Dow R.G.C. 10'* is located within the Site … ."[17]

Based on the number of ESA and geotechnical reports conducted on this parcel since 1982, which MDR and its contractors had access to, it was apparent that there was oil and gas contamination on the site, potential issues with respect to corrosion, and one plugged oil well located on the site, which would need to be re-opened and re-plugged.  Despite possessing all of these identified technical and environmental assessments, MDR proceeded with knowledge of the above to enter the lease "as is" and then failed to plan a re-abandonment that accounted for such realities and risks.

---

[15] Shannon & Wilson, Inc., Geotechnical Design Report, July 28, 2016 (MDR0264046).
[16] Shannon & Wilson, Inc., Geotechnical Design Report, July 28, 2016 (MDR0264088).
[17] Shannon & Wilson, Inc., Geotechnical Design Report, July 28, 2016 (MDR0264059).

November 2022

Expert Report of J. Daniel Arthur P.E., SPEC



**Figure 2:  Map Modified from Shannon and Wilson showing the site and the location of previously conducted geotechnical borings.**  The location of LC-3, a 1982 boring that showed contaminated soil near surface level is marked with a green arrow.  The location of RGC #10 is circled in green (Shannon & Wilson, Inc., Geotechnical Design Report, July 28, 2016, MDR0264078)

Expert Report of J. Daniel Arthur P.E., SPEC



**Figure 3:  Geotechnical boring 3 showing oil contaminated soil near surface level**
(Shannon & Wilson, Inc., Geotechnical Design Report, July 28, 2016, MDR0264118)

### 3.7.3   MDR's Hotel Plan Approval and Magnetometer Surveying Further Demonstrated MDR's Awareness of the Site's Methane Issues

In November 2016, Methane Specialists provided MDR with plans for a Proposed Hotel Building with 1 Subterranean Parking Level Methane Gas Control System to the County Department of Public Works. The plans were developed and submitted with consideration and full knowledge of the RGC #10 well on site and previous oilfield activities in the general vicinity of the proposed hotel location, indicating MDR was aware of potential methane related issues as previously described in Leighton's 2006 Phase I ESA Report (Case **Exhibit 328**) and Methane Specialist's 2008 Environmental Impact Report (Case **Exhibit 53**).

On December 16, 2016, the County approved MDR's plans for a Proposed Hotel Building with a Subterranean Parking Level Methane Gas Control System.  MDR proceeded with the originally submitted construction plans, including the wellhead riser.

In 2008 and 2017, Methane Specialists' subcontractor performed two magnetometer surveys of the property to locate the abandoned oil well on the property.  Both surveys identified magnetic anomalies that strongly indicated the presence of a well on the property.  The magnetic anomaly shown on the property in both reports was later determined to be RGC #10 and was clearly located with Global Positioning System to within +/- four feet.

### 3.7.4   MDR's Interaction with DOGGR Demonstrated It Hired Contractors Who Were Ill-Suited to Abandon the Well

An August 23, 2017 DOGGR email acknowledges receipt of a Construction Site Well Review submittal for RGC #10 prepared by Methane Specialists on MDR's behalf.  In a follow-up email exchange, on August 29, 2017, Methane Specialists was informed by DOGGR that cutting the wellhead and concrete cap to install a new well plate would require a DOGGR Well Work Permit and that a leak test of RGC #10 was required.[18]  In a subsequent email exchange, on August 30, 2017, Methane Specialists sought clarification from DOGGR, and, despite serving as MDR's well abandonment expert, was uncertain how to comply with DOGGR's rules, demonstrating a level of unfamiliarity and unpreparedness as compared to that which a qualified consultant should possess:

> *"To clarify, if we discover the well has a concrete cap, we remove the cap, cut the well down, do the leak test and the leak test passes, we're good to go?  Assuming we get the permit and install the ID plate, vent cone, etc. after the leak test."[19]*

In response, DOGGR advised Methane Specialists to submit a NOI to cut down or add a riser and to re-abandon the RGC #10 well to current regulatory standards.  MDR was aware of these requirements.

On September 18, 2017, R.D. Olson Construction (MDR's general contractor) excavated RGC #10, uncovering the well's cap for Methane Specialists to perform a leak test.  Dewatering of the excavation site was required to access the well casing stub.  A leak test is required by DOGGR to demonstrate that a plugged well is not leaking.  The leak test was performed with Methane Specialists' site personnel noting in their field report that a "1-3%" Lower Explosive Limit ("LEL") was recorded.  This indicated that the well failed the leak test.  The field report also mentioned the presence of a "*viscous liquid in soil*

---

[18] Dep. Ex. 9 (Email correspondence, page 18 of 21, CALGEM00011973).
[19] Dep. Ex. 9 (Email correspondence, page 15 of 21, CALGEM00011970).

*surrounding well head"* and is indicative of oilfield contamination or a sign of a possible casing leak.[20] Once the leak test was completed, R.D. Olson backfilled and compacted the hole and marked the well location with a white pipe.

On the same day (September 18, 2017) as the leak-test at RGC #10, Methane Specialists (on MDR's behalf) sent an email to DOGGR inquiring as follows:

> *"We realized that the well casing diagram that we previously sent over is not correct. Based on the well records attached, there appears to be evidence of a cement plug and abandonment that occurred in 1959. Based on this and what I've already sent over, can you confirm or deny that the well is abandoned to current DOGGR standards? Can you also tell me where I can find what the current abandonment standards are?"[21]*

MDR and its consultant, Methane Specialists, should have been more aware of the current abandonment standards and whether the then current condition of RGC #10 met those standards. Since the leak test failed, RGC #10 would need to be re-plugged to current standards.

On October 4, 2017, Methane Specialist filed a Notice of Intention to Abandon / Re-Abandon Well (Form OG108) on MDR's behalf (see **Figure 4**).[22] The proposed work included *"cut well to depth, install new ID plate, install vent cone."* DOGGR responded to Methane Specialists in an email dated October 16, 2017, informing them that RGC #10 did not meet current abandonment requirements, and noting that the well had open perforations in a hydrocarbon zone and that the other plugs were inadequate.[23] DOGGR went on to state that the final construction site well review letter would be completed after a leak test was performed. In this same email, DOGGR requested notification at least 24 hours prior to the leak test so that a DOGGR engineer could be present to witness the test. Methane Specialists, which had performed a leak-test on September 18, 2017, failed to notify DOGGR in advance of the leak-test results or of its subsequent failure.



**Figure 4:  The Incomplete Notice of Intention to Abandon / Re-Abandon Well.**

---

[20] Dep. Ex. 321 (Methane Specialist Field Report, 9/18/17, METHANE00000853).

[21] Dep. Ex. 9 (Email correspondence, page 13 of 21, CALGEM00011968).

[22] Dep. Ex. 4 (CalGEM RGC #10 Well File, page 48 of 87).

[23] Dep. Ex. 9 (Email correspondence, page 7 of 21, CALGEM00011962).

Expert Report of J. Daniel Arthur P.E., SPEC

Even though MDR had already conducted a leak test at RGC #10 on September 18, 2017, in its reply to DOGGR on October 16, 2017, Methane Specialists omitted knowledge of that test in its reply, asking: *"We need to cut the well down in order for it to be below the proposed building's foundation pad.  Does it make sense to do the leak-off test after the well has been cut down and a new Identification (ID) plate installed?"*[24]

An October 31, 2017 email from DOGGR informed MDR *"that any permit issued by DOGGR, even for a casing cutdown, would require the well be brought up to current regulatory standards.  DOGGR further notes that any well found to be leaking would be required be brought up to current standards."*[25]

In a November 2, 2017 email exchange, Methane Specialists on MDR's behalf provided DOGGR with an incomplete Notice of Intention to Abandon / Re-Abandon Well (Form OG108), noting that at this point they *"had no luck securing any rights from anyone at County of Los Angeles.  Until we do that, we can't secure the bond or transfer ownership."*[26]  Subsequently, on February 9, 2018, Methane Specialists informed DOGGR that they had received a letter granting permission from the Department of Beaches and Harbors to modify RGC #10.[27]

A November 3, 2017, Notice of Intention to Abandon Well - Oil and Gas (Form OG108) also characterized the status of RGC #10 as a critical well as defined in the California Code of Regulations, Title 14, Section 1720(a).  RGC #10 met two requirements defining a critical well:

1. Being with 300 feet of any building intended for human capacity that is not necessary to the operation of the well.
2. Being within 100 feet of any dedicated public street highway or the nearest rail of an operating railway that is in general use.

On the same day, November 3, 2017, DOGGR informed MDR that the Notice of Intention to Abandon Well - Oil and Gas (Form OG108) would be held in abeyance pending receipt and approval of:

1. Report of property transfer (Form OG30A) or a letter from the operator or the mineral rights owner granting MDR the right to access the well; and
2. Indemnity bond, as required per California Public Resources Code section 3204

DOGGR returned the November 3, 2017 Notice of Intention to Abandon Well - Oil and Gas (Form OG108) to Methane Specialists on November 17, 2017.  Subsequently, on February 9, 2018, Methane Specialists informed DOGGR that they had received a letter granting permission from the County of Beaches and Harbors to modify the well.  [28],[29]

In later October 2017, Methane Specialists reached out to InterAct for help on the RGC #10 abandonment[30] and to help it plan and execute the plugging and abandonment operations.  California Well Services ("CWS") was contracted to work on the rig and worked under InterAct.

---

[24] Dep. Ex. 9 (Email correspondence, page 8 of 21, CALGEM00011963).
[25] Dep. Ex. 9 (Email correspondence, page 4 of 21, CALGEM00011959).
[26] Dep. Ex. 9 (Email correspondence, page 3 of 21, (CALGEM00011958).
[27] Dep. Ex. 9 (Email correspondence, page 2 of 21, (CALGEM00011957).
[28] Dep. Ex. 9 (Email correspondence, pages 1 & 2 of 21, CALGEM00011956-57).
[29] Dep. Ex. 16 (County of LA - Beaches & Harbors, Letter, February 26, 2018, MDR0003708-12).
[30] Dep. Ex. 322 (InterAct Letter, METHANE00000283).

Expert Report of J. Daniel Arthur P.E., SPEC

On February 28, 2018, DOGGR informed MDR that the previously filed Notice of Intent Well Work did not address bringing RGC #10 to current standards.  DOGGR requested that the program include a plan to place *"cement plugs, cement squeezes, and mud"* to meet the current standards (MDR0182936).[31]

On April 27, 2018, DOGGR received a second Notice of Intention to Re-Abandon prepared by InterAct on MDR's behalf.  This new Notice of Intention to Re-Abandon provided a plan to bring RGC #10 up to current DOGGR standards.

On June 5, 2018, DOGGR informed MDR that the April 27, 2018 Notice of Intention to Re-Abandon prepared by InterAct had been approved.  DOGGR provided MDR with a series of stipulations for the approval, and a few of note are presented below:[32]

- The installation and maintenance of Blowout Prevention ("BOP") Equipment.
- Required weekly BOP practice drills and documentation of such on the tour sheet.
- The use of a hole fluid of a quality and quantity sufficient to control all subsurface conditions in order to prevent blowouts.
- The need for Division Approval prior to any program changes.

### 3.7.5  MDR's Daily Reports Demonstrated It Was Ill-Prepared to Abandon a Well Like RGC #10

I reviewed and analyzed the daily reports prepared by InterAct for MDR during the initial excavation operations through the completion of the re-plugging and abandonment activities associated with RGC #10.  This included both the Daily Report Summary Dow RGC #10 Re-abandonment from August 6, 2018 through April 9, 2019, Bates Numbers MDR0025846 through MDR0025855, and InterAct's Daily Workover/Completion Reports from October 23, 2018 to January 13, 2019, Bates Numbers MDR0021665 through MDR0021750.  In reviewing and analyzing these reports, I focused primarily on the issues and problems that occurred during the re-plugging and re-abandonment of RGC #10.

It is clear that details were left out from these reports at times.  In addition, there were discrepancies between the summary of daily reports and InterAct's Daily Workover/Completion Reports.  Examples of omitted information include gas leaking at the surface prior to re-entry, sidetracking out of the wellbore, and not reporting the initial surface breach.  Notably, InterAct omitted this information from the daily report summary, but, despite this omission, these events are documented in CWS' Daily Reports and in InterAct emails prepared on the same dates on which MDR was copied, and thus MDR was fully aware of the situation.[33]

This is an issue of concern as it raises questions as to whether any other significant details were potentially omitted, whether intentionally or unintentionally, from the daily reports and whether the contractor's staff were unqualified or incompetent.  Moreover, excluding key information from reports that are required by the regulatory agency and critical to assuring that the well is plugged properly (and that health and safety issues are properly addressed), suggests not only sub-standard work, but also negligence.  A further concern with these types of documented practices is that MDR, Methane

---

[31] Dep, Ex. 10 (Email correspondence, page 6 of 12, MDR0182936).
[32] DOGGR Letter dated 6/5/2018, Permit No.: 7000607, To:  Anthony Santo, MDR Hotels, LLC, From:  Senior Oil and Gas Engineer, Chris Phillips as found in CalGEM RGC #10 Well File download 10/26/2022, (see Appendix D).
[33] Dep. Ex. 449 (Email chain, page 6 of 6, MDR0131155).

Expert Report of J. Daniel Arthur P.E., SPEC

Specialists, CWS, and InterAct did not follow procedures that would have avoided these unintended results, (i.e., the surface breaches and blowout).

Based on my analysis and assessment of these daily reports, there were early indications of well integrity issues, gas and fluid migration behind and into the casings, and surface breaches that should have alerted MDR to stop work and reassess these critical issues.  Unfortunately, MDR chose not to stop work and reassess these critical issues, leading to the January 11, 2019 blowout.  A more detailed narrative analyzing the Well Work Reports and the issues encountered by MDR is provided in Section 4 below.

# 4   Analysis and Opinions

This section details key issues causal to the surface breaches and blowouts that occurred at the RGC #10 well during MDR's 2018-2019 re-abandonment operations.  Where applicable, discussion of alternative approaches or complimentary considerations is provided to highlight effective or safer options that MDR should have considered and implemented.

## 4.1   Failure to Plan and React

### 4.1.1   MDR's Lack of Detail in Its Procedures Was Harmful

MDR failed to conduct appropriate due diligence, including a thorough review of the history of RGC #10, the local geology of the Marina del Rey oilfield, and oil and gas development in the area.  If MDR had conducted appropriate due diligence, it would have been better informed so as to consider alternative approaches and mitigation measures necessary for a complex operation of this nature.  Operations in old oil wells, especially re-abandonment operations in vintage wells like RGC #10 that have a blowout history, are inherently dangerous.  A review of publicly available information on the nearby oil wells would have revealed the inherent challenges and risks specific to this well.

MDR's contractor InterAct only allocated 8 hours to conduct a well history review and construct a current wellbore diagram and 2 hours for discussion with DOGGR to seek agreement on exactly what needed to be done to re-abandon RGC #10.[34]

An informed rig crew, equipped with the knowledge of how to respond effectively as quickly as possible in any situation, is essential to maintaining well control.  Here, pressurized gas pockets and lost circulation zones were encountered during the re-abandonment operations of the RGC #10 well.  Yet the original well work plan prepared by InterAct was generic and did not anticipate any problems or provide procedures for these types of conditions.  In abandonment operations, the on-site personnel must be able to identify indications of a gas kick into the well or a lost circulation event.  The April 27, 2018 InterAct Re-abandonment Program procedure provided no guidance on how to monitor for a gas kick or lost circulation events nor trip pipe-out of the well in underbalanced conditions.[35]  Having this guidance in place would have allowed the rig crew to train for those scenarios and to safely assess the situation and respond to atypical events with practiced procedures and proven methods.  This would have prevented or at least reduced the chances of the blowout and surface breaches that occured.

The Re-abandonment Program procedure largely relied on InterAct's knowledge and experience, which were inadequate under the circumstances, and lacked evidence of any foundation based on the historical records of wells in the Playa del Rey oilfield.  The procedure prepared by InterAct and implemented by CWS was too general in nature.  Procedures should detail critical elements of the operation to help ensure that operations are tailored to the specific well and are performed using consistently safe practices and that all primary and secondary barriers are maintained to prevent and mitigate gas kicks and lost circulation.

Beyond simply providing the basic step-by-step instructions, a fully developed procedure should include comprehensive plans that establish the expectation of what are the normal operating conditions for

---

[34] Dep. Ex. 337 (Master Consulting Services Agreement, InterAct and Methane Specialists, Exhibit A, page 6 of 6, MDR0008322).

[35] Dep. Ex. 17 (InterAct Re-Abandonment Program Dow RGC-10, MDR0003713-16).

Expert Report of J. Daniel Arthur P.E., SPEC

each task, making it easier to identify an abnormal situation.  When such an abnormal situation occurs, potentially leading to deviation from the baseline procedure, the management of change process should be initiated.

Competent consultants and contractors with well abandonment experience would have created specific procedures sufficiently detailed and appropriate for the different types of operations that the on-site personnel may have to perform.  For instance, when tripping tubing work string from a well, it is important that the rig crew replace the displaced volume of pipe removed from the well with mud.  Properly replacing the pipe displacement volume with mud maintains the level of mud in the well, which maintains the hydrostatic pressure.  In this regard, InterAct or CWS could have filled the annular space with weighted mud while tripping out to maintain hydrostatic pressure.  But this was not identified or detailed in MDR's contractors' existing procedure (nor was it done), and the final blowout occurred.

### 4.1.2   MDR's Policies for Controlling Abnormal or Unexpected Conditions Were Deficient

Any operation on an oil or gas well occurs in a dynamic environment.  Operations require prediction of how the underground formations might behave in certain locations.  There is always the chance of encountering pressures that are higher than expected or geologic formations that behave differently than expected.  In these instances, companies need a way to identify what is occurring and move forward by developing a new plan on how to proceed.

Here, MDR failed to investigate and predict such occurrences (MDR utterly failed to perform *any* of this due diligence) and was simply wrong in its conclusions.  Initially, before the decision was made to run the 7" casing, InterAct should have run a downhole camera to investigate and identify the problem with the obstruction at 308 feet.  A larger casing string could have been run to support drilling out cement plugs utilizing a full-sized bit in comparison to the 6-1/4" bit.  Using a smaller sized drill bit did not allow for complete removal of the residual cement rings inside the 11-3/4" casing; this itself could have contributed to the side tracking of the well outside the existing borehole.  Further, the smaller drill bit limited access to larger outer diameter ("OD") tools downhole.  MDR did not do this.

Additionally, the 7" casing set at 466 feet should have been cemented in when it was installed to provide well control, as the other existing casing strings lacked integrity.  Utilizing a cementing packer would have allowed for cementing inside of the 7" x 11-3/4" annular space to the surface.  Not only that, but pumping cement under pressure into the 7" x 11-3/4" annular space could have supplied an additional benefit in some cement also being placed behind the 11-3/4", which could have prevented the initial surface breach on December 18, 2018.  MDR did not do this either.

Following the numerous gas kicks and lost circulation events in the days leading up to the January 11, 2019 blowout, InterAct or CWS should have exercised SWA.  Once exercised, detailed discussions would have been held with DOGGR on an alternative plan that could have prevented the blowout.

Sometimes operational deviations from original plans are possible due to the inability to accurately predict geological behavior, formation pressures, or well conditions.  The April 27, 2018 Re-Abandonment Program did not include detailed plans for underbalanced drilling.  When the well unexpectedly became underbalanced, MDR chose to improvise a new plan as it proceeded with plugging operations.  MDR chose to:

- run a 7" casing sleeve;

Expert Report of J. Daniel Arthur P.E., SPEC

- reduce mud weight from 9.0 ppg to 8.4 ppg;
- continue to use lost circulation material with no positive results; and
- react ineffectively to gas kicks repeatedly.

These decisions were made at the spur of the moment, leading to MDR and its contractors not fully considering the hazards of the operation or seeing the need for specialized equipment and procedures. The use of lost circulation materials as a means of plugging casing holes should have been reconsidered. In this situation, it would have been more effective and prudent to perform squeeze cementing or other remedial measures.

During the re-abandonment of RGC #10, a management of change program was not used—and was not expected to be used by on-site personnel—during the unexpected and abnormal operation conditions preceding the incident to control or correct the hazards because such a program was not described in the April 27, 2018 Re-abandonment Program procedure.

### 4.1.3   There Are Multiple Instances of MDR's Failure to Plan or React

Specific instances of MDR's failures to properly plan and react are referenced in the Daily Well Work Reports prepared by InterAct and are discussed further below.  Additionally, several other MDR documents clearly state that both fluids and gas were flowing up the outside of the stove pipe casing in August 2018 during the excavation of the well prior to re-entry and re-abandonment.  None of this critical information was documented in the daily report summaries.[36]  MDR and its consultants failed to act on this information and revise the proposed re-plugging program to address the lack of integrity in RGC #10.

Also, based on these initial observations of fluids and gas emanating at the surface during the RGC #10 excavation, MDR's consultants should have realized that this was a "live well" (meaning pressurized). The CWS service rig was not prepared to be used in a live well situation.  Indeed, even the Wild Well Control ("WWC") Project Memo 1 dated January 23, 2019 (which was drafted by MDR's contractor WWC) clearly stated that "A conventional workover rig is not a 'live well' tool ….Therefore, continuing to intervene in this anticipated scenario would not be within the normal scope of operations of the rig. The most noted live well tools in the industry are snubbing units and Coiled Tubing (CT) units."[37]

The following are additional examples of MDR's failures to plan and/or react:

- On October 4, 2018, during the excavation of the stove pipe casing, water was noted to be flowing up outside of the stove pipe.  This was the first indication of well integrity issues documented in the daily well work reports.  There are no indications in the records reviewed that on-site personnel saw this water flow as a cause for alarm or a deviation from the proposed plan.  This is a failure to react to the conditions as they presented themselves.

- On November 2, 2018, the drill bit entered into a gas pocket at 165 feet.  This is the first instance in which InterAct documented gas in the wellbore.  Gas in the wellbore at this shallow depth should have been a strong indicator that the well had integrity issues.  This is an instance

---

[36] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 175 of 210, MDR0004031).
[37] Dep. Ex. 224 (Wild Well Control, Project Memo 1, page 4 of 7, MDR0059646).

of a failure to react to the unexpected presence of gas and should have been a cause for a deviation from the proposed re-abandonment plan.

- Four days later, on November 6, 2018, as the bit drilled to approximately 440 feet, 50 barrels of mud were brought into the location to replace mud lost downhole.  This is the first indication of serious lost circulation issues occurring during the re-abandonment of RGC #10.  Fifty (50) barrels is not an insignificant amount.  Lost volumes of this amount should have been a cause for concern, especially at such a shallow working depth.  The 11-3/4" 54 pound per foot casing used as the production casing string of RGC #10 has a volumetric capacity of 0.115 barrels per foot.  At a depth of 440 feet, the casing was capable of containing only 50.6 barrels, meaning that the lost volume was near the entire capacity of the pipe.  Lost circulation issues of this magnitude should have been a cause for alarm and should have warranted a call for a more enhanced approach to well control.  This instance is a failure to react by MDR's on-site personnel.

- On November 10, 2018, the rig crew drilled down to 546 feet and circulated the hole and got back iron, cement, rubber, and formation material in returns from 532 feet to 546 feet.  This was at the same approximate depth where Dow had attempted to shoot off the 11-3/4" casing during the 1956 abandonment.  Iron, formation (drill cuttings of rock), and cement in returns are a strong indicator that the casing and cement were being drilled as the drill bit sidetracked out of the wellbore though the point at which it had been shot off in 1956.  The possibility of sidetracking out of the casing was not considered in the daily records reviewed and the failure to plan for this outcome is noteworthy.  However, WWC later documented this event in WWC Memo 1 dated January 23, 2019, stating, "It was reported that the well has been accidentally sidetracked at 525', and additional complications are noted within the wellbore @ 1,100'."[38] The inability to recognize that the drill cuttings returning from 532 to 546 feet were an indication of sidetracking was a failure to react to the conditions as they presented themselves.

- On November 26, 2018, after having continuing issues with the 8-1/2" bit setting down at a depth of 308 feet and 398 feet where in 1956 the 11-3/4" casing had been shot off (meaning separating a pipe string with an explosive cutter) and pulled up 30 feet, MDR made the decision to run a total of 466 feet of 7" casing into the well to get past these bad spots.  Running the 7" casing was not well thought out.  The 7" casing reduced the ability to completely drill out the remaining 11-3/4" plugs.  Running the 7" casing was merely a reaction to conditions as they presented themselves.  MDR planned to withdraw the 7" casing after the well was plugged back to that depth.  This operation was not planned for in the proposed procedures and exemplifies the failure to properly plan for contingencies that could possibly arise as work progressed on an old well such as this.

- On November 29, 2018, after having drilled to a depth of 555 feet, the decision was made to run a magnet into the hole.  Upon returning to surface, it was discovered that the magnet had recovered 19 pieces of metal.  This is a strong indication that the drill bit was milling (meaning removing a blockage by drilling with a metal-cutting device to gain access to the area beyond) into the 11-3/4" casing.  The next working day, the rig crew continued to drill ahead,

---

[38] Dep. Ex. 224 (Wild Well Control, Project Memo 1, page 2 of 7, MDR0059644).

demonstrating their failure to react or change the course of action in the face of strong indicators that the bit had milled through the 11-3/4" casing.  Additionally, the rig crew did not consider the possibly that the mill had exited the wellbore nor did they alter their actions based on these findings.

- On December 11, 2018, the work string was tripped out of the hole and a 5-foot piece of 4-3/4" tubing with a 5-1/4" OD (outer diameter) collar was found on the bottom of the assembly.  There is no indication in the daily well work reports that on-site personnel provided any report of tubing work string being left in the hole.  The recovered 4-3/4" is of the same dimension of tubing work string used by MDR's contractors during the 2018 re-abandonment.  If junk pipe was left in the hole and this detail remained unreported (as appears to be the case), then this represented a significant failure to react to complications.  This could also be an indication that on-site personnel were intentionally omitting or obfuscating the fact they had previously lost some tubing work string in the well.[39]

- One week later, on December 18, 2018, the mill broke through at approximately 888 feet.  The hole was then circulated clean (meaning fluids were pumped down the annulus and up the drill pipe clearing any debris).  A December 20, 2018 email exchange reported a mud seep occurred at the surface and was first noticed midday.[40]  A mud seep at the surface is a clear sign that the integrity of the casing was compromised and is an indicator that the primary barrier of well control was not stable.  This email appears to show knowledge and discussion of a surface breach that went unreported in the daily well work reports prepared by MDR's contractors.  In an attempt to repair the breach, on-site personnel ordered Maxi-Seal lost circulation material ("LCM") and added it to the mud, which seemed to stop the seep at the surface for the time being.  This email exchange is the first documentation of a surface breach, yet there was no documentation of this mud seep at the surface in any of the MDR contractors' daily reports.  This was clearly evidence of loss of well integrity and should have been a cause for alarm.  This mud seep should have warranted a call for a more enhanced approach to well control.  This instance was a serious failure to react by the on-site personnel.  The inability to recognize the mud seep as a lost barrier is an indication of a failure to react to the conditions as they presented themselves.

- In the December 20, 2018 email exchange, it was noted that:

"The normal course of action would be to alert DOGGR of the condition and seek their advice on how to proceed.  I see two potential issues with this condition:

1. We could experience a loss of well control due to the breach.  We have not experienced anything that would indicate a LIKELY loss of control but as you know this is a fluid process and that may change at any time.

2. I am concerned the presence of the mud at the surface may impact the cantilever shoring system.  I don't know what the likelihood of this impact is, if at all.  The shoring engineer should be consulted for a thorough review of this condition."

[39] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 137 of 210, MDR0003993).
[40] Dep. Ex. 449 (p Email chain, age 6 of 6, MDR0131155).

This email exchange is particularly concerning because it clearly evidences a hesitancy by MDR to communicate with DOGGR about the conditions of the well.  This email exchange also exhibits a lack of willingness to acknowledge the loss of well control.  A mud seep at the surface is clear evidence that well control was lost.

- Two days later, on December 20, 2018, it was reported that the hole lost most of the circulation of fluids at a depth of 986 feet.  It was then reported that mud returns were observed coming out of the ground at the surface approximately 20 feet from the cellar.  This was the second surface breach, the first being the unreported mud seep that occurred on December 18, 2018.  This second breach is an indication that efforts to resolve the lost circulation issues with Maxi-Seal LCM were ineffective and inadequate.  The second breach was a failure to react properly to the first surface breach.

- As a consequence of the second breach, plugging operations ceased temporarily on December 21, 2018, and the rig crew conditioned the hole with gel and LCM while waiting for orders.  No activity was reported for December 22 and 23, 2018.  This is concerning because there were no on-site personnel on location for more than 48 hours, leaving an unstable well unmonitored.  This is a failure to react to the hazardous and unstable conditions that the well was presenting and it was negligent considering the tenuous situation.  A reasonable and competent well operator would not have left this well completely unattended for 48 hours given the circumstances.

- On December 24, 2018, the rig crew reported no pressure on the well and that the fluid level was not observable in the hole from the surface.  These details could be an indication that the well was actually on a vacuum, meaning that that the fluid level in the well was actually falling as the mud exited out of the casing.  The rig crew then topped off the well by adding 2.5 barrels of mud to the well and then returned to the office.  By topping off the well with mud, the rig crew failed to address the underlying issue that the well was losing fluids and investigate the reason behind the loss.  This is yet another instance of a failure to react to the hazardous and unstable conditions that RGC #10 presented.  MDR's contractors made no changes in the course of action in light of the falling fluid level and then went on to leave the well unmonitored until December 26, 2018, again demonstrating negligence.

- According to the daily well work reports, when the rig crew arrived on location on December 26, 2018, the on-site personnel discovered that the well had *"blown out over the Christmas break presumably through uncemented gap in casing between 290'-308' and up to the surface just outside the rig and slurry pit"*.[41]  The third breach at the surface discovered on December 26, 2018 is the strongest indicator as of that date that prior efforts to resolve the lost circulation issues at RGC #10 were ineffective and the on-site rig crew failed to react properly to the conditions as they presented themselves.

- The third surface breach was the impetus for a significant deviation from the proposed re-abandonment plan, as the decision was made to spot a cement plug below the 7" casing sleeve and then place cement in the 7" x 11-3/4" annulus.  (This decision is undocumented though it is

[41] Daily Report Summary, Dow RGC #10 Re-Abandonment, Page 4 of 10, (MDR0025849).

Expert Report of J. Daniel Arthur P.E., SPEC

reported it had DOGGR approval.)  The cement plug was placed from 532 – 590 feet later that day on December 26, 2018.

- On December 28, 2018, a fourth breach was discovered, this one being a *"bathtub sized hole 15' from cellor [sic]*.[42]  The rig crew then dumped 10 barrels of mud down the 7" x 11-3/4" annulus and the well went on vacuum.  The fact that the well went on vacuum is a strong indicator that well control was not obtained and uncontrolled flow was still occurring and that all efforts thus far undertaken had been ineffective at resolving the lost circulation issues.

## 4.2   Inadequate Mud Weight

### 4.2.1   MDR's Well Control and Barriers Were Inadequate

While any operations (drilling, repair/workover, or abandonment) are performed on a live well (pressurized), the on-site personnel prevent formation fluids from entering into the wellbore by placing a hydrostatic pressure column of mud between the pressurized formation and the surface.  Any method of preventing fluid flow from the formation into the wellbore is referred to as a barrier.  Two barriers, one primary and one secondary, are typical and advisable in the oil and gas industry.[43]

The column of drilling mud inside the wellbore acts as the primary barrier used to prevent formation gas/fluids from entering the wellbore and travelling to the surface.  The primary barrier is maintained by the hydrostatic pressure produced by the weight of the column of drilling mud in the well imparted upon the formation face.  As long as the column of drilling mud inside the well exerts a pressure on the formation that is higher than the pore pressure, gas or other fluids in the formation cannot flow into the well.

Mud weight selection is critical because if the mud is not heavy enough in ppg, it may not sufficiently prevent a gas kick.  Conversely, if the mud is too heavy, it might fracture the formation and leak out of the wellbore resulting in "lost circulation" or "lost returns."  Lost circulation reduces the height of the mud column, reducing the imparted hydrostatic pressure, which can result in gas kicks (i.e., an unwanted flow of fluids from a formation into the wellbore).

A common method for mud program evaluation in a region where other wells have already been drilled is to review what other operators have used successfully on similar nearby wells.  There are no indications in the April 27, 2018 Re-abandonment Program that such an evaluation of proper mud weight was undertaken in preparation of the re-abandonment work plan.

Additionally, many operations were undertaken during the course of the re-abandonment of RGC #10 that occurred while the well was in an "underbalanced" state.  A well is considered to be "underbalanced" when the hydrostatic pressure imparted by the mud column is less than the formation pore pressure.  Conducting operations while the well was underbalanced resulted in gas unintentionally reaching the surface.  Underbalanced operations were not planned for in the proposed work plan.  On-site personnel chose to continue drilling with underbalanced fluids in the wellbore.  Underbalanced drilling reduced the effectiveness of the primary well control barrier and contributed to the blowout.

---

[42] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 125 of 210, MDR0003981).
[43] API RP 59 (R2018) Recommended Practice for Well Control Operations, Second Edition, May 2006, Reaffirmed, December 2018, Primary Well Control.

Expert Report of J. Daniel Arthur P.E., SPEC

### 4.2.2   Instances of Inadequate Mud Weight Causing Underbalanced Operations

After cementing the 7" casing sleeve into the well following the previous surface breaches of mud, the on-site rig crew were faced with a different issue, inadequate mud weight.  Below are examples of instances in which MDR's use of inadequate mud weight caused underbalanced operations.

- On December 29, 2018, when the rig crew arrived on location, an unreported amount of wellhead pressure had to be bled off (released).  Previously, the well had little pressure at the surface or had been on a vacuum.  Positive and substantial wellhead pressure is an indication that formation fluids and gases are entering the wellbore, which can only occur if the hydrostatic pressure exerted by the mud weight is inadequate and less than the formation pressure.  The rig crew pumped 211 cubic feet of cement through a retainer at 416 feet.  Good cement returns were observed during this job and no cement was observed at any of the previous surface breaches. This allowed for one casing string to have integrity and the well was secured.[44]

- On January 2, 2019, when rig crew arrived, 10 psi was observed on the 7" x 11-3/4" annulus, an indication of either fluid loss or inadequate mud weight.  The rig crew rigged up a pump onto the annulus to conduct a pressure test, pumping 1 barrel per minute at 0 psi, indicating that the past cement jobs were ineffective at sealing the annular space.  As a consequence of the failed pressure test, on-site personnel appropriately elected to pump an additional 376 cubic feet of cement into the 7" x 11-3/4" annulus.  During this operation, mud returns were observed coming to the surface from the breach near the cellar, a sign that there was a hole in the casing.[45]

- On January 4, 2019, drilling resumed.  Neither surface pressures nor mud weight was reported in the daily well work report for January 4.  On January 7, 2019, the rig crew arrived to find the well with zero pressure at the surface.  Later that day, as they continued to drill ahead, the decision was made to condition the mud to 9 ppg.  Whether this is a reduction or an increase in mud weight cannot be determined because the weight of the mud had not been previously reported in the daily well work reports.[46]

- On January 8, 2019, the on-site personnel reported a gas kick while reaming (enlarging a hole or a window through the casing).  The well work report states:

    "Picked-up power swivel and continued circulating and reaming down to 996' when took a gas kick.  Closed in well and conditioned mud to 9.0 PPG. Slowly bleed off gas in 10 minutes."[47]

    This statement indicates that there was still gas entering the wellbore because the mud weight of 9.0 ppg was inadequate to supply sufficient hydrostatic pressure to act as a primary barrier.  Later that same day, as the rig crew drilled ahead at 1,120 feet all circulation was lost, meaning

---

[44] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 124 of 210, MDR0003980).
[45] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 123 of 210, MDR0003979).
[46] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, pages 120 & 121 of 210, MDR0003976 and MDR0003977).
[47] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 119 of 210, MDR0003975).

Expert Report of J. Daniel Arthur P.E., SPEC

that the bit had entered into another thief zone (a high permeability zone that serve as a loss site for wellbore fluids).  The well work report notes:

> "Lost all returns at 1120'.  Attempted to maintain circulation with LCM, no good.  Drilled with no returns from 1120' to 1214'.  POOH [pull out of the hole] with bit to 437'."[48]

Once again, it was made apparent that the LCM was ineffective in plugging the thief zone.  The depth at which mud was being lost could not be determined because there are multiple locations that it could have occurred.  Historic well records for RGC #10 indicate that there were no cement plugs in the casing from 887 feet to 3,376 feet.[49]  In addition, there were unplugged knife cuts in the casing from 3,076 feet to 3,341 feet.

The on-site personnel continued to drill ahead with no returns from 1,120 feet to 1214 feet before shutting down for the day.  Drilling ahead with no returns was a dangerous decision.  The lost circulation issue should have been addressed immediately and then the hole should have been refilled with mud before drilling ahead.

- On January 9, 2019, while MDR was preparing for another cement job in an effort to seal the leaks in the casing, RGC #10 experienced another gas kick.  New 8.4 ppg mud was circulated into the well, replacing the remaining 9.0 ppg mud in an attempt to kill the well.  An unreported amount of surface pressure was bled off, then the on-site personnel pumped a 43 cubic foot cement plug from 786 feet to 880 feet.  Later events reveal that the cement plug across the casing window was ineffective in shutting off the source of gas.[50]

Decreasing the mud weight to 8.4 ppg increased the risk of losing control of the well.  Gas kicks continued and the lost circulation issues remained unresolved.  The well work reports reveal that on-site personnel did not increase the weight of the mud before resuming drilling, a consequential decision.

- On January 10, 2019, MDR's on-site personnel were drilling out the recently placed cement plug when the well took another gas kick.  This gas kick undoubtedly evidenced that the recently placed cement plug and any previous cement squeezed into the annulus were ineffective and had failed to stop the leaks in the casing as gas continued to enter the wellbore at or below the working depth.  This gas kick is also a clear demonstration that the 8.4 ppg mud was inadequate and that a heavier mud was needed.[51]

- On January 11, 2019, the day of the blowout, the rig crew arrived to find zero pressure on the wellhead.  The daily well work reports indicate that no fluid level was encountered until reaching 1,306 feet and that 30 barrels of mud had to be pumped to initiate circulation as stated in the report from January 11, 2019:

---

[48] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 119 of 210, MDR0003975).
[49] DOW RGC 10 Well Files.pdf (MDR0083178-212).
[50] Dep. Ex. 112 (Exponent, Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 118 of 210, MDR0003974).
[51] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 117 of 210, MDR0003973).

November 2022

Expert Report of J. Daniel Arthur P.E., SPEC

"Lowered bit back down to 1306', no fill.  Pumped 30 barrels to break circulation.  Well kicked gas bubble then lost all circulation.  Attempted to treat mud with LCM to regain circulation, no good."[52]

Taking yet another gas kicks should have been a serious warning signal indicating that a higher mud weight was required to mitigate additional gas influxes.  This change was not made.  On-site personnel made the decision to continue drilling ahead.  Drilling resumed on January 11, 2019, without circulation from 1,306 feet to 1,368 feet.  It was while the on-site personnel pulled the drill pipe out of the hole to about 1,492 feet that the well blew out.

