# EXHIBIT B

# Expert Rebuttal Report
# of J. Daniel Arthur, P.E., SPEC

## In the matter of:
## MDR Hotels, LLC, Plantiff

## Vs.

## Marathon Oil Company, The Dow Chemical Company, and Does 1 through 50, inclusive, Defendants

## Case No. 2:20-cv-08008



1/19/2023

**Prepared for:**

Phillips Lytle LLP and Latham & Watkins LLP

**Prepared by:**

J. Daniel Arthur, P.E., SPEC
ALL Consulting, LLC
1718 S. Cheyenne Ave.
Tulsa, OK 74120



**January 19, 2023**

1/19/2023

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

**TABLE of CONTENTS**

**1    INTRODUCTION, DESCRIPTION OF ASSIGNMENT, AND SUMMARY OF OPINIONS ......................... 1**

**2    RESPONSE TO JEFF JORDAN EXPERT REPORT OPINIONS ............................................................. 2**

2.1   RESPONSE TO OPINION 1: ......................................................................................................... 2

2.1.1   Response to Mr. Jordan's Claim that Ohio Oil Company Failed to Isolate Shallow High Pressure Gas Sands ................................................................................................................................................ 2

2.1.2   Response to Mr. Jordan's Claim that the Surface Casing Used Was Thin-walled, Pliable Stovepipe with No Pressure Integrity ............................................................................................................. 5

2.1.3   Response to Mr. Jordan's Claim of Failure to Isolate Hydrocarbon Zones ............................... 8

2.1.4   Response to Mr. Jordan's Claim that Corrosion Led to Casing Failure ..................................... 9

2.2   RESPONSE TO OPINION 2: ....................................................................................................... 10

2.2.1   Response to Mr. Jordan's Claim that: that "Marathon did not set sufficient strength casing prior to drilling into over pressurized hydrocarbon zones because it used riveted stove pipe set at only 686 feet that had no pressure integrity and little cement behind it." ................................................................................. 10

2.2.2   Response to Mr. Jordan's Claim that "Marathon did not isolate the shallow, high-pressure gas zones with competent steel casing and cement, which resulted in contamination of water zones, well integrity failures, gas leaking to surface, and subsequent blowouts." ................................................................. 11

2.2.3   Response to Mr. Jordan's Claim that "Marathon did not document whether all water overlying and underlying oil-bearing strata were shut off as required by the California statutes." ........................... 12

2.3   RESPONSE TO OPINION 3: ....................................................................................................... 13

2.3.2   Response to Mr. Jordan's Claim that Dow "failed to plug several hundred feet of holes in the production casing directly above the original oil producing zone of the Repetto formation." ........................ 14

2.3.3   Response to Mr. Jordan's Claim that Dow "failed to plug perforations in the production casing that were in an oil-saturated sand in the Repetto formation." ..................................................................... 15

2.3.4   Response to Mr. Jordan's Claim that Dow "failed to isolate the known hydrocarbon zones above the original oil producing zone of the Repetto Formation." ...................................................................... 16

2.3.5   Response to Mr. Jordan's Claim that Dow "failed to isolate the shallow, permeable water zones above the known hydrocarbon zones to prevent contaminating the freshwater zones and prevent pathways for hydrocarbons to escape to the surface soil and atmosphere." ..................................................... 17

2.3.6   Response to Mr. Jordan's Claim that Dow "failed to leave competent barriers in and/or outside the wellbore to prevent hydrocarbons from breaching the surface." ........................................................ 19

2.4   RESPONSE TO OPINION 4: ....................................................................................................... 19

2.4.1   Response to Mr. Jordan's Claim that "[t]he operator of a well must protect any underground water suitable for irrigation or domestic purposes from the infiltration of any detrimental substances." ................. 19

2.4.2   Response to Mr. Jordan's Claim that "[u]pon abandonment of a well, the operator must cap the well such as to prevent the escape of natural gas into the atmosphere." ..................................................... 20

2.5   RESPONSE TO OPINION 5: ....................................................................................................... 20

2.5.1   Response to Mr. Jordan's Claim that Dow "failed to list several hundred feet of perforations that were present in the 11-3/4 production casing . . ., including 10 feet of perforations in a documented oil sand." ................................................................................................................................................ 20

2.6   RESPONSE TO OPINION 6: ....................................................................................................... 23

2.6.1   Response to Mr. Jordan's Claim that "The junk left inside the production casing was not documented and was unexpected when MDR entered the well in 2018 to re-abandon it." ..................................... 23

2.6.2   Response to Mr. Jordan's Claim that "California state statutes and DOGGR required the condition of the well be fully documented, including the presence of any junk left in the hole." ............................ 24

January 19, 2023

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

2.6.3    Response to Mr. Jordan's Claim that "[t]he junk Dow left in the hole in 1956 severely increased the difficulty and costs of MDR's re-abandonment operations in 2018/2019." ....................................................24

2.7    RESPONSE TO OPINION 7: ..............................................................................................................................25

2.7.1    Response to Mr. Jordan's Claim that "[i]n Exponent's root cause analysis of the January 11, 2019 blowout, the first two main causal factors of the 2019 blowout identified are similar to my first two opinions stated above.  Namely: 1) Marathon's construction of the well in 1931 and Dow's abandonment in 1956 resulted in compromised well integrity of the casing strings that allowed gas influx into the wellbore through corrosion holes, and manmade perforations and cuts; and 2) insufficient placement and lack of cement barriers during Dow's abandonment in 1956 allowed gas from both deep and shallow intervals to enter the wellbore and led to lost circulation problems." ................................................................................................25

2.7.2    Response to Mr. Jordan's Claim that that *"the other four main causal factors of the blowout listed in the RCA are either not correct or only partially correct."* ...................................................................................26

2.8    RESPONSE TO OPINION 8: ..............................................................................................................................29

2.8.1    Response to Mr. Jordan's claim that "MDR accomplished the re-abandonment of the DOW RGC #10 well in 2019 in a reasonable and appropriate manner considering the condition of the well when MDR re-entered it." ....................................................................................................................................................29

2.8.2    Response to Mr. Jordan's claims that "MDR was able to effectively plug and abandon the well, successfully isolating the hydrocarbon-bearing zones from the USDW and BFW, as well as effectively sealing the well so that no hydrocarbons will come to the surface via the wellbore." .................................................30

2.9    RESPONSE TO OPINION 9: ..............................................................................................................................31

2.9.1    Response to Mr. Jordan's Claim that "The costs MDR incurred for the re-abandonment of the Dow RGC #10 well were reasonable given the condition of the well when located in 2018." ...................................31

2.9.2    Response to Mr. Jordan's Claim that "In addition, the discovery of hydrocarbon contaminated soil surrounding the well caused MDR significant additional expense to remove it to an approved hazardous material disposal site." ....................................................................................................................................32

2.10   RESPONSE TO OPINION 10: ...........................................................................................................................35

2.10.1   Response to Mr. Jordan's Claim that "The hydrocarbon contaminated soil surrounding the DOW RGC #10 well was a result of oil storage and processing on the well location while owned and operated by Marathon." ...........................................................................................................................................................35

## List of Figures

Figure 1:  Image showing 18" stovepipe taken from "The Stovepipe or California Method of Well Drilling as Practiced in Arizona". ........................................................................................................................................7

Figure 2:  Excerpt of the 1956 Report of Well Abandonment ....................................................................14

Figure 3:  Excerpt of the February 21, 1956, Report of Proposed Operations granting Dow Approval to Abandon the RGC #10. ...............................................................................................................................................15

Figure 4:  Excerpt of the RGC #10 Core Sample Descriptions for the Perforated Saltwater Zone ............16

Figure 5:  Excerpt of the November 17, 1941, Subsequent Work Form Listing the Depth and Quantity of Iodine Production Perforations.......................................................................................................................21

Figure 6:  Image showing the undocumented junk recovered from the hole............................................24

Figure 7:  Excerpt of InterAct's Daily Report from January 11, 2019.  The highlighted portion indicates circulation was occurring directly before the blowout. ...............................................................................28

Figure 8:  1938 Aerial Photo of the RGC #10 Location Showing Adjacent Oil Wells and Tank Batteries Just to the West of the Parcel (Modified from Earl James Expert Report, Exhibit 6). ......................................34

**APPENDIX A** - Information Considered in Analysis and Other Consulted Materials

January 19, 2023

# 1   Introduction, Description of Assignment, and Summary of Opinions

My name is J. Daniel Arthur, P.E., SPEC.  I previously submitted an expert report in this matter on November 22, 2022.

It is my understanding that several expert reports have been submitted on behalf of MDR Hotels, LLC ("MDR" or "Plaintiff"), and I have been asked to review and assess one of those reports on behalf of Marathon Oil Company ("Marathon") and The Dow Chemical Company ("Dow" and together with Marathon, "Defendants").  Specifically, I address herein claims made in the report entitled Analysis of the Dow RGC #10 Well:  Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019 ("Jordan Report").  The opinions that I have expressed herein are in addition to those provided in my initial report.  I have also reviewed the Expert Report of Daniel Dudak submitted on behalf of Marathon and Dow, and I agree with the opinions and conclusions set forth in Mr. Dudak's report.  As part of my work in this matter, I have prepared this report to rebut and refute the claims, opinions, and conclusions reached by Plaintiff's proposed expert, Jeff S. Jordan of Apex Petroleum Engineering.

This rebuttal report sets forth my expert opinions based on the information available to me as of the date of this report.  The information I considered in my analysis and other consulted materials are identified in **Appendix A**.  The opinions that I set forth in this report are based on my review of this information as well as my knowledge, education, experience, and training.  The information I relied upon in forming my opinions is consistent with the materials and information I review in my normal course of business.  If additional documents and/or other information are made available to me, I will review such documents and/or information if directed and may incorporate additional information learned about the facts and circumstances into my analyses, conclusions, and/or opinions.  I reserve the right to update, supplement, and amend my opinions as additional information becomes available, and to provide additional information and opinions regarding this matter.

After carefully reviewing the information made available to me in this proceeding and the reports identified above, and based on my knowledge, education, and many years of training and experience working in the oil and gas industry, I have reached the following opinions and conclusions to a reasonable degree of engineering certainty.

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

## 2   Response to Jeff Jordan Expert Report Opinions

## 2.1   Response to Opinion 1:

The first opinion reached by Jeff S. Jordan, P.E. states *"Marathon did not Construct the Well to Ensure Isolation of Known Hydrocarbon Zones from Shallow, Permeable, Freshwater Zones or Protect the Well Casings from Corrosion."[1]*

### 2.1.1   Response to Mr. Jordan's Claim that Ohio Oil Company Failed to Isolate Shallow High Pressure Gas Sands

In support of his first opinion, Mr. Jordan claims that *"When Marathon originally constructed the well in 1931, it failed to isolate the known shallow high-pressure gas sands of the Pico Formation from 1,500-2,500 feet with cement behind the production casing."[2]*

#### 2.1.1.1   Jordan Misstates Statutory and Regulatory Requirements for the Relevant Time Period

Mr. Jordan fails to reveal that there were no provisions in the California statutes or regulations that required cement behind the production casing (the 11-3/4" casing of the Recreation Gun Club ("RGC") #10 well ("RGC #10 well" or "RGC #10")).  The Ohio Oil Company complied with the 1931 California Division of Oil, Gas, and Geothermal Resources ("DOGGR")[3] approved permit conditions for the RGC #10 well which required that a column of mud-laden fluid be placed in the annular space of the 11-3/4" casing and maintained to the surface for at least 30 days after cementing.[4]  Notification of intended operations was provided to DOGGR as was required so that operations could be authorized and witnessed by representatives.[5]  The RGC #10 well was constructed as required by DOGGR in 1931 and was also consistent with standard industry practices for the time.

Chapter 535 of the California regulations in effect on May 28, 1929, states under Section 3 as follows:

> *"It shall be the duty of the state oil and gas supervisor to supervise the drilling, operation and maintenance and abandonment of petroleum or gas wells in the State of California, as to prevent, as far as possible, damage to underground petroleum and gas deposits from infiltrating water and other causes and loss of petroleum and natural gas.  It shall be the duty of any person, firm or corporation engaged in operating any petroleum or gas well in this state wherein high pressure gas is known to exist, and any person, firm or corporation drilling for petroleum or gas is unknown, to equip any such well with casings of sufficient strength, and such other safety devices as may be necessary, in accordance with method approved by the state oil and gas*

---

[1] Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019 ("Jordan Report"), p. 55.

[2] Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019 ("Jordan Report"), p. 55.

[3] As discussed in my initial report, the name of the state agency responsible for regulating California's oil and gas industry has changed over time, and it is now currently referred to as CalGEM.  To avoid confusion, this report will refer to that agency as DOGGR despite later name changes.

[4] DOW RGC 10 Well Files.pdf p. 33 of 35, (MDR0083210).

[5] DOW RGC 10 Well Files.pdf p. 32 of 35, (MDR0083209).

January 19, 2023

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

> *supervisor, and to use every effort and endeavor to effectually prevent blow-outs, explosions and fires."[6]*

In accordance with applicable statutes of the time, Ohio Oil Company submitted a Notice of Intention to Drill New Well form to DOGGR.  This form, dated February 19, 1931, described the proposed location and well construction details, including the planned casing size, weight, and landing depths of the casing strings, and total depth for a new well to be named the RGC #10.[7]  The proposed well construction as set out in the RGC #10 Notice of Intent complied with requirements of the time set forth in Chapter 535 regulating casing placement.

The Notice of Intent proposed surface casing comprised of new 18" 84 pound per foot casing with an estimated setting depth of 690 feet intended to be cemented in place.  Two casing sizes (either 18-5/8" or 18") were articulated throughout the historical record to describe the outer diameter of the stove pipe surface casing.  This document will use 18" as the measure of the outer diameter of the stove pipe surface casing, which is the measure indicated in the original drilling records.[8]

The same form states that a production casing string comprised of new 11-3/4-inch 54 pound per foot casing was estimated to be set and cemented in place at a depth of approximately 3,500 feet.  Again, there was no statute or regulation in place at this time that required a casing string to be cemented back to the surface.  The only statutory requirement at this time was shutting-off of the water-bearing zones to prevent water from damaging the oil-producing reservoir.

The RGC #10 well was drilled and completed in accordance with all applicable state laws, regulations, and standard industry practices at the time.  As ascertained from the RGC #10 well records, the Ohio Oil Company drilled and completed the RGC #10 adhering closely to the DOGGR approved drilling and completion plan described in the Notice of Intention to Drill New Well.  The 686 feet of 18" 8-10 gauge American Double Lock stove pipe used was typical of that era and was commonly used as a surface casing.[9]  According to well records, the surface casing at the RGC #10 was cemented in place with 500 sacks of Blue Diamond Oil Well Cement pumped under pressure using the Perkins two-plug method and allowed to cure for 20 hours.[10]  Cement was placed between the borehole wall and stovepipe casing as a means to provide pressure integrity and an effective barrier between shallow water zones and hydrocarbon or saltwater encroachment.

---

[6] Heinonline.2021. "California – Extra Session of 47th Legislative; 48th Regular Session: 923-943, (accessed December 29, 2022).

[7] DOW RGC 10 Well Files.pdf p. 34 of 35, (MDR0083211).

[8] DOW RGC 10 Well Files.pdf p. 24 of 35, (MDR0083201).

[9] Casing is large-diameter steel pipe inserted into a wellbore and cemented into place. Casing protects weak formations from potentially damaging pressures produced by the drilling mud.

[10] The Perkins Two Plug Method was a common method utilized by operators of that time to pump cement into place into the annular space between the casing and wellbore during the construction of the well.  A cementing crew uses special mixers and pumps to displace drilling mud and place cement across a predetermined interval.

**January 19, 2023**

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

### 2.1.1.2   Jordan Acknowledges, But Ignores, the Fact that the Well's Construction Was Typical of the Period

Mr. Jordan admits that the "*majority of the wells [he] reviewed did not have cement to the surface behind them.*"[11]  In addition, his report acknowledges that "*in the Playa Del Rey field, most of the wells that were drilled in the 1930s used riveted stovepipe as surface casing.*"[12]

Despite these admissions, Mr. Jordan ignores that RGC #10 was built in accordance with the standard practices of the period, and instead seeks to impose today's standards upon Ohio Oil Company's 1930s and 1940s conduct.  That is inappropriate.

### 2.1.1.3   Jordan Errs Regarding the Depth of Gas Shows in the Formation

According to the well records, the Ohio Oil Company had no issues with the shallow gas shows during the drilling and completion of the RGC #10 well, as the well did not blow out and well control was maintained throughout the construction process.[13]  Mud fluid not less than 70 pounds per cubic foot was required to be maintained in the RGC #10 during the drilling of the well.

Mr. Jordan incorrectly assumes in his expert report that the depths of the shallow gas shows in the Pico Formation were from 1,500 to 2,500 feet.[14,15]  The Ohio Oil Company collected core samples from the Pico Formation in the RGC #10 during drilling operations.[16]  Based on the geologic core descriptions submitted by the Ohio Oil Company in the Core Record of Oil or Gas Well, the top of the gas shows in these cores were documented at a depth of 2,200 feet and the last gas shows identified in the cores samples in the Pico Formation were at a depth of 3,082 feet.

Technical evaluation and assessment of the six other wells that blew out in the Pico Formation during drilling or plugging operations indicate that these blowouts occurred at depths ranging from 2,200 to 3,134 feet, which correlates to the gas shows within the Pico Formation in the cores taken at the RGC #10 well.[17]

Furthermore, there is no geological evidence to suggest these gas zones were at a shallower depth. These gas shows were isolated behind the 11-3/4" casing.

---

[11] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 26 of 186.

[12] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 27 of 186.

[13] Gas shows are volumes of gas that rise to the surface within the drilling mud.  Detection and mitigation of gas shows is crucial because in sufficient quantity they can reduce the density of the drilling mud.

[14] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 15 of 186.

[15] In his deposition, Mr. Jordan testified that the hydrocarbon zone was from 1,500 to 2,200 feet, despite all recorded gas shows occurring at 2,200 feet or below.  Rough Deposition Transcript of Jeff Jordan, January 13, 2023, p. 109 of 206.

[16] DOW RGC 10 Well Files.pdf pp. 25 of 35, (MDR0083202) and 26 of 35, (MDR0083203).

[17] Expert Opinion of J. Daniel Arthur in the matter of MDR Hotels, LLC, Plaintiff Vs Marathon Oil Company, The Dow Chemical Company, and Does 1 through 50, inclusive, Defendants, November 2022, pp. 148 through 152.

January 19, 2023

#### 2.1.1.4  Using 1950s Neutron Logs Is Problematic and Unreliable

Using only the cased-hole neutron logs from the RGC #8 and RGC #14 wells, as Mr. Jordan does, which were run in 1951, in an effort to identify gas zones for RGC #10 is problematic.  Neutron logs are a type of porosity log that measures the hydrogen ion concentration in a formation.  If gas is present in the formation, the gas causes the neutron porosity to be lowered.  In an open hole logging operation, the neutron log is used in conjunction with the density log to determine formation porosities.  If there is gas present, the neutron log measures too low and crosses over the density log to create what is called "gas effect".[18]  A reduction in the neutron log curve by itself is not a reliable log to identify gas zones and low neutron readings could also indicate formations with low porosities.

Furthermore, these 1951 case hole logs had no scale for the neutron curve and even Ohio Oil Company's geologist had difficulty trying to identify gas zones.[19]  These 1951 vintage neutron logs are not reliable in trying to develop cross sections of alleged shallow gas zones because discrete values collected from individual wells cannot be compared to one another since there is no scale to discern the actual value of the readings obtained from the individual neutron logs.

In Jordan's Report, a flawed cross section using gamma ray logs for the RGC #10, #8, and #14 wells and the neutron curves for the RCG #8 and #14 wells is presented as Figure 4-17.  Jordan highlights low neutron readings on this figure from approximately 1,500 to 1,600 feet in an effort to claim these are gas shows in these wells.  This is a misinterpretation of the data, as there are no scales present on the logs, meaning that the values recorded are not accurate.  Close examination of the Ohio Oil Company well records for the RCG #8 and #14 wells reveals no evidence of gas shows in these shallower Pico Formation sands.  There is no geological evidence suggesting gas in these wells from 1,500 to 1,600 feet.

#### 2.1.1.5  The Lack of Gas Production from this Field Is Additional Evidence that Any Purported Failure to "Isolate" Was Irrelevant

Of the 78 wells in the Playa del Rey oilfield technically reviewed, assessed, and analyzed, none of those wells were completed or produced from the shallow gas zones within the Pico Formation.[20]  This confirms that these shallow gas sands were not commercially productive at that time.  Thus, any purported failure to "isolate" such gas did not violate California statutes in effect at the time because no producible quantities of gas were present.

### 2.1.2  Response to Mr. Jordan's Claim that the Surface Casing Used Was Thin-walled, Pliable Stovepipe with No Pressure Integrity

Mr. Jordan incorrectly and without evidence claims that *"The surface casing used was thin-walled, pliable stovepipe with no pressure integrity and was not cemented to the surface."*[21]

[18] Hester, T. C. (2005). Estimation of gas-production potential using well logs, Cretaceous of northern Montana. Scientific Investigations Report. https://doi.org/10.3133/sir20055082.

[19] Garlepy, Glen B., Review Recreation Gun Club Lease, 1951, (MAR00015811-MAR00015819).

[20] Expert Opinion of J. Daniel Arthur in the matter of MDR Hotels, LLC, Plaintiff Vs Marathon Oil Company, The Dow Chemical Company, and Does 1 through 50, inclusive, Defendants, November 2022, pp. 148 through 152.

[21] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 55 of 186.

### 2.1.2.1   The Well's Casing Was Strong

According to the RGC #10 well records, the stovepipe used as the surface casing measured 18" in diameter and weighed 84 pounds per foot.  Being 84 pounds per foot, the stove pipe was not thin-walled or pliable.  Modern API grade 18" steel casing weighs from 78 to 96.5 pounds per foot, so the 18" stovepipe is very comparable in weight and strength to modern 18" steel casing.  As evidence of this fact, an image showing 18" diameter stovepipe is presented as **Figure 1.**  Additionally, a California Division of Oil and Gas publication from 1931 purports that *"The usual casing program consists of 16" or 14" stovepipe casing cemented at 600 to 750 feet."*[22]  The 18" stove pipe surface casing was cemented in at the bottom of the well (estimated top of the cement was at 371 feet), which would have prevented gas migration from below into the shallower water zones used for irrigation.

Mr. Jordan's claim that the stovepipe surface casing had "no pressure integrity" ignores relevant facts presented in RGC #10's well file.  The placement of cement in the annulus between the borehole wall and the exterior of the 18" stovepipe surface casing was accomplished using the Perkins Cementing Method, a commonly used practice in California at that time.  The Perkins Cementing Method involved multiple plugs placed between stages of cement and water pumped under pressure.[23]  The stovepipe casing demonstrated pressure integrity as it was pressurized in order to displace the cement around the end of the casing and into the annulus using the Perkins cementing method.  The casing withstood this test with no noted integrity issues.

### 2.1.2.2   Stovepipe Casing Was Common and Approved by DOGGR

As Mr. Jordan's report admits[24], utilizing stovepipe as a surface casing was a common place industry practice regularly approved by DOGGR officials for wells drilled during that time in the Playa del Rey as substantiated with the issuance of the Report of Proposed Operations on March 2, 1931, for the RGC #10 well.[25]  In fact, 66 of the 78 wells in the Playa del Rey oilfield I reviewed for my initial expert report used stovepipe surface casing as approved by DOGGR officials.[26]

Cement placed by the Perkins Method was accepted by DOGGR officials as an effective barrier to protect water that could be used for irrigation purposes.  There were no provisions within the California statutes that required cement to be circulated back to the surface on any casing strings or back up into the previous casing string.  Of the 78 wells I technically reviewed in the Playa del Rey oilfield, 77 did not cement the surface casing back to the surface.[27]

---

[22] California Division of Oil and Gas. 1931. Summary of Operations California Oil Fields, Volume 17, No. 2.

[23] Casetext. 2022. Owen v. Perkins Oil Well Cementing Co., Circuit Court of Appeals, Ninth Circuit No. 5927, February 10, 1930. (Accessed October 6, 2022. https://casetext.com/case/owen-v-perkins-oil-well-cementing-co.

[24] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 26-27 of 186.

[25] DOW RGC 10 Well Files.pdf p. 33 of 35, (MDR0083210).

[26] Expert Opinion of J. Daniel Arthur in the matter of MDR Hotels, LLC, Plaintiff Vs Marathon Oil Company, The Dow Chemical Company, and Does 1 through 50, inclusive, Defendants, November 2022, Appendix D: RGC #10 CalGEM Historical Well Records.

[27] Expert Opinion of J. Daniel Arthur in the matter of MDR Hotels, LLC, Plaintiff Vs Marathon Oil Company, The Dow Chemical Company, and Does 1 through 50, inclusive, Defendants, November 2022, Appendix D: RGC #10 CalGEM Historical Well Records.

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC



**Figure 1:  Image showing 18" stovepipe taken from "The Stovepipe or California Method of Well Drilling as Practiced in Arizona".**

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

### 2.1.3  Response to Mr. Jordan's Claim of Failure to Isolate Hydrocarbon Zones

Despite evidence available in the RGC #10 well record to the contrary, Mr. Jordan claims that the *"failure to isolate hydrocarbon zones from the permeable shallow zones above with competent, permanent barriers such as steel casing with cement, left the wellbore susceptible to allowing formation fluid crossflow which allowed invasion of hydrocarbons into shallow water zones and even to the surface."[28]*

#### 2.1.3.1  Shallow Water Zones Were Protected

Any shallow gas shows in the Pico Formation were isolated behind the 54 pounds per foot 11-3/4" steel production casing (not the stovepipe surface casing).  The steel production casing string is of sufficient strength such that it is able to provide a barrier preventing the shallow gas shows from entering into the wellbore.[29]  The production casing was cemented using the Perkins pressure cementing method.

Based on the cement fill-up calculations on the 11-3/4" production casing, the top of cement is estimated at 2,652 feet.  The producing oil zone was plugged in 1940 by Ohio Oil Company and the top of the cement plug was tagged at 48 feet above the top of the perforated liner.  The oil producing zone in the RGC #10 well was plugged with cement in 1940 and completely isolated any migration of oil or gas from this producing zone.  There was no indication in the 2018-2019 re-plugging operations by InterAct or California Well Services, LLC ("CWS") of any oil being encountered.  Furthermore, well integrity was demonstrated by the results of the Water Shut-Off Test that was witnessed and approved by DOGGR officials.[30]  Additionally, there is no evidence of crossflow in the RGC #10 well as the shallow Pico Formation gas zones were documented on the Ohio Oil Company core logs and on the other well blowouts that occurred in these shallow gas zones.

#### 2.1.3.2  California's Historic Statutory Provisions Were Enacted to Protect Oil and Gas Producing Formations from Water Contamination

California's historic oil and gas statutes were focused on protecting oil and gas from the encroachment of water and were less concerned with whether any oil or gas impacted water sources.  Isolation of shallow water bearing zones from hydrocarbon infiltration was not a requisite legal obligation upon oil well operators at that time.  The shallow water bearing zones were isolated with the 18" stove pipe surface casing with cement.

California's law Chapter 759, Section 15 demonstrates focus, by requiring a "water shut-off test."

A successful demonstration of a water shut-off test would confirm two things:

1. The integrity of the casing string is intact and able to hold pressure; and
2. Oil-bearing strata are protected from encroachment from overlying water-bearing formations.

---

[28] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 55 of 186.

[29] Mr. Jordan testified in his deposition that the 11-3/4" production casing was sufficiently strong.  Rough Deposition Transcript of Jeff Jordan, January 13, 2023, p. 179 of 206.

[30] DOW RGC 10 Well Files.pdf p. 31 of 35, (MDR0083208).

**January 19, 2023**

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

RGC #10 Well passed this test, demonstrating the RGC #10 well's proper construction, and that the oil zone was protected from any other water bearing zones or stray gas zones by the 11-3/4" production casing and the estimated top of cement behind this casing at a depth of 2,686 feet.

### 2.1.3.3   RGC #10's Records Establish that Appropriate Barriers Were in Place

An April 15, 1931, DOGGR Report on Test of Water Shut-off Form established that a successful Water Shut-Off Test was conducted on the RGC #10 well on April 7 and 8, 1931.[31]  As specified in Chapter 718, Section 19 of the California Statutes of 1915, a supervisor with DOGGR was required to witness and verify the results of the testing.  According to the RGC #10 well records, two representatives from DOGGR witnessed the Water Shut-Off Test that occurred at the RGC #10[32]

To test the effectiveness and integrity of the 11-3/4" water string casing and cement, the fluid in the hole was bailed to approximately 1,200 feet.  Then, approximately eight hours were allowed to elapse for testing.  A report prepared by the DOGGR Inspector verified the successful result of the testing of the 11-3/4" water string casing, noting that no fluid entered the well during the eight-hour period and the fluid level remained at 1,200 feet after the test concluded.[33]

Following the conclusion of the first part of the Water Shut-off Test, 50 feet of cement was then drilled out from the bottom of the 11-3/4" casing.  Once the cement had been drilled out, the well was then left idle and monitored for 18-1/2 hours.  It was observed that the fluid level in the well rose 70 feet during that time.  Two fluid samples were collected from 1,430 and 3,433 feet, both consisting of gas-cut mud that apparently tasted of fresh water.[34]  The Water Shut Off Test was approved by DOGGR representatives and drilling was allowed to resume.

Regulatory requirements and statutes in place in 1931 did not require cement across shallow gas shows, but rather isolation with sufficient strengthen casing.  The strength of the 11-3/4" production casing and the cementing of it in place provided the barrier needed to prevent the flow of shallow gas shows into the wellbore or into shallow water zones.  Acceptance by DOGGR officials of the successful Water Shut Off Test demonstrated that the oil producing zone was isolated from the deeper gas zones and the shallower water bearing formations.

## 2.1.4   Response to Mr. Jordan's Claim that Corrosion Led to Casing Failure

### 2.1.4.1   Well Records Clearly Show No Corrosion While Defendants Controlled the Well and MDR Failed to Consider Potential Changes Occurring in Ensuing 60 Years

The Ohio Oil Company drilled and completed the RGC #10 well in accordance with the regulations and industry standards practiced in 1931.  DOGGR officials accepted that the RGC #10 well construction effectively protected hydrocarbon zones from water and shallow gas infiltration.  DOGGR officials accepted that the saltwater zone above the oil-producing zone was effectively isolated considering the results of the Water Shut-Off Test in April 1931.[35]

---

[31] DOW RGC 10 Well Files.pdf p. 31 of 35, (MDR0083208).
[32] DOW RGC 10 Well Files.pdf p. 31 of 35, (MDR0083208).
[33] DOW RGC 10 Well Files.pdf p. 31 of 35, (MDR0083208).
[34] DOW RGC 10 Well Files.pdf p. 31 of 35, (MDR0083208).
[35] DOW RGC 10 Well Files.pdf p. 31 of 35, (MDR0083208).

**January 19, 2023**

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

Any corrosion and casing failure occurred after the re-plugging operation conducted by Los Angeles County in 1959.  There was no evidence of loss of well integrity with the re-plugging of the shallow zones at that time.  Regardless, the blowout and surface breeches that occurred during MDR's re-abandonment attempt were the consequence of the loss of well integrity when the well was excavated in September 2017.  This loss of well integrity occurred years later after the successful re-plugging in 1959 and was not related to anything done by Marathon or Dow.  Instead, the loss of well integrity was known to MDR in September 2017, which failed to address this well integrity issue.  This failure led to the surface breaches and blowout experienced by MDR in 2018 and 2019.

MDR was well aware of the potential loss of integrity of RGC #10 well when the well was first exposed in September 2017.  In light of this, MDR still failed to revise its proposed re-plugging plan to address any loss of integrity and a leaking well at the surface.  Instead of adopting a more prudent approach to its re-abandonment plans, MDR simply assumed the Well was in perfect condition, even though a more experienced and capable abandonment expert would have proposed caution and anticipated potential problems.[36]

## 2.2  Response to Opinion 2:

In his report, Mr. Jordan's opines that *"Marathon Violated California Statutes and Regulations that were in Place at the Time it Drilled and Completed the RGC #10 Well in 1931."*[37]

This opinion is incorrect and unsupported for the reasons below.

### 2.2.1  Response to Mr. Jordan's Claim: that "Marathon did not set sufficient strength casing prior to drilling into over pressurized hydrocarbon zones because it used riveted stove pipe set at only 686 feet that had no pressure integrity and little cement behind it."[38]

#### 2.2.1.1  The Casing Used by Ohio Oil Company Complied with California's Statutes, Was Approved by California's Regulators, and Was Commonly Used in the California Oil Industry

As reported in the RGC #10 well records and discussed above, the stovepipe surface casing weighed 84 pounds per foot and was capable of maintaining pressure integrity as demonstrated by the successful placement of cement.  The surface casing prevented shallow water zones from infiltrating the productive hydrocarbon formations as intended, provided well control for drilling operations, and was able to maintain a stable fluid level during water shut off testing.  The cementing of the 18" stovepipe surface casing was conducted using the Perkins method, which was commonly used in California, and as discussed, previously involved using a two-plug method and the pumping of cement and water under

---

[36] Mr. Jordan stated in his deposition that a prudent operator should review the publicly available information prior to planning and executing an abandonment on a nearly 90 year old well with a documented history of a blowout and would have anticipated well integrity issues. Rough Deposition Transcript of Jeff Jordan, January 13, 2023, pp. 185-196 of 206.

[37] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 55 of 186.

[38] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 55 of 186.

**January 19, 2023**

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

pressure to displace the cement around the annulus of the casing.  This process was commonly practiced and accepted at the time as a method capable of preventing shallow water zones from infiltrating the deeper productive hydrocarbon formations.  Contrary to Mr. Jordan's assertion,[39] the placement and cementing of the stovepipe casing were authorized and accepted by DOGGR officials, which demonstrates that Marathon complied with 1929 California Statute, Chapter 535, Section 16.[40]

Moreover, 66 of the 78 wells in the Playa del Rey oilfield that I reviewed for my initial report used stovepipe as surface casing, which evidences that the practice was commonly accepted and authorized by DOGGR officials as a method to effectively *"protect any underground water suitable for irrigation from infiltration of any detrimental substances."*[41]  The use of stovepipe casing was in alignment and in accordance with state statutes, industry standards, local best practices, and available technical knowledge at the time.

## 2.2.2   Response to Mr. Jordan's Claim that "Marathon did not isolate the shallow, high-pressure gas zones with competent steel casing and cement, which resulted in contamination of water zones, well integrity failures, gas leaking to surface, and subsequent blowouts."[42]

### 2.2.2.1   Marathon Maintained Control of the Well

The Ohio Oil Company maintained well control throughout its drilling and operation of the Well.  The RGC #10 well did not blow out during the drilling and completion process, indicating that gas zones were isolated behind enough cement and steel casing.  The RGC #10 well was drilled and completed without incident.

The use of the term "high pressure gas" by Jordan is exaggerated and is not defined by Mr. Jordan in his report.[43]  In fact, during his deposition, Mr. Jordan could not define the term "high pressure".  Mr. Jordan did not review any standards when applying this term, merely declaring it as "relative term" that he employed because of the blowouts that occurred in 1956 and during MDR's re-abandonment.[44]  Mr. Jordan does not consider the fact that the Ohio Oil Company had no problem drilling the well.  Ohio Oil Company had no issues with these shallow gas zones during the drilling and completion of the RGC #10 well in 1931.  Proper well control was maintained, and no blowout occurred during the time of drilling and completion operations.  These gas zones were isolated by Ohio Oil Company behind the 11-3/4" production casing, which was cemented with 600 sacks of cement and the estimated top of cement was at 2,652 feet.  It was also well documented that no efforts to produce these shallower Pico Formation

---

[39] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 55 of 186.
[40] Mr. Jordan admits in his deposition that DOGGR is responsible for enforcing such laws. Rough Deposition Transcript of Jeff Jordan, January 13, 2023, p. 178 of 206.
[41] The 1929 California Statute, Chapter 535, Section 16 (as amended).
[42] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, pp. 55-56 of 186.
[43] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, pp. 20-22 of 186.
[44] Rough Deposition Transcript of Jeff Jordan, January 13, 2023, p. 23 of 206.

gas zones were attempted, other than one well drilled by Southern California Gas, which was abandoned as a dry hole.

Moreover, the Well's casing was evidently considered competent, as its use was authorized by DOGGR officials.  All casing strings and cementing details were authorized and approved by DOGGR as accepted and established methods for the time to effectively *"protect any underground water suitable for irrigation from infiltration of any detrimental substances"*[45] and *"all water overlying and underlying such oil-bearing strata was successfully and permanently shut off."*[46]  The methods used at the RGC #10 followed methods approved by the supervisor as required by the relevant statute.[47]  Casing strings and cementing methods utilized by Marathon were in alignment with state statutes, industry standards, local best practices, and available technical knowledge for the time.

The surface breaches and blowout that occurred during MDR's re-abandonment operation are not the consequence of a lack of "competent steel casing."  Instead, MDR and its contractors failed to perform reasonable due diligence of the extensive public records available of well construction history in the Playa del Rey oilfield.  Only allocating one day's time and effort to do this research led to a poorly developed re-plugging plan that ultimately led to the surface breaches and blowout in 2018 and 2019.

### 2.2.3  Response to Mr. Jordan's Claim that "Marathon did not document whether all water overlying and underlying oil-bearing strata were shut off as required by the California statutes."[48]

#### 2.2.3.1  Mr. Jordan's Contention that California Statutes Were Violated Is Incorrect

The successful Water Shut-Off Test performed by the Ohio Oil Company was authorized and witnessed by DOGGR officials as required at the time.  This test clearly demonstrated that all water-bearing zones were isolated behind emplaced cement and casing strings.  A copy of this test is available in RGC #10 well files, indicating compliance with California's statute with 1929 California Statute, Chapter 535, Section 18.

Mr. Jordan's claim that certain 1920s and 1930s statutes were violated by Marathon's 1930s actions and Dow's 1940s and 1950s actions because such statutes "*imply that the BFW [Base of Fresh Water] and USDW [Underground Safe Drinking Water] was required to be isolated*"[49] is nonsensical.  The terms, BFW and USDW, stemmed from environmental regulatory changes that began in 1974 with the Safe Drinking Water Act.[50]  Mr. Jordan's report provides no basis for how Defendants' actions decades earlier could be retroactively determined to violate a future regulatory standard.  Additionally, contrary to the express terms of the statutes in effect at the time, Mr. Jordan references waters suitable for use for irrigation or domestic purposes in his expert report.  DOGGR officials never identified any water that was suitable for either purpose or defined the requisite water quality standards.  Mr. Jordan conceded

---

[45] The 1929 California Statute, Chapter 535, Section 16 (as amended).
[46] The 1929 California Statute, Chapter 535, Section 18 (as amended).
[47] California Laws Relating to Oil and Gas Wells, 1915, Section 8 (as amended).
[48] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.
[49] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 33 of 186.
[50] 88 Stat. 1660 - Safe Drinking Water Act.

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

this fact during his deposition, noting that there was no requirement to isolate any water zones under the original statute.[51]

Similarly unsupported is the Report's conclusion that because a civil complaint was asserted against Ohio Oil Company in 1935 about actions not involving the RGC #10 well, that "*Marathon . . . [was] not abiding by California laws in the 1930s . . .*"[52]  The conclusion is even more suspect given that it is based only on a complaint; it does not appear that Mr. Jordan tracked down the outcome before offering the mere allegations as evidence of violating other California laws.  Even if it were true that Ohio Oil Company was violating other California laws in the 1930s (and I have seen no evidence to support that assertion), such other purported violations would not support a claim that a violation occurred regarding the RGC #10 well.  Additionally, if DOGGR was enforcing those laws in 1935 vis-à-vis a gas plant (unrelated to RGC #10), it can be expected that DOGGR would have done so if it believed there was gas waste associated directly with RGC #10.

## 2.3  Response to Opinion 3:

In his report, Mr. Jordan opines that "*The Dow Chemical Company Failed to Properly P&A the Well in 1956.*"[53]  This is incorrect and contrary to the fact that in 1956, DOGGR considered the RGC #10 well as properly abandoned by Dow.  DOGGR officials acknowledged that all requirements of well abandonment had been fulfilled in a Report of Well Abandonment dated April 27, 1956.

### 2.3.1.1  Dow RGC #10 Was Properly Abandoned

The assertion that the Well was not properly plugged and abandoned is untrue.  DOGGR officials acknowledged that all requirements of well abandonment had been fulfilled in a Report of Well Abandonment dated April 27,1956, excerpted below in **Figure 2** and accessible in the RGC #10 well file.

---

[51] Rough Deposition Transcript of Jeff Jordan, January 13, 2023, pp. 62-63 of 206.
[52] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, pp. 34 of 186.
[53] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.

     **January 19, 2023**

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC



**Figure 2:  Excerpt of the 1956 Report of Well Abandonment**

### 2.3.2   Response to Mr. Jordan's Claim that Dow "failed to plug several hundred feet of holes in the production casing directly above the original oil producing zone of the Repetto formation."[54]

#### 2.3.2.1   Dow's Abandonment Plan Was Disclosed To, Approved By, and Witnessed By DOGGR

On February 15, 1956, Dow submitted a Notice of Intention to Abandon Well for the RGC #10, see **Figure 3**.[55]  This form included a description of the Well's present condition and a summary of the proposed work, including a provision that Dow would notify DOGGR officials of progress and timing so that they may witness the setting location and hardness of each cement plug.  On February 21, 1956, DOGGR officials accepted Dow's abandonment plan for the RGC #10, approved the plan,[56] and subsequently witnessed the abandonment operation.[57]  DOGGR then concluded that its "*requirements . . . have been fulfilled.*"[58]

---

[54] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.
[55] DOW RGC 10 Well Files.pdf p. 14 of 35, (MDR0083191).
[56] DOW RGC 10 Well Files.pdf p. 13 of 35, (MDR0083190).
[57] DOW RGC 10 Well Files.pdf p. 10 of 35, (MDR0083187).
[58] DOW RGC 10 Well Files.pdf p. 8 of 35, (MDR0083185).

January 19, 2023

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC



**Figure 3:  Excerpt of the February 21, 1956, Report of Proposed Operations granting Dow
Approval to Abandon the RGC #10**

Additionally, since the perforations from 3,076 to 3,341 feet were in a saltwater zone and not in an oil-
producing or gas horizon, DOGGR did not require those perforations to be plugged with cement.

## 2.3.3   Response to Mr. Jordan's Claim that Dow "failed to plug perforations in the production casing that were in an oil-saturated sand in the Repetto formation."[59]

### 2.3.3.1   Any Purported Error Was Harmless

Mr. Jordan's claim that the saltwater zone used by Dow for iodine production was within an oil-
saturated formation misrepresents the data.  Samples were collected by the Ohio Oil Company at the
RGC #10 well to assess the geology and hydrocarbon content of the formations encountered during
drilling in 1931.[60]  The geologic conditions and the hydrocarbon content of each interval was assessed
and any zones with sufficient hydrocarbon content were produced.  The saltwater zone or iodine
production strata, from 3,076 to 3,341 feet was not part of the completed oil-producing interval in the

---

[59] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in
1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.
[60] DOW RGC 10 Well Files.pdf p. 25 of 35, (MDR0083202).

RGC #10 well, which was plainly rejected by the Ohio Oil Company as not having producible quantities of
oil in the interval, see **Figure 4**.[61]



**Figure 4:  Excerpt of the RGC #10 Core Sample Descriptions for the Perforated Saltwater Zone**

The record shows the perforated interval across the saltwater zone (3,076 to 3,341 feet) used by Dow
for iodine production, and it contains a single 32-foot sample (3,331 to 3363) that includes an oil sand.[62]
Just ten feet of the lowest perforations (from 3,331 to 3,341 feet) are in this 32-foot section.  The term
"oil sands" is not meaningful in this instance as it is common parlance, subjectively used in place for
many stained sands and is not indicative of a large producible quantity of hydrocarbon.  The proportion
of each type of rock found within described in the 30-foot sample is not provided thus it cannot be
inferred that this entire zone is oil saturated.  The core description of this oil sand did not warrant any
further actions by Ohio Oil Company as the producing oil zone was completed from 3,424 to 3,903
feet.[63]

Moreover, MDR's own oil well abandonment expert concluded that the supposed failure to plug the
perforations was harmless.  That contractor concluded that the "*well has cement above the oil zone that
has effectively isolated and protected the oil zone for 60 years; <u>no evidence of oil migration</u> has been
observed in the DOW RGC 10 well.*"[64]

### 2.3.4   Response to Mr. Jordan's Claim that Dow "failed to isolate the known hydrocarbon zones above the original oil producing zone of the Repetto Formation."[65]

The relevant hydrocarbon zone of the RGC #10 well was plugged December 20-21, 1940.  The Special
Report on Operations Witnessed form prepared by a DOGGR deputy inspector indicated that the hole
was cleaned out to 3,906 feet and 90 sacks of Victor construction cement was dumped in the hole from
3,906 to 3,376 feet and allowed to cure.[66]  The location and hardness of the cement plug at 3,376 feet

---

[61] DOW RGC 10 Well Files.pdf p. 25 of 35, (MDR0083202).
[62] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in
1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.
[63] DOW RGC 10 Well Files.pdf p. 24 of 35, (MDR0083201).
[64] Letter from InterAct regarding "DOW RGC 10 Well Recommendations," dated Feb. 14, 2019, at 6 (MDR0063005,
emphasis added).
[65] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in
1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.
[66] DOW RGC 10 Well Files.pdf p. 19 of 35, (MDR0083196).

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

was approved by a DOGGR representative who witnessed and recorded the results.[67]  The oil horizon was completely plugged with cement with the top of cement being 48 feet above the oil-producing zone and the top perforation in the production liner.

Zones above the oil-producing zone were considered to contain saltwater, which meant that there was no requirement to isolate or place cement across these intervals.  Mr. Jordan concedes that, *"few if any wells fully isolated the high-pressure gas sands in the Pico formation."[68]*

The methods Dow used during the 1956 abandonment of the RGC #10 adhered to common industry practices at the time in California and more specifically in the Playa del Rey oilfield and complied with contemporaneous statutes, state requirements, local best practices, and available technical knowledge for the time.

Thus, it is my expert opinion that Dow complied with applicable California law as evidenced by the facts that,

1. The techniques employed during the 1956 abandonment operation complied with "methods approved by supervisor";
2. Overlying water zones were "shut off" (not isolated) from entering oil or gas bearing strata as there is no evidence of cross flow (water mixed with oil or gas); and
3.  Dow plugged the well at 776 feet and above in an effort to *"endeavor to protect any underground or surface water suitable for irrigation or domestic purposes from the infiltration of any detrimental substances"*.  The absence of any evidence of "detrimental substances" in "water suitable for irrigation or domestic purposes" is an indication of the success of the 1956 abandonment.

## 2.3.5 Response to Mr. Jordan's Claim that Dow "failed to isolate the shallow, permeable water zones above the known hydrocarbon zones to prevent contaminating the freshwater zones and prevent pathways for hydrocarbons to escape to the surface soil and atmosphere."[69]

### 2.3.5.1 Dow Properly Protected Water Suitable for Irrigation or Domestic Purposes

Dow's re-abandonment actions properly protected underground or surface water suitable for irrigation or domestic purposes from infiltration of any detrimental substances.

Any usable irrigation water was considered isolated behind the 18" surface casing of which the type, weight, setting depth, and method of cementing was reviewed, accepted, authorized and witnessed by DOGGR officials.[70]  The deeper saltwater zones were considered isolated behind the 11-3/4" production casing through the demonstration of a successful water shut off test conducted on the 11-3/4" witnessed and approved by DOGGR officials.[71]

---

[67] DOW RGC 10 Well Files.pdf p. 20 of 35, (MDR0083197).
[68] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 36 of 186.
[69] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.
[70] DOW RGC 10 Well Files.pdf page 31-33 of 35, (MDR0083208-MDR0083210).
[71] DOW RGC 10 Well Files.pdf MDR0083208, p. 31 of 35.

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

During Dow's 1956 abandonment, Dow encountered issues in the well.  On March 12, 1956, while trying to cut and remove salvageable pieces of the 11-3/4" casing, the RGC #10 blew out marsh gas, salt water, and unconsolidated sand at an undetermined rate.[72]  By March 14, 1956, the well had bridged itself off with sand and operations were able to resume.[73]

Cement plugs (150 sacks) were pumped under pressure into those intervals where casing cuts were attempted below the surface casing shoe and above the production casing top of cement as a method of achieving isolation in the uncemented portions of the annular space.[74]  Cement plugs (150 sacks) were placed in the RGC #10 wellbore from 786 feet to 887 feet and from 556 feet to 625 feet.[75]  An additional 32 sacks of cement were dumped onto the casing cuts where the surface casing and production casing overlap, creating an internal wellbore plug from 291 feet to 310 feet.[76]  A surface cement plug was placed on top of a wooden plug in the 18" casing from 10 feet to 35 feet.[77]

Mr. Jordan's report repeatedly misstates the standard that governed Dow's re-abandonment activities.  Rather than addressing the statute's language, the report instead contends Dow had a duty to "isolate" certain zones.  However, the statute did not impose any such duty on Dow (or Marathon) to "isolate" anything.  Dow's only obligation was to "shut off" water from oil and gas zones, and "endeavor to protect" water suitable for irrigation and domestic purposes from infiltration of any detrimental substances—obligations Dow fulfilled.

These abandonment operations and methods utilized were approved, authorized, and observed by DOGGR.  As documented and discussed throughout this document, Dow fulfilled all DOGGR requirements during the 1956 Dow abandonment (**see Figure 3**).[78,79]  By its actions, Dow did "shut off" water from oil and gas zones and its conduct certainly met any requirement to "endeavor to protect" water suitable for irrigation or domestic purposes.  Mr. Jordan acknowledged this fact during his deposition.[80]

In a February 2019 letter from InterAct to MDR, InterAct states that *"The well has cement above the oil zone that has effectively isolated and protected the oil zone for 60 years; no evidence of oil migration has been observed in the Dow RGC 10 well"* and further states *"…that the saltwater zone is depleted, contains no hydrocarbons and is blocked from contaminating freshwater sources."[81]*  The abandonment of the RGC #10 well by Dow in 1956 with multiple shallow cement plugs not only isolated the shallow gas zones from the freshwater zones, but also protected the freshwater zones from any contamination from the saltwater zone Dow had perforated in 1941.

---

[72] DOW RGC 10 Well Files.pdf p. 12 of 35, (MDR0083189).
[73] DOW RGC 10 Well Files.pdf p. 12 of 35, (MDR0083189).
[74] DOW RGC 10 Well Files.pdf p. 10 of 35, (MDR0083187).
[75] DOW RGC 10 Well Files.pdf p. 10 of 35, (MDR0083187).
[76] DOW RGC 10 Well Files.pdf p. 11 of 35, (MDR0083188).
[77] DOW RGC 10 Well Files.pdf p. 11 of 35, (MDR0083188).
[78] The report also criticizes Dow for cutting and pulling the well's casing.  But cutting and retrieving salvageable casing was a common practice condoned and accepted by DOGGR officials.  Indeed, the practice was so common, Dow's lease expressly authorized it to pull the casing. (Ex. 74 at 2.).
[79] DOW RGC 10 Well Files.pdf p. 8 of 35, (MDR0083185).
[80] Rough Deposition Transcript of Jeff Jordan, January 13, 2023, pp. 66-68 of 206.
[81] InterAct PMTI. 2019. "Dow RGC 10 Well Recommendations." Bates Numbers MDR0063000-MDR0063006.

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

### 2.3.6   Response to Mr. Jordan's Claim that Dow "failed to leave competent barriers in and/or outside the wellbore to prevent hydrocarbons from breaching the surface."[82]

Prior to the attempt to cut off the 11-3/4" production casing at 887 feet during the 1956 abandonment, the shallow gas zones were shut off behind the production casing string.[83]  The shallow gas shows present at depths where casing cuts were attempted were blocked with cement plugs pumped under pressure.  Additionally multiple plugs were placed within the 18" surface casing.[84]

The cement plugs left in place by Dow were considered sufficient and competent barriers and the plugs as evidenced by the acceptance and approval of the condition of the RGC #10 post-abandonment in 1956 by DOGGR.[85]

## 2.4   Response to Opinion 4:

For his fourth opinion, Mr. Jordan states that "*Dow Failed to Adhere to California State Statutes and Regulations in the 1956 P&A.*"[86]  This statement is untrue.

### 2.4.1   Response to Mr. Jordan's Claim that "[t]he operator of a well must protect any underground water suitable for irrigation or domestic purposes from the infiltration of any detrimental substances."[87]

#### 2.4.1.1   Dow's Actions Complied with the Relevant Statutes

As previously discussed, any usable irrigation water was considered shut off behind the 18" surface casing, the type, weight, setting depth, and cementing method of which was reviewed, accepted, and authorized by DOGGR officials.

Moreover, Dow's successful efforts to insert cement plugs in the Well provided additional protection for protected waters.  Such actions plainly satisfied its obligations under the statute.

Dow's abandonment of the RGC #10 fulfilled all requirements set forth by DOGGR officials (see **Figure 3**).[88]  The acceptance and approval of the condition of the RGC #10 as it was in 1956 by DOGGR officials and supervisors demonstrates Dow's compliance and adherence to applicable statutes and regulations.

---

[82] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well:  Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.

[83] DOW RGC 10 Well Files.pdf p. 31 of 35, (MDR0083208).

[84] DOW RGC 10 Well Files.pdf p. 21 of 35, (MDR0083198).

[85] DOW RGC 10 Well Files.pdf p. 11 of 35, (MDR0083188).

[86] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.

[87] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.

[88] DOW RGC 10 Well Files.pdf p. 11 of 35, (MDR0083188).

January 19, 2023

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

### 2.4.2   Response to Mr. Jordan's Claim that "[u]pon abandonment of a well, the operator must cap the well such as to prevent the escape of natural gas into the atmosphere."[89]

#### 2.4.2.1   Dow's Plugging Operations Were Successful

Dow's abandonment of the RGC #10 fulfilled all requirements set forth by DOGGR officials (see **Figure 3**).[90]  As a result, when Dow turned over the Well to the County, there is no record of any gas leaks.  The Well, however, was also subject to additional work by the County.  The 1956 blowout was addressed, and cement plugs were set in place to shut off the gas zone where casing cuts were attempted.  These multiple cement plugs were placed across the casing cuts not only to seal inside the 11-3/4" production casing but also the annular space behind this casing to shut off the gas shows that were originally encountered below in the Pico Formation.  The County of Los Angeles performed this additional shallow re-plugging work in 1959 and had no issues with well integrity or gas leaking to the surface, demonstrating the efficacy of the existing plugs at that time.[91]  While Dow is unaware of any actions by the County that may have resulted in a leak, no such leak occurred while Dow was in control of the Well.

## 2.5   Response to Opinion 5:

As his fifth opinion, Mr. Jordan states that *"Dow Mislead DOGGR Prior to the 1956 P&A."[92]*  This statement is false and is itself misleading.  DOGGR was previously informed of and approved the depth and quantity of all of the perforations Mr. Jordan references.  This record was part of the well file and DOGGR would have reviewed it and thus been aware of it in approving the 1956 plugging and abandonment.  Furthermore, even if DOGGR were not aware of these perforations, the perforations were in the saltwater zone, a zone with respect to which DOGGR did not require cement plugs to be set across.  Mr. Jordan has provided no evidence that these perforations were in a zone capable of producing oil and such speculation contradicts MDR's own oil well abandonment experts' – InterAct's – conclusions.

### 2.5.1   Response to Mr. Jordan's Claim that Dow "failed to list several hundred feet of perforations that were present in the 11-3/4 production casing . . ., including 10 feet of perforations in a documented oil sand."[93]

#### 2.5.1.1   The Report's Conclusions Concerning the Absence of Perforation Notations Is Unsupported by the Record

A Subsequent Work Form dated November 17, 1941 (see **Figure 5**),[94] prepared by Dow and received by DOGGR, lists the depths and quantity of perforations used for iodine production purposes, and notes that the well was producing water only.  There is no indication in the RGC #10 well records or in any

---

[89] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.
[90] DOW RGC 10 Well Files.pdf p. 11 of 35, (MDR0083188).
[91] DOW RGC 10 Well Files.pdf pp. 2-3 of 35, (MDR0083179-MDR0083180).
[92] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.
[93] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 56 of 186.
[94] DOW RGC 10 Well Files.pdf p. 17 of 35, (MDR0083194).

January 19, 2023

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

other documents I have reviewed that the interval perforated by Dow was capable of producing oil.  As recorded, water was being produced from 657 perforations created using a Midway Knife Perforator from a depth of 3,076 feet to 3,341 feet.



**Figure 5:  Excerpt of the November 17, 1941, Subsequent Work Form Listing the Depth and Quantity of Iodine Production Perforations**[95]

DOGGR had previously been made aware of the depth and quantity of the correct perforations in RGC #10 from previous documentation submitted by Dow in 1941.[96]  Even if additional information regarding the perforations had been included in Dow's abandonment notice, DOGGR would not have proceeded any differently because DOGGR did not require cement plugs to be set across saltwater zones.

The perforations placed by Dow are not in the saturated producing oil sands.  As discussed, the lowermost ten feet of Dow's perforations were in an interval where a 30-foot core section was collected.  The 30-foot core section is described as having oil sand, shale, and sandy shale.[97]  This zone was not part of the Ohio Oil Company's perforated oil-producing zone.[98]  There is no evidence in the RGC #10 well records or in any documents I reviewed that the interval perforated by Dow was capable of producing oil.  The November 17, 1941, Subsequent Work Form listing the depths and quantity of perforations used for iodine production purposes deliberately notes that the RGC #10 was producing water only.[99]  As such, even if the perforation depths had been included in the 1956 form, DOGGR would not have required any additional plugging to occur.  Indeed, the County included information about the perforation and DOGGR did not require it to cement those perforations.

---

[95] DOW RGC 10 Well Files.pdf p. 17 of 35, (MDR0083194).
[96] DOW RGC 10 Well Files.pdf p. 17 of 35, (MDR0083194).
[97] DOW RGC 10 Well Files.pdf p. 25 of 35, (MDR0083202).
[98] DOW RGC 10 Well Files.pdf p. 24 of 35, (MDR0083201).
[99] DOW RGC 10 Well Files.pdf p. 17 of 35, (MDR0083194).

756

January 19, 2023

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

Mr. Jordan's Report contends the absence in Dow's DOGGR filings of notations of Dow perforating the casing was: (1) negligent; and (2) *"influenced DOGGR not to require that these perforations be plugged with cement."* Neither conclusion is supported by the evidence.

In essence, Dow's DOGGR filings accurately convey the relevant information DOGGR needed to assess Dow's proposed activity in the Well. The absence of any criticism by DOGGR (or any entity) at that time, or later, concerning Dow's filings supports the view that the filings were appropriate, and defeats any claim that the absence of information about perforations in the salt water zone was "negligent." Indeed, not including every bit of minutia about the Well may well have been the common practice at the time, as the County, like Dow, did not include such information in each of its filings.[100]

In addition, Mr. Jordan points to no rule or statute requiring operators to describe perforations in non-producing zones. While his report cites to Chapter 535, Section 18, that provision makes no mention of recording perforations, despite providing a robust list of what should be recorded (*e.g.*, "core record and history," "character and depth of the formations passed through," "amounts, kinds and size of casing used").

The Report's claim that the absence of a listing of the perforations impacted DOGGR's decisions regarding plugging such saltwater perforations is unsupported by the record. It assumes DOGGR was unaware of the perforations when Dow submitted its Notice of Intent to Abandon the Well. And this assumes DOGGR, the very regulator tasked with overseeing oil well operations in California, did not know what was in its own file. However, the Report provides no basis for such an assumption. Indeed, such an assumption fails the common sense test, as the Well file, at the time Dow submitted its supposedly negligent and misleading notice, consisted of only 28 pages, less than half of which had been prepared by Dow. It is an unreasonable and unwarranted assumption to assert that a competent regulator (and there is no evidence or argument that DOGGR is anything other than a competent and capable regulator), lacked a complete understanding of its very own files.

Finally, there is no evidence that the supposed negligence in not cementing these perforations had any adverse impact on MDR, and the Report offers none. The Well file shows no oil contamination in any other zone from this supposed failure; indeed, it shows the well was producing water only. As discussed above, MDR's own oil well abandonment expert concluded that the *"well has cement above the oil zone that has effectively isolated and protected the oil zone for 60 years; no evidence of oil migration has been observed in the DOW RGC 10 well."*[101] MDR's contractor also concluded that the lack of cement across the salt water zone was *"inconsequential as the salt water zone is depleted, contained no hydrocarbons and is blocked from contaminating fresh water sources."*[102]

Further, there is no argument in the Report (nor could there be), that the uncemented perforations contributed to the movement of gas in the Well. As plainly documented in the Report, the gas zones were *above* Dow's perforations and therefore played no role in any supposed movement of gas.

---

[100] *Compare* Ex. 7 at MDR0083180 (excluding information re perforations) *with* Ex. 7 at MDR0083181 (including information re perforations).

[101] Letter from InterAct regarding "DOW RGC 10 Well Recommendations," dated Feb. 14, 2019, at 6 (MDR0063005, emphasis added.)

[102] Letter from InterAct regarding "DOW RGC 10 Well Recommendations," dated Feb. 14, 2019, at 6 (MDR0063005.).

January 19, 2023

## 2.6   Response to Opinion 6:

For his sixth opinion, Mr. Jordan claims that *"Dow Left Undocumented Junk in the Well During the 1956 P&A."*[103]   Contrary to Mr. Jordan's assertion and as discussed further below, there is no evidence in the well record that Dow left junk in the well, and it is actually more likely that the junk Mr. Jordan references was actually unreported junk from MDR's abandonment operations.

### 2.6.1   Response to Mr. Jordan's Claim that "The junk left inside the production casing was not documented and was unexpected when MDR entered the well in 2018 to re-abandon it."[104]

#### 2.6.1.1   Any "Junk" Found in the Well Likely Resulted from MDR's, Not Dow's, Actions

As part of the 2018 Abandonment Plan for the RGC #10, MDR was required to drill out the existing plugs in the wellbore.[105]   Early efforts resulted in slow progress.  Noteworthy, during the course of the 2018 abandonment operation, there were strong indicators that the drill bit sidetracked at 525 feet and milled outside of the 11-3/4" casing.[106]   On December 11, 2018, the work string was tripped out of the hole and a 5-foot piece of 4-3/4" tubing with a 5-1/4" OD (outer diameter) collar was found on the bottom of the assembly.[107]   The junk found was likely from MDRs abandonment operations since it was known that MDR's contractors had sidetracked the well at approximately 525 feet and was documented in the Daily Report Summary from November 10, 2018, which was the first indication of metal and formation in the returns to the surface.[108]   In fact, at approximately 555 feet, recovery runs with magnetic tools returned 19 pieces of metal as documented in the Daily Report Summary from November 10, 2018.[109]

Mr. Jordan's claim that the junk found in the hole resulted from Dow's actions fails to consider the fact that the recovered tubing does not appear to be corroded (see **Figure 6**).[110]   It is unlikely this piece of junk was left in the hole for 62 years without showing any evidence of corrosion.  It is more likely that it is unreported junk from MDR's abandonment operations.

---

[103] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.

[104] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.

[105] Re-Abandonment Program Dow RGC-10, pp. 17-18 of 33, (MDR0095996-MDR0095997).

[106] Sidetracking in this instance means to accidentally drill through the casing and away from the original wellbore; see also Jan. 23, 2019, Wild Well Control Project Memo, at 2 (Dep. Ex. 224).

[107] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-abandonment in 2018/2019, Apex Petroleum Engineering, Appendix IV – Daily Reports of Dow RGC #10 Well Re-abandonment in 2018/2019, p. 158 of 186.

[108] Daily Report Summary, p. 2 of 10, (MDR0025847).

[109] Daily Report Summary, p. 2 of 10, (MDR0025847).

[110] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-abandonment in 2018/2019, Apex Petroleum Engineering, Figure 5-12: Junk tubing stuck on mill, recovered at 848 ft from Dow RGC #10 in December 2018, p. 139 of 186.

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC



**Figure 6:  Image showing the undocumented junk recovered from the hole.**[111]

There is no evidence in the RGC #10 well file that Ohio Oil Company or Dow left any junk in the borehole.  There is also no indication in the RGC #10 well file that tubing work string of this dimension was used during Marathon's oil or Dow's previous plugging operations.  Moreover, the type of recovered junk, tubing, would not have been used by Dow at the depth the junk was recovered.  Tubing was not needed during Dow's attempts to cut and retrieve salvageable 11-3/4" casing.  Dow's attempts to cut the 11-3/4" casing at 310 feet, 542 feet, and 887 feet would have been conducted with a wireline conveyed device, not a tubing workstring and would not have resulted in the type of junk left in the hole.

### 2.6.2  Response to Mr. Jordan's Claim that "California state statutes and DOGGR required the condition of the well be fully documented, including the presence of any junk left in the hole."[112]

There is no evidence in the RGC #10 well record that any undocumented junk was left in the borehole by Ohio Oil Company or Dow.  The 1956 abandonment operation was authorized, witnessed, and approved by DOGGR officials.[113]  All records indicate that Dow appropriately documented the condition of the well after abandonment.

### 2.6.3  Response to Mr. Jordan's Claim that "[t]he junk Dow left in the hole in 1956 severely increased the difficulty and costs of MDR's re-abandonment operations in 2018/2019."[114]

There is no evidence in the RGC #10 well record that any undocumented junk was left in the borehole by Dow.  The 1956 abandonment operation was authorized, witnessed, and approved by DOGGR

---

[111] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, Figure 5-12: Junk tubing stuck on mill, recovered at 848 ft from Dow RGC #10 in December 2018, p. 139 of 186.
[112] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 11 of 186.
[113] DOW RGC 10 Well Files.pdf p. 11 of 35, (MDR0083188).
[114] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 11 of 186.

**January 19, 2023**

officials.[115] All records indicate that Dow appropriately documented the condition of the well after abandonment.  Additionally, there are multiple MDR sources (e-mail and daily report) indicating that the well was sidetracked, which Jordan completely denied in his deposition.[116]

## 2.7  Response to Opinion 7:

For his seventh opinion, Mr. Jordan states that he agrees with the First Two Causal Factors of the RCA (Root Cause Analysis) of the 2019 Blowout.[117]

### 2.7.1  Response to Mr. Jordan's Claim that "[i]n Exponent's root cause analysis of the January 11, 2019 blowout, the first two main causal factors of the 2019 blowout identified are similar to my first two opinions stated above. Namely: 1) Marathon's construction of the well in 1931 and Dow's abandonment in 1956 resulted in compromised well integrity of the casing strings that allowed gas influx into the wellbore through corrosion holes, and manmade perforations and cuts; and 2) insufficient placement and lack of cement barriers during Dow's abandonment in 1956 allowed gas from both deep and shallow intervals to enter the wellbore and led to lost circulation problems."[118]

#### 2.7.1.1   The Well's Known, Historical Condition Did Not Cause the Blowout

The drilling, completion, and abandonment of RGC #10 adhered to common industry practices at the time in California and more specifically in the Playa del Rey oilfield.  Furthermore, DOGGR approved of the Ohio Oil Company's drilling, completion, and partial abandonment of RGC #10, and approved of Dow's plugging and abandonment of RGC #10.[119]  Moreover, operations were witnessed and approved by DOGGR superintendents and engineers, which demonstrates that DOGGR determined Ohio Oil Company and Dow's actions were compliant with applicable contemporaneous statutes and law.  Based on my review of the well record of RGC #10 and nearby well records and based on my experience in the oil and gas industry with wells of this age, it is my opinion, to a reasonable degree of engineering certainty, that Ohio Oil Company followed industry best practices and applicable regulations and law in its drilling, completion, operation, partial abandonment of RGC #10, and that Dow followed industry best practices and applicable statutes and law in its operation, plugging and abandonment of RGC #10.

In addition, there is no record or indication in DOGGR records that the RGC #10 well was leaking fluids and gas at the surface following the 1959 placement of the shallow plugs by the County of Los

---

[115] DOW RGC 10 Well Files.pdf p.e 11 of 35, (MDR0083188).
[116] Rough Deposition Transcript of Jeff Jordan, January 13, 2023, p. 76 of 206.
[117] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.
[118] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.
[119] DOW RGC 10 Well Files.pdf page 24 of 35, (MDR0083201), pp. 19 of 35, (MDR0083196), and 8 of 35, (MDR0083185).

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

Angeles.[120]  Almost 60 years passed before the RGC #10 well was uncovered by MDR's contractors in September of 2017.  During excavation, it was evident that gas was leaking at the surface from or near RGC #10.  This was a clear indication that the RGC #10 lost well integrity in the interim, which should have prompted any competent operator to adjust its plan to address this potential issue.  This was not done by MDR.

MDR failed to submit the required leak test to DOGGR regarding the state of RGC #10 leaking gas at the surface in September 2017.  This is a violation of DOGGR-required regulatory conditions.  Had this information been submitted in a timely manner, DOGGR likely would have required stringent regulatory conditions for the re-abandonment operation.  More stringent well control protocols and a thoroughly detailed procedures including risk analysis and contingency planning would have been required had DOGGR knew the RGC #10 well was leaking at the surface and lacked well integrity.  In addition, DOGGR likely would have required a revised draft of InterAct's Re-abandonment Plan to address the recently uncovered well integrity issues obvious from the leaking gas at the surface.[121]  Failure by MDR and its contractors to notify DOGGR of the leak test performed on the RGC #10 well and the failure to submit the results of the leak test was a violation of DOGGR's regulatory requirements.  DOGGR requires any well found leaking to be reported immediately, and DOGGR indicated in its July 15, 2019, letter to MDR that no well leak test had been reported.[122]

DOGGR also concluded that the Well's historical condition did not cause the blowout.  For example, in response to the first causal factor in Exponent's Root Cause Analysis, DOGGR provided the following response: *"This statement implies that Ohio Oil and Dow are somehow responsible for the 2019 blowout. The Division's response is that lack of action by Ohio Oil and Dow in 1956 has no bearing on what InterAct did in 2019."* [123]

Comparing historical plugging and abandonment methods to the modern standards promulgated by the current regulatory environment is inappropriate, as it would expose past operators to unreasonable and in certain instances impossible modern expectations despite the fact that those operators met all regulatory requirements in place at the time and utilized contemporaneous methods approved by the authoritative regulatory agency.

### 2.7.2  Response to Mr. Jordan's Claim that that *"the other four main causal factors of the blowout listed in the RCA are either not correct or only partially correct."*[124]

Outright dismissal of four causal factors from Exponent's Root Cause Analysis is an unprofessional and unreasoned response.  These other Exponent causal factors were accepted by DOGGR as substantial issues that led to the January 11, 2019, blowout.

---

[120] Mr. Jordan acknowledged in his deposition that there is no indication in the well file that RGC #10 was leaking when Dow abandoned it, nor did the County of Los Angeles initiate any action against Dow claiming it was leaking. Rough Deposition Transcript of Jeff Jordan, January 13, 2023, p. 147 of 206.
[121] (Bates Number MDR0095996).
[122] (Exhibit 0042 Bate Number CALGEM00006950).
[123] (Exhibit 0469 Bates Number CALGEM00000847).
[124] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.

January 19, 2023

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

**2.7.2.1  The Ohio Oil Company and Dow Chemical Company, along with other operators of wells in the vicinity, were aware of and documented the existence of shallow gas formations in the region of the well.**

Formations bearing oil in producible quantities were the intended target of wells drilled near Marina del Rey during the early 1930s.  Whenever shallow gas formations were encountered during the course of drilling an oil well, their depths were noted and drilling proceeded, as measurable quantities of natural gas were passed up in order to extract the deeper more lucrative oil sands.

Multiple geologic core samples were collected by Ohio Oil Company during the drilling of RGC #10, many of which indicated the presence of natural gas.  The presence of natural gas is noted in cores collected from an approximate depth of 2,233 to 3,082 feet.  Mr. Jordan's statement that that the depths of the shallow gas shows in the Pico Formation are from 1,500 to 2,500 feet is incorrect and does not match the results obtained from review of the core samples collected from the Pico Formation during drilling of the RGC #10 well.  These geologic core samples provide conclusive physical proof of the presence of a gas bearing formation at recorded and measured depths.

**2.7.2.2  Mr. Jordan's statement that "*the reason lost circulation was encountered was due to the compromised well integrity caused by the original completion of the well by Marathon*" is misleading and incorrect.**

Lost circulation problems are not an uncommon occurrence when drilling.  Practices, methods, and procedures for dealing with lost circulation problems are well established and ubiquitous to experienced professionals.  The Ohio Oil Company was able to pass through the same zone with no casing in the borehole during its initial construction of the RGC #10 well and no blowouts occurred.  The reason lost circulation was encountered by MDR was failure to maintain proper mud weight and failure of the lost circulation materials and control methods utilized.

**2.7.2.3  Reducing the mud weight from 9.0 ppg to 8.4 ppg was a critical factor in the January 11, 2019 Blowout**

During drilling operations on an oil well, managing the weight of the mud in the wellbore is the primary method of preventing gas influxes into the wellbore.  The weight of the column of mud in the hole exerts a hydrostatic pressure onto any exposed formations.  If that mud weight exerts less pressure than a formation's pore pressure, gas will enter into the wellbore.

The formula used by industry professionals to determine the hydrostatic pressure exerted by a column of fluid is:

Hydrostatic Pressure (psi) = 0.052 × Mud Weight (ppg) × True Vertical Depth (feet)[125]

This formula shows that there is a direct relationship between hydrostatic pressure and two properties, mud weight and depth.  In Mr. Jordan's report, he presents a pressure calculation at a depth of 1,600 feet for the 9.0 ppg and for the 8.4 ppg mud weights, dismissively noting that the difference between

---

[125] Bourgoyne, A.J.T., Chenevert, M.E. & Millheim, K.K., 1986. SPE Textbook Series, Volume 2: Applied Drilling Engineering, Society of Petroleum Engineers.

January 19, 2023

the two result is "*only 50 psi*".  50 psi is a significant pressure differential, a large enough pressure differential to initiate gas flow into the wellbore from the formation.

Mr. Jordan fails to mention that the physical volume of any gas influx that enters the wellbore rapidly expands as it rises to the surface because the hydrostatic pressure exerted by the mud weight onto the gas is less at shallower depths.  Mr. Jordan also fails to note that the speed at which any gas influx travels up the hole is accelerated if circulation is occurring, which was the activity that had occurred just before MDR's crew attempted to pull the bit up to 1,492 feet, (see **figure 7**).  The rapid expansion of the volume of the gas influx as it traveled to shallower depths while circulating the hole clean caused the blowout of gases as the surface.  The blowout is a direct consequence of the decision to lower the mud weight.

### INTERACT

| DAILY  WORKOVER / COMPLETION REPORT | | Date: | January 11, 2019 |
|---|---|---|---|
| AFE #: | | Supr: ▮ | Days on Well: 55 |
| Lease / Well #: | DOW RGC-10 | EFTD | |
| Contr / Rig: CWS #9 | Toolpusher: ▮ | | |

Objective: REABANDONMENT

| Time / Hrs | DESCRIPTION DAILY ACTIVITY |
|---|---|
| 6:30AM | HELD JSA. SERVICED RIG AND PUMP. FOUND WELL W/ ZERO PSI ON WELL. CONDITIONED |
| | MUD IN PIT TO 35 VISC W/ 8 SX OF LCM. LOWRED 6 1/4" BIT ASSY BACK DOWN TO 1306', |
| | NO FILL. PUMPED 30 BBLS TO BREAK CIRCULATION, WELL KICKED GAS BUBBLE THEN |
| | LOST ALL CIRCULATION. ATEMPTED TO TREAT MUD W/ LCM TO REGAIN CIRCULATION TO |
| | NO AVAIL. PULLED BIT ASSY TO 871', BROKE CIRCULATION EASILY, LOWERD BIT ASSY TO |
| | 996' AND BROKE CIRCULATION EASILY, LOWERED BIT ASSY TO 1120', UNABLE TO BREAK |
| | CIRCULATION. LOWERED BIT ASSY BACK DOWN TO 1306' , CONDITIONED MUD W/ POLY |
| | VISC AND LCM. DRILLED W/ NO CIRCULATION FROM 1306' TO 1368' WHEN REGAINED VERY |
| | GOOD CIRCULATION, CONTINUED HARD DRILLING TO 1617'. CIRCULATED HOLE CLEAN, |
| | POOH W/ BIT TO 1492' WHEN WELL BLEW OUT AND UNABLE TO STAB TIW VALVE TO |
| | CLOSE WELL IN, HAD TO DROP DRILL STRING DOWN HOLE TO CLOSE BLIND RAMS, |
| | FOUND WELL W/ 300 PSI SHUT IN PRESSURE. CONDITIONED MUD IN PIT TO 40 VISC @ 10.2 |
| | PPG. BULL HEADED MUD AWAY @ 200 PSI. SHUT DOWN PUMP AND PRESSURE STILL @ 300 |
| | PSI SHUT IN AND CLIMBED TO 360 PSI IN ONE HOUR. STARTED BLEEDING BACK SLOWLY |
| 12:00PM | TO PUMP TILL MID NITE |

**Figure 7:  Excerpt of InterAct's Daily Report from January 11, 2019.  The highlighted portion indicates circulation was occurring directly before the blowout.**

Additionally, Mr. Jordan's selection of 1,600 feet as the single point of calculation is misleading and should also be scrutinized.  As noted previously, Mr. Jordan incorrectly assumes in his expert report that the depths of the shallow gas shows in the Pico Formation were from 1,500 to 2,500 feet.  The Ohio Oil Company collected core samples from the Pico Formation in the RGC #10 during drilling operations.[126] Based on the geologic core descriptions submitted by the Ohio Oil Company in the Core Record of Oil or Gas Well, the top of the gas shows in these cores were documented at a depth of 2,200 feet and the last gas shows identified in the cores samples in the Pico Formation were at a depth of 3,082 feet.

At deeper depths, the impact of the reduction of mud weight is more significant, simply because the difference in hydrostatic pressure imparted by the 9.0 ppg and 8.4 ppg increases as depth increases.

---

[126] DOW RGC 10 Well Files.pdf pp. 25 of 35, (MDR0083202) and 26 of 35, (MDR0083203).

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

The gas kick that caused the January 11, 2019, blowout entered the wellbore from below the end of tubing and from a formation where gas is present. The Pico formation is the likely source of the gas influx as it is present at the RGC #10 well from approximately 2,200 feet to 3,082 feet.[127] By using these deeper depths, the difference between the 9.0 ppg and the 8.4 ppg mud weights increases to 69 psi at a depth of 2,200 feet and up to 96 psi at a depth of 3,082 feet. By selecting a shallower depth of 1,600 feet for use in his calculation, it appears that Mr. Jordan is attempting to minimize the role played by the reduction of the mud weight in the January 11, 2019, blowout.

### 2.7.2.4   The sixth causal factor described by investigators in the RCA concerning the possible swabbing of a gas kick when pulling the bit up from 1,671 ft to 1,492 ft. is reasonable. Mr. Jordan cannot provide evidence to the contrary.

MDR's well service contractor did not collect basic recordable real time drilling information such as tripping speed or circulating rate. Mr. Jordan mistakes this lack of information as support for his conclusion, despite the fact that investigators have concluded the contrary. In reality, there is no support for Mr. Jordan's conclusion. In fact, Mr. Jordan hedges this conclusion by stating that *"However, the possibility of swabbing cannot be ruled out with certainty."*

The failure to assign any culpability for the surface breaches and blowouts that occurred during the re-abandonment operation to MDR and its contractors clearly shows bias on the part of Mr. Jordan as the technical facts plainly demonstrate that MDR and its contractors failed to address safety concerns and maintain well control, ultimately leading to the surface breeches and blowouts and DOGGR's final disapproval of the re-plugging efforts at the RGC #10 well.

## 2.8  Response to Opinion 8:

For his eighth opinion, Mr. Jordan states that *"the 2018/2019 Re-Abandonment by MDR was Reasonable and Effective."*[128]

### 2.8.1   Response to Mr. Jordan's claim that "MDR accomplished the re-abandonment of the DOW RGC #10 well in 2019 in a reasonable and appropriate manner considering the condition of the well when MDR re-entered it."[129]

### 2.8.1.1   My November 22, 2022, report details MDR's Failures in Abandoning the Well[130]

Based on my experience in the oil and gas industry with wells of this age and for the reasons discussed in detail in my initial report, it is my opinion, to a reasonable degree of engineering certainty, that the 2018-2019 re-plugging efforts by MDR and its contractors were not reasonable and not effective. Indeed, even the entity MDR chose to retain to publish the Root Cause Analysis criticized MDR's

---

[127] DOW RGC 10 Well Files.pdf pp. 28-29 of 35, (MDR0083202) and 26 of 35, (MDR0083205-MDR0083206).
[128] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.
[129] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.
[130] Expert Opinion of J. Daniel Arthur in the matter of MDR Hotels, LLC, Plaintiff Vs Marathon Oil Company, The Dow Chemical Company, and Does 1 through 50, inclusive, Defendants, November 2022, pp. 21-36 of 157.

abandonment decisions and actions and concluded that those decisions and actions were root causes of
the blowout.  Also, even after MDR completed its abandonment, DOGGR disapproved of the final state
of the RGC #10 well, as it failed to meet the regulatory standards listed as conditions of the permit.
MDR failed to perform the required DOGGR plugging conditions during its re-abandonment attempt due
to the blowout and lost tubing string.  During his deposition, Mr. Jordan acknowledged this fact, and
further admitted that MDR's abandonment does not prevent gas from migrating in the annulus and
away from the well.  Mr. Jordan conceded that the condition of the RGC #10 does not prevent gas from
reaching the surface outside the wellbore.[131]

### 2.8.1.2   Mr. Jordan's Report Provides No Basis to Conclude MDR's Abandonment Was Reasonable

The Report, in a conclusory manner, states that MDR's abandonment of the Well was reasonable.
However, it fails to address the myriad of problems caused by MDR's faulty abandonment plan,
including the specific issues detailed by the RCA and DOGGR.  For example, the Report fails to address
the fact that the abandonment plans developed by InterAct and CWS were only drafted AFTER the
blowout, and that these plans never accounted for the actual condition of the Well, even though the
Well's condition was detailed in the Well file.  The Report also acknowledges that CWS's failure to have
properly certified operators was wrong, but then summarily absolves CWS (and MDR) for this error.
Similarly, the Report fails to address the testimony of Mr. Brun Hilbert, who MDR hired to prepare the
Root Cause Analysis.  Mr. Hilbert expressly stated that it was the "actions and inactions of MDR's
contractors that were factors in causing the blowout."[132]  This conclusion was echoed by the DOGGR
official who examined the blowout.[133]

## 2.8.2   Response to Mr. Jordan's claims that "MDR was able to effectively plug and abandon the well, successfully isolating the hydrocarbon-bearing zones from the USDW and BFW, as well as effectively sealing the well so that no hydrocarbons will come to the surface via the wellbore."[134]

### 2.8.2.1   The Report Assumes the Well's Proper Abandonment

Mr. Jordan's claim that the cement plugs emplaced by MDR effectively sealed the wells so that no
hydrocarbons will come to the surface via the wellbore is an assumption.  No cement bond logs were
run on the RGC #10 well to confirm cement placement, top of cement, and efficacy.  Mr. Jordan
conceded this fact during deposition.[135]  The top of cement behind the 11-3/4" casing was estimated
based on the typical volumetric yield per sack of cement.  Estimating the top of cement was commonly
practiced during that time as the cement bond logging tools used today were not developed then.

---

[131] Rough Deposition Transcript of Jeff Jordan, January 13, 2023, p. 177 of 206.  Mr. Jordan further acknowledged
in his deposition that MDR did not abandon the well to current DOGGR standards.  Id.
[132] Hilbert Tr. at 80.
[133] Gibicar Tr. at 77-78.
[134] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in
1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.
[135] Rough Deposition Transcript of Jeff Jordan, January 13, 2023, pp. 197-199 of 206.

MDR's contractors elected not to run any cement bond logging tools during their re-abandonment operation despite the technology being commonly available today.

Mr. Jordan fails to consider the possibility that the RGC #10 well squeeze cement plugs set by MDR could have had been gas cut, meaning that natural gas could have contaminated the cement, which could severely affect cement bonding performance resulting in microscopic pathways and gas channels in the cement.  There is no guarantee and certainly no evidence to suggest that the RGC #10 well will not leak gas and water again sometime in the future.  This concern was the reason DOGGR placed the regulatory requirement to allow for future access to the well.

Mr. Jordan also does not address the fact that MDR failed to set the plugs at the depths required by DOGGR.  This error contributed to DOGGR's conclusion that MDR's reabandonment was failed to meet regulatory standards.[136]

## 2.9  Response to Opinion 9:

For his ninth opinion, Mr. Jordan states that *"The Costs MDR Incurred to Re-Abandoned the DOW RGC #10 Well Were Reasonable."*[137]

### 2.9.1  Response to Mr. Jordan's Claim that "The costs MDR incurred for the re-abandonment of the Dow RGC #10 well were reasonable given the condition of the well when located in 2018."[138]

#### 2.9.1.1  The Report's Conclusion that MDR's Abandonment Costs Were Reasonable Is Unsupported by the Evidence

It is my opinion that the costs incurred by MDR and its contractors during the re-abandonment of RGC #10 likely exceeded reasonable estimated costs of more experienced well abandonment experts.  If competent well control professionals were initially consulted when it became apparent the RGC #10 well was leaking gas at the surface, a more thorough re-abandonment plan could have been prepared.  An enhanced and fully realized re-abandonment plan that utilized appropriate contractors, proper procedures, and suitable equipment, could have prevented the surface breaches and blowout thus reducing the associated costs incurred due to the long delays and intensive cleanup.

Had more experienced well abandonment experts been consulted, such as contractors familiar with the historic oil wells of Playa del Rey, the initial upfront costs for seasoned expertise may have been greater, but it is likely that many of the issues that transpired at RGC #10 could have been avoided, resulting in overall cost savings.  Outcomes are hard to predict, but it is obvious to this expert that having more expertise on the RGC #10 location during the re-abandonment operations would have been beneficial.

Mr. Jordan's Report misunderstands MDR's costs and abandonment plans, which may be why he concludes (incorrectly) that MDR's costs were reasonable.  For example, the Report, relying on a June 5,

---

[136] Ex. 32 at 1.

[137] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.

[138] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

2017, Methane Specialists proposal, contends MDR's *"cost estimate to comply with DOGGR requirements was approximately $18,000."*[139]  That is incorrect.

MDR's initial estimate to re-abandon the Well was $120,000.[140]  Even a cursory review of that "estimate" demonstrates that it was prepared by an operator inexperienced in well abandonment and unprepared to re-abandon a nearly 100 year-old well like RGC #10.  MDR's own project manager admitted that MDR's budget numbers for its re-abandonment plan were developed *"without consultation of [an] oil well abandonment expert."*[141]

MDR's failure to consult competent oil well abandonment experts only compounded the cost and budgeting problems it faced when it had to actually abandon a complex well, like RGC #10.

The Report also points to costs MDR incurred due to "*the time it took to get approval from DOGGR . . .*"[142]  However, these delays were not caused by Defendants.  Moreover, the additional time needed by DOGGR was caused, in part, by DOGGR's concerns with MDR and its contractors.[143]

Finally, the Report concludes MDR's costs were reasonable "*based on my 43 years of experience in oil and gas well operations."*[144]  In other words: "take my word for it."  That is not employing an expert's scientific, technical, or other specialized knowledge to help the trier of fact to understand the evidence or to determine a fact in issue.  Such conclusory statements should be ignored.

## 2.9.2   Response to Mr. Jordan's Claim that "In addition, the discovery of hydrocarbon contaminated soil surrounding the well caused MDR significant additional expense to remove it to an approved hazardous material disposal site."[145]

### 2.9.2.1   The Report's Conclusions Regarding Soil Contamination Costs Are Speculative and Should be Ignored

Certain of the previous Phase I and Phase II environmental assessments conducted on this parcel failed to properly reflect the extent of surface contamination on the site from prior oilfield operations and from the placement of dredged materials during the construction of the marina.  Despite knowledge of the prevalence of wells in the Playa del Rey oilfield, Mr. Jordan attributes the oil contamination at Parcel 9U solely to activities associated with the RGC #10 well.  In his expert report, Mr. Jordan states *"the hydrocarbon contaminated soil was most probably the result of drilling and oil production operations of the Dow RGC #10 well.  However, additional hydrocarbon contamination may also be attributed to the*

---

[139] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 49 of 186.

[140] *See* Ex. 420; *see also* Pangelinan Tr. at 111.

[141] Pangelinan Tr. at 130.

[142] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 49 of 186.

[143] Dudak, Daniel, Expert Report of Daniel Dudak, p. 12 of 28.

[144] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 57 of 186.

[145] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 58 of 186.

January 19, 2023

leaking wellbore caused by the disastrous 1956 P&A by Dow, which suffered an extended blowout." Mr. Jordan chooses to singularly focus on the RGC #10 as a source for contamination while failing to consider numerous other potential contamination sources such as widespread activity in the Playa del Rey oilfield, the dredged contaminated hydraulic fill material placed on the parcel during 1960's Marina development, or the presence of a very large active marina with documented historical sources of contamination. Figures 6-2, 6-3, and 6-4 in Mr. Jordan's expert report show gas bubbles apparently coming from within the RGC #10 wellbore, and an oily sheen on the water at surface during excavation of the well. These pictures, taken after the pumping of groundwater for excavation and leak testing of the RGC #10 well by MDR, demonstrate only that the groundwater being pumped at the site contained hydrocarbons. Neither MDR nor Jordan made any attempt to characterize area groundwater contamination. To my knowledge, MDR nor Mr. Jordan made no meaningful efforts to source the hydrocarbon contaminations present at the RGC #10 site, and in fact they have neglected to consider clear and obvious factors.[146]

These dredged materials have contributed significantly to the onsite contamination. For instance, the Phase I Environmental Site Assessment (ESA) performed by Leighton Consulting, Inc. in 2006 addressed potential offsite sources for contamination that was not discussed in other Phase I and Phase II ESAs. The Report does not mention this issue.

Between 1962 and 2016, multiple environmental assessments were conducted on Parcel 9U. However, there is no evidence that any of the assessments constructed a groundwater surface map or identified the groundwater flow direction on this site. Considering the number of borings and monitor wells installed on Parcel 9U, it is a significant oversight that the groundwater flow direction was not established as groundwater flow direction would have been critical to assessing offsite contamination issues to this parcel.

Based on the examination of the groundwater levels and ground elevations documented in the 12 boreholes from the various environmental assessments, the groundwater flow direction trends eastward toward the marina area from the Silver Strand area across the MDR parcel. There were multiple nearby oil wells and existing oil tank batteries previously owned by such operators as Walter M. Crawford, Barnsdall Oil Company, Metropolitan Oil Corporation Limited, and others that were in close proximity to the west of Parcel 9U that would have allowed for groundwater flow of offsite oilfield contamination onto the site. These other offsite oilfield sources were not associated with Marathon or Dow wells and likely contributed to the hydrocarbon contamination on the parcel. **Figure 8** is a 1938 aerial photograph of the RGC #10 well and tank battery location looking north, and shows adjacent oil tank batteries and wells just west of the parcel.[147]

---

[146] Mr. Jordan admitted in his deposition that he is unaware that the County of Los Angeles placed hydraulic fill on the property. Rough Deposition Transcript of Jeff Jordan, January 13, 2023, p. 140 of 206.
[147] James, Earl. 2022. Expert Report of Earl James, EKI Environment & Water, Inc., Exhibit 6.



**Figure 8:  1938 Aerial Photo of the RGC #10 Location Showing Adjacent Oil Wells and Tank Batteries Just to the West of the Parcel (Modified from Earl James Expert Report, Exhibit 6).**

The Report does not point to a single instance of soil contamination caused by Defendants.  Instead of pointing to such a fact or considering the issues above, the Report openly speculates that Defendants caused the contamination.[148]  Such speculation, which ignores (and even fails to mention) other potential factors, should be accorded no weight.  In fact, the only instance that Mr. Jordan implicates Dow in soil contamination in his report is related to methane emissions, stating that "*methane leakage into the surface soils continued after Dow improperly P&A'd the well in 1956.*"[149] This statement is unreasonable.

Other sources for the soil contamination were known to MDR.  According to document prepared by Hardage Hospitality (an MDR affiliate) in March 2018, it concluded that "*Based on the detected concentrations from all of the samples collected in February 2018 by both Shannon & Wilson and PLS, it appears that the majority of the soils at the site are impacted with metals and petroleum hydrocarbons and would be considered impacted.  The results of the Shannon & Wilson grid sampling event appear to show that the concentrations of the impacts are variable across the site, and may be associated with the placement of dredge material placed on the site during the initial development of Marina del Rey in the 1960's, as well as the petroleum exploration and storage activities.*[150]

Mr. Jordan also fails to account for the presence of metals and the role they played in preventing MDR from using the landfill of it choice.  Mr. Jordan also provides no analysis of any role Defendants may have played in causing those metals to be found in the soil.  This is a glaring omission.

---

[148] Report at 12 ("it is likely that hydrocarbon leakage from the well contributed to the contaminated soil"); at 19 ("It is likely that storage and processing of produced oil . . .contributed to the hydrocarbon contamination"); at 41 ("hydrocarbon contaminated soil was most probably the result of drilling and oil production operations"); at 49 ("soil was most likely contaminated during the drilling and oil production operations in the 1930s").

[149] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 49 of 186.

[150] Executive Summary of Contaminated Soil Issue, Exhibit 0144, MDR202182

## 2.10 Response to Opinion 10:

For his final opinion, Mr. Jordan states that *"The Hydrocarbon Contaminated Soil Surrounding the DOW RGC #10 Well Was a Result of Oil & Gas Storage and Processing on Location and the Leaking Wellbore."*

### 2.10.1 Response to Mr. Jordan's Claim that "The hydrocarbon contaminated soil surrounding the DOW RGC #10 well was a result of oil storage and processing on the well location while owned and operated by Marathon."[151]

#### 2.10.1.1 The Reports Failure to Assess Other Potential Sources of Contamination Make Its Conclusions Unreasonable

Multiple environmental assessments available to MDR found evidence that soil contamination existed on the site.[152,153,154,155]  There is no evidence that any contamination was caused by the Ohio Oil Company; a conclusion by a January 18, 1955 report that found that the storage tanks on the property were in good condition, having lately been repaired.[156,157]  Additionally, when the County re-plugged the RGC #10 well in 1959, there was no documented evidence of surface leakage from the well.

---

[151] Jordan, P.E., Jeff S. 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019, Apex Petroleum Engineering, p. 58 of 186.

[152] Partner Engineering and Science, Inc., 2016, Phase II Subsurface Investigation Report, pp. 13-15, (MDR0137938-MRD0137940).

[153] Leighton Consulting, Inc., Phase I Environmental Site Assessment Report, November 30, 2006, (LEIGHTON00000291).

[154] Salem Engineering Group Inc., Soil Sample Results Summary Report, September 14, 2017, (QWEST00000303).

[155] Los Angeles County Department of Public Works, Phase II Environmental Investigation, October 23, 1996, (LACDBH0022418).

[156] Mr. Jordan admits in his deposition that there is no evidence of Ohio Oil Company equipment leaking or otherwise causing contamination at the location.  Rough Deposition Transcript of Jeff Jordan, January 13, 2023, p. 193 of 206.

[157] Kistner, C.L. 1955. Evaluation of Ohio Leases Playa del Rey Field Los Angeles Division (Bates Number MAR00015872).

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

During the construction of the marina, an unknown amount of contaminated dredge material was deposited on this site in the 1960s.  Based on the available historical photographs of the area and the location of the parcel during the dredging operations, there is evidence of the hydraulic fill and also some type of material storage on the location, which could have contributed to the oilfield-related contamination.[158]  Moreover, as detailed above, operations on neighboring oil sites could have caused or contributed to the purported soil contamination.  The Report's failure to address these factors make its conclusions unsupportable.  The Partners Engineering and Science, Inc. 2016 Phase II report clearly documented refined oil products, specifically gasoline and diesel, which was found within the hydraulic fill material that would have originated from marina operations rather than the naturally-occurring crude oil that comes from a well.[159]


J. Daniel Arthur, P.E., SPEC
January 19, 2023

---

[158] Marina del Rey Historical Society. 2022. Aerial Photograph of the Dredging and Creation of the Marina, (Accessed December 6, 2022, https://www.marinadelreyhistroicalsociety.org/dredging/).

[159] Partner Engineering and Science, Inc., 2016, Phase II Subsurface Investigation Report, pp. 13-15, (MDR0137938-MRD0137940).

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

**Appendix A:**

**List of Information Considered for Analysis**
**and**
**Other Consulted Materials.**

A - 1

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

## List of Information Considered for Analysis

1. Deposition of Aaron G. Scheet (Wild Well Control) dated February 11, 2022.
2. Deposition of Val Lerma (InterAct PMTI) dated March 29, 2022.
3. Deposition of Brun Hilbert (Exponent, Inc.) dated February 1, 2022.
4. Deposition of Chris Conahan (Methane Specialists) dated February 24, 2022.
5. Deposition of Christopher Phillips (CalGEM) dated December 17, 2021.
6. Deposition of Christopher Phillips (CalGEM) dated January 18, 2022.
7. Deposition of Phillip Gibicar (CalGEM) dated May 17, 2022.
8. Deposition of Michel Vasconcellos (CalGEM) dated February 14, 2022.
9. Deposition of William Pangelinan (La Jolla Pacific Development Group) dated April 14, 2022.
10. Deposition of Randy Moskal (California Well Services) dated February 9, 2022.
11. Rough Deposition Transcript of Jeff Jordan, January 13, 2023.
12. Deposition Exhibit 0004: Well File (No Bates Number)
13. Deposition Exhibit 0009: 2017 and 2018 Emails Between Dave Bell and Chris McCullough (CALGEM00011956-CALGEM00011976).
14. Deposition Exhibit 0010: 2017 and 2018 Emails (MDR0182931-MDR0182942).
15. Deposition Exhibit 0016: February 26, 2018, Letter (MDR0003708-MDR0003712).
16. Deposition Exhibit 0017: Re-Abandonment Program from InterAct dated April 27, 2018 (MDR0003713-MDR0003716).
17. Deposition Exhibit 0024: Permit (MDR0001272-MDR0001300).
18. Deposition Exhibit 0032: Report of Well Plugging and Abandonment (MDR0000034).
19. Deposition Exhibit 0042: Letter dated July 15, 2019 (CALGEM00006950-CALGEM00006955).
20. Deposition Exhibit 0053: A Document from SubSurface Surveys & Associates, Inc. dated May 3, 2008, to Methane Specialists (MDR0350429-MDR0350433).
21. Exhibit 0057: Partner Engineering and Science, Inc., 2016, Phase II Subsurface Investigation Report (MDR0137926-MRD0138082).
22. Deposition Exhibit 0112: Exponent Report (210 pages) (MDR0003857-MDR0004066).
23. Deposition Exhibit 0144: Executive Summary of Contaminated Soil Issue (MDR202182).
24. Deposition Exhibit 224: Project Memo 1 dated 23 Jan 2019 (MDR0059643-MDR0059649).
25. Deposition Exhibit 0265: A Document from SubSurface Surveys & Associates, Inc. dated April 2, 2017, to Methane Specialists (BEAZ00000150-BEAZ00000154).
26. Deposition Exhibit 316: Fax with Attachment "Methane Site Assessment Report".
27. Deposition Exhibit 321: Field Inspection Report (METHANE00000852-METHANE00000853).
28. Deposition Exhibit 322: October 31, 2017, Letter (METHANE00000283).
29. Deposition Exhibit 328: Document Entitled "Phase I Environmental Assessment Report Parcel 9-U" (LEIGHTON00000291-LEIGHTON00000627).
30. Deposition Exhibit 329: Excerpt of a March 2008 Draft Environmental Impact Report (LACDBH0021218-LACDBH0021253).

A - 2

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

31. Deposition Exhibit 331: Document Titled "Proposed Hotel Building with One Subterranean Parking Level, Methane Gas Control System" (MDR0244177-MDR0244192).

32. Deposition Exhibit 332: Methane Specialists Map (CALGEM00005076).

33. Deposition Exhibit 337: Document Entitled "Master Consulting Services Agreement" (MDR0008317-MDR0008322).

34. Deposition Exhibit 339: Permit Approval (MDR0001272-MDR0001300).

35. Deposition Exhibit 348: As-Built Plan (MDR0239411-MDR0239430).

36. Deposition Exhibit 351: Exponent Root Cause Analysis (EXP000000948-EXP000001018).

37. Deposition Exhibit 354: Document Titled "Exhibit Well Location" (METHANE00000276).

38. Deposition Exhibit 0376: Summary of Telecom and Resulting Action Plan for DOW RGC 10 Well dated 1/1/19 (MDR0021470-MDR0021482).

39. Deposition Exhibit 0383: Daily Report Summary DOW RGC #10 Re-Abandonment (INTERACT001729-INTERACT001733).

40. Deposition Exhibit 0406: Financing Request dated 6/17/14 (LACBDH0013437-LACBDH0013445).

41. Deposition Exhibit 0409: Email dated 2/3/12 (MDR0219634-MDR0219635).

42. Deposition Exhibit 0417: Email dated 10/10/12 (PANGEL00032898).

43. Deposition Exhibit 0418: Compilation of Documents (PANGEL00032899-PANGEL00032936).

44. Deposition Exhibit 0420: Compilation of Documents (PANGEL00084545-PANGEL00084551).

45. Deposition Exhibit 0437: Summary of Terms for Lease Option dated 12/23/13 (PANGEL00042980-PANGEL00043011).

46. Deposition Exhibit 0449: Email Chain dated 12/20/18 through 4/12/19 (MDR0131150-MDR0131155).

47. Deposition Exhibit 0469: Letter dated 7/1/19 from Alan Walker to Michael Hale (CALGEM00000844-CALGEM00000854).

48. DOW RGC 10 Well Recommendations dated February 14, 2019 (MDR0063000-MDR0063006).

49. California Division of Oil and Gas, Special Report on Operations Witnessed, prepared by G.L. Graham on April 15, 1956, (MDR0083187).

50. Glen B. Gariepy, Review Recreation Gun Club Lease, Ohio Oil Company I-LA-51-5 unpublished report (1951) (MAR00015811-MAR00015819).

51. C.L. Kistner, Evaluation of Ohio Leases Playa Del Rey Field, Los Angeles Division, Ohio Oil Company I-LA-51-5, unpublished Intracompany Correspondence (1955) (MAR00015861-MAR00015887).

52. Marina del Rey Historical Society, Early Aerial Photos (2016), https://www.marinadelreyhistoricalsociety.org/photos-early-aerials/ (last visited Sep 22, 2022).

53. Marina del Ray Historical Society, Marina del Rey History - Los Angeles County, California, http://file.lacounty.gov/SDSInter/dbh/docs/149901_MDRHistory.pdf (last visited Oct 5, 2022).

A - 3

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

54. Shannon & Wilson, Inc., Geotechnical Design Report, Marina del Ray Marriot Courtyard and Residence Inn Hotels, Marina del Ray, California (2016) (MDR0264046-MDR0264157).

55. Expert Opinion of J. Daniel Arthur in the matter of MDR Hotels, LLC, Plaintiff Vs Marathon Oil Company, The Dow Chemical Company, and Does 1 through 50, inclusive, Defendants, November 2022.

56. Jeff S. Jordan, P.E., 2022. Analysis of the Dow RGC #10 Well: Construction in 1931, Plug and Abandonment in 1956, and Re-Abandonment in 2018/2019.

57. Earl James, 2022. Expert Report of Earl James, EKI Environment & Water, Inc., Exhibit 6.

58. Heinonline.2021. "California – Extra Session of 47th Legislative; 48th Regular Session: 923-943, (accessed December 29, 2022).

59. Hester, T. C. (2005). Estimation of gas-production potential using well logs, Cretaceous of northern Montana. Scientific Investigations Report. https://doi.org/10.3133/sir20055082.

60. California Division of Oil and Gas. 1931. Summary of Operations California Oil Fields, Volume 17, No. 2.

61. Casetext. 2022. Owen v. Perkins Oil Well Cementing Co., Circuit Court of Appeals, Ninth Circuit No. 5927, February 10, 1930. (Accessed October 6, 2022. https://casetext.com/case/owen-v-perkins-oil-well-cementing-co.

62. 88 Stat. 1660 - Safe Drinking Water Act.

63. Bourgoyne, A.J.T., Chenevert, M.E. & Millheim, K.K., 1986. SPE Textbook Series, Volume 2: Applied Drilling Engineering, Society of Petroleum Engineers.

64. Salem Engineering Group Inc., Soil Sample Results Summary Report, September 14, 2017, (QWEST00000303).

65. Los Angeles County Department of Public Works, Phase II Environmental Investigation, October 23, 1996, (LACDBH0022418).

66. Well file packages downloaded from CalGEM on December 2, 2021, through October 20, 2022, for American Petroleum Institute (API) numbers:

| | |
|---|---|
| 1. 037-13798 (RGC #10) | 15. 037-13817 |
| 2. 037-13805 | 16. 037-13818 |
| 3. 037-13806 | 17. 037-13819 |
| 4. 037-13807 | 18. 037-13820 |
| 5. 037-13808 | 19. 037-13385 |
| 6. 037-13809 | 20. 037-13386 |
| 7. 037-13810 | 21. 037-13751 |
| 8. 037-13797 | 22. 037-13752 |
| 9. 037-13811 | 23. 037-13754 |
| 10. 037-13812 | 24. 037-13755 |
| 11. 037-13813 | 25. 037-13756 |
| 12. 037-13814 | 26. 037-13757 |
| 13. 037-13815 | 27. 037-13758 |
| 14. 037-13816 | 28. 037-13759 |

A - 4

Expert Rebuttal Report of J. Daniel Arthur P.E., SPEC

29. 037-13763
30. 037-13764
31. 037-13767
32. 037-13771
33. 037-13774
34. 037-13776
35. 037-13780
36. 037-13781
37. 037-13790
38. 037-13837
39. 037-13839
40. 037-13840
41. 037-13842
42. 037-13845
43. 037-13951
44. 037-13954
45. 037-13960
46. 037-13963
47. 037-13964
48. 037-13989
49. 037-13990
50. 037-13992
51. 037-14091
52. 037-14092
53. 037-14096
54. 037-14200

55. 037-14203
56. 037-14212
57. 037-14213
58. 037-14214
59. 037-14216
60. 037-14217
61. 037-14218
62. 037-14219
63. 037-14220
64. 037-14221
65. 037-14222
66. 037-14223
67. 037-14227
68. 037-14232
69. 037-14233
70. 037-14234
71. 037-14235
72. 037-14240
73. 037-14242
74. 037-14249
75. 037-14326
76. 037-14332
77. 037-14336
78. 037-14349
79. 037-14350

A - 5

**Textbooks:**

1. David Talbot Day, A Handbook of the Petroleum Industry (1922).
2. Larry W. Lake, VII Petroleum Engineering Handbook (2007).

**Published Standards:**

1. California Statutes and Amendments to the Codes 1915.
2. California Statutes and Amendments to the Codes 1917.
3. California Statutes and Amendments to the Codes 1939.

**Technical Documents:**

1. American Petroleum Institute, Recommended Practice for Well Control Operations, (2006).
2. American Petroleum Institute, Wellbore Plugging and Abandonment Practices, (2018).
3. The Department of the Interior, Bureau of Safety and Environmental Enforcement, Effects of Tripping and Swabbing in Drilling and Completion Operations, Bourgoyne Engineering, LLC, (2017).
4. Engineering Enterprises, Inc., Technical Assistance Document: Cementing for the Plugging and Abandonment of Injection Wells, (1989).
5. F.B. Tough, Methods of Shutting Off Water in Oil and Gas Wells, (1918).
6. Harold C. Schwalen, The Stovepipe or California Method of Well Drilling as Practiced in Arizona, (1924).
7. Joe Herndon & Dwight K. Smith, Plugging Wells for Abandonment, (1976).
8. Mercy Achang, Li Yanyao &; Mileva Radonjic, A Review of Past, Present, and Future Technologies for Permanent Plugging and Abandonment of Wellbores and Restoration of Subsurface Geologic Barriers, 37 Environmental Engineering Science 395–408, (2020).
9. S. Taku Ide, S. Julio Friedmann &; Howard J. Herzog, CO2 Leakage Through Existing Wells: Current Technology and Regulations.
10. Technology Subgroup of the Operations & Environment Task Group NPC North American Resource Development Study, Plugging and Abandonment of Oil and Gas Wells, (2011).
11. U.S. Chemical Safety and Hazard Investigation Board, Gas Well Blowout and Fire at Pryor Trust Well 1H-9, (2019).

A - 6