# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | | |
|---|---|---|
| _____ ) | | |
| MDR HOTELS, LLC, ) | **Case No. 2:20-cv-08008-FLA (JPRx)** | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| MARATHON OIL COMPANY; ) | | |
| THE DOW CHEMICAL ) | | |
| COMPANY; and DOES 1 ) | | |
| through 10, inclusive, ) | | |
| ) | | |
| Defendants ) | | |
| _____) | | |

## EXPERT REPORT OF LAURA S. UNDERKUFFLER, J.S.D.

## I. Introduction

### A. Qualifications and Experience

1. I, Laura S. Underkuffler, am the J. DuPratt White Professor of Law at Cornell University Law School. I have held this position since January 2009. Prior to this appointment, I was the Arthur Larson Professor of Law at Duke University Law School from 2004 to 2009, and Professor of Law at Duke before that. I have held visiting appointments as Professor of Law at Harvard Law School, the University of Pennsylvania Law School, Georgetown University Law Center, and the University of Maine Law School. I have taught property law and advanced property law at all of these institutions. I have also taught land use, state and local government, evidence, and federal courts.

2. During these academic appointments, I served as a fellow at the Woodrow Wilson International Center for Scholars in Washington, D.C. I also served in the United States Senate as Special Counsel from 1991 to 1992.

3. Prior to entering the legal academy, I practiced law at Meagher, Geer in Minneapolis. I was the head of the appellate department during my final four years at the firm. While at Meagher, Geer, I also served as a member of the Advisory Committee to the United States Court of Appeals for the Eighth Circuit.

4. I received a Doctor of Juridical Science degree and a Master of Laws degree from Yale

1

Law School. I received a Juris Doctor degree from William Mitchell College of Law in St. Paul, Minnesota.

**B. Relevant Background**

5. I am a leading expert in the area of property law, which is the primary focus of my teaching, research, and publication. At Cornell, as at other academic institutions over the past thirty years, I have taught courses in both property law and advanced property law. These courses include basic and advanced concepts involved in the idea of property, the transfer of title, kinds of deeds and their uses and meaning, transaction instruments and interests that run or do not run with the land, commercial leasing, and all phases of interpretation of documents that pertain to property interests and land.

6. Property law is also the focus of my research and scholarship, and I have published extensively about the policies and theory that underlie property law, the historical background of property law, and other significant questions that affect its interpretation by practitioners, legislatures, and courts. I am recognized as a leading authority on American property law, and property theory generally, both in the United States and abroad. I have published in the field of property law and property theory in numerous leading legal journals and law reviews in the United States, Canada, and the United Kingdom. I have also published work in property law as book chapters, commentaries, and essays. An area of particular interest in my teaching, research, and writing has been the point of intersection of property law, contract law, and tort. A copy of my Curriculum Vitae is attached to this Report as Appendix A.

**C. Assignment and Materials Considered**

7. I was retained by Latham & Watkins, LLP, counsel for Marathon Oil Company ("Marathon"), and Phillips Lytle LLP, counsel for The Dow Chemical Company ("Dow"), to offer opinions in this matter. Specifically, I was asked to offer opinions regarding how contemporary and historical land use records (and gaps in such records) should be understood in light of their language, context, and historical policy concerns. These issues involve historical and (to some extent) contemporary issues, and consideration of the complex area of the intersection of property rights, land transfers, and contract.

8. In connection with my work in this matter, I have drawn on the knowledge and experience gained in my professional career and scholarship. My opinions are based on my knowledge and expertise in property law and practice, as well as my examination of various materials including documents produced in this case, publicly recorded land transfer documents, pleadings, treatises and other secondary source materials, state statutes, and cases representing historical developments in the law, and are made to a reasonable degree of certainty in the field of property law and practice. A list of documents that I have considered is attached to this Report as Appendix B.

9. I have never offered a report, sat for a deposition, or testified at trial as an expert witness.

10. I am being compensated at my standard hourly billing rate of $300 per hour for research, writing, and other out-of-court work, and $400 per hour for time in depositions and trial. My compensation is not contingent in any way on my opinions or on the outcome of this matter.

## II.  Summary of Opinions

1. In the context of the surrender of an oil and gas lease, the execution of a quitclaim deed by a lessee (here, Ohio Oil Company (Marathon's predecessor) and Dow) releases the executing lessee from any further involvement in or responsibility for the condition of the property. This is because of the particular nature of a quitclaim deed in American real estate law, which is to convey whatever interest the executing party has, without any guarantee as to the existence or extent of the interest. It is also because of the particular commercial needs in the oil and gas context, and the fact that a quitclaim transaction in this context is an "as-is" transfer. In short, a quitclaim deed operates as a release of the lessee.

2. The acceptance of the complete exit of the lessee by the lessor (i.e., the owner of title) is reinforced when the oil and gas lease contained specific operating conditions to be observed by the lessee during its presence on the land, and the lessor has made no objection or any other claim of breach of those conditions.

3. Based on my review of the record, and my knowledge, education, training, and experience in American property law (including oil and gas leases), the Ohio Oil Company and Dow were in compliance with their leases. The record I reviewed demonstrated that the lessor of the land made no claim of violation of the leasing contracts or their operating conditions as to either Ohio Oil Company or Dow. Moreover, the record does not support that any claim could have been made. Both lessees completely exited from their leases upon the lessor's acceptance of tendered quitclaim deeds, which established the release of both lessor and lessee from all obligations under the leases, in amicable agreement.

4. No rights or obligations established under an oil and gas lease that was previously surrendered by quitclaim deed, in accordance with its terms and with no claim or evidence of breach, may successfully be asserted by a current or subsequent owner or lessee, because neither is a "successor in interest" or otherwise a beneficiary of the rights or obligations established by that lease.

## III. Background

1. As of February 1929, the land on which Well No. 10 (the well at issue in this litigation) would later be drilled was owned by Recreation Gun Club. A lease between Recreation Gun Club, as lessor, and A.A Curtice, as lessee, was executed on February 5, 1929. This document, entitled "Oil and Gas Lease," granted Mr. Curtice "the sole and exclusive right ... to explore, mine, and operate, take, store, remove and dispose of oil, gas, casing-head gas and other hydrocarbon substances for all that certain tract of land [described] ... for a period of twenty (20) years ... ." This lease included the location of Well No.10. The February 5, 1929 lease was "ratif[ied] and confirm[ed]" by a subsequent lease dated December 28,

3

1929.[1]

2. There was also, apparently, an Operating Agreement (alternatively described as dated March 13, 1920 or March 13, 1929) which was a part of those leases.[2] I was not provided a copy of this Operating Agreement, and I understand from counsel that it could not be found.

3. On January 16, 1930, the rights of A.A. Curtice under the above leases were assigned to the Ohio Oil Company, subject to all of the terms and provisions of the Operating Agreement.[3]

4. On February 19, 1931, the Ohio Oil Company notified the California Department of Natural Resources Division of Oil and Gas of its intention to commence the work of drilling what would be Well No. 10. A detailed listing of the seventeen steps subsequently taken during the drilling and testing process was filed with the State by Paul H. Henderson, Chief Geologist, on April 25, 1931.[4]

5. On January 21, 1939, Recreation Gun Club and Ohio Oil Company extended the term of their lease to "a period of thirteen (13) years from and after February 5, 1929, and so long thereafter up to twenty (20) years." Their agreement stated that "[e]xcept as herein expressly modified, said Lease shall remain in full force and effect ... . This agreement shall inure to the benefit of and be binding upon the successors and assigns of the respective parties hereto."[5]

6. On November 12, 1940, Ohio Oil Company notified State regulators that it intended to abandon Well No. 10. On January 3, 1941, Ohio Oil Company reported to State regulators that Well No. 10 had been plugged, as "witnessed by R.S.M.B." Ohio Oil Company also notified the State that the "I-O-Dow Chemical Co. has proposed to take this well and attempt to develop salt water production. ... Your office will be notified if the well is transferred to the above Company or if abandonment is completed."[6]

---

[1] *See* Oil and Gas Lease between Recreation Gun Club (lessor) and A.A. Curtice (lessee) dated December 28, 1929, attached to this Report as Exhibit 1.

[2] *See* reference in Assignment of Oil and Gas Lease between A.A. Curtice et. al. and Ohio Oil Company dated January 16, 1930, attached to this Report as Exhibit 2.

[3] *See id.*

[4] *See* Notice of Intention to Drill New Well filed by Ohio Oil Company and dated February 19, 1931, attached to this Report as Exhibit 3.

[5] *See* Agreement between Recreation Gun Club and Ohio Oil Company dated January 21, 1939, attached to this Report as Exhibit 5.

[6] *See* Supplementary Notice filed by Ohio Oil Company and dated January 3, 1941, attached to this Report as Exhibit 6.

7. On July 10, 1941, a Partial Release of Ohio Oil Company regarding the Ohio Oil Company/Recreation Gun Club lease was executed. Under this document, the lease of three wells, including Well No. 10, was terminated. Specifically, the Partial Release stated that the Ohio Oil Company, Curtice, and others collectively did "release, surrender, quitclaim and relinquish unto the said Recreation Gun Club all rights and titles whatsoever acquired or held by them under [the February 5, 1929] lease in and to" certain land, including the location of Well No. 10, and that the lease is "cancelled, surrendered, annulled, and held for naught in so far as concerns those portions of said lands as so set forth and described ... ."[7]

8. By lease dated July 15, 1941, Dow, as lessee, and Recreation Gun Club, as lessor, entered into a lease agreement for the three wells that were subject to the Partial Release of July 10, 1941 discussed above. This lease stated that the lessor "has granted, demised, leased, and let ... unto Lessee, for the purpose of producing oil, gas, other hydrocarbon substances, waste salt water and iodine, and taking, storing, removing and disposing of same ... ."[8]

9. The July 15, 1941 lease also contained a list of operating conditions and a release if Dow complied with those conditions. The conditions included that:

- "Lessee shall carry on all operations on the demised premises in a careful and workmanlike manner and in accordance with the law of the State of California and shall keep full records of its operations ... and all such records and its operations on the property shall at all reasonable times be open to the inspection of Lessor."

- "Lessee may, at any time, quitclaim this Lease in its entirety or as to part of the acreage covered hereby, and thereupon Lessee shall be released from all further obligations as to [the] part of the land so quitclaimed. All land quitclaimed shall remain subject to easements for rights of way necessary or convenient for Lessee's operations on land retained by it. ..."

- "[O]n the expiration of this Lease or if sooner terminated Lessee shall quietly and peaceably surrender possession of the premises to Lessor and deliver to it a good and sufficient quitclaim deed and shall fill all sump holes, ... remove all structures and foreign matter and ... leave the premises in substantially the same condition as existed on the 5th day of February, 1929."

The lease also stated that "upon the violation of any of the terms or conditions of this Lease by Lessee and the failure to remedy same, then at the option of Lessor this Lease shall forthwith cease and terminate ... . ... [T]his Lease and all of its terms, conditions and stipulations shall be for the benefit of and binding upon the successors and assigns of said

---

[7] *See* Partial Release from Ohio Oil Company to Recreation Gun Club dated July 10, 1941, attached to this Report as Exhibit 7.

[8] *See* Lease between Recreation Gun Club and Dow Chemical Company dated July 15, 1941, attached to this Report as Exhibit 8.

Lessor and Lessee."[9]

10. On November 17, 1941, Dow reported to State regulators that Well No. 10 was being used for "produc[ing] ... iodine bearing salt water."[10]

11. The State Deputy Supervisor subsequently reported to his supervisor that Well No. 10 was transferred to Dow and that Dow was the present operator of the Well, which was being used for iodine extraction.[11]

12. On February 15, 1956, Dow filed a Notice of Intention to Abandon Well No. 10 with State regulators. This included a description of the proposed work. On February 21, 1956, State regulators responded that "[t]he proposal is approved provided that this Division shall be notified to witness the placing of and the location and hardness of each cement plug."[12]

13. State regulators subsequently filed a Special Report on Operations Witnessed regarding Well No.10. This described the operations witnessed and concluded that "[t]he plugging operations as witnessed and reported are approved." A Report of Well Abandonment was filed by State regulators on April 27, 1956. This report concluded: "A review of the reports and records shows that the requirements of this Division, which are based on all information filed with it, have been fulfilled."[13]

14. On November 24, 1958, a quitclaim deed from Ohio Oil Company to the County of Los Angeles ("the County") was executed. The deed stated that "Ohio Oil Company ... does hereby remise, release, and forever quitclaim to County of Los Angeles ... all [of] its right, title, and interest in and to ... that certain oil and gas lease dated December 28, 1929 executed by Recreation Gun Club, as lessor, to A.A. Curtice, as lessee, ... and as assigned to [Ohio Oil Company] together with all easements and rights of way as saved and excepted in the partial release and quitclaim deed recorded August 21, 1941." The effect of this document was to convey to the County all of the leasehold interests retained by Ohio Oil Company after the Partial Release executed on July 10, 1941. Because Well No. 10 and the immediately surrounding land was the subject of the previous Partial Release, it was not

---

[9] *See id.*

[10] *See* Subsequent Work Report filed by Dow Chemical Company and dated November 17, 1941, attached to this Report as Exhibit 9.

[11] *See* Letter from E.H. Musser dated November 24, 1941, attached to this Report as Exhibit 10.

[12] *See* Notice of Intention to Abandon Well filed by Dow Chemical Company and dated February 15, 1956, attached to this Report as Exhibit 11; Report on Proposed Operations by R.W. Walling dated February 15, 1956, attached to this Report as Exhibit 12.

[13] *See* Special Report on Operations Witnessed by R.W. Walling, describing operations conducted on April 16-17, 1956, attached to this Report as Exhibit 13; Report of Well Abandonment by R.W. Walling, April 27, 1956, attached to this Report as Exhibit 14.

included in this quitclaim deed transaction.[14]

15. On December 1, 1958, a quitclaim deed was executed by Recreation Gun Club to the County. This document stated that "Recreation Gun Club ... does hereby remise, release, and forever quitclaim to County of Los Angeles ... all [of] its rights, title, and interest in and to all of" the tract described. This tract contained Well No. 10. The acceptance of this quitclaim deed by the County was noted to have occurred on December 4, 1958.[15]

16. It was subsequently reported by State regulators that as of December 4, 1958, the operator of Well No. 10 was no longer Dow, and was instead the County.[16]

17. On December 9, 1958, the County filed a Notice of Intention to Abandon Well No. 10 with State regulators. In this document, it is stated that "[t]he property on which this well is located was acquired by the County of Los Angeles as a part of the Marina del Rey on December 4, 1958. It is requested that the former designation of Dow Chemical Company Well R.G.C. No. 10 be changed to County of Los Angeles Well Dow R.G.C. No. 10."[17]

18. The County re-abandoned Well No. 10 under State observation on April 7, 1959. On April 9, 1959, State regulators reported that "[a] review of the reports and records shows that the requirements of this Division, which are based on all information filed with it, have been fulfilled."[18]

19. On December 4, 1961, Dow executed a quitclaim deed to the County. This deed stated that Dow "does hereby REMISE, RELEASE, AND QUITCLAIM TO the County of Los Angeles the real property" described. This quitclaim deed conveyed any interest that Dow had in the larger tracts of land, which included Well No 10. The County accepted this quitclaim deed on December 8, 1961 and the deed was recorded in the official records on

---

[14] *See* Quitclaim Deed from Ohio Oil Company to County of Los Angeles dated November 24, 1958, attached to this Report as Exhibit 15.

[15] *See* Quitclaim Deed from Recreation Gun Club to the County of Los Angeles dated December 1, 1958, attached to this Report as Exhibit 16.

[16] *See* Report of Property and Well Transfer by William C. Bailey dated December 23, 1958, attached to this Report as Exhibit 17; Report on Proposed Change of Well Designation by William C. Bailey dated December 23, 1958, attached to this Report as Exhibit 18.

[17] *See* Notice of Intention to Abandon Well by County of Los Angeles, dated December 9, 1958, attached to this Report as Exhibit 19.

[18] *See* History of Oil or Gas Well filed by County of Los Angeles dated April 8, 1959, attached to this Report as Exhibit 21; Special Report on Operations Witnessed by William C. Bailey dated April 9, 1959, attached to this Report as Exhibit 22; Report of Well Abandonment by William C. Bailey dated April 14, 1959, attached to this Report as Exhibit 23.

December 17, 1961.[19]

20. On October 23, 2013, MDR Hotels, LLC ("MDR") submitted a development plan to the
County for a tract of land that included the location of old Well No. 10. The development
plan explicitly acknowledged the presence of an abandoned oil well and methane gas on the
property. It was stated that the well "will have to be re-abandoned" in accordance with State
regulations.[20]

21. On July 31, 2017, MDR leased land from the County which included the location of old
Well No. 10 for the construction of two hotels with approximately 288 rooms, a promenade
along the waterfront, parking facilities, hardscape, landscape, and other related
improvements.[21] This lease expressly stated that MDR, as lessee, accepted the premises on
an "as-is" basis:

> ... Lessee accepts the Premises in their present condition notwithstanding the fact
> that there may be certain defects in the Premises, whether or not known to either
> party as of the Effective Date, and Lessee hereby represents that it has performed all
> investigations that it deems necessary or appropriate with respect to the condition of
> the Premises or Improvements. Lessee hereby accepts the Premises on an "AS-IS,
> WITH ALL FAULTS" basis and, except as expressly set forth in this Lease, Lessee
> is not relying on any representation or warranty of any kind whatsoever, express or
> implied, from County or any other governmental authority or public agency ...
> including without limitation: (i) the quality, nature, adequacy and physical condition
> and aspects of the premises or any Improvements located thereon ...; (ii) the quality,
> nature, adequacy and physical condition of soils, geology and any groundwater; ...
> (iv) the development potential of the Premises, and the use, habitability,
> merchantability or fitness, or the suitability, value or adequacy of the Premises or
> any Improvements located thereon for any particular purpose; (vi) the compliance
> of the Premises or Improvements with any applicable codes, rules, regulations,
> statutes, resolution, ordinances ... or law of the County, State, United States of
> America, California Coastal Commission or any other local, state or federal
> governmental or quasi-governmental entity ...; (vii) the presence of any underground
> storage tank or Hazardous Substances on, in, under, or about the Premises,
> Improvements, the adjoining or neighboring property, or ground or other subsurface
> waters ... ."[22]

---

[19] *See* Corporation Quitclaim Deed from Dow Chemical Company to County of Los Angeles, dated
December 4, 1961, recorded as Instrument No. 5318 in the Official Records of Los Angeles County,
Book D1447, pages 297-300, and attached to this Report as Exhibit 24.

[20] *See* Development Plan dated October 23, 2013, attached to this Report as Exhibit 25 (page 3).

[21] *See* Lease Agreement between County of Los Angeles and MDR Hotels, LLC, dated July 31,
2017, attached to this Report as Exhibit 26 (page 1).

[22] *See id.* (page 13).

8

22. The Lease Agreement also provided that:

- MDR "accepts the Premises in their present condition notwithstanding the fact that there may be certain defects in the Premises, whether or not known to either party to this Lease, at the time of the execution of this Lease by Lessee and Lessee hereby represents that it has performed all investigations necessary, including without limitation soils and engineering inspections, in connection with its acceptance of the Premises 'AS IS.'"

- MDR "acknowledges that it may incur additional engineering and construction costs above and beyond those contemplated by either party to this Lease at the time of the execution hereof and Lessee agrees that it will make no demands upon County for any construction, alterations, or any kind of labor that may be necessitated in connection therewith."

- MDR "hereby waives, withdraws, releases, and relinquishes any and all claims, suits, causes of action (other than a right to terminate as otherwise provided in this Lease), rights of rescission, or charges against the County, its officers, agents, employees ... which Lessee now has or may have or asserts in the future which are based upon any defects in the physical condition of the Premises and the soil thereon and thereunder, including without limitation, any existence of Hazardous Materials in, or on or under the Premises or any other environmental condition affecting the Premises, regardless of whether or not said conditions were known at the time of the execution of this instrument."

- MDR "acknowledges that it has read, is familiar with, and waives the provisions of California Civil Code §1542 ... ." [That Code section sets forth the background rule that a general release does not extend to claims which a creditor does not know or suspect to exist at the time of the execution of the release.][23]

## IV.  Opinions

**1. First Opinion: In the context of the surrender of an oil and gas lease, the execution of a quitclaim deed by a lessee (here, Ohio Oil Company (Marathon's predecessor) and Dow) releases the executing lessee from any further involvement in or responsibility for the condition of the property. This is because of the particular nature of a quitclaim deed in American real estate law, which is to convey whatever interest the executing party has, without any guarantee as to the existence or extent of the interest. It is also because of the particular commercial needs in the oil and gas context, and the fact that a quitclaim transaction in this context is an "as-is" transfer. In short, a quitclaim deed operates as a release of the lessee.**

---

[23] *See id.* (pages 99-100).

9

2. The most common use of a quitclaim deed is in the general transfer of title (or lesser interest) in real estate. When land has been "quitclaimed," the usual question is *what title* the grantor in such a transaction received. There are many cases dealing with this proposition, and the universal answer is that the giving of a quitclaim deed does not guarantee transfer of any title whatsoever. The grantor simply gives what it has: it might be good title, it might be flawed title, it might be no title at all.

3. Indeed, that is the purpose of a quitclaim deed. One who executes a quitclaim deed uses this device precisely because it does not wish to give warranty of title. A quitclaim deed might be used in a situation where the giver of the deed is aware of a definite or possible title flaw (e.g., a possible adverse possession claim to part of the property) for which the grantor expressly wishes to take no responsibility. Or it might be used simply to "clean up title" – for instance, where there is someone with a possible spousal interest, mortgage interest, or other attenuated interest which needs to be cleared up before closing. Holders of attenuated or remotely possible interests are often approached to execute quitclaim deeds to eliminate their interests in property for which sale is planned. Important for purposes of my conclusions here, there is copious authority for the proposition that a quitclaim deed puts the party on notice that the interest is of an "unknown extent" or has a "dubious basis."

4. I was asked to consider whether the use of a quitclaim instrument – as well as other language of release – establishes the transaction as one in which the quitclaiming party is released from any obligation regarding *the condition* of the property. Because of the nature of a quitclaim deed, the idea that such a deed would convey property-condition guarantees is a logical contradiction. It makes no logical sense that an entity which intends to make no guarantee about the *existence of title* would simultaneously intend to convey some "implied warranty" or other guarantee about the property's *condition*. As a result, in those few situations in which such a question has been raised, the general conclusion and common understanding is that if a quitclaim deed in fact conveys any interest in land, it necessarily conveys it "as is," and with no representations made about the condition of the property.

5. In the oil and gas context, from the 1920s to the present, quitclaim deeds were and are the method universally used – by contractual agreement – when an oil and gas lessee surrenders a lease and is to be released from the lease's obligations. The ubiquitous use of quitclaim deeds to clearly terminate obligations and transfer rights has particular value in this context. Oil and gas exploration is a dynamic industry, with different companies and individuals continually entering and exiting the leasing of land depending upon exploration results, continually changing economic constraints, and boom and bust cycles. Lessees often have a need to cleanly and completely exit from lease obligations on one piece of land, in order to salvage business or commence exploration on another. Lessors, on the other hand, need a way to completely, simply, and by means of one universally understood document recover all of their rights to a piece of land upon a lessee's exit. The quitclaim deed in oil and gas leasing performs these important functions for both parties.

6. As a result of this function in the oil and gas context, and the fundamental nature of a quitclaim deed discussed above, the execution of a quitclaim deed in the surrender of all or part of an oil and gas lease was historically and is now universally understood to be a full

termination of the lease and of all interests created under the leasehold. Surrender of a lease by quitclaim deed terminates the existing relations of the lessor and lessee created by the lease, and all obligations of the parties under it. Termination of existing relations, under the exigencies of the oil and gas industry, means exactly that. Unless some independent breach of other contractual provisions by the lessee is asserted by the lessor, acceptance of a quitclaim deed accomplishes conveyance of title and possession of the property to the lessor in an "as-is" condition. It operates both as a conveyance to the grantee (lessor) without warranty, and as a release of the grantor (lessee).

7. In this case, the lease of Well No. 10 by Ohio Oil Company (lessee) was surrendered to Recreation Gun Club (lessor) by quitclaim deed, with the usual commonly understood language of release, on July 10, 1941.[24] There is no evidence that any breach of any independent contractual conditions contained in the lease was asserted at any time, then or thereafter, by the lessor.

8. The lease later given by Recreation Gun Club to Dow regarding Well No. 10 also specified that surrender of the lease would be accomplished by quitclaim deed. It specified that "Lessee may, at any time, quitclaim this lease in its entirety or as to part of the acreage covered hereby, and thereupon Lessee shall be released from all further obligations as to the part of the land so quitclaimed."[25]  It should be presumed that this contractual provision was followed, and that Dow surrendered its lease by quitclaim deed to Recreation Gun Club prior to the time that the tract of land containing Well No. 10 was transferred by Recreation Gun Club to the County (see instrument of December 1, 1958).[26] This is confirmed by the State regulator's report that as of December 4, 1958, the operator of Well No. 10 was no longer Dow, but the County.[27]  It is also confirmed by the County's re-abandonment of Well No. 10 under State supervision on April 7, 1959.[28] There is no evidence that any breach of

---

[24] See Partial Release from Ohio Oil Company to Recreation Gun Club dated July 10, 1941, attached to this Report as Exhibit 7.

[25] See Lease between Recreation Gun Club and Dow Chemical Company dated July 15, 1941, attached to this Report as Exhibit 8.

[26] See Quitclaim Deed from Recreation Gun Club to the County of Los Angeles, dated December 1, 1958 (accepted by the County on December 4, 1958), attached to this Report as Exhibit 16.

[27] See Report of Property and Well Transfer by William C. Bailey dated December 23, 1958, attached to this Report as Exhibit 17; Report on Proposed Change of Well Designation by William C. Bailey dated December 23, 1958, attached to this Report as Exhibit 18.

[28] See Notice of Intention to Abandon Well filed by County of Los Angeles and dated December 9, 1958, attached to this Report as Exhibit 19; History of Oil or Gas Well filed by County of Los Angeles dated April 8, 1959, attached to this Report as Exhibit 21; Special Report on Operations Witnessed by William C. Bailey dated April 9, 1959, attached to this Report as Exhibit 22; Report of Well Abandonment by William C. Bailey dated April 14, 1959, attached to this Report as Exhibit 23.

11

any independent contractual condition contained in the lease was asserted at any time, then or thereafter, by the lessor.

Furthermore, and in any case, by conveying its 1961 quitclaim deed, which quitclaimed all of Dow's remaining interest in the property to the County (by then the owner and lessor), Dow again complied with the lease's provisions and effectuated its release.[29]

9. By the nature of these quitclaim transactions and their conveyance of land "as is," as well as by the explicit language in the leases that terminated the lessees' responsibilities upon the accomplishment of quitclaim transactions, Ohio Oil Company and Dow were released from any further obligations regarding the property. As a further consequence, the lessor's acceptance of these quitclaim deeds established the lessor's consent to the leasing operations and activities as performed.

**10. Second Opinion: The acceptance of the complete exit of the lessee by the lessor (i.e., the owner of title) is reinforced when the oil and gas lease contained specific operating conditions to be observed by the lessee during its presence on the land, and the lessor has made no objection or any other claim of breach of those conditions.**

11. Oil and gas leases, both historically and in contemporary times, contain specified operating conditions and constraints with which the lessee must comply. These are typically broad, covering issues from compliance with existing state law, interference with existing uses of the land by the lessor, the creation and maintenance of easements, disposal of waste products, disposition of casings and other fixtures at the end of the lease, land restoration requirements at the end of the lease, and so on. These agreements are intended to create certainty about obligations governing both operation and exit, during fast-paced lease creation and termination, for the protection of both parties.

12. Monitoring of compliance with operating conditions is specified in these agreements to occur both during the lease term and upon its termination. For instance, it is typical for the lessor to reserve the right to enter the leased land upon reasonable notice for the purposes of inspection during the lease term. Upon termination, an assessment of compliance is obviously critical. Because both parties are acutely aware that acceptance of a quitclaim deed from the lessee to the lessor will terminate all obligations of both parties under the lease, it is standard practice that the compliance assessment is done prior to legal surrender of the lease by quitclaim deed.

13. Where an oil and gas leasehold was terminated by quitclaim deed, it should be presumed that no outstanding operating agreement compliance issues existed. This conclusion is reinforced if long periods of time passed after the surrender of the lease – here, many decades – with no record of asserted claims of breach.

---

[29] *See* Corporation Quitclaim Deed from Dow Chemical Company to County of Los Angeles dated December 4, 1961, recorded as Instrument No. 5318 in the Official Records of Los Angeles County, Book D1447, pages 297-300, attached to this Report as Exhibit 24.

**14. Third Opinion: Based on my review of the record, and my knowledge, education, training, and experience in American property law and practice (including oil and gas leases), the Ohio Oil Company and Dow were in compliance with the operating conditions in their leases. The record I reviewed demonstrated that the lessor of the land made no claim of violation of the leasing contracts or their operating conditions as to either the Ohio Oil Company or Dow. Moreover, the record does not support that any claim could have been made. Both lessees completely exited from their leases upon the lessor's acceptance of tendered quitclaim deeds, which established the release of both lessor and lessee from all obligations under the leases, in amicable agreement.**

15. In this case, both the Recreation Gun Club/Ohio Oil Company lease and the Recreation Gun Club/Dow lease contained Operating Agreements. The Recreation Gun Club/Ohio Oil Company lease was initially created by assignment of the prior Recreation Gun Club/Curtice lease to Ohio Oil Company.[30] In this assignment, it was explicitly stated that it was "executed and delivered subject to all the terms and provisions of ... [the] Operating Agreement of March 13, 1929."[31] When Recreation Gun Club and Ohio Oil Company later extended the term of this lease, it was reiterated that "[e]xcept as herein expressly modified, said Lease shall remain in full force and effect."[32]

16. The Recreation Gun Club/Dow lease also contained an Operating Agreement within it. The list of operating conditions was extensive, and specified that "Lessee shall carry on all operations on the demised premises in a careful and workmanlike manner and in accordance with the laws of the State of California ... ." It further specified that "[Lessee] shall keep full records of its operations ..., and such records and the operations on the property shall at all reasonable times be open to inspection of Lessor." It further specified that prior to the surrender of the lease, the lessee "shall fill all sump holes, ... remove all structures and foreign matter and shall leave the premises in substantially the same condition as existed on the 5th day of February, 1929." "[U]pon the violation of any terms or conditions ... by Lessee and the failure to remedy same, then at the option of Lessor this lease shall forthwith cease and terminate... ."[33]

17. The termination of both leases by quitclaim transactions, with no evidence of any objection or claim of breach of any operating agreement provision at that time or after, establishes that both lessees fulfilled their obligations to the lessor's satisfaction, that the leases were surrendered effectively, that all rights and obligations of all parties were

---

[30] *See* Assignment of Oil and Gas Lease between A.A. Curtice et. al. and Ohio Oil Company dated January 16, 1930, attached to this Report as Exhibit 2.

[31] *See id.*

[32] *See* Agreement between Recreation Gun Club and Ohio Oil Company dated January 21, 1939, attached to this Report as Exhibit 5.

[33] *See* Lease between Recreation Gun Club and Dow Chemical Company dated July 15, 1941, attached to this Report as Exhibit 8.

13

terminated, and that the complete exit of all parties from the leasing contracts was
accomplished.

**18. Fourth Opinion: No rights or obligations established by an oil and gas lease that
was previously surrendered by quitclaim deed, in accordance with its terms and with
no claim or evidence of breach, can be asserted by a current or subsequent owner or
lessee, because neither is a "successor in interest" or other beneficiary of the rights or
obligations established by that lease.**

19. In this case, the rights and obligations under both leases were stated – as is customary –
to run with the land to "successors and assigns." Even were MDR, the present lessee of the
same land, to claim that it is the beneficiary of historical lease provisions as a "successor or
assign," such a claim would be a theoretical impossibility under American land law and
practice and the lease contracts involved. No right or obligation, under a lease or otherwise,
can run with the land to a subsequent purchaser or lessee if the right or obligation has been
previously terminated or discharged. A subsequent successor in interest can only possess
those rights and obligations that its *predecessor in interest* possessed, and that *still exist*.
Only existing rights and obligations can pass with the transfer of land. If – under the terms
of the instrument(s) which created those rights and obligations – the previous interest-holder
in fact gave up those rights and obligations, lost them by operation of law, or they were
otherwise terminated, there is – after that event – nothing to pass with the land to a successor
or assign.

20. In addition, the existence of old Well No. 10 on the property that MDR leased was
acknowledged by the parties to the current transaction, as is apparent from the produced
documents, including MDR's lease transaction document itself. The development plan
submitted by MDR to the County in 2013 acknowledged the existence of an old, previously
abandoned oil well and methane gas on the property, and that this well would "have to be
re-abandoned" in accordance with State regulations.[34] The lease expressly and prominently
states that the property was leased "as-is," "with all faults,"[35] and that the lessee accepts the
premises in their current condition, notwithstanding the fact that there might be defects in
the premises.[36] The lessee also represented, in signing the document, that it had performed
all investigations that it deemed necessary or appropriate regarding the condition of the
premises, including soils and engineering inspections. It acknowledged that it might incur

---

[34] *See* Development Plan dated October 23, 2013, attached to this Report as Exhibit 25 (page 3).

[35] *See* Lease Agreement between County of Los Angeles and MDR Hotels, LLC, dated July 31,
2017, attached to this Report as Exhibit 26 (page 13).

[36] *See id.* (pages 99-100).

additional engineering and construction costs above and beyond those contemplated, depending on what the condition of the property revealed. It also expressly waived any claim that it might have due to defects in the premises, including conditions of the soil or other environmental conditions.[37]

21. Under commercially reasonable assumptions, both MDR and the County were aware that the lease involved a property where additional cleanup might be possible, and that this reality was reflected in the terms of the lease and in the price that MDR paid.

_Laura S. Underkuffler_

Laura S. Underkuffler, J.S.D.
November 22, 2022

---

[37] *See id.*

15

797

11-22-2022                                                          Appendix A

## LAURA S. UNDERKUFFLER
### Curriculum Vitae

*Cornell University Law School • 316 Myron Taylor Hall, Ithaca, NY 14853*
*(607) 255-1245 • lu27@cornell.edu*

## HONORS AND AWARDS

Anne Lukingbeal Award for Service to Women Students, Cornell Law School, 2019
Annual Excellence Award, Association for Law, Property, and Society, 2015
Dean's Prize for Faculty Scholarship, Duke Law School, 2003
Distinguished Teaching Award, Duke Law School, 2003

## ACADEMIC APPOINTMENTS:

CORNELL UNIVERSITY LAW SCHOOL
*J. DuPratt White Professor, 2009 - present*
*Associate Dean for Academic Affairs, 2011- 2015*

DUKE UNIVERSITY SCHOOL OF LAW
*Arthur Larson Professor, 2004-2009*
*Professor, 1990-2004*

HARVARD LAW SCHOOL
*Visiting Professor, Spring 2005*

UNIVERSITY OF PENNSYLVANIA LAW SCHOOL
*Visiting Professor, 2000-2001*

GEORGETOWN UNIVERSITY LAW CENTER
*Visiting Professor, Spring 2000*

UNIVERSITY OF MAINE LAW SCHOOL
*Godfrey Visiting Professor, Fall 2010*
*Libra Visiting Professor, Fall 2006*
*Godfrey Visiting Professor, Fall 1999*

## PUBLICATIONS:

BOOKS:

CAPTURED BY EVIL: THE IDEA OF CORRUPTION IN LAW (Yale University Press - 2013)

THE IDEA OF PROPERTY: ITS MEANING AND POWER (Oxford University Press - U.K. 2003)

1

Appendix A

SELECTED ARTICLES:

*Challenging Equality: Property Loss, Government Fault, and the Global Warming Catastrophe*, 117
NORTHWESTERN UNIVERSITY LAW REVIEW 1611 (2022)

Plessy *Redux: Why the Human Rights of Gay, Lesbian, and Transgender Citizens Lost to Religious
Claims,* 71 EMORY LAW JOURNAL 1611 (2022)

*The Telos of Property,* ___ JURISPRUDENCE ___ (2022) (review of HANOCH DAGAN, A LIBERAL THEORY OF
PROPERTY (Cambridge University Press 2021))

*Do Property Owners Owe Duties to Others? It's Simply a Matter of Tort*, 72 CASE WESTERN LAW REVIEW
287 (2022)

*Coastal Destruction and Climate Change: Is Takings Law the Answer?,* ___ POWELL ON REAL PROPERTY
___ (2021)

Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*: On Art, Law, and
the Power of the Sea,* in PAINTING CONSTITUTIONAL LAW: XAVIER CORTADA'S IMAGES OF
CONSTITUTIONAL RIGHTS 214 (M.C. Mirow & Howard M. Wasserman eds.) (Brill Nijhoff Publishers,
Leiden, The Netherlands, 2021).

*In Search of Affordable Housing: How Deregulatory Strategies Fail the Poor,* 9 (WILLIAM AND MARY)
BRIGHAM-KANNER PROPERTY RIGHTS JOURNAL 227 (2020)

*The Holy Grail of Progressive Property,* 29 CORNELL JOURNAL OF LAW AND PUBLIC POLICY 717 (2020)

*Why Sub-State Groups Are Endowed with Rights*, in RESOLVING CONFLICTS IN THE LAW 181 (Chiara
Giorgetti & Natalie Klein eds.) (Brill Nijhoff Publishers, Leiden, The Netherlands, 2019)

*Fiduciary Theory: The Missing Piece for Positive Rights,* in FIDUCIARY GOVERNMENT 96 (Evan J. Criddle,
Evan Fox-Decent, Andrew S. Gold, Sung Hui Kim, & Paul B. Miller eds.) (Cambridge University Press,
2018)

*Should Religion Be Exempt? Questions of Justice, Character, and the Maintenance of Norms,* CRIMINAL
JUSTICE ETHICS (2018)

*Religious Freedom in an Egalitarian Age: Rejecting Doctrinal Nihilism in the Adjudication of Religious
Claims,* 31 JOURNAL OF CIVIL RIGHTS AND ECONOMIC DEVELOPMENT 217 (2018)

*Markets, Morals, and the Maintenance of Government*, 27 CORNELL JOURNAL OF LAW AND PUBLIC POLICY
601 (2018)

*Property, Sovereignty, and the Public Trust*, 18 THEORETICAL INQUIRIES IN LAW 329 (2017)

*Subversive Property*, 50 NEW ENGLAND LAW REVIEW 295 (2016)

*What Does the Constitutional Protection of Property Mean?,* 5 (WILLIAM & MARY) BRIGHAM-KANNER
PROPERTY RIGHTS CONFERENCE JOURNAL 109 (2016)

*The Challenge of Eminent Domain*, Property - Jotwell (August, 2016) http://property.jotwell.com/the-
challenge-of-eminent-domain

*A Moral Theory of Property*, 2 JOURNAL OF REAL ESTATE LAW 301 (2015)

2

*Religious Exceptionalism and Human Rights,* in RELIGION AND THE DISCOURSE OF HUMAN RIGHTS (Hanoch Dagan, Yedidia Z. Stern, & Shahan Lifshitz eds.) (Tel Aviv: Israeli Democracy Institute, 2014)

*Reality and Illusion,* 1 CRITICAL ANALYSIS OF LAW 239 (2014) (University of Toronto)

*A Theoretical Approach: The Lens of Progressive Property*, 3 PROPERTY LAW REVIEW 152 (2014), reprinted in RESEARCHING PROPERTY LAW 11 (Susan Bright & Sarah Blandy eds.) (Palgrave, 2016)

*Individual Reliance and Government Forbearance: A Tale of Five Cases*, 3 (WILLIAM & MARY) BRIGHAM - KANNER PROPERTY RIGHTS CONFERENCE JOURNAL 141 (2014)

*Property and Change: The Constitutional Conundrum*, 91 TEXAS LAW REVIEW 2015 (2013)

*Judicial Takings: A Medley of Misconceptions*, 61 SYRACUSE LAW REVIEW 999 (2011)

Book Review, in [2011] PUBLIC LAW 200 (London School of Economics) (reviewing JUDICIAL REVIEW IN THE AGE OF MORAL PLURALISM by Ronald C. Den Otter) (Cambridge University Press 2009)

Book Review, 61 JOURNAL OF LEGAL EDUCATION 231 (2011) (reviewing AMERICAN PROPERTY: A HISTORY OF HOW, WHY, AND WHAT WE OWN, by Stuart Banner) (Harvard University Press 2011)

*Open, Notorious, and Continuously Occupied: A Claim for Adverse Possession*, CORNELL JOURNAL OF LAW AND PUBLIC POLICY ON-LINE (November 16, 2011)

*Takings and the Problem of Value: Grappling with Truth in Land-Restriction Cases*, 11 VERMONT JOURNAL OF ENVIRONMENTAL LAW 465 (2010) (symposium issue)

*The Idea of Corruption: Implications for Action,* in CORRUPTION, GLOBAL SECURITY, AND WORLD ORDER 27 (Harvard Kennedy School Program on Interstate Conflict & American Academy of Arts & Sciences, Robert I. Rotberg ed.) (Brookings Institution Press, 2009)

*Property as Constitutional Myth: Utilities and Dangers*, 92 CORNELL LAW REVIEW 1239 (2007)

*Human Genetics Studies: The Case for Group Rights*, 35 JOURNAL OF LAW, MEDICINE & ETHICS 383 (2007) (reprinted, India)

*Lessons from Outlaws*, 156 UNIVERSITY OF PENNSYLVANIA LAW REVIEW (PENNUMBRA) 262 (2007)

Book Review, in 25 LAW AND HISTORY REVIEW 426 (2007) (reviewing BOURGEOIS NIGHTMARES: SUBURBIA, 1870-1930, by Robert M. Fogelson) (Yale University Press 2007)

*Kelo's Moral Failure*, 15 WILLIAM AND MARY BILL OF RIGHTS JOURNAL 377 (2006)

*Tahoe's Requiem: The Death of the Scalian View of Property and Justice*, 21 CONSTITUTIONAL COMMENTARY 727 (2004) [2006]

*Telling Property Stories*, 55 Journal of Legal Education 152 (2005) (reviewing PROPERTY STORIES, Gerald Korngold & Andrew P. Morriss, eds.) (West Academic Press, 2004)

*Moral Rights, Judicial Review, and Democracy: A Response to Horacio Spector*, 22 LAW AND PHILOSOPHY 335 (2003)

*Public Funding for Religious Schools: Difficulties and Dangers in A Pluralistic Society*, 27 OXFORD REVIEW OF EDUCATION 577 (2001) (symposium issue)

3

Appendix A

*Religion, History, and the Constitution*, 16 Journal of Law and Religion 559 (2001) (reviewing RELIGION AND THE CONTINENTAL CONGRESS, 1774-1879: CONTRIBUTIONS TO ORIGINAL INTENT, by Derek H. Davis) (Oxford University Press 2000)

*When Should Rights Trump? An Examination of Speech and Property* (adapted from Edward S. Godfrey Endowed Lecture), 52 MAINE LAW REVIEW 2 (2000)

*Agentic and Conscientic Decisions in Law: Death and Other Cases,* 74 NOTRE DAME LAW REVIEW 101 (1999)

*El Concepto de Corrupción* (The Nature of Corruption), in FRACTURAS EN LA GOBERNABILIDAD DEMOCRATICA (Raúl Urzúa and Felipe Agüero eds.) (Santiago: Universidad de Chile, Centro de Análisis de Políticas Públicas, 1998)

*Takings and the Nature of Property*, 1X CANADIAN JOURNAL OF LAW AND JURISPRUDENCE 161 (1996)

*Property: A Special Right*, 71 NOTRE DAME LAW REVIEW 1033 (1996)

*The Separation of the Religious and the Secular*: *A Foundational Challenge to First Amendment Theory*, 36 WILLIAM AND MARY LAW REVIEW 837 (1995)

*The Perfidy of Property*, 70 TEXAS LAW REVIEW 293 (1991)

*Individual Conscience and the Law*, 42 DE PAUL LAW REVIEW 93 (1992)

*On Property: An Essay*, 100 Yale Law Journal 127 (1990), reprinted in II PROPERTY LAW - THE INTERNATIONAL LIBRARY OF ESSAYS IN LAW AND LEGAL THEORY (Elizabeth Mensch and Alan Freeman eds.) (New York University Press 1992)

## SELECTED ADDRESSES AND PROFESSIONAL ACTIVITIES:

*The Future of the Establishment Clause after* Trinity Lutheran *and* Espinoza, presentation at *Continuity, Change, and the Establishment Clause* program, AALS (January, 2021)

*Theories of Fault and the Challenge of Catastrophe*, presentation at *Reimagining Property Law in the Era of Inequality* conference, Northwestern University Law School (November, 2021)

*Art and Constitutional Law*, AALS Art Law Webinar (April, 2021)

*Coastal Destruction and Climate Change: Is Takings Law the Answer?*, Wolf Family Lecture Series, University of Florida Law School (October, 2020)

*Law, Religion and Justice: Why Popular Legal Approaches Fail*, Berkeley Workshop on Natural Law, Religion, and Justice (February, 2019)

*The Dark Side of Affordable Housing*, Brigham-Kanner Property Rights Conference, College of William & Mary Law School (October, 2019)

*How Tribalism is Affecting Our Faith in American Institutions*, MPR News, with Aziz Huq - University of Chicago (October, 2018)

*In Defense of Positive Rights,* Annual Property Works in Progress Conference, Boston University (October, 2018)

4

Appendix A

*Property and Fiduciary Government*, UCLA Conference on Theories of Fiduciary Government (June, 2017)

*Religious Exceptionalism in American Law*, Annual Law and Religion Roundtable, Montreal, Canada (June, 2016)

*The Political Economy of Global Corruption Regulation,* Fordham Law School (March, 2015)

*From Bailouts to Bogs: Shaking the Takings Money Tree*, Keynote Speech, Annual Meeting of the Association of Law, Property, and Society, Athens, Georgia (May, 2015)

*The Social Function of Property and Environmental Protection*, University of Buenos Aires Law School (March, 2015)

*Framing Property Law in Light of the Looming Ecological Crisis*, Center for Progress Studies, Claremont, California (June, 2015)

*The Place of Economic Analysis within Competing Conceptions of Property,* Annual Meeting of the American Association of Law Schools (January, 2015)

*What Should Progressives Think About Religious Freedom?,* Hot Topics: Cool Talk, Terrence J. Murphy Institute for Catholic Thought, Law, and Public Policy, University of St. Thomas Law School (March, 2014)

*Captured by Evil? Markets, Morals, and the Rule of Law,* Chapman Dialogue Series, Chapman Law School (April, 2014)

*A Moral Theory of Property*, Annual Meeting of the Association for Law, Property, and Society, Vancouver, Canada (May, 2014)

*Legal Treatment of Common-Law Resource Pools* (with Katrina Wyman and Peter M. Gerhart), Case Western Reserve University Law School Podcast (June, 2013)

*Property from a Theoretical Point of View: The Idea of Progressive Property*, Plenary Session - Annual Meeting of the Association for Law, Property, and Society, Minneapolis, Minnesota (April, 2013)

*Property and Constitutional Interpretation*, Symposium on Constitutional Interpretation, University of Texas Law School (February, 2013)

*Religious Revival in a Post-Multicultural Age*, co-sponsored by the McGill Centre for Human Rights and Legal Pluralism & The Minerva Center for Human Rights, Tel Aviv University, in Montreal, Canada (January, 2011)

*Property and Poverty*, Southeastern Association of Law Schools Conference (July, 2011)

*An Evolving Landscape: The* Ibanez *Case and Beyond* (with Peter Pitegoff), American Constitution Society (September, 2011)

*Smith, Religious Exemptions, and Civil Rights Laws*, at Symposium: *Twenty Years After Employment Division v. Smith: Assessing the Twentieth Century's Landmark Case on the Free Exercise of Religion*, sponsored by Cardozo Law School & the Floerscheimer Center for Constitutional Democracy, New York, New York (October, 2010)

5

Appendix A

*The Question of the Commons: Is There Too Much Property?*, Brigham-Kanner
Property Rights Conference, College of William & Mary Law School (October, 2010)

*The Role of Illusion in Establishment Clause Jurisprudence*, Annual Law & Religion Conference, New
York, NY (June, 2010)

*The Norms of the Mortgage Crisis: Property and Contract*, Plenary Speaker, AALS Mid-Year Property
Conference, New York, New York (June, 2010)

*Evil and Corruption*, Faculty Workshop, DePaul University Law School (March, 2010)

*Progressive Property*, Annual Meeting of the Association for Law, Property, and Society (March, 2010)

*The Role of Property Theory in Law*, University of Oslo, Norway (May, 2009)

*The Troubled History of Church and State in the United States*, University of Oslo (May, 2009)

*Funding Faith*, Princeton University (May, 2008)

*The Idea of Corruption in Law*, Queen's University, Ontario, Canada (March, 2008)

*A Question of Distributive Justice*, Conference - Comparative Property Law, University of Durham,
England (July, 2007)

*The Myth of Constitutional Property,* Conference - Techniques of Ownership, London School of Economics
(July, 2007)

*Takings and the Legacy of Margaret Jane Radin*, Brigham-Kanner Property Rights Conference, William &
Mary Law School (October, 2007)

*Religious Exemptions and the Common Good,* Symposium - The Religion Clauses in the 21st Century, West
Virginia University College of Law (April, 2007)

*Power and Property Rights: 21st Century Land Reforms Conference*, Andrew W. Mellon Foundation
Seminar on the Changing Nature of Land, University of North Carolina - Chapel Hill (October, 2007)

*A Theory of Corruption*, Boston University Law School (November, 2006)

*The Establishment Clause: Van Orden, McCreary, and a Reconstituted Court*, University of North Carolina
Law School (February, 2006)

*The Just and the Wild in Property*, Yale Law School (November, 2005)

*The Idea of Corruption*, Annual Meeting of the European Society of Criminology, Cracow, Poland (August,
2005), and Corruption Conference, Hebrew University, Jerusalem (June, 2005)

*Captured by Evil: The Idea of Corruption in Law*, Faculty Workshop at Harvard Law School (May, 2005),
Faculty Workshop at University of California - Davis School of Law (October, 2005),
and Legal Studies Workshop at the University of Virginia School of Law (November, 2005)

*Van Orden v. Perry and McCreary v. ACLU: Ten Commandments and Government*, Princeton University
(May, 2005)

*Property and Human Dignity*, Brigham-Kanner Property Rights Conference, William & Mary College Law
School (in honor of Prof. Frank Michelman) (November, 2004)

6

*Property, Privacy, and Genetic Information*, Conference in Bioethics, Genetics, and Group Rights, Arizona State University (October, 2004)

*Tahoe's Requiem,* 2nd Annual Constitutional Theory Conference, NYU Law School (October, 2004)

*Tahoe's Requiem*, Faculty Workshops at the University of Connecticut Law School (February, 2005), Seton Hall University Law School (October, 2004) and University of Indiana- Indianapolis School of Law (September, 2004)

*Comparative Law and Takings*, plenary session of the AALS Conference on Environmental and Property Law, University of Oregon (June, 2004)

*Church Autonomy and Free Exercise*, Conference on Church Autonomy, Brigham Young University Law School (February, 2004)

*The Idea of Property*, Faculty Workshop, University of North Carolina Law School (January, 2004)

*Point/Counterpoint on Takings and Property,* with Prof. Carol Rose, University of Maine Law School (September, 2003)

*The Post-*Zellman *Landscape: State Funding of Religious Schools*, University of Maine School of Law (September, 2003)

*State "Blaine" Amendments: Are They Constitutional?,* University of North Carolina Law School and Pew Forum on Religion and Public Life (March, 2003)

*Visions of Property in Takings Cases: A Question of Justice*, Fourth Annual Duke Public Law Conference (December, 2002)

*The Political and Social Idea of Property*, with Prof. James Ely, Chicago Public Radio (December, 2002)

*A Reply to Horacio Spector*, Workshop in Law and Philosophy, University of North Carolina (October, 2002)

*The Meaning of Property*, ITT Chicago-Kent School of Law (October, 2002)

*Law and Conscience*, University of Maine School of Law Commencement Address (May, 2002)

*Vouchers, Individual Choice, and State Neutrality: Hidden Dangers for Religious Freedom*, University of Detroit Mercy School of Law (October, 2000)

*Workshop on Corruption and International Law*, Duke University School of Law (November, 2000)

*Property: A Special Right?*, Edward S/ Godfrey Fund Lecture, University of Maine School of Law (November, 1999)

*Vouchers and Beyond: The Individual as Causative Agent in Establishment Clause Jurisprudence*, Indiana University School of Law - Bloomington (April, 1999)

*Roundtable on Legal Theory: History, Philosophy, Aesthetics, and Post - Modernism in Property Law and Rhetoric*, Working Group on Law, Culture, and the Humanities, Georgetown University Law Center (March, 1998)

7

Appendix A

*Property Rights and Religious Freedom Issues Under the New South African Constitution*, University of South Africa, Pretoria (October, 1996)

*Theories of Corruption*, Conference on Issues in Democratic Governance, Universidad de Chile, Santiago, Chile (July, 1996)

*Property Theory and Chinese Rights in Property*, Workshop on Chinese Rights in Property, Columbia University (May, 1996)

*Environmental Reform: The Next Generation Project*, Yale Law School and Yale Center for Environmental Law and Policy (May, 1996)

*International Colloquium: Property Law on the Threshold of the 21ˢᵗ Century*, Section on Constitutional Protection of Property, Rijksuniversiteit Limburg, Maastrict, the Netherlands (August, 1995)

*Corruption and Democratic Governance Issues*, Office of the Attorney General, Caracas, Venezuela (May, 1993)

*What Is Corruption?*, Overseas Development Council, Washington, DC (March, 1993)

*The Separation of the Religious and the Secular: An Inquiry*, Faculty Workshop of New York University School of Law (January, 1992)

*Conscience and the Law*, Center for Law and Religion, De Paul University (symposium) (December, 1991)

*The Justice Content of Property*, Cleveland-Marshall School of Law (symposium) (October, 1991)

## PROFESSIONAL EXPERIENCE:

WOODROW WILSON INTERNATIONAL CENTER FOR SCHOLARS
*Fellow, 1993*
South America - study of the concept of corruption

UNITED STATES SENATE
*Special Counsel, 1991 - 1992*
Legal advisor for Senator Paul Wellstone

YALE LAW SCHOOL
*Tutor in Law, 1988 - 1990*
*Research Fellow, 1987 - 1988*

ADVISORY COMMITTEE TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT
*Member, 1984 - 1986*

MINNESOTA STATE PUBLIC DEFENDER (APPELLATE DIVISION)
*Attorney, 1985 - 1986*
Representation of indigent persons convicted of felonies on appeal in federal and state courts

MEAGHER, GEER, MARKHAM, ANDERSON, ADAMSON, FLASKAMP, & BRENNAN
*Attorney, 1979 - 1985*
*Partner, 1985*
Head of appellate department; briefed and argued more than 30 appeals in federal and state courts

8

Appendix A

HONORABLE GERALD W. HEANEY
UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT
*Law Clerk, 1978 - 1979*

## ACADEMIC PREPARATION:

YALE LAW SCHOOL
*Doctor of the Science of Law, 1994*
*Master of Laws, 1987*
- Honors in 20 of 24 credit hours

WILLIAM MITCHELL COLLEGE OF LAW
*Juris Doctor, 1978*
- Magna Cum Laude

CARLETON COLLEGE
*Bachelor of Arts, 1974*
- Degree conferred "with Distinction" in major field of study (urban studies)
- Magna Cum Laude
- Phi Beta Kappa and Mortar Board (National Women's Honor Society)

9

Appendix B

## MATERIALS CONSIDERED

**Case Documents:**

Oil and Gas Lease between Recreation Gun Club (lessor) and A.A. Curtice (lessee) dated December 28, 1929 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-4 Page ID# 258) (also Defendants' Request for Judicial Notice in Support of Motion to Dismiss (hereinafter "DRJN") Exh. 1).

Assignment of Oil and Gas Lease between A.A. Curtice et. al. and Ohio Oil Company dated January 16, 1930 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-5 Pages ID# 260-261) (also DRJN Exh. 2).

Notice of Intention to Drill New Well filed by Ohio Oil Company with State of California, Department of Natural Resources Division of Oil and Gas, dated February 19, 1931 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-6 Pages ID# 263-264) (also DRJN Exh. 3).

History of Oil or Gas Well filed by Paul L. Henderson, Chief Geologist, with State of California, Department of Natural Resources Division of Oil and Gas, dated April 25, 1931 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-6 Page ID# 265) (also DRJN Exh. 3).

Agreement between Recreation Gun Club and Ohio Oil Company dated January 21, 1939 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-7 Pages ID# 267-268) (also DRJN Exh. 4).

Supplementary Notice filed by Ohio Oil Company with State of California, Department of Natural Resources Division of Oil and Gas, dated January 3, 1941 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-11 Page ID# 285) (also DRJN Exh. 8).

Partial Release executed by Ohio Oil Company to Recreation Gun Club dated July 10, 1941 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-8 Pages ID#270-272) (also DRJN Exh. 5).

Lease between Recreation Gun Club and Dow Chemical Company dated July 15, 1941 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-9 Pages ID# 274-279) (Bates numbers MAR00000013 - 18).

Subsequent Work Report filed by Dow Chemical Company with State of California, Department of Natural Resources Division of Oil and Gas, dated November 17, 1941 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-11 Page ID# 283) (also DRJN Exh. 8).

Letter from E.H. Musser, State Oil and Gas Deputy Supervisor, dated November 24, 1941 (this case

1

Appendix B

record citation: Case 2:20-cv-08008-DSF-JPR Document 36-10 Page ID#281) (also DRJN Exh. #7).

Notice of Intention to Abandon Well filed by Dow Chemical Company with State of California, Department of Natural Resources Division of Oil and Gas, dated February 15, 1956 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-12 Page ID# 287) (also DRJN Exh. 9).

Report on Proposed Operations by State Oil and Gas Deputy R. W. Walling (partially legible name) dated February 21, 1956 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-12 Page ID# 288) (also DRJN Exh. 9).

Special Report on Operations Witnessed by State Oil and Gas Deputy R.W. Walling (partially legible name), describing operations conducted on April 16-17, 1956 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-12 Page ID# 289) (also DRJN Exh. 9).

Report of Well Abandonment by State Oil and Gas Deputy Supervisor R.W. Walling (partially legible name) dated April 27, 1956 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-12 Page ID# 290) (also DRJN Exh. 9).

Quitclaim Deed from Ohio Oil Company to the County of Los Angeles dated November 24, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-13 Pages ID# 292-294 (also DRJN Exh. 10).

Quitclaim Deed from Recreation Gun Club to County of Los Angeles dated December 1, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-14 Pages ID#296-298) (also DRJN Exh. 11).

Report of Property and Well Transfer by State Oil and Gas Deputy Supervisor William C. Bailey dated December 23, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document ID#36-15 Page ID# 300) (also DRJN Exh. #12).

Report on Proposed Change of Well Designation by State Oil and Gas Deputy Supervisor William C. Bailey dated December 23, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-15 Page ID #301) (also DRJN Exh. #12).

Notice of Intention to Abandon Well filed by County of Los Angeles with State of California, Department of Natural Resources Division of Oil and Gas, dated December 9, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 303) (also DRJN Exh. 13).

Report on Proposed Operations by State Oil and Gas Deputy William C. Bailey dated January 2, 1959 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 304) (also DRJN Exh. 13).

2

Appendix B

History of Oil or Gas Well filed by the County of Los Angeles with the State of California, Department of Natural Resources Division of Oil and Gas, dated April 8, 1959 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 306) (also DRJN exh. #13).

Special Report on Operations Witnessed by State Oil and Gas Deputy William C. Bailey dated April 9, 1959 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 305) (also DRJN Exh. 13).

Report of Well Abandonment by State Oil and Gas Deputy Supervisor William C. Bailey dated April 14, 1959 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 307) (also DRJN exh. #13).

Corporation Quitclaim Deed from Dow Chemical Company to County of Los Angeles executed December 4, 1961, recorded in Official Records of Los Angeles County, December 11, 1961, Instrument No. 5318, Book D 1447, pages 297-300 (Bates numbers LACREG00000379 - 382).

Development Plan, dated October 23, 2013, attached as Exhibit B to Lease Agreement by and between County of Los Angeles and MDR Hotels, LLC, dated July 31, 2017 (Bates numbers MDR0000698 - 703).

Lease Agreement by and between County of Los Angeles and MDR Hotels, LLC dated July 31, 2017 (excerpts) (Bates numbers MDR0000569, MDR0000576, MDR0000587 - 88, MDR0000674 - 675).

**Docket Entries:**

Complaint, MDR Hotels, LLC v. Marathon Oil Company, The Dow Chemical Company, and Does 1 through 50, Case No. 2:20-cv-08008-DSF-JPR (C.D. Cal.), July 31, 2020.

Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss, Case No. 2:20-cv-08008-DSF-JPR (C.D. Cal.), November 2, 2020, Document 36-1, Pages ID #206-240.

Plaintiff MDR Hotel's Opposition to Defendants' Motion to Dismiss, Case No. 2:20-cv-08008-DSF-JPR (C.D. Cal.), December 14, 2020, Document 38, Pages ID #373-401.

Defendants' Reply in Support of Motion to Dismiss, Case No. 2:20-cv-08008-DSF-JPR (C.D. Cal.), December 21, 2020, Document 43, Pages ID #418-437.

Order Re: Defendants' Motion to Dismiss, Case No. 2:20-cv-08008-FLA-JPR (C.D. Cal.), April 20, 2021, Document 54, Pages ID# 526-539.

**Academic Literature:**

LAWRENCE M. FRIEDMAN, A HISTORY OF AMERICAN LAW (2nd ed. 1986)

3

3 AMERICAN LAW OF PROPERTY: A TREATISE ON THE LAW OF PROPERTY IN THE UNITED STATES (A. James Casner ed., 1952)

3 W. L. SUMMERS, THE LAW OF OIL AND GAS: A TREATISE COVERING THE LAW RELATING TO THE PRODUCTION OF OIL AND GAS FROM PUBLIC AND PRIVATE LANDS AND THE TRANSPORTATION THEREOF (1958)

**Cases:**

*Clark v. J.L. Warner & Co.,* 6 La. Ann. 408 (1851)

*Graff v. Middleton,* 43 Cal. 341 (1872)

*Hamman v. Keigwin,* 39 Tex. 34 (1873)

*Allison v. Thomas,* 72 Cal. 562, 14 P. 309 (1887)

*Title Ins. & Trust Co. v. Amalgamated Oil Co.,* 63 Cal. App. 29, 218 P. 71 (1923)

*Hill v. General Petroleum Corp.,* 128 Cal. App. 284, 16 P.2d 1035 (1932)

*Gibbs v. Seeger,* 130 Cal. App. 123, 19 P.2d 514 (1933)

*Schuman v. McLain,* 177 Okla. 576, 61 P.2d 226 (1936)

*Bell v. Rio Grande Oil Co.,* 23 Cal. App.2d 436, 73 P.2d 662 (1937)

*In re Rose's Estate v. Hagler,* 23 Cal. App.2d 686, 73 P.2d 1232 (1937)

*La Laguna Ranch Co. v. Dodge*, 18 Cal.2d 132, 114 P.2d 351 (1941)

*Stockton v. Weeks,* 51 Cal. App.2d 447, 125 P.2d 110 (1942)

*Westlake v. Silva.* 49 Cal. App.2d 476, 121 P.2d 872 (1942)

*Superior Oil Co. v. Dabney*, 147 Tex. 51, 211 S.W.2d 563 (1948)

*Shapiro v. Hu,* 188 Cal. App.3d 324, 233 Cal. Rptr. 470 (1986)

*Beck Development Co., Inc. v. Southern Pacific Transportation Co.,* 44 Cal. App. 4th 1160, 52 Cal. Rptr.2d 518 (1996)

*City of Manhattan Beach v. Superior Court*, 52 Cal. Rptr.2d 82, 914 P.2d 160 (1996)

4

Appendix B

**Other Materials:**

6 ENCYCLOPEDIA OF MISSISSIPPI LAW: OIL AND GAS LAW §53:34 (2nd ed. 2021)

Miss. Code Ann. §89-1-37

Ohio Revised Code Annotated §5302.11

162 A.L.R. 556, *Rights or Interests Covered by Quitclaim Deed* (1946) (with later Supplement)

5

# Report Exhibits

**Exhibit 1.** Oil and Gas Lease between Recreation Gun Club (lessor) and A.A. Curtice (lessee) dated December 28, 1929 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-4 Page ID# 258) (also Defendants' Request for Judicial Notice in Support of Motion to Dismiss (hereinafter "DRJN") Exh. 1).

**Exhibit 2.** Assignment of Oil and Gas Lease between A.A. Curtice et. al. and Ohio Oil Company dated January 16, 1930 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-5 Pages ID# 260-261) (also DRJN Exh. 2).

**Exhibit 3.** Notice of Intention to Drill New Well filed by Ohio Oil Company with State of California, Department of Natural Resources Division of Oil and Gas, dated February 19, 1931 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-6 Pages ID# 263-264) (also DRJN Exh. 3).

**Exhibit 4.** History of Oil or Gas Well filed by Paul L. Henderson, Chief Geologist, with State of California, Department of Natural Resources Division of Oil and Gas, dated April 25, 1931 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-6 Page ID# 265) (also DRJN Exh. 3).

**Exhibit 5.** Agreement between Recreation Gun Club and Ohio Oil Company dated January 21, 1939 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-7 Pages ID# 267-268) (also DRJN Exh. 4).

**Exhibit 6.** Supplementary Notice filed by Ohio Oil Company with State of California, Department of Natural Resources Division of Oil and Gas, dated January 3, 1941 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-11 Page ID# 285) (also DRJN Exh. 8).

**Exhibit 7.** Partial Release executed by Ohio Oil Company to Recreation Gun Club dated July 10, 1941 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-8 Pages ID#270-272) (also DRJN Exh. 5).

**Exhibit 8.** Lease between Recreation Gun Club and Dow Chemical Company dated July 15, 1941 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-9 Pages ID# 274-279) (Bates numbers MAR 00000013-18).

**Exhibit 9.** Subsequent Work Report filed by Dow Chemical Company with State of California, Department of Natural Resources Division of Oil and Gas, dated November 17, 1941 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-11 Page ID# 283) (also DRJN Exh. 8).

1

**Exhibit 10.** Letter from E.H. Musser, State Oil and Gas Deputy Supervisor, dated November 24, 1941 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-10 Page ID#281) (also DRJN Exh. #7).

**Exhibit 11.** Notice of Intention to Abandon Well filed by Dow Chemical Company with State of California, Department of Natural Resources Division of Oil and Gas, dated February 15, 1956 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-12 Page ID# 287) (also DRJN Exh. 9).

**Exhibit 12.** Report on Proposed Operations by State Oil and Gas Deputy R. W. Walling (partially legible name) dated February 21, 1956 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-12 Page ID# 288) (also DRJN Exh. 9).

**Exhibit 13.** Special Report on Operations Witnessed by State Oil and Gas Deputy R.W. Walling (partially legible name), describing operations conducted on April 16-17, 1956 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-12 Page ID# 289) (also DRJN Exh. 9).

**Exhibit 14.** Report of Well Abandonment by State Oil and Gas Deputy Supervisor R.W. Walling (partially legible name) dated April 27, 1956 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-12 Page ID# 290) (also DRJN Exh. 9).

**Exhibit 15.** Quitclaim Deed from Ohio Oil Company to the County of Los Angeles dated November 24, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-13 Pages ID# 292-294 (also DRJN Exh. 10).

**Exhibit 16.** Quitclaim Deed from Recreation Gun Club to County of Los Angeles dated December 1, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-14 Pages ID#296-298) (also DRJN Exh. 11).

**Exhibit 17.** Report of Property and Well Transfer by State Oil and Gas Deputy Supervisor William C. Bailey dated December 23, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document ID#36-15 Page ID# 300) (also DRJN Exh. #12).

**Exhibit 18.** Report on Proposed Change of Well Designation by State Oil and Gas Deputy Supervisor William C. Bailey dated December 23, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-15 Page ID #301) (also DRJN Exh. #12).

**Exhibit 19.** Notice of Intention to Abandon Well filed by County of Los Angeles with State of California, Department of Natural Resources Division of Oil and Gas, dated December 9, 1958 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 303) (also DRJN Exh. 13).

2

**Exhibit 20.** Report on Proposed Operations by State Oil and Gas Deputy William C. Bailey dated January 2, 1959 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 304) (also DRJN Exh. 13).

**Exhibit 21.** History of Oil or Gas Well filed by the County of Los Angeles with the State of California, Department of Natural Resources Division of Oil and Gas, dated April 8, 1959 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 306) (also DRJN exh. #13).

**Exhibit 22.** Special Report on Operations Witnessed by State Oil and Gas Deputy William C. Bailey dated April 9, 1959 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 305) (also DRJN Exh. 13).

**Exhibit 23.** Report of Well Abandonment by State Oil and Gas Deputy Supervisor William C. Bailey dated April 14, 1959 (this case record citation: Case 2:20-cv-08008-DSF-JPR Document 36-16 Page ID# 307) (also DRJN exh. #13).

**Exhibit 24.** Corporation Quitclaim Deed from Dow Chemical Company to County of Los Angeles executed December 4, 1961, recorded in Official Records of Los Angeles County, December 11, 1961, Instrument No. 5318, Book D 1447, pages 297-300 (Bates numbers LACREG 0000379-382).

**Exhibit 25.** Development Plan, dated October 23, 2013, attached as Exhibit B to Lease Agreement by and between County of Los Angeles and MDR Hotels, LLC, dated July 31, 2017 (Bates numbers MDR 0000698-703).

**Exhibit 26.** Lease Agreement by and between County of Los Angeles and MDR Hotels, LLC dated July 31, 2017 (excerpts) (Bates numbers MDR 0000569, MDR 0000576, MDR 0000587-588, MDR 0000674-675).

3

Case 2:20-cv-08008-FLA-JPR   Document 131-1   Filed 03/10/23   Page 34 of 86   Page ID
#:6268
Case 2:20-cv-08008-DSF-JPR   Document 3   Filed 11/02/20   Page 2 of 2   Page ID #:258

Exhibit 1

242 2cv Book No. 3

IN THE MUNICIPAL COURT, CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA.

Frederick Ray,          Plaintiff,          Case No. 88703
          vs.
James Gelfuso, et al.,   Defendant.          ABSTRACT OF JUDGMENT

Judgment Creditor, Frederick Ray   Judgment Debtor, James Gelfuso   Amount of Judgment
$500.03   Entered in Judgment Book No. -- at page --, on December 19, 1929.
     I CERTIFY that the above is a true and correct abstract of the judgment entered in
the above entitled case.        Date of issuance of this abstract, January 21, 1930.
(Municipal Court Seal)          W. S. Dinsmore, Clerk of Municipal Court,
          City of Los Angeles, County of Los Angeles, State of California.
          By C. M. Clapp, Deputy.
#1169. Copy of original recorded at request of Attorney, Feb 1, 1930, 10:29 A.M.
Copyist #39. Compared - O.L.Logan, County Recorder, By
$1.00-2          En Clan (?) Deputy.

----oooOooo----

OIL AND GAS LEASE     THIS LEASE made and entered into this 28th day of December, 1929,
by and between Recreation Gun Club, party of the first part, hereinafter called "Lessor"
and A. A. Curtice, party of the second part, hereinafter called "Lessee";
          WITNESSETH:     WHEREAS, by certain agreement entitled "Oil and Gas Lease" dated
the 5th day of February, 1929, the Lessor leased, let and demised unto the Lessee with the
sole and exclusive right to the Lessee to explore, mine and operate, take, store, remove
and dispose of oil, gas, casing-head gas and other hydrocarbon substances from all that
certain tract of land situated in the County of Los Angeles, State of California,
described as follows, to-wit:-
          Lots 1, 2 and 3 of the Recreation Gun Club's Tract as per map recorded in Book 13,
Page 131 in the office of the County Recorder of Los Angeles County, State of
California, subject to any right, title or interest in and to Lot 3 claimed by Dana
Burke, and containing 258 acres, more or less,          for a period of twenty (20)
years from the date of said Oil and Gas Lease as therein set forth; and
          WHEREAS, by a certain agreement dated the 25th day of October, 1929, the Lessor and
Lessee amended said Oil and Gas Lease with respect to the payment of taxes thereunder;
          NOW, THEREFORE, the parties hereto do hereby ratify and confirm said Oil and Gas
Lease and said Agreement and the Lessor does hereby lease, let and demise unto the Lessee
the tract above described with the sole and exclusive right to the Lessee to explore,
mine and operate, take, store, remove and dispose of oil, gas, casing-head gas and other
hydrocarbon substances from the above described tract on the terms, conditions and pro-
visions more particularly set forth in said Oil and Gas Lease and said Agreement.
          IN WITNESS WHEREOF the parties hereto have executed this Agreement the day and year
first above written.
(Corporate Seal)
          Recreation Gun Club
          By T. L. Ely, President.
          By Guy L. Gunner, Secretary.
          A. A. Curtice          Lessor.
          Lessee.
WRG          State of California, County of Los Angeles) ss     On this 30th day of December, 1929,
before me, Jos. C. Jenkins, a Notary Public in the County and State aforesaid, residing
therein, duly commissioned and sworn, personally appeared T. L. Ely and Guy L. Gunner,
known to me to be the President and Secretary, respectively, of Recreation Gun Club, the
corporation that executed the within instrument, and acknowledged to me that such cor-
poration executed the same.          In Witness Whereof, I have hereunto set my hand
and affixed my official seal the day and year in this certificate first above written.
(Notarial Seal)          Jos. C. Jenkins, Notary Public
in and for said County of Los Angeles, State of California.
State of California, County of Los Angeles) ss.     On this 16th day of January, in the
year nineteen hundred and 30, A.D., before me, Edna Taft, a Notary Public in and for the
said County of Los Angeles, State of California, residing therein, duly commissioned and
sworn, personally appeared A. A. Curtice, personally known to me to be the person whose name is
subscribed to the within instrument, and acknowledged to me that he executed the same.
     In Witness Whereof, I have hereunto set my hand and affixed my official seal the
day and year in this certificate first above written.
(Notarial Seal)          Edna Taft, Notary Public
in and for Los Angeles County, State of California.
#179. Copy of original recorded at request of Title Ins. & Tr. Co., Feb 1, 1930, 5:30 A.M.
#1100 #39. Compared - O.L.Logan, County Recorder, By          Deputy.

Exhibit 2

**Book No. 9506**

598

State of California, County of Los Angeles,) ss.  On this 25th day of January, A.D., 1930, before me, Neil W. Hibbard, a Notary Public in and for the County of Los Angeles, State of California, residing therein, duly commissioned and sworn, personally appeared Frank L. Meline and Leonore M. White, and Donal H. Welch, known to me to be the persons described in, and whose names are subscribed to, the foregoing instrument, as Trustees for the Franklin Park Company, a Trust, and they acknowledged to me that they executed the same as such Trustees.  WITNESS my hand and official seal;

(Notarial Seal)                                         Neil W. Hibbard, Notary Public
in and for said County and State. My com. exp. Sept. 24, 1933.
#323. Copy of original recorded at request of Calif. Title Ins. Co., Feb. 3. 1930 8:30 A.M.
Copyist #29. Compared. C. L. Logan, County Recorder. By  *A. M. Zenner, es*  Deputy.
$1.90-11

ASSIGNMENT OF OIL AND GAS LEASE

THIS AGREEMENT, made and entered into this 18th day of January, 1930, by and between A. A. Curtice and Kathryn Ott Curtice, his wife, of Los Angeles, California, parties of the first part, and THE OHIO OIL COMPANY, an Ohio corporation, party of the second part;  WITNESSETH: WHEREAS, under date of February 5, 1929, Recreation Gun Club and said A. A. Curtice entered into a certain Oil and Gas Lease covering the following described tract of land in the County of Los Angeles, State of California, to-wit:

Lots 1, 2 and 3 of the Recreation Gun Club's Tract, as per map recorded in Book 15, Page 131 of Maps in the Office of the County Recorder of Los Angeles County, State of California; subject to any right, title or interest in and to Lot 3 claimed by Dana Burke; and containing 258 acres, more or less; which oil and gas lease was amended under date of October 26, 1929, with respect to the payment of taxes; and

WHEREAS, said Oil and Gas lease of February 5, 1929, specifically provides that the same may be assigned to The Ohio Oil Company; and WHEREAS, a certain Oil and Gas Lease was made and entered into between said parties under date of December 20, 192., constituting what is known as a "Notice Lease" wherein said oil and gas lease of February 5, 1929, as amended on October 26, 1929, is referred to, which Oil and Gas Lease dated December 20, 1929, was recorded in conjunction herewith on the records in the Office of the County Recorder of Los Angeles County; and WHEREAS, said above described property is a part of the subject matter of a certain "Operating Agreement" dated March 13, 1929, by and between A. A. Curtice and Kataryn Ott Curtice, his wife, and other parties, . . The Ohio Oil Company, party of the second part herein; and WHEREAS, said Operating Agreement dated March 13, 1929, provides that upon request the parties of the first part herein will execute and deliver to The Ohio Oil Company a proper assignment of their interests in said Oil and Gas Lease;  NOW, THEREFORE, for and in consideration of the premises and the sum of Ten Dollars ($10.00) and other valuable considerations, receipt of which is hereby acknowledged, the parties of the first part, owners of said Oil and Gas Lease as amended, and all rights thereunder or incident thereto, do hereby sell, convey, assign, transfer and set over to The Ohio Oil Company, an Ohio corporation, its successors and assigns, all the right, title and interest of said original Lessee and the parties of the first part, said present owners, in and to the aforesaid original Oil and Gas Lease, as amended, and said so-called "Notice Lease", and in and to the lands covered thereby as above described; and for the same consideration the parties of the first part do hereby covenant with the said party of the second part, its successors and assigns that they are the lawful owners of the said Original Oil and Gas Lease as amended, and said so-called "Notice Lease", and all rights and interests thereunder and have good right and authority to sell, convey and assign the same and that said rights, interests and property are free and clear of all liens and encumbrances, and that the parties of the first part will warrant and defend the same against the lawful claims and demands of all persons whomsoever.    This assignment is executed and delivered subject to all the terms and provisions of said Operating Agreement of March 13, 1929.

IN WITNESS WHEREOF, the parties of the first part have executed this Assignment the day and year first above written.

                                              A. A. Curtice.
                                              Kathryn Ott Curtice:
                                              Parties of the First Part.

State of California, County of Los Angeles,) ss.  On this 18th day of January,1930, before me, Edna Taft, a Notary Public in and for said County and State, residing therein, duly commissioned and sworn, personally appeared A. A. Curtice and Kathryn Ott Curtice, his wife, known to me to be the persons whose names are subscribed to the within instru-

Case 2:20-cv-08008-FLA-JPR   Document 131-1   Filed 03/10/23   Page 36 of 86   Page ID
Case 2:20-cv-08008-DSF-JPR   Document 62-10   Filed 11/02/20   Page 3 of 3   Page ID #:261
#:6270

Exhibit 2

9586   399

ment, and acknowledged to me that they executed the same.   IN WITNESS WHEREOF, I have
hereunto set my hand and affixed my official seal the day and year in this certificate
first above written.
(Notarial Seal)                                                Edna Tuft, Notary Public
in and for said County of Los Angeles, State of California.
#180, Copy of original recorded at request of Title Ins. & Tr. Co, Feb 5 1930 8:00 A.M.
Copyist #29, Compared. C. L. Logan, County Recorder. By A. M. Pigeumer (D.S.) Deputy.
$1.50-3

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS; That Sibyl F. Bennett, hereinafter designated
as the Seller, for and in consideration of the sum of Seventy-five and No/100 Dollars,
lawful money of the United States of America, to her in hand paid, by M. Martin, herein-
after designated as the Buyer, the receipt whereof is hereby acknowledged, does by these
presents grant, bargain, sell and convey unto the said Buyer, her executors, administra-
tors and assigns;

| | |
|---|---|
| 1 R15 #302 3-pc. Living Room Suite | 1 Brass Vase Lamp |
| 1 Fancy Velure Pillow | 1 Vase Lamp Shade |
| 1 R2 #52 Bed (Walnut) #415 | 1 Mohawk Rug _ 9x12 |
| 1 R3 #62 Walnut Vanity | 1 4/6 White Knight Mattress |
| 1 R2 #63 Walnut Bench | 1 4/6 64-coil Spring |
| 1 R3 #62 Walnut Chest | 1 Pair Queen Pillows |
| 1 Glass Jr. Shade | 1 22x54 Mohawk Rug |
| 1 Onyx Jr. Standard. | 1 Illinois Refrigerator #5102 |

TO HAVE AND TO HOLD the same to the said Buyer, his executors, administrators and
assigns forever.   And the said Seller does for his heirs, executors and administrators
covenant and agree to and with the said Buyer, his executors, administrators and assigns,
to warrant and defend the title to the said property, goods and chattels hereby conveyed,
against the just and lawful claims and demands of all persons whomsoever.

WITNESS his hand and seal this 1st day of February, 1930.
Signed, Sealed and Delivered in the Presence of
Harry Marcus,                                               Sibyl F. Bennett. (Seal)
State of California, County of Los Angeles; ss.   On this 1st day of Feb., 1930,
before me, C. Jack Gaines, a Notary Public in and for the said County and State, person-
ally came Sibyl F. Bennett, known to me to be the person whose name is subscribed to the
above instrument and acknowledged to me that she executed the same.   IN WITNESS WHEREOF,
I have hereunto set my hand and seal on the day and year first above mentioned.
(Notarial Seal)                                        C. J. Gaines, Notary Public
in and for the County of Los Angeles, State of California. My com. exp. Dec. 14, 1930.
#1122, Copy of original recorded at request of Vandas, Feb 4 1930, 11:32 A.M.
Copyist #29, Compared. C. L. Logan, County Recorder. By A. M. Pigeumer (D.S.) Deputy.
$1.00-4

## DEED OF TRUST

THIS DEED OF TRUST, Made this 15th day of January, 1930, between D. A. E.
Thompson and Mary A. Thompson, his wife, herein called TRUSTOR, Citizens National Trust
& Savings Bank of Los Angeles, a National Banking Association, of Los Angeles, Califor-
nia, herein called Trustee, and Citizens National Trust & Savings Bank of Los Angeles,
herein called BENEFICIARY;   WITNESSETH; That Trustor hereby GRANTS to TRUSTEE, IN
TRUST, WITH POWER OF SALE, all that property in the City of and County of Los Angeles,
State of California, described as: Lot Twenty (20) in Block Fourteen (14) of Tract 8470,
as per map recorded in Book 68, Pages 93 to 99 inclusive of Maps, Records of said County.
Except all underground streams and all subsurface water other than for use upon said land.

FOR THE PURPOSE OF SECURING; FIRST, Payment of the indebtedness evidenced by one
promissory note (and any renewal or extension thereof) substantially in form as follows:
### STRAIGHT NOTE
$625.00                                     Los Angeles, California, January 15th, 1930.

Three (3) years after date, for value received, we, or either of us promise
to pay to Citizens National Trust & Savings Bank of Los Angeles, or order, at Los Ange-
les, California, the sum of Six Hundred Twenty-five and No/100 Dollars, with interest
from date until paid, at the rate of seven per cent per annum, payable quarterly. Should
interest not be so paid it shall thereafter bear like interest as the principal. Should
default be made in payment of interest when due, the whole sum of principal and interest
shall, at the option of the holder of this note, become immediately due. Principal and
interest payable in United States gold coin. If suit or action shall be instituted in
any Court to collect any sum becoming due on this note, the undersigned promise to pay
such sum as the Court may adjudge reasonable as attorney's fees in said suit or action.
This note is secured by a Deed of Trust to Citizens National Trust & Savings Bank of
Los Angeles, a National Banking Association of Los Angeles, California.
                                                        D. A. E. Thompson.
                                                        Mary A. Thompson.

FORM 105.  68219  6-29  10M
CALIFORNIA STATE PRINTING OFFICE





Exhibit 3

DIVISION OF OIL AND GAS
RECEIVED
FEB ~~ 19~~
LOS ANGELES, CA ~~~~

037-13798

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

### Notice of Intention to Drill New Well
This notice must be given before drilling begins

_____

Los Angeles _____, Cal. **February 19th** 19**31**

MR. **E. Huguenin** _____

Deputy State Oil and Gas Supervisor

**611 New Orpheum Bldg., Los Angeles,** _____Cal.

DEAR SIR:

In compliance with Section 17, Chapter 718, Statutes of 1915, as amended, notice is hereby given that it is our intention to commence the work of drilling well No. **10** , Sec. **21** , T. **2 S.** , R. **15 W.** , S.B.B. & M., **Del Rey** _____ Oil Field, **Los Angeles** _____County.

The well is _1918.4_ feet N. ~~or S.~~ and _114.88_ feet E. ~~or W.~~ from **SEE ATTACHED SKETCH** _____ F.G.H.
(Give location in distance from section corners or other corners of legal subdivision)    SW.Cor. Recreation Gun Club lease.

The elevation of the derrick floor above sea level is _____**8**_____feet.

We propose to use the following strings of casing, either cementing or landing them as here indicated:

| Size of Casing, Inches | Weight, Lb. Per Foot | New or Second Hand | Depth | Landed or Cemented |
|---|---|---|---|---|
| 18" (8-8) | 84 | New | 690' ± | Cemented |
| 11¾" | 54 | " | 3500' ± | " |
| | | | | |
| | | | | |

It is understood that if changes in this plan become necessary we are to notify you before cementing or landing casing.

We estimate that the first productive oil or gas sand should be encountered at a depth of about_____feet, more or less.

Respectfully yours

Address **1250 Subway Terminal Bldg.**        **THE OHIO OIL COMPANY**
(Name of Company or Operator)

Telephone number **Mutual 3251**        By *Fredericks D. Anderson*
Superintendent---California Division

ADDRESS NOTICE TO DEPUTY STATE OIL AND GAS SUPERVISOR IN CHARGE OF DISTRICT WHERE WELL IS LOCATED

| Maps | | | | Forms |
|---|---|---|---|---|
| F.G.H. | | | ✓ | 121 ✓ |

2/25/31

Lease consists of: **258 Acres** _____

known as **Recreation Gun Club Tract** _____

818



Exhibit 3

THE OHIO OIL CO.
MAP SHOWING
LOCATION OF OIL WELL
SECTION 21, T.2S, R.15W, S.B.B.&M.
DEL REY OIL FIELD
VENICE, L.A. COUNTY, CALIF.
Scale: 1"=300'            Feb. 1931

THE OHIO OIL COMPANY
(Recreation Gun Club)
LOT 2

Location of
The Ohio Oil Co. Well
Recreation Gun Club No 10
1918.42' Northerly along West line of Lot 3
from SW corner of Rec. Gun Club Tract
thence Easterly at \S. 114.88 Elev. 8.'

SILVER STRAND TRACT

LOT 4

SECT. 21 T 2S R 15W
SECT. 28 T 2S R 15W

N

52ND        AVE.        EcB.

FORM 103.  78346 7-30 10M
CALIFORNIA STATE PRINTING OFFICE



STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

### History of Oil or Gas Well

Exhibit 4

DIVISION OF OIL AND GAS
RECEIVED
MAY 11 1931
LOS ANGELES, CALIFORNIA

FIELD _DEL REY_                                    COMPANY _THE OHIO OIL COMPANY_

Sec. _21_ , T. _2 S_ , R. _15 W_ , S.B. B. & M., Well No. _RECREATION GUN CLUB #10_

Signed _Paul L. Henderson_ .

Date _April 25th, 1931_                    Title _Chief Geologist_

*President, Secretary or Agent*

It is of the greatest importance to have a complete history of the well.  Please state in detail the dates of redrilling, together with the reason for the work and its results.  If there were any changes made in the casing, state fully, and if any casing was "sidetracked" or lost in the well, give its size and location.  If the well has been dynamited, give date, size, position, and number of shots.  If plugs or bridges were put in to test for water, state kind of material used, position, and results of pumping or bailing.

| | |
|---|---|
| Mar. 17, 1931 | Commenced drilling 25 1/2" hole. |
| Mar. 18 | Drilled and reamed to 686'. Cemented 686' of 18 5/8" American Double Lock Casing with 500 sacks of Blue Diamond Oil Well cement. |
| Mar. 19 To Mar. 21 | Stood cemented 20 hrs. Commenced drilling 17 1/2" hole. Drilled to 2200'. Commenced coring 17 1/2" hole. |
| To Mar. 27 | Cored to 3082 ft. |
| Mar. 28 | Drilled to 3300 ft. |
| Mar. 29 To Apr. 1 | Cored to 3426 ft. Reamed to 3426'. Cemented 3423 ft. of 11 3/4" Republic 54#, 8 thread casing with 600 sacks of Victor Oil Well Cement. Last 100 sacks treated. |
| To April 5 | Stood cemented. Bailed to 1500 ft. at 11:00 PM |
| Apr. 6 | Found fluid at 1500 at 9:00 AM  Casing test approved. Found top plug at 3373. Drilled out to 3431. Ran 2 1/2" tubing to 2675'. |
| Apr. 7 | Swabbed to 1500 ft. at 1:30 PM |
| Apr. 8 | Found fluid at 1430 ft. at 8:30 AM  Bottom sample consisted of oily, gas cut mud. W. S. O. approved by S. M. B. |
| Apr. 9 | Commenced coring 10 5/8" hole. |
| Apr. 13 | Cored and reamed to 3906'. Hung 507' of 6 5/8" L. H. Insert liner including 479 ft. perforated at 3903 ft. |
| To Apr. 16 | Washed hole. Ran 2½" tubing to 3608 ft. with packer @ 3375'. Swabbed well for 3 days. Well flowed occasional heads. |
| Apr. 17 | Pulled tubing. Repaired packer. Ran tubing with packer at 3380' Swabbed well in at 10:00 PM. I. P.   245 bbls. - 19.6° gr. - 0.4% cut. |
| Apr. 22, 1931 | Production 221 bbls - 20.4° - 10% |

820

Exhibit 5

undertaking, or new surety, in lieu of the property which has been or is about to be
attached....   GIVEN under my hand and seal of the SUPERIOR COURT of the STATE of
CALIFORNIA in and for the CITY AND COUNTY OF SAN FRANCISCO.

DATED FEBRUARY 4th, 1939.

(SEAL)                                   H. A. van der KEE, CLERK

By F. H. KOCKLER, DEPUTY CLERK

WRIT OF ATTACHMENT

NOTICE OF REAL ESTATE ATTACHED

OFFICE OF THE SHERIFF OF LOS ANGELES COUNTY, CALIFORNIA:

NOTICE is hereby given that under and by virtue of a writ of ATTACHMENT to
me issued and delivered, and which the annexed is a true copy, I have, this, the 9th day
of FEBRUARY 1939, at the COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, levied upon and at-
tached all of the right, title and interest of DANIEL H. THOMASON, also known as D. H.
THOMASON, also known as D. A. HAGENS, also known as ROBERT B. BILLINGS, also known as
GOWLAND STEWART, also known as FRANK STEWART, also known as GEORGE STEWART, individually
and doing business under the fictitious name and style of SACRAMENTO AUTO SALES, defend-
ants named in said writ, in and to certain real property situate in the said COUNTY OF
LOS ANGELES, STATE OF CALIFORNIA, and more particularly described as follows, to-wit:

BUNGALOW COURT known as VALENCIA COURT, comprising numbers 1457-1459-1451-
1453-1455-1457 and 1459 WEST 16th STREET, LOS ANGELES, CALIFORNIA, the legal description
as follows:         Lot 18, Block 4, CITY CENTRE TRACT as per map thereof recorded
in Book 13, MISCELLANEOUS RECORDS, page 11.

E. W. BISCAILUZ, SHERIFF

By L. M. LEONARD, DEPUTY

#1517. Copy of original  recorded at request of SHERIFF, FEB.9,1939, 3:51 P.M.
Copyist fees. Compared, MAME B. BEATTY, COUNTY RECORDER, BY _____ West Co   DEPUTY.
61749-G.P.

AGREEMENT

THIS AGREEMENT, made and entered into this 31st day of JANUARY, 1939, by
and between RECREATION GUN CLUB, a California corporation, party of the first part, here-
inafter termed "RECREATION" and THE OHIO OIL COMPANY, an OHIO corporation, party of the
second part, hereinafter termed "OHIO",        WITNESSETH:

THAT, WHEREAS, a certain oil and gas lease was made and entered into by and
between RECREATION, as lessor, and A. A. CURTICE, as lessee, dated FEBRUARY 5, 1929, cov-
ering the following described tract of land situate in the COUNTY OF LOS ANGELES, STATE
OF CALIFORNIA, to-wit:

LOTS 1, 2 and 3, of the RECREATION GUN CLUB'S TRACT as per map recorded in
Book 15, Page 131 of Maps, in the office of the COUNTY RECORDER OF LOS ANGELES COUNTY,
STATE OF CALIFORNIA.        SUBJECT TO any right, title  or interest in and to LOT
3, claimed by DANA BUNER, and containing 288 acres  more or less, which said lease is
the "OIL AND GAS LEASE" referred to in that certain agreement entered  into by and be-
tween RECREATION and the said A. A. CURTICE, dated DECEMBER 28, 1929, and recorded Feb-
ruary 3, 1930, in Book 9672, Page 242, OFFICIAL RECORDS OF SAID COUNTY; and

WHEREAS, by agreement by and between RECREATION and the said A. A. CURTICE,
dated OCTOBER 26, 1929, the said lease was changed  and amended in certain particulars;
and      WHEREAS, said A. A. CURTICE and KATHRIN UTT CURTICE, his wife, assigned all
their right, title and interest as lessees and present owners of said oil and gas lease
to OHIO by assignment dated JANUARY 18, 1930, and recorded FEBRUARY 3, 1930, in Book
9596, Page 308, OFFICIAL RECORDS OF SAID COUNTY; and

WHEREAS, the "habendum clause" contained in said lease, being the first un-
numbered paragraph on page 2 thereof, has heretofore been amended  by the parties hereto
to provide for a term of "ten years from and after FEBRUARY 5, 1929, and so long there-
after" etc.,  as provided therein; and

WHEREAS, OHIO is desirous of  extending the term of said lease for an ad-
ditional period  of time of three years.

NOW, THEREFORE, in consideration of the premises and of the sum of TEN DOL-
LARS ($10.00) to RECREATION in hand paid by OHIO, receipt whereof is hereby acknowledged,
the parties hereto

Case 2:20-cv-08008-FLA-JPR   Document 131-1   Filed 03/10/23   Page 41 of 86   Page ID
Case 2:20-cv-08008-DSF-JPR   Document 62-75   Filed 11/02/20   Page 3 of 3   Page ID #:268
#:6275

Exhibit 5

16581   539

1. That the said habendum clause so changed and amended as aforesaid, shall
be and is hereby further changed and amended to read as follows, to-wit:

TO HAVE AND TO HOLD the same for a term of thirteen (13) years from and
after FEBRUARY 5, 1929, and so long thereafter up to twenty (20) years as the Lessor's
monthly royalty income shall equal or exceed an amount equal to one-twelfth (1/12) of
six (6) per cent of the appraised valuation of the realty value of the demised premi-
ses for that particular month, plus one-twelfth (1/12) of Lessor's one-sixth (1/6)
share of those taxes payable jointly by Lessor and Lessee as set forth in paragraph 14
hereinafter. Said appraised valuation to be made by a committee of three members, ap-
pointed as follows: one member to be appointed by the Lessor, one by the Lessee, and
the third by the other two.

2. Except as herein expressly modified, said lease shall remain in full
force and effect as expressed in said instrument of FEBRUARY 5, 1929, as amended.

3. This agreement shall inure to the benefit of and be binding upon the suc-
cessors and assigns of the respective parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be exe-
cuted the day and year first above written.

(CORPORATE SEAL)                      RECREATION GUN CLUB
                                      By C. F. A. LAST, PRESIDENT
                                      By GUY L. CUZNER, SECRETARY
                                          Party of the First Part

(CORPORATE SEAL)                      THE OHIO OIL COMPANY
                                      By G. E. McCULLOUGH, VICE-PRESIDENT
                                      By W. R. HODGE, ASS'T SECRETARY                OK
                                          Party of the Second Part                  HE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES)SS.       On this 21st day of JANUARY, 1929,
before me, ELEANOR ENNIS, A NOTARY PUBLIC in and for the said COUNTY AND STATE, resid-
ing therein, duly commissioned and sworn, personally appeared C. F. A. Last and GUY L.
CUZNER, known to me to be the PRESIDENT and SECRETARY of RECREATION GUN CLUB, the corpo-
ration that executed the within instrument, and acknowledged to me that such corpora-
tion executed the same.       IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my official seal the day and year in this certificate first above written.
(NOTARIAL SEAL)                       ELEANOR ENNIS, NOTARY PUBLIC
in and for said COUNTY OF LOS ANGELES, STATE OF CALIFORNIA. My commission expires -
My Commission Expires Dec. 8, 1941.
STATE OF OHIO, COUNTY OF HANCOCK)SS.       On this 31st day of JANUARY, 1929, be-
fore me, L. C. McCOX, a NOTARY PUBLIC in and for the County and State aforesaid, resid-
ing therein, duly commissioned and sworn, personally appeared G. E. McCULLOUGH and W.R.
Hodge, known to me to be the Vice-President and Asst. Secretary, respectively, of THE
OHIO OIL COMPANY, the corporation that executed the within instrument, and acknowledged
to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal
the day and year in this certificate first above written.
(NOTARIAL SEAL)                       L. C. McCOX, NOTARY PUBLIC
in and for said COUNTY OF HANCOCK, STATE OF OHIO. My commission expires -
                                      (L. C. McCOX) NOTARY PUBLIC
FINDLAY, HANCOCK COUNTY, OHIO. My commission expires Sept. 19, 1929.
#1147. Copy of original recorded at request of THE OHIO OIL COMPANY, FEB.9,1929, 1:54
P.M. Compared. NAME B. BEATTY,COUNTY RECORDER,  M. R. West Co. Deputy.
$1.50-11.2.

--------------------
U.S.I.R.S. $.50 Cancelled.       ASSOCIATION GRANT DEED       Tr. 5158  R 5444
                                                                 EC EM

CITIZENS NATIONAL TRUST & SAVINGS BANK OF LOS ANGELES, A NATIONAL BANKING
ASSOCIATION, organized under the STATUTES OF THE UNITED STATES OF AMERICA, for and in
consideration of the sum of TEN DOLLARS ($10.00) to it in hand paid, the receipt there-
of being hereby duly acknowledged, does hereby grant to EARL GEORGE CASTLEBERRY and
ELIZA MIRIAM CASTLEBERRY, husband and wife, as joint tenants, all that certain real
property situate in the CITY OF INGLEWOOD, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA,
more particularly described as follows, to-wit:

Case 2:20-cv-08008-FLA-JPR   Document 131-1   Filed 03/10/23   Page 42 of 86   Page ID
#:6276
Case 2:20-cv-08008-DSF-JPR   Document 36-1 Filed 11/02/20   Page 4 of 4   Page ID #:285

FORM 123. 62133 1-31 10M
CALIFORNIA STATE PRINTING OFFICE

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

Exhibit 6

### Supplementary Notice

MEMO

Venice _____ Cal. ____ Jan 3rd _____ 19 41

MR.   E.Huguenin

Deputy State Oil and Gas Supervisor

Los Angeles _____ Cal.

DEAR SIR:

Please be advised that our notice to you dated   Nov 12th,1940 _____ 19___,

stating our intention to____Abandon_____ well No. Recreation Gun Club # 10____,
                         (Drill, deepen, redrill, abandon)

Sec.___21____, T.__2 S__, R.__15 W__,_____ B. & M.   Del Rey _____Oil Field

____Los Angeles_____County, must be amended on account of changed or recently

discovered conditions.

The new conditions are as follows:

Hole has been filled with cement from bottom at 3906ʼ to 3376ʼ.
Hardness and location of the plug witnessed by R.S.M.B.

We now propose

The I-O-Dow Chemical Co has proposed to take this well and attempt to
develop Salt Water production.If and when satisfactory arrangements are
made,tests will be made by perforating casing above present plug at
3376ʼ.Your office will be notified if the well is transferred to the
above Company or if abandonment is completed.

Respectfully yours

The Ohio Oil Co.

(Name of Company)

By_____

823

Case 2:20-cv-08008-FLA-JPR   Document 131-1   Filed 03/10/23   Page 43 of 86   Page ID
#:6277
Case 2:20-cv-08008-DSF-JPR   Document 36   Filed 11/02/20   Page 2 of 4   Page ID #:270

Exhibit 7

350      15657

### PARTIAL RELEASE

KNOW ALL MEN BY THESE PRESENTS: That THE OHIO OIL COMPANY, an Ohio corporation,
A. A. CURTICE and KATHRYN OTT CURTICE, his wife, M. L. EFFINGER and LAURA A. EFFINGER,
his wife, and ROBERT B. MORAN and EDNA V. MORAN, his wife, owners, collectively, of les-
see's rights in and to that certain oil and gas lease by and between Recreation Gun Club,
a corporation, and the said A. A. Curtice, dated February 5, 1929, and covering that cer-
tain land situate in the County of Los Angeles, State of California, described as Lots 1,
2 and 3 of Recreation Gun Club's Tract as per map recorded in Book 13, Page 131 of Maps,
in the office of the County Recorder of said County, which said lease is the "Oil and Gas
Lease" referred to in the agreement of December 26, 1929, by and between the said Recre-
ation Gun Club and the said A. A. Curtice, and recorded February 3, 1930, in Book 9672 of
Official Records, Page 242, records of said county, do hereby release, surrender, quit-
claim and relinquish unto the said Recreation Gun Club all rights and titles whatsoever
acquired or held by them under said lease in and to those portions of the said lands as
set forth and described in the instrument marked Exhibit "A" attached hereto and made a
part hereof, and as delineated on the plat marked Exhibit "B" attached hereto and made a
part hereof, and the said lease is by these presents cancelled, surrendered, annulled and
held for naught in so far as concerns those portions of said lands as so set forth and
described in said Exhibit "A" and as so delineated on said Exhibit "B", EXCEPTING AND
SAVING unto the undersigned, however, all easements for rights-of-way necessary or con-
venient for the operations of said The Ohio Oil Company on the remainder of said lands.
It is intended that said lease shall remain in full force and effect as to all other
lands not specifically released, surrendered, quitclaimed or relinquished b.  .  s in-
strument.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed
as of this 10th day of July, 1941.

(Seal)                           THE OHIO OIL COMPANY,
                                 By G. E. McCullough, Vice-President
                                 Attest: W. R. Hodge, Ass't. Secretary

                                 A. A. Curtice
                                 Kathryn Ott Curtice
                                 M. L. Effinger
                                 Laura A. Effinger
                                 Robt. B. Moran
                                 Edna V. Moran

State of California, County of Los Angeles) ss.   On this 18th day of August, A.D., 1941,
before me, Alice F. Wieder, a Notary Public in and for said County and State, personally
appeared A. A. Curtice and Kathryn Ott Curtice, husband and wife, known to me,(or proved
to me on the oath of -),to be the persons whose names are subscribed to the within in-
strument, and acknowledged to me that they executed the same.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the
day and year in this certificate first above written.
(Seal)                               Alice E. Wieder, Notary Public in and
for said County and State.  My commission expires 7-5-43.

State of California, County of Los Angeles) ss.

On this 18th day of August,A.D., 1941, before me, Alice E. Wieder, a Notary Pub-
lic in and for said County and State, personally appeared Robt. B. Moran and Edna V.Moran,
husband and wife, known to me, (or proved to me on the oath of-), to be the persons whose
names are subscribed to the within instrument, and acknowledged to me that they executed
the same.   In Witness Whereof, I have hereunto set my hand and affixed my official seal
the day and year in this certificate first above written.
(Seal)                               Alice E. Wieder, Notary Public in and for
said County and State.  My commission expires 7-5-43.

State of California Ohio, County of Hancock) ss.   On this 22nd day of July, A.D., 1941,
before me, Anthony J. Kresser, a Notary Public in and for the said County and State, per-
sonally appeared G. E. McCullough, Vice-President,and W. R. Hodge, Asst. Secretary, both
known to me,(or proved to me on the oath of -), to be the Vice-President and Asst. Secre-
tary of the The Ohio Oil Company,the Corporation that executed the within instrument,
known to me to be the persons who executed the within instrument, on behalf of the Cor-
poration thereinnamed, and acknowledged to me that such Corporation executed the same.

Exhibit 7

18657      341

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day
and year in this certificate first above written.

(Seal)                              Anthony J. Kresser, Notary Public in and
for said County and State.  (Anthony J. Kresser) Notary Public, Hancock County, Ohio.
My commission expires March 4, 1944.

State of California, County of Sacramento) ss..  On this 15th day of August in the year
one thousand nine hundred and 41, before me, Valerie O'Connor, a Notary Public in and for
the County of Sacramento, State of California, residing therein, duly commissioned and
sworn, personally appeared M. L. Effinger and Laura A. Effinger known to me to be the
persons whose names - subscribed to the within instrument and acknowledged to me that they
executed the same.   In Witness Whereof, I have hereunto set my hand and affixed my of-
ficial seal at my office in the County of Sacramento the day and year in this certificate
first above written.

(Seal)                              Valerie O'Connor, Notary Public in and for
the County of Sacramento, State of California. My commission expires July 1, 1944.

FOREGOING PARTIAL RELEASE EFFECTIVE AS TO THE FOLLOWING PARCELS OF LAND
ALL SITUATE IN LOT 2 OF SAID RECREATION GUN CLUB'S TRACT, TO-WIT:

A. All right, title and interes  in and to a parcel of land ten (10) feet square,
the westerly side of which square is parallel to and distant 114.31 feet easterly from
the westerly line of said Recreation Gun Club's Tract, and the center point of which
square is a point located 1043.40 feet northerly along said westerly line from the south-
west corner of said Recreation Gun Club's Tract, thence easterly at right angles 119.31
feet, it being understood for convenience and clarity that the said center point so de-
scribed and the surface location of said The Ohio Oil Company's Recreation Gun Club Well
No. 7 are intended to be one and the same; ALSO all right, title and interest in and to
said Well No. 7, TOGETHER WITH all right, title and interest in and to the surface of a
parcel of land surrounding the ten foot square parcel in this paragraph above described
and extending to a depth of 100 feet vertically from the surface of said real property
and described as follows:  Commencing at a point on the westerly line of said Recreation
Gun Club's Tract, distant thereof 1,000 feet northerly from the southwest corner of said
Recreation Gun Club's Tract; thence running easterly at right angles 200 feet; thence at
right angles northerly 100 feet; thence at right angles westerly 200 feet; thence at right
angles southerly 100 feet to the point of commencement.

B. All right, title and interest in and to a parcel of land ten (10) feet square,
the westerly side of which is parallel to and distant 111.42 feet easterly from the west-
erly line of said Recreation Gun Club's Tract, and the center point of which is 1643.42
feet northerly along said westerly line from the southwest corner of said Recreation Gun
Club's Tract, thence easterly at right angles 116.42 feet, it being understood for con-
venience and clarity that the said center point so described and the surface location of
said The Ohio Oil Company's Recreation Gun Club Well No. 9 are intended to be one and the
same; ALSO all right, title and interest in and to said Well No. 9, TOGETHER WITH all
right, title and interest in and to the surface of a parcel of land surrounding the ten
foot square parcel in this paragraph above described and extending to a depth of 100 feet
veritcally from the surface of said real property and described as follows: Commencing at
a point on the westerly line of said Recreation Gun Club's Tract, distant thereon 1600
feet northerly from the southwest  corner of said Recreation Gun Club's Tract; running
thence easterly at right angles 200 feet; thence at right angles northerly 100 feet; thence
at right angles westerly 200 feet; thence  at right angles southerly 100 feet to the point
of commencement.

C. All right, title and interest in and to a parcel of land ten (10) feet square,
the westerly side of which is parallel to and distant 109.88 feet easterly from the wester-
ly line of said Recreation Gun Club's Tract, and the center point of which is 1918.42 feet
northerly along said westerly line from the southwest corner of said Recreation Gun Club's
Tract, thence easterly at right angles 114.88 feet, it being understood for convenience
and clarity  that the said center point so described and the surface location of said The

Ohio Oil Company's Recreation Gun Club's Well No. 10 are intended to be one and the same;
also all right, title and interest in and to said Well No. 10, TOGETHER

Exhibit 7



342     15657

Exhibit"A"   WITH all right, title and interest in and to the surface of a parcel of land surrounding
the ten foot square parcel in this paragraph above described and extending to a depth of
100 feet vertically from the surface of said real property and described as follows:  Com-
mencing at a point on the westerly line of said Recreation Gun Club's Tract, distant there-
on 1860 feet northerly from the southwest corner of said Recreation Gun Club's Tract; running
thence easterly at right angles 200 feet; thence at right angles northerly 100 feet; thence
at right angles westerly 200 feet; thence at right angles southerly 100 feet to the point
Exhibit"A"  of commencement.

NOTE:

The areas in solid color and
outlined in orange ink indicate
the portions quitclaimed and
released in entirety.

The parcels 100' x 200', out-
lined in red ink, surrounding
each well site are those quit-
claimed and released as to sur-
face, and 100' vertically below
such surfaces, only.

EXHIBIT "B"

#1509.  Copy of original recorded at request of Rex Hardy Aug. 21, 1941, 3:13 P. M.
Copyist #48.  Compared.  Mame B. Beatty, County Recorder, By: . . . . . . . . , Deputy.
#5,30-22. O.

Exhibit 8

170   1868

Dated this 6th day of August, 1941.

Laura Lucille Ridgway

STATE OF CALIFORNIA )
County of Los Angeles) ss   On this 6th day of August, 1941, before me, Marjorie Zarubica
a Notary Public in and for said County, personally appeared Laura Lucille Ridgway known
to me to be the person whose name is subscribed to the foregoing instrument and acknowl-
edged that she executed the same.   WITNESS my hand and official seal.

(Seal)                                    Marjorie Zarubica  Notary Public
In and for said County and State.   My commission expires May 29, 1945.
#345. Copy of original recorded at request of Title Insurance & Trust Co., Aug. 21,1941,
8:30 A.M. Copyist #2. Compared. Mame B. Beatty, County Recorder,
$1.00-J.B.                                         By         D. Munch   Deputy.

U.S.I.R.S. $1.10 Cancelled.

IN CONSIDERATION of TEN Dollars JAMES WILLARD ROBERTS AND KATHLEEN F. ROBERTS,
his wife, Do Hereby Grant to MARIA GESARONI, a widow all that Real Property situate in
the County of Los Angeles, State of California, described as follows:   Lot 265 of
Mettler's Main Street-South Park Tract, as per map recorded in book 8, Page 194 of Maps,
in the office of the County Recorder of said County.   SUBJECT TO;  General and Special
Taxes for the fiscal year 1941-1942;   Conditions, restrictions, reservations, rights,
and rights of way of record, if any;   Deed of Trust of Record;   Deed of Trust of
Record;   WITNESS our hands this 30th day of July, 1941.
                                              James Willard Roberts
                                              Kathleen F. Roberts

State of California )
County of Los Angeles) ss.  ON THIS 30th day of July, in the year 1941, before me, the
undersigned a Notary Public in and for said County, personally appeared JAMES WILLARD
ROBERTS AND KATHLEEN F. ROBERTS known to me to be the persons whose names are subscribed
to the within instrument, and acknowledged that they executed the same.
      Witness my hand and official seal.

(Seal)                                    Alberta Lundell Notary Public
In and for said County and State.
#740. Copy of original recorded at request of Title Guarantee & Trust Co., Aug. 22, 1941,
8:30 A.M. Copyist #2. Compared. Mame B. Beatty, County Recorder,
$1.00-H.J.                                        By     H. Madden   ui    Deputy.

IN THE MUNICIPAL COURT, CITY OF LOS ANGELES
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA

FIRST INDUSTRIAL LOAN COMPANY OF CALIFORNIA )
A CORPORATION            Plaintiff,          )   Case No. 566726.
                 vs.                         )
Paul B. Weaver, et al    Defendant.          )   ABSTRACT OF JUDGMENT

      Judgment Creditor  FIRST INDUSTRIAL LOAN COMPANY OF CALIFORNIA A CORPORATION
      Judgment Debtor    EARL M. WITHROW and HOMER F. WEST
      Amount of Judgment $352.23
      Entered under date of July 23 1941 in the Minute Book of the Court.

      I CERTIFY that the above is a true and correct abstract of the judgment entered in
the above entitled case.
      Date of issuance of this instrument August 4, 1941.
(Seal)                                    URBAN F. KNUE, Clerk of Municipal Court,
                                          City of Los Angeles, County of Los Angeles, State of California.
                                          By Lucille Needy   Deputy.
#906. Copy of original recorded at request of Attorney, Sep.16,1941, 9:05 A.M. Copyist #2.
Compared.  Mame B. Beatty, County Recorder, By             A. Munch uv Deputy.
$1.00-J.B.

LEASE

      This LEASE made and entered into this 15th day of July, 1941, by and between
RECREATION GUN CLUB, a corporation Party of the First Part, hereinafter referred to as
"Lessor" and THE DOW CHEMICAL COMPANY, a corporation, Party of the Second Part, herein-
after referred to as "Lessee";

      WITNESSETH;   That Lessor, for and in consideration of Ten ($10.00) Dollars in
hand paid, receipt of which is hereby acknowledged, and of the covenants and agreements
hereinafter contained on the part of Lessee to be kept and performed, has granted,
demised, leased and let, and by these presents does grant, demise, lease and let unto
Lessee, for the purpose of producing oil, gas, other hydrocarbon substances, waste salt
water and iodine, and taking, storing, removing and disposing of same, with the right for
such purpose to the free use of oil, gas or water from said land, but not from Lessor's
water wells or ponds, and granting the right to build, erect and maintain tanks, power
houses, stations, pumps and such other structures (excepting a refinery) as may be
necessary or convenient in Lessee's operations hereon, together with rights of ways,
easements and servitudes for pipe lines, power lines, telephone and telegraph lines,

Exhibit
0074
1/21/2022
C. Hardage

Non-Confidential                                                    MAR00000013

Exhibit 8

18685                    171

with the right of removing, either during or after the term hereof, any and all improvements placed or erected on the premises by Lessee, or purchased by Lessee from The Ohio Oil Company and which are now located on said premises, including the right to pull all casing, all that certain real property situated in the County of Los Angeles, State of California, described in Exhibit "A" attached hereto and made a part hereof by reference.

TO HAVE AND TO HOLD the same for so long as that certain oil and gas lease, dated the 5th day of February, 1929 by and between the Recreation Gun Club, as Lessor, and A.A. Curtice, as Lessee, continues in force and effect, and thereafter until such time as either of the parties hereto shall terminate this lease by giving the other party 30 days' written notice of intent to so terminate.

In consideration of the premises IT IS HEREBY MUTUALLY AGREED as follows:

1. That Lessee shall pay Lessor as royalty and rental hereunder:

(a) One-sixth (1/6) part of the value of all oil removed from the leased premises, after making customary deductions for temperature, water and b.s., at the posted market price in the district in which the premises are located, for oil of like gravity the day the oil is sold;

(b) One-sixth (1/6) of the net proceeds derived from sale of gas from each well operated on the demised premises while same is being sold or used off the premises, but nothing in this agreement contained shall require Lessee to save or market gas from said lands;

(c) One-sixth (1/6) of the net proceeds of the sale of gasoline or other products manufactured from gas produced from any well operated on the demised premises, after deducting costs of manufacturing and marketing same.

Settlement shall be made by Lessee on or before the 20th day of each month for accrued royalty for the preceding calendar month.

2. That in the event the combined royalty and rental payed to Lessor by Lessee under Paragraph I above on any well operated on the demised premises is less than Twenty ($20.00) Dollars in any month during the term hereof, then and in that event Lessee shall pay Lessor such additional sum of money as shall be necessary to provide Lessor with Twenty ($20.00) Dollars per well operated on the demised premises during any such month. Settlement for such minimum rental shall be made by Lessee at the same time as payment under Paragraph I above.

3. That Lessee shall carry on all operations on the demised premises in a careful and workmanlike manner and in accordance with the laws of the State of California and shall keep full records of its operations and of the production of gas, oil and other hydrocarbon substances from said property and sales thereof, and such records and the operations on the property shall at all reasonable times be open to the inspection of Lessor.

4. That Lessor shall have the right to use the surface of the demised premises for agriculture, grazing and Gun Club purposes to such extent as will not interfere with Lessee's operations thereon for oil, gas, other hydrocarbon substances, waste salt water and iodine. That Lessee shall conduct its operations so as to interfere as little as possible with the use of the land for agricultural, grazing or Gun Club purposes consistent hereunder with the economical operations of the property for the production of oil, gas, other hydrocarbon substances, waste salt water and iodine.

5. That Lessee shall pay the surface owner or surface tenant for all actual damages to live stock, crops, trees, fences, existing pipe lines, canals, buildings and other improvements caused by its operations under this lease. In the event the parties hereto are unable to agree on the amount of such damages, then the same shall be left to arbitration. When requested by Lessor, Lessee shall bury the pipe lines below plough depth.

6. That Lessee may, at any time, quitclaim this lease in its entirety or as to part of the acreage covered hereby, and thereupon Lessee shall be released from all further obligations as to part of the land so quitclaimed. All land quitclaimed shall remain subject to easements for rights of way necessary or convenient for Lessee's operations on land retained by it. Except as herein provided full right to said land shall revert to Lessor free and clear of all claims of Lessee.

7. That Lessee shall pay all taxes levied against any improvements placed upon said land by Lessee subsequent to the 5th day of February, 1929. That Lessor shall pay all

Non-Confidential

MAR00000014

Exhibit 8

172   18665

governments for improvements such as paving, sewage installation, etc.   That Lessee shall pay all taxes levied against improvements and property placed on said demised premises by it or by A.A. Curtice and/or The Ohio Oil Company since February 5, 1929, and upon Lessee's portion of any oil stored on said premises.   That Lessee shall pay five-sixths (5/6) and the Lessor one-sixth (1/6) of all taxes upon the oil or mineral rights of the respective lots, pieces or parcels of land constituting said demised premises in any year.

8. That on the expiration of this lease or if sooner terminated Lessee shall quietly and peaceably surrender possession of the premises to Lessor and deliver to it a good and sufficient quitclaim deed and shall fill all sump holes, shall remove all structures and foreign matter and shall leave the premises in substantially the same condition as existed on the 5th day of February, 1929.   That in case Lessee desires to abandon any well and Lessor desires to retain the same, Lessor may notify Lessee to that effect, and thereupon Lessee shall leave such casing in the well as Lessor may require, and Lessor shall pay Lessee fifty (50%) per cent of the original cost of such casing on the ground.

9. That upon the violation of any of the terms or conditions of this lease by Lessee and the failure to remedy same, then at the option of Lessor this lease shall forthwith cease and terminate, and all rights of Lessee in and to said land shall be at an end save and except as to any and all wells producing and in respect of which Lessee shall not be in default, and saving and excepting rights of way necessary for Lessee's operations.

10. That all work done on the land by Lessee shall be at Lessee's sole cost and expense, and Lessee shall protect said land and Lessor against claims of contractors, laborers or material men, and Lessor may post or keep posted on said lands such notices as it may desire in order to protect said land against liens.

11. That Lessor shall and by these presents does hereby warrant and agree to defend the title to the land herein described.   That Lessee, at its option may pay and discharge any taxes, liens or mortgages levied or assessed on the above described lands, and in the event Lessee exercises such option Lessor shall be subrogated to the holder of any rights thereof and may reimburse itself by applying to the discharge of any such mortgage, tax or other lien any royalty or rental accruing hereunder.

12. That in case Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein then the royalty and rentals herein provided for shall be paid Lessor only in the proportion which its interest bears to the whole and undivided fee.

13. That if the estate of Lessor is assigned, the covenants hereof shall extend to its successors and assigns, but no change of ownership in the land shall be binding on Lessee until after Lessee has been furnished with written notice of such transfer or assignment together with a certified copy of the instruments of transfer or assignment.

14. That all waste salt water and iodine contained therein produced from any or all of the wells operated on the demised premises shall belong to and be the sole and exclusive property of Lessee, and Lessor shall have no rights or interest therein or thereto.

15. That Lessee may give any notice provided for herein to Lessor by delivering the same in person or by registered mail addressed to Lessor at 1001 North Highland Avenue, or at such other address as Lessor may from time to time designated in writing. If registered mail the usual time for transmission of mail shall be computed and thereby service of notice shall be considered made.

That Lessor may give any notice provided for herein to Lessee by delivering the same in person or by registered mail addressed to Lessee at P.O. Box 245, Seal Beach, California, or at such other address as Lessee may from time to time designate in writing.

16. That at any time within three (3) months after the expiration of this Lease or termination of Lessee's rights hereunder, in whole or in part, Lessee may remove from any and all property of every kind whatsoever placed on said demised premises by Lessee, or which Lessee has purchased from The Ohio Oil Company and which is now located on said premises.

17. That notwithstanding anything in this lease contained, to the contrary it is

Non-Confidential

MAR00000015

Exhibit 8

12685    173

expressly agreed that the obligations impressed on Lessee may be suspended so long as Lessee's ability to comply is prevented by the elements, strikes, floods, riots, or other causes of whatsoever kind or nature beyond the reasonable control of the Lessee.

18. That this lease and all of its terms, conditions and stipulations shall be for the benefit of and binding upon the successors and assigns of said Lessor and Lessee.

IN WITNESS WHEREOF the parties hereto have executed this Lease as of the day and year first above written.

(Seal)                                  RECREATION GUN CLUB
                                        BY: C.F.A. Last
                                        BY  Guy L. Ouzner  Sec'y.

(Seal)                                  THE DOW CHEMICAL COMPANY
                                        BY: Willard H. Dow, President
                                        BY: Earl W. Bennett, Secretary        HAG
                                                                              CAO

STATE OF CALIFORNIA    )
COUNTY OF LOS ANGELES) SS.    On this 30 day of July A.D., 1941, before me, RUTH A. ENDICOTT, a Notary Public in and for said County and State, personally appeared C.F.A. LAST known to me to be the President, and GUY L. OUZNER known to me to be the Secretary of RECREATION GUN CLUB, the Corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument, on behalf of the Corporation herein named, and acknowledged to me that such Corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

(Seal)                                  Ruth A. Endicott, Notary Public
in and for said County and State.

STATE OF MICHIGAN     )
COUNTY OF MIDLAND     ) SS.    On this 15th day of July, A.D., 1941, before me, Wm. W. Ross, Jr., a Notary Public in and for said County and State, personally appeared Willard H. Dow known to me to be the President, and Earl W. Bennett known to me to be the Secretary of THE DOW CHEMICAL COMPANY, the Corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument, on behalf of the Corporation herein named, and acknowledged to me that such Corporation executed the same.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

(Seal)                                  Wm. W. Ross Jr., Notary Public
in and for said County and State.    (WM. W. ROSS JR.) Notary Public   My Commission
expires Dec. 22, 1941.

EXHIBIT "A"              LANDS SURROUNDING EACH WELL AGREED
                        BY OHIO TO BE SURRENDERED TO GUN
                        CLUB UPON NOTICE OF DOW'S ELECTION
                              TO EXERCISE OPTION.

OHIO'S RECREATION GUN CLUB WELL #7:

All of the right, title and interest in and to said Well #7, and all right, title and interest in and to said demised lands insofar as concerns a parcel of land ten (10) feet square, the Westerly side of which square is parallel to and distant 114.31 feet easterly from the westerly line of the Recreation Gun Club's Tract, as per map recorded in Book 13, Page 131 of Maps, in the office of the County Recorder of Los Angeles County, California, and the center point of which square is a point located 1043.40 feet northerly along said westerly line from the southwest corner of said Recreation Gun Club's Tract, thence easterly at right angles 119.31 feet, the said center point also being the location of said Well #7;  TOGETHER WITH all right, title and interest in and to said demised lands in so far as concerns the surface of that portion thereof surrounding the ten foot square parcel above described lying not more than 100 feet vertically in depth from the surface of said real property and described as follows:  Commencing at a point on the westerly line of said Recreation Gun Club's Tract, distant thereon 1000 feet northerly from the southwest corner of said Recreation Gun Club's Tract; running thence easterly at right angles 200 feet;  thence at right angles northerly 100 feet;  thence at right angles westerly 200 feet;  thence at right angles southerly 100 feet to the point of commencement.

SUBJECT TO:  the reservation in The Ohio Oil Company of easements for rights-of-way necessary or convenient for its operations on lands retained by it.

OHIO'S RECREATION GUN CLUB WELL #9:

All of the right, title and interest in and to said Well #9, and all right, title

Non-Confidential                                                MAR00000016

Exhibit 8

174   16665

and interest in and to said demised lands insofar as concerns a parcel of land ten (10) feet square, the westerly side of which square is parallel to and distant 111.42 feet easterly from the westerly line of said Recreation Gun Club's Tract, as per map recorded in Book 13, Page 131 of Maps, in the office of the County Recorder of Los Angeles County, California, and the center point of which square is a point located 1643.42 feet northerly along said westerly line from the southwest corner of said Recreation Gun Club's Tract, thence easterly at right angles 116.42 feet, the said center point also being the location of the said Well #9; TOGETHER WITH all right, title and interest in and to said demised lands in so far as concerns the surface of that portion thereof surrounding the ten foot square parcel above described lying not more than 100 feet vertically in depth from the surface of said real property and described as follows:   Commencing at a point on the westerly line of said Recreation Gun Club's Tract, distant thereon 1600 feet northerly from the southwest corner of said Recreation Gun Club's Tract;  running thence easterly at right angles 200 feet;   thence at right angles northerly 100 feet;  thence at right angles westerly 200 feet;   thence at right angles southerly 100 feet to the point of commencement.

SUBJECT TO:  the reservation in The Ohio Oil Company of easements for rights-of-way necessary or convenient for its operations on lands retained by it.

OHIO'S RECREATION GUN CLUB WELL #10:                                    Exhibit "A"

All of the right, title and interest in and to said Well #10, and all right, title and interest in and to said demised lands in so far as concerns a parcel of land ten (10) feet square, the westerly side of which square is parallel to and distant 109.88 feet easterly from the westerly line of said Recreation Gun Club's Tract, as per map recorded in Book 13, page 131 of Maps, in the office of the County Recorder of Los Angeles County, California, and the center point of which square is a point located 1918.42 feet northerly along said westerly line from the southwest corner of said Recreation Gun Club's Tract, thence easterly at right angles 114.88 feet, the said center point also being the location of said Well #10; TOGETHER WITH all right, title and interest in and to said demised lands in so far as concerns the surface of that portion thereof surrounding the ten foot square parcel above described lying not more than 100 feet vertically in depth from the surface of said real property and described as follows:   Commencing at a point on the westerly line of said Recreation Gun Club's Tract, distant thereon 1860 feet northerly from the southwest corner of said Recreation Gun Club's Tract;  running thence easterly at right angles 200 feet;   thence at right angles northerly 100 feet;  thence at right angles westerly 200 feet;   thence at right angles southerly 100 feet to the point of commencement.

SUBJECT TO:  The reservation in The Ohio Oil Company of easements for rights-of-way necessary or convenient for its operations on lands retained by it.

Non-Confidential

MAR00000017

Exhibit 8



NOTE:

The areas in solid color and outlined in orange ink indicate the portions quitclaimed and released in entirety.

The parcels 100'x200', outlined in red ink, surrounding each well site are those quitclaimed and released as to surface, and 100' vertically below such surfaces, only.

EXHIBIT "A"

41510. Copy of original recorded at request of W. H. Nicholas, Aug. 21, 1941, 3:14 P.M.
Copyist #2. Compared.   Mass B.Beatty, County Recorder,
$5.90-37.C.                               By _____ Deputy.

FULL RECONVEYANCE

WHEREAS, SECURITY-FIRST NATIONAL BANK OF LOS ANGELES, a National Banking Association, of Los Angeles, California, as Trustee under Deed of Trust dated December 4th, 1940, made by ARDELIA A. McCAUSLAND, a widow, Trustor, and recorded as No. 17 on December 9, 1940, in Book 17973 Page 347 of Official Records, in the office of the Recorder of Los Angeles County, California, has received from Beneficiary thereunder a written request to reconvey, reciting that all sums secured by said Deed of Trust have been fully paid and that said Deed of Trust and the note or notes secured thereby have been surrendered to said Trustee for cancellation;

NOW THEREFORE, in accordance with said request and the provisions of said Deed of Trust, said SECURITY-FIRST NATIONAL BANK OF LOS ANGELES, as trustee, does hereby reconvey without warranty to the person or persons legally entitled thereto, the estate

Non-Confidential

MAR00000018

FORM 102.     19M
CALIFORNIA STATE PRINTING OFFICE

SUBMIT IN DUPLICATE



DIVISION OF OIL & GAS
RECEIVED
NOV 19 1941
LOS ANGELES, CALIFORNIA

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## Subsequent Work Report

OPERATOR **The Dow Chemical Company**   FIELD **Playa Del Rey**

Well No. **Recreation Gun Club #10** , Sec. _____ , T. _____ , R. _____ , _____ B. & M.

In compliance with the provisions of Chapter 93, Statutes 1939, the information given herewith is a complete and correct record of all work done on the well since the previous record, dated _____

_____ , was filed.

SIGNED **The Dow Chemical Company**

Date **November 17, 1941** _____   Title *Wm Howard S Nichols* Attorney
(President, Secretary or Agent)

Outline in the order of performance, together with the dates thereof, all important operations which alter the condition of the well. Include such information as depth at which redrilling operations were started, size of hole redrilled or deepened; size of pipe, amount of perforations in casing, weight and length of casing landed or cemented or removed; number of sacks of cement used in cementing or plugging operations and exact position thereof. If the well was dynamited, give date, size, position and number of shots. If plugs or bridges were put in to test for water, state kind of material used, position and results of pumping or bailing.

Date

Well produced for iodine bearing salt water.

Perforated with knife perforator 265' commencing 35' above plug

which is set at 3376'

No oil being produced.

3376
35
3341
265
3076

Exhibit 10

629 South Hill Street
Los Angeles, California
November 24, 1941.

Mr. R. D. Bush,
State Oil and Gas Supervisor,
San Francisco, Calif.

Dear Sir:

The Ohio Oil Company wells No. "Recreation Gun Club" 7 and "Recreation Gun Club" 9, in Sec. 28, and "Recreation Gun Club" 10 in Sec. 21, T. 2 S., R. 15 W., S. B. B. & M., Playa del Rey oil field, were transferred to The Dow Chemical Company on July 10, 1941.

Our records are being changed to show The Dow Chemical Company as the present operator of these wells. It will not be necessary to request The Dow Chemical Company to appoint an agent for Los Angeles County because the company intends to operate these wells for water production only, for iodine extraction.

Yours truly,

E. H. Musser

CVB:EMS                                Deputy Supervisor.

CC – M. Cooley

834



RM 108. 95391 3-54 23,800 ⓞ SPO

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

Exhibit 11

## Notice of Intention to Abandon Well
This notice must be given at least five days before work is to begin; one copy only

DIVISION OF OIL AND GAS
FEB 1? 1956
LOS ANGELES, CALIFORNIA

Long Beach , Calif. **February 15** , 19 56

DIVISION OF OIL AND GAS

In compliance with Division 3, Public Resources Code, notice is hereby given that it is our intention to abandon

Well No. **"Recreation Gun Club" 10** , Sec. **21** , T. **2S** ,

R. **15W** , **SB** B. & M., **Playa Del Rey** Field, **Los Angeles** County,

commencing work on **February 16** 19 56 .

THE PRESENT CONDITION OF THE WELL IS:

1. Total Depth:
   3906'
2. Complete casing record, including plugs:
   18-5/8" cem. 686'
   11-3/4" cem. 3423', W.S.O.
   6-5/8" ld. 3396'-3903', perf. 3424'-3903'

   plugged with cement 3906' to 3376'

3. Last Produced **Unknown**
   (Date)   (Oil, B/D)   (Water, B/D)

ADDITIONAL DATA FOR DRY HOLE

4. Oil or Gas showings and results of tests:

5. Stratigraphic markers and depths:

6. Geologic age at bottom:
7. Base of fresh water sands:

THE PROPOSED WORK IS

1. Shoot and pull as much 11-3/4" casing as possible, and place a 20' cement plug
   on the stub.
2. If the 11-3/4" casing is recovered from below the shoe of the 18-5/8" casing
   a 40' cement plug will be placed across the shoe.
3. Place a 10' cement plug in the 18-5/8" casing at the surface.

The Division of Oil and Gas shall be notified to witness the location and
hardness of each cement plug.

MAP | MAP BOOK | LONG | FORMS 114 | 121

P. O. Box 245, Seal Beach
(Address)

(Telephone No.)

THE DOW CHEMICAL COMPANY
(Name of Operator)

By _____
Contractor

ADDRESS ONE COPY OF NOTICE TO DIVISION OF OIL AND GAS IN DISTRICT WHERE WELL IS LOCATED

Case 2:20-cv-08008-FLA-JPR   Document 131-1   Filed 03/10/23   Page 55 of 86   Page ID
#:6289
Case 2:20-cv-08008-DSF-JPR   Document 36-12   Filed 11/02/20   Page 3 of 5   Page ID #:288

Exhibit 12

FORM 111

 

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## REPORT ON PROPOSED OPERATIONS

No. P. 156-293

Mr. G L Graham
P. O Box 229
Long Beach California
Agent for THE DOW CHEMICAL CO

Los Angeles 15
February 21 1956 Calif.

DEAR SIR:

Your _____ proposal to _____ abandon _____ Well No. _____ "Recreation Gun Club"
10

Section 21 , T. 2 S , R. 15 W , S B B. & M., Playa del Rey Field, Los Angeles County,

dated Feb. 15, 1956 , received Feb. 16, 1956 , has been examined in conjunction with records filed in this office.

Present conditions as shown by the records and the proposal are as follows:

THE NOTICE STATES
"The present condition of the well is:
1. Total Depth: 3906'

2. Complete casing record, including plugs:
   18-5/8" cem. 686'
   11-3/4" cem. 3423', W.S.O.
   6-5/8" ld. 3396'-3903', perf. 3424'-3903'

   plugged with cement 3906' to 3376'

3. Last Produced  Unknown."

PROPOSAL
"The proposed work is
1. Shoot and pull as much 11-3/4" casing as possible, and place a 20' cement plug on the
   stub.
2. If the 11-3/4" casing is recovered from below the shoe of the 18-5/8" casing a 40'
   cement plug will be placed across the shoe.
3. Place a 10' cement plug in the 18-5/8" casing at the surface.

   The Division of Oil and Gas shall be notified to witness the location and hardness
   of each cement plug."

DECISION
THE PROPOSAL IS APPROVED PROVIDED THAT THIS DIVISION SHALL BE NOTIFIED TO WITNESS the
placing of and the location and hardness of each cement plug.

RC:OH

cc  Mr G L Graham, Contractor
    P O Box 245
    Seal Beach California

P/L

E. H. MUSSER, State Oil and Gas Supervisor

By R H Walling , Deputy

28483 10-55 80M SPO
NO bond required.

836

Exhibit 13

FORM 109-X
17484 8-85 6800 SPO

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES



# DIVISION OF OIL AND GAS

### Report on Test of Water Shut-off
or
### Special Report on Operations Witnessed

No. T 156-659

Page

THE DOW CHEMICAL CO

Well No. "Recreation Gun Club" 10 , Sec. 21 , T. 2 S , R 15 W , S B B. & M.

2.  A wooden plug was driven to 310'.

THE ENGINEER NOTED THAT plugging operations were started by dumping cement in the hole at 310'.

ON APRIL 16, 1956, ENGINEER CROWDER WAS PRESENT AT THE WELL FROM 11:00 - 11:40 A.M., AND MR. GRAHAM REPORTED THAT 32 sacks of cement was dumped at 310', filling to 291'. THE ENGINEER NOTED THAT the bailer could not be spudded below 291' and brought up samples of set cement.

ENGINEER A. HLUZA VISITED THE WELL FROM 3:30 - 4:15 P.M., APRIL 17, 1956, AND MR. GRAHAM REPORTED:
1.  The 11-3/4" casing was backed off at 40' and pulled from that depth.
2.  The hole was bridged at 35' with a wooden plug and sacks.

THE ENGINEER NOTED: 2 cu. yds  Crowder/Graham
1.  Fifteen sacks of cement was poured into the hole.
2.  The top of the cement in the 18-5/8" casing was at 10' below the ground surface.

THE PLUGGING OPERATIONS AS WITNESSED AND REPORTED ARE APPROVED.

RC:OH

4/G

cc  Mr Gordon L Graham

E. H. MUSSER
State Oil and Gas Supervisor

By _R. W. Nelling_ Deputy

Exhibit 14 

FORM 159 (9-49)



STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES
DIVISION OF OIL AND GAS

# REPORT OF WELL ABANDONMENT

Los Angeles _____ California

April 27 1956 _____

Mr. Gordon Graham _____
The Dow Chemical Co _____
P O Box 229 _____
Long Beach California _____

Dear Sir

Your report of abandonment of Well No. "Recreation Gun Club" 10 _____,

Sec. 21 , T. 2 S , R. 15 W , S B. B. & M., Playa del Rey _____ field,

Los Angeles _____ County, dated April 24, 1956 _____, has been

examined in conjunction with records filed in this office.

A review of the reports and records shows that the requirements of this Division, which

are based on all information filed with it, have been fulfilled.

| MAP | MAP BOOK | CARDS | BOND | FORMS | |
|---|---|---|---|---|---|
| | | | | 114 | 121 |
| 45 ah | PS | | No bond required | | 45 |

cc Mr E H Musser
Mr Gordon Graham
Mr L A Dutton
Fire Prevention Bureau
Conservation Committee
es

E. H. MUSSER
State Oil and Gas Supervisor

By R. H. Welling
Deputy Supervisor

17601 5-55 11,200 SPO

Exhibit 15

4595

QUITCLAIM DEED

GRANTOR

GRANTEE

FREE 3 M

For a VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

THE OHIO OIL COMPANY, an Ohio corporation,

does hereby remise, release, and forever quitclaim to

COUNTY OF LOS ANGELES, a body politic and corporate,

all its right, title, and interest in and to the following:

(1) That certain oil and gas lease dated December 29, 1927, executed by Recreation Gun Club, as lessor, to A. A. Curtiss, as lessee, recorded February 3, 1930, in Book 9472, page 542, and assigned to transferor by an assignment recorded February 3, 1930, in Book 9546, page 790, together with any and all amendments, modifications, extensions, and supplements thereto, whether of record or not. Also together with all easements and rights of way as saved and excepted in the partial release and quitclaim deed recorded August 21, 1941, in Book 18457, page 340, of Official Records;

(2) That certain unrecorded surface lease executed by Recreation Gun Club, as lessor, and The Ohio Oil Company, as lessee, as disclosed by instruments recorded September 21, 1949, in Book 28889, page 381, and September 4, 1953, in Book 42629, page 810, both of Official Records;

(3) Those certain pipe line easements, as granted in an agreement recorded February 5, 1931, in Book 10634, page 160, of Official Records.

Said interests affect all that certain real property situate in the County of Los Angeles, State of California, and more particularly described as follows:

PARCEL A: (Partly in the City of Los Angeles)

Lots 1 and 2, Tract No. 7750, as shown on map recorded in Book 171, pages 8 and 9, of Maps, in the office of the Recorder of said County.

Excepting from said Lot 1, that portion thereof within the following described boundaries:  Beginning at the

RECORDED IN OFFICIAL RECORDS
OF LOS ANGELES COUNTY, CALIF.

47  Min.  3 P.M. DEC 9 1958
    Past

RAY E. LEE, County Recorder

Exhibit 15



intersection of the southeasterly prolongation of
the northeasterly line of said Lot 1 with the
southwesterly prolongation of the northwesterly
line of said last mentioned lot; thence northeast-
erly along said southwesterly prolongation 84.00
feet to the easterly terminus of that certain
course shown as having a length of 195.16 feet in
the northerly boundary of said tract; thence west-
erly along said course 195.16 feet to said
northeasterly line; thence southeasterly along said
southeasterly prolongation 141.75 feet to the point
of beginning.

PARCEL B:

Block A, Tract No. 9532, as shown on map recorded in
Book 171, page 18, of above mentioned map.

PARCEL C: (Partly in the City of Los Angeles)

Lots 5, 6, and 7, Fradera Tract, as shown on map re-
corded in Book 14, page 38, of Maps, in the office of
the Recorder of said County.

Excepting from said Lots 6 and 7, those portions
thereof which lie northeasterly of the southeasterly
boundary of the 100 foot strip of land described in
deed to State of California for State Highway purposes,
recorded on July 6, 1951, in Book 15979, page 393, of
Official Records, in the office of said Recorder.

PARCEL D:

That portion of Lot 1, Tract No. 7750, as shown on
map recorded in Book 171, pages 8 and 9, of Maps, in
the office of the Recorder of said County, within the
following described boundaries:

Beginning at the intersection of the southeasterly
prolongation of the northeasterly line of said lot
with the southwesterly prolongation of the northwest-
erly line of said lot; thence northeasterly along said
southwesterly prolongation 84.00 feet to the easterly
terminus of that certain course shown as having a
length of 195.16 feet in the northerly boundary of
said tract; thence westerly along said certain course
195.16 feet to said northeasterly line; thence south-
easterly along said southeasterly prolongation 141.75
feet to the point of beginning.

Dated: November 4, 1958.          THE OHIO OIL COMPANY,
an Ohio corporation

By _____ president
_____ Secretary

840

Case 2:20-cv-08008-FLA-JPR   Document 131-1   Filed 03/10/23   Page 60 of 86   Page ID
Case 2:20-cv-08008-DSF-JPR   Document 36   Filed 11/02/20   Page 4 of 4   Page ID #:294
#:6294

Exhibit 15

STATE OF ~~CALIFORNIA~~ OHIO )
County of ~~Los Angeles~~ ) ss
MINCOLN

On this 28th day of _November_ in the year 1958,
before me, the undersigned, a Notary Public in and for said
County and State, personally appeared _Fred E. Smith_
known to me to be the _Vice_ President, and _____
_L. C. Feldman_ known to me to be the _____
_Asst_ Secretary of the corporation that executed
the within instrument, and known to me to be the persons who
executed the within instrument on behalf of the corporation
therein named, and acknowledged to me that such corporation
executed the within instrument pursuant to its by-laws or a
resolution of its board of directors.
WITNESS my hand and official seal.

R. C. REDMAN                          _R. C. Redman_
NOTARY PUBLIC, MEDINA COUNTY, OHIO    Notary Public in and for said
MY COMMISSION EXPIRES NOV 4, 1963             County and State


CERTIFICATE OF ACCE:

This is to certify that this in-
est in real property conveyed by the
within deed or grant to the County of
Los Angeles, a governmental agency, is
hereby accepted under authority of a
resolution adopted by the Board of
Supervisors of said County on Septem-
ber 10, 1957, and the Grantee consents
to the recordation thereof by its duly
authorized officer.

Dated _____ 6/19 _____

By _Mark A. Ferran_

This is to certify that this document presents County Clerk and
meet within the meaning of Section 8103 of the Government Code

HAROLD J. OSTLY, County Clerk

By _____ Deputy

When recorded, return to R. B. Wood,
Room 1007, Hall of Records

Exhibit 16

**RECORDING REQUESTED BY**

**GRANTEE**

4594

**QUITCLAIM DEED**

FREE 3 M

12-9-1958
I.D. # 4594

For a **VALUABLE CONSIDERATION**, receipt of which is hereby acknowledged,

**RECREATION GUN CLUB**, a California corporation,

does hereby remise, release, and forever quitclaim to

**COUNTY OF LOS ANGELES**, a body politic and corporate,

all its right, title, and interest in and to all that certain real property situate in the County of Los Angeles, State of California, more particularly described as follows:

**PARCEL A:** (Partly in the City of Los Angeles)

Lots 1 and 2, Tract No. 7750, as shown on map recorded in Book 171, pages 8 and 9, of Maps, in the office of the Recorder of said County.

Excepting from said Lot 1, that portion thereof within the following described boundaries: Beginning at the intersection of the southeasterly prolongation of the northeasterly line of said Lot 1 with the southwesterly prolongation of the northwesterly line of said last mentioned lot; thence northeasterly along said southwesterly prolongation 84.00 feet to the easterly terminus of that certain course shown as having a length of 195.16 feet in the northerly boundary of said tract; thence westerly along said certain course 195.16 feet to said northeasterly line; thence southeasterly along said southeasterly prolongation 141.75 feet to the point of beginning.

**PARCEL B:**

Block A, Tract No. 9532, as shown on map recorded in Book 171, page 10, of above mentioned map.

**PARCEL C:**

All oil, gas, and other hydrocarbon substances lying within and under the above described Parcels A and B.

**PARCEL D:**

All right, title, and interest accruing to the transferor under that certain oil and gas lease recorded February 3, 1930, in Book 9672, page 242, of Deeds, insofar as the transferor is entitled to participate in production and all other benefits under said lease.

RECORDED IN OFFICIAL RECORDS
OF LOS ANGELES COUNTY, CALIF.

47 Min. Past 3 P.M. DEC 9 1958

RAY E. LEE, County Recorder

Case 2:20-cv-08008-FLA-JPR   Document 131-1   Filed 03/10/23   Page 62 of 86   Page ID
Case 2:20-cv-08008-DSF-JPR   Document 36-16   Filed 11/02/20   Page 3 of 4   Page ID #:297
#:6296

Exhibit 16

PARCEL E:

Also all the right, title, and interest which transferor
may have by reason of the recordation of Map of Recreation
Gun Club's Tract, recorded March 2, 1908, in Book 13, page
131, of Maps, in the office of the Recorder of the County
of Los Angeles, and map of Tract No. 7750, recorded April
29, 1930, in Book 171, pages 8 and 9, of Maps, in the
office of said Recorder, which recite that the transferor
is the sole owner or proprietor of said land.  Said interest
affects that certain real property situate in the County of
Los Angeles, State of California, within the following
described boundaries:

That portion of Lot 1, Tract No. 7750, as shown on map
recorded in Book 171, pages 8 and 9, of Maps, in the
office of the Recorder of said County, within the following
described boundaries:  Beginning at the intersection of the
southeasterly prolongation of the northeasterly line of
said lot with the southwesterly prolongation of the north-
westerly line of said lot; thence northeasterly along said
southwesterly prolongation 84.00 feet to the easterly
terminus of that certain course shown as having a length
of 195.16 feet in the northerly boundary of said tract;
thence westerly along said certain course 195.16 feet to
said northeasterly line; thence southeasterly along said
southeasterly prolongation 141.75 feet to the point of
beginning.

PARCEL F:

All right, title, and interest in and to all easements and
rights of way conveyed in the deed recorded December 6,
1884, in Book 132, page 345, of Deeds; together with all
right, title, and interest in and to any and all other
easements and rights of way which may exist, in, over,
under, along, and across the following described property
situate in the County of Los Angeles, State of California,
and more particularly described as follows:

    Lots 5, 6, and 7, Pradera Tract, partly in the City
    of Los Angeles, said County and State, as shown on
    map recorded in Book 16, page 38, of Maps, in the
    office of the Recorder of said County.

    Excepting from said Lots 6 and 7, those portions
    thereof which lie northeasterly of the southwest-
    erly boundary of the 100 foot strip of land
    described in deed to State of California for State
    Highway purposes, recorded on July 6, 1931, in Book
    10970, page 203, of Official Records, in the office
    of said Recorder.

PARCEL G:

All right, title, and interest of transferor in and to
that certain appurtenant easement and right of way for
road purposes, as established by a decree quieting
title, in the Superior Court of the State of California,
in and for the County of Los Angeles, Case No. 602257,
a certified copy of which was recorded January 12, 1953,
in Book 40712, page 129, of Official Records.

Exhibit 16

Dated: Dec 1, 195_      RECREATION GUN CLUB,
                        A California corporation

                        _Grant Peeple_ by
                                          President

                        _James A. Cagney_
                                          Secretary

STATE OF CALIFORNIA }
County of Los Angeles} ss.

On this _1st_ day of _December_, in the year
195_8_, before me, the undersigned, a Notary Public in and for
said County and State, personally appeared_____
_Albert Ralpherd_ known to me to be the_____
President, and _James A. Cagney_ known to me
to be the_____Secretary of the corporation that
executed the within instrument, and known to me to be the persons
who executed the within instrument on behalf of the corporation
therein named, and acknowledged to me that such corporation
executed the within instrument pursuant to its by-laws or a
resolution of its board of directors.

WITNESS my hand and official seal.

                        _Louise C. Brown_
                        Notary Public in and for said
                        County and State
                        My Commission Expires August 11, 1959

CERTIFICATE OF ACCEPTANCE

    This is to certify that the inter-        This is to certify that this document covers County busi-
est in real property conveyed by the         ness within the meaning of Section 6103 of the Gov-
within deed or grant to the County of         ernment Code
Los Angeles, a governmental agency, is            HAROLD J. OSTLY County Clerk
hereby accepted under authority of a
resolution adopted by the Board of                By _____ Deputy
Supervisors of said County on Septem-
ber 10, 1957, and the Grantee consents
to the recordation thereof by its duly
authorized officer.
    Dated _Dec 1, 1958_

    By _Frank A. Sull_

                                              When recorded, return to R. B. West,
                                              Room 1007, Hall of Records

844

FORM 156                                                                          Exhibit 17

**STATE OF CALIFORNIA**
**DEPARTMENT OF NATURAL RESOURCES**
**DIVISION OF OIL AND GAS**

## REPORT OF PROPERTY AND WELL TRANSFER

Field or County       **Playa del Rey**                      District      **1**

Former Owner:    **The Dow Chemical Co.**              Date     **December 23, 1958**

Description of Property     **Sec. 21 and 28, T. 2 S., R. 15 W., S. B. B. & M.**

List of Wells        **"Recreation Gun Club" 7, "Recreation Gun Club" 9, Sec. 28, and**
                     **"Recreation Gun Club" 10, Sec. 21.**

Date of Transfer          **December 4, 1958**
New Owner:                **County of Los Angeles**
Address:                  **c/o Richard A. Del Guercio, Deputy County Counsel, Suite 1100 Hall of**
Telephone No.                    **Records, Los Angeles 12, Calif.**

Type of Organization      **Governmental**
Reported by:              **Harry F. Stolz for County of Los Angeles   (Notices to abandon dated**
Confirmed by:                                                                   **12-9-58)**
New Operator New Status      **NPI**              , Old Operator New Status        **NPI**
Request designation of agent for the following County.           **No**

Remarks:

**eb**
**CC- Mr. E. H. Musser**
      **Prod. Dept.**
      **Conservation Committee**

_Wm. C. Bailey_
Deputy Supervisor

| | INITIALS | DATE |
|---|---|---|
| Form 121 | | |
| New Well Cards | | |
| Well Records | | |
| Electric Logs | | |
| Production Reports | | |
| Map and Book | 42  R J | 1 - 5 |
| Form 148 | | |
| Notice to be cancelled | | |

| LEGEND |
|---|
| PA—Producing Active |
| NPA—Non Potential Active |
| PI—Potential Inactive |
| NPI—Non Potential Inactive |
| Ab—Abandoned or No More Wells |
| NOTE—If Transfer Does Not Change Overall Status Enter "No Change" |

68378 12-57 4500 ⊛ SPO

Case 2:20-cv-08008-FLA-JPR   Document 131-1   Filed 03/10/23   Page 65 of 86   Page ID
#:6299
Case 2:20-cv-08008-DSF-JPR   Document 36-15   Filed 11/02/20   Page 3 of 3   Page ID #:301

Exhibit 18

FORM 157

### STATE OF CALIFORNIA
### DEPARTMENT OF NATURAL RESOURCES
### DIVISION OF OIL AND GAS

## REPORT ON PROPOSED CHANGE OF WELL DESIGNATION

830 North La Brea Avenue
Inglewood 3, _____ California

December 23, 1958

Mr. Harry P. Stolz
530 West Sixth Street
Los Angeles 14, California
Agent for ___ COUNTY OF LOS ANGELES

DEAR SIR:

Your request dated ___ December 9, 1958 ___, relative to change in designation of
well(s) in Sec. 28 21 and ___, T. 2 S., R. 15 W., S.B. B. & M., ___ Playa del Rey ___ field,
Los Angeles _____ County, District No. 1 ___, has been received;

and in accordance with Section 3203, Public Resources Code, reading in part as follows:

> "* * * The number or designation by which any well heretofore drilled has
> been known, and the number or designation specified for any well in a notice
> filed as required by Section 3203, shall not be changed without first obtaining
> a written consent of the Supervisor."

the proposed change in designation is hereby authorized as follows:

Wells No. "Recreation Gun Club" 7, "Recreation Gun Club" 9 and "Recreation Gun Club" 10,
formerly owned by The Dow Chemical Company, will hereafter be known as your wells No.
"Dow R.G.C." 7, "Dow R.G.C." 9 and "Dow R.G.C." 10, respectively.

42 RJ 1-5

eb
CC- Mr. E. H. Musser
    Prod. Dept.
    Conservation Committee
    Mr. Richard A. Del Guercio
    Dept. of Harbors and Marina
    County Engineer, 524 Pan Amer. Bldg.
    Stanley & Stolz (2)

E. H. MUSSER
*State Oil and Gas Supervisor*

By _____
*Deputy Supervisor*

66445 11-57 2350 SPO

FORM 108. 80261 7-58 15M ⊕ SPO

Exhibit 19

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

DIVISION OF OIL AND GAS
RECEIVED

DEC 23 1958

## Notice of Intention to Abandon Well

This notice must be given at least five days before work is to begin; one HOLLYWOOD, CALIFORNIA

Los Angeles                              Calif. DECEMBER 9      19 58

DIVISION OF OIL AND GAS

In compliance with Division 3, Public Resources Code, notice is hereby given that it is our intention to abandon

~~Well No.~~ Dow Chemical Company Well R.G.C. No. 10 _____, Sec. 21 , T. 2-S,

R. 15-W , S.B. B. & M., _____ Playa del Rey _____ Field, _____ Los Angeles _____ County,

commencing work on _____ 19____.

THE PRESENT CONDITION OF THE WELL IS: ABANDONED Additional Data for Dry Hole

1. Total Depth: 3906'

2. Complete casing record, including plugs:

18⅝" Cemented at 686'
11¾" Cemented at 3426'
11¾" Casing knife perforated 3341' (100 holes), 3245' to 3076' (165 holes), 3272' to 3076' (392 holes). Shot at 887' and pulled up to 883' — well blew out. Shot hole at 625' for cementing during abandonment. Collar shot at 542' for cementing during abandonment. Collar shot at 310' and pulled

3. Last Produced _____ Not Available _____
   (Date)      (Oil, B/D)      (Water, B/D)

THE PROPOSED WORK IS Re-enter and Re-abandon

1. Clean out top plug and clean out 11¾" casing to top of cement plug reported at a depth of 291'
2. Test location and hardness of cement plug @ 291' with drill pipe & bit. Clean out, additional cement plug will be placed at discretion of County Engineer.
3. Place a 50' running bridge (cement) in top of 18⅝" & 11¾" casing strings.
4. Cut and pull 18⅝" casing from a minimum depth of 0.0' M.L.L.W.
5. Weld steel plate on top of 18⅝" casing.

~~4.—Oil or Gas showings and results of tests.~~
casing up to 295' for cementing during abandonment. Backed off and removed from 40'
507' of 6⅝" liner landed at 3903' (Top at 3396') including 479' of perforations from 3424'-3903'

~~5.—Stratigraphic markers and depths:~~
Plugs:
(a) 3376'-3906'
(b) From unknown depth below 883' in stages, by pressure cementing

~~6.—Geologic age at bottom:~~
~~7.—Base of fresh water sands:~~
and pumping to 291'
(c) Wood plug in 18⅝" casing at 35'
(d) 35' to 10' from surface.

The property on which this well is located was acquired by the County of Los Angeles as a part of the Marina del Rey on December 4, 1958. It is requested that the former designation of Dow Chemical Company well R.G.C. No. 10 be changed to County of Los Angeles well Dow R.G.C. No. 10.

Please send 3 copies of all notices to Stanley and Stolz

530 West Sixth
(Address)
MAdison 2-2079
(Telephone No.)

| MAP | MAP BOOK | CARDS | BOND | FORMS | |
|-----|----------|-------|------|-------|-----|
| | | | | 114 | 121 |

County of Los Angeles
(Name of Operator)
By HARRY P. STOLZ, Agent

Address One Copy of Notice to Division of Oil and Gas in District Where Well Is Located

FORM 111  

Exhibit 20

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

# DIVISION OF OIL AND GAS

## REPORT ON PROPOSED OPERATIONS

No. P 159-4

Mr. Harry P Stolz
530 West 6th Street
LOS ANGELES 14

Inglewood 3 ___ Calif.
January 2, 1959

Agent for COUNTY OF LOS ANGELES

DEAR SIR:

Your supplementary proposal to abandon Well No. "Dow R.G.C." 10

Section 21 , T. 2 S , R. 15 W , S B B. & M., Playa del Rey Field, Los Angeles County,

dated Dec. 9, 1958 , received Dec. 23, 1958 , has been examined in conjunction with records filed in this office.

Present conditions as shown by the records and the proposal are as follows:

RECORDS IN ADDITION TO, OR AT VARIANCE WITH, THOSE SHOWN IN THE NOTICE: 11-3/4" cem. 3423',
W.S.O., perf. 3341'-3076', shot 887', pulled to 883', shot at 625', 542', 310' and 40',
pulled from 40'. Plugged w/150 sacks of cement below 786', 150 sacks of cement below 556',
310'-291', and 40'-10'.

THE NOTICE STATES
"The present condition of the well is: Abandoned
1. Total Depth: 3906'
2. Complete casing record including plugs: 18-5/8" cemented at 686'
                                            11-3/4" cemented at 3426'
11-3/4" casing knife perforated 3341' (100 holes), 3245' to 3076' (165 holes), 3272' to 3076'
(392 holes). Shot at 887' and pulled up to 883' - well blew out. Shot hole at 625' for
cementing during abandonment. Collar shot at 542' for cementing during abandonment. Collar
shot at 310' and pulled casing up to 295' for cementing during abandonment. Backed off and
removed from 40'. 507' of 6-5/8" liner landed at 3903' (top at 3396') including 479' of
perforations from 3424'-3903'. Plugs: (a) 3376'-3906'
3. Last Produced Not Available             (b) From unknown depth below 883' in stages, by
                                               pressure cementing and pumping to 291'
                                           (c) Wood plug in 18-5/8" casing at 35'
                                           (d) 35' to 10' from surface."
PROPOSAL
"The proposed work is  Re-enter and Re-abandon
1. Clean out top plug and clean out 11-3/4" casing to top of cement plug reported at a depth
   of 291'.
2. Test location and hardness of cement plug @ 291' with drill pipe & bit. Clean out, addi-
   tional cement plug will be placed at discretion of County Engineer.
3. Place a 50' running bridge (cement) in top of 18-5/8" & 11-3/4" casing strings.
4. Cut and pull 18-5/8" casing from a minimum depth of 0.0' M.L.L.W.
5. Weld steel plate on top of 18-5/8" casing."
DECISION
THE PROPOSAL IS APPROVED PROVIDED THAT
1. If the hole is cleaned out below 341', a 50' cement plug shall be placed from 310' to 291'.
2. All portions of the hole not plugged with cement, shall be filled with heavy rotary mud.
3. THIS DIVISION SHALL BE NOTIFIED TO WITNESS (a) The location and hardness of the cement
   plug at 291'. (b) The placing of the 50' cement surface plug.

RC:OH
cc  Mr Richard A Del Guercio
    Dept of Harbors & Marina                    E. H. MUSSER, State Oil and Gas Supervisor
No bond   Stanley & Stolz (3)
required. County Engineers, Attn Geo Arndt      By _____ , Deputy

Exhibit 21

  

FORM 103

SUBMIT IN DUPLICATE
STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

DIVISION OF OIL AND GAS  RECEIVED

**DIVISION OF OIL AND GAS** APR 13 1959

INGLEWOOD, CALIFORNIA

History of Oil or Gas Well

OPERATOR County of Los Angeles   FIELD Playa del Rey

Well No. "Dow R.G.C." 10 , Sec. 21 , T. 2-S , R. 15-W  S.B. B. & M.

Date April 8 , 19 59   Signed Harry P. Stott
AGENT FOR THE COUNTY OF
530 W. 6TH St., L.A. 14   MA 2-2079   Los Angeles
(Address)   (Telephone Number)   Title
(President, Secretary or Agent)

It is of the greatest importance to have a complete history of the well. Use this form to report a full account of all important operations during the drilling and testing of the well or during re-drilling, altering of casing, plugging, or abandonment with the dates thereof. Be sure to include such items as hole size, formation test details, amounts of cement used, top and bottom of plugs, perforation details, sidetracked junk, bailing tests, shooting and initial production data.

Date

**REPORTED MECHANICAL AND ABANDONED CONDITION PRIOR TO RE-ENTRY**
TOTAL DEPTH 3906'
18⅝" CASING CEMENTED AT 686'
11¾" CASING CEMENTED AT 3423', PERFORATED 3341'-3076', SHOT AT 887',
    PULLED UP TO 883', SHOT AT 625', 542' AND 310', PULLED UP TO
    295', SHOT AND PULLED FROM 40'.
6⅝" LINER LANDED 3903'-3396', PERFORATED 3903'-3424'
PLUGGED DEPTHS
    (A) 3906'-3376'
    (B) PLUGGED WITH 150 SAXS OF CEMENT BELOW 786'
    (C) "   "   "   "   "   "   556'
    (D) 310'-304' (K.B. MEASUREMENT ON RE-ABANDONMENT)
    (E) WOODEN PLUG IN 18⅝" CASING AT 35'
    (F) 35'-10'
**WORK DONE DURING RE-ABANDONMENT-JOHN S. HAGESTAD DRLG. CO., CONTRACTOR**
ALL MEASUREMENTS ARE FROM THE K.B. WHICH IS 15.72' ABOVE M.L.L.W. AND
12.92' ABOVE SEA LEVEL.
CLEANED OUT SURFACE CEMENT PLUG.
FOUND TOP OF 11¾" CASING AT 44'. ENTERED 11¾" CASING WITH 9⅞" BIT AND
CLEANED OUT TO 304'. ENCOUNTERED CEMENT PLUG AT 304' (K.B. MEASUREMENT),
WHICH SUPPORTED FULL WEIGHT OF KELLY, DRILL PIPE, COLLARS AND BIT.
LOCATION AND HARDNESS OF PLUG WITNESSED BY A REPRESENTATIVE OF THE
DIVISION OF OIL AND GAS.

SURFACE PLUG - TO PLUG 11¾" & 18⅝" CASING FROM 50' BELOW M.L.L.W. TO
M.L.L.W.
WITH 4½" OPEN END DRILL PIPE HANGING AT 68', B-J SERVICE, INC. PUMPED
IN 76 SAXS CONSTRUCTION CEMENT. OBTAINED GOOD CEMENT RETURNS AT THE
SURFACE. CEMENTING OPERATIONS WITNESSED BY A REPRESENTATIVE OF THE
DIVISION OF OIL AND GAS.
CIRCULATED OUT CEMENT TO 17'

4/7/59

WELL RE-ABANDONED APRIL 7, 1959
18⅝" CASING REMOVED FROM M.L.L.W. LEVEL AND STEEL
PLATE WELDED ON STUB.

FORM 109-D

 

STATE OF CALIFORNIA
DEPARTMENT OF NATURAL RESOURCES

Exhibit 22

# DIVISION OF OIL AND GAS

## Special Report on Operations Witnessed

No. T **159-250**

Mr. **Harry P Stolz**
**530 West 6th Street**
**LOS ANGELES 14**                                        **Inglewood 3** Calif.
Agent for **COUNTY OF LOS ANGELES**                        **April 9, 1959**

DEAR SIR:

Operations at your well No. **"Dow R.G.C." 10** , Sec. **21** , T. **2 S** , R. **15 W** , **S B** B & M.
**Playa del Rey** Field, in **Los Angeles** County, were witnessed
on **April 7, 1959** Mr. **G. Beecroft, Engineer** , representative of the supervisor was present
from **5:00** to **9:00 p.m.** There were also present **R. Geddes, Engineer.**

Present condition of well: **18-5/8" cem. 686'; 11-3/4" cem. 3423', shot 887', pulled to 883',
shot at 625', 542', 310', pulled from 40': 6-5/8" ld. 3396'-3906', perf. 3424'-3903'.
T.D. 3906', plugged w/cement 3906'-3376', 150 sacks of cement below 786', 150 sacks
of cement below 556', plugged w/cement 310'-304' and 68'-17'.**

The operations were performed for the purpose of **witnessing the plugging operations in the process**
**of reabandonment.**
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~

**MR. GEDDES REPORTED THAT** the hole was cleaned out to 304'.

**THE ENGINEER NOTED:**
1. The cement plug at the reported depth of 304' supported all the weight of the drill pipe.
2. On April 7, 1959, 76 sacks of cement was pumped into the hole through 4-1/2" drill pipe
   hanging at 68'.
3. Cement returned to the surface.
4. Cement was circulated out of the hole to 17'.

**THE PLUGGING OPERATIONS AS WITNESSED AND REPORTED ARE APPROVED.**

GB:OH

cc  Mr Richard A Del Guercio
    Department of Harbors & Marina
    Stanley & Stolz
    County Engineers, Attention Mr Geo Arndt

E. H. MUSSER
State Oil and Gas Supervisor

_____ Deputy

63193 2-57 17M ⓢ SPO

850

FORM 159 (9-49)



Exhibit 23



### STATE OF CALIFORNIA
### DEPARTMENT OF NATURAL RESOURCES
### DIVISION OF OIL AND GAS

## REPORT OF WELL ABANDONMENT

Inglewood _____ California

April 14 1959 _____

Mr. Harry P Stolz _____
530 West 6th Street _____
Los Angeles 14 California _____
Agent for  COUNTY OF LOS ANGELES ___

DEAR SIR:

Your report of abandonment of Well No. "Dow R.G.C." 10 _____,

Sec. 21 , T. 2 S , R. 15 W , S B B. & M., Playa del Rey _____ field,

Los Angeles _____ County, dated April 8, 1959 _____, has been

examined in conjunction with records filed in this office.

A review of the reports and records shows that the requirements of this Division,

which are based on all information filed with it, have been fulfilled.

| MAP | MAP BOOK | CARDS | BOND | FORMS | |
|---|---|---|---|---|---|
| | | | | 114 | 121 |
| N C 6 D | N C 6 D | | No bond required | | E J |

RC:es
cc Mr E H Musser
   Mr R A Del Guercio
   Dept of Harbors and Marina
   Stanley and Stolz
   County Engineers
      Attn Mr Geo Arndt
   Conservation Committee
   Mr L A Dutton
   Fire Prevention Bureau

E. H. MUSSER
*State Oil and Gas Supervisor*

By _____
                              *Deputy Supervisor*

84442 9-28 10M SPO

Exhibit 24

5318

RECORDED IN
OFFICIAL RECORDS
LOS ANGELES COUNTY, CALIF.
RAY E. LEE, RECORDER

1961 DEC 11 PM 4:12

CORPORATION QUITCLAIM DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby
acknowledged, THE DOW CHEMICAL COMPANY, a corporation organized
under the laws of the state of Delaware, does hereby REMISE,
RELEASE AND QUITCLAIM TO the COUNTY OF LOS ANGELES the real
property in the County of Los Angeles, State of California, de-
scribed as:

FREE #J

Lots 1 and 2, Tract No. 7750, as shown on map recorded
in Book 171, pages 8 and 9, of Maps, in the office of the
Recorder of the County of Los Angeles.

Excepting from said Lot 1 that portion thereof within
the following described boundaries:

Beginning at the intersection of the southeasterly
prolongation of the northeasterly line of said Lot 1 with
the southwesterly prolongation of the northwesterly line of
said last mentioned lot; thence northeasterly along said
southwesterly prolongation 84.00 feet to the easterly ter-
minus of that certain course shown as having a length of
195.16 feet in the northerly boundary of said tract; thence
westerly along said certain course 195.16 feet to said
northeasterly line; thence southeasterly along said south-
easterly prolongation 141.75 feet to the point of beginning.

Block A, Tract No. 9532, as shown on map recorded in
Book 171, page 10 of above mentioned Maps.

That portion of the Rancho La Ballona, as shown on map
filed in Case No. 965 of the District Court of the First
Judicial District of the State of California, in and for the
County of Los Angeles, within the following described
boundaries:

-1-

HAROLD W. KENNEDY, COUNTY COUNSEL
1100 HALL OF RECORDS
LOS ANGELES, CALIFORNIA
MADISON 6-9211

LACREG00000379

Exhibit 24

HAROLD W. KENNEDY, COUNTY COUNSEL
1100 HALL OF RECORDS
LOS ANGELES, CALIFORNIA
MAdison 6-9211

Beginning at the intersection of the northeasterly line
of Del Rey Beach, as shown on map recorded in Book 6, page
186, of Maps, in the office of the Recorder of said county
with the northwesterly line of the 380 foot strip of land
described in Parcel No. 150 of Final Judgment in favor of
Los Angeles County Flood Control District, a certified copy
of which was recorded on February 10, 1939, in Book 16382,
page 191, of Official Records, in the office of said Recorder;
thence northwesterly along said northeasterly line to the
most northerly corner of Lot 14, Block 13, said Del Rey
Beach; thence northeasterly along the line established by
agreement deed between G. W. Colton, A. R. Fraser et al re-
corded in Book 2108, page 13, of Deeds, in the office of
said Recorder, a distance of 63.43 feet to the southwesterly
prolongation of the southeasterly line of Lot 1, Tract No.
7750, as shown on map recorded in Book 171, pages 8 and 9,
of said Maps; thence northeasterly along said southwesterly
prolongation and along said southwesterly line 2238.24 feet
to the most westerly corner of that certain parcel of land
described as Parcel B in deed to Hughes Tool Company, re-
corded as Document No. 2792, on April 2, 1947, in Book 24394,
page 241, of said Official Records; thence southeasterly,
northeasterly and northwesterly along the southwesterly,
southeasterly and northeasterly boundaries of said certain
parcel of land the following described bearings and dis-
tances; South 27° 53' 30" East 700.00 feet; thence North
62° 06' 30" East 581.37 feet; thence North 27° 53' 30" West
50.00 feet; thence North 62° 06' 30" East 150.00 feet; thence
South 27° 53' 30" East 50.00 feet; thence North 62° 06' 30"
East 275.00 feet to the southwesterly line of that certain
parcel of land described as Parcel A in said deed to Hughes

-2-

LACREG00000380

Exhibit 24

Tool Company; thence southeasterly along said last mentioned southwesterly line 300.00 feet to the southeasterly line of said last mentioned certain parcel of land; thence northeasterly along said last mentioned southeasterly line 323.57 feet; thence southeasterly parallel with the northeasterly line of said Del Rey Beach to the northwesterly line of said 380 foot strip of land; thence southwesterly along said last mentioned northwesterly line to the point of beginning.

Excepting therefrom that portion thereof which lies northeasterly of the following described line:

Beginning at a point in the northwesterly line of said 380 foot strip of land, distant North 55° 11' 23" East thereon 2600.00 feet from the northeasterly line of Del Rey Beach, as shown on map recorded in Book 6, page 186, of said Maps; thence North 34° 48' 37" West 490.00 feet; thence North 0° 40' 04" West 1308.84 feet; thence North 30° 21' 28" East 291.36 feet to the southeasterly line of Lot 1, said Tract No. 7750.

IN WITNESS WHEREOF, said corporation has caused its corporate name and seal to be affixed hereto and this instrument to be executed by its Executive Vice President and ___Assistant___ Secretary thereunto duly authorized.

Dated: December 4, 1961

THE DOW CHEMICAL COMPANY

By _____
Executive Vice President

By _____
Assistant Secretary

STATE OF MICHIGAN )
                  ) ss.
COUNTY OF MIDLAND )

On ___December 4, 1961___, before me, the undersigned,

-3-

HAROLD W. KENNEDY, COUNTY COUNSEL
1100 HALL OF RECORDS
LOS ANGELES, CALIFORNIA
MADISON 6-9211

LACREG00000381

Exhibit 24

2    a Notary Public in and for said County and State, personally

3    appeared    H. P. Dean    , known to me to be the

4    Executive Vice President, and    Fred H. Brown

5    known to me to be the    Assistant    Secretary of the

6    corporation that executed the within instrument, and known to

7    me to be the persons who executed the within instrument on behalf

8    of the corporation therein named, and acknowledged to me that such

9    corporation executed the same.

        WITNESS my hand and official seal.

(SEAL)

                        _in and for said County and State_

HAROLD W. KENNEDY, COUNTY COUNSEL
1120 HALL OF RECORDS
LOS ANGELES, CALIFORNIA
MAdison 6-9211

## CERTIFICATE OF ACCEPTANCE

    This is to certify that the interest in real property conveyed by the within deed ... s. a ... ... ... the Board of Supervisors of said County on February 17, 1959, and the Grantee consents to the recordation thereof by its duly authorized officer.

-4-

855

LACREG00000382

Exhibit 25

## EXHIBIT B

### DEVELOPMENT PLAN

(See attached)

B

MDR0000698

Exhibit 25

THE HARDAGE GROUP
[illegible]

October 23, 2013

Mr. Gary Jones, Acting Director
Los Angeles County Department of Beaches & Harbors
13837 Fiji Way
Marina del Rey, CA 90292

Re: Parcel 9U Hotel
    Marina del Rey, California

Dear Mr. Jones,

We are pleased to submit our application to the Design Control Board for its
conceptual review of the proposed improvements to Parcel 9U, Marina del Rey
California. The subject parcel is located at the northeast corner of Via Marina and
Tahiti Way. The 3.7-acre property is currently vacant land, of which approximately
1.46 acres of the southerly portion is dedicated to open space as a wetland park.

This application is seeking the Design Control Board's conceptual approval for the
design of a dual-brand hotel accommodated within a 5-story and 6-story wing,
connected by a single-story structure, all over one level of subterranean parking.
MDR Hotels, LLC is the applicant and developer of the leasehold property. Hardage
Hospitality, LLC will be the operator of the Marriott duel brand (Residence Inn and
Courtyard) hotel.

Enclosed, please find 14 sets of drawings and a computer disk, which is part of the
required package that includes the existing site plan and the proposed conceptual
site plan, floor plans and exterior elevations for the above project.

Background
This project was previously conceptually approved by the Design Control Board in
June 2006 for a 19-story hotel/timeshare design that was submitted by this
applicant under a previous entity known as Woodfin Suite Hotels, LLC. The project
permits and the associated Final Environmental Impact Report were subsequently
unanimously approved/certified by the Regional Planning Commission in March
2010. Project opponents then appealed the Regional Planning Commission's
approval action to the Board of Supervisors, who, in turn, remanded the project

1975 EL CAMINO REAL SUITE 101 SAN DIEGO CA 92108
(858) 411-2910 • (858) 411-2910 FAX
WWW.THEHARDAGEGROUP.COM

B
2

857

MDR0000699

Exhibit 25

Jones Letter
October 23, 2013
Page 2

back to the Regional Planning Commission for its further review of a lower-in-height
hotel concept. Around that time, the public wetland park planned for development
on the southerly approximately 1.46 acres of the parcel was undergoing further
study and design changes as part of the Coastal Commission staff's review of an
appeal to the County's approval of the Coastal Development Permit for the wetland
park that had been filed with the Coastal Commission by opponents of the wetland
park. . The Coastal Commission unanimously approved a Coastal Development
Permit for the wetland park in December 2012, which approval was subsequently
challenged in court by an opponent of the wetland park; the wetland park litigation
is ongoing. The plans submitted herewith accurately depict the wetland park as
unanimously approved by the Coastal Commission.

This application is submitted in accordance with the directive from the Board of
Supervisors that we resubmit a lower-in-height hotel design.

## PROJECT DESCRIPTION

### Existing Site

The existing site is vacant and generally slopes from west to east approximately five
feet. There is one known abandoned oil well on the site that will have to be re-
abandoned in accordance with the Department of Conservation - Division of Oil, Gas,
& Geothermal Resources. Furthermore, the building structure will have to be
designed for the mitigation of methane gas. An easement along the north property
line, reserved for the County of Los Angeles for sewer, fire access, and harbor utility
purposes, encroaches 10 feet into the site. Approximately 50 steel I-beams, along
the north and west property lines, from a previous hotel development that was
abandoned, will have to be removed. The site will require geotechnical remediation
with stone columns or auger piles to stabilize the site against liquefaction.

### Hotel

The hotel project consists of three components: the hotel, promenade and wetland
park. The hotel is situated on the northerly 2.3 acres of the site with frontage on Via
Marina to the west, apartments to the north, the harbor to the east, and the wetland
and fire road to the south. A 6-story Marriott Residence Inn wing frames the southerly
northerly side of the structure and a 5-story Courtyard wing frames the southerly
side of the structure. The hotel room wings will be joined by a single-level structure
that will accommodate the duel lobbies, common areas and meeting spaces, the
hotel's *On the Water* restaurant/bar, an outdoor dining terrace, and a rooftop pool
and fitness center.

B
3

858

MDR0000700

Exhibit 25

Jones Letter
October 24, 2013
Page 3

The hotel will have 129 rooms in the north "Residence Inn" wing and 159 rooms in the south "Courtyard" wing for a total of 288 hotel rooms; **none of the proposed hotel rooms will be timeshares.** The north and south wings are approximately 86,235 and 79,750 square feet, respectively.  The single-level connecting common area structure is approximately 12,000 square feet.

In contrast to the striking mass and height of the previously-approved, 225-foot-tall hotel/timeshare structure, the overall design for the exterior of the revised hotel is relaxed and casual with a residential scale to reflect the character of the west Marina del Rey neighborhood. The architectural character is contemporary incorporating simple clean lines, with varied planes to create an interesting play of Southern California sun and shadow across each façade, with large expanses of clear glazing to take full advantage of the stunning views of the marina and wetland preserve. Guest suites located on the ends of each hotel tower are designed with large walk-out terraces with clear glass railings to fully optimize the views throughout the marina. The color and material palette is one to compliment the clean contemporary design with a strong base of smooth formed warm gray concrete, striated with horizontal bands to create a strong base to anchor the building into the landscape. The ground and upper floors consist of very light colored monochromatic stucco with slightly darker/gray accents, clear glass railings and energy efficient clear glazing.

Parking for the hotel guest and wetland park will be provided in the subterranean garage and at grade level. A total of 216 parking spaces (the car parking count was previously approved by Regional Planning) will be provided by the hotel's 24/7 valet service. 21 parking spaces will be reserved for wetland park visitors. The parking structure is approximately 70,000 square feet.

The public will be encouraged to use the hotel's *On the Water* restaurant/bar. Guest and visitors can enjoy outdoor dining and an indoor/outdoor bar on a tiered terrace that is elevated above and slightly steps down to the promenade to allow patrons to enjoy an uninterrupted panoramic view of the harbor. Direct stair access to the restaurant and bar will be provided from the promenade along with an ADA approved lift for persons with disabilities. Bicycle stands will be provided on the promenade to make the hotel a convenient stop for cyclist. The roof of the central lobby area will feature guest amenities such as a gas-fired fire pit, residential style barbeque grilles, and the hotel's pool and fitness center where guest can enjoy a leisurely swim or a stimulating workout with state-of-the-art equipment while enjoying a magnificent view of the harbor.

B
4

1321595.4

MDR0000701

Exhibit 25

James Letter
October 23, 2013
Page 4

A loading dock and a shielded trash enclosure will be located at street level on the west end of the north wing and accessed from Via Marina. A service elevator in the receiving room will provide access to the back-of-house services at the garage level.

Fire truck access to the building is provided from Via Marina on the west side, a 28-foot-wide Grasscrete (or similar material) fire road on the south side (provided as part of the wetland improvements), a 28 foot wide promenade on the harbor side, and a 28-foot-wide paved fire road on the adjoining north property (provided in the Parcel 10R development).

Mechanical units located on the roofs will be visibly shielded on four sides. Enclosed stairs will provide access to the roofs. Mechanical equipment located on the pool deck will be enclosed.

View Corridor
The wetland park, which takes up over a third of the site, will allow expansive views of the harbor from Via Marina and Tahiti Way. This area will serve in meeting the open space requirements of the project. In addition, the two mid-rise wings connected by a single-level structure will also provide a sense of openness that is harmonious with the scale of the community.

Promenade
The promenade is a 28-foot-wide walkway between the harbor and the hotel property that also serves as an emergency fire lane. The Design Control Board approved the conceptual plan for the promenade in December 2009, with conditions (attached). This application proposes to comply with the approval and its conditions, which includes decorative paving, lighting, landscaping, benches, and a sheltered water taxi gate.

Wetland Park
The California Coastal Commission issued a *Notice of Intent to Issue Permit* for the wetland park in January 2013 that included standard and special conditions (attached). This application proposes to comply with the notice as stated.

Conclusion
The new design mitigates the concern of height and massing expressed by the community for the previous design. As noted, we have removed the timeshare units in their entirety, which was also a key point of concern with the prior hotel program. The proposed hotel is fully consistent with the development criteria and parcel land use designation of the certified Marina del Rey Local Coastal Program. The new

B
5

MDR0000702

Exhibit 25

James Letter
October 23, 2013
Page 5

design will create a genuine sense of place for the community – particularly important for the largely residential west side of Marina del Rey. The hotel will become a destination not only for visitors to Marina del Rey, but for local residents as well. The hotel's restaurant and elevated terrace, in particular, will serve as exciting new Marina del Rey amenities. These spaces will allow hotel guest to comingle with members of the public such as strollers along the adjacent promenade, visitors to the adjacent wetland park, boaters from the adjacent transient anchorage, or residents of nearby multi-family housing developments. The unmatched waterfront setting will allow everyone to rest, dine or simply people-watch, all while soaking in the magnificent views of the Marina.

Sincerely,

Samuel A. Hardage
Chairman

B
6

Exhibit 26

# LEASE AGREEMENT

by and between

COUNTY OF LOS ANGELES

and

MDR HOTELS, LLC

(Parcel 9U -- Lease No. _____)

Dated as of _____, 2017

**Exhibit 0496**

Geisinger

MDR0000569

Exhibit 26

## LEASE AGREEMENT
## PARCEL 9U — MARINA DEL REY

THIS LEASE AGREEMENT ("**Lease**") is made and entered into as of July 31_____, 2017 ("**Effective Date**"), by and between the COUNTY OF LOS ANGELES ("**County**"), as lessor, and MDR HOTELS, LLC, a Delaware limited liability company (together with its permitted successors and assigns, "**Lessee**"), as lessee.

## W I T N E S S E T H

WHEREAS, County and Lessee entered into that certain Option to Lease Agreement dated October 6, 2015 (the "**Option Agreement**"), pursuant to which County granted Lessee an option (the "**Option**") to enter into a lease agreement with County for the lease to Lessee of the real property in the Marina del Rey Small Craft Harbor now referred to as Parcel 9U and specifically described on Exhibit A-1 attached to this Lease (the "**Premises**"); and

WHEREAS, a portion of the Premises constituting of approximately 2.076 acres, as specifically described on Exhibit A-2 attached to this Lease (the "**Hotel Related Premises**"), will be developed by Lessee with two hotels that contain approximately (but not more than) 288 hotel rooms (the "**Hotels**"), a promenade along the waterfront from the boundary with Parcel 10R to the boundary with Parcel 8T, parking facilities, hardscape, landscape and other related improvements (collectively, the "**Hotel Development**"); and

WHEREAS, the remaining portion of the Premises constituting approximately 1.59 acres, as specifically described on Exhibit A-3 attached to this Lease (the "**Wetland Park Premises**"), will be developed with wetland public park, buffer and related improvements (collectively, the "**Wetland Park Development**") and Lessee's leasehold interest in the Wetland Park Premises shall be subject to County's reservation of an exclusive public use easement in, on, under and over the Wetland Park Premises for the use, occupancy, operation, maintenance, repair, alteration, reconstruction and replacement of the Wetland Park Development; and

WHEREAS, the boundaries of the Premises, the Hotel Related Premises and the Wetland Park Premises are depicted on Exhibit A-4 attached to this Lease; and

WHEREAS, the site plan for the Premises, the Hotel Related Premises and the Wetland Park Premises is depicted on Exhibit A-5 attached to this Lease; and

WHEREAS, Lessee has exercised the Option in accordance with the terms and provisions of the Option Agreement.

NOW, THEREFORE, in reliance on the foregoing and in consideration of the mutual covenants, agreements and conditions set forth herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto and each of them do agree as follows:

1.   BACKGROUND AND GENERAL.

1.1   Definitions.  The defined terms in this Lease shall have the following meanings:

1321595.4

MDR0000576

Exhibit 26

1.1.140    "STATE" shall mean the State of California.

1.1.141    "STATEMENT OF POSITION" shall have the meaning set forth in Subsection 16.5(2)(a).

1.1.142    "SUBLEASE" shall have the meaning set forth in Subsection 11.1.1.

1.1.143    "SUBLESSEE" shall have the meaning set forth in Subsection 11.1.1.

1.1.144    "SUBSECTION" shall mean a subsection of a Section of this Lease.

1.1.145    "substantial completion" means the completion of the Development Work, Future Renovation or other work of improvement (as applicable), including without limitation, the receipt of a certificate of occupancy (whether temporary or permanent) or other applicable governmental certificate or approval for legal use and occupancy of the subject Improvements (if applicable with respect to the particular work), subject only to minor punch-list items that do not interfere with the use and occupancy of the subject Improvements, provided that any such minor punch-list items are completed in a diligent manner as soon as reasonably possible thereafter.

1.1.146    "TERM" shall have the meaning set forth in Section 2.1.

1.1.147    "TIME OF THE ESSENCE" shall have the meaning set forth in Section 15.2.

1.1.148    "UMBRELLA COVERAGE" shall have the meaning set forth in Subsection 9.1.1

1.1.149    "UNINSURED LOSS" shall have the meaning set forth in Section 10.5.

1.1.150    "UNREASONABLE COUNTY ACT" shall have the meaning set forth in Section 5.6.

1.1.151    "WETLAND PARK DEVELOPMENT" shall have the meaning set forth in the Recitals to this Lease.

1.1.152    "WETLAND PARK AGREEMENT" shall have the meaning set forth in Subsection 5.1.1.

1.1.153    "WETLAND PARK PREMISES" shall have the meaning set forth in the Recitals to this Lease.

1.1.154    "WRITTEN APPRAISAL EVIDENCE" shall have the meaning set forth in Section 16.7.

1.2    Lease. For and in consideration of the payment of rentals and the performance of all the covenants and conditions of this Lease, County hereby leases to Lessee, and Lessee

MDR0000587

Exhibit 26

hereby leases and hires from County, an exclusive right to possess and use, as tenant, the Premises for the Term (as hereinafter defined) and upon the terms and conditions and subject to the requirements set forth herein, including without limitation the terms, conditions, and reservations set forth in Sections 3.8, 15.20, 15.21 and 15.22 below.

      1.2.1   <u>As-Is</u>. Except as provided in Subsection 1.2.3, Lessee accepts the Premises in their present condition notwithstanding the fact that there may be certain defects in the Premises, whether or not known to either party as of the Effective Date, and Lessee hereby represents that it has performed all investigations that it deems necessary or appropriate with respect to the condition of the Premises or Improvements. Lessee hereby accepts the Premises on an "AS-IS, WITH ALL FAULTS" basis and, except as expressly set forth in this Lease, Lessee is not relying on any representation or warranty of any kind whatsoever, express or implied, from County or any other governmental authority or public agency, or their respective agents or employees, as to any matters concerning the Premises or any Improvements located thereon, including without limitation: (i) the quality, nature, adequacy and physical condition and aspects of the Premises or any Improvements located thereon, including, but not limited to, the structural elements, foundation, roof, protections against ocean damage, erosion, appurtenances, access, landscaping, parking facilities and the electrical, mechanical, heating, ventilating and air conditioning, plumbing, sewage and utility systems, facilities and appliances, and the square footage of the land or Improvements, (ii) the quality, nature, adequacy and physical condition of soils, geology and any groundwater, (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Premises and the Improvements located thereon, (iv) the development potential of the Premises, and the use, habitability, merchantability or fitness, or the suitability, value or adequacy, of the Premises or any Improvements located thereon for any particular purpose, (v) the zoning, entitlements or other legal status of the Premises or Improvements, and any public or private restrictions affecting use or occupancy of the Premises or Improvements, (vi) the compliance of the Premises or Improvements with any applicable codes, rules, regulations, statutes, resolutions, ordinances, covenants, conditions and restrictions or laws of the County, State, United States of America, California Coastal Commission or any other local, state or federal governmental or quasi-governmental entity ("**Applicable Laws**"), including, without limitation, relevant provisions of the Americans with Disabilities Act ("**ADA**"), (vii) the presence of any underground storage tank or Hazardous Substances on, in, under or about the Premises, Improvements, the adjoining or neighboring property, or ground or other subsurface waters, (viii) the quality of any labor and materials used in any Improvements, (ix) the condition of title to the Premises or Improvements, and (x) the economics of the operation of the Premises or Improvements.

      1.2.2   <u>Title</u>. County represents that County owns fee title to the Premises and that County has authority to enter into this Lease. Lessee hereby acknowledges the title of County and/or any other public entity or agency having jurisdiction thereover, in and to the Premises, and covenants and agrees never to contest or challenge the extent of said title, except as is necessary to ensure that Lessee may occupy the Premises pursuant to the terms and conditions of this Lease.

      1.2.3   <u>Excluded Conditions</u>. Notwithstanding anything to the contrary set forth herein, the terms and provisions of Subsection 1.2.1 shall not be applicable to any sewer, storm drain or other improvements which have been dedicated to (and such dedication has been accepted by) the Department of Public Works of the County ("**Excluded Conditions**");

13

MDR0000588

Exhibit 26

in connection with the attempted audit of the inadequate records and the reconstruction and estimation of Gross Receipts and the calculation of Percentage Rent due.

15.    MISCELLANEOUS.

15.1    Quiet Enjoyment.  Lessee, upon performing its obligations hereunder, shall have the quiet and undisturbed possession of the Premises (subject to the public easement over the Wetland Park Premises and Promenade as set forth in this Lease) throughout the Term of this Lease, subject, however, to the terms and conditions of this Lease.

15.2    Time is of the Essence.  Except as specifically otherwise provided for in this Lease, time is of the essence of this Lease and applies to all times, restrictions, conditions, and limitations contained herein.

15.3    County Costs.  Lessee shall promptly reimburse County for the Actual Costs incurred by County in the review, negotiation, preparation and documentation of this Lease and the term sheets and memoranda that preceded it.

15.4    County Disclosure and Lessee's Waiver.

15.4.1    Disclosures and Waiver.

15.4.1.1    "AS IS".  Lessee accepts the Premises in their present condition notwithstanding the fact that there may be certain defects in the Premises, whether or not known to either party to this Lease, at the time of the execution of this Lease by Lessee and Lessee hereby represents that it has performed all investigations necessary, including without limitation soils and engineering inspections, in connection with its acceptance of the Premises "AS IS".

15.4.1.2    Lessee acknowledges that it may incur additional engineering and construction costs above and beyond those contemplated by either party to this Lease at the time of the execution hereof and Lessee agrees that, it will make no demands upon County for any construction, alterations, or any kind of labor that may be necessitated in connection therewith.

15.4.1.3    Lessee hereby waives, withdraws, releases, and relinquishes any and all claims, suits, causes of action (other than a right to terminate as otherwise provided in this Lease), rights of rescission, or charges against County, its officers, agents, employees or volunteers which Lessee now has or may have or asserts in the future which are based upon any defects in the physical condition of the Premises and the soil thereon and thereunder, including without limitation, any existence of Hazardous Materials in, on or under the Premises or any other environmental condition affecting the Premises, regardless of whether or not said conditions were known at the time of the execution of this instrument. The waiver and release set forth in this Subsection 15.4.1.3 (i) shall not apply to the Excluded Conditions.

15.4.1.4    California Civil Code Section 1542 provides as follows:

99

1321595.4

MDR0000674

Exhibit 26

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
WHICH THE CREDITOR DOES NOT KNOW OR
SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF
EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM
MUST HAVE MATERIALLY AFFECTED HIS
SETTLEMENT WITH THE DEBTOR.

By initialing this paragraph, Lessee acknowledges that it has read, is familiar with,
and waives the provisions of California Civil Code §1542 set forth above, and agrees
to all of the provisions of Subsection 15.4.1.3 above.

_____
Lessee's Initials

  15.4.2 <u>Right of Offset</u>. Lessee acknowledges that the rent provided for in this
Lease has been agreed upon in light of Lessee's construction, maintenance and repair obligations
set forth herein, and, notwithstanding anything to the contrary provided in this Lease or by
applicable law, Lessee hereby waives any and all rights, if any, to make repairs at the expense of
County and to deduct or offset the cost thereof from the Annual Minimum Rent, Monthly
Minimum Rent, Percentage Rent or any other sums due County hereunder.

  15.5 <u>Holding Over</u>.  If Lessee holds over after the expiration of the Term for any cause,
with or without the express or implied consent of County, such holding over shall be deemed to
be a tenancy from month-to-month only, and shall not constitute a renewal or extension of the
Term. During any such holdover period, the Minimum Monthly Rent and Percentage Rent rates
in effect at the end of the Term shall be increased to one hundred twenty-five percent (125%) of
such previously effective amounts. Such holdover shall otherwise be subject to the same terms,
conditions, restrictions and provisions as herein contained. Such holding over shall include any
time employed by Lessee to remove machines, appliances and other equipment during the time
periods herein provided for such removal, except as expressly provided in Subsection 2.3.2 with
respect to any Post Term Removal Period.

  Nothing contained herein shall be construed as consent by County to any holding over by
Lessee, and County expressly reserves the right to require Lessee to surrender possession of the
Premises to County as provided in this Lease upon the expiration or other termination of this
Lease. The provisions of this Section 15.5 shall not be deemed to limit or constitute a waiver of
any other rights or remedies of County provided at law or in equity. If Lessee fails to surrender
the Premises upon the termination or expiration of this Lease, in addition to any other liabilities
to County accruing therefrom, Lessee shall protect, defend, indemnify and hold County harmless
from all losses, costs (including reasonable attorneys' fees), damages, claims and liabilities
resulting from such failure, including, without limitation, any claims made by any succeeding
tenant ground lessee (or subtenant) arising from such failure to surrender, and any lost profits to
County resulting therefrom, provided that County notifies Lessee that Lessee's failure to timely
surrender the Premises will cause County to incur such lost profits.

  15.6 <u>Waiver of Conditions or Covenants</u>.  Except as stated in writing by the waiving
party, any waiver by either party of any breach of any one or more of the covenants, conditions,

100

1321595.4

MDR0000675