## 4.3   MDR's Well Swabbing in an Underbalanced Environment Contributed to the Blowout

Whenever pipe is withdrawn from a hole containing fluid, a vacuum is created due to the displacement of the volume of pipe, and formation fluids will enter the wellbore to replace the pipe volume.  This effect is called swabbing.  The vacuum generated when swabbing can contribute to a gas influx entering the well, particularly if the pipe is withdrawn very quickly.  Reducing the mud weight from 9.0 ppg to 8.4 ppg reduced the hydrostatic pressure and nullified any existing safety margin required for swabbing pressures during a trip out of the hole.  The blowout occurred while the density of the drilling mud was too light and near that of fresh water and while the tubing work string was being pulled up the wellbore.

But here, during the re-abandonment operation at RGC #10, MDR failed to collect real-time telemetry data such as pipe trip speed, so it is impossible to determine the speed at which the pipe was being raised when the blowout occurred was a factor.  Additionally, there is no evidence of trip sheets or trip books being used to monitor the well to quickly identify potential gas kicks.  Given the previous history of gas kicks in the well, real time telemetry or paper trip sheets would have aided in maintaining proper trip speed as the pipe was tripped out of the hole.

It is my opinion that the gas influx that caused the January 11, 2019 blowout was swabbed-in during the trip-out operation when the density of the mud was near that of fresh water.  Since there are no trip sheets or telemetry data there is no evidence to suggest otherwise.  Gas influxes are known to occur when tubulars are pulled from the wellbore.[53]  Gas and fluids were coming up the tubing work string suggesting that the gas was entering the wellbore below the bottom hole assembly.

As a primary means of preventing such a blowout, calculations can and should be made based on the mud properties and well dimensions to estimate the magnitude of the swabbing effect that will occur due to pipe movement during a trip-out of the hole.  From these calculations, a safety margin may be determined such that the mud density would be increased by an amount that would keep the well overbalanced during tripping.

A proper and thoroughly planned procedure should include details on the necessary safety margin between proposed downhole drilling fluid weights and the estimated formation pressure.  A safety margin of 0.3 ppg to 0.5 ppg above the equivalent circulating density was noted as being commonly

---

[52] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 116 of 210, MDR0003972).
[53] The Department of Interior, Bureau of Safety and Environmental Enforcement, 2017, Effects of Tripping and Swabbing in Drilling and Completion Operations, Bourgoyne Engineering, LLC.

Expert Report of J. Daniel Arthur P.E., SPEC

accepted by regulators in a review prepared by the Bureau of Safety and Environmental Enforcement.[54]
There is no evidence to suggest that mud weight safety margin calculations were done by MDR.

## 4.4   MDR's Well Control Was Inadequate

Given the history of gas kicks and lost circulation events witnessed during the re-abandonment of RGC
#10, additional equipment and alternative techniques should have been used by on-site personnel to
maintain adequate well control.  Specifically, the re-abandonment plans should have been adapted to
include the utilization of a snubbing unit and an Internal Blowout Preventer ("IBOP") or check valve in
the drill string.

A snubbing unit is a machine designed to move pipe into or out of a well bore when a well is under
pressure or in an underbalanced live well.  Internal drill string valves stop fluid from flowing up the drill
string often if the well takes a kick.

Utilizing an IBOP or check valve as a contingency component of a well control plan may have decreased
gas flow up the drill pipe during the January 11, 2019 blowout.  During this blowout, the rig crew was
unable to stab the TIW valve into the work string due to the high rate and volume of flow coming from
the tubing.  A TIW valve would be unnecessary if alternative equipment such as a snubbing unit and
coiled tubing unit had been in use.

As pointed out in Exponent's Root Cause Analysis, InterAct's daily workover reports show that a check
valve was used in the drill string for the remainder of the wellbore operations after the January 11, 2019
blowout.  Additionally, the Daily Well Work Reports indicate that MDR's contractors increased the
density of the mud from 8.4 ppg to 10.0 ppg, a 19% increase over what was previously used.  Further, on
the next day, January 12, 2018, a coiled tubing unit was utilized and a snubbing unit was placed on
standby.  As these actions show, MDR changed its approach and utilized different methods once the
January 11th blowout occurred.  These changes were not based on the well control failures that
transpired during this operation, but instead were based on the blowout itself, which MDR could and
should have avoided.

InterAct on MDR's behalf had developed a Well Re-abandonment Plan, but it did not specify what
barriers were required to be maintained, or how to identify or respond if a barrier was lost.  API RP 59[55]
recommends that two barriers to prevent flow be maintained during drilling operations.  For the RGC
#10 re-abandonment operation, the two intended barriers were:

1. hydrostatic pressure produced by the mud weight to keep the well overbalanced (primary
   barrier); and
2. the Fully Opening Safety Valve ("FOSV")/TIW valve (secondary barrier).

When the well became underbalanced during the re-abandonment, the operation lost one of its two
barriers.  MDR's well plan did not describe what to do in the event that a barrier was lost.  Had a well
plan been in place requiring at least two barriers and information on how those barriers were to be
maintained, continuing to drill in an underbalanced manner would have been a violation of the well

---

[54] The Department of Interior, Bureau of Safety and Environmental Enforcement, 2017, Effects of Tripping and
Swabbing in Drilling and Completion Operations, Bourgoyne Engineering, LLC.
[55] API RP 59 (R2018) Recommended Practice for Well Control Operations, Second Edition, May 2006, Reaffirmed,
December 2018, Primary Well Control.

Expert Report of J. Daniel Arthur P.E., SPEC

control plan.  Continuing to drill also would have led to increasing mud weight to return to the original plan or the creation of a new plan that included the use of an IBOP, snubbing unit, and/or coiled tubing.

## 4.5   Safety Was Not a Priority for MDR

Safety management by MDR did not become a priority until after the blowout on RGC #10 on January 11, 2019.  Based on my knowledge, education, training, and experience, and as discussed below, it is my opinion that MDR should have made safety a priority from the outset and doing so would have prevented the blowout.

MDR did not request or require a well control plan from its contractors (InterAct or CWS) prior to the start of operations.  Indeed, the InterAct Risk Assessment Protocol document was developed *after* the blowout in response to DOGGR's February 12, 2019 letter.  This document purports to summarize InterAct and CWS's analysis of RGC #10 historic records and DOGGR's requirements for BOP equipment and the potential risks associated with re-entry and re-abandonment of the RGC #10 well.  However, it was clear in this post-facto document and other InterAct documents that early warning signs of well integrity issues were either ignored or not considered as a critical safety factor prior to re-entry and re-plugging operations. These issues are listed below:

1. In the Master Services Agreement ("MSA") between InterAct and Methane Specialists, InterAct allocated only one day to review historic well records for the RGC #10 well and generate a wellbore diagram.  This demonstrated that InterAct failed to thoroughly investigate the RGC #10 well and other surrounding wells within the Playa del Rey oil field to assess geologic conditions and plugging and abandonment issues.  Only AFTER the January 11, 2019 blowout did InterAct, on MDR's behalf, conduct a thorough analysis and assessment of the RGC #10 well and other surrounding wells.  A comprehensive investigation of the well records should have been undertaken PRIOR to the development of a plugging and abandonment plan and commencement of plugging operations, not after the blowout.

2. During the initial excavation of the wellhead on September 18, 2017, there was clear evidence that RGC #10 was leaking fluid and gas at the surface.  MDR failed to coordinate with DOGGR so it could witness the test, and failed to submit a written report of the leak test to DOGGR as required.

3. Then, an August 6, 2018 InterAct document states *"Cement was found on the inside of the stove pipe, but water was flowing up the outside of the stove pipe."*[56]  A second InterAct document from Val Lerma and Mike Giuliani dated February 14, 2019 to Mike Hale at Hardage Hospitality states that *"Gas was observed escaping from the DOW RGC 10 in August of 2018 before the well was entered for reabandonment."*[57]  A third InterAct document states *"During excavation and removal of the surface stove pipe down to about 25', constant gas bubbling was noticed*

[56] InterAct. 2019. Summary of Telecom and Resulting Action Plan for DOW R.G.C. 10 Well, Dated January 16, 2019, to Callie Callum, DOGGR. CAGOEM0000274-79.
[57] InterAct. 2019. DOW RGC 10 Well Recommendations. to Mike Hale, PMP, LEED AP, Hardage Hospitality. MDR0063000-MDR0063006.

> *emanating from the excavation pit.  This was a reminder of the 1956 blowout and the need to remain vigilant while drilling-out below the surface."[58]*

These warning signs and MDR's failures to act on them clearly demonstrate MDR and its contractors were unprepared despite the fact that a well integrity problem was plainly identifiable on numerous occasions before the January 11, 2019 blowout.  Evidence was available indicating that gas was emitting at the surface prior to any re-entry and re-abandonment efforts.  Leaking gas was a severe issue indicating the mechanical integrity of RGC #10 had been compromised.  This issue should have required not only a major revision to the original proposed InterAct generic plugging plan, but also should have alerted MDR and its contractors, InterAct and Methane Specialists, that additional well control expertise was needed.  MDR failed to address this issue until *after* the blowout when it eventually brought in WWC to assist and offer a second opinion.  This well integrity issue and the expired well control certifications and lack of documentation of safety drills and BOP testing suggest that safety was NOT a priority for MDR and its contractors.

MDR did not request or require well control training certification documentation from its contractors.  These documents were only provided in response to DOGGR's February 12, 2019 Emergency Order.  A review of these certificates reveals that the CWS employees' certificates had expired prior to the beginning of the re-abandonment operations at RGC #10.  This demonstrates that safety was not a priority for MDR or its contractor CWS.

There is also no documentation of safety drills or BOP testing in the Daily Well Work Reports prepared by CWS or InterAct.  Furthermore, daily Job Safety Analysis ("JSA") may have been performed but was not documented consistently.  Moreover, Emergency Response Plans were also not provided in the procedure documents.  These omissions and oversights demonstrate that safety was not a priority for MDR or its contractors.

## 4.6   MDR Ignored Shallow Gas Presence

MDR failed to conduct thorough due diligence on the geology and history of other oil wells near the RGC #10 well prior to the blowout on January 11, 2019.  This failure ultimately resulted in significant well control challenges during re-abandonment operations due to lack of consideration of the shallow gas presence in the Playa del Rey field.  Despite the fact that MDR, armed with knowledge of a previous gas blowout at RGC #10 and the gas leaking at the surface during the excavation process, knew or should have known it was conducting an inherently dangerous operation in attempting to re-abandon an old oil well (whose inherent danger was significantly heightened by the known blowout history of the well), MDR and its contractors Methane Specialists, InterAct, and CWS failed to properly account for or respond to the lack of well integrity and proper barriers in the wellbore which ultimately contributed to the surface breaches and blowout events.

Historic well records indicate that multiple gas blowouts had occurred at 6 wells within approximately 1-mile of RGC #10 (see **Appendix E**).  Additionally, RGC #10 had a blowout event in 1956 where it was reported that gas was coming from behind the 11-3/4" casing at a depth of 1,800 feet.  The 1956 blowout clearly indicated a pathway for gas to enter the wellbore existed, yet MDR and its contractors Methane Specialists, InterAct, and CWS failed to consider the age and condition of the well, ignoring the

---

[58] Dep. Ex. 112 (Exponent Root Cause Analysis of the DOW RGC 10 Well Blowouts, Appendix K, pages 206-10 of 210, MDR0004062-66).

Expert Report of J. Daniel Arthur P.E., SPEC

gas presence within the wellbore prior to re-entry.  During 2018 re-abandonment operations, there
were numerous indications that shallow gas was present in the wellbore, yet operations continued
without proper planning in place to mitigate potential shallow gas related issues.

The first indications of gas in the wellbore occurred during excavation efforts in August 2018.  InterAct's
Risk Assessment Protocol document states "During excavation and removal of the surface stove pipe
down to about 25', constant gas bubbling was noticed emanating from the excavation pit. This was a
reminder of the 1956 blowout and the need to remain vigilant while drilling-out below the surface."
Additionally, other MDR documents further support the presence and MDR's knowledge of the presence
of this shallow gas during the excavation process of the stove pipe casing.

Multiple gas kicks at various depths during re-abandonment operations were encountered and have
been previously described in detail in the early sections of this report.  These gas kicks not only indicated
the presence of shallow gas, but also presented a significant risk to well control operations.  This risk
finally came to a head on January 11, 2019, when the RGC #10 well blew out sending gas, water, and
sand almost to the top of the rig derrick.

## 4.7   MDR Failed to Utilize Its Stop Work Authority

Responses to abnormal conditions should be guided using robust Management of Change ("MOC") and
stop work authority ("SWA") programs.  The April 27, 2018 Re-abandonment Program did not discuss
troubleshooting.  The MSA between InterAct and Methane Specialists did not discuss a MOC process.
InterAct's MOC program was not documented until after the blowout in January 2019.  The MOC
discussion and implementation was included in the document submitted to Exponent and is included as
Appendix E of Exponent's Root Cause Analysis.[59]  InterAct (on behalf of MDR) implemented five MOCs
during the RGC #10 well re-plugging operations.  The five MOCs are listed below.

1. The first MOC was done when InterAct encountered the exposed surface casing, which was 18"
   stove pipe and not 18-5/8" casing.  Changes to the wellhead design were undertaken.
2. The second MOC occurred when InterAct had issues with drilling below 308 feet and made the
   decision to install the 7" casing.
3. The third MOC was accomplished when CWS and InterAct arrived on location on December 26,
   2018, and discovered the surface breach.  The decision was made to cement in the 7" casing
   string.
4. Starting on January 8, 2019, the fourth MOC occurred when a gas kick occurred at 996 feet.
   Remedial cementing was performed on January 9, 2019, in an attempt to regain circulation.
5. The final MOC occurred on January 10, 2019, when another gas kick was taken and was done in
   an effort to persuade DOGGR to terminate well cleanout operations at a depth of approximately
   1,300 feet.  The next day, January 11, 2019, the well blew out.

Importantly, the Root Cause Analysis report prepared by Exponent purports that these five MOC
requests to DOGGR were written and added to the Well Control Plan after the blowout events had
occurred.[60]

---

[59] Dep. Ex. 112 (Exponent Root Cause Analysis of the DOW RGC 10 Well Blowouts, Appendix E, pages 84-86 of 210,
MDR0003940-42).
[60] Dep. Ex. 112 (Exponent Root Cause Analysis of the Dow RGC 10 Well Blowouts, page 14 of 210, MDR0003870).

Expert Report of J. Daniel Arthur P.E., SPEC

As noted above, InterAct (on behalf of MDR) only implemented five MOCs.  Based on my analysis and
assessment of the re-entry and re-plugging of RGC #10, it is my opinion that many more MOCs should
have occurred.  Two of the most important MOCs that were not implemented are as follows:

1. The first MOC that was not implemented by InterAct should have been undertaken immediately
   upon realization that RGC #10 was leaking both fluid and gas at the surface when the 18" stove
   pipe was uncovered.  An MOC at this time should have not only modified the existing and
   generic plugging plan, but also reached out for more expertise in well control and plugging a
   well with KNOWN well integrity issues at the surface.  MDR had hired a third-party consultant,
   Ramboll, which had primarily oil and gas offshore expertise, but questionable expertise dealing
   with plugging and abandonment of oil and gas wells.  Ramboll supposedly supported all of
   InterAct's decision-making processes regarding the first three MOCs according to the InterAct
   Well Control Plan.  After implementation of the third MOC by InterAct (on behalf of MDR),
   Ramboll was no longer involved with the project.

2. The second MOC that should have been implemented was how well control was to be handled
   with no well integrity.  There was no initial well control on the RGC #10 well other than 41 feet
   of 12-3/4" casing cemented in the hole by InterAct (on MDR's behalf).  The decision to run the
   7" casing to 466 feet and not cementing it in place when it was run led to multiple surface
   breaches in December 2018.  Fortunately, the mud within the wellbore at the time of these
   December 2018 surface breaches was sufficient in weight to have prevented a gas blowout
   behind the 18" surface casing at the surface, which otherwise could have resulted in a major
   disaster.

SWA is an important last resort-type tool, available to all employees on job, and which they have duty to
exercise, permitting them to stop an unsafe activity.  Before reaching the point of relying on SWA to
prevent an event such as a blowout or surface breach, practices, such as thorough due diligence,
detailed planning, and a management of change program must be established and maintained.  These
are critical aspects of a company's safety management system.  Though not required for onshore drilling
operations by any regulatory standard, these elements are important safety management systems.

Based on my review of the materials, there is no indication that any of the contractors onsite and hired
by MDR such as Methane Specialists, InterAct, or CWS exercised SWA anytime during the re-entry and
re-plugging operations of the RGC #10 well.  Early on there were indications that SWA should have been
implemented.  Initial SWA should have occurred before re-entry was even considered due to the fact
that the RGC #10 well was leaking fluid and gas at the surface both inside and outside the 18" stove pipe
surface casing.  Failure to address the lack of well integrity led to the multiple surface breaches and
blowout that occurred.  Anyone on location during the daily JSA meetings should have been informed
every day that they had SWA.  The failure by the contractors onsite to implement SWA may have led to
the problems that occurred during re-entry and re-plugging.  Furthermore, it was evident that none of
MDR's contractors had familiarity with dealing with DOGGR on regulatory protocols and issues and this
inexperience led to problems later such as lost well control and the blowout.

Expert Report of J. Daniel Arthur P.E., SPEC

## 4.8   DOGGR Disapproved of MDR's Re-abandonment of the RGC #10 Well

MRD failed to comply with the conditions and standards required by DOGGR in the re-plugging and
abandonment of the RGC #10 well.  Several of the required DOGGR permit conditions were not followed
by MDR and MDR was non-compliant.  Due to MDR's non-compliance with DOGGR requirements and
permit, DOGGR did not approve the reabandonment of RGC #10.  MDR nevertheless completed its
redevelopment and the re-plugged condition of the RGC #10 well will remain disapproved for the future.
The current and permanent condition of the RGC #10 is of MDR's own making.

J. Daniel Arthur, P.E., SPEC
November 22, 2022

## Glossary of Oilfield Terms

**Annulus** – The space between the wellbore walls or casing and the outside of the drill string.

**Barrel** – The standard measurement of volume in the drilling industry.  A barrel equals 42 U.S. gallons of fluid.

**Barrier (Well Control)** – A type of protection to prevent a hydrocarbon blowout.  The primary well control barrier for this drilling operation was the drilling fluid column in the well exerting sufficient hydrostatic pressure to prevent formation fluids from entering the wellbore.  The secondary well control barrier for this operation was human detection of a gas influx by workers on the rig floor, and subsequent human-activated closure of the TIW or FOSV to be found on the rig floor and closure of the blowout preventer.

**Blind Rams** – Part of the blowout preventer stack.  Two rams close to seal the well when no drill pipe is in the well.

**Blowout** – The uncontrolled release of gas, oil, or other well fluids from a well.

**Blowout Preventer (BOP)** – A stack of devices installed at the wellhead (blind rams, pipe rams, and annular preventer) to prevent or stop the escape of fluid from the well.

**Bridged off** – The accumulation or buildup of material, such as sand, fill, or scale, within a wellbore, to the extent that the flow of fluids or passage of tools or downhole equipment is severely obstructed.

**Calculated Fill Tripping Method** –The Calculated Fill tripping method involves stopping all mud flow from the well by closing the flow line isolation valve with the pressure-containing rotating head installed.  A calculated volume of mud was periodically pumped into the well with the intent to replace the calculated volume of the drill pipe removed by turning on and off the trip tank pumps.

**Casing** – Large-diameter steel pipe inserted into a wellbore and cemented into place. Casing protects weak formations from potentially damaging pressures produced by the drilling mud.

**Circulation/Circulating/ Circulated Hole -** Establishing flow down the tubing or drill pipe and up the annulus.  Reverse circulating involves injecting down the annulus and up the drill pipe.

**Continuous Fill Tripping Method** – Common tripping method used in overbalanced tripping operations.  Mud is pumped continuously from the trip tank into the well and excess return flow is routed through the open flow line and back to the trip tank.

**Displacement Volume** – The equivalent volume of liquid occupied by a solid object.

**Drill Bit** – Equipment on the bottom of a drill string used to cut through rock to drill a well.

**Drill Pipe** – Piping through which mud is pumped during drilling operations.  The piping is rotated while drilling to rotate the drill bit, allowing the drill bit to cut through rock.

**Drill String** – The length of drill pipe used to lower and rotate the drill bit to drill the well. Mud is pumped down through the drill string and up through the annulus during drilling and circulating operations.

**Equivalent Circulating Density (ECD)** – The equivalent heavier mud density of a static fluid that would exert the same pressure of a circulating fluid in the wellbore.

**Flow Check** – An operation performed to identify if formation fluids have entered the well.  The drilling crew halts all operations to monitor if mud flows from the well when no mud is pumped into the well.  Observed flow during a flow check could be an indication of formation fluid in the well.

Expert Report of J. Daniel Arthur P.E., SPEC

**Flow Line** – The piping through which mud coming out of the top of the wellbore is routed to mud-treating equipment.  The flow line is an inclined, gravity-flow pipe.  The Patterson Rig 219 flow line was equipped with a sensor that indicated the quantity of flow (as a percentage) flowing through the flow line.  The flow sensor was on the flow line downstream of the orbit valve.

**Formation** – A distinctive geological layer of rock.

**Formation Pressure** – The pressure of fluids (e.g., natural gas, oil, or water) within a geological formation.  Also called "pore pressure."

**Gas Shows** – Any indication of gas in the drilling fluid or cuttings that indicates gas production from a reservoir that has been drilled.

**Hydrostatic Pressure** – The pressure produced by the column of fluid in the wellbore.  Hydrostatic pressure is a function of the density and height of the fluid.

**Influx** – The uncontrolled flow of formation fluid (natural gas, oil, or water) into the wellbore from the formation.  Also called a "kick."

**Kick** – The uncontrolled flow of formation fluid (natural gas, oil, or water) into the wellbore from the formation.  Also called an "influx."

**Lost Circulation Material (LCM)** – Material used during mud losses into a formation to plug areas in the wellbore wall where mud flows from the well into the formation.

**Milling** – Removing a blockage, fish, or casing wall by drilling with a metal-cutting device to gain access to the area beyond.

**Mud** – Drilling fluid pumped down the drill string and up through the annulus during drilling operations.  Mud can be oil or water based.

**Overbalanced Drilling** – Conventional drilling operation in which the hydrostatic pressure of the drilling fluid is maintained above the formation pressure to prevent formation fluids from entering the wellbore.

**Pipe Rams** – Part of the blowout preventer stack.  Two steel rams with a half-circle hole on the edge meet inside the well to seal around drill pipe.

**Pore Pressure** – The pressure of fluids (e.g., natural gas, oil, or water) within a geological formation.  Also called "formation pressure."

**Ram** – A closing component of the blowout preventer stack.

**Reaming** – Enlarging a hole or a window through the casing.

**Rig Floor** – The elevated platform on which the rig crew conducts drilling operations.

**Rotating Head (Rotating Control Device)** – A rotating pressure-sealing device that seals around the drill string and is designed to hold wellbore pressure.  The rotating head installed on Rig 219 could hold up to 650 psi at static conditions.

**Shot off** – In the context of pipe recovery, shot off is separating a pipe string with an explosive cutter.

**Slug** – A dense volume of mud pumped into the drill pipe.  Its hydrostatic pressure is used to push mud downward and out of the bottom of a drill string.  Because of its higher density, it results in the fluid level in the drill pipe being some distance below the surface, facilitating "tripping" the pipe from the well.  The slug allows drill pipe being removed during a "tripping" operation to be empty of mud (pulled "dry").  When, instead, the drill pipe segments removed from a drill string contain mud (pulled "wet"), the mud from the removed drill pipe segment empties out when the segment is disconnected from the drill string.  In wet tripping operations (mud is inside the drill

Expert Report of J. Daniel Arthur P.E., SPEC

string), rigs often use a "mud bucket," which surrounds the drill string to collect mud from removed drill pipe segments for re-use. Wet tripping is slow and unpleasant work.

**Surface Breach** – Uncontrolled flow of pressurized gas and fluids escaping from the ground outside the wellbore.

**SWA** – Stop Work Authority.

**Swabbing** – Reduction in pressure in a wellbore while removing pipe from the well, usually due to fluid friction between the mud and the upward-moving drill string. The reduction in pressure could cause the well to become underbalanced and allow formation fluids to enter the wellbore.

**Thief Zone** – A high permeability streak that serve as a loss site for wellbore fluids.

**Tripping** – The act of removing or inserting drill pipe from or into a well. For example, drill pipe could be tripped out to change the drill bit.

**Tubing Work String** – A smaller diameter steel pipe used for plugging operations to cement

through or to drill out existing cement plugs. Mud is pumped down through the tubing workstring string and up through the annulus during drill out and circulating operations.

**Underbalanced** – When a wellbore pressure (produced by mud density, mud level, circulating pressure, and including the effects of any gas in the annulus) is less than an adjacent formation pressure.

**Underbalanced Operations (UBO)** – Drilling operations in which the wellbore pressure is intentionally kept below the formation pressure so that formation fluids are brought to the surface.

**Vacuum** – A condition created by a falling fluid level in the wellbore causing a negative pressure (suction effect) relative to the atmosphere.

**Well** – The hole drilled by the drill bit to reach the oil or gas reservoir. "Well" and "wellbore" are used interchangeably in this report.

November 2022

615

Expert Report of J. Daniel Arthur P.E., SPEC

# APPENDICES

**APPENDIX A:  Curriculum Vitae, J. Daniel Arthur, P.E. SPEC**



# J. Daniel Arthur, P.E., SPEC
**President, Petroleum Engineer, Program Manager**



## Education

B.S., Petroleum Engineering, University of Missouri-Rolla

## Professional Registrations

- *Professional Engineer*: Alabama, Arkansas, Arizona, California, Colorado, Florida, Idaho, Indiana, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, New Jersey, Nebraska, New York, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

- *Society of Petroleum Engineers (International Professional Petroleum Engineering Registration)*: SPE Petroleum Engineer Certification (SPEC)

- *Certified Senior Project Manager*

- *Registered Water Well Driller via ALL Consulting, LLC (Pennsylvania, USA)*

- *Testifying and/or Consulting Expert in the following areas: Engineering & Engineering Design (various), Design-Build construction projects (various) – including planning/cost estimating/project bidding, Standard Contracts (e.g., NSPE, etc.), Engineering/Construction Standard of Care, Oil & Gas Field Operations (including standard of care, production operations, production forecasting, well plugging & site restoration, etc.), Well Plugging & Abandonment, Various issues related to pipelines (various types of pipelines), drilling & completion planning, Emergency Response (e.g., well control issues, etc.), Hydraulic Fracturing (including well completion design/evaluation, Frac Hits [and drilling hits, trespass, etc.], injuries, safety processes, etc.), Water Treatment/Supply Systems (various), Impoundments/Reservoirs (various), Underground Injection (various aspects related to Class I-VI Injection Wells), Aquifer Exemptions, Well & Cavern Integrity, Stray Gas/Gas Migration, Well Plugging and Valuation, Groundwater, Induced Seismicity, Alleged Impacts Associated with Hydraulic Fracturing, Well Interference, Spill/Release investigations (e.g., brine, condensate, NGLs, Oil, etc.), Contamination/Remediation (spills, releases, streams, and other various), Produced Water Treatment, Produced Water Pits & Impoundments, Pit Design and Closure, Salt Solution Mining (e.g., Cavern Stability & Integrity, Well Integrity, Gas Storage, etc.), Well Spacing, Unitization, Paying Well Determinations, Well Valuation, Well Plugging, Fast Tract Design/Build Projects, BOP Installation/Safety, Various Safety Engineering (e.g., Pipeline Pigging Safety, Flash Fires,*

J. Daniel Arthur, P.E.

> *Static Electricity as a Source to Flash Fires, Proper Grounding of Equipment, etc.), Standard*
> *of Care/Standard Practices (e.g., regarding insurance coverage, contracts, etc.), Class I-VI*
> *injection well issues & permitting.*

## Distinguishing Qualifications

Mr. Arthur is a registered professional petroleum engineer specializing in fossil energy, planning/engineering, oil & gas operations and production forecasting, the entire lifecycle of water (including water used in hydraulic fracturing, produced water treatment, water & waste disposal, etc.), underground injection & gas storage, resource development best practices, clean energy development, CCUS (Carbon Capture, Utilization and Storage), stranded gas utilization, and environmental/regulatory issues.  He has more than 35 years of diverse experience that includes work in industry, government, and consulting.  Mr. Arthur is a founding member of ALL Consulting and has served as the company's President & Chief Engineer since its inception in 1999.

Prior to founding ALL Consulting, Mr. Arthur served as a Vice President of a large international consulting engineering firm and was involved with a broad array of work, including supporting the energy and other industries, various federal agencies, water and wastewater projects (municipal/industrial), environmental projects, various utility related projects, and projects related to the mining industry.  Mr. Arthur's experience also includes serving as an enforcement officer and National Expert for the U.S. Environmental Protection Agency (EPA) and a drilling and operations engineer with an independent oil producer, as well as direct work with an oilfield service company in the mid-continent.

In 2016, Mr. Arthur was appointed to serve on a Steering Committee for Natural Gas Storage for the California Council on Science and Technology (CCST).  Mr. Arthur's role on the Committee was primarily focused on well construction, integrity and testing based on his expertise, but also included overall analysis on issues such as global climate change and other issues (e.g., induced seismicity, gas markets, etc.).  In 2010, as the shale boom was heightening, Mr. Arthur was appointed to serve as a Sub-Group Leader for a National Petroleum Council (NPC) study on North American Resource Development (NARD).  His Sub-Group focused on technology that is and will be needed to address development (e.g., hydraulic fracturing, horizontal drilling, production, etc.) and environmental challenges through the year 2050.  Mr. Arthur was also appointed to a U.S. Department of Energy Federal Advisory Committee on Unconventional Resources.  Over the last 20 years, Mr. Arthur has also served as a Peer Reviewer on several research documents and reports, including studies/investigations performed by the Government Accounting Office, various Universities, and also private research groups.  And lastly, Mr. Arthur supported the U.S. Department of Energy through the Annex III Agreement between the United States and China to provide support relative to coal bed methane and shale gas development in China (including produced water recycling & disposal).

Mr. Arthur routinely serves as a testifying and/or consulting expert on a broad variety of issues that range from basic engineering to catastrophic incidents.  He has also served to advise management and legal teams on a plethora of issues in an effort to avoid litigation, reach settlements, or develop strategies for future activities.  His experience and continued level of activity on such issues has

J. Daniel Arthur, P.E.

expanded his experience on a variety of issues, while also exposing him to an array of technical and forensic approaches to assess past activities, claims, etc.  Mr. Arthur is also a member of the National Association of Forensic Engineers (NAFE) and routinely practices forensics in the project and litigation support work he has been involved in.

Mr. Arthur has managed an assortment of projects/programs, including regulatory analysis (e.g., new regulation development process, commenting/strategizing on new proposed regulations, negotiating with regulatory agencies on proposed regulations, analysis of implementation impacts, etc.); engineering design (including roads, well pads, design of various types of wells; completions/fracturing; water and wastewater systems, and oil & gas facilities (including trucking loading/unloading, fueling stations, pipelines, treatment systems, pigging stations, valves/controls, etc.); life cycle analysis and modeling; resource evaluations; energy development alternatives analysis (e.g., oil, gas, hydrogen, compressed air, coal, electric utility, etc.); feasibility analyses (including power plants, landfills, injection wells, water treatment systems, mines, oil & gas plays, etc.); remediation and construction; site closure and reclamation site decommissioning; reservoir evaluation; regulatory permitting and environmental work; geophysical well logging; development of new mechanical integrity testing methods, standards, and testing criteria; conduction and interpretation of well tests; restorative maintenance on existing wells and well sites; extensive hydrogeological and geochemical analysis of monitoring and operating data; sophisticated 2-dimensional and 3-dimensional modeling; geochemical modeling; drilling and completion operations; natural resource and environmental planning; natural resource evaluation; governmental and regulatory negotiations; restoration and remediation; environmental planning, design, and operations specific to the energy industry in environmentally sensitive areas; water management planning; alternative analysis for managing produced water; beneficial use of produced water; water treatment analysis and selection; produced water disposal alternatives; facilities engineering for wastewater handling (e.g., disposal wells, injection wells, water treatment, water recycling, water blending, etc.); feasibility & cost analysis for design, permitting, drilling/completion, and facility construction of Class I, II, III, V, & VI type injection wells throughout the U.S. and Internationally (although specific classes may not be applicable outside of the U.S.); construction oversight; contract negotiations and management; contract negotiation with wastewater treatment companies accepting produced water; data management related to water and environmental issues; property transfer environmental assessments; and data management of oil and gas producing and related injection well data and information.  He maintains experience with the technical and regulatory aspects of oil and gas and underground injection throughout North America.  He has given presentations, workshops, and training sessions to groups and organizations on an assortment of related issues and has provided his consulting expertise to hundreds of large and small clients – including several major international energy companies and government agencies.

Specific to unconventional resource development, Mr. Arthur has gained experience in all aspects of planning, development, drilling, well completion, operations, closure, pipelines, facilities, equipment, etc.  Mr. Arthur has supported the evolution of various activities through this process that have included technical issues such as water sourcing, well drilling techniques, cement design, well integrity analysis, fracturing design & analysis, well performance assessment, production

**J. Daniel Arthur, P.E.**

operations and facilities, well plugging & abandonment, site closures, and regulatory compliance. Mr. Arthur's experience covers ever major unconventional play in North America and on other continents.  Moreover, Mr. Arthur's experience also includes work with horizontal drilling and various types of completions in both conventional and unconventional reservoirs and with various types of unconventional reservoirs (e.g., shales, limestones, coal).

As a petroleum/environmental engineer and senior project manager, Mr. Arthur's experience ranges from the drilling and construction of oil- and gas-producing wells to performing site characterization and remediation of soils and groundwater at a variety of sites throughout the United States to develop/protect groundwater supply resources.  Mr. Arthur has also gained experience in evaluating large-scale resource plays, responsibility for drilling/completion and operations; conducting implication analysis of new laws and regulations, evaluating options for developing resources (based on economics, environmental impacts, water management challenges, and other factors), and conducting analysis specific to broad program development.  Mr. Arthur's experience uniquely qualifies him for dealing with the complex issues associated with projects and concerns of the energy, natural resource, and environmental industries.  Mr. Arthur is a recognized expert in the area of environmental law and regulations, as well as fossil energy, produced water, and environmental issues.  He has managed large multi-discipline projects, has completed more than 100 publications/presentations, and has been a distinguished lecturer on numerous topics.

## Professional Organizations:

Society of Petroleum Engineers
National Association of Forensic Engineers
Petroleum Historical Institute
Seismological Society of America
Dark Sky Institute
American Society of Civil Engineers
Society of Professional Well Log Analysts
American Association of Petroleum Geologists
Ground Water Protection Council
International Association of Hydrogeologists
Southeast Geological Society
Montana Geological Society
Society of American Military Engineers
The Nature Conservancy
Sierra Club
Wildlife Federation
National Ground Water Association
Various Others

**J. Daniel Arthur, P.E.**

## Recent Publications and Presentations:

J. Daniel Arthur, P.E.; Tom Tomastik, CPG; Mark Faucher; and William Green (ALL Consulting). Orphan Wells: A best Practices Approach.  Presented to the International Petroleum Environmental Conference, November 2022.

J. Daniel Arthur, P.E.; Tom Tomastik, CPG; Mark Faucher; and William Green (ALL Consulting). Planning, Evaluation, and Plugging of Orphan & Abandoned Wells.  Presented to the American Association of Petroleum Geologists, November 2022.

J. Daniel Arthur, P.E.; Tom Tomastik, CPG; Mark Faucher; and William Green (ALL Consulting). Orphan and Abandoned Wells: Overview, Considerations, and Path Forward.  Presented at the American Association of Petroleum Geologists, August 2022.

J. Daniel Arthur, P.E., SPEC (ALL Consulting).  Challenges with Induced Seismicity in the Midcontinent.  Presented at the U.S. Environmental Protection Agency's Region 8 UIC Director's Meeting, September 2021.

J. Daniel Arthur, P.E., SPEC (ALL Consulting).  Limitations of Step Rate Testing when Estimating Formation Parting Pressure.  Presented at the Ground Water Protection Council, San Antonio, Texas, February 2020.

J. Daniel Arthur, P.E., SPEC; David Alleman; Mark Faucher; Steve Tipton, P.E. (ALL Consulting). Permian & Anadarko Basin Produced Water Recycling: Keys to Success.  Presented at the Ground Water Protection Council UIC Conference, Tulsa, Oklahoma, February 2018.

J. Daniel Arthur, Tom Tomastik, and William Green (ALL Consulting).  Application of Infrared Imagery for the Identification of Leaking Historical Production and Idle Oil & Gas Wells in Ohio" presented at Petroleum History Institute Oil History Symposium, Findlay, Ohio.  July 2017.

J. Daniel Arthur and Kris Andersen (ALL Consulting). The Changing Oilfield: An Environmental Impact Perspective." Presented at the Petroleum History Symposium, Findlay, Ohio.  July 2017.

J. Daniel Arthur and Nathan Alleman (ALL Consulting).  Induced Seismic Monitoring: A Regulatory Update.  Presented at the Independent Petroleum Association of New York.  July 2017.

J. Daniel Arthur, P.E., SPEC. "Oilfield Water Injection: A Summary of Issues". Presented at the 2017 Ground Water Protection Council UIC Conference. Austin, TX. February 21-23, 2017.

Tom Tomastik and J. Daniel Arthur, P.E., SPEC (ALL Consulting).  "An Evaluation of Well Construction/Drilling/Conversion Methodologies Associated with Gas Storage Depleted Field Operations in the United States."  Presented at the Ground Water Protection Council's Annual Forum. Orlando, FL. September 11-14, 2016.

Steve Tipton, J. Daniel Arthur, P.E., SPEC, and Nate Alleman (ALL Consulting). "Innovation in the Oilfield: How Best Management Practices Have Reduced the Impacts of Shale Development." Presented at the 23nd IPEC Conference. New Orleans, LA. November 8-10, 2016.

## J. Daniel Arthur, P.E.

J. Daniel Arthur, Tom Tomastik, David Cornue, and Mark Russell (ALL Consulting). Understanding Key Aspects of Well Integrity: A Workshop Ground Water Protection Council, Annual Forum, Orlando, Florida, September 11-14, 2016.

Nate Alleman; J. Daniel Arthur, P.E., SPEC; David Alleman; Tom Tomastik; and Kris Andersen (ALL Consulting). "Underground Natural Gas Storage in the U.S.: State of Play". Presented at the 2016 GWPC Annual Forum. Orlando, FL.  September, 2016.

J. Daniel Arthur, P.E. (ALL Consulting) and Will Green, P.G. (ALL Consulting), "Well Integrity Analysis using Infrared Imaging." Presented at the GWPC Annual Forum: State Water Sustainability Planning. Orlando, Florida, September 2016.

Arthur, J.D. "Application of Well Integrity Methods for Gas Storage Wells". Presented at the U.S. DOE National Laboratories Workshop on Well Integrity for Natural Gas Storage in Depleted Reservoirs and Aquifers, Denver, Colorado, July 12-13, 2016.

J. Daniel Arthur, P.E., SPEC; Kris Andersen; Tom Tomastik; and Nathan Alleman (ALL Consulting). "A Historical Look at Underground Natural Gas Storage in America". Presented at the Petroleum History Symposium, Casper, WY. July 28-31, 2016.

David Alleman; J. Daniel Arthur, P.E., SPEC; Nathan Alleman; Tom Tomastik; and Kris Andersen (ALL Consulting). "A Look at Underground Natural Gas Storage Operation and Regulation in the United States". Presented at the 2016 IOGCC Annual business Meeting. Denver, CO.  May, 2016.

J. Daniel Arthur, Will Green P.G., Tom Tomastik and Kris Andersen, ALL Consulting, "A Proactive Approach to Addressing Annular Pressure Issues in the Utica-Point Pleasant Shale Play" Presented at the AADE Annular Gas Migration Conference, Ohio, April 28, 2016.

Arthur, J. Daniel, Tom Tomastik, David Overstreet, and Greg Casey, ALL Consulting. "Class II Disposal Well Best Management Practices Workshop." Presented at the GWPC 2016 UIC Annual Conference, Denver, Colorado, February 23-25, 2016.

Nathan Alleman; J. Daniel Arthur, P.E., SPEC; Tom Tomastik; and Kris Andersen (ALL Consulting). "A Look at Underground Natural Gas Storage Operation and Regulation in the United States". Presented at the GWPC 2016 UIC Conference. Denver, CO. February 25, 2016.

J. Daniel Arthur, Tom Tomastik, Kris Anderson, and Will Green, ALL Consulting, "A Proactive Approach to Addressing Annular Pressure Issues and Stray Gas Migration in the Unconventional Shale Plays" Presented at the GWPC 2016 UIC Annual Conference, Denver, Colorado, February 23-25, 2016.

J. Daniel Arthur (ALL Consulting). "Gas Well Integrity and Associated Gas Migration Investigations in the Marcellus Shale." Presented at the National Association of Forensic Engineers, Winter Meeting 2016, Tampa, FL, January 23, 2016.

Nate Alleman, J. Daniel Arthur, P.E., SPEC, and Mark Faucher (ALL Consulting). "Innovation in the Oilfield: How Best Management Practices Have Reduced the Impacts of Shale Development." Presented at the SPE Mid-Continent Section Luncheon. Denver, CO. January 13, 2016.

## J. Daniel Arthur, P.E.

Mark Faucher, J. Daniel Arthur, P.E., SPEC, and Nathan Alleman (ALL Consulting). "Innovation in the Oilfield: How Best Management Practices Have Reduced the Impacts of Shale Development." Presented at the Environmental Technology & Management Association (ETMA) Technical Dinner Meeting. Saudi Arabia. December 15, 2015.

Nathan Alleman, J. Daniel Arthur, P.E., SPEC, and Mark Faucher (ALL Consulting). "Innovation in the Oilfield: How Best Management Practices Have Reduced the Impacts of Shale Development." Presented at the 22nd IPEC Conference. Denver, CO. November 17-19, 2015.

Tipton, D. Steven, PE (ALL Consulting). "The Oklahoma Water Conundrum." Presented at the Ground Water Protection Council Annual Forum, September 28-30, 2015, Oklahoma City, OK.

J. Daniel Arthur, P.E., SPEC., Kris Andersen. "Spill Response in Ohio: Practical Guidance for Operators of Horizontal Oil and Gas Wells". Presented at GWPC Conference in Oklahoma City, OK. September 2015.

J. Daniel Arthur, P.E., SPEC, Thomas E. Tomastik, Greg Casey, P.E., H. William Hochheiser, David Alleman, Fernando DeLeon, Chuck Lowe (ALL Consulting). "How Things Have Changed: Class II Disposal Wells and Unconventional Oil and Natural Gas Development." Presented at GWPC Conference in Oklahoma City, OK. September 2015.

Arthur, J. Daniel (ALL Consulting). "The Necessary Transition of Best Practices for Conventional Resource Development to Modern Shale Development Worldwide." Presented at Global Shale Oil & Gas Summit – 2015 Europe. London, UK. July 9-10, 2015.

David Overstreet, J. Daniel Arthur, P.E., SPEC, and Nate Alleman (ALL Consulting). "Innovation in the Oilfield: Reducing Environmental Impacts of Shale Development through Best Management Practices." Presented at the Independent Oil and Gas Association of New York. Findley Lake, NY. July 7-9, 2015.

Arthur, J. Daniel (ALL Consulting).  "It's Not Easy Being Green: Why Does the Color of the Chemicals Matter?"  Presented at the 2015 National Science Foundation Workshop at the University of Arkansas at Little Rock, Little Rock, Arkansas, April 2015.

J. Daniel Arthur, P.E., SPEC and Kris Andersen (ALL Consulting). "Spill Response in Ohio: Practical Guidance for Operators of Horizontal Oil & Gas Wells." Presented at the American Independent Association of Professional Geologists, Columbus, Ohio, April 2015.

J. Daniel Arthur, P.E., SPEC; Kevin Shepard, P.E.; and Blake Arthur, P.E. (ALL Consulting).  "Ohio Horizontal Well Sites: Past History and Future Regulations." Presented at the American Independent Association of Professional Geologists, Columbus, Ohio. April 2015.

Tomastik, Tom and Arthur, J. Daniel (ALL Consulting).  "Class II Saltwater Disposal Wells in Ohio: Understanding the Avenue to Success."  Presented at the American Independent Association of Professional Geologists, Columbus, Ohio. April 2015.

Tomastik, T. and J. Daniel Arthur, ALL Consulting, "A Proactive Approach to Induced Seismicity: Can the Oil and Gas Industry Manage Induced Seismicity and Work in Cooperation with the

**J. Daniel Arthur, P.E.**

Regulatory Agencies?" Presented at the GWPC 2015 UIC Conference, Austin, Texas, February 9-11, 2015.

Tomastik, Tom and Arthur, J. Daniel (ALL Consulting).  "A Proactive Approach to Induced Seismicity: Can the Oil & Gas Industry Manage Induced Seismicity and Work in Cooperation with the Regulatory Agencies?"  Presented at the Ohio Oil & Gas Association Oilfield EXPO and Technical Conference, December 2014.

J. Daniel Arthur, P.E., SPEC., Bill Hochheiser, "Water Use Analysis for Shale Development in the United States".  Presented at the 21st Annual IPEC Conference, Houston, TX. October 14-16, 2014.

J. Daniel Arthur, Tom Tomastik, Doug Louis, and Fernando DeLeon, ALL Consulting. "Disposal Wells and Shale Resource Development: A National Perspective." Presented at the GWPC Annual Meeting, Seattle, WA, October, 5-8, 2014.

Arthur, J.D., Casey, Greg, Bruce Jankura, and Tom Tomastik (ALL Consulting). "Summary of Recent Advances in Well Integrity Analysis for Wellbore Gas Intrusion".  Presented at the Ground Water Protection Council's Annual Meeting, Seattle, Washington. October 5-8, 2014.

Arthur, J.D. (ALL Consulting), Casey, G. (ALL Consulting), and Zampogna, D. (ALL Consulting).  "Engineering Best Practices for Well-Site Environmental Protection".  Presented at the American Society of Civil Engineers' Shale Energy Engineering Conference, Pittsburgh, PA. July 20-23, 2014.

J. Daniel Arthur, P.E., SPEC., Bill Hochheiser, Roy Arthur "Analysis of U.S. Hydraulic Fracturing Chemical Disclosure Data from FracFocus."  Presented at Hydraulic Fracturing in Western Canada – an Environmental Perspective. May 29, 2014.

Arthur, J.D. (ALL Consulting), Hagemeier, P. (ALL Consulting), and Overstreet, D. (K&L Gates). "Oil & Gas Development and Environmental Protection".  Presented at the Ground Water Protection Council's Annual UIC Conference, New Orleans, Louisiana. January 22, 2014.

Arthur, J. Daniel and David Alleman (ALL Consulting). "Innovative Strategies for Management of Water in Unconventional Resource Projects." Presented at the 33rd Annual Governor's Water Conference, 10th Annual OWRRI Water Research Symposium, Tulsa, Oklahoma, November 13-14, 2013.

## Short Courses Completed:

Environmental Protection for Oil & Gas Development Activities
Engineering Ethics
Various State & Other Courses required for Engineering Licensure
Well Pad Design (ALL Consulting)
Well Integrity and Gas Migration Investigations (GWPC/ALL)
ALL Consulting Annual Technical Training Seminar (2021, 2019, 2018, 2017, 2016, 2015, 2014, 2013, 2012, 2011, 2010)
Safe Lands

**J. Daniel Arthur, P.E.**

H2S Safety (various courses)
Temperature, Noise, and Radioactive Tracer Logging, Exxon/Robert S. Kerr Lab
Successful Project Management, CH2M HILL
Successful Project Execution, CH2M HILL
Fundamentals of Cementing, Halliburton Services
Petroleum Engineering as related to Underground Injection Control, Richland College, TX
Ground Water Monitoring, Engineering Enterprises
Well Casings and Tubulars, NL Industries
Expert Witness Short Course, NWWA
Reservoir Pressure Transient Testing, Society of Pet. Engineers
Cased Hole Logging, Schlumberger Well Services
Open Hole Well Logging, Welex
Advanced Open Hole Well Logging, Welex
Class V Injection Wells, Engineering Enterprises
Mechanical Integrity Testing, Engineering Enterprises
Simulation of Hazardous Waste Injection, Scientific Software
UIC Enforcement Training, USEPA - Headquarters
Environmental Risk Analysis, USEPA - Region V
Hazardous Waste Safety Training, HST
Hazardous Waste Safety Training For Managers, HST
Professional Liability, CH2M HILL
Speaking with Others, CH2M HILL
Various Computer Short Courses, Various
First Aid and CPR, Red Cross

Expert Report of J. Daniel Arthur P.E., SPEC

**Appendix B:  List of Recent Expert Testimony**

## J. Daniel Arthur, P.E., SPEC

Listing of Cases (Generally Limited to those where an Expert Report (or written technical analysis) was Prepared or Testimony was given (or is scheduled)).  Cases where Mr. Arthur has been retained, but that have not yet required the preparation of an expert report, written technical analysis, Deposition, or trial testimony are not listed.  The list below does NOT include all testimony given at State Oil & Gas related Hearings.

2018-Present (November 2022)

1. **MDR Hotels, LLC, v. Marathon Oil Company, et al., Case No. 2:20-cv-08008 (C.D. Cal.)**
2. **Double D Ranch of Woodward, Inc., v. DCP Midstream, LLC, et al., Case No. CJ-2020-73 (2021-Present)**
3. **Commonwealth of Pennsylvania, Department of Environmental Protection, and Pennsylvania General Energy Company, L.L.C. vs. Grand Township of Indiana County and The Grand Township Supervisors, Case No. 126, M.D., 2017 (2021-2022)**
4. **Securities and Exchange Commission (SEC) Support in the Investigation of Heartland Production**
5. **Wildhorse Interest, LLC (2021)**
6. **Kinder Morgan Liquids Terminal LLC and Kinder Morgan, Inc. v. David James Manning Trucking (2021)**
7. **Robert Hordis and Hordis Family v. Cabot Oil & Gas (2021).**
8. **Layne Christensen (2020-Present)**
9. **Powell-Murphy, et al v Racer Trust, et al (2021)**
10. **Red Rocks Resources LLC v. Camino Natural Resources, LLC (2021-Present)**
11. **Peoples Gas (2021-Present)**
12. **Howard-Estruct, LLC v. Rural Water District No. 3 Washington County, Oklahoma (2019-2022)**
13. **New Dominion (2015-Present)**
14. **Veolia v. Antero Resources (2019-2022)**
15. **Vista Disposal (2019-2021)**
16. **Kinsale Insurance Company v. ETOPSI Oil & Gas dba East Texas Oilfield Productions SVC, INC and McBride Operating, LLC (2020-2021).**  Civil Action No. 6:19-cv-00413-JCB
17. **Phyllis Okland v. Enduro Operating, LLC, et al. (2018-2020).** Claim No. Z01287908
18. **Blackbuck Resources (2019-2020)**
19. **James Binkley, et al vs. White Star Petroleum, LLC, et al. (2018-2019).** Case Number CJ-2017-44

**Additional Cases**

Mr. Arthur has and continues to serve as a testifying or consulting expert on multiple cases for both Defendants and Plaintiffs.  However, these other cases have either not yet developed to the point of requiring an expert report/deposition/testimony or did not develop to the point of requiring an expert report, deposition, or testimony.

Expert Report of J. Daniel Arthur P.E., SPEC

**APPENDIX C:  List of Information Considered for Analysis**

Expert Report of J. Daniel Arthur P.E., SPEC

# Information Considered for Analysis

1) Deposition of Aaron G. Scheet (Wild Well Control) dated February 11, 2022.

2) Deposition of Val Lerma (InterAct PMTI) dated March 29, 2022.

3) Deposition of Brun Hilbert (Exponent, Inc.) dated February 1, 2022.

4) Deposition of Chris Conahan (Methane Specialists) dated February 24, 2022.

5) Deposition of Christopher Phillips (CalGEM) dated December 17, 2021.

6) Deposition of Christopher Phillips (CalGEM) dated January 18, 2022.

7) Deposition of Phillip Gibicar (CalGEM) dated May 17, 2022.

8) Deposition of Michel Vasconcellos (CalGEM) dated February 14, 2022.

9) Deposition of William Pangelinan (La Jolla Pacific Development Group) dated April 14, 2022.

10) Deposition of Randy Moskal (California Well Services) dated February 9, 2022.

11) Deposition Exhibit 4:  CalGEM RGC #10 Well File (87 pages No Bates Numbers).

12) Deposition Exhibit 9:  2017 and 2018 Emails Between Dave Bell and Chris McCullough (CALGEM00011956-76).

13) Deposition Exhibit 10:  2017 and 2018 Emails (MDR0182931-42).

14) Deposition Exhibit 16:  February 26, 2018, Letter (MDR0003708-12).

15) Deposition Exhibit 17:  Re-Abandonment Program from InterAct dated April 27, 2018 (MDR0003713-16).

16) Deposition Exhibit 24:  Permit (MDR0001272-300).

17) Deposition Exhibit 53:  A Document from SubSurface Surveys & Associates, Inc. dated May 3, 2008, to Methane Specialists (MDR0350429-33).

18) Deposition Exhibit 112:  Exponent Root Cause Analysis of the DOW RGC 10 Well Blowouts (MDR0003857-4066).

19) Deposition Exhibit 224:  Project Memo 1 dated 23 Jan 2019 (MDR0059643-49).

20) Deposition Exhibit 265:  A Document from SubSurface Surveys & Associates, Inc. dated April 2, 2017, to Methane Specialists (BEAZ00000150-B54).

21) Deposition Exhibit 316:  Fax with Attachment "Methane Site Assessment Report".

22) Deposition Exhibit 321:  Field Inspection Report (METHANE00000852-53).

23) Deposition Exhibit 322:  October 31, 2017, Letter (METHANE00000283).

24) Deposition Exhibit 328:  Document Entitled "Phase I Environmental Assessment Report Parcel 9-U" (LEIGHTON00000291-627).

25) Deposition Exhibit 329:  Excerpt of a March 2008 Draft Environmental Impact Report (LACDBH0021218-53).

26) Deposition Exhibit 331:  Document Titled "Proposed Hotel Building with One Subterranean Parking Level, Methane Gas Control System" (MDR0244177-92).

27) Deposition Exhibit 332:  Methane Specialists Map (CALGEM00005076).

28) Deposition Exhibit 337:  Document Entitled "Master Consulting Services Agreement" (MDR0008317-22).

29) Deposition Exhibit 339:  Permit Approval (MDR0001272-300).

30) Deposition Exhibit 348:  As-Built Plan (MDR0239411-30).

31) Deposition Exhibit 351:  Exponent Root Cause Analysis (EXP000000948-1018).

32) Deposition Exhibit 354:  Document Titled "Exhibit Well Location" (METHANE00000276).

C-1

Expert Report of J. Daniel Arthur P.E., SPEC

33) Deposition Exhibit 376:  Summary of Telecom and Resulting Action Plan for DOW RGC 10 Well dated 1/1/19 (MDR0021470-82).

34) Deposition Exhibit 383:  Daily Report Summary DOW RGC #10 Re-Abandonment (INTERACT001729-33).

35) Deposition Exhibit 406:  Financing Request dated 6/17/14 (LACBDH0013437-45).

36) Deposition Exhibit 409:  Email dated 2/3/12 (MDR0219634-35).

37) Deposition Exhibit 417:  Email dated 10/10/12 (PANGEL00032898).

38) Deposition Exhibit 418:  Compilation of Documents (PANGEL00032899-936).

39) Deposition Exhibit 437:  Summary of Terms for Lease Option dated 12/23/13 (PANGEL00042980-P3011).

40) Deposition Exhibit 449:  Email Chain dated 12/20/2018 through 4/12/2019 (MDR0131150-55).

41) DOW RGC 10 Well Recommendations dated February 14, 2019 (MDR0063000-06).

42) California Division of Oil and Gas, Special Report on Operations Witnessed, prepared by G.L. Graham on April 15, 1956, (MDR0083187).

43) Glen B. Gariepy, Review Recreation Gun Club Lease, Ohio Oil Company I-LA-51-5 unpublished report (1951) (MAR00015811-19).

44) C.L. Kistner, Evaluation of Ohio Leases Playa Del Rey Field, Los Angeles Division, Ohio Oil Company I-LA-51-5, unpublished Intracompany Correspondence (1955) (MAR00015861-87).

45) Marina del Rey Historical Society, Early Aerial Photos (2016), https://www.marinadelreyhistoricalsociety.org/photos-early-aerials/ (last visited Sep 22, 2022).

46) Marina del Ray Historical Society, Marina del Rey History - Los Angeles County, California, http://file.lacounty.gov/SDSInter/dbh/docs/149901_MDRHistory.pdf (last visited Oct 5, 2022).

47) Shannon & Wilson, Inc., Geotechnical Design Report, Marina del Ray Marriot Courtyard and Residence Inn Hotels, Marina del Ray, California (2016) (MDR0264046-MDR0264157).

48) Well file packages downloaded from CalGEM on December 2, 2021, through October 20, 2022, for American Petroleum Institute (API) numbers:

| | | | | | |
|---|---|---|---|---|---|
| 1. | 037-13798 | 19. | 037-13385 | 37. | 037-13790 |
| 2. | 037-13805 | 20. | 037-13386 | 38. | 037-13837 |
| 3. | 037-13806 | 21. | 037-13751 | 39. | 037-13839 |
| 4. | 037-13807 | 22. | 037-13752 | 40. | 037-13840 |
| 5. | 037-13808 | 23. | 037-13754 | 41. | 037-13842 |
| 6. | 037-13809 | 24. | 037-13755 | 42. | 037-13845 |
| 7. | 037-13810 | 25. | 037-13756 | 43. | 037-13951 |
| 8. | 037-13797 | 26. | 037-13757 | 44. | 037-13954 |
| 9. | 037-13811 | 27. | 037-13758 | 45. | 037-13960 |
| 10. | 037-13812 | 28. | 037-13759 | 46. | 037-13963 |
| 11. | 037-13813 | 29. | 037-13763 | 47. | 037-13964 |
| 12. | 037-13814 | 30. | 037-13764 | 48. | 037-13989 |
| 13. | 037-13815 | 31. | 037-13767 | 49. | 037-13990 |
| 14. | 037-13816 | 32. | 037-13771 | 50. | 037-13992 |
| 15. | 037-13817 | 33. | 037-13774 | 51. | 037-14091 |
| 16. | 037-13818 | 34. | 037-13776 | 52. | 037-14092 |
| 17. | 037-13819 | 35. | 037-13780 | 53. | 037-14096 |
| 18. | 037-13820 | 36. | 037-13781 | 54. | 037-14200 |

C-2

Expert Report of J. Daniel Arthur P.E., SPEC

| | | | | | | |
|---|---|---|---|---|---|
| 55. | 037-14203 | 64. | 037-14221 | 73. | 037-14242 |
| 56. | 037-14212 | 65. | 037-14222 | 74. | 037-14249 |
| 57. | 037-14213 | 66. | 037-14223 | 75. | 037-14326 |
| 58. | 037-14214 | 67. | 037-14227 | 76. | 037-14332 |
| 59. | 037-14216 | 68. | 037-14232 | 77. | 037-14336 |
| 60. | 037-14217 | 69. | 037-14233 | 78. | 037-14349 |
| 61. | 037-14218 | 70. | 037-14234 | 79. | 037-14350 |
| 62. | 037-14219 | 71. | 037-14235 | | |
| 63. | 037-14220 | 72. | 037-14240 | | |

C-3

Expert Report of J. Daniel Arthur P.E., SPEC

**Appendix D:  R.G.C. #10 - Historical Well Records**

1 | DEPARTMENT OF CONSERVATION
Division of Oil, Gas, and Geothermal Resources
2 | 801 K Street, MS 24-03 (Legal Office)
Sacramento, California 95814-3530
3 | Telephone (916) 323-6733
Facsimile (916) 445-9916
4

5

6

7

# STATE OF CALIFORNIA

8

# NATURAL RESOURCES AGENCY

9

# DEPARTMENT OF CONSERVATION

10

# DIVISION OF OIL, GAS, AND GEOTHERMAL RESOURCES

11

12

13

## EMERGENCY ORDER TO

14

## PERFORM REMEDIAL WORK

15

16

17

### NO. 1143

18

**Dated:  January 18, 2019**

19

**Operator:  MDR Hotels, LLC.**

20

**Field:  Playa Del Rey**

21

**Well:  DOW R.G.C. 10 (API 0403713798)**

22

23

24

**BY**

25

**Kenneth A. Harris, Jr.**

26

**STATE OIL AND GAS SUPERVISOR**

27

28

1

## I.     Introduction

On the afternoon of January 11, 2019, well DOW R.G.C. 10 in Marina del Rey released fluids and gas.  Despite the use of blow-out prevention equipment, an uncontrolled release of fluids, including gas, occurred spraying about 60 feet into the air.

DOW R.G.C. 10 was first drilled in 1931.  It has not been used for production since it was plugged with cement in the 1950s.  When the uncontrolled release occurred, the well was being brought into compliance with current standards for unused wells, a process called "re-abandonment" of the well.  The operator was re-abandoning the well as part of a commercial construction project in a populated section of Marina del Rey.

The uncontrolled release suggests that the well's pressure is higher than the Operator expected and causes the Division of Oil, Gas, and Geothermal Resources (Division) to question the structural integrity of the well.  Immediate action is necessary to secure the well site and stabilize the well to prevent another uncontrolled release.  The well is in a dense urban area on the coast and any such release threatens damage to life, health, property, and natural resources. The well must also be tested and evaluated.  The entire well must be plugged and abandoned to current standards which will require sealing any conduit for pressurized fluids, including gas. The Operator must monitor air quality to protect public health and safety.

The State Oil and Gas Supervisor (Supervisor) has determined that an emergency exists, and that this order is necessary to prevent damage to life, health, property, and natural resources.

## II.     Factual and Procedural Summary

At all times relevant to this Order, MDR Hotels, LLC (Operator) was the "Operator," as defined in PRC section 3009, of the herein identified "well," as defined in PRC section 3008, subdivision (a), located in the Playa Del Rey Field, and was conducting "operations" as defined in Regulations section 1720, subdivision (f).

On or about June 5, 2018, the Operator received approval to re-abandon DOW R.G.C. 10. As part of its permit to re-abandon the well, the Operator was required to install and maintain blowout prevention equipment as defined by the Division's publication No. MO7.

///

2

On or about January 11, 2019, during well-abandonment activities, pressure built up within the well casing which caused an uncontrolled release of fluid, including gas, from the well thereby causing the Division to question the structural integrity of the well.  The well must now be properly plugged and abandoned which includes the sealing of any conduit for pressurized gas to escape.

From January 11 through January 16, 2019, Division staff maintained 24-hour supervision of DOW R.G.C. 10, coordinated with state and local emergency responders, and instructed the Operator in regaining well control and planning to protect life, health, property, and natural resources.  The Operator's proposals for maintaining well control and proceeding with re-abandonment were determined to be insufficient to protect life, health, property, and natural resources. Because of the serious concerns about the structural integrity of the well and the sensitive location of the well, efforts to secure the site and properly plug and abandon the well must be undertaken without delay.

Acting through the State Oil and Gas Supervisor, and under the authority of the Public Resources Code (PRC) and California Code of Regulations, title 14 (Regulations), the California Department of Conservation, Division of Oil, Gas, and Geothermal Resources may determine that an emergency exists in connection with oilfield operations.  In so determining, the Division may issue an order that directs the Operator to take any actions that the Supervisor deems necessary to protect life, health, property, or natural resources.  (PRC, §§ 3013, 3106, 3224, 3226.)

For the reasons described in this Order, including the likely loss of the structural integrity of the well, the Supervisor determined that an emergency exists which poses an immediate danger to life, health, property, or natural resources.  Therefore, according to PRC sections 3013, 3106, 3208.1, 3224, and 3226, and Regulations section 1722.5, among others, and as set forth below in Section VI and VII, the Supervisor is requiring the Operator to immediately and properly plug and abandon Well Dow R.G.C. 10 (API 0403713798) and all associated casing by sealing off any conduit for pressurized gas to escape and in a manner consistent with PRC sections 3208, 3219 and 3220.

3

1    The Supervisor further orders that the Operator prepare a report detailing the causal

2  factors that contributed to the uncontrolled release of fluids, including gas (Root Cause Analysis

3  Report) which occurred on or about January 11, 2019, during the well reabandonment effort.

4  The Supervisor is required to supervise the drilling, operation, maintenance, and abandonment

5  of wells to prevent, as far as possible, damage to life, health, property, and natural resources

6  pursuant to PRC section 3106.  The Operator and Supervisor must understand the causal factors

7  associated with the uncontrolled release to confirm the necessary steps to effectively remediate

8  the well and protect the public.

9                        **III.    Definitions**

10    The following definitions apply to the terms used in this Order:

11    **PRC section 3008, subdivision (a)** defines "Well" to mean, among other things, "any

12  well on lands producing or reasonably presumed to contain oil or gas[.]"

13    **PRC section 3009** defines "Operator" to mean "a person who, by virtue of ownership, or

14  under the authority of a lease or any other agreement, has the right to drill, operate, maintain, or

15  control a well or production facility."

16    **Regulations section 1720, subdivision (f)**, defines "Operations" to mean "any one or all

17  of the activities of an Operator covered by Division 3 of the Public Resources Code [i.e., the oil

18  and gas law, commencing with PRC section 3000]."

19                        **IV.    Statutory and Related Authority**

20    **PRC section 3013** states that the oil and gas law (Division 3 of the PRC, commencing

21  with section 3000) "shall be liberally construed to meet its purposes" and grants the Supervisor

22  "all powers" that may be necessary to carry out those purposes.

23    **PRC section 3106, subdivision (a),** authorizes the Supervisor to "supervise the drilling,

24  operation, maintenance, and abandonment of wells and the operation, maintenance, and removal

25  or abandonment of tanks and facilities attendant to oil and gas production … so as to prevent, as

26  far as possible, damage to life, health, property, and natural resources[.]"

27    **PRC section 3208** states that a well is properly abandoned when it has been shown, to

28  the satisfaction of the Supervisor, that all proper steps have been taken to isolate all oil-bearing

4

1  or gas-bearing strata encountered in the well, and to protect underground or surface water

2  suitable for irrigation or farm or domestic purposes from the infiltration or addition of any

3  detrimental substance and to prevent subsequent damage to life, health, property, and other

4  resources. For purposes of this subdivision, proper steps include the plugging of the well,

5  decommissioning the attendant production facilities of the well, or both, if determined necessary

6  by the Supervisor.

7       **PRC section 3208.1** authorizes the Supervisor to order the reabandonment of any

8  previously abandoned well if the Supervisor or the district deputy has reason the question the

9  previous abandonment.

10      **PRC section 3219** states that "any person engaged in operating any oil or gas well

11  wherein high pressure gas is known to exist, and any person drilling for oil or gas in any district

12  where the pressure of oil or gas is unknown shall equip the well with casings of sufficient

13  strength, and with such other safety devices as may be necessary, in accordance with methods

14  approved by the Supervisor, and shall use every effort and endeavor effectually to prevent

15  blowouts, explosions, and fires."

16      **PRC section 3220** states that "[t]he owner or Operator of any well on lands producing or

17  reasonably presumed to contain oil or gas shall properly case it with water-tight and adequate

18  casing, in accordance with methods approved by the Supervisor or the district deputy, and shall,

19  under his direction, shut off all water overlying and underlying oil-bearing or gas-bearing strata

20  and prevent any water from penetrating such strata. The owner or Operator shall also use every

21  effort and endeavor to prevent damage to life, health, property, and natural resources; to shut out

22  detrimental substances from strata containing water suitable for irrigation or domestic purposes

23  and from surface water suitable for such purposes; and to prevent the infiltration of detrimental

24  substances into such strata and into such surface water."

25      **PRC section 3222** provides: "The owner or Operator of any well shall, at the request of

26  the Supervisor, demonstrate that water from any well is not penetrating oil-bearing or gas-

27  bearing strata or that detrimental substances are not infiltrating into underground or surface

28  water suitable for irrigation or domestic purposes. The owner or Operator shall give the district

5

1  deputy adequate notice of the time at which he will demonstrate the test for shutoff in the well."

2  **PRC section 3224** requires the Supervisor to "order such tests or remedial work as in his

3  judgment are necessary to prevent damage to life, health, property, and natural resources[.]"

4  **PRC section 3226** states: "[I]f the Supervisor determines that an emergency exists, the

5  Supervisor may order or undertake the actions he or she deems necessary to protect life, health,

6  property, or natural resources."

7  **PRC section 3357** authorizes the Supervisor with authority to require technical or

8  monitoring reports.

9  **Regulations section 1722, subdivision (a)**, requires Operator to conduct all operations

10  "in accordance with good oilfield practice."

11  **Regulations section 1722.5** states that "[b]lowout prevention and related well control

12  equipment shall be installed, tested, used, and maintained in a manner necessary to prevent an

13  uncontrolled flow of fluid from a well. Division of Oil, Gas, and Geothermal Resources

14  publication No. MO 7, "Blowout Prevention in California," shall be used by Division personnel

15  as a guide in establishing the blowout prevention equipment requirements specified in the

16  Division's approval of proposed operations."

17  **Regulations section 1723** provides general requirements which apply to plugging and

18  abandoning wells.

19  **Regulations section 1723.1** applies to plugging of Oil or Gas Zones.

20  **V.     Alleged Acts/Omissions**

21  Upon information and belief, Operator experienced serious well control issues which led

22  to a degradation of the well's mechanical integrity resulting in a loss of well control and an

23  uncontrolled release of fluid, including gas, on or about January 11, 2019. Operator's

24  subsequent actions to the uncontrolled release of January 11, 2019, have not been consistent

25  with the actions required to properly control the well and protect life, health, property, and

26  natural resources.

27  ///

28  ///

6

*EMERGENCY ORDER TO PERFORM REMEDIAL WORK NO. 1143*

# VI.  Operator's Required Actions (Emergency)

Based on information and belief arising from the above referenced facts, and in accord with the legal authorities described in this Order, the Supervisor has determined that an emergency exists and immediate action is necessary to protect life, health, property, or natural resources.  Therefore, **IT IS HEREBY ORDERED**, pursuant to PRC sections 3013, 3106, 3222, 3224, and 3226, and Regulations section 1722.5, among others, that Operator shall perform the work and acts identified below:

1. **Immediately initiate and maintain continuous ("24/7") well control operations until the anomalous gas zone(s) that contributed to the January 11, 2019 event (described above) are permanently isolated from the wellbore.**

2. **If not already completed, within twelve hours, establish a safety perimeter to limit public access to the well site and surrounding area. The safety perimeter shall be sufficient to prevent public persons from exposure to hazards associated with well control and plugging and abandonment operations.**

3. **If not already completed, within twelve hours, begin monitoring and recording of well pressure, and report well pressure to the Division daily.  Monitoring and recording shall be done continuously.**

4. **If not already completed, within twelve hours, acquire adequate blowout prevention equipment and achieve well control to protect natural resources and public health and safety until the well is properly plugged and abandoned.**

5. **If not already completed, within twelve hours, and every twelve hours thereafter, conduct inspections of the well site, construction site, harbor, and surrounding area for signs of gas or other fluids surfacing.  Inspections should include thermal imaging and/or other technologies designed to detect methane gas emissions. Utilize air monitoring equipment capable of detecting methane concentrations of 1% of the lower explosive limit (LEL) or less.  Report inspection results to the Division daily.**

7

6. Within twelve hours, develop and submit to the Division a plan presenting Operator's rationale and actions to:

   a. Establish the safety perimeter;

   b. Monitor air quality at the well site, within and outside the safety perimeter to ensure public safety;

   c. Monitor well pressure, fluid level, and other well conditions.

7. Within twenty-four hours, develop and submit to the Southern District office, for review and approval by the Supervisor, a well-control and well-abandonment program which will include the following:

   a. Stabilization of the well;

   b. Removing all debris, as practical, from inside the production casing of the well,

   c. Diagnostic testing to determine lithology and gas migration pathways within and immediately outside the well to include but not limited to a gamma ray, temperature, and noise log;

   d. Evaluating casing and cement integrity.  This will include, but is not limited to, an ultrasonic cement evaluation log and appropriate magnetic flux casing inspection;

   e. Identifying anomalous gas-bearing zones behind casing;

   f. A detailed chemical evaluation of any fluids released, including but not limited to natural gas; and

   g. Any other actions deemed necessary to eliminate the threat of gas migration and properly abandon the well.

8. Preserve and secure all records and evidence acquired by the operator and/or any third-party contractors related to the plugging and abandonment work associated with the well, which includes but is not limited to the blow out prevention equipment.

/ / /

8

## VII.   Operator's Required Actions (Non-Emergency)

Based on information and belief arising from the above referenced facts, and in accord with the legal authorities described in this Order, the Supervisor has determined that remedial work is necessary to prevent damage to life, health, property and natural resources.  Therefore, **IT IS HEREBY ORDERED**, pursuant to PRC sections 3013, 3106, 3222, 3224, and 3357(b)(1), and Regulations section 1722.5, among others, that Operator shall perform the work and acts identified below:

**A. Within 60 days following receipt of this Order, complete a root cause analysis detailing the causal factors which led to loss of well control and the release of fluids, including gas, which occurred on or about January 11, 2019 during the Operator's reabandonment efforts of DOW R.G.C. 10.**

    **a. The Analysis must be facilitated by an independent third party acceptable to the Supervisor and must document the decision-making process and all factors contributing to the uncontrolled release, including geology and reservoir characterization.**

    **b. The report must include findings and any lessons learned.**

    **c. Within 10 days of receipt of this Order, develop and submit the protocol for the analysis, for review, and approval by the Supervisor.**

    **d. Prior to beginning any testing, provide the Southern District Office with the scheduled date, time, and location of the testing to allow for a Division representative to witness any testing.**

    **e. Ensure the contractor performing the root cause analysis distributes all reports, whether final or draft, in their entirety to the Supervisor at the same time they are made available to Operator.**

## VIII.  Operator's Appeal Rights

The Operator may appeal this Order by filing a written notice of appeal with the Director of Conservation as described in PRC section 3350.  Failing to file a notice of appeal within the

9

1  timeframe prescribed in PRC section 3350, subdivision (a), waives Operator's right to challenge

2  this Order and makes the Order final.

3       If the Operator timely files a notice of appeal, Operator will be informed of the appeal

4  hearing date, time, and place. After the close of the hearing, Operator will receive a written

5  decision that affirms, sets aside, or modifies the Order.

6       The filing of an appeal of this Order will not operate as a stay of any remedial actions

7  which are issued pursuant to the Supervisor's emergency order authority according to PRC

8  section 3226. (PRC, § 3350, subd. (b)(1).) Therefore, **regardless of whether Operator timely**

9  **files a notice of appeal of the "Operator's Required Actions (Emergency)" in section VI**

10  **above, Operator must immediately perform the work described herein.** If the work is not

11  immediately commenced and continued to completion, the Supervisor may appoint necessary

12  agents to enter the premises and perform the work. Any amount the Supervisor expends will

13  constitute a lien against Operator's real and/or personal property. (PRC, § 3226.) If Operator

14  believes that it will be irretrievably injured by performing the work required by this Order

15  pending the appeal's outcome, Operator may seek an order from the appropriate superior court

16  restraining the Division from enforcing the Order pending the outcome of the appeal. (PRC, §

17  3350, subd. (b)(4).)

18             **IX.**    **Other Potential Actions to Enforce This Order**

19       Failing to comply with Sections VI or VII (Operator's Required Actions – Emergency

20  and Non-Emergency) of this Order could subject Operator to further enforcement action.

21       PRC section 3236.5 authorizes the Supervisor to impose a civil penalty on a person who

22  violates any provision in Chapter 1 of Division 3 of the PRC or any regulation that implements

23  those statutes, and the Supervisor may in the future impose a civil penalty based on the facts and

24  omissions underlying this emergency order.

25       Further, PRC section 3236 makes it a misdemeanor for any person to violate, fail,

26  neglect, or refuse to comply with any of the provisions of the oil and gas law. The misdemeanor

27  is punishable by a fine of not less than one hundred dollars ($100) nor more than one thousand

28  dollars ($1,000), or by imprisonment not exceeding six months, or by both the fine and

*EMERGENCY ORDER TO PERFORM REMEDIAL WORK NO. 1143*

imprisonment for each separate offense.  PRC section 3359 makes it a misdemeanor to fail or neglect to comply with an order of the Supervisor.  Each day's further failure, refusal, or neglect is a separate and distinct offense.  (PRC, § 3359.)

DATED: January 18, 2019

Kenneth A. Harris, Jr.

State Oil and Gas Supervisor

See attached PROOF OF SERVICE for distribution list

11

## PROOF OF SERVICE BY CERTIFIED U.S. MAIL

I declare that I am employed in the County of Sacramento, California. I am over the age of 18 and not a party to the within captioned cause. My business address is 801 K Street, MS 18-05, Sacramento, California 95814. On January 18, 2019, I served the following document(s):

**EMERGENCY ORDER PERFORM REMEDIAL WORK and ORDER NO. 1143**

by enclosing them in an envelope and placing the envelope for collection and mailing by certified U.S. mail on the date and at the below listed address(es) following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

I served the documents on the person or persons below, as follows:

| | |
|---|---|
| Anthony Santo<br>MDR Hotels, LLC<br>Hardage Hospitality<br>12555 High Bluff Drive, Suite 330<br>San Diego, CA 92130<br>Certified Mail Receipt Number:<br>7016 1370 0000 0837 9491 | Don Geisinger<br>County of Los Angeles<br>13837 Fiji Way<br>Marina del Rey, CA 90292<br>Certified Mail Receipt Number:<br>7016 1370 0000 0837 9507 |
| Wu Tan<br>Los Angeles County<br>Department of Regional Planning<br>900 Fremont Avenue<br>Alhambra, CA 91808<br>Certified Mail Receipt Number:<br>7016 1370 0000 0837 9514 | Interact (contractor):<br>Val Lerma<br>Interact PMTI<br>260 Maple Court Suite 210<br>Ventura, CA 93003<br>Certified Mail Receipt Number:<br>7016 1370 0000 0837 9521 |

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on <u>January 18, 2019</u>, at Sacramento, CA.

Rachael Tadlock

PROOF OF SERVICE - CCP, § 1013; PRC, § 3350



State of California • Natural Resources Agency                                    Edmund G. Brown Jr., *Governor*

Department of Conservation
**Division of Oil, Gas, and Geothermal Resources**                Kenneth A. Harris Jr., *State Oil and Gas Supervisor*
801 K Street • MS 18-05
Sacramento, CA  95814
(916) 445-9686 • FAX (916) 319-9533

6/5/2018

API: 0403713798

Permit No.: 7000607

Anthony Santo
MDR Hotels, LLC
12555 High Bluff Drive
Suite 330
San Diego, CA 92040

Dear MDR Hotels, LLC,

The Division has received your Notice of Intention to Re-Abandon dated 04/27/2018 for Dow R.G.C.
10, API. 0403713798, 700021 bond, Playa Del Rey field, Sec. 21, T. 02S, R. 15W, SB B&M, Los
Angeles County.

Your Notice of Intention has been reviewed by our division in conjunction with records currently held
by our office. Please review all categories below as statuses may have changed since submission.

## DECISION: THE NOTICE OF INTENTION IS APPROVED PROVIDED THAT :

1.  Blowout Prevention Equipment (BOPE), as defined by this Division's publication No. M07, shall be
installed and maintained in operating condition and meet the following minimum requirements:
a.  Class II2M, with hydraulic controls, during downhole operations. All casing annuli control valves
must meet, or exceed, the same minimum pressure rating as the BOPE. The pipe safety valve must be
suitable for all pipe in use, including casing.
b.  A 2M lubricator for wireline operations.

BOPE requirements for critical wells must also comply with the following:
c.  Any and all control lines common to the BOPE and installed within 25 feet of the well bore must be
shielded properly and insulated so the temperature rating is equal to or greater than 450 degrees
Fahrenheit.
d.  Separate controls must be connected to each preventer in the BOPE stack. All control stations
must be capable of providing complete opening and closure of each preventer in the BOPE stack.
e.  A minimum of one control station must be located at least 25 feet from the well bore.

f.  An emergency backup system must be installed that utilizes an independent, explosive-safe source
of actuating energy. The source of energy and all controlling mechanisms associated with the backup
system must be located at least 25 feet from the well bore, and in close proximity to the control station
described above.
g.  An access line of 2-inch minimum outside diameter must be installed below the preventer(s). In
addition to the control valve installed at the wellhead, the access line must have a minimum of one
control valve located at least 10 feet outside the cellar. The valve outside of the cellar will be the
primary control valve for well work operations. The part of the access line located between the well

646



State of California • Natural Resources Agency                                    Edmund G. Brown Jr., *Governor*

Department of Conservation                                              Kenneth A. Harris Jr., *State Oil and Gas Supervisor*
**Division of Oil, Gas, and Geothermal Resources**
801 K Street • MS 18-05
Sacramento, CA  95814
(916) 445-9686 • FAX (916) 319-9533

bore and the control valve outside of the well cellar must be shielded properly and insulated so the temperature rating is equal to or greater than 450 degrees Fahrenheit.

2.  Blowout prevention practice drills are conducted at least weekly and recorded on the tour sheet. A practice drill may be required at the time of the test/inspection.

3.  Hole fluid of a quality and in sufficient quantity to control all subsurface conditions in order to prevent blowouts shall be used.

4.  Prior to shooting any perforations for bradenhead squeezes, a pressure test of the 11-3/4" casing shall be made to ensure casing integrity. If casing integrity is not demonstrated, a retainer or packer is required for squeeze operations.

5.  All portions of the well not plugged with cement are filled with inert mud fluid having a minimum density of 72 lbs/cu.ft and a minimum gel shear strength of 25 lbs./100 sq. ft.

6.  All casing of the well, both inside and outside, are plugged with cement from at least 25 feet below the final cut down of the well to the surface.

7.  A steel plate, at least as thick as the outer well casing and bearing the last five digits of the API number, shall be tack welded around the top circumference of the outer casing.

8.  The well location shall be surveyed prior to burying the well, and the survey shall be filed with this office.  Latitude and longitude shall be in decimal degrees, to six decimal places, in NAD83.

9.  Well site restoration shall be completed within 60 days following the completion of plugging operations.

10.  No program changes are made without prior Division approval.

11.  THIS DIVISION SHALL BE NOTIFIED TO:
a.  Inspect the installed BOPE prior to commencing downhole operations.
b.  Witness the clean-out depth at 3376'.
c.  Witness all mudding operations.
d.  Witness the running of the cement bond log from 3376' to surface.
e.  Witness the placing, location and hardness of the cement plug from 3376' to 2936'.
f.  Witness the cement squeeze through the retainer at 2100'.
g.  Witness the cement squeeze through the perforations at 1462' to 1562'.
h.  Witness the cement squeeze through the perforations at 625' to 765'.
i.  Witness the placing of the cement plug from 50' to 5' and all annuli from 35' to 5'.
j.  Witness the location and hardness of the cement plug, both inside and outside of all casings, at the final cut down of the well.
k.  Inspect the restored well site.

NOTES:

1.  All depth measurements are from top of the derrick floor which is 8' above ground surface.

647

State of California • Natural Resources Agency                                          Edmund G. Brown Jr., *Governor*

Department of Conservation                                              Kenneth A. Harris Jr., *State Oil and Gas Supervisor*
**Division of Oil, Gas, and Geothermal Resources**
801 K Street • MS 18-05
Sacramento, CA  95814
(916) 445-9686 • FAX (916) 319-9533

2.  When staging cement plugs, full circulation must be established. If full circulation is not maintained, cement staging must cease. The Division shall be notified to witness the location and hardness of the cement plug.

3.  The proposed surface plug shall not contain rock or gravel.

4.  The Division recommends that no structure be placed in a manner that will impede future access to the well.

5.  Well site and lease restoration shall conform to the requirements specified in the California Code of Regulations, Title 14, Section 1776.

6.  Upon completion of the proposed work, a Well Summary Report (form OG100), a History of Oil or Gas Well (form OG103), and copies of all logs, tests, and surveys shall be submitted to this office.

7.  Report of Well Plugging and Re-Abandonment (form OG159) will not be released until all records and histories are on file with this Division.

8.  Bonds held by this Division shall only be released following completion of well plugging and re-abandonment operations to the Division's current abandonment standards.

9.  The operator shall isolate the following zones:
a.  The Base of Freshwater at 700'±
b.  The USDW at 1512'±
c.  Top of the upper most hydrocarbon zone at 2200'±
d.  Top of the Upper zone at 3330'±
Failure to achieve zonal isolation may have a negative impact on current and future operations. In addition, failure to achieve adequate zonal isolation will also be noted on the Report of Operations (OG109).

10.  This permit is for an oil, gas, or geothermal activity within the scope of the analysis set forth in the final environmental document(s) prepared and approved by the Lead Agency, in connection with this project.  The California Division of Oil, Gas, and Geothermal Resources (Division) has considered the environmental document and the analysis therein, made findings regarding the proposed activity to any extent necessary, and issues this permit in the capacity as a Responsible Agency with expertise in the activity(ies) authorized by this permit.  Notice(s) filed with the State Clearinghouse can be found on the Division's website at http://www.conservation.ca.gov/dog/CEQA/Pages/CEQANotices.aspx.

11.  This permit was held in abeyance pending:
a.  Receipt of information requested in the CEQA information portion of the NOI Form (OG106) regarding local agency requirements for this NOI activity.
b.  Receipt of the appropriate bond for the work to be completed.
c.  Updated Agent contact information for the County of Los Angeles.

The Division has also made a determination in relation to your Confidentiality Request.

**DECISION: THE CONFIDENTIALITY REQUEST STATUS IS Not Applicable**
648



State of California • Natural Resources Agency                                    Edmund G. Brown Jr., *Governor*

Department of Conservation
**Division of Oil, Gas, and Geothermal Resources**                               Kenneth A. Harris Jr., *State Oil and Gas Supervisor*
801 K Street • MS 18-05
Sacramento, CA 95814
(916) 445-9686 • FAX (916) 319-9533

If you have any supplemental questions, please contact your nearest DOGGR office or visit us at www.conservation.ca.gov/dog.

Sincerely,
Chris Phillips

Senior Oil and Gas Engineer

CC People:  Dana Anderson dana.anderson@interactprojects


CC Organizations: City of Los Angeles Fire Department
Los Angeles City Office of Petroleum and Natural Gas Administration,
Attn: Uduak Ntuk

State of California Natural Resources Agency
DEPARTMENT OF CONSERVATION

**NOTICE OF INTENTION**

Rcv'd 4/27/18

Notice Type: ■

☐ New Drill   ☐ Deepen   ☐ Sidetrack   ☐ Rework   ☐ Abandon   ■ Re-Abandon   ☐ Refile

NOI Date: _____4/27/18_____ Organization Number: _01876_____

Organization Name:  County of Los Angeles

Contact Name:  _____   Contact Phone: _____ *<u>**Waiting on Bond from LA County**</u>

Contact Email: _____

Is this a Supplementary Notice to a previously approved permit?                    ☐ Yes   ■ No

If yes, provide the Permit No:_____

Description: _____

_____

Well API: _04-037-13798-00_____ Bond Number (required):_____
*Leave blank for New Drill – assigned by DOGGR*

_____Dow-Recreational Gun Club     _____10_____
Well Name                                           Well Number

OG 106 (Rev 03/2018) Previously OG 105,107,108 (Page 1 of 7)

State of California Natural Resources Agency
DEPARTMENT OF CONSERVATION
**NOTICE OF INTENTION**

Well Information                                    *This section is not required for an Abandon or Re-abandon*

Well Type:

☐ Air Injection            ☐ Gas Disposal – Injection        ☐ Gas Storage – Production & Inject.
☐ Geothermal               ☐ Water Disposal – Injection      ☐ Liquefied Gas – Production & Inject.
☐ Observation              ☐ Cyclic Steam – Injection        ☐ Pressure Maintenance – Injection
☐ Dry Gas – Production     ☐ Steamflood – Injection          ☐ Water Source - Production
☐ Oil & Gas – Production   ☐ Water Source - Production

Oil & Gas Lease(s) associated with this Notice: _____

Do the mineral and surface leases coincide?                                    ☐Yes  ☐ No
If no, attach a legal description of both surface and mineral leases, and a map or plat to scale.

Mineral Owner:      ☐Fee   ☐Federal   ☐State   ☐Tribal
Surface Owner:      ☐Fee   ☐Federal   ☐State   ☐Tribal

Do any of the following conditions apply to this well?    ☐ This is an exploratory well
(Check all that apply)                                   ☐ This is a dry hole

Are you including a Confidentiality Request Letter with this Notice?            ☐Yes  ☐No
**If yes, please attach.**

Is this notice submitted in conjunction with a request for Well Stimulation project authorization?
**If yes, please attach.**                                                     ☐Yes  ☐No

Is H2S (Hydrogen Sulfide) or waste gas anticipated?                            ☐Yes  ☐No
**If yes, please attach contingency plan.**  Concentration (ppm):_____

If this well is part of a UIC Project, or UIC Project Application, please indicate the Project Code:

_____

Well Information Continued

OG 106 (Rev 03/2018) Previously OG 105,107,108 (Page 2 of 7)

State of California Natural Resources Agency
DEPARTMENT OF CONSERVATION
**NOTICE OF INTENTION**

*Well Information Continued*                    *This section is not required for an Abandon or Re-abandon*

Depth measurements taken from top of: _____Which is _____ feet above ground.
Elevation of ground above Mean Sea Level:  Proposed: _____

**Please submit proposed Directional Drilling Survey Electronic Data, and indicate the direction of your well:**         ☐ Horizontally Drilled  ☐ Directionally Drilled  ☐ Vertically Drilled

☐Yes  ☐No     Will the well be drilled with underbalanced fluids program?
☐Yes  ☐No     Is Fresh Water present?
☐Yes  ☐No     Is USDW present?
☐Yes  ☐No     Will this proposal result in the well passing into, or through, a thermal enhanced oil recovery project? If yes, what steps are you proposing to address the anticipated heat?
_____
_____
_____

| *Zones of Significance:* | Proposed Measured Depth (ft.) | Proposed Vertical Depth (ft.) |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

*Proposed Completion Zones:*
| Zone Name | Measured Depth | Pressure (PSI) |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Describe any known significant geologic markers below, and estimated depths:
_____
_____
_____
_____

Blowout Prevention Equipment
Please check any of the following Blowout Prevention Equipment that are present (check all that apply)

☐  Annular Preventer.  Pressure rating (in PSI:) _____
    *Ram Types:*
☐  Pipe Pressure rating (in PSI:)        _____ How many?    _____
☐  Blind Pressure rating (in PSI:)       _____ How many?    _____
☐  Shear Pressure rating (in PSI:)       _____ How many?    _____
☐  Rotating Head. Pressure rating (in PSI:)   _____

Drilling Program Information
Check all that apply
    ☐  Salt Formations are anticipated. Formation names: _____
    ☐  Salt Based drilling fluids will be used
    ☐  Oil Based drilling fluids will be used
    ☐

Mud System: _____  Mud Disposal Method: _____  Cuttings Disposal: _____

652
OG 106 (Rev 03/2018) Previously OG 105,107,108 (Page 3 of 7)

State of California Natural Resources Agency
DEPARTMENT OF CONSERVATION
**NOTICE OF INTENTION**

*Location Information*                          *This section is not required for an Abandon or Re-abandon*

Surface Location:
*Surface location information is only required for a New Drill.*

_____    _____    _____    _____    _____    _____    _____

Section    Township    Range    B&M    Field    Latitude    Longitude
                                                                                        (Datum NAD 83)

Corner Call: _____    County: _____

_____

Location Description

☐Yes ☐No    Is this an offshore well?
☐Yes ☐No    This this well in an urban area?
☐Yes ☐No    Is this a critical well as defined in California CCR, title 14, to Section 1720(a)?
☐Yes ☐No    Is this well in an environmentally sensitive area as defined in California CCR, title 14, to Section 1760(e)

If this is a critical well or in an environmentally sensitive area, check all that apply, and enter the distance in feet:

☐Occupied Building    ☐Operating Railroad    ☐Water Well    ☐Road    ☐Power Line
☐Surface Water    ☐Airport Runway    ☐Recreational Area    ☐Wildlife Preserve

Bottom Hole Location:

_____    _____    _____    _____    _____    _____    _____

Section    Township    Range    B&M    Field    Latitude    Longitude
                                                                                        (Datum NAD 83)

Corner Call: _____    County: _____

653

OG 106 (Rev 03/2018) Previously OG 105,107,108 (Page 4 of 7)





State of California Natural Resources Agency
DEPARTMENT OF CONSERVATION
**NOTICE OF INTENTION**

Casing & Cement




State of California Natural Resources Agency
DEPARTMENT OF CONSERVATION
**NOTICE OF INTENTION**

If a description is available for Feature and Cement Segment, please attach additional information.

**Feature Record:** Feature Type can be one of the following: Surface Casing, Intermediate Casing, Casing Liner, Production Casing, Hole Size, Plug, Junk, Casing Damage, Repair-Patch, Repair-Squeeze

| | Feature Type | Top | Bottom | Diameters Outside | Inside | Weight | Grade/Type | New Pipe? | Install Date | Remove Date | Pulled | Pressure | Connection Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F1 | Surface Casing | 0 | 686 | 18.625 | 17.885 | 84 | UNK | Y | 3/18/31 | | | | |
| F2 | Production Casing | 0 | 3423 | 11.75 | 10.88 | 54 | UNK | Y | 4/1/31 | 4/17/56 | 44' | | |
| F3 | Casing Liner | 3396 | 3903 | 6.625 | 5.855 | 26 | UNK | Y | 4/13/31 | | | | |

**Cement Interval**

| | Associated Feature (ex: F1) | Inside/Out Casing? | Top | Bottom | Volume (Sacks) | Yield (cubic ft) | Cement Co. | Verify Method | Install Date | Remove Date | Cement ID | Job Type | Compressive Strength | Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C1 | F1 | Outside | 371 | 686 | 500 | 590 | | | 3/18/31 | | BlueDia (A) | | | 1.18 Yield |
| C2 | F2 | Outside | 2686 | 3423 | 600 | 708 | | | 4/1/31 | | Victor-Cls A | | | 1.18 Yield |
| C3 | F2 | Inside | 3376 | 3396 | 10.9 | 12.9 | | | 12/21/40 | | Victor-Cls A | | | 1.18 Yield |
| C4 | F3 | Inside | 3396 | 3906 | 80.8 | 95.4 | | | 12/21/40 | | Victor-Cls A | | | 1.18 Yield |
| C5 | F2 | Outside | 765 | 887 | 94.7 | 111.79 | | | 3/21/56 | | Class A | | | 1.18 Yield |
| C6 | F2 | Inside | 786 | 887 | 55.2 | 65.2 | | | 3/21/56 | | Class A | | | 1.18 Yield |
| C7 | F2 | Outside | 488 | 625 | 112.2 | 132.5 | | | 4/5/56 | | Class A | | | 1.18 Yield |
| C8 | F2 | Inside | 556 | 625 | 37.7 | 44.6 | | | 4/5/56 | | Class A | | | 1.18 Yield |
| C9 | F2 | Outside | 284 | 310 | 21.6 | 25.5 | | | 4/11/56 | | Class A | | | 1.18 Yield |
| C10 | F2 | Inside | 304 | 310 | 10.4 | 12.3 | | | 4/11/56 | | Class A | | | 1.18 Yield |
| C11 | F2 | Inside | 44 | 68 | 13.1 | 15.5 | | | 4/7/59 | | Class A | | | 1.18 Yield |
| C12 | F1 | Inside | 0 | 44 | 64.1 | 75.7 | | | 4/7/59 | | Class A | | | 1.18 Yield |

**Cement Class**

| Associated Cement (ex: C1) | Cement Type | Volume Sacks | Yield (cubic ft) | Weight | Gel Viscosity | Lead Tail | Description |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | 655 | | | |



State of California Natural Resources Agency
DEPARTMENT OF CONSERVATION
**NOTICE OF INTENTION**



Contact & Perforation                                   This section is not required for an Abandon or Re-abandon

---

**Completion Interval**

| Type | Status | Top | Bottom | Pool Code | Formation |
|------|--------|-----|--------|-----------|-----------|
|      |        |     |        |           |           |
|      |        |     |        |           |           |
|      |        |     |        |           |           |
|      |        |     |        |           |           |
|      |        |     |        |           |           |
|      |        |     |        |           |           |
|      |        |     |        |           |           |

**Completion Perforation**

| Type | Method | Diameter | Top | Bottom | Spacing | Number of Shots | Perforated Date |
|------|--------|----------|-----|--------|---------|-----------------|-----------------|
|      |        |          |     |        |         |                 |                 |
|      |        |          |     |        |         |                 |                 |
|      |        |          |     |        |         |                 |                 |
|      |        |          |     |        |         |                 |                 |
|      |        |          |     |        |         |                 |                 |
|      |        |          |     |        |         |                 |                 |

---

Proposed Work

The proposed work is as follows.  **A complete program is preferred and may be attached.**
**"See attached reabandonment program for Dow RGC-10"**

_____

_____

_____

_____

_____

_____

_____

_____

_____

State of California Natural Resources Agency
DEPARTMENT OF CONSERVATION
**NOTICE OF INTENTION**



CEQA Information

| | |
|---|---|
| ☐Yes ■No | Is a permit for this activity required by a local agency? If yes, attach a copy of the approved local permit. |
| ☐Yes ■No | Is a CEQA document required by a local agency? If yes, attach a copy of your CEQA document. |

If a CEQA document is required, complete the information below:

☐ Notice of Exemption ☐ Notice of Determination

Exemption Class: _____ State Clearinghouse Number: _____

Lead Agency: _____ Lead Agency Contact: _____

Lead Agency Address: _____ City: _____

_____ State: _____ Zip: _____

Abandonment Information                    This section is ONLY required for an Abandon or Re-abandon

| | |
|---|---|
| ☐Yes ■No | Are you abandoning the last well on the lease? If yes, attach a Lease Restoration Plan. |

OG 106 (Rev 03/2018) Previously OG 105,107,108 (Page 8 of 7)



April 27, 2018

# RE-ABANDONMENT PROGRAM
## DOW RGC-10

## Well Data:

| Field Location | Playa Del Rey Field; Sec 21, T2S, R15W |
|---|---|
| Well API Number | 04-037-13798-00 |
| Wellhead Datum | 15.7' KB (1959 re-abandonment) |
| Depth of BFW | 700' |
| Depth of USDW | 1512' (see attached justification) |
| Surface Casing | 18-5/8", 84# cemented at 686' in 25-1/2" hole. ETOC-371' |
| Production Casing | 11-3/4", 54# cemented at 3423' in 17-1/2" hole. ETOC-2686'; Stub ~44' |
| Production Liner | 6-5/8", 26# landed 3396'-3903' in 10-5/8" hole. Slotted: 3423'-3903' |
| Cement Plug | 6-5/8", 26# liner: 3376'-3903' |
| Cement Plugs | 11-3/4", 54# casing: 17'-68'; 304'-310'; 556'-625'; 786'-887' |
| Perforated Casing | 11-3/4", 54# casing: 3076'-3341' |
| DOGGR Contact | (714) 816-6847 |
| Engineer Contact | Dana Anderson, (818) 691-6275, dana.anderson@interactprojects.com |

## Required Pre-Job Equipment/Activities

- Equipment List: 20" dual-ram preventer with 1-pipe ram and 1-blind ram, 2-500 Bbl Baker Tanks (fill one tank with lease water), 3500' 2-7/8" N80, PH6 workstring, drill bits, power swivel, mud pump, pit tank, shale shaker, fork lift, and 11-¾" 54# scraper.

- Developer to excavate around wellbore and install 8' diameter cellar ring deep enough to allow welder room to stand and work. Developer also responsible for any dewatering that is required to enable installation of flange/riser.

- Cut-off casing and weld on 20" riser as required to fit BOPE to rig platform height.

**Note: notify DOGGR to witness BOPE testing, perforating, placement & tagging of all cement plugs, and final site restoration.**

## Procedure

1. **Rig-up on Well & Test BOPE**
   a. Perform pre-job safety meeting. Rig-up on well.
   b. Install Class II2M BOPE on riser/flange. Test BOPE/flange to 1500 psig.

2. **Drill out Cement Plugs and Scrape 11-3/4" Casing**
   a. Pick-up a 17-1/2" drill bit with drill collar and lower bit to cement plug estimated at ~17'.

1 of 4

**InterAct**

<div align="right">April 27, 2018</div>

b. Rig-up power swivel and begin drilling out cement inside 18-5/8" casing.  Use lease water and viscosify as needed to assist with cleanout to **plug at 3,376'**.

c. Drill to ~40' before changing BHA to a 10-5/8" drill bit and DCs to re-enter 11-3/4" 54# casing at 44'.   Pick-up 2-7/8" N80, PH6 workstring while drilling down.

d. After changing out drill bit to 10-5/8" bit, drill out cement from 40'-68', cement/wooden plug at 304'-310' and cement plugs at 556'-625', 786'-887'.

**Note: consult engineering if any problems encountered while drilling out especially where windows exist in the casing.**

e. Continue cleaning out with bit and tag cement plug located at 3376'. Record tag depth.

f. POOH with drill bit. Lay down bit and collars.

g. Pick-up 11-3/4" 54# casing scraper set 1/8" under drift with bumper-sub. Run scraper on workstring and tag plug at 3,376'. POOH and lay down scraper/bumper-sub.

**3. Run Cement Bond Log**

a. Hold pre-job safety meeting. Rig-up wireline unit to log 11-3/4" 54# casing. (Record fluid level depth when running in with logging tools. If fluid level is below 600', plan on calling for 11-3/4" retrievable bridge-plug while wireline unit is still on location and continue logging lower section of wellbore. Critical intervals for recording cement bond log are 3,376'-2,500' and 875'-550'.)

b. Pressure test lubricator to 500 psig before RIH with tools. Bleed off pressure. Resolve any leak issues before proceeding.

c. Run in well with cement bond tool/gamma-ray/casing collar locator. Log 11-3/4" casing from 3,376' to surface.

d. POOH with logging tools and lay down.  If interval from 875' to 550' was logged, rig-down wireline unit.  Otherwise, run retrievable bridge-plug in 11-3/4" casing and set at 875'.  Fill casing with water and run CBL from 875' to 40'.  Rig down wireline unit.  Contact engineer to evaluate cement bond log and correlate casing details (collars/stubs) to well diagram.

e. Using CBL log results, verify depth of cement outside the 11-3/4" is at least 100' above shallowest oil sand at 3,330' (**from driller's log/core data**) before proceeding with plug-back.  **Note: the 11-3/4" casing will need to be squeezed if annular cement is below 3,230'.**

**4. Plug Back Hydrocarbon Zone ("Upper Zone").**

a. RIH with 2-7/8", 6.5# open-ended workstring to 3,376' (top of cement plug).

b. Mix 284 CF of Class G cement (10% excess) low fluid loss cement.  Pump cement down tubing and displace with 95 CF of lease water. Estimated tag depth is 2,936'.

c. Pull tubing above cement and reverse circulate tubing clean.

d. Wait on cement. RIH with tubing and tag cement. Report tag depth on plug and verify that cement is at least 100' above the top perforation at 3,076'.  Re-cement if needed.

e. Pressure test casing to 500 psig for 5 minutes. Bleed off pressure to 0 psig.

**5. Spot 72 PCF Abandonment Mud from TOC at ~2936' to 2200'.**

a. Volume is 85 Bbls.

<div align="right">2 of 4</div>

Dow RGC-10 Re-abandonment

April 27, 2018

6.  **Perforate above gas sand at 2200' Place Cement Plugs.**
    a.  Hold pre-job safety meeting. Rig-up wireline unit to perforate the 11-3/4" casing.
    b.  Pressure test lubricator to 500 psig before RIH with gun. Bleed off pressure. Resolve any leak issues before proceeding.
    c.  RIH and perforate between 2198-2200' 4SPF w/0.50" holes and 90-degree phasing.
    d.  POOH with spent carrier and lay down.  Rig down wireline unit.
    e.  RIH with cement retainer for 11 ¾" 54# casing. Set retainer at 2100'.
    f.  Perform breakdown test at 1-2 Bbl/min. Record pump rate and pressure.
    g.  Mix 160 CF of Class G cement. Pump cement and displace to retainer with 68 CF (12 Bbl) of mud, placing cement 100' inside and outside of the 11-3/4" casing.
    h.  Unstab and POOH cement retainer.

7.  **Spot 72 PCF Abandonment Mud from Retainer at 2100' to 0'.**
    a.  Volume is 251 Bbl.

8.  **Perforate across USDW and Place Cement Plugs.**
    a.  Hold pre-job safety meeting. Rig-up wireline unit to perforate the 11-3/4" casing.
    b.  Pressure test lubricator to 500 psig before RIH with gun. Bleed off pressure. Resolve any leak issues before proceeding.
    c.  RIH and perforate between 1562' and 1462' across the USDW at 1512' (50' below and 50' above - 100' total) at 4SPF w/0.50" holes and 90-degree phasing.
    d.  POOH with spent carrier and lay down. Rig down wireline unit.
    e.  RIH with open-ended workstring and place tail at bottom perforation (50' below USDW).
    f.  Mix 225 CF of Class G cement (w/fluid loss additive) and balance to place top of cement 246' above top perforation (total plug length - 349'), displacing cement with lease water.
    g.  Pull tubing above cement and reverse clean.
    h.  If casing tested to 500 psig in Step #4, fill well and down squeeze 92 CF of cement to fill the annulus of the perforated interval, leaving TOC 100' above the top perforation.  WOC.  RIH and tag cement.  Re-cement if needed.
    i.  If the casing did not test in Step #4, run and set an 11-3/4" retainer ~50' above the estimated top of balanced cement plug.
    j.  Down squeeze the required 92 CF out the perforated interval, leaving 100' of cement above the top perforation.  Unstab from retainer, reverse tubing clean and POOH with tubing.

9.  **Evaluate CBL/Place Cement Plug at BFW**
    a.  Evaluate annular cement bonding outside 11-3/4" casing and determine if casing is bonded between external cement plugs at 625' and 765'.  Note: if casing has sufficient bond to cover the 17 ½"x11 ¾" annulus do not perforate and place Class-G cement inside the 11-3/4" casing from 800' to 600'; **otherwise continue with job as programmed**.
    b.  Hold pre-job safety meeting. Rig-up wireline unit to perforate the 11-3/4" casing.
    c.  Pressure test lubricator to 500 psig before RIH with gun. Bleed off pressure. Resolve any leak issues before proceeding.
    d.  Perforate across the length of observed void between 625'-765' at 4SPF w/0.50" holes and 90-degree phasing.

3 of 4

Dow RGC-10 Re-abandonment

**InterAct**

April 27, 2018

    e.  POOH with spent carrier and lay down. Rig down wireline unit.

    f.  Mix enough Class G cement (w/fluid loss additive) to fill annular void and to fill inside of the 11 3/4" <u>from 800' to 100' above the top perforation and to at least 600'</u>.  <u>Spot cement with open-ended tubing starting at 800'</u>. Displace cement with abandonment mud.

    g.  If casing tested to 500 psig in Step #4, fill well and down squeeze enough cement to fill the annulus of the perforated interval, and <u>from 800' to 100' of above the top perforation and to at least 600'</u>. RIH and tag cement. Bring cement level 100' above the top perforation as needed.

    h.  If the casing did not test in Step #4, spot the total cement volume with tubing starting at 800', run and set an 11-3/4 retainer ~50' above the estimated top of balanced cement plug.

    i.  Down squeeze enough cement out perforated interval to fill annular void, <u>leaving 100' of cement above the top perforation and to at least 600'</u>. Unstab from retainer.

**10. Place Surface Plug**

    a.  Place open-ended tubing tail at 50'.

    b.  Mix 75 CF of Class G cement and balance cement to surface.

    c.  Have DOGGR witness placement of surface cement plug.

**11. Rig-Down and Cut Casing**

    a.  Nipple down and remove BOPE.

    b.  Rig-down and move off well.

    c.  Wait on cement for 24 hours.

    d.  Cutoff 18-5/8" casing approximately 5' below ground level.

    e.  Weld a metal plate on the 18-5/8" casing stub, equal in thickness to 18-5/8", 84# casing, with the API number (04-037-13798-00) marked on metal plate.

**12. Developer to remove cellar ring, cover wellbore with dirt and restore to original grade.**

**Well**
# Dow RGC 10

API #: 04-037-13798-00
Sec 21, T2S, R15W

Cut CSG ±5' BGL (Assume) & Welded on Plate

Operator: County of Los Angeles

25-1/2" Hole

9.6 ppg MUD Assumed

11-3/4" CSG Window  290' - 310'
(***Calc'd 25 CF SQZ'd Away, 4/5/1956)
18-5/8" ETOC  371'

9.6 ppg MUD Assumed

Surface Casing
18-5/8" (17.7605" ID), 84#
±5' - 686'

CMT'D w/ 500 SKS

686'

9.6 ppg MUD Assumed

*11-3/4" ETOC  765'

11 3/4" CSG Window  883' - 887'
(*112 CF SQZ'D Away, 3/12/1956)

17-1/2" Hole (686' - 3426')

9.6 ppg MUD Assumed

11 3/4" ETOC  2686'

Production Casing
11 3/4" (10.880" ID), 54#, 8rd
44'††† (Stub) - 3423'

CMT'D w/ 600 SKS

3396'

3423'

10-5/8" Hole (3426' - 3906')

Liner
6-5/8" (5.855" ID), 26#
3396' - 3903'

TD  3906'

3903'

Surface - 68'  CMT Plug (76 SKS)
44'†††  11-3/4" CSG Stub

284'  ***11-3/4" ETOC
304'†† - 310'  CMT Plug (32 SKS SQZ'D Away***)
310'  Wooden Plug (4/11/1956)

488'  **11-3/4" ETOC

542'  Collar Shot (4/5/1956)
556' - 625'  CMT Plug (150 SKS SQZ'D**)

625'  Collar Shot (**Calc'd 132 CF SQZ'D Away, 3/28/1956)

786' - 887'  CMT Plug (150 SKS SQZ'D*)

11 3/4" Perfs:
3076' - 3341'  Knife Perforated w/ 100 Holes (1941)
3076' - 3242'  392 Holes (10/11/1941)
3076' - 3241'  165 Holes (5/5/1941)
3241' - 3341'  100 Holes (4/16/1941)

3376' - 3903'  CMT Plug (90 SKS)

Liner Perfs:
3424' - 3903'  2" x 100M, 12R Slots

Lease: Dow RGC
Field: Playa Del Rey
Status: Map Oil and Gas
BFW: 700'
USDW: 1512'

Ground Elevation: ±5' asl
Datum to Ground: 8' DF

Spud Date: 03/17/1931
Completion Date: 04/17/1931
Re-Abandonment Date†: 4/7/1959

Junk: None

**Notes**
*Collar Shot 11-3/4" CSG @ 887', pulled up to 883'. SQZ'D Window.
***Collar Shot 11-3/4" CSG @ 310' and pulled up to 290', SQZ'D Window.
†Well was originally abandoned on 4/17/1956. Re-enetered and Re-abandoned on 4/7/1959
††Depths measured to a KB of 15.72' (1959 Re-Abandonment)

Prepared by: MAM ()

662

Inte**A**ct

Well
# Dow RGC 10

API #: 04-037-13798-00
Sec 21, T2S, R15W

## Proposed



Cut CSG ±5' BGL & Welded on Plate

25-1/2" Hole

11-3/4" CSG Window  290' - 310'
(***Calc'd 25 CF SQZ'd Away, 4/5/1956)
18-5/8" ETOC  371'

9.6 ppg MUD

Surface Casing
18-5/8" (17.7605" ID), 84#
±5' - 686'

686'

CMT'D w/ 500 SKS

*11-3/4" ETOC  765'

11 3/4" CSG Window  883' - 887'
(*112 CF SQZ'D Away, 3/12/1956)

9.6 ppg MUD

17-1/2" Hole (686' - 3426')

11 3/4" ETOC  2686'

9.6 ppg MUD

Production Casing
11 3/4" (10.880" ID), 54#, 8rd
44'†† (Stub) - 3423'

CMT'D w/ 600 SKS

3396'

3423'

10-5/8" Hole (3426' - 3906')

Liner
6-5/8" (5.855" ID), 26#
3396' - 3903'

TD   3906'

3903'

5' - 50'   CMT Plug
44'†† 11-3/4" CSG Stub

284'  ***11-3/4" ETOC

488'  **11-3/4" ETOC
542'  Collar Shot (4/5/1956)
600' - 800' CMT Plug†††
625'  Collar Shot (**Calc'd 132 CF SQZ'D Away, 3/28/1956)

1362' - 1562'   CMT Plug

1462' - 1562'   Four (4) 1/2" HPF

2100'   CMT Retainer

2198' - 2200'   Four (4) 1/2" HPF

2936' - 3376'   CMT Plug

11 3/4" Perfs:
3076' - 3341'  Knife Perforated w/ 100 Holes (1941)
3076' - 3242'  392 Holes (10/11/1941)
3076' - 3241'  165 Holes (5/5/1941)
3241' - 3341'  100 Holes (4/16/1941)

3376' - 3903'  CMT Plug (90 SKS)

Liner Perfs:
3424' - 3903'  2" x 100M, 12R Slots

Operator: County of Los Angeles

Lease: Dow RGC
Field: Playa Del Rey
Status: Map Oil and Gas
BFW: 700'
USDW: 1512'

Ground Elevation: ±5' asl
Datum to Ground: 8' DF

Spud Date: 03/17/1931
Completion Date: 04/17/1931
Re-Abandonment Date†: 4/7/1959

Junk: None

**Notes**
*Collar Shot 11-3/4" CSG @ 887', pulled up to 883'. SQZ'D Window.
***Collar Shot 11-3/4" CSG @ 310' and pulled up to 290', SQZ'D Window.

†Well was originally abandoned on 4/17/1956. Re-enetered and Re-abandoned on 4/7/1959

††Depths measured to a KB of 15.72' (1959 Re-Abandonment)

†††If CBL results show no CMT in annulus f/ 625' - 765', perforations will be shot across the length of observed void between previously mentioned interval and CMT will be down SQZ'D to fill annulus of the perforated interval

Prepared by: MAM (4/24/2018)
Updated by: MAM (4/27/2018)



**Jerry Nichols** <jerry.nichols@interactprojects.com>

Mike,


The only thing I can call on is the DOGGR's own map and cross-section, copied below. The
structure map is on basement (here Catalina Schist), with a gradual decrease in dip from MDR
to SCG moving upwards through the section as the basin filled with sediment. At the near
surface, in the upper part of the Pico Formation, there is almost no dip at all, and no structural
discontinuities such as faults that might be barriers to groundwater flow are indicated.



CONTOURS ON TOP OF CATALINA SCHIST





665





DOW R G C : 10

COVINGTON : 1
DEL REY : 10
S C G : 1

667

Scale = 1:16899

0   1000   2000   3000 ft



(424) 526-7777 • 13837 Fiji Way, Marina del Rey, CA 90292 • beaches.lacounty.gov

Caring for Your Coast

• • •

**Gary Jones**
Director

**Kerry Silverstrom**
Chief Deputy

**John Kelly**
Deputy Director

**Brock Ladewig**
Deputy Director

February 26, 2018

Mr. Tony Santo
Hardage Hospitality
12555 High Bluff Drive, Suite 330
San Diego, California 92130

## PARCEL 9 – EXISTING WELL
## 4360 VIA MARINA, MARINA DEL REY, CA

Dear Mr. Santo:

To the extent that the County owns "[A]ll oil, and the other hydrocarbon substances lying within and under the above described Parcels A and B" pursuant to the certain Quitclaim Deed between Recreation Gun Club, a California corporation, and the County of Los Angeles, a body politic and corporate, dated December 1, 1958 (attached/enclosed), the County consents to lessee's plugging and reabandonment of the existing well on Parcel 9, which is part of Lot 1, as shown on the attached drawing.

If you have any additional questions or would like further information please contact me at (424) 526-7730 or dgeisinger@bh.lacounty.gov.

Very truly yours,

Don Geisinger, Lease Specialist
Asset Management Division

DLG:ms

Enclosure

c: John Kelly
   Michael G. Rodriguez

668



669

RECORDING REQUESTED BY

GRANTEE

4594

QUITCLAIM DEED

12·9·1958
Inst #
4594

FREE ) M

For a VALUABLE CONSIDERATION, receipt of which is hereby
acknowledged,

RECREATION GUN CLUB, a California corporation,
does hereby remise, release, and forever quitclaim to

COUNTY OF LOS ANGELES, a body politic and corporate,
all its right, title, and interest in and to all that certain real
property situate in the County of Los Angeles, State of California,
more particularly described as follows:

PARCEL A:   (Partly in the City of Los Angeles)

Lots 1 and 2, Tract No. 7750, as shown on map recorded
in Book 171, pages 8 and 9, of Maps, in the office of
the Recorder of said County.

Excepting from said Lot 1, that portion thereof within
the following described boundaries:  Beginning at the
intersection of the southeasterly prolongation of the
northeasterly line of said Lot 1 with the southwesterly
prolongation of the northwesterly line of said last
mentioned lot; thence northeasterly along said south-
westerly prolongation 84.00 feet to the easterly terminus
of that certain course shown as having a length of 195.16
feet in the northerly boundary of said tract; thence west-
erly along said certain course 195.16 feet to said north-
easterly line; thence southeasterly along said southeast-
erly prolongation 141.75 feet to the point of beginning.

PARCEL B:

Block A, Tract No. 9532, as shown on map recorded in
Book 171, page 10, of above mentioned map.

PARCEL C:

All oil, gas, and other hydrocarbon substances lying
within and under the above described Parcels A and B.

PARCEL D:

All right, title, and interest accruing to the transferor
under that certain oil and gas lease recorded February 3,
1930, in Book 9672, page 242, of Deeds, insofar as the
transferor is entitled to participate in production and all
other benefits under said lease.

RECORDED IN OFFICIAL RECORDS
OF LOS ANGELES COUNTY, CALIF.

47 Min.
Past 3 P.M. DEC 9 1958

RAY E. LEE, County Recorder

670

**PARCEL E:**

Also all the right, title, and interest which transferor may have by reason of the recordation of Map of Recreation Gun Club's Tract, recorded March 2, 1908, in Book 13, page 131, of Maps, in the office of the Recorder of the County of Los Angeles, and map of Tract No. 7750, recorded April 29, 1930, in Book 171, pages 8 and 9, of Maps, in the office of said Recorder, which recite that the transferor is the sole owner or proprietor of said land. Said interest affects that certain real property situate in the County of Los Angeles, State of California, within the following described boundaries:

That portion of Lot 1, Tract No. 7750, as shown on map recorded in Book 171, pages 8 and 9, of Maps, in the office of the Recorder of said County, within the following described boundaries: Beginning at the intersection of the southeasterly prolongation of the northeasterly line of said lot with the southwesterly prolongation of the northwesterly line of said lot; thence northeasterly along said southwesterly prolongation 84.00 feet to the easterly terminus of that certain course shown as having a length of 195.16 feet in the northerly boundary of said tract; thence westerly along said certain course 195.16 feet to said northeasterly line; thence southeasterly along said southeasterly prolongation 141.75 feet to the point of beginning.

**PARCEL F:**

All right, title, and interest in and to all easements and rights of way conveyed in the deed recorded December 6, 1884, in Book 132, page 345, of Deeds; together with all right, title, and interest in and to any and all other easements and rights of way which may exist, in, over, under, along, and across the following described property situate in the County of Los Angeles, State of California, and more particularly described as follows:

Lots 5, 6, and 7, Pradera Tract, partly in the City of Los Angeles, said County and State, as shown on map recorded in Book 16, page 38, of Maps, in the office of the Recorder of said County.

Excepting from said Lots 6 and 7, those portions thereof which lie northeasterly of the southwesterly boundary of the 100 foot strip of land described in deed to State of California for State Highway purposes, recorded on July 6, 1931, in Book 10970, page 203, of Official Records, in the office of said Recorder.

**PARCEL G:**

All right, title, and interest of transferor in and to that certain appurtenant easement and right of way for road purposes, as established by a decree quieting title, in the Superior Court of the State of California, in and for the County of Los Angeles, Case No. 602257, a certified copy of which was recorded January 12, 1953, in Book 40712, page 129, of Official Records.

671

Dated: _____ Dec 4 _____ 195_8_ .

RECREATION GUN CLUB,
A California corporation

_Ernest Phelps Sr._
President

_James A. Cagney_
Secretary

STATE OF CALIFORNIA }
County of Los Angeles } ss.

On this _1st_ day of _December_ , in the year
195_8_, before me, the undersigned, a Notary Public in and for
said County and State, personally appeared_____
_Albert Ralph Sr._ known to me to be the_____
President, and _James A. Cagney_ known to me
to be the_____Secretary of the corporation that
executed the within instrument, and known to me to be the persons
who executed the within instrument on behalf of the corporation
therein named, and acknowledged to me that such corporation
executed the within instrument pursuant to its by-laws or a
resolution of its board of directors.

WITNESS my hand and official seal.

_Louise C Brown_
Notary Public in and for said
County and State
My Commission Expires August 11, 1959

CERTIFICATE OF ACCEPTANCE

This is to certify that the inter-
est in real property conveyed by the
within deed or grant to the County of
Los Angeles, a governmental agency, is
hereby accepted under authority of a
resolution adopted by the Board of
Supervisors of said County on Septem-
ber 10, 1957, and the Grantee consents
to the recordation thereof by its duly
authorized officer.

Dated _Dec 4, 1958_

By _Mark A. Sims_

This is to certify that this document covers busi-
ness within the meaning of Section 6103 of the Gov-
ernment Code
HAROLD J OSTLY County Clerk

By _____ _____
Deputy

When recorded, return to R. B. Wood,
Room 1007, Hall of Records

672

April 25, 2018

Mike Giuliani
InterAct PMTI Inc.
260 Maple Court, Suite #210
Ventura CA 93003

## Review of Apparent Formation Water Salinity : Playa Del Rey

I was asked to review available data and estimate formation water salinity as a function of depth in the Playa Del Rey Oil Field, specifically for the selected well Covington No. 1.

It was determined that the SP log could be used for this purpose and that the results could be evaluated against RWA methodology.

In a clean sandstone containing predominantly sodium chloride brine, the magnitude of the SP deflection is driven primarily by the ratio of mud filtrate resistivity (Rmf) to water resistivity (Rw). Using measured mud properties and a good SP log, Rw can be calculated at any depth and converted to apparent salinity.

An oversimplified representation of this relationship is given as SP = -K log (Rmf/Rw).

> **Well Covington No. 1 was selected for review since this hole was logged almost to surface (980 FT KB) with a fresh, water based mud system producing a strong "negative" SP deflection in the clean sands. While this is a highly deviated well, it is essentially vertical through the USDW transition and the surface location is in reasonably close proximity to the area under review for salinity.**
> **In addition, there were modern porosity logs available to permit the RWA crosscheck.**
>
> **For the purpose of this report, "fresh water" is defined as having salinity less than 3,000 ppm TDS.**
> **No aquifers containing "fresh water" were observed in the logged section of this well.**
> **The base of "fresh water", BFW can be safely reported for this location as above 908 FT KB.**
> **The USDW threshold (10,000 ppm NaCl equivalent) is estimated to be at 1550 FT KB**

The following steps were used to derive an apparent salinity from the SP curve:

1. The raw SP data is baseline shifted (create SPBL, see track 1)
2. A temperature gradient is established from log header information.
3. A "clean sand" line constructed.
4. RWSP is calculated at zone temperature. This  involves a series of algorithms which duplicate the Schlumberger charts listed here:
    a. SP-1 (Rmf to Rmfe)
    b. SP-2E (Rwe to Rw)
    c. SP-3 (invasion corrections)
    d. SP-4E (bed thickness corrections)
5. RWSP is then converted to apparent salinity in ppm NaCL per Schlumberger Chart GEN-9.

Page **1** of **2**

It should be noted that this calculation is only valid with the occurrence of a fully developed SP.
The GR curve, an independent clay indicator, is also used to support the SP discrimination between sand
and shales. Logic is applied to filter and confine results to clean sand intervals.

A proper cross check for this type of work is to calculate an apparent water resistivity (RWA) from a
resistivity based saturation model and compare the results. RWA is calculated using industry standard
petrophysical techniques assuming each interval to be 100% water bearing.

Results for both methods are presented for comparison on two log-plots, one of which is a compressed
scale output (1:5000) of the entire logged interval; the other is a detail presentation (1:600) over the
USDW transition.

No calculations were attempted below 7150 FT KB.
Below this depth there are hydrocarbons present and both methods will fail for apparent salinity
calculation. Water in this interval would of course already be contaminated by hydrocarbon and
therefore not relevant to this review.

Robert Bedard
Petrophysical Services
48 S Chestnut St
Ventura, CA 93001

Voice -  760 370 0598
Email - earthquest2@earthlink.net

Since well log interpretations are opinions based upon inferences from well logs, we cannot and do not guarantee the correctness or
accuracy of any interpretation. Therefore we shall not be liable or responsible for any loss, damage, cost or expense incurred or sustained by
anyone resulting from any interpretation.

Email 05/09/2018  rl



# DEPARTMENT OF CONSERVATION
## DIVISION OF OIL, GAS & GEOTHERMAL RESOURCES
5816 Corporate Ave., Suite 100 Cypress, CA 90630-4731
Phone: (714) 816-6847 Fax: (714) 816-6853

Cypress, California
May 8, 2018

## <u>VIA EMAIL ONLY</u>

Mr. Don Geisinger
County of Los Angeles (01876)
13837 Fiji Way
Marina del Rey, CA 90292
dgeisinger@gh.lacounty.gov

This Division has received your Notice of Intention (NOI) to **re-abandon**, dated **4/27/2018**, and received **4/27/2018**, for **Dow R.G.C 10**, API. **037-13798**, **Playa del Rey** field, Sec. **21**, T. **02S**, R. **15W**, SB B&M, **Los Angeles** County.

Your notice is being held in abeyance pending:

1. Receipt of information requested in the CEQA information portion of the NOI Form (OG106) regarding local agency requirements for this NOI activity.
2. Receipt of the appropriate bond for the work to be completed.
3. Updated Agent contact information for the County of Los Angeles

If you have any questions, please call Callie L. Cullum at (714) 816 - 6847.

Kenneth A. Harris Jr.
State Oil and Gas Supervisor

Digitally signed by Callie L. Cullum
DN: cn=Callie L. Cullum, o=Department of
Conservation, ou=Division of Oil, Gas, &
Geothermal Resources,
email=callie.cullum@conservation.ca.gov, c=US
Date: 2018.05.08 16:54:17 -07'00'

By
for        Daniel J. Dudak, *District Deputy*

CLC:clc

cc:    EDP
       Dana Anderson, dana.anderson@interactprojects.com

OG113

675

# Dow R.G.C. 10 (037-13798)  Playa del Rey

| Completion Date: 1931 | | D.F 8' asl   KB | Elevation @   5' +/- above sea level. Mat ASL: |

Diagram Created and Well File Reviewed by Callie L. Cullum on 02/28/2018

**Casing History:**

| 18-5/8" cem 686'<br>84#<br>8-10 Ga. SP<br>cemented w/ 500 sx<br>Perkins  (B.D.O.W.)<br>25-1/2" hole to 686' | 11-3/4" cem 3423' wso<br>54#<br>cement w/600 sx<br>Perkins (V.O.W.) 17-<br>1/2" hole to 3431'  50'<br>cement (27 sx) reported<br>to have been drilled out<br>of casing from 3373' | 6-5/8" ld 3424'-3903'<br>26#<br>perfs 3424'-3903'<br>10-5/8" hole to 3906' | oil sand rpt 3331'-3363', 3394'-3426', 3534'-3553',<br>3781'-3809', 3836'-3864', 3891'-3906'.<br>Gas bubbles outside of core:  2200'-2233',2297'-<br>2329', 2726'-2872', 2875'-2907'<br>gas in core barrel 2233'-2267', 2329'-2362', 2362'-<br>2395', 2461'-2492', 2492'-2604', 2636'-2662', 2753'-<br>2872', 2875'-2907', 3058'-3082' (wet),<br>O.S strks 3456'-3605', 3633'-3809', 3836'-3906' |

Table markings (cf/f, cf/, cf/f etc.):

| | | cf/f | | cf/f | | cf/ | | cf/f | | cf/f | |
| | | cf/f | | cf/f | | | | cf/f | | cf/f | |
| | | | | cf/f | | | | cf/f | | cf/f | |

Diagram annotations:

- Well was cleaned out to 304' and a cement plug placed from 68' to 17'
- shot and pulled fr 40'

- wooden plug driven to 310'. Cement cleaned out to 304'. Cement plug is now located from 304' to 310' ±
- shot at 310' and pulled up to 290'

- etoc 338'

- shot at 542'

- cement plug from 556' to 600' ±
- shot at 625'

- 686'

- cement plug from 786' to 875' ±

- Casing was collar shot at 887' and pulled up to 883'

- etoc 2707'

- Perfed 3076' - 3341' (1941)

- Plugged w/ cem 3376'-3906' (1940)
- 6-5/8" ld 3424'-3903'  perfs 3424'-3903'

- 3426'

- 3903'

676



Conditions of Use | Privacy Policy
Copyright © 2010 State of California

**Louie, Tammi@DOC**

| | |
|---|---|
| **From:** | Louie, Tammi@DOC |
| **Sent:** | Friday, November 17, 2017 11:24 AM |
| **To:** | 'Dave Bell' |
| **Cc:** | Moser, Ellen@DOC; Huff, John@DOC |
| **Subject:** | County of LA well Dow RGC 10 (037-13798) |
| **Attachments:** | 03713798_2017-11-03_abNOI.PDF |

The Notice of Intention from Methane Specialists to abandon County of Los Angeles well Dow R.G.C. 10 (037-13798) is being returned as an attachment in this email.

*Tammi Louie*

Office Technician
Division of Oil, Gas and Geothermal Resources
District 1 – Cypress
Tammi.Louie@conservation.ca.gov
(714) 816-6847 *Main*
(714) 816-6563 *Direct*

Every Californian should conserve water.  Find out how at:



SaveOurWater.com · Drought.CA.gov



# DEPARTMENT OF CONSERVATION
### DIVISION OF OIL, GAS & GEOTHERMAL RESOURCES
5816 Corporate Ave., Suite 100 Cypress, CA 90630-4731
Phone:(714) 816-6847 Fax:(714) 816-6853

Cypress, California
November 03, 2017

**VIA EMAIL ONLY**

Mr. Dave Bell
Methane Specialist
621 Via Alondra, Suite 610
Camarillo, CA 93012
dbell@methanespecialists.com

This Division of Oil, Gas and Geothermal Resources ("Division") has received your Notice of Intention (NOI) to **Abandon** dated **10/4/2017,** for **"Dow R.G.C." 10**, API. **037-13798**, **Playa Del Rey** field, Sec. **21**, T. **02S**, R. **15W**, **SB** B&M, **Los Angeles** County.

This notice is being held in abeyance pending receipt and approval of the following:

- Report of property transfer (Form OG30A) or a letter from the operator or the mineral rights owner granting Methane Specialist the right to access the well
- Indemnity bond, as required per California Public Resources Code section 3204

Please submit the above requested documents to the Division by November 17, 2017 or your NOI will be returned and permit will not be issued.

If you have any questions, please contact Ellen Plaza Moser at (714) 816-6847 or ellen.moser@conservation.ca.gov.

Kenneth A. Harris Jr.

State Oil and Gas Supervisor

Digitally signed by Ellen Plaza Moser
DN: cn=Ellen Plaza Moser, o=Division of Oil, Gas & Geothermal Resources, ou=Department of Conservation,
email=Ellen.Moser@conservation.ca.gov, c=US
Date: 2017.11.06 11:23:18 -08'00'

By _____

For          Daniel J. Dudak, *District Deputy*

EPM:tl

OG113                                          679



# DEPARTMENT OF CONSERVATION

DIVISION OF OIL, GAS & GEOTHERMAL RESOURCES
5816 Corporate Ave., Suite 100 Cypress, CA 90630-4731
Phone:(714) 816-6847 Fax:(714) 816-6853

Cypress, California
November 03, 2017

**VIA EMAIL ONLY**

Mr. Dave Bell
Methane Specialist
621 Via Alondra, Suite 610
Camarillo, CA 93012
dbell@methanespecialists.com

This Division of Oil, Gas and Geothermal Resources ("Division") has received your Notice of Intention (NOI) to **Abandon** dated **10/4/2017**, for **"Dow R.G.C." 10**, API. **037-13798**, **Playa Del Rey** field, Sec. **21**, T. **02S**, R. **15W**, **SB** B&M, **Los Angeles** County.

This notice is being held in abeyance pending receipt and approval of the following:

- Report of property transfer (Form OG30A) or a letter from the operator or the mineral rights owner granting Methane Specialist the right to access the well
- Indemnity bond, as required per California Public Resources Code section 3204

Please submit the above requested documents to the Division by November 17, 2017 or your NOI will be returned and permit will not be issued.

If you have any questions, please contact Ellen Plaza Moser at (714) 816-6847 or ellen.moser@conservation.ca.gov.

Kenneth A. Harris Jr.
State Oil and Gas Supervisor

Digitally signed by Ellen Plaza Moser
DN: cn=Ellen Plaza Moser, o=Division of Oil, Gas
& Geothermal Resources, ou=Department of
Conservation,
email=Ellen.Moser@conservation.ca.gov, c=US
Date: 2017.11.06 11:23:18 -08'00'

By
For          Daniel J. Dudak, *District Deputy*

EPM:tl

OG113                                            680

Rcv'd 11/3/17



NATURAL RESOURCES AGENCY OF CALIFORNIA

DEPARTMENT OF CONSERVATION

DIVISION OF OIL, GAS, AND GEOTHERMAL RESOURCES

| FOR DIVISION USE ONLY | | |
|---|---|---|
| | Forms | |
| Bond | OGD114 | OGD121 |
| | | |

# NOTICE OF INTENTION TO ABANDON / RE-ABANDON WELL

Detailed instructions can be found at: www.conservation.ca.gov/dog

In compliance with Section 3229, Division 3, Public Resources Code, notice is hereby given that it is our intention to abandon ☐ / re-abandon ☐ well "Daw R.G.C." 10 , API No. 03713798 .
(Check one)

Sec. 21 , T. 25 , R. 15W , 5B B.&M., Playa Del Rey Field, Los Angeles County.

**The complete casing record of the well (present hole), including plugs and perforations, is as follows:** (Attach wellbore schematics diagram also.)

The total depth is: 3906 feet.    The effective depth is: feet.

Present completion zone(s): _____    Present zone pressure: _____ psi.
(Name)

Oil or gas shows: _____ feet.    Depth to base of fresh water: _____ feet.
(Name and depth)

Top of uppermost hydrocarbon zone (which may be behind unperforated casing): _____ feet.
(Depth of interval)

Is this a critical well as defined in the California Code of Regulations, Title 14, Section 1720(a) (see next page)? Yes ☑ No ☐

**The proposed work is as follows: (A complete program is preferred and may be attached.)**

Cut well to depth. Install new I.D plate. Install Vent Cone.

**The Division must be notified immediately of changes to the proposed operations. Failure to provide a true and accurate representation of the well and proposed operations may cause rescission of the permit.**

Name of Operator
Methane Specialist

| Address 621 Via Mondra, Suite 610 | | City/State Camarillo, CA | Zip Code 93012 |
|---|---|---|---|
| Name of Person Filing Notice David Bell | Telephone Number: 805 987-1386 | Signature DBell | Date 10/4/17 |
| Individual to contact for technical questions: Same as above | Telephone Number: Some as above | E-Mail Address: dbell@methanespecialists.com | |

This notice must be filed, and approval given, before plugging and abandonment operations begin. If operations have not commenced within one year of the Division's receipt of the notice, this notice will be considered cancelled.

OG108 (1/09)

## CRITICAL WELL DEFINITION

As defined in the California Code of Regulations, Title 14, Section 1720 (a), "Critical well" means a well within:

(1)  300 feet of the following:
  (A)  Any building intended for human occupancy that is not necessary to the operation of the well; or
  (B) Any airport runway.
(2)  100 feet of the following:
  (A)  Any dedicated public street, highway or the nearest rail of an operating railway that is in general use;
  (B)  Any navigable body of water or watercourse perennially covered by water;
  (C)  Any public recreational facility such as a golf course, amusement park, picnic ground, campground or any
       other area of periodic high-density population; or
  (D)  Any officially recognized wildlife preserve.

This form may be printed from the DOGGR website at www.conservation.ca.gov/dog/



Conditions of Use | Privacy Policy
Copyright © 2010 State of California

FORM 159 (9-49)



STATE OF CALIFORNIA
**DEPARTMENT OF NATURAL RESOURCES**
**DIVISION OF OIL AND GAS**

# REPORT OF WELL ABANDONMENT

Inglewood _____ California

April 14 1959 _____

Mr. Harry P Stolz _____
530 West 6th Street _____
Los Angeles 14 California _____
Agent for COUNTY OF LOS ANGELES _____

DEAR SIR:

Your report of abandonment of Well No. **"Dow R.G.C." 10** _____,

Sec. 21 , T. 2 S , R. 15 W , S B B. & M., Playa del Rey _____ field,

Los Angeles _____ County, dated April 8, 1959 _____, has been

examined in conjunction with records filed in this office.

A review of the reports and records shows that the requirements of this Division,

which are based on all information filed with it, have been fulfilled.

| MAP | MAP BOOK | CARDS | BOND | FORMS 114 | 121 |
|---|---|---|---|---|---|
| N.C. 6B | N.C. 6B | | No bond required | | |

RC:es
cc Mr E H Musser
   Mr R A Del Guercio
   Dept of Harbors and Marina
   Stanley and Stolz
   County Engineers
      Attn Mr Geo Arndt
   Conservation Committee
   Mr L A Dutton
   Fire Prevention Bureau

**E. H. MUSSER**
*State Oil and Gas Supervisor*

By _Wm C Bal_____
                              *Deputy Supervisor*

684

84442 9-58 10M SPO

SUBMIT IN DUPLICATE

FORM 103

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

DIVISION OF OIL AND GAS
RECEIVED
APR 13 1959
INGLEWOOD, CALIFORNIA

# DIVISION OF OIL AND GAS

## History of Oil or Gas Well



OPERATOR **COUNTY OF LOS ANGELES**          FIELD **PLAYA DEL REY**

Well No. **"Dow R.G.C." 10**     , Sec. **21**, T. **2-S**, R. **15-W**, **S.B.** B. & M.

Date **APRIL 8**     , 19**59**     Signed *Harry C. Stoft*

AGENT FOR THE COUNTY OF

**530 W. 6TH ST., L.A. 14   MA 2-2079** Title **LOS ANGELES**

(Address)               (Telephone Number)                           (President, Secretary or Agent)

It is of the greatest importance to have a complete history of the well. Use this form to report a full account of all important operations during the drilling and testing of the well or during re-drilling, altering of casing, plugging, or abandonment with the dates thereof. Be sure to include such items as hole size, formation test details, amounts of cement used, top and bottom of plugs, perforation details, sidetracked junk, bailing tests, shooting and initial production data.

Date

REPORTED MECHANICAL AND ABANDONED CONDITION PRIOR TO RE-ENTRY
TOTAL DEPTH 3906'
18⅝" CASING CEMENTED AT 686'
11¾" CASING CEMENTED AT 3423', PERFORATED 3341'-3076', SHOT AT 887',
    PULLED UP TO 883', SHOT AT 625', 542' AND 310', PULLED UP TO
    295', SHOT AND PULLED FROM 40'.
6⅝" LINER LANDED 3903'-3396', PERFORATED 3903'-3424'
PLUGGED DEPTHS
(A) 3906'-3376'
(B) PLUGGED WITH 150 SAXS OF CEMENT BELOW 786'
(C) "     "     "     "     "     "     556'
(D) 310'-304' (K.B. MEASUREMENT ON RE-ABANDONMENT)
(E) WOODEN PLUG IN 18⅝" CASING AT 35'
(F) 35'-10'

WORK DONE DURING RE-ABANDONMENT–JOHN S. HAGESTAD DRLG. CO., CONTRACTOR

4/7/59   ALL MEASUREMENTS ARE FROM THE K.B. WHICH IS 15.72' ABOVE M.L.L.W. AND
12.92' ABOVE SEA LEVEL.
CLEANED OUT SURFACE CEMENT PLUG.
FOUND TOP OF 11¾" CASING AT 44'. ENTERED 11¾" CASING WITH 9⅞" BIT AND
CLEANED OUT TO 304'. ENCOUNTERED CEMENT PLUG AT 304' (K.B. MEASUREMENT),
WHICH SUPPORTED FULL WEIGHT OF KELLY, DRILL PIPE, COLLARS AND BIT.
LOCATION AND HARDNESS OF PLUG WITNESSED BY A REPRESENTATIVE OF THE
DIVISION OF OIL AND GAS.

SURFACE PLUG – TO PLUG 11¾" & 18⅝" CASING FROM 50' BELOW M.L.L.W. TO
M.L.L.W.
WITH 4½" OPEN END DRILL PIPE HANGING AT 68', B-J SERVICE, INC. PUMPED
IN 76 SAXS CONSTRUCTION CEMENT. OBTAINED GOOD CEMENT RETURNS AT THE
SURFACE. CEMENTING OPERATIONS WITNESSED BY A REPRESENTATIVE OF THE
DIVISION OF OIL AND GAS.
CIRCULATED OUT CEMENT TO 17'

WELL RE-ABANDONED APRIL 7, 1959

18⅝" CASING REMOVED FROM M.L.L.W. LEVEL AND STEEL
PLATE WELDED ON STUB.

Form 109-D

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## Special Report on Operations Witnessed

No. T **159-250**

Mr. **Harry P Stolz**
**530 West 6th Street**                                   **Inglewood 3**   Calif.
**LOS ANGELES 14**                                        **April 9, 1959**
Agent for **COUNTY OF LOS ANGELES**

DEAR SIR:

Operations at your well No. **"Dow R.G.C." 10** , Sec. **21** , T. **2 S** , R. **15 W** , **S B** B & M. **Playa del Rey** Field, in **Los Angeles** County, were witnessed on **April 7, 1959** , Mr. **G. Beecroft, Engineer** , representative of the supervisor was present from **5:00** to **9:00 p.m.** . There were also present **R. Geddes, Engineer.**

Present condition of well: **18-5/8" cem. 686'; 11-3/4" cem. 3423', shot 887', pulled to 883', shot at 625', 542', 310', pulled from 40'; 6-5/8" ld. 3396'-3906', perf. 3424'-3903'. T.D. 3906', plugged w/cement 3906'-3376', 150 sacks of cement below 786', 150 sacks of cement below 556', plugged w/cement 310'-304' and 68'-17'.**

The operations were performed for the purpose of **witnessing the plugging operations in the process of reabandonment.**

~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~

**MR. GEDDES REPORTED THAT** the hole was cleaned out to 304'.

**THE ENGINEER NOTED:**
1. The cement plug at the reported depth of 304' supported all the weight of the drill pipe.
2. On April 7, 1959, 76 sacks of cement was pumped into the hole through 4-1/2" drill pipe hanging at 68'.
3. Cement returned to the surface.
4. Cement was circulated out of the hole to 17'.

**THE PLUGGING OPERATIONS AS WITNESSED AND REPORTED ARE APPROVED.**

GB:OH

cc  Mr Richard A Del Guercio
    Department of Harbors & Marina
    Stanley & Stolz
    County Engineers, Attention Mr Geo Arndt

E. H. MUSSER
State Oil and Gas Supervisor

686   By _____ Deputy

Y/H

63193 9-57 17M ⊗ SPO

FORM 111

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## REPORT ON PROPOSED OPERATIONS

No. P 159-4

Mr. **Harry P Stolz**
**530 West 6th Street**
**LOS ANGELES 14**                          **Inglewood 3** Calif.
Agent for **COUNTY OF LOS ANGELES**          **January 2, 1959**

DEAR SIR:

Your **supplementary** proposal to **abandon** Well No. **"Dow R.G.C." 10**,

Section **21**, T. **2 S**, R. **15 W**, S B B. & M., **Playa del Rey** Field, **Los Angeles** County,

dated **Dec. 9, 1958**, received **Dec. 23, 1958**, has been examined in conjunction with records filed in this office.

Present conditions as shown by the records and the proposal are as follows:

RECORDS IN ADDITION TO, OR AT VARIANCE WITH, THOSE SHOWN IN THE NOTICE: 11-3/4" cem. 3423', W.S.O., perf. 3341'-3076', shot 887', pulled to 883', shot at 625', 542', 310' and 40', pulled from 40'. Plugged w/150 sacks of cement below 786', 150 sacks of cement below 556', 310'-291', and 40'-10'.

THE NOTICE STATES
"The present condition of the well is: Abandoned
1. Total Depth: 3906'
2. Complete casing record including plugs: 18-5/8" cemented at 686'
   11-3/4" cemented at 3426'
   11-3/4" casing knife perforated 3341' (100 holes), 3245' to 3076' (165 holes), 3272' to 3076' (392 holes). Shot at 887' and pulled up to 883' - well blew out. Shot hole at 625' for cementing during abandonment. Collar shot at 542' for cementing during abandonment. Collar shot at 310' and pulled casing up to 295' for cementing during abandonment. Backed off and removed from 40'. 507' of 6-5/8" liner landed at 3903' (top at 3396') including 479' of perforations from 3424'-3903'. Plugs: (a) 3376'-3906'
3. Last Produced Not Available          (b) From unknown depth below 883' in stages, by pressure cementing and pumping to 291'
                                        (c) Wood plug in 18-5/8" casing at 35'
                                        (d) 35' to 10' from surface."

PROPOSAL
"The proposed work is Re-enter and Re-abandon
1. Clean out top plug and clean out 11-3/4" casing to top of cement plug reported at a depth of 291'.
2. Test location and hardness of cement plug @ 291' with drill pipe & bit. Clean out, additional cement plug will be placed at discretion of County Engineer.
3. Place a 50' running bridge (cement) in top of 18-5/8" & 11-3/4" casing strings.
4. Cut and pull 18-5/8" casing from a minimum depth of 0.0' M.L.L.W.
5. Weld steel plate on top of 18-5/8" casing."

DECISION
THE PROPOSAL IS APPROVED PROVIDED THAT
1. If the hole is cleaned out below 341', a 50' cement plug shall be placed from 310' to 291'.
2. All portions of the hole not plugged with cement, shall be filled with heavy rotary mud.
3. THIS DIVISION SHALL BE NOTIFIED TO WITNESS (a) The location and hardness of the cement plug at 291'. (b) The placing of the 50' cement surface plug.

RC:OH
cc Mr Richard A Del Guercio
   Dept of Harbors & Marina
   Stanley & Stolz (3)
No bond required. County Engineers, Attn Geo Arndt

687

E. H. MUSSER, State Oil and Gas Supervisor

By _____, Deputy

FORM 157

**STATE OF CALIFORNIA**
**DEPARTMENT OF NATURAL RESOURCES**
**DIVISION OF OIL AND GAS**

# REPORT ON PROPOSED CHANGE OF WELL DESIGNATION

830 North La Brea Avenue
Inglewood 3, _____ California

December 23, 1958 _____

Mr. Harry P. Stols
530 West Sixth Street
Los Angeles 14, California
Agent for COUNTY OF LOS ANGELES

DEAR SIR:

Your request dated _____ December 9, 1958 _____, relative to change in designation of
well(s) in Sec. 28 21 and , T. 2 S., R. 15 W., S.B. B. & M., Playa del Rey _____ field,
Los Angeles _____ County, District No. 1 , has been received;

and in accordance with Section 3203, Public Resources Code, reading in part as follows:

> "* * * The number or designation by which any well heretofore drilled has
> been known, and the number or designation specified for any well in a notice
> filed as required by Section 3203, shall not be changed without first obtaining
> a written consent of the Supervisor."

the proposed change in designation is hereby authorized as follows:

Wells No. "Recreation Gun Club" 7, "Recreation Gun Club" 9 and "Recreation Gun Club" 10,

formerly owned by The Dow Chemical Company, will hereafter be known as your wells No.

"Dow R.G.C." 7, "Dow R.G.C." 9 and "Dow R.G.C." 10, respectively.

42 R√ 1-5

eb
CC- Mr. E. H. Musser
Prod. Dept.
Conservation Committee
Mr. Richard A. Del Guercio
Dept. of Harbors and Marina
County Engineer, 524 Pan Amer. Bldg.
Stanley & Stols (2)

**E. H. MUSSER**
*State Oil and Gas Supervisor*

By _Wm. C. Baily_
*Deputy Supervisor*

66445 11-57 2350 SPO

688

FORM 156

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES
DIVISION OF OIL AND GAS

# REPORT OF PROPERTY AND WELL TRANSFER

Field or County     **Playa del Rey**               District    **1**

Former Owner:     **The Dow Chemical Co.**          Date    **December 23, 1958**

Description of Property    **Sec. 21 and 28, T. 2 S., R. 15 W., S. B. B. & M.**

List of Wells       **"Recreation Gun Club" 7, "Recreation Gun Club" 9, Sec. 28, and "Recreation Gun Club" 10, Sec. 21.**

Date of Transfer     **December 4, 1958**
New Owner:         **County of Los Angeles**
Address:            **c/o Richard A. Del Guercio, Deputy County Counsel, Suite 1100 Hall of**
Telephone No.          **Records, Los Angeles 12, Calif.**

Type of Organization     **Governmental**
Reported by:          **Harry F. Stols for County of Los Angeles (Notices to abandon dated**
Confirmed by:                                     **12-9-58)**
New Operator New Status    **NPI**        , Old Operator New Status    **NPI**
Request designation of agent for the following County.    **No**

Remarks:

**eb**
**CC- Mr. E. H. Musser**
     **Prod. Dept.**
     **Conservation Committee**

*Wm. C. Bailey*
Deputy Supervisor

| | INITIALS | DATE |
|---|---|---|
| Form 121 | | |
| New Well Cards | | |
| Well Records | | |
| Electric Logs | | |
| Production Reports | | |
| Map and Book   42 | R√ | 1- 5 |
| Form 148 | | |
| Notice to be cancelled | | |

| LEGEND |
|---|
| PA—Producing Active |
| NPA—Non Potential Active |
| PI—Potential Inactive |
| NPI—Non Potential Inactive |
| Ab—Abandoned or No More Wells |
| NOTE—If Transfer Does Not Change Overall Status Enter "No Change" |

639

68275 12-57 4500 ⓢ SPO

Case 2:20-cv-08008-FLA-JPR   Document 130-1   Filed 03/10/21   Page 117 of 158   Page ID #:6143

FORM 108.

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

DIVISION OF OIL AND GAS
RECEIVED

DEC 23 1958

HOLLYWOOD, CALIFORNIA

## Notice of Intention to Abandon Well

This notice must be given at least five days before work is to begin; one copy

LOS ANGELES _____ Calif. DECEMBER 9 19 58

DIVISION OF OIL AND GAS

In compliance with Division 3, Public Resources Code, notice is hereby given that it is our intention to abandon

~~Well No.~~ DOW CHEMICAL COMPANY WELL R.G.C. No. 10 _____, Sec. 21, T. 2-S,

R. 15-W, S.B. B. & M., _____ PLAYA DEL REY Field, LOS ANGELES County,

commencing work on _____ 19___.

THE PRESENT CONDITION OF THE WELL IS: ABANDONED | ADDITIONAL DATA FOR DRY HOLE

1. Total Depth: 3906'

2. Complete casing record, including plugs:

18⅝" CEMENTED AT 686'
11¾" CEMENTED AT 3426'
11¾" CASING KNIFE PERFORATED 3341' (100 HOLES), 3245' TO 3076' (165 HOLES), 3272' TO 3076' (392 HOLES). SHOT AT 887' AND PULLED UP TO 883'. - WELL BLEW OUT. SHOT HOLE AT 625' FOR CEMENTING DURING ABANDONMENT. COLLAR SHOT AT 542' FOR CEMENTING DURING ABANDONMENT. COLLAR SHOT AT 310' AND PULLED

3. Last Produced ___ NOT AVAILABLE ___
(Date) _____ (Oil, B/D) _____ (Water, B/D)

THE PROPOSED WORK IS RE-ENTER AND RE-ABANDON

1. CLEAN OUT TOP PLUG AND CLEAN OUT 11¾" CASING TO TOP OF CEMENT PLUG REPORTED AT A DEPTH OF 291'

2. TEST LOCATION AND HARDNESS OF CEMENT PLUG @ 291' WITH DRILL PIPE & BIT. CLEAN OUT, ADDITIONAL CEMENT PLUG WILL BE PLACED AT DISCRETION OF COUNTY ENGINEER.

3. PLACE A 50' RUNNING BRIDGE (CEMENT) IN TOP OF 18⅝" & 11¾" CASING STRINGS.

4. CUT AND PULL 18⅝" CASING FROM A MINIMUM DEPTH OF 0.0' M.L.L.W.

5. WELD STEEL PLATE ON TOP OF 18⅝" CASING.

THE PROPERTY ON WHICH THIS WELL IS LOCATED WAS ACQUIRED BY THE COUNTY OF LOS ANGELES AS A PART OF THE MARINA DEL REY ON DECEMBER 4, 1958. IT IS REQUESTED THAT THE FORMER DESIGNATION OF DOW CHEMICAL COMPANY WELL R.G.C. No. 10 BE CHANGED TO COUNTY OF LOS ANGELES WELL DOW R.G.C. No. 10.

4. ~~Oil or Gas showings and results of tests~~
CASING UP TO 295' FOR CEMENTING DURING ABANDONMENT. BACKED OFF AND REMOVED FROM 40'
507' OF 6⅝" LINER LANDED AT 3903' (TOP AT 3396') INCLUDING 479' OF PERFORATIONS FROM 3424'-3903'

5. ~~Stratigraphic markers and depths:~~
PLUGS:
(A) 3376'-3906'
(B) FROM UNKNOWN DEPTH BELOW 883' IN STAGES, BY PRESSURE CEMENTING

6. ~~Geologic age at bottom:~~

7. ~~Base of fresh water sands:~~
AND PUMPING TO 291'
(C) WOOD PLUG IN 18⅝" CASING AT 35'
(D) 35' TO 10' FROM SURFACE.

PLEASE SEND 3 COPIES OF ALL NOTICES TO STANLEY AND STOLZ

530 WEST SIXTH
(Address)
MADISON 2-2079
(Telephone No.)

| MAP | MAP BOOK | CARD | BOND | FORMS 114 | 121 |
|---|---|---|---|---|---|

COUNTY OF LOS ANGELES
(Name of Operator)
By HARRY P. STOLZ, AGENT

690

ADDRESS ONE COPY OF NOTICE TO DIVISION OF OIL AND GAS IN DISTRICT WHERE WELL IS LOCATED

Form 159 (9-49)

**STATE OF CALIFORNIA**
**DEPARTMENT OF NATURAL RESOURCES**
**DIVISION OF OIL AND GAS**



# REPORT OF WELL ABANDONMENT

Los Angeles ............................................ California

April 27 1956 ......................................................

Mr. Gordon Graham .................................................
The Dow Chemical Co .............................................
P O Box 229 ..........................................................
Long Beach California ...........................................

Dear Sir

Your report of abandonment of Well No. "Recreation Gun Club" 10 .............,

Sec. 21 , T. 2 S , R. 15 W , S B B. & M., Playa del Rey .......................... field,

Los Angeles ....................... County, dated April 24, 1956 ..............., has been

examined in conjunction with records filed in this office.

A review of the reports and records shows that the requirements of this Division, which

are based on all information filed with it, have been fulfilled.

| MAP | MAP BOOK | CARDS | BOND | FORMS | |
|-----|----------|-------|------|-------|---|
| | | | | 114 | 121 |
| ah | Rs | | No bond required | | ✓ |

cc Mr E H Musser
   Mr Gordon Graham
   Mr L A Dutton
   Fire Prevention Bureau
   Conservation Committee

es

**E. H. Musser**
*State Oil and Gas Supervisor*

By R. W. Walling
             *Deputy Supervisor*

17601 5-55 11,200 SPO

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

DIVISION OF OIL AND GAS
RECEIVED
APR 26 1956
LOS ANGELES, CALIFORNIA

# DIVISION OF OIL AND GAS

## History of Oil or Gas Well

OPERATOR  Gordon L. Graham
for Dow Chemical Company      FIELD  Playa del Rey

Well No. "Recreation Gun Club #10", Sec. 21 , T. 2 S , R. 15 W , S. B B. & M.

Signed  *Gordon L. Graham*

Date  April 24, 1956        Title  Contractor
(President, Secretary or Agent)

It is of the greatest importance to have a complete history of the well. **Use this form in reporting the history of all important operations at the well, together with the dates thereof, prior to the first production.** Include in your report such information as size of hole drilled to cementing or landing depth of casings, number of sacks of cement used in the plugging, number of sacks or number of feet of cement drilled out of casing, depth at which cement plugs started, and depth at which hard cement encountered. If the well was dynamited, give date, size, position and number of shots. If plugs or bridges were put in to test for water, state kind of material used, position and results of pumping or bailing.

| Date | |
|---|---|
| 3/12/56 | Shot 11 3/4" casing at 887'. Pulled to 883' |
| | Well blew out |
| 3/14/56 | Installed Mac Clatchie cement head on 11 3/4" casing |
| | Gas built up to 250# |
| 3/21/56 | Cemented under pressure with 150 sacks of cement and displaced with heavy mud |
| 3/28/56 | Located top of cement at 786' |
| | Shot hole in 11 3/4" casing at 625' and pumped in 150 sacks of cement |
| 3/29/56 | Applied 500# pressure on 11 3/4" casing |
| 4/5/56 | Locate top of cement at 556' |
| | Shot 11 3/4" casing at 542' & 310' |
| | Pulled up 30' where bottom of 11 3/4" casing was 290' |
| 4/11/56 | Dumped 32 sacks of cement on wooden plug at 310' |
| 4/16/56 | Located top of cement plug at 291' |
| 4/17/56 | Backed off 11 3/4" casing at 40' |
| 4/17/56 | Hung wwoden plug 35' from surface in 18 5/8" casing |
| | Dumped 2 yds. of ready mix concrete in hole filling to 10' below surface |

Please mail copies of report to:

Gordon L. Graham

3032 Cherry Ave

Long Beach 7, Calif.

**STATE OF CALIFORNIA**
**DEPARTMENT OF NATURAL RESOURCES**

# DIVISION OF OIL AND GAS

### Special Report on Operations Witnessed

No. T 156-659

Mr. G L Graham
P O Box 229
LONG BEACH California                                  Los Angeles 15   Calif.
Agent for   THE DOW CHEMICAL CO                        April 19   1956

DEAR SIR:         "Recreation Gun Club"
Operations at your well No. 10          Sec. 21     , T. 2 S. , R. 15 W. , S. B. B. & M.,
Playa del Rey          Field, in   Los Angeles          County, were witnessed
on      XXXX     , 19 XX. Mr.    XXXXXX          , representative of the supervisor was present
from    XXX   to    XXXX   . There were also present   G. Graham, Contractor,
R. Cook, Driller.

Present condition of well: 18-5/8" cem. 686'; 11-3/4" cem. 3423', shot 887', pulled to 883',
shot at 625', 542', 310' and 40', pulled from 40'; 6-5/8" ld. 3396'-3906', perf. 3424'-
3903'. T.D. 3906', plugged with cement 3906'-3376', 150 sacks of cement below 786',
150 sacks of cement below 556', plugged with cement 310'-291' and 40'-10'.

The operations were performed for the purpose of witnessing the plugging operations in the process
of abandonment.
Mr.    XXXXXXXX          reported:

ON MARCH 22, 1956, Engineer Crowder was present at the well from 10:30 a.m. to 6:00 p.m., and
Mr. Gordon Graham reported the following:
1. The 11-3/4" casing was collar shot at 887' and pulled to 883', when the well blew out.
2. The well finally bridged itself off with sand at approximately 300'.
THE ENGINEER NOTED THE FOLLOWING:
1. A MacClatchie head and pressure gauge were installed on the 11-3/4" casing, and the gauge in-
dicated 150 Psi pressure on the 11-3/4" casing.
2. The sand bridge was washed out of the 11-3/4" casing by pumping 800 cu. ft. of water into
the hole under a final pressure of 250 Psi. The pressure decreased to 0 Psi, and a slight
vacuum was noted thereafter.
3. One hundred and fifty sacks of cement was pumped into the hole, and calculated to be dis-
placed to 875'.
On March 27, 1956, Engineer Thomas visited the well from 10:00 a.m. to 3:00 p.m., and Mr. Graham
reported: 1. The top of the cement was at 786'.
2. Gas was escaping from the annulus of the 18-5/8" and 11-3/4" casings.
3. A 2½ lb. shot was exploded at a collar in the 11-3/4" casing at 625', and the gas subsided
shortly thereafter.
4. One hundred sacks of cement was pumped into the hole without building up any pressure, and
was followed by a cementing plug to an estimated depth of 600'.
On April 5, 1956, Engineer Crowder was present at the well from 10:30 a.m. to 1:30 p.m., and
Mr. Graham reported that an additional 50 sacks of cement was pumped into the hole under a
pressure of 500 Psi.
THE ENGINEER NOTED THE FOLLOWING:
1. The bailer could not be spudded below 556', and brought up samples of set cement.
2. The 11-3/4" casing was collar shot at 542' and could not be pulled loose from that depth.
3. The 11-3/4" casing was collar shot at 310'.
ENGINEER G. LEE VISITED THE WELL FROM 12:30 - 1:15 P.M., APRIL 11, 1956, AND MR. COOK REPORTED:
1. The 11-3/4" casing was pulled up to 290'.

E. H. MUSSER
**State Oil and Gas Supervisor**

693   By  (CONTINUED ON PAGE 2)          Deputy

FORM 109-X
17494 5-55 6500 SPO

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## Report on Test of Water Shut-off
### or
## Special Report on Operations Witnessed

No. T 156-659

Page _____

THE DOW CHEMICAL CO _____

Well No."Recreation Gun Club" 10 ____, Sec. 21 _____, T. 2 S ____, R 15 W _____, S B ___ B. & M.

2.  A wooden plug was driven to 310'.

THE ENGINEER NOTED THAT plugging operations were started by dumping cement in the hole at 310'.

ON APRIL 16, 1956, ENGINEER CROWDER WAS PRESENT AT THE WELL FROM 11:00 - 11:40 A.M., AND MR. GRAHAM REPORTED THAT 32 sacks of cement was dumped at 310', filling to 291'.
THE ENGINEER NOTED THAT the bailer could not be spudded below 291' and brought up samples of set cement.

ENGINEER A. HLUZA VISITED THE WELL FROM 3:30 - 4:15 P.M., APRIL 17, 1956, AND MR. GRAHAM REPORTED:
1.  The 11-3/4" casing was backed off at 40' and pulled from that depth.
2.  The hole was bridged at 35' with a wooden plug and sacks.
THE ENGINEER NOTED: 2 cu. yds   Crowder/Graham
1.  Fifteen sacks of cement was poured into the hole.
2.  The top of the cement in the 18-5/8" casing was at 10' below the ground surface.

THE PLUGGING OPERATIONS AS WITNESSED AND REPORTED ARE APPROVED.

RC:OH

4/G

cc  Mr Gordon L Graham

E. H. MUSSER
State Oil and Gas Supervisor

694   By _R. W. Walling_ _____ Deputy

Form 110
1975 7-54 1260 SPO

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## MEMORANDUM OF TELEPHONE OR PERSONAL CONVERSATION

Los Angeles _____, Calif.

March 14 ____ 19 56

Operator ____ The Dow Chemical Company ____ Well No. "Recreation Gun Club" 10

Field ____ Playa del Rey ____ Sec. 21 ___ T. 2 S. ___ R. 15 W. ___ S. B. ___ B. & M.

personal
A ~~telephone~~ conversation was held, concerning the above well, with Mr. ___ Gordon Graham ____

____ contractor ____ for the above operator on ____ March 12 ____ 19 56 at 5:00 P. M.

Details of the conversation were as follows:

The well was being abandoned by the contractor, Gordon Graham. The 11-3/4"

casing was shot and parted at 887' and was pulled up 4' when the well blew out at

3:10 p.m., March 12, 1956.

The well is located on the northeast corner of the structure with no producing

wells to the north or east. The well was being used to produce salt water for the

manufacturing of iodine.

Engineer Crowder arrived at the well at 5:00 p.m., March 12, 1956, and noted

that the well was blowing marsh gas, salt water and sand at an undetermined rate

through the 11-3/4" casing. The gas was apparently coming from behind the 11-3/4"

casing at a depth of 1800'.

At 3:00 a.m., March 14, 1956, the well had bridged itself off with sand and a

MacClatchie head was installed.

[SIGNED] Robert E Crowder

REC:rw

695       Title  Associate Oil and Gas Engineer

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## REPORT ON PROPOSED OPERATIONS

No. P 156-293

Mr. G L Graham
P O Box 229
Long Beach California
Agent for THE DOW CHEMICAL CO

Los Angeles 15 Calif.
February 21 1956

DEAR SIR:

Your proposal to **abandon** Well No. **10**,

Section **21**, T. **2 S**, R. **15 W**, S.B. B. & M., **Playa del Rey** Field, **Los Angeles** County,

dated **Feb. 15, 1956**, received **Feb. 16, 1956**, has been examined in conjunction with records filed in this office.

"Recreation Gun Club"

Present conditions as shown by the records and the proposal are as follows:

**THE NOTICE STATES**
"The present condition of the well is:
1. Total Depth: 3906'

2. Complete casing record, including plugs:
   18-5/8" cem. 686'
   11-3/4" cem. 3423', W.S.O.
   6-5/8" ld. 3396'-3903', perf. 3424'-3903'

   plugged with cement 3906' to 3376'

3. Last Produced  Unknown."

**PROPOSAL**
"The proposed work is
1. Shoot and pull as much 11-3/4" casing as possible, and place a 20' cement plug on the stub.
2. If the 11-3/4" casing is recovered from below the shoe of the 18-5/8" casing a 40' cement plug will be placed across the shoe.
3. Place a 10' cement plug in the 18-5/8" casing at the surface.

   The Division of Oil and Gas shall be notified to witness the location and hardness of each cement plug."

**DECISION**
**THE PROPOSAL IS APPROVED PROVIDED THAT THIS DIVISION SHALL BE NOTIFIED TO WITNESS the placing of and the location and hardness of each cement plug.**

RC:OH

cc  Mr G L Graham, Contractor
    P O Box 245
    Seal Beach California

E. H. MUSSER, State Oil and Gas Supervisor

696

By R. H. Wallung , Deputy

P/L

25462 10-55 60M SFO
No bond required.

DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

DIVISION OF OIL AND GAS
P 7 '7 D

## Notice of Intention to Abandon Well

This notice must be given at least five days before work is to begin; one copy only

FEB 16 1956

LOS ANGELES, CALIFORNIA

Long Beach ............................... Calif. **February 15** ....... 19 **56**

DIVISION OF OIL AND GAS

In compliance with Division 3, Public Resources Code, notice is hereby given that it is our intention to abandon

Well No. ........ **"Recreation Gun Club" 10** .................................... , Sec. **21** , T. **2S** ,

R. **15W** , SB B. & M., **Playa Del Rey** .................... Field, **Los Angeles** County,

commencing work on ................ **February 16** ............. 19 **56** .

THE PRESENT CONDITION OF THE WELL IS:

ADDITIONAL DATA FOR DRY HOLE

1. Total Depth:
   **3906'**

2. Complete casing record, including plugs:
   **18-5/8" cem. 686'**
   **11-3/4" cem. 3423', W.S.O.**
   **6-5/8" ld. 3396'-3903', perf. 3424'-3903'**

   **plugged with cement 3906' to 3376'**

4. Oil or Gas showings and results of tests:

5. Stratigraphic markers and depths:

3. Last Produced ........ **Unknown** ........
   (Date)       (Oil, B/D)       (Water, B/D)

6. Geologic age at bottom: ....................
7. Base of fresh water sands: ....................

THE PROPOSED WORK IS

1. **Shoot and pull as much 11-3/4" casing as possible, and place a 20' cement plug on the stub.**
2. **If the 11-3/4" casing is recovered from below the shoe of the 18-5/8" casing a 40' cement plug will be placed across the shoe.**
3. **Place a 10' cement plug in the 18-5/8" casing at the surface.**

**The Division of Oil and Gas shall be notified to witness the location and hardness of each cement plug.**

*See pl to abandon*

| MAP | MAP BOOK | CARDS | BOND | FORMS 114 | 121 |
|-----|----------|-------|------|-----------|-----|

*no bond required*

**P. O. Box 245, Seal Beach**
(Address)

**THE DOW CHEMICAL COMPANY**
(Name of Operator)

By *J. Graham*

(Telephone No.)      697      *Contractor*

ADDRESS ONE COPY OF NOTICE TO DIVISION OF OIL AND GAS IN DISTRICT WHERE WELL IS LOCATED

CALIFORNIA STATE PRINTING OFFICE

SUBMIT IN DUPLICATE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

DIVISION OF OIL & GAS
RECEIVED
APR 2 0 1942
LOS ANGELES, CALIFORNIA

**THE DOW CHEMICAL COMPANY**

## Subsequent Work Report

Operator **The Ohio Oil Co.** Field **Playa Del Rey**

Well No. **Recreation Gun Club # 10**, Sec. **21**, T. **2 S**, R. **15 W**, _____ B. & M.

In compliance with the provisions of Chapter 93, Statutes 1939, the information given herewith is a complete and correct record of all **work done on the well since the previous record, dated Jan 3-1941**

**Supplementary Report** was filed.

SIGNED _____

Date **4-17-1942** Title **Superintendent.**
(President, Secretary or Agent)

Outline in the order of performance, **together with the dates thereof,** all important operations which alter the condition of the well. Include such information as depth at which redrilling operations were started, size of hole redrilled or deepened; size of pipe, amount of perforations in casing, weight and length of casing landed or cemented or removed; number of sacks of cement used in cementing or plugging operations and exact position thereof. If the well was dynamited, give date, size, position and number of shots. If plugs or bridges were put in to test for water, state kind of material used, position and results of pumping or bailing.

**Date**

**Abandonment as an Oil well.**

**12-30-40** Cement plug from 3906' to 3376' witnessed by Chas Corwin RSMB.

**7-10-41** Well sold to Dow Chemical Co to be used for the production of salt water. 122' Steel derrick left over hole.

629 South Hill Street
Los Angeles, California
November 24, 1941.


Mr. R. D. Bush,
State Oil and Gas Supervisor,
San Francisco, Calif.

Dear Sir:

  The Ohio Oil Company wells No. "Recreation Gun
Club" 7 and "Recreation Gun Club" 9, in Sec. 28, and "Recreation
Gun Club" 10 in Sec. 21, T. 2 S., R. 15 W., S. B. B. & M., Playa
del Rey oil field, were transferred to The Dow Chemical Company
on July 10, 1941.

  Our records are being changed to show The Dow Chemical
Company as the present operator of these wells.  It will not be
necessary to request The Dow Chemical Company to appoint an agent
for Los Angeles County because the company intends to operate
these wells for water production only, for iodine extraction.

    Yours truly,

    E. H. Musser

CVB:EHS         Deputy Supervisor.

CC - M. Cooley

| Corrections Made as Follows | By Whom |
| --- | --- |
| Weekly Summaries | |
| 121 | |
| Env. and Loc. Cards | |
| Production Records | |
| Well Records | |
| Pes Music | |
| Graphics | |

CALIFORNIA STATE PRINTING OFFICE

SUBMIT IN DUPLICATE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

OIL & GAS
RECEIVED
NOV 18 1941
LOS ANGELES, CALIFORNIA

## Subsequent Work Report

OPERATOR **Great Western Division**
**The Dow Chemical Company**   FIELD   **Playa del Rey**

Well No. **Recreation Gun Club #10**, Sec. **21**, T. **2-S**, R. **15-W**, **SB** B. & M.

In compliance with the provisions of Chapter 93, Statutes 1939, the information given herewith is a complete and correct record of all **work done on the well since the previous record**, dated **April 10, 1941**

_____, was filed.

SIGNED   *H. Hilsinger*

Date **November 17, 1941**

Title **Manager, Seal Beach Plant**
(President, Secretary or Agent)

Outline in the order of performance, **together with the dates thereof**, all important operations which alter the condition of the well. Include such information as depth at which redrilling operations were started, size of hole redrilled or deepened; size of pipe, amount of perforations in casing, weight and length of casing landed or cemented or removed; number of sacks of cement used in cementing or plugging operations and exact position thereof. If the well was dynamited, give date, size, position and number of shots. If plugs or bridges were put in to test for water, state kind of material used, position and results of pumping or bailing.

| Date | |
|---|---|
| | **Using Midway knife perforator** |
| 4-16 | **Perforated 100 holes, 3341 to 3241** |
| 5- 5 | **Perforated 165 holes, 3241 to 3076** |
| 10-6 to 10-11 | **Perforated 392 holes, 3272 to 3076** |
| * | **Well is producing water only,** *for Iodine purposes* |

DIVISION OF OIL & GAS
RECEIVED
NOV 19 1941
LOS ANGELES, CALIFORNIA

FORM 102.

CALIFORNIA STATE PRINTING OFFICE

SUBMIT IN DUPLICATE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

### Subsequent Work Report

OPERATOR **The Dow Chemical Company**      FIELD **Playa Del Rey**

Well No. **Recreation Gun Club #10**, Sec._____, T._____, R._____, _____ B. & M.

In compliance with the provisions of Chapter 93, Statutes 1939, the information given herewith is a complete and

correct record of all **work done on the well since the previous record**, dated_____

_____, was filed.

SIGNED **The Dow Chemical Company**

Date **November 17, 1941**      Title _Wᵐ Howard Nicholas_ **Attorney**

(President, Secretary or Agent)

Outline in the order of performance, **together with the dates thereof**, all important operations which alter the condition of the well. Include such information as depth at which redrilling operations were started, size of hole redrilled or deepened; size of pipe, amount of perforations in casing, weight and length of casing landed or cemented or removed; number of sacks of cement used in cementing or plugging operations and exact position thereof. If the well was dynamited, give date, size, position and number of shots. If plugs or bridges were put in to test for water, state kind of material used, position and results of pumping or bailing.

Date

**Well produced for iodine bearing salt water.**

**Perforated with knife perforator 265' commencing 35' above plug**

**which is set at 3376'**

**No oil being produced.**

$$\begin{array}{r} 3376 \\ \underline{35} \\ 3341 \\ \underline{265} \\ 3076 \end{array}$$

701

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## Special Report on Operations Witnessed

No. T 1-39386

Los Angeles, Calif. April 29, 19 41.

Mr. H. Hilsinger,

Long Beach, Calif.

Agent for THE DOW CHEMICAL COMPANY, CONTRACTORS

DEAR SIR:          THE OHIO OIL COMPANY

Operations at your/well No. "RECREATION     Sec. 21    , T. 2S. , R. 15W. S. B. B. & M.,
                           GUN CLUB" 10

Playa del Rey         Field, in   Los Angeles               County, were witnessed by

James T. Carriel, Inspector                , representative of the supervisor,

on    April 15    , 19  41. There was also present   R. Austin, Driller,

and G. Wilkinson, Helper

Casing Record  18" cem. 686', 11-3/4" cem. 3423', W. S. | Junk  None
O., 6-5/8" liner ld. 3396'-3903', perf. 3424'-3903'.
T. D. 3906', plugged with cement 3906'-3376'.

The operations were performed for the purpose of    demonstrating that the 11-3/4" casing is water
tight,

and the data and conclusions are as follows:

THE INSPECTOR ARRIVED AT THE WELL AT 8:15 A. M. AND MR. AUSTIN REPORTED THAT at 8:30 p. m.
on April 14, 1941, the water in the 11-3/4" casing had been bailed to 2100'.

THE INSPECTOR NOTED THE FOLLOWING:
1.  The fluid rose 25' in 12-1/2 hr., equivalent to 5.5 bbl. per 24 hr.
2.  The hole was open to 3376'.
The test was completed at 9:15 a. m.

THE OPERATIONS AS WITNESSED AND REPORTED ARE APPROVED AS INDICATING THAT the 11-3/4"
casing is water tight.

cc- The Ohio Oil Co. (3)
    The Dow Chemical Co.
    JTC:G

*Wm Howard Nicholas VA 6121 knows about the work done on this well.*

**R. D. BUSH**
State Oil and Gas Supervisor

702  By _____ Deputy

CALIFORNIA STATE PRINTING OFFICE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## Report on Proposed Operations

No. P. 1-36234

Los Angeles, Calif. April 10, 19 41.

Mr. H. Hilsinger,

Long Beach, Calif.

Agent for THE DOW CHEMICAL COMPANY, CONTRACTORS

DEAR SIR:

THE OHIO OIL COMPANY

Your supplementary proposal to abandon / Well No. "RECREATION GUN CLUB" 10

Section 21, T. 2S., R. 15W. S. B. B. & M., Playa del Rey Field, Los Angeles County,

dated Mar. 28, 1941, received Apr. 8, 19 41, has been examined in conjunction with records filed in this office.

Present conditions as shown by the records and the proposal are as follows:

Records in addition to, or at variance with those shown in the notice:
18" S. P. cem. 686'; 6-5/8" ld. 3396'-3903', perf. 3424'-3903'. Total depth 3906',
plugged with cement 3906'-3376'.
This well has stood idle since December 30, 1940, when the hole below 3376' was abandoned
by The Ohio Oil Company.

THE NOTICE STATES:
"The present condition of the well is as follows:
11-3/4" - 54# Casing at 3423'.
Top of Cement Plug at 3376' (Witnessed by RSMB).

PROPOSAL:
"The proposed work is as follows:
Perforate between 3376 ft. and 3076 ft. and test the well for salt water production."

— should be 11¾"

DECISION:
THE PROPOSAL IS APPROVED PROVIDED THAT this division shall be notified to witness a bailing
test to demonstrate that the 6-5/8" casing is now water tight.

NOTE: A complete report in duplicate on our form 102 should be filed with this division
after the completion of the above work.

cc-The Dow Chemical Company
The Ohio Oil Co. (3)
CVB:G

R. D. BUSH
State Oil and Gas Supervisor

By Huguenin Deputy

703

FORM 107.  76783 5-30 10M
CALIFORNIA STATE PRINTING OFFICE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

RECEIVED
APR 8 - 1941
LOS ANGELES, CALIFORNIA

### Notice of Intention to Deepen, Redrill, Plug or Alter Casing in Well
This notice must be given fifteen days before work begins when possible

Venice, _____ Cal. March 28, _____ 19 41

Mr. E. Huguenin

Deputy State Oil and Gas Supervisor
629 S. Hill St.
Los Angeles, _____ Cal.

DEAR SIR:

In compliance with Section 17, Chapter 718, Statutes of 1915, as amended, notice is hereby given that it is our intention to commence the work of deepening, redrilling, plugging or altering casing at well No. 10
(Cross out unnecessary words)

Recreation Gun Club , Sec. 21 , T. 2 S , R. 15 W , _____ B. & M.

Venice _____ Oil Field, Los Angeles, _____ County.

The present condition of the well is as follows:
11-3/4" - 54# Casing at 3423'
Top of Cement Plug at 3376± (Witnessed by RSMB)

The proposed work is as follows:

Perforate between 3376 ft. and 3076 ft. and test the well for
salt water production.

cc. Contractor
3.c.c. Alris Oil Co.
The Dow Chemical Company, Contractor.
P.O. Box 3598. Belmont Shore Station, L.B. Calif.

C.V.B. - Nicholas
4/9/41.

Reference on file of same

Respectfully yours

Contractors.

THE DOW CHEMICAL COMPANY,
Name of Company or Operator
(Phone
L.Bch 32117)

704   By H. Hilsinger
H. Hilsinger

| Maps | Model | Photostat etc. | Cards | Forms | | |
|------|-------|------|-------|-------|---|---|
| | | | | 10X | | |

ADDRESS NOTICE TO DEPUTY STATE OIL AND GAS SUPERVISOR IN CHARGE OF DISTRICT WHERE WELL IS LOCATED

DIVISION OF OIL & GAS
RECEIVED
JAN 7 - 1941
LOS ANGELES, CALIFORNIA

FORM 123. 82133 1-31 10M
CALIFORNIA STATE PRINTING OFFICE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## Supplementary Notice

MEMO

Venice _____ Cal. Jan 3rd 19 41

Mr. E.Huguenin _____

Deputy State Oil and Gas Supervisor

Los Angeles _____ Cal.

DEAR SIR:

Please be advised that our notice to you dated Nov 12th,1940 _____ 19___,

stating our intention to Abandon _____ well No. Recreation Gun Club # 10 ,
(Drill, deepen, redrill, abandon)

Sec. 21 , T. 2 S , R. 15 W , _____ B. & M. Del Rey _____ Oil Field

Los Angeles _____ County, must be amended on account of changed or recently

discovered conditions.

The new conditions are as follows:

Hole has been filled with cement from bottom at 3906# to 3376'.
Hardness and location of the plug witnessed by R.S.M.B.

We now propose

The I-O-Dow Chemical Co has proposed to take this well and attempt to
develop Salt Water production.If and when satisfactory arrangements are
made,tests will be made by perforating casing above present plug at
3376'.Your office will be notified if the well is transferred to the
above Company or if abandonment is completed.

Respectfully yours

The Ohio Oil Co.
_____
(Name of Company)

By 705 _____

FORM 109-D.
CALIFORNIA STATE PRINTING OFFICE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## Special Report on Operations Witnessed

No. T 1-38998

Los Angeles, Calif. January 9, 19 41

Mr. John B. Sutherland,

Los Angeles, Calif.

Agent for THE OHIO OIL COMPANY

DEAR SIR:

"RECREATION GUN CLUB"

Operations at your well No. 10 Sec. 21, T. 2S, R. 15W., S. B. B. & M.,

Playa del Rey Field, in Los Angeles County, were witnessed by

Chas. Corwin, Inspector , representative of the supervisor,

on December 30, 19 40. There was also present L. H. Hollingsworth, Drilling Foreman,

and C. W. Doe, Driller.

| Casing Record 18" S. P. cem. 686', 11-3/4" cem. | Junk None. |
|---|---|
| 3423' W. S. O.; 6-5/8" liner ld. 3396'-3903', perf. | |
| 3424'-3903'. T. D. 3906', plugged with cement 3906'- | |
| 3376'. | |
| | |
| | |

The operations were performed for the purpose of testing the location and hardness of a cement plug proposed to be placed from 3903' to 3376' in the process of abandonment,

and the data and conclusions are as follows:

THE INSPECTOR ARRIVED AT THE WELL AT 11:30 A. M. AND MR. DOE REPORTED THE FOLLOWING:
1. The hole was cleaned out to 3906'.
2. On December 20 and 21, 1940, a total of 90 sacks of Victor construction cement was dumped in the hole, beginning at 3906'.

THE INSPECTOR NOTED THAT the bailer could not be spudded below 3376' and brought up a sample of set cement.

The test was completed at 12:20 p. m.

THE LOCATION AND HARDNESS OF THE CEMENT PLUG AT 3376' ARE APPROVED.

cc- Company (2)
CC:G

R. D. BUSH
State Oil and Gas Supervisor

706    By _Hegelein_ Deputy

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## Report on Proposed Operations

No. P 1-35768

Los Angeles, Calif. November 14, 19 40.

Mr. John B. Southerland,

Los Angeles, Calif.

Agent for THE OHIO OIL COMPANY

DEAR SIR:

"RECREATION GUN CLUB"

Your proposal to abandon Well No. 10,

Section 21, T. 2 S., R. 15 W., S.B. B. & M., Playa del Rey Field, Los Angeles County,

dated Nov. 12, 19 40, received Nov. 13, 19 40, has been examined in conjunction with records filed in this office.

Present conditions as shown by the records and the proposal are as follows:

Records in addition to, or at variance with those shown in the notice:
11-3/4" cem. 3423', W. S. O.
The last production reported from this well was during 30 days in September, 1940, when the daily average yield was 11 bbl. of oil and 73 bbl. of water.

THE NOTICE STATES:
"The present condition of the well is as follows:
Total Depth          3906'.
18" 8-10 Ga. S P Casing     L&C      @      686'.
11-3/4" 54#    Casing     L&C      @      3423'.
507'  6-5/8" 26# Liner Landed      @      3903'.
        Top of Liner          @      3396'.
        Top of Perf.          @      3424'."

PROPOSAL:
"The proposed work is as follows:
(1) Fill hole with cement          3903' to 3376'.
    Remove 11-3/4" casing from          666'.
(2) Place cement plug      666' to  646'.
(3) Fill hole from top to 3376' with 70# mud.
(4) Cap top of hole in accordance with regulations."

DECISION:
THE PROPOSAL IS APPROVED PROVIDED THAT THIS DIVISION SHALL BE NOTIFIED TO WITNESS the location and hardness of cement plugs at 3376' and 646'.

NOTE:  A complete report in duplicate on our Form 102 should be filed with this division after the completion of the above work.

NOTE:  In the event the proposed work is done by a contractor, this division shall be consulted regarding additional requirements.

PWB. to Edmondson

cc- Company
CVB:OH

R. D. BUSH
State Oil and Gas Supervisor
By _____ Deputy

FORM 108. 85798 11-27 5M
[CALIFORNIA STATE PRINTING OFFICE]

DIVISION OF OIL & GAS
RECEIVED
NOV 13 1940.
LOS ANGELES, CALIFORNIA

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES
DIVISION OF MINES AND MINING

# DEPARTMENT OF PETROLEUM AND GAS

## Notice of Intention to Abandon Well

This notice must be given at least five days before work is to begin

_____**Venice**_____ Cal. **November 12th** 19**40**

MR. **E. Huguenin**_____

*Deputy State Oil and Gas Supervisor*

_____**Los Angeles**_____ Cal.

DEAR SIR:

In compliance with Section 16, Chapter 718, Statutes of 1915, as amended, notice is hereby given that it is

our intention to abandon well No. **10** **Recreation Gun Club Lease** Section **21**, T. **2 S**

R. **15 W**, _____ B. & M., **Playa Del Rey** Oil Field,

**Los Angeles** County, commencing work ~~during~~ **Interim** ~~day~~

of **November - December** 19**40**

The present condition of the well is as follows:

| | | | |
|---|---|---|---|
| **Total Depth** | **3906'.** | | |
| **18" 8-10 Ga. S P Casing** | **L&C** | **@** | **686'.** |
| **11-3/4" 54# Casing** | **L&C** | **@** | **3423'.** |
| **507' 6-5/8# 26# Liner Landed** | | **@** | **3903'.** |
| **Top of Liner** | | **@** | **3396'.** |
| **Top of Perf.** | | **@** | **3424'.** |

The proposed work is as follows:

(1) **Fill hole with cement** **3903'** to **3376'.**
    **Remove 11-3/4" casing from** **666'.**
(2) **Place cement plug** **666'** to **646'.**

(3) **Fill hole from top to 3376' with 70# mud.**

(4) **Cap top of hole in accordance with regulations.**

Respectfully yours

**The Ohio Oil Company.**

Name of Company or Operator

By _____

ADDRESS NOTICE TO DEPUTY STATE OIL AND GAS SUPERVISOR IN CHARGE OF DISTRICT WHERE WELL IS LOCATED

708

No. 71098 12-29 30M
CALIFORNIA STATE PRINTING OFFICE

SUBMIT IN DUPLICATE
FILL THIS BLANK IN WITH TYPEWRITER. WRITE ON ONE SIDE OF PAPER ONLY

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

DIVISION OF OIL AND GAS
RECEIVED
MAY 11 1931
LOS ANGELES, CALIFORNIA

## LOG OF OIL OR GAS WELL

FIELD Playa DEL REY                                        COMPANY THE OHIO OIL COMPANY

Sec. 21 , T. 2 S , R. 15 W , S. B. B. & M., Elevation 5'± Well No. RECREATION GUN CLUB #10

In compliance with the provisions of Chapter 718, Statutes of 1915, as amended, the information given herewith is a complete and correct record of the present condition of the well and all work done thereon, so far as can be determined from all available records.

Signed *Paul L. Henderson*

Date April 25, 1931                    Title Chief Geologist
(President, Secretary or Agent)

The summary on this page is for the ORIGINAL condition of the well

### OIL SANDS

1st sand from 3426 to 3906          4th sand from _____ to _____
2d sand from _____ to _____         5th sand from _____ to _____
3d sand from _____ to _____         6th sand from _____ to _____

### IMPORTANT WATER SANDS

1st sand from _____ to _____        3d sand from _____ to _____
2d sand from _____ to _____         4th sand from _____ to _____

### CASING RECORD

| Size of Casing | Where Landed | Where Cut | Weight Per Foot | Threads Per Inch | Kind of Shoe | Make of Casing | Cemented Yes | No | Number of Sacks |
|---|---|---|---|---|---|---|---|---|---|
| 18 5/8" | 686 | - | 8 - 10 | Welded | Baker | A.D.L. | x | | 500 B.D.O.W. |
| 11 3/4" | 3426 | - | 54 | 8 | " | Republic | x | | 600 V.O.W. |
| | 3423 | | | | | | | | |

### CEMENTING OR OTHER SHUT-OFF RECORD

| Casing, Size | Sacks | Time Set | Method | Test and Result (Give water level and bailing results) |
|---|---|---|---|---|
| 18 5/8" | 500 | 20 hrs | Perkins | |
| 11 3/4 | 600 | 6 days | " | Bailed 1500 stood 19 hrs 70 ft. rise W.S.O. ok by S.M.B. |

### PLUGS AND ADAPTERS

Heaving Plug—Material _____ Length _____ Where set _____

Adapters —Material Steel Size 11 3/4 - 54# x 6 5/8 - 26#

### TOOLS

Rotary Tools were used from 0 ft. to 3906 ft. _____

Cable Tools were used from _____ ft. to _____ ft. _____

### PERFORATIONS

State clearly whether a machine was used or casing was drilled in shop

| From | To | Size of Holes | Number of Rows | Holes Per Foot | Machine—Shop |
|---|---|---|---|---|---|
| 3424 ft. | 3903 ft. | 100 m slotted | 12 | 2 | Keystone Undercut |
| ft. | ft. | | | | |
| ft. | ft. | | | | |
| ft. | ft. | | | | |
| ft. | ft. | | | | |

Eight days after completion well produced 221 barrels of oil per day.

The gravity of oil was 20.4 degrees Baume. API Water in oil amounted to 10 per cent.

| NAMES OF DRILLERS | NAMES OF TOOL DRESSERS |
|---|---|
| B. H. Doan | Don W. Bivens |
| E. J. McElroy | J. R. Wilkins |
| R. Maxwell | W. B. Heath |

Date drilling started March 17, 1931          709          Date well was completed April 17, 1931

FORMATIONS PENETRATED BY WELL

CALIFORNIA STATE PRINTING OFFICE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

### History of Oil or Gas Well

DIVISION OF OIL AND GAS
RECEIVED
MAY 1 1 1931
LOS ANGELES, CALIFORNIA

FIELD Playa DEL REY ............................................  COMPANY THE OHIO OIL COMPANY

Sec. 21 ......., T. 2 S ......, R. 15 W ......, S.B. B. & M., Well No. RECREATION GUN CLUB #10

Signed Paul L. Henderson.

Date April 25th, 1931 ........................................  Title Chief Geologist

President, Secretary or Agent

It is of the greatest importance to have a complete history of the well. Please state in detail the dates of redrilling, together with the reason for the work and its results. If there were any changes made in the casing, state fully, and if any casing was "sidetracked" or left in the well, give its size and location. If the well has been dynamited, give date, size, position, and number of shots. If plugs or bridges were put in to test for water, state kind of material used, position, and results of pumping or bailing.

| Date | Description |
|---|---|
| Mar. 17, 1931 | Commenced drilling 25 1/2" hole. |
| Mar. 18 | Drilled and reamed to 686'. Cemented 686' of 18 5/8" American Double Lock Casing with 500 sacks of Blue Diamond Oil Well cement. |
| Mar. 19 | Stood cemented 20 hrs. Commenced drilling 17 1/2" hole. |
| To Mar. 21 | Drilled to 2200'. Commenced coring 17 1/2" hole. |
| To Mar. 27 | Cored to 3082 ft. |
| Mar. 28 | Drilled to 3300 ft. |
| Mar. 29 | Cored to 3426 ft. |
| To Apr. 1 | Reamed to 3426'. Cemented 3423 ft. of 11 3/4" Republic 54#, 8 thread casing with 600 sacks of Victor Oil Well Cement, Last 100 sacks treated. |
| To April 5 | Stood cemented. Bailed to 1500 ft. at 11:00 PM |
| Apr. 6 | Found fluid at 1500 at 9:00 AM Casing test approved. Found top plug at 3373. Drilled out to 3431. Ran 2 1/2" tubing to 2675'. |
| Apr. 7 | Swabbed to 1500 ft. at 1:30 PM |
| Apr. 8 | Found fluid at 1430 ft. at 8:30 AM Bottom sample consisted of oily, gas cut mud. W. S. O. approved by S. M. B. |
| Apr. 9 | Commenced coring 10 5/8" hole. |
| Apr. 13 | Cored and reamed to 3906'. Hung 507' of 6 5/8" L. H. Insert liner including 479 ft. perforated at 3903 ft. |
| To Apr. 16 | Washed hole. Ran 2½" tubing to 3608 ft. with packer @ 3375'. Swabbed well for 3 days. Well flowed occasional heads. |
| Apr. 17 | Pulled tubing. Repaired packer. Ran tubing with packer at 3380' Swabbed well in at 10:00 PM. I. P.   245 bbls. - 19.6° gr. - 0.4% cut. |
| Apr. 22, 1931 | Production 221 bbls - 20.4° - 10% |

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

### LOG OF OIL OR GAS WELL—CONTINUED    Page No. 2

FIELD **DEL REY**    COMPANY **THE OHIO OIL COMPANY**

Sec. **21**, T. **2 S**, R. **15 W**, S.B. B. & M.    Well No. **RECREATION GUN CLUB #10**

## FORMATIONS PENETRATED BY WELL

| Top of Formation | Bottom of Formation | Thickness | Name of Formation |
|---|---|---|---|
| 0 | 124 | 124 | Shale |
| 124 | 643 | 519 | Shale and boulders |
| 643 | 686 | 43 | Shale |
| 686 | 860 | 174 | Shale and sand |
| 860 | 1639 | 779 | Sticky shale and sand |
| 1639 | 1907 | 268 | Sticky shale and sandy shale |
| 1907 | 2200 | 293 | Shale and shells |
| 2200 | 2233 | 33 | Core 33' — Sandy shale |
| 2233 | 2267 | 34 | Core 34' — " " showing gas |
| 2267 | 2297 | 30 | Core 26' — Sand and shale |
| 2297 | 2329 | 32 | Core 32' — " " " showing gas |
| 2329 | 2362 | 33 | Core 33' — " " " " " |
| 2362 | 2395 | 33 | Core 33' — " " " " " |
| 2395 | 2428 | 33 | Core 33' — " " " |
| 2428 | 2461 | 33 | Core 22' — " " " |
| 2461 | 2492 | 31 | Core 31' — " " " |
| 2492 | 2510 | 18 | Core 18' — " " " |
| 2510 | 2540 | 30 | Core 26' — " " " |
| 2540 | 2572 | 32 | Core 24' — Brown shale and sand |
| 2572 | 2604 | 32 | Core 18' — Sand and shale |
| 2604 | 2636 | 32 | Core 4' — Sand |
| 2636 | 2662 | 26 | Core 18' — Sand and shale |
| 2662 | 2694 | 32 | Core 32' — Sand and shale |
| 2694 | 2726 | 32 | Core 21' — Sandy shale and sand |
| 2726 | 2753 | 27 | Core 24' — " " " " |
| 2753 | 2785 | 32 | Core 32' — Sand and shale |
| 2785 | 2818 | 33 | Core 33' — " " " |
| 2818 | 2850 | 32 | Core 32' — Sand and shale |
| 2850 | 2872 | 22 | Core 21' — " " " |
| 2872 | 2875 | 3 | Core 1' — Shell and shale |
| 2875 | 2907 | 32 | Core 9' — Shale |
| 2907 | 2939 | 32 | Core 15' — Sand and shale |
| 2939 | 2962 | 23 | Core 25' — Hard shale and sand |
| 2962 | 2994 | 32 | Core 21' — Sand, sand and shale |
| 2994 | 3026 | 32 | Core 30' — Sand and shale |
| 3026 | 3058 | 32 | Core 27' — Sand and shale |
| 3058 | 3082 | 24 | Core 18' — Sand and shale |
| 3082 | 3133 | 51 | Shale and shells |
| 3133 | 3134 | 1 | Shell |
| 3134 | 3300 | 166 | Sand and shale |
| 3300 | 3331 | 31 | Core 31' — Sand and shale |
| 3331 | 3363 | 32 | Core 30' — Oil sand, shale and sandy shale |
| 3363 | 3394 | 31 | Core 18' — Sand and shale |
| 3394 | 3426 | 32 | Core 24' — Shale and oil sand |
| 3426 | 3431 | 5 | Shale |

711

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## LOG OF OIL OR GAS WELL—CONTINUED   Page No. 3

FIELD_____DEL REY_____   COMPANY_____THE OHIO OIL COMPANY_____

Sec.___21____ , T.___2 S___ , R.___15 W___ , S.B. B. & M.   Well No.___RECREATION GUN CLUB #10___

### FORMATIONS PENETRATED BY WELL

| DEPTH TO | | Thickness | Name of Formation |
|---|---|---|---|
| Top of Formation | Bottom of Formation | | |
| 3431 | 3456 | 25 | Shale, sand and shells |
| 3456 | 3481 | 25 | Core 20' - Sand, shale and thin shell |
| 3481 | 3506 | 25 | Core 15' - Sand and shale |
| 3506 | 3534 | 28 | Core 28' - Sand and shale |
| 3534 | 3553 | 19 | Core 19' - Oil sand, shale and shells |
| 3553 | 3580 | 27 | Core 21' - Sand and shale |
| 3580 | 3605 | 25 | Core 20' - Sand and shale |
| 3605 | 3633 | 28 | Core 27' - Shale |
| 3633 | 3661 | 28 | Core (2)' - Shale and sand |
| 3661 | 3688 | 27 | Core 27' - Shale and sand |
| 3688 | 3716 | 28 | Core 15' - Sand and shale |
| 3716 | 3743 | 27 | Core 27' - Sand and shale |
| 3743 | 3771 | 28 | Core 28' - "    "    " |
| 3771 | 3781 | 10 | CORRECT MEASUREMENT |
| 3781 | 3809 | 28 | Core 21' - Oil sand and shale |
| 3809 | 3836 | 27 | Core 11' - Sand and shale |
| 3836 | 3864 | 28 | Core 26' - Oil sand and shale |
| 3864 | 3891 | 27 | Core 24' - Shale, thin streaks of sand |
| 3891 | 3906 | 15 | Core 15' - Shell, oil sand and shale |

TOTAL DEPTH   3906

| | OIL WELL CORE BBL | STEPP CORE BBL | TOTAL |
|---|---|---|---|
| FEET CORED | 1008 | 440 | 1448 |
| FEET RECOVERED | 829 | 346 | 1175 |
| NUMBER CORES TAKEN | 34 | 17 | 51 |
| PERCENT RECOVERY | 82.2 | 78.6 | 81.1 |
| FEET PER CORE DRILLED | 29.6 | 25.9 | 28.4 |
| FT. PER CORE RECOVERED | 24.4 | 20.4 | 23.0 |

712

FORM 101-A. 73065 12-29 20M
CALIFORNIA STATE PRINTING OFFICE

DIVISION OF OIL AND GAS
RECEIVED
MAY 1 1 1931
LOS ANGELES, CALIFORNIA

**SUBMIT IN DUPLICATE**
FILL THIS BLANK IN WITH TYPEWRITER.  WRITE ON ONE SIDE OF PAPER ONLY

**STATE OF CALIFORNIA**
**DEPARTMENT OF NATURAL RESOURCES**

# DIVISION OF OIL AND GAS

## CORE RECORD OF OIL OR GAS WELL

FIELD **Playa DEL REY**                    COMPANY **THE OHIO OIL COMPANY**

Sec. **21**, T. **2 S**, R. **15 W**, S.B. B. & M., Elevation **5'+**     Well No. **RECREATION GUN CLUB #10**

In compliance with the provisions of Section 18, Chapter 718, Statutes of 1915, as amended, the information given herewith is a complete and correct record of all cores taken in this well to the depth on the accompanying log.

Signed *Reference of the system L. L. Henderson*

Date **April 25th, 1931**                 Title **Chief Geologist**
(President, Secretary or Agent)

| DATE | MAKE OF BARREL | SIZE OF BARREL | FROM (DEPTH) | TO (DEPTH) | CORE RECOVERED | DESCRIPTION OF CORE | ETHER TEST | CONDITION OF CORE |
|---|---|---|---|---|---|---|---|---|
| | | | 2200 | 2233 | 33 | Grey-brown clay shale with streaks of sand. Gas bubbles on outside of core. Sand looks dry. Total sand 3 ft. | | |
| | | | 2233 | 2267 | 34 | Same lithology. Total sand 4 ft. When top plug of core barrel was removed, gas pressure blew it and 6 ft. of core against rotary chain guard with sufficient force to dent guard. Upon ignition gas burned at end of barrel for 1/2 minute. While core was being pumped out, 6 feet blew out of barrel. Gas burned with strong flame for 2 minutes. | | |
| | | | 2267 | 2297 | 26 | Same lithology. | | |
| | | | 2297 | 2329 | 32 | Same lithology as 2233-67. Total sand 6 ft. Gas bubbles on outside of core. Did not show any pressure in barrel. | | |
| | | | 2329 | 2362 | 33 | Same as above. Total sand 6 ft. Did not look very wet. No pressure in barrel. Short flashes when ignited. | | |
| | | | 2362 | 2395 | 8 | Grey, soft sand; tasted faintly salty and looked a little bit wet. | | |
| | | | | | 25 | Grey sandy shale with streaks of sand totalling 6 ft. Pressure in barrel blew two feet of shale from barrel. Burned with strong flame for five minutes. | | |
| | | | 2395 | 2428 | 33 | Same. Sand 10 ft. No pressure in barrel. Would not ignite. | | |
| | | | 2428 | 2461 | 21 | Same. Sand 3 ft. No pressure in barrel | | |
| | | | 2461 | 2492 | 31 | Same. Sand 8 ft. A little pressure in barrel. Short Flashes when ignited. | | |
| | | | 2492 | 2510 | 18 | Grey soft fine sand with a few streaks of very sandy shale. Burned with strong flame for 5 minutes. | | |

213

DIVISION OF OIL AND GAS

Page No. 2

CORE RECORD OF OIL OR GAS WELL

FIELD   DEL REY

THE OHIO OIL COMPANY

Sec. 21- 2S - 15 W

RECREATION GUN CLUB #10

| | | | |
|---|---|---|---|
| 2510 | 2540 | 21 | Same. Shale totals 6 ft. Burned with strong flame 1 minute. |
| 2540 | 2572 | 9 | Interbedded grey soft sand and grey sandy shale. Sand 3 ft. Burned with strong flame for 3 minutes. |
| 2572 | 2604 | 18 | Same. Sand 8 ft. Burned 3 minutes with fairly strong flame. |
| 2604 | 2636 | 4 | Same. Would not burn |
| 2636 | 2662 | 15 | Grey soft, fine dry looking sand with streaks of sandy shale. Short flashes when ignited. |
| 2662 | 2694 | 32 | Interbedded firm sandy clay shale and grey sand. |
| 2694 | 2711 | 21 | Same lithology. |
| 2711 | 2726 | 15 | Grey, firm sandy shale. a few gas bubbles on outside of core. |
| 2726 | 2753 | 27 | Same. Slickensided 2742-2753. Gas bubbles on outside |
| 2753 | 2785 | 7 | Grey soft sand with streaks of shale. Burned with strong flame for 2 minutes. |
| | | 25 | Grey, shattered, slickensided sandy shale. Gas bubbles on outside of core |
| 2785 | 2818 | 33 | Grey, sandy shale with streaks of grey, soft sand. 6 ft. sand. Gas bubbles on outside. Short flashes |
| 2818 | 2850 | 21 | Interbedded grey soft sand and grey sandy shale; Sand 8 ft. Gas bubbles on outside   Short flashes. |
| 2850 | 2872 | 9 | Grey soft dry looking sand. Blew out of barrel |
| | | 13 | Grey firm sandy shale. Many gas bubbles on outside of core. |
| 2872 | 2875 | 1 | Grey, very hard sandstone shell. |
| 2875 | 2907 | 9 | Interbedded grey soft sand and grey sandy shale. Gas bubbles on outside of core. |
| 2907 | 2939 | 14 | Same. No gas bubbles. Would not burn |
| 2939 | 2962 | 24 | Same.   "    "    "         "    "   " |
| 2962 | 2994 | 21 | Same.   "    "    "         "    "   " |
| 2994 | 3026 | 30 | Same.   "    "    "         "    "   " |
| 3026 | 3058 | 15 | Same.   "    "    "         "    "   " |
| 3058 | 3082 | 18 | Same. Burned for 1 minute, sand looked wet. |
| 3456 | 3481 | 22 | Grey silty shale with few O.S. strks totalling 6" thick  Dip 4°± |
| | | 2 | Soft well saturated O. S. |
| 3481 | 3506 | 1 | Soft well saturated O. S. |
| | | 1 | Hd. silty sh. |

DIVISION OF OIL AND GAS

CORE RECORD OF OIL OR GAS WELL

FIELD    DEL REY                                    THE OHIO OIL COMPANY

Sec. 21- 2S- 15 W.                            RECREATION GUN CLUB #10

| | | | |
|---|---|---|---|
| 3481 | 3506 | 1 | Soft well saturated O. S. |
| Cont'd | | 9 | Compact silty Sh. Dip 4°± |
| 3506 | 3534 | 20 | Silty shale with several ¼" strks O. S. |
| | | 8 | Silty shale with several strks O. S. totalling 18" thickness. |
| 3534 | 3553 | 2 | Hd. S. S. shell |
| | | 14 | Soft saturated coarse O. S. with 1' shale |
| | | 3 | Two 1' beds O. S. separated by 1' shale |
| 3553 | 3580 | 10 | Compact silty sh. with few stringers O.S. totalling about 7" |
| | | 8 | 5' good O. S. & 3' shale |
| | | 3 | Compact shale with O. S. stringers totalling about 6" |
| 3580 | 3605 | 12 | Compact silty sh. with thin O. S. strks 8" |
| | | 10 | "    "    "    "    "    "    "    2'8" |
| 3605 | 3633 | 28 | Solid shale zone. No O.S. |
| 3633 | 3661 | 2 | O. S. and thin streak shale. 3' recovery |
| 3661 | 3688 | 23 | Shale with several thin strks O. S. totalling 14" |
| | | 4 | O. S. and 1' shale |
| 3688 | 3716 | 9 | Dark silty shale. 1'8" O.S. in bottom |
| 3716 | 3743 | 3 | Compact silty sh. |
| | | 3 | Bentonite  at 3720'. (Lower Bentonite marking) |
| | | 6 | Firm shale and thin streaks O. S.  Total 1' |
| | | 3 | Oil sand |
| | | 12 | Shale with two thin streaks O. S.  Total 14" |
| 3743 | 3771 | 7 | Hard firm shale |
| | | 1 | O. S. |
| | | 20 | Firm silty shale with few very thin O.S. streaks 1/4" in thickness totalling 4" |
| 3781 | 3809 | 21 | Alternating shale & O.S. each averaging 1' thickness Total O.S. in core 8' |
| 3809 | 3836 | 12 | Firm dark shale. No O.S. |
| 3836 | 3864 | 3 | O.S. |
| | | 1 | Shale |
| | | 1 | O.S. |
| | | 1 | Shale |
| | | 3 | O.S. |
| | | 7 | Shale |
| | | 3 | O.S. |
| | | 8 | Shale |
| 3864 | 3891 | 24 | Firm silty shale with 3 strks O.S. totalling 6" |
| 3891 | 3906 | 2 | Hard shell |
| | | 5 | Shale |
| | | 5 | Firm oil sand |
| | | 3 | Shale |

CALIFORNIA STATE PRINTING OFFICE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

### Report on Test of Water Shut-off
#### (BAILING)

No. T-1-22911

Los Angeles, Cal. April 15, 1931.

Mr. **Frederick D. Anderson,**

**Los Angeles,** Cal.

Agent for **THE OHIO OIL** Company

DEAR SIR:
  "**RECREATION GUN CLUB**"
  Your well No. **10**, Sec. **21**, T. **2 S.**, R.**15 W.**, S.B. B. & M.,

**Playa del Rey** Oil Field, in **Los Angeles** County, was tested for

shut-off of water on **April 8**, 1931. Mr. **Alva M. Johnson**,
                        Time and date

designated by the supervisor, was present as prescribed in Section 19, Chapter 718, Statutes 1915, as amended, and there

were also present **K. E. Bynum, Superintendent, and**

**P. L. Henderson, Engineer.**

Location of water tested **above 3423'** and normal fluid level**Not reported.**

Depth and manner of water shut-off: { **3423** ft. of **11¾** in.**54** lb. } casing was **4/1/31** { cemented } in **Shale**
                                     { xxxxxxxxxxxxxxxxxxxx } { xx lands } Formation

at **3423** ft. with **600** sacks **Victor** cement by **casing** method.

Water string was landed in **17" rotary** hole.
                                Size, rotary or cable tool

Casing record of well **18" S.P. cem. 686'; 11¾" as above; 2½" tubing hung at 3000' for this**

**test only.**

Reported total depth of hole**3431** ft. Hole bridged from **xx** ft. to **xx** ft. Hole cleaned out to**3431** ft. for this test.

At time of test depth of hole measured**3433** ft. and bailer brought up sample of**oil sand.**

At**1:30 p.m., April 7, 1931** oil bailed to **no oil** ft., drilling fluid { xxxxxxxx } to**500** ft.
    Time and date                                                  { swabbed }

At**8:00 a.m., April 8, 1931** top of oil found at **no oil** ft., top of fluid found at **1430** ft.
    Time and date

Result of test:
MR. BYNUM REPORTED THE FOLLOWING:
1.  No fluid entered the well when bailed to 1200' and allowed to stand 8 hr. for casing test.
2.  50' of set cement was drilled out of the 11¾" casing, equivalent to 27 sacks.
3.  The last 100 sacks of cement was treated with quick setting chemical.
THE INSPECTOR NOTED THE FOLLOWING:
1.  The fluid rose 70' in 18½ hr., equivalent to 10.5 bbl. per 24 hr.
2.  Fluid samples from 1430' and 3433' consisted of gas-cut mud which tasted fresh.

THE SHUT-OFF IS APPROVED.

cc-Company

AMJ:OH

R. D. BUSH
State Oil and Gas Supervisor

716   By _____ Deputy

FORM 106.  86793 11-27 8M
[CALIFORNIA STATE PRINTING OFFICE]

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES
DIVISION OF MINES AND MINING

# DEPARTMENT OF PETROLEUM AND GAS

DIVISION OF OIL AND GAS
RECEIVED
APR 2 - 1931
LOS ANGELES, CALIFORNIA

## Notice of Test of Water Shut-Off

This notice must be given at least five days before the test, and a longer time is desirable

Los Angeles _____ Cal. **April 1st** ___ 19**31**

Mr. **E. Huguenin** _____
Deputy State Oil and Gas Supervisor

**629 S. Hill Street, Los Angeles,** _____ Cal.

DEAR SIR:

In compliance with Section 19, Chapter 718, Statutes of 1915, as amended, notice is hereby given that it is our intention to test the shut-off of water in well No. **Recreation Gun Club No. 10** , Sec. **21** ,

T. **2 S.** , R. **15 W.** , S. B. B. & M., *Playa* **Del Rey** _____ Oil Field,

**Los Angeles** _____ County, on the **6th** day of **April** ___ 19**31**

**11¾** inch **54** lb. casing was landed/cemented in **shale** at **3423**
                                                    (Formation)        (Depth)

on **April 1st** ___ 19**31**
   (Date)

**600** sacks **Victor O. W.** of cement were used.
              (Kind)

The **Perkins** _____ method was used in placing cement.

Fluid level will be bailed to a depth of **1500** feet and left undisturbed for at least 12 hours before your inspection.

The well is **3426** feet deep. There is/is not a plug or bridge from **0** feet to **3426** feet.

**Notice of exact time of test will be given by telephone**

Respectfully yours

**THE OHIO OIL COMPANY**
(Name of Company or Operator)

717   By *Frederick D. Anderson*
Superintendent---California Division

ADDRESS NOTICE TO DEPUTY STATE OIL AND GAS SUPERVISOR IN CHARGE OF DISTRICT WHERE WELL IS LOCATED

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

### Report on Proposed Operations

No. P -1-23066

Los Angeles, Cal. March 2, 19 31.

MR. **Frederick D. Anderson,**

**Los Angeles,** Cal.

Agent for **THE OHIO OIL** Company

DEAR SIR:

Your proposal to **drill** Well No. **"RECREATION GUN CLUB"** 10 ,

Section **21** , T. **2 S.** , R. **15 W., S.B.** B. & M., **Playa del Rey** Oil Field, **Los Angeles** County,

dated **Feb. 19,** 19 **31** , received **Feb. 24,** 19 **31** , has been examined in conjunction with records filed in this office.

Present conditions as shown by the records and the proposal are as follows:

THE NOTICE STATES:

"The well is 1918.4 feet N. and 114.88 feet E. from S.W. Cor. Recreation Gun Club Lease
The elevation of the derrick floor above sea level is 8 feet.
We estimate that the first productive oil or gas sand should be encountered at a depth of about --------- feet, more or less."

PROPOSAL:

"We propose to use the following strings of casing, either cementing or landing them as here indicated:

| Size of Casing | Weight | New or Second Hand | Depth | Landed or Cemented |
|---|---|---|---|---|
| 18" (8-8) | 84 | New | 690' ± | Cemented |
| 11¾" | 54 | " | 3500' ± | " |

It is understood that if changes in this plan become necessary we are to notify you before cementing or landing casing."

DECISION:

THE PROPOSAL IS APPROVED PROVIDED THAT:

1.  (a) Mud fluid of not less than 70 lb. per cubic foot shall be used in the drilling of the well and the column of mud fluid shall be maintained at all times to the surface, particularly while pulling the drill pipe.
    (b) Adequate blow-out prevention equipment shall be provided and ready for operation at all times.
2.  Any hole to be sidetracked at any time during the drilling of this well shall be completely filled with cement.
3.  The exact cementing depth for the 11¾" casing shall be determined by careful coring, beginning not lower than 3400'.
4.  The column of mud fluid back of the 11¾" casing shall be maintained to the surface for at least 30 days after cementing this casing."
5.  THIS DIVISION SHALL BE NOTIFIED TO WITNESS:
    (a) Final mudding operations before cementing the 11¾" casing.
    (b) Bailing test of the 11¾" shut-off.

cc-Company
BBN:OH
CLB

R. D. BUSH
State Oil and Gas Supervisor

718   By _____ Deputy

CALIFORNIA STATE PRINTING OFFICE

**STATE OF CALIFORNIA**
**DEPARTMENT OF NATURAL RESOURCES**

# DIVISION OF OIL AND GAS

### Notice of Intention to Drill New Well
This notice must be given before drilling begins

DIVISION OF OIL AND GAS
RECEIVED
FEB 24 1931
LOS ANGELES, CALIFORNIA

037 - 13798

**Los Angeles** _____ Cal. **February 19th** 19 **31**

Mr. **E. Huguenin**

Deputy State Oil and Gas Supervisor

**611 New Orpheum Bldg., Los Angeles,** _____ Cal.

Dear Sir:

In compliance with Section 17, Chapter 718, Statutes of 1915, as amended, notice is hereby given that it is our intention to commence the work of drilling well No. **10** , Sec. **21** , T. **2 S.** , R. **15 W.** , S.B.B. & M., **Recreation Gun Club**

_Playa_ **Del Rey** _____ Oil Field, **Los Angeles** _____ County.

The well is **1918.4** feet N. or S., and **114.88** feet E. or W. from **SEE ATTACHED SKETCH** _S.W. Cor. Recreation Gun Club lease._ FCH.
(Give location in distance from section corners or other corners of legal subdivision)

The elevation of the derrick floor above sea level is **8** feet.

We propose to use the following strings of casing, either cementing or landing them as here indicated:

| Size of Casing, Inches | Weight, Lb. Per Foot | New or Second Hand | Depth | Landed or Cemented |
|---|---|---|---|---|
| **18" (8-8)** | **84** | **New** | **690' ±** | **Cemented** |
| **11¾"** | **54** | **"** | **3500' ±** | **"** |
| | | | | |
| | | | | |

It is understood that if changes in this plan become necessary we are to notify you before cementing or landing casing.

We estimate that the first productive oil or gas sand should be encountered at a depth of about _____ feet, more or less.

Respectfully yours

Address **1250 Subway Terminal Bldg.**

**THE OHIO OIL COMPANY**
(Name of Company or Operator)

Telephone number **Mutual 3251**

By _Frederick D. Anderson_
Superintendent---California Division

ADDRESS NOTICE TO DEPUTY STATE OIL AND GAS SUPERVISOR IN CHARGE OF DISTRICT WHERE WELL IS LOCATED

Reference to file of data.

| Maps | Model | Cross Section | Cards | Forms | |
|---|---|---|---|---|---|
| FCH | FCH | | | ✓ | 121 |

2/25/31

Lease consists of : **258 Acres**

known as **Recreation Gun Club Tract**

THE OHIO OIL CO.
MAP SHOWING
LOCATION OF OIL WELL
SECTION 21, T.2 S., R.15 W., S.B.B.& M.
DEL REY OIL FIELD
VENICE, L.A. COUNTY, CALIF.
Scale: 1"= 300'          Feb. 1931

THE OHIO OIL COMPANY

(Recreation Gun Club)

LOT 2

N

SECT. 21 T2S R15W
SECT. 28 T2S R15W

Location of
The Ohio Oil Co. Well
Recreation Gun Club Nº 10
1918.42' Northerly along West line of Lot 3
from SW corner of Rec. Gun Club Tract,
thence Easterly at S. 114.88 Elev. 8.'

SILVER STRAND TRACT

LOT 4

1918.42'

52 ND        AVE.        E.B.

# Appendix E:  Summary Table – 78 Playa Del Rey Oilfield Well Details

Expert Report of J. Daniel Arthur P.E., SPEC

Phillips Lytle LLP and Latham & Watkins LLP

| # | Well Name; Operator; API; Location (S-T-R) (Lat, Long) | Completion Date; Total Depth (feet) Target Formation | Surface Casing Details Diameter (inches) Weight (pounds per foot) Setting Depth (feet) | Production Casing Details Size (inches) Weight (pounds per foot) Setting Depth (feet) | Liner Details Size (inches) Weight (pounds per foot) Setting Depth (feet) | Stove pipe casing used: (Yes/No) (comment) | Surface casing cemented to ground-level (Yes/No) (comment) | Production casing cement across hydrocarbon interval (Yes/No) (comment) | Cement placed across saltwater zone during abandonment (Yes/No) (comment) | Casing cut during abandonment (Yes/No) (comment) | Cemented production casing annulus from 2,200' to surface during abandonment (Yes/No) (comment) | Issues encountered during drilling or abandonment: (Yes/No) (comment) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Well Name: Dow R.G.C. #5 Operator: Geauty of Los Angeles API: 037-13812 28-02S-15W-(33.973804?, -118.457036?) | 02/06/1931 5,890' Miocene Oil Sands | 13-3/8" 55.5# 689' | 11-3/4" 54# 3,800' | 6-5/8" 26# 3,369',5,888' | Yes Hercules 8-8 Gauge | No 400 sacks behind pipe Top of cement behind pipe | No 500 sacks behind pipe Uncemented liner from3,369'-5,888' | No Plugs 3,345' - 3,899' and 667'-644' | Yes Cut at 740' | No | Yes. During water test on production casing gas was encountered and fluid level rose. When LA County cut the casing at 740' well started to flow. Mixed mud and conditioned it to control well. |
| | Well Name: Burks #7 Operator: Geauty Oil Co. API: 037-14218 28-02S-15W-(33.972335?, -118.456360?) | 04/28/1931 3,850' Miocene Oil Sands | 14" 56# 673' | 8-5/8" 32# and 36# 3,430' | 6-5/8" 26# 3,410'-3,840' | Yes Welded | No 350 sacks behind pipe Top of cement behind pipe | No 510 sacks behind pipe Uncemented liner from 3,410'-3,840' | No Plugs at 3,317'-3,637' & 0-56' | Yes Attempted to cut 10-3/4" at 63'.Cut off 8-5/8" casing at 65'. | No | Yes. Well blew out for two days after drilling to 3,334 feet. Bad surface casing cement job and remedial cement work and intermediate casing string ran and cemented in. |
| | Well Name: Olin R.G.C. #5 Operator: Geauty of Los Angeles API: 037-13809 28-02S-15W-(33.972113?, -118.456913?) | 11/28/1930 4,120' Miocene Oil Sands | 14" 55# 684' | 8-5/8" 36# 3,410' | 6-5/8" 26# 3,388',5,891' | Yes Hercules | No 400 sacks behind pipe Top of cement not reported | 8-5/8" casing TOC reported at 3,377'. 500 sacks behind pipe Uncemented liner from 3,388'-3,891' | No Plugs at 3,806' -3,171' & 777'-584' & 0'- 65'. | Yes Cut at 777' | No | Yes. Strong gas flow after setting and cementing production casing during water shut-off test. |
| | Well Name: Olin R.G.C. #13 Operator: Geauty of Los Angeles API: 037-13815 28-02S-15W-(33.9719868?, -118.4518363?) | 11/28/1933 5,722' Miocene Oil Sands | 18" 70# 684' | Not run. Hole collapsed. Drill pipe stuck in hole. Top of fish at 1,299'. | Not run. Hole collapsed. Drill pipe stuck in hole. Top of fish at 1,299'. | Yes | No 400 sacks behind pipe Top of cement behind pipe | Lost hole. No production casing run. | No. | No, no production casing in hole. | No. | Lost hole. Hole filled with heavy mud. Plugged from 651-706 feet and then 20 feet to surface. LA County replugged in 1959. Ran two strings of casing and then remedial cementing. |
| | Well Name: Olin R.G.C. #17 Operator: Geauty of Los Angeles API: 037-13819 28-02S-15W-(33.9727324?, -118.4511631?) | 06/13/1935 3,830' Miocene Oil Sands | 14" 48# 690' | 8-5/8" 36# 3,425' | 6-5/8" 26# 3,393',5,827' | Yes | No 350 sacks behind pipe Top of cement not reported | No 500 sacks behind pipe Uncemented liner from 3,393'-3,827' | No Plugs at 3,383-3,388 & 3,317-3,378' & 2,497-2,605' & 740'-789' & 0'-533' | Yes Cut at 1,012' | No | No. |
| | Well Name: Olin R.G.C. #18 Operator: Geauty of Los Angeles API: 037-13818 28-02S-15W-(33.9721868?, -118.4509735?) | 04/16/1935 3,855' Miocene Oil Sands | 14" 48# 690' | 8-5/8" 36# 3,490' | 6-5/8" 26# 3,458-3,855' | Yes | No 350 sacks behind pipe Top of cement not reported | No 500 sacks behind pipe Uncemented liner from 3,458'-3,855' | No Plugs at 2,492 - 2,600 & 0'-667' | Yes Cut at 977' | No | No. |
| | Well Name: Olin R.G.C. #14 Operator: Geauty of Los Angeles API: 037-13814 28-02S-15W-(33.9724658?, -118.4515135?) | 02/19/1932 3,855' Miocene Oil Sands | 12-3/4" 40# 703' | 8-5/8" 36# 3,340' | 6-5/8" 26# 3,312',4,177' | Yes | No 400 sacks behind pipe Top of cement not reported | No 400 sacks behind pipe Uncemented liner from 3,312'-4,177' | No Plugs at 3,055'-4,177' & 3,261'-3,840' & 2,489'-2,597' & 45'-903' | Yes Cut at 853' | No | No. Plugged by LA County in 1959. |
| | Well Name: Olin R.G.C. #11 Operator: Geauty of Los Angeles API: 037-13813 28-02S-15W-(33.9196709?, -118.4560786?) | 10/09/1931 5,757' Miocene Oil Sands | 18-5/8" Weight not reported 687' | 8-5/8" 38# 5,410' | 5-3/4" 17# 5,377-5,752' | Yes | No 400 sacks behind pipe Top of cement not reported | No 400 sacks behind pipe Uncemented liner from 5,377-5,752' | No Plugs at 5,137-5,734 & 3,075'-3,154 & 620'-720' & 14'-67' | Yes Cut at 738' | No | No. Plugged by LA County in 1959. |
| | Well Name: Olin R.G.C. #6 Operator: Geauty of Los Angeles API: 037-13810 28-02S-15W-(33.9716682?, -118.4579528?) | 11/08/1930 4,005' Miocene Oil Sands | 14" Weight not reported 680' | 8-5/8" 36# 3,352' | 6-5/8" 26# 3,322'-4,002' | Yes Hercules | No 400 sacks behind pipe Top of cement not reported | No XXX sacks behind pipe Uncemented liner from 3,322'-4,002' | No Plugs at 3,196'-3,806' & 623'-729' & 14'-65' | Yes Attempted cuts at 1,075' and at 99'.Could not pull. Cut at 913 feet and pulled out 913 feet of 8-5/8" production casing. | No | No. Plugged by LA County in 1959. |
| | Well Name: Dow R.G.C. #7 Operator: Geauty of Los Angeles API: 037-13811 28-02S-15W-(33.9728543?, -118.4563698?) | 01/01/1931 3,943' Miocene Oil Sands | 14" 55.5# 685' | 8-5/8" 36# 3,943' | 6-5/8" 26# 3,305',3,943' | Yes Hercules | No 500 sacks behind pipe Top of cement not reported | No 400 sacks behind pipe Uncemented liner from 3,305'-3,943' | No Plugs at 3,270'-3,888 & 533'-733 & 15'-65' | Yes Cut at 735' | No | Gas cut mud during water shut-off test on 8-5/8" production casing. |
| | Well Name: Olin R.G.C. #2 Operator: Geauty of Los Angeles API: 037-13806 28-02S-15W-(33.9364473?, -118.4600617?) | 05/03/1930' 6,150' Miocene Oil Sands | 18-5/8" 55.5# 650' | 8-5/8" 36# 6,050' | 6-5/8" 26# 6,024'-6,150' | Yes | No 300 sacks behind pipe Top of cement not reported | No 600 sacks behind pipe Uncemented liner from 6,024'-6,150' | No No. Oil zone plugged. Cement plugs at 6,193'-5,973'-6,052' & 1,559'-1,989' & 10'-580' | No 8-5/8" cut at 1,993'. Cut 11-3/4" intermediate casing at 588' and pulled out. Cut 11-3/4" casing at 700'. | No | Reopened in 2011 by LA County. Drilled out to 580' and then stage cement through tubing to the surface. Not plugged in accordance with state regulations per permit per CalGEM in 2017. |
| | Well Name: Burks #3 Operator: Geauty Oil Co. API: 037-14217 28-02S-15W-(33.9374837?, -118.4603082?) | 08/19/1930 6,074' Miocene Oil Sands | 14" 55# 708' | 9" 450# 5,894' | 6-5/8" 26# 5,891'-6,042' | Yes | No 300 sacks behind pipe Top of cement not reported | No 400 sacks behind pipe Uncemented liner from 5,891'-6,042' | No Plugs at 5,819' - 6,039' & 612'-676' & 0'-35' | Yes Cut at 676' | No | No. Plugged by Geauty Oil Co. in 1965. |
| | Well Name: Morrison #1 Operator: Gary Wells API: 037-13386 28-02S-15W-(33.9365669?, -118.4587009?) | 06/17/1930 5,934' Weight not reported 652' | | 6-5/8" 26# 5,909' | 6-3/4" Weight not reported unknown - 6,045' | Yes CA DOG requirement | No Sacks behind pipe not reported Uncemented liner from unknown - 6,045' | No 5,400'-5,520 and 0'-35' | No. | No. | Well went into bankruptcy. Converted to injection well in some zone in 1961. Plugged in 1970. |
| | Well Name: Edgar K. Brown #1 Operator: Marathon Oil Company API: 037-13839 28-02S-15W-(33.9364283?, -118.4608019?) | 06/26/1930 6,057' Miocene Oil Sands | 18" 80# 685' | 8-5/8" 36# 5,959' | 6-5/8" 26# 5,932'-6,057' | Yes | No 250 sacks behind pipe Top of cement not reported | No 600 sacks behind pipe Uncemented liner from 5,932'-6,057' | No Plugs at 5,910'-6,047 & 670'-1,212' & 5'-660' | Yes Cut at 662' | No | Initially plugged in 1933. Re-opened and replugged in 1987 by Marathon Oil Co. Drilled out to 1,200' and shot holes in 8-5/8" and squeezed cement back to 668 feet. The cement plug from 660' to surface. |
| | Well Name: Marcell Black #1 Operator: Exxon Mobil Corporation API: 037-13771 28-02S-15W-(33.9375461?, -118.4593398?) | December 1930 6,240' Miocene Oil Sands | 13-3/8" Weight not reported 739' | 9" Weight not reported 3,657' | 5-3/4" Weight not reported 3,614'-6,255' | No | No Top of cement not reported | No Sacks behind pipe not reported Uncemented liner from 3,614'-6,255' | No 3,590'-4,246' and 686'-704' | Yes Cut at 708' | No | Gas coming into the casing during the water shut-off test. Originally, not approved by CA Division of Oil & Gas. |
| | Well Name: Lease by International Petro. Corp., Ltd. #2 Operator: International Petro. Corp., Ltd. API: 037-13731 28-02S-15W-(33.9376959?, -118.4595277?) | 2/12/1931 4,200' Not lined | 16" 63# welded 695' | 10-3/4" 45.5# 3,495' | 6-5/8" 26# 4,200' Cutoff at 3,339' | Yes American Double Lock | No 300 sacks behind pipe Top of cement not reported | No 400 sacks behind production casing. Uncemented liner from 3,339'-4,200'. | No Cement plug from 3,293' -4,192' | Yes Production casing cut prior to abandonment | No | November 1930 blowout and fire during drilling noted on P&A proposal |
| | Well Name: Lease by Metropolitan Oil Corp., Ltd. #2 Operator: Metropolitan Oil Corp., Ltd. API: 037-13845 28-02S-15W-(33.9404009?, -118.4591989?) | 12/15/1930 4,327' Not lined | 13-3/8" 61# 596' | 10-3/4" 36# 3,469' | 5" 16# 4,327' Cutoff at 3,447' | Yes Std thread pipe lined | No 300 sacks behind pipe Top of cement not reported | No 350 sacks behind production casing. Uncemented liner from 3,447'-4,327'. | No Plugs from 3,380'-3,400' and Surface to 740' | Yes Cut at 576' | No | Could not locate casing stub and lost circulation during 2000 abandonment. |
| | Well Name: Lease by F. H. & B. Oil Co. #3-A Operator: F. H. & B. Oil Co. API: 037-13814 28-02S-15W-(33.9362137?, -118.4568793?) | 5/19/1931 3,822' Not Lined | 12-1/2" 40# 596' | 6-5/8" 26# 3,411' | 4-3/4" and 5" 16# 3,822' Cutoff at 3,399 | No | No 200 sacks behind pipe Top of cement not reported | No 350 sacks behind production casing. Uncemented liner from 3,399'-3,822'. | No Tubing left in hole from 277-3,394' Plugged from 277' to surface. | No | No Tubing left in hole from 277-3,394' Plugged from 277' to surface. | Multiple blowouts and instances of lost circulation during drilling. Set whipstock and sidetracked |
| | Well Name: Burks #8 Operator: Geauty Oil Co. API: 037-14219 28-02S-15W-(33.9375800?, -118.4560793?) | 12/15/1930 4,050' Not Lined | 16" 65# 672' | 11-3/4" 54# 3,385' | 9" and 6-5/8" (pulled) 450' and 26# 3,855' and 4,050' (abandoned) | Yes Welded Larsen | No 600 sacks behind pipe Top of cement not reported | Yes, 750 sacks Top of cement not reported not reported | No Plug from 514'-550' | Yes Multiple cutoff attempts. Successful at 545' | No | None reported |
| | Well Name: Lease by Hugh Ward Late #1 Operator: Hugh Ward Late API: 037-13847 28-02S-15W-(33.9726089?, -118.4576781?) | 12/17/1930 4,122' Not Lined | 15-1/2" -not listed- 641' | 6-5/8" 32# 3,489' | -not listed- 3,497-4,122 | Yes stove pipe and screw pipe lined | No 400 sacks behind pipe Top of cement not reported | No 400 sacks behind production casing. Uncemented liner from 3,497'-4,122'. | No Plug from 607'-625' | Yes Cut at 625' | No | None reported |

| # | Well Name: / Operator: / API: / Location (S-T-R) (Lat, Long) | Completion Date: / Total Depth (feet) / Target Formation: | Surface Casing Details: Diameter (inches) / Weight (pounds per foot) / Setting Depth (feet) | Production Casing Details: Size (inches) / Weight (pounds per foot) / Setting Depth (feet) | Liner Details: Size (inches) / Weight (pounds per foot) / Setting Depth (feet) | Stove pipe casing used: (Yes/No) (comment) | Surface casing cemented to ground-level (Yes/No) (comment) | Production casing cemented across hydrocarbon interval (Yes/No) (comment) | Cement placed across saltwater zone during abandonment (Yes/No) (comment) | Casing cut during abandonment (Yes/No) (comment) | Cemented production casing annulus from 2,200' to surface during abandonment (Yes/No) (comment) | Issues encountered during drilling or abandonment: (Yes/No) (comment) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Well Name: Berry #9 / Operator: Gruner Oil Co. / API 037-14220 / 28-02S-15W (33.9725970°, -118.4576187°) | 10/11/1930 / 3,933' / Not Listed | 16" / 650 / 673' | 11-3/4" / 548 / 3,597' | 6-5/8" / 260 / 3,405-3,930' | Yes / Welded Lances | 315 sacks behind pipe / Top of cement not reported | Yes, 780 sacks / Top of cement not reported not reported | No / Plugs at 804'-854' and 645'-693' | Yes / Cut at 854' | No | Production casing failed WSOT |
| | Well Name: Nelson #2 / Operator: Exxon Mobil Corporation / API 037-13776 / 28-02S-15W (33.9725274°, -118.4576649°) | 10/17/1930 / 4,199' / Not Listed | 18" / 728 / 645' | 10-3/4" / 458 / 3,467' | 6-5/8" / 260 / 3,410-4,199' | Yes / Welded Lances | 500 sacks behind pipe / Top of cement not reported | No, 400 sacks behind production casing. Uncemented liner from 3,410-4,199'. | No / Plug from 391'-425' | Yes / Cut at 412' | No | Production casing failed WSOT |
| | Well Name: Butts #10 / Operator: Gruner Oil Co. / API 037-14221 / 28-02S-15W (33.9721173°, -118.4571532°) | 01/19/1931 / 4,201' / Not Listed | 16" / 650 / 673' | 11-3/4" / 548 / 3,381' | 6-5/8" / 260 / 3,369-4,195' | Yes / Welded Lances | 600 sacks behind pipe / Top of cement not reported | No, 750 sacks behind production casing. Uncemented liner from 3,369-4,195' | No / Plugs at 3,305'-3,700' and 10'-35' | No | No | None reported |
| | Well Name: Butts #11 / Operator: Gruner Oil Co. / API 037-14222 / 28-02S-15W (33.9716390°, -118.4567337°) | 02/12/2013 / 4,300' / Not Listed | 16" / 650 / 673' | 11-3/4" / 548 / 5,564' | 6-5/8" & 4-3/4" / 260 & 164 / 3,834'-4,300' | Yes / Welded Lances | 600 sacks behind pipe / Top of cement not reported | No, 750 sacks behind production casing. Uncemented liner from 3,834'-4,300' | No / Plugs at 3,246' - 4,280' & 0'-35' | No | No | None reported |
| | Well Name: Lease by George Walters Ind Oil & Gas #4 / Operator: George Walters Ind Oil & Gas / API 037-14092 / 28-02S-15W (33.9716500°, -118.4570030°) | 01/19/1931 / 4,313' / Not Listed | 18" / 708 / 605' | 10-3/4" / 458 / 3,474' | 6-5/8" / 260 / 3,475'-4,297' | Yes / Hercules Stovepipe | 250 sacks behind pipe / Top of cement not reported | No, 500 sacks behind production casing. Uncemented liner from 3,475'-4,297' | No / Plug on top cut-off tubing stub from 3,854'-3,070'. Plug across cut-off casing from 560'-590' | Yes / Cut at 590' | No | Tubing did not release during abandonment. Left as fish in hole. |
| | Well Name: Gruner #9V / Operator: Gruner Oil Co. / API 037-14235 / 28-02S-15W (33.9741266°, -118.4568634°) | 06/20/1931 / 5,583' / Not Listed | 13-3/8" / - / 755' | 4-3/4" / 164 / 4,770' | 3" / Not reported / 4,770-5,583' | Not reported | # of sacks / Top of cement not reported | No / 115 sacks behind production casing | No / Plugs at 4,197'-4,770' 2,300-2,390' and 5'-155' | 4-3/4" cut and pulled from 2,267'. Attempted to cut 9-5/8" at 833', 633', & 32', no success. | No | Dropped 8-5/8" casing & drill pipe, plugged back and side-tracked twice. Lost circulation zones during second side-track, lost cement during abandonment in 8-5/8" casing cut holes. |
| | Well Name: P & W #3 / Operator: P. H. & B. Oil Co. / API 037-13963 / 28-02S-15W (33.9747260°, -118.4568600°) | 10/23/1930 / Not Listed / Not Listed | 13" / - / 750' | 8-5/8" / 368 / 3,502' | 4-3/4" / Not reported / Not reported, TD assumed to be ~4,200' | Yes | # of sacks / Top of cement not reported | Not Reported | No / Plugs at 3,438'-4,162' and 632'-676' | Yes / Cut at 713' | No | No |
| | Well Name: Lease by Beaudette-Dunn Petro. Co. Ltd. #1 / Operator: Beaudette-Dunn Petro. Co. Ltd. / API 037-14326 / 28-02S-15W (33.9715268°, -118.4574882°) | 01/26/1931 / 4,300' / Not Listed | 14" / 408 / 695' | 8-5/8" / 368 / 3,493' | 4-3/4" / Weight not listed / 3,494'-4,300' | Yes | 250 sacks behind pipe / Top of cement not reported | No, 600 sacks behind production casing. Uncemented liner from 3,493'-4,300' | No / Plugs at 4,260-4,300' & 3,432'-3,602' & 627'-646' | Yes / Cut at 661' | No | 8-5/8" WSOT inconclusive. Bailer left in hole at 3,670'. |
| | Well Name: Lease by George Walters Ind Oil & Gas #3 / Operator: George Walters Ind Oil & Gas / API 037-14091 / 28-02S-15W (33.9716606°, -118.4570552°) | 12/24/1930 / 4,400' / Not Listed | 14" / 660 / 500' | 8-5/8" / 368 / 3,400' | 6-5/8" / Not Reported / 3,400'-4,400' | Yes / Hercules Stovepipe | 250 sacks behind pipe / Top of cement not reported | No, 600 sacks behind production casing. Uncemented liner from 3,400'-4,400' | No / Plugs at 2,398'-2,553' and 408'-454' | Yes / Cut at 440' | No | Pump and rods left in hole. Top of at 2,530'. |
| | Well Name: Black #3 / Operator: Marcell Oil & Gas Corp. / API 037-13840 / 28-02S-15W (33.9719505.9°, -118.4581985.9°) | 12/3/1930 / 3,500' / - | 12-1/2" / N/A / 724' | None | None | Yes / 12-1/2" | No / Top of cement not reported | No / No production casing | No / Cement plugged 744'-951', 120'-0' | No | No | No |
| | Well Name: Lease by Smith & Graham #2 / Operator: Smith & Graham / API 037-13990 / 28-02S-15W (33.9722310°, -118.4583302°) | 9/11/1930 / 4,234' / - | 16" / N/A / 687' | 10-3/4" / 458 / 3,544' | 6-1/4" / N/A / 3,482' - 4,234' | Yes / 16" | No / 250 sacks behind pipe / Top of cement not reported | No / 350 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,466'-3,488', 635'-596' | Yes / Cut at 610' | No | No |
| | Well Name: Lease by Smith & Graham #4 / Operator: Smith & Graham / API 037-13992 / 28-02S-15W (33.9724846°, -118.4580394°) | 10/11/1930 / 5,547' / - | 16" / N/A / 783' | 8-5/8" / 368 / 3,501' | 4-1/2" / 4" D.P. / 4,950 - 5,540' | Yes / 16" | No / 250 sacks behind pipe / Top of cement not reported | Yes / 300 sacks behind pipe / Top of cement not reported | No / Cement plugged 5,162'-4,993', 3,350'-3,306', 650'-680' | Yes / Cut at 3,350' | No | Yes, Drilling: Gas was issuing from the casing at intervals during testing. Fluid rose 800' in 25 hr. and was mainly muddy froth. |
| | Well Name: V #2 / Operator: Chevron U.S.A. Inc. / API 037-14200 / 28-02S-15W (33.9727006°, -118.4597402.9°) | 9/10/1930 / 4,797' / - | 14" / N/A / 645' | 9" / 458 / 4,100' | 4-3/4" / N/A / 3,537'-4,122' | Yes / 14" | No / 500 sacks behind pipe / Top of cement not reported | No / 600 sacks behind pipe / Top of cement not reported | No / Cement plugged 4,710'-3,500', 470'-340', 327'-0' | Yes / Cut at 576' | No | No |
| | Well Name: V #6 / Operator: Chevron U.S.A. Inc. / API 037-14203 / 28-02S-15W (33.9730567.9°, -118.4590480.9°) | 10/18/1930 / 4,418' / - | 13-3/8" / 614 / 831' | 8-5/8" / 368 / 3,523' | 6-5/8" / N/A / 3,495' - 4,418' | No | No / 500 sacks behind pipe / Top of cement not reported | No / 600 sacks behind pipe / Top of cement not reported | No / Cement plugged 4,418'-3,477', 579'-551' | Yes / Cut at 585' | No | No |
| | Well Name: Gruner #1V / Operator: Gruner Oil Co. / API 037-14211 / 28-02S-15W (33.9725134°, -118.4595227.9°) | 11/9/1930 / 4,400' / - | 12-1/2" / 458 / 650' | 8-5/8" / 368 / 3,500' | 6-5/8" / 260 / 3,438' - 4,400' | Yes / 12-1/2" | No / 200 sacks behind pipe / Top of cement not reported | Yes / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,490'-3,340', 650'-607', 60'-0' | Yes / Cut at 650' | No | Yes, blowout during drilling (11/14/1930). Heavy mud pumped in under pressure to stop blowout. |
| | Well Name: Lease by Venezia Oil Corp. #2 / Operator: Venezia Oil Corp. / API 037-14240 / 28-02S-15W (33.9732742.9°, -118.4597473.9°) | 9/17/1930? / 4,439' / - | 16" / N/A / 673' | 9" / 458 / 3,485' | 4-3/4" / N/A / 3,454' - 4,439' | Yes / 16" | No / 600 sacks behind pipe / Top of cement not reported | Yes / 400 sacks behind pipe / Top of cement not reported | No / Cement plugged 4,000'-3,320', 56'-0' | No | No | Yes, blowout during drilling (9/19/1930). Well caught fire 9/19/1930 - extinguished 9/20. |
| | Well Name: Lease by Island Petro. Co., Ltd. #1 / Operator: Island Petro. Co., Ltd. / API 037-13780 / 28-02S-15W (33.9736635?, -118.4596570?) | 11/10/1930 / 4,420' / - | 16" / N/A / 710' | 8-5/8" / 368 / 3,492' | 5" / N/A / 3,466' - 4,420' | Yes / 16" | No / No cementing details | No / 600 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,382'-3,130', 735'-688' | Yes / Cut at 993' | No | Yes, lost circulation during drilling (11/14/1930). 8-5/8" casing bad at 1,232' during drilling. Blowout during plugging (2/2/1932) |
| | Well Name: Lease by Nelson Petro. Co., Ltd. Tyler, Roc. #3 / Operator: Nelson Petro. Co., Ltd. Tyler, Roc. / API 037-13951 / 28-02S-15W (33.9736605?, -118.4602600?) | 9/27/1930 / 4,410' / - | 14" / N/A / 653' | 9" / 458 / 3,475' | 5-3/4" / 22.58 / 3,410 - 4,410' | Yes / 14" | No / 450 sacks behind pipe / Top of cement not reported | No / 450 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,440'-3,320', 631'-594' | Yes / Cut at 633' | No | No |
| | Well Name: P & W #2 / Operator: P. & W Oil Co. / API 037-13964 / 28-02S-15W (33.9742535?, -118.4602204?) | 10/21/1930 / 3,580' / - | 13" / N/A / 830' | 9" / 458 / 3,573' | 4-3/4" / N/A / 3,585' - 4,494' | Yes / 13" | No / No cementing details | No / 600 sacks behind pipe / Top of cement not reported | No / Cement plugged 4,918'-3,535', 774'-742' | Yes / Cut at 774' | No | No |
| | Well Name: Stanley-Larber #1 / Operator: Chevron U.S.A. Inc. / API 037-14200 / 28-02S-15W (33.9740729?, -118.4604263?) | 7/9/1930 / 5,756' / - | 20" / N/A / 739' | 13-3/8" / 614 / 3,453' | 6-5/8" / 368 / 5,664'-5,961' | Yes / 20" | No / 1000 sacks behind pipe / Top of cement not reported | No / 300 sacks behind pipe / Top of cement not reported | No / Cement plugged 6,029'-5,698, 2,689'-2,599', 672'-654', 599'-5' | Yes / Cut at 685' | No | No |

| # | Well Name: / Operator: / API: / Location (N-T-R) (Lat, Long) | Completion Date: / Total Depth (feet) / Target Formation | Surface Casing Details Diameter (inches) / Weight (pounds per foot) / Setting Depth (feet) | Production Casing Details Size (inches) / Weight (pounds per foot) / Setting Depth (feet) | Liner Details Size (inches) / Weight (pounds per foot) / Setting Depth (feet) | Stove pipe casing used: (Yes/No) (comment) | Surface casing cemented to ground-level (Yes/No) (comment) | Production casing cemented across hydrocarbon interval (Yes/No) (comment) | Cement placed across saltwater zone during abandonment (Yes/No) (comment) | Casing cut during abandonment (Yes/No) (comment) | Cemented production casing annulus from 2,200' to surface during abandonment (Yes/No) (comment) | Issues encountered during drilling or abandonment: (Yes/No) (comment) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Well Name: Jones & Premke #1 / Operator: E. G. Curtis / API 037-13385 / 21-02S-15W (33.9751799', -118.46122742') | 7/5/1930 / 4,610' | 14" / N/A / 713' | 9" / 45# / 3,490' | 4-3/4" / N/A / 3,950' - 4,610' | Yes 14' | No / 375 sacks behind pipe / Top of cement not reported | No / 300 sacks behind pipe / Top of cement not reported | No / Cement plugged 4,568'-3,436', 730'-654' | Yes / Cut at 933' | No | No |
| | Well Name: Mcdonald #2 / Operator: McQueen-Whalen Revocable Trust / API 037-13842 / 21-02S-15W (33.97509656', -118.46135712') | 6/30/1930 / 5,860' | 14" / N/A / 690' | 8-5/8" / 36# / 3,520' | None | Yes 14' | No / No cementing details | No / 350 sacks behind pipe / Top of cement not reported | No / Cement plugged 4,642'-4,560', 2,018'-1,896', 720'-675', 7-5' | Yes / Cut at 980' | No | Yes, Drilling: Casing bad at 2,000' |
| | Well Name: Herbert R. Gage #1 / Operator: Conservative Petro. Corp. Ltd. / API 037-14349 / 21-02S-15W (33.97082626', -118.46116630') | 9/15/1930 / 4,800' | 14" / N/A / 732' | None | None | Yes 14' | No / No cementing details | No / No production casing | No / Cement plugged 752'-702' | No | No | No |
| | Well Name: Lease by Venezia Oil Corp. #C4 / Operator: Venezia Oil Corp. / API 037-13756 / 20-02S-15W (33.97016148', -118.45823560') | 6/30/1930 / 5,635' | 14" / 56# / 660' | 10-3/4" / 45.5# / 3,460' | 4-3/4" / 26# / 5,635' | Yes 14' | No / 300 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 5,600'-5,233', 611'-539', 50'-surface | Yes / 620' | No | No |
| | Well Name: Pacific Shore #2 / Operator: Elk M. Kroeskop, H. G. Triplett & Roof / API 037-13790 / 20-02S-15W (33.96994787', -118.45825958') | 9/25/1930 / 4,721' | 15-3/8" / 610 / 607' | 9" / 40# / 3,587' | 4-3/4" / N/A / 4,721' | No | No / 300 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,451'-3,401', 579'-544' | Yes / 579 | No | Junk in hole 3,597'-5,657' |
| | Well Name: Block L #2 / Operator: Gruner Oil Co. / API 037-14214 / 20-02S-15W (33.971347', -118.46029662') | 11/24/1930 / 6,219' | 18" / 8.8 gauge / 508' | 11-3/4" / 54# / 3,699' | 8-5/8" / 36# / 5,590' | Yes 18' | No / 400 sacks behind pipe / Top of cement not reported | Yes / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 6,202'-6,090', 4,473'-3,514', 3,352'-3,332', 1,020'-990', 454'-410' | Yes / 1,020' | No | Junk in hole 459'-492' |
| | Well Name: Lease by J. C. Hanemeyer Oil Co. #C3 / Operator: J. C. Hanemeyer Oil Co. / API 037-13755 / 20-02S-15W (33.97004316', -118.45847059') | 8/30/1930 / 4,490' | 12-1/2" / 45# / 700' | 8-5/8" / 36# / 3,600' | 6-5/8" / N/A / 4,490' | Yes / 12-1/2' | No / 450 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,655'-3,385', 741'-655' | Yes / 741' | No | No |
| | Well Name: Block L #1 / Operator: Gruner Oil Co. / API 037-14213 / 20-02S-15W (33.97143930', -118.46045685') | 10/14/1930 / 4,569' | 14" / 600 / 690' | 8-5/8" / 36# / 3,516' | 6-5/8" / N/A / 4,569' | Yes 14' | No / 400 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,694'-3,333' | No | No | No |
| | Well Name: Col-Stone Venice #4 / Operator: Smith and Davidson / API 037-13989 / 20-02S-15W (33.9715544', -118.4594424#) | 11/12/1930 / 5,495' | 12-1/2" / 360 / 750' | 8-5/8" / 36# / 3,512' | 6-5/8" / 260 / 5,420' | Yes / 12-1/2' | No / 490 sacks behind pipe / Top of cement not reported | No / 600 sacks behind pipe / Top of cement not reported | No / Cement plugged 5,387'-5,341', 2,776'-2,799', 652'-611' | Yes / 2,781' | No | Junk in hole at 5,383' |
| | Well Name: Lease by Venezia Oil Corp. #C5 / Operator: Venezia Oil Corp. / API 037-13757 / 20-02S-15W (33.97186279', -118.45986958#) | 7/7/1930 / 4,209' | 12-1/2" / 508 / 777' | 8-5/8" / 36# / 3,547' | 4-3/4" / 16# / 4,209' | Yes / 12-1/2' | No / 400 sacks behind pipe / Top of cement not reported | No / N/A | No / Cement plugged 3,565-3,520, 120'-0 | Yes / 70' | No | No |
| | Well Name: Lease by Venezia Oil Corp. #19 / Operator: Venezia Oil Corp. / API 037-14249 / 20-02S-15W (33.97136689', -118.46006617#) | 10/27/1930 / 6,319' | 16" / 650 / 740' | 10-3/4" / 45# / 3,600' | 6-5/8" / 26# / 5,600' | Yes 16' | No / 450 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 4,320-3,900', 2,668-2,553', 32'-0 | Yes / N/A | No | No |
| | Well Name: Lease by Venezia Oil Corp. #C6 / Operator: Venezia Oil Corp. / API 037-13758 / 20-02S-15W (33.97219467', -118.46006617#) | 9/19/1930 / 4,507' | 12-1/2" / 450 / 765' | 8-5/8" / 350 / 3,468' | 4-3/4" / N/A / 4,507' | Yes / 12-1/2' | No / 450 sacks behind pipe / Top of cement not reported | No / 525 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,587-3,075', 50'-0 | Yes / 50' | No | Junk left in hole from 3,385'-4,000' during abandonment |
| | Well Name: Lease by Venezia Oil Corp. #P-1 / Operator: Venezia Oil Corp. / API 037-13763 / 20-02S-15W (33.97245769', -118.45993042#) | 8/5/1930 / 4,312' | 14" / 550 / 655' | 9" / 408 / 3,492' | 4-3/4" / 16# / 4,312' | Yes 14' | No / 400 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 594'-568', 53'-11' | No | No | Junk left in hole from 617'-4,312 during abandonment |
| | Well Name: Block K #1 / Operator: Gruner Oil Co. / API 037-14212 / 20-02S-15W (33.97260770', -118.46095709#) | 11/10/1930 / 4,623' | 14" / N/A / 715' | 8-5/8" / 36# / 3,521' | 6-5/8" / N/A / 3,483' - 4,623' | Yes / 12-1/2' | No / 400 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,022'-3,000', 250'-222', 32'-5' | Yes / 250' | No | No |
| | Well Name: Lease by Venezia Oil Corp. #C7 / Operator: Venezia Oil Corp. / API 037-13759 / 20-02S-15W (33.97296147', -118.46076202#) | 6/12/1930 / 4,650' | 12-1/2" / 508 / 733' | 8-5/8" / 36# / 3,495' | 4-3/4" / 16# / 4,650' | No | No / 400 sacks behind pipe / Top of cement not reported | No / 400 sacks behind pipe / Top of cement not reported | No / Cement plugged 4,000'-3,360', 607'-432, 50'-0 | Yes / 607' | No | No |
| | Well Name: Gruner #8V / Operator: Gruner Oil Co. / API 037-14234 / 20-02S-15W (33.97312317', -118.45794678#) | 10/3/1930 / 5,807' | 14" / 550 / 643' | 8-5/8" / 36# / 3,489' | 5-3/4" / N/A / 4,397' | Yes 14' | No / 300 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 5,807'-5,248', 4,280-3,369, 640'-614' | Yes / 890' | No | Junk in hole 4,539-4,597 |
| | Well Name: Lease by Block Oil Co. #2 / Operator: Block Oil Co. / API 037-14332 / 20-02S-15W (33.97099669', -118.45705414#) | 10/25/1930 / 4,443' | 16" / 8-10 gauge / 615' | 10-3/4" / 458 / 3,457' | 6" / 258 / 4,443' | Yes / 16" 8-10 gauge | No / 300 sacks behind pipe / Top of cement not reported | No / 300 sacks behind pipe / Top of cement not reported | No / Cement plugged 2,500'-2,474', 1,025'-1,005', 635'-580', 55'-5' | Yes / 1,025' | No | No |
| | Well Name: Lease by Venezia Oil Corp. #P-6 / Operator: Venezia Oil Corp. / API 037-13764 / 20-02S-15W (33.97099669', -118.45756531#) | 10/3/1930 / 4,250' | 16" / 63.50 / 673' | 10-3/4" / 458 / 3,483' | 5-3/4" / 22.50 / 4,250' | Yes 16" | No / 400 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 4,000'-3,375', 790-641', 95'-0 | No | No | No |
| | Well Name: Lease by Block Oil Co. #9 / Operator: Block Oil Co. / API 037-14336 / 20-02S-15W (33.97048698', -118.45738622#) | 10/27/1930 / 5,644' | 12-1/2" / 508 / 625' | 8-5/8" / 36# / 3,406' | 6-5/8" / N/A / 4,180' | Yes / 12-1/2' | No / 400 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 5,640-5,290, 3,410-3,344, 476'-440' | Yes / 500' | No | No |
| | Well Name: Ohio R.G.U. #8 / Operator: County of Los Angeles / API 037-13811 / 20-02S-15W (33.97097739', -118.45525369#) | 11/25/1930 / 4,343' | 14" / 600 / 680' | 8-5/8" / 36# / 3,354' | N/A | Yes 14' | No / 400 sacks behind pipe / Top of cement not reported | No / 500 sacks behind pipe / Top of cement not reported | No / Cement plugged 3,012'-3,097, 2,902'-2,842', 1,460'-3,396, 2,467-2,287, 750'-626', 70'-15' | Yes / 830' | No | Blowout during bailing |

E-3

| # | Well Name:<br>Operator:<br>API:<br>Location: (S-T-R) (Lat, Long) | Completion Date:<br>Total Depth (feet)<br>Target Formation: | Surface Casing Details<br>Diameter (inches)<br>Weight (pounds per foot)<br>Setting Depth (feet) | Production Casing Details<br>Size (inches)<br>Weight (pounds per foot)<br>Setting Depth (feet) | Liner Details<br>Size (inches)<br>Weight (pounds per foot)<br>Setting Depth (feet) | Stove pipe casing used:<br>(Yes/No)<br>(comment) | Surface casing cemented to ground-level<br>(Yes/No)<br>(comment) | Production casing cemenent across hydrocarbon interval<br>(Yes/No)<br>(comment) | Cement placed across saltwater zone during abandonment<br>(Yes/No)<br>(comment) | Casing cut during abandonment<br>(Yes/No)<br>(comment) | Cemented production casing annulus from 2,200' to surface during abandonment<br>(Yes/No)<br>(comment) | Issues encountered during drilling or abandonment:<br>(Yes/No)<br>(comment) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | Well Name: Graner #7V<br>Operator: Graner Oil Co.<br>API: 037-14233<br>28-02S-15W (33.97093964º, -118.45642853º) | 1/30/1931<br>5,855' | 10-3/4"<br>45#<br>750' | 6-5/8"<br>25#<br>3,471' | 4-3/4"<br>16#<br>5,377' | No | No<br>N/A | No<br>400 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 5,030'-4,863', 691'-625', 60'-5' | Yes<br>675' | No | No |
| 62 | Well Name: Burks #12<br>Operator: Graner Oil Co.<br>API: 037-14223<br>28-02S-15W (33.97106934º, -118.45630646º) | 10/29/1930<br>5,905' | 16"<br>65#<br>673' | 11-3/4"<br>54#<br>3,385' | 9"<br>45#<br>4,399' | Yes<br>16" | No<br>325 sacks behind pipe<br>Top of cement not reported | No<br>750 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 5,582'-5,240', 1,949'-1,899', 58'-6' | Yes<br>63' | No | No |
| 63 | Well Name: Lease by P. H. & B. Oil Co. #13-A<br>Operator: P. H. & B. Oil Co.<br>API: 037-13960<br>28-02S-15W (33.97068024º, -118.45682526º) | 10/20/1930<br>4,500' | 14"<br>65#<br>505' | 8-5/8"<br>36#<br>3,504' | 5"<br>N/A<br>4,500' | Yes<br>14" | No<br>250 sacks behind pipe<br>Top of cement not reported | No<br>600 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 112 sx below 3,396', 30 sx below 427', 375'-155', 122'-0' | Yes<br>493' | No | Gas issuing from casing during casing test<br>Junk below 403' |
| 64 | Well Name: Burks #2<br>Operator: Graner Oil Co.<br>API: 037-14216<br>28-02S-15W (33.97049713º, -118.45583344º) | 12/30/1930<br>4,440' | 16"<br>65#<br>677' | 11-3/4"<br>54#<br>3,394' | 6-5/8"<br>26#<br>4,435' | Yes<br>16# | No<br>600 sacks behind pipe<br>Top of cement not reported | No<br>750 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 3,390'-3,228', 75'-8' | Yes<br>75' | No | No |
| 65 | Well Name: Lease by Venezia Oil Corp. #B5<br>Operator: Venezia Oil Corp.<br>API: 037-13752<br>28-02S-15W (33.97101212º, -118.45918274º) | 10/18/1930<br>4,490' | 14-1/2"<br>40#<br>723' | 9"<br>40#<br>3,440' | 4-3/4"<br>16#<br>4,490' | Yes<br>14-1/2# | No<br>350 sacks behind pipe<br>Top of cement not reported | No<br>400 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 3,460'-3,270', 40'-6' | No | No | No |
| 66 | Well Name: Lease by Venezia Oil Corp. #6<br>Operator: Venezia Oil Corp.<br>API: 037-14242<br>28-02S-15W (33.97039413º, -118.45658875º) | 12/5/1930<br>4,409' | 16"<br>N/A<br>684' | 8-5/8"<br>36#<br>3,497' | 5-1/2"<br>N/A<br>4,409' | Yes<br>16# | No<br>250 sacks behind pipe<br>Top of cement not reported | No<br>500 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 3,910'-3,406', 60'-10' | No | No | Gas issuing from casing during casing test<br>Collapse at 3,920' |
| 67 | Well Name: Graner #6V<br>Operator: Graner Oil Co.<br>API: 037-14232<br>28-02S-15W (33.97043228º, -118.45677948º) | 12/19/1930<br>4,457' | 14"<br>49.7#<br>743' | 9"<br>40#<br>3,479' | 5-3/4"<br>34#<br>4,450' | Yes<br>14" | No<br>300 sacks behind pipe<br>Top of cement not reported | No<br>500 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 4,061'-3,401', 1,079'-1,060', 753'-722' | Yes<br>1,079' | No | Junk in hole 4,150'-4,450' |
| 68 | Well Name: Langley #1<br>Operator: Exxon Mobil Corporation<br>API: 037-13774<br>28-02S-15W (33.97098541º, -118.45930481º) | 11/8/1930<br>5,844' | 14"<br>N/A<br>623' | 8-5/8"<br>35#<br>3,600' | 6-5/8"<br>26#<br>5,497' | Yes<br>16" | No<br>500 sacks behind pipe<br>Top of cement not reported | No<br>300 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 5,844'-5,280', 4,440'-3,570', 3,556'-3,534', 609'-589', 25'-surface | Yes<br>609' | No | No |
| 69 | Well Name: Lease by George Wolfe #5<br>Operator: George Wolfe<br>API: 037-14096<br>28-02S-15W (33.97082901º, -118.4595871º) | 1/9/1931<br>5,804' | 16"<br>52#<br>712' | 10-3/4"<br>45.5#<br>3,610' | 6-5/8"<br>26#<br>5,530' | Yes<br>16" | No<br>N/A | No<br>500 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 5,780'-5,475', 3,244'-3,208', 688'-655' | Yes<br>688' | No | No |
| 70 | Well Name: Lease by J. C. Hansmeyer Oil Co. #C2<br>Operator: J. C. Hansmeyer Oil Co.<br>API: 037-13754<br>28-02S-15W (33.97032547º, -118.4597168º) | 9/22/1933<br>4,846' | 13-3/8"<br>54#<br>735' | 7"<br>30#<br>3,618' | 4-3/4"<br>16#<br>4,442' | No | No<br>100 sacks behind pipe<br>Top of cement not reported | No<br>300 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 4,434'-3,460', 722'-633' | Yes<br>722' | No | No |
| 71 | Well Name: Venice #1<br>Operator: JK Pacific Group, LLC<br>API: 037-13767<br>28-02S-15W (33.97068024º, -118.45983887º) | 2/4/1931<br>4,772' | 14"<br>N/A<br>749' | 8-5/8"<br>36#<br>3,604' | 4-3/4"<br>N/A<br>4,772' | Yes<br>14" | No<br>N/A | No<br>300 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 990'-972', 734'-713', 38'-8' | No | No | 8-5/8" bad at 1,314'<br>Junk in hole 1,014'-3,500'<br>Reabandoned in 2012 |
| 72 | Well Name: Lease by J. C. Hansmeyer Oil Co. #B4<br>Operator: J. C. Hansmeyer Oil Co.<br>API: 037-13751<br>28-02S-15W (33.97021484º, -118.45943451º) | 3/3/1931<br>4,736' | 12-1/2""<br>45#<br>704' | 8-5/8"<br>32#<br>3,565' | 5"<br>16#<br>4,736' | No | No<br>300 sacks behind pipe<br>Top of cement not reported | No<br>300 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 3,708'-3,480', 3,048'-2,953', 686'-624' | Yes<br>686' | No | 8-5/8" bad at 3,070 |
| 73 | Well Name: **Ohio R.G.C. #1**<br>Operator: County of Los Angeles<br>API: 037-13805 | 8/2/1929<br>6,199' | 18"<br>70#<br>744' | 9"<br>40#<br>3,825' | 6-5/8"<br>28#<br>5,947' | Yes | No<br>200 sacks behind pipe<br>Top of cement not reported | No<br>600 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 6,202'-6,199', 6,184'-5,848', 3,044'-3,001', 794'-690', 67'-16' | Yes<br>3,041' | No | No |
| 74 | Well Name: **Ohio R.G.C. #3**<br>Operator: County of Los Angeles<br>API: 037-13807 | 8/1/1930<br>4,022' | 14"<br>50#<br>684' | 8-5/""<br>36#<br>3,408' | 6-5/8"<br>N/A<br>4,022' | Yes | No<br>400 sacks behind pipe<br>Top of cement not reported | No<br>500 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 4,005'-3,645', 3,645'-3,405', 3,405'-3,280', 734'-684', 680-634', 50'-surface | Yes<br>1,094' | No | No |
| 75 | Well Name: **Ohio R.G.C. #4**<br>Operator: County of Los Angeles<br>API: 037-13808 | 11/18/1930<br>5,515' | 18"<br>N/A<br>715' | 13-3/8"<br>61#<br>3,410' | 8-5/8"<br>36#<br>5,446' | Yes | No<br>400 sacks behind pipe<br>Top of cement not reported | No<br>500 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 5,509'-5,254', 3,282'-3,217', 765'-715', 50'-surface | Yes<br>770' | No | No |
| 76 | Well Name: **Ohio R.G.C. #14**<br>Operator: County of Los Angeles<br>API: 037-13816 | 3/17/1934<br>3,861' | 13"<br>36#<br>693' | 8-5/8"<br>36#<br>3,385' | 6-5/8"<br>26#<br>3,861' | Yes | No<br>200 sacks behind pipe<br>Top of cement not reported | No<br>500 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 3,816'-3,217', 743'-662', 660'-632', 50'-surface | Yes<br>994' | No | No |
| 77 | Well Name: **Ohio R.G.C. #15**<br>Operator: County of Los Angeles<br>API: 037-13817 | 8/1/1934<br>4,080' | 12-3/4"<br>43#<br>690' | 8-5/8"<br>36#<br>3,436' | 6-5/8"<br>26#<br>3,885' | No | No<br>300 sacks behind pipe<br>Top of cement not reported | No<br>500 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 3,304'-2,600', 2,600'-2,492', 789'-739', 738'-536', 535'-16' | Yes<br>963' | No | No |
| 78 | Well Name: **Ohio R.G.C. #18**<br>Operator: County of Los Angeles<br>API: 037-13820 | 1/15/1936<br>6,380' | 12-3/4"<br>43#<br>694' | 6-5/8"<br>26#<br>6,298' | 4-3/4"<br>16#<br>6,361' | No | No<br>400 sacks behind pipe<br>Top of cement not reported | No<br>500 sacks behind pipe<br>Top of cement not reported | No<br>Cement plugged 6,353'-6,130', 5,100'-4,972', 3,100'-2,972', 793'-743', 743'-513', 511'-55' | No | No | No |

**Appendix F:  List of Plugging Records and Details for 18 RGC wells Plugged by Los Angeles County and Summary Table**

Eighteen (18) RGC wells were plugged or re-plugged by the County in March through May of 1959. Plugging jobs performed on RGC wells by the County in 1959 are summarized below:

1. **RGC #1:**
   a. Cement plugs placed from 794 to 744 feet, 745 to 694 feet, and from 50 feet below mean lower low water (M.L.L.W) to M.L.L.W.
   b. 18" casing removed from M.L.L.W and steel plate welded on stub.
   c. Re-abandonment completed March 31, 1959.

2. **RGC #2:**
   a. Cement plugs placed from 706 to 656 feet, 643 to 606 feet, and from 50 feet below M.L.L.W to M.L.L.W.
   b. 18" casing removed from M.L.L.W and steel plate welded on stub.
   c. Re-abandonment completed April 3, 1959.

3. **RGC #3:**
   a. Cement plugs placed from 4,005 to 3,645 feet, 3,645 to 3,405 feet, 3,405 to 3,280 feet, 734 to 684 feet, 680 to 634 feet, and from 50 feet below M.L.L.W to M.L.L.W.
   b. 14" casing removed from M.L.L.W and steel plate welded on stub.
   c. Abandonment completed April 29, 1959.

4. **RGC #4:**
   a. Cement plugs placed from 5,509 to 5,254 feet, 3,282 to 3,217 feet, 765 to 715 feet, and from 50 feet below M.L.L.W to M.L.L.W.
   b. 18" casing removed from M.L.L.W and steel plate welded on stub.
   c. Abandonment completed May 3, 1959.

5. **RGC #5:**
   a. Cement plugs placed from 3,801 to 3,171 feet, 734 to 684 feet, 668 to 668 feet, and from 50 feet below M.L.L.W to M.L.L.W.
   b. 14" casing removed from M.L.L.W and steel plate welded on stub.
   c. Abandonment completed April 26, 1959.

6. **RGC #6:**
   a. Cement plugs placed from 3,806 to 3,196 feet, 730 to 680 feet, 665 to 630 feet, and from 52 feet below M.L.L.W to M.L.L.W.
   b. 14" casing removed from M.L.L.W and steel plate welded on stub.
   c. Abandonment completed April 23, 1959.

7. **RGC #7:**
   a. Cement plugs placed from 735 to 710 feet, 710 to 697 feet, 697 to 533 feet, and from 50 feet below M.L.L.W to M.L.L.W.
   b. 14" casing removed from M.L.L.W and steel plate welded on stub.
   c. Re-abandonment completed April 9, 1959.

8. **RGC #8:**
   a. Cement plugs placed from 3,812 to 3,497 feet, 3,492 to 3,462 feet, 3,460 to 3,196 feet, 2,465 to 2,387 feet, 736 to 674 feet, 674 to 626 feet, and from 50 feet below M.L.L.W to M.L.L.W.
   b. 14" casing removed from M.L.L.W and steel plate welded on stub.
   c. Abandonment completed April 15, 1959.

9. **RGC #9:**
   a. Cement plugs placed from 739 to 697 feet, 697 to 628 feet, and from 50 feet below M.L.L.W to M.L.L.W.
   b. 18" casing removed from M.L.L.W and steel plate welded on stub.
   c. Re-abandonment completed April 11, 1959.

10. **RGC #10:**
   a. Cement plug placed from 50 feet below M.L.L.W to M.L.L.W.
   b. 18" casing removed from M.L.L.W and steel plate welded on stub.
   c. Re-abandonment completed April 7, 1959.

11. **RGC #11:**
   a. Cement plugs placed from 5,734 to 5,157 feet, 3,163 to 3,075 feet, 730 to 640 feet, 638 to 626 feet, and from 53 feet below M.L.L.W to M.L.L.W.
   b. 18" casing removed from M.L.L.W and steel plate welded on stub.
   c. Re-abandonment completed April 20, 1959.

12. **RGC #12:**
   a. Cement plugs placed from 3,840 to 3,324 feet, 3,320 to 3,261 feet, 2,597 to 2,489 feet, 803 to 752 feet, 753 to 507 feet, and from 505 feet to 22 feet below M.L.L.W.
   b. 12-3/4" casing removed from 40 feet.
   c. Abandonment completed May 6, 1959.

13. **RGC #13:**
   a. Cement plugs placed from 784 to 730 feet, 728 to 650 feet, and 648 to 45 feet.
   b. 18" casing removed from 40 feet.
   c. Re-abandonment completed May 19, 1959.

14. **RGC #14:**
   a. Cement plugs placed from 3,816 to 3,217 feet, 743 to 662 feet, 660 to 632 feet, and from 50 feet below M.L.L.W to M.L.L.W.
   b. 13" casing removed from M.L.L.W and steel plate welded on stub.
   c. Abandonment completed May 9, 1959.

15. **RGC #15:**
   a. Cement plugs placed at 3,304 feet, 2,600 to 2,492 feet, 789 to 739 feet, 738 to 536 feet, and 535 to 16 feet.
   b. 12-3/4" casing removed from M.L.L.W and steel plate welded on stub.
   c. Abandonment completed May 15, 1959.

16. **RGC #16:**
   a. Cement plugs placed from 3,728 to 3,251 feet, 2,600 to 2,492 feet, 796 to 746 feet, 746 to 668 feet, and 667 to 45 feet.
   b. 14" casing cut and pulled from 40 feet.
   c. Abandonment completed May 17, 1959.

17. **RGC #17**
   a. Cement plugs placed from 3,388 to 3,383 feet, 3,378 to 3,317 feet, 2,605 to 2,497 feet, 789 to 743 feet, 742 to 535 feet, and 533 to 45 feet.
   b. 14" casing removed from 40 feet.
   c. Abandonment completed May 13, 1959.

18. **RGC #18:**
   a. Cement plugs placed from 6,353 to 6,130 feet, 5,100 to 4,972 feet, 3,100 to 2,972 feet, 793 to 743 feet, 743 to 513 feet, and 511 to 55 feet.
   b. 12-3/4" casing removed from 59 feet.
   c. Abandonment completed May 26, 1959.

Expert Report of J. Daniel Arthur P.E., SPEC

**Appendix G:  Other Consulted Material**

Expert Report of J. Daniel Arthur P.E., SPEC

**Textbooks:**

1. David Talbot Day, A Handbook of the Petroleum Industry (1922).
2. **Larry W. Lake, VII Petroleum Engineering Handbook (2007).**

**Published Standards:**

1. California Statutes and Amendments to the Codes 1915.
2. California Statutes and Amendments to the Codes 1917.
3. California Statutes and Amendments to the Codes 1939.

**Technical Documents:**

1. American Petroleum Institute, Recommended Practice for Well Control Operations, (2006).
2. American Petroleum Institute, Wellbore Plugging and Abandonment Practices, (2018).
3. The Department of the Interior, Bureau of Safety and Environmental Enforcement, Effects of Tripping and Swabbing in Drilling and Completion Operations, Bourgoyne Engineering, LLC, (2017).
4. Engineering Enterprises, Inc., Technical Assistance Document: Cementing for the Plugging and Abandonment of Injection Wells, (1989).
5. Environmental Guidance Document, Well Abandonment and Inactive Well Practices for U.S. Exploration and Production Operations. American Petroleum Institute, Underground Injection Control Issues Group, July 1992.
6. F.B. Tough, Methods of Shutting Off Water in Oil and Gas Wells, (1918).
7. Harold C. Schwalen, The Stovepipe or California Method of Well Drilling as Practiced in Arizona, (1924).
8. Joe Herndon & Dwight K. Smith, Plugging Wells for Abandonment, (1976).
9. Mercy Achang, Li Yanyao &; Mileva Radonjic, A Review of Past, Present, and Future Technologies for Permanent Plugging and Abandonment of Wellbores and Restoration of Subsurface Geologic Barriers, 37 Environmental Engineering Science 395–408, (2020).
10. S. Taku Ide, S. Julio Friedmann &; Howard J. Herzog, CO2 Leakage Through Existing Wells: Current Technology and Regulations.
11. Technology Subgroup of the Operations & Environment Task Group NPC North American Resource Development Study, Plugging and Abandonment of Oil and Gas Wells, (2011).
12. U.S. Chemical Safety and Hazard Investigation Board, Gas Well Blowout and Fire at Pryor Trust Well 1H-9, (2019).

G-1