# EXHIBIT A

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MDR HOTELS, LLC,<br><br>                       Plaintiff,<br><br>vs.<br><br>MARATHON OIL COMPANY ; THE DOW CHEMICAL COMPANY ; AND DOES 1 through 10, inclusive,<br><br>                       Defendants. | Case No. 2:20-cv-08008-FLA (JPRx) |

## EXPERT REPORT OF DANIEL DUDAK

**November 22, 2022**

## I.      Qualifications

1.      My name is Daniel Dudak.  I am the founder and co-owner of Dudak, McCullough, and Evans Environmental Consulting, LLC ("DME").  DME's primary focus is to provide expert consulting services to landowners, developers, and government agencies, including local land-use authorities and others, who are seeking guidance on projects that involve sensitive construction and development on properties that contain oil or gas wells.

2.      From 2012 to 2020, I served as District Deputy (CEA/Deputy Director) of the Southern District of California Geologic Energy Management Division ("CalGEM") (formerly Division of Oil, Gas, and Geothermal Resources, or "DOGGR") within the Department of Conservation.  Prior to that, I served as manager of the Underground Injection Control Unit in DOGGR's District 1 (predecessor to Southern District).  From 2000 to 2011, I managed both the geothermal and natural gas programs for the California State Lands Commission (CSLC).  From 1988 to 2000, I was Energy and Mineral Resources Engineer for DOGGR.  Before my government service career began, I spent a total of just over four years at the Earth Technology Corporation's Environmental Geomechanics Laboratory in Huntington Beach and Petroleum Testing Service (PTS) in Los Angeles, Bakersfield, and Houston.

3.      During my more than three decades with CSLC and DOGGR/CalGEM, I witnessed and permitted drilling operations on hundreds of oil, gas, and geothermal wells, and thousands of oil and gas well abandonments, spanning those that were originally dug by hand in the mid-1800s to those that were drilled employing modern technology in the 21st Century.  Most wells I have worked on with the State of California were those in the LA Basin, offshore California, the Geysers Geothermal Field, and the geothermal fields of Imperial Valley, California.  In my work with DOGGR/CalGEM, I was also involved with several blowouts (uncontrolled release of fluids from a well) and other methane-leakage events, such as the 2015 gas blowout in Aliso Canyon, the 1989

2

methane leak in the Fairfax District of Los Angeles, the 2014 Playa del Rey SoCal Gas "Riegle" 1 well leak, and others.  I also worked closely with legal and other headquarters staff in drafting State policy and regulation.  While at PTS and Earth Technology Corp., I analyzed thousands of cores from exploration and development wells around the world for lithology and petrophysical properties such as porosity, permeability, density, fluid flow, and geomechanical properties.

4. I hold a Bachelor of Science degree in Geology from Illinois State University, and attended numerous short courses in petroleum engineering, petroleum geology, geothermal engineering, and well control.  I worked with the University of California Santa Barbara ("UCSB") Geology and Marine Science departments from the 1990s thru the mid-2000s with respect to their studies on oil and gas seeps in the Santa Barbara Channel.  In 2005, I co-authored a study with UCSB researcher Ira Leifer on methane gas seepage at the Playa Vista Freshwater Marsh, adjacent to the SoCal Gas storage facility.  My education and experience is set forth in Appendix A.

5. I have never previously provided an expert report, sat for a deposition as an expert, or testified at trial as an expert.

6. I am being compensated at a rate of $550 per hour for my services, and the rates for DME personnel working on this assignment under my direction are also $550 per hour.  My fees are not contingent upon the outcome of this matter.

## II.    Assignment and Summary of Opinions

7. I understand that Plaintiff MDR Hotels, LLC ("MDR") filed a complaint (the "Complaint") against Marathon Oil Company ("Marathon") and the Dow Chemical Company ("Dow") in the above-captioned matter alleging, among other things, that Ohio Oil Company, Marathon's predecessor, and Dow improperly drilled, completed, and abandoned a well ("the Well") located at 4360 Via Marina in Marina del Rey, California.  It is also my understanding that

MDR alleges that Ohio Oil Company's and Dow's purported improper drilling, completion, and abandonment of the Well caused the Well to blowout in December 2018 and on January 11, 2019. From reviewing the Complaint, it does not appear that MDR itself takes any responsibility whatsoever for either of the blowouts.

8.      This report sets forth my expert opinion based on information available to me as of the filing of this report. The materials I considered in my analysis are identified in Appendix B. The opinions set forth in this report are based on my review of this information as well as my knowledge, education, experience, and training.  If additional documents or information are made available to me, I reserve the right to review such documents and/or information and to incorporate that additional information learned about the facts or circumstances of this matter into my analyses, conclusions, and/or opinions.  I reserve the right to update, supplement, and amend my opinions as additional information becomes available and to provide additional information and opinions, including through a rebuttal report.

9.      The methodology I used in preparing this report was a combination of several factors, including, but not limited to: (i) my extensive 30+ year experience in oil and gas operations, oversight, and regulation in California in general, and the LA Basin in particular, which includes witnessing, analyzing, and permitting thousands of drilling operations, workovers, and abandonments; (ii) oversight experience on approximately a dozen or more blowouts and methane leaks over the past 30 years, including: Methane Gas Leakage, Fairfax District, Los Angeles, 1989; Methane Gas Leakage, Playa Vista Development, 2005; Covington and Riegel Wells Blowout, SoCal Gas, Playa del Rey, 2011; Golden State Water Well Blowout, Hawthorne, CA, 2013; Standard Sesnon Well No 25 Methane Blowout, SoCal Gas, Aliso Canyon, 2015-2016; and comparing and contrasting those events with the events here; (iii) utilizing my education in geology and my early work experience in petrophysical and lithological analysis of cores from

4

exploratory and development wells around the world; (iv) personal memories, which were somewhat fresh in my mind because of the nature of the event – this specific well blowout – and its relative recency; (v) review of relevant testimony of depositions and exhibits in this case; (vi) a review of Well histories, daily reports, a Root Cause Analysis (RCA) prepared by Exponent, and other documents; and (vii) a review of geological and geochemical analysis of methane gas hazards in Playa del Rey.

10. After reviewing the information in this proceeding, and based on my education, and many years of experience working for DOGGR/CalGEM regulating the oil and gas industry, including work related to regulating/overseeing MDR's reabandonment of the Well in my capacity as District Deputy of DOGGR/CalGEM, I have reached the following conclusions and opinions to a reasonable degree of scientific certainty:

- Marathon and Dow properly constructed and abandoned the Well in compliance with the regulations that were in place at the time their work on the Well occurred.

- MDR should have anticipated the work that was needed with respect to reabandoning the Well and it should have anticipated and better planned and prepared for the risk of a blowout.

- MDR was responsible for the blowout because it legally acquired the rights to abandon the well and was the operator in full control of the Well at the time of the blowout.

- MDR was unable to and did not finally reabandon the Well in accordance with DOGGR/CalGEM requirements/regulations, and it is not reasonably possible to fully abandon the Well given MDR's actions and failures.

## III.   Background Regarding DOGGR/CalGEM and Abandonment Statutes, Regulations, and Requirements

11. In 1915, the State Mining Bureau, Department of Petroleum and Gas ("Department") was created as the precursor to the Division of Oil and Gas ("DOG"), which later became the Division of Oil, Gas, and Geothermal Resources (DOGGR), and then eventually the

California Geologic Energy Management Division (CalGEM).  At the time of its creation, the Department's primary directive was "…to prevent, as far as possible, damage to underground petroleum and gas deposits from infiltrating water and other causes and loss of petroleum and natural gas…" through the supervision of drilling, operation, maintenance, and abandonment of oil or gas wells.  These early steps to regulate oil well abandonment demonstrate that the agency's early focus was the protection of the natural oil and gas resources for possible exploitation and development, and not on the potential harm these resources might cause to other natural resources or public human health and safety.

12.     As the oil and gas industry grew and matured in the late 1800s through the mid-1900s, and as oil and gas development began intersecting with growing population centers in California, DOG slowly shifted its focus to protecting freshwater aquifers and prioritizing the protection of public health and safety, property, and the environment.  An early indicator of this gradual shift in focus was the creation of the Public Recourse Code in 1939.  Specifically, Section 3220 set forth that "[t]he owner or operator of any well on lands producing or reasonably presumed to contain oil or gas shall properly case it with water-tight and adequate metal casing, in accordance with methods approved by the supervisor or the district deputy, and shall, under his direction, shut off all water overlying and underlying oil-bearing or gas-bearing strata and prevent any water from penetrating such strata.  The owner or operator shall also use every effort and endeavor to shut out detrimental substances from strata containing water suitable for irrigation or domestic purposes and from surface water suitable for such purposes; and to prevent the infiltration of detrimental substances into such strata and into such surface water."[1]  In 1972, with the passage of the federal

---

[1] *See* Public Resources Code, § 3220.

Clean Water Act, limited steps were taken to protect different underground resources, e.g., protecting fresh water from oil and gas well drilling and operations.

13.     In 1983, DOG received "primacy" from the federal EPA to regulate Class II injection wells, which are wells used to enhance oil and gas production through the injection of produced waters (i.e., water that comes out of the ground with oil and gas) and other waters into productive oil and gas zones, and the disposal of oil field fluids into approved disposal zones, and to protect Underground Sources of Drinking Water ("USDW"), which are subsurface aquifers with total dissolved solids ("TDS") of less than 10,000 parts per million ("PPM"); however, this primacy did not apply to production or other types of wells.  The policy and practice of protecting the Base of Freshwater (BFW), which is the depth above which waters contain less than 3,000 PPM TDS, and the USDW in all wells, including with respect to abandonments, has only been in effect since 1983.

14.     Not only are abandonment statutes and regulations that are passed imposed prospectively, but Final Reports issued by DOG/DOGGR/CalGEM are considered the official record of the well at issue until additional reports are filed and the record is updated by DOG/DOGGR/CalGEM.

15.     Since its creation, DOG/DOGGR/CalGEM has always required the protection of hydrocarbon zones.  By 1939, this protection became inclusive of waters suitable for irrigation or domestic purposes, and surface waters.  However, while the requirement for protection existed, the prescription for how to accomplish such protection, and the criteria for identifying which hydrocarbon zones and waters were to be protected, was either vague or non-existent.  As such, the specific requirements for an operator's well operations were contained in the Permit to Conduct Well Operations, and its predecessor, the Report on Proposed Operations.  The permits/reports reflected the most current requirements of DOG/DOGGR/CalGEM.

16.     In 1940, when Ohio Oil Company submitted a Notice of Intention ("NOI") to abandon the Well, it was required only to place a cement plug across the producing hydrocarbon zone, on top of the production casing stub (i.e., the remainder of the lower section of casing after removal of the higher section), and at the surface.  At the time, protection of non-productive or non-commercial hydrocarbon zones was not a requirement.  Likewise, only waters in use, or identified for use in irrigation or domestic settings, were protected.  DOG had no significant change in its requirements in 1956, when Dow applied for and completed abandonment of the Well.

17.     By 2017, seventy-seven years later, the laws surrounding well construction, maintenance, and abandonment had changed significantly.  The federal EPA and the California Department of Water Resources had established criteria for waters requiring protection, no longer limiting protection to waters in use.  DOGGR/CalGEM clarified that all hydrocarbon zones required protection, not just productive ones.  In addition, cement plugging requirements were upgraded to require longer plugging intervals both inside and outside casing.

## IV.     Marathon and Dow Properly Constructed and Abandoned the Well

18.     After having reviewed the documents and well records and based on many years of experience in regulating oil and gas well work and abandonments, which has involved reviewing similar historical drilling, operation, and abandonment records, it is my opinion that Ohio Oil Company's and Dow's work on and partial abandonment/abandonment of the Well were proper and were consistent with applicable statutes and regulations at the time.

### A.     The Significance of Department/DOG/DOGGR/CalGEM's Approval of Drilling, Completion, and Abandonment Work

19.     The State Oil and Gas Supervisor ("supervisor") is the highest-ranking officer of the Department/DOGGR/CalGEM, normally appointed by either the Director of the Department of Conservation, the Secretary of the Natural Resources Agency, or the Governor.  The supervisor

8

880

is the ultimate authority in the administration and enforcement of the statutes, regulations, and policies of the Department/DOGGR/CalGEM. District deputies are normally appointed by the supervisor to administer and enforce the statutes, regulations, and policies of the Department/DOGGR/CalGEM within three large geographical areas of the state and have many of the same powers as the supervisor. Written approval of the supervisor or district deputy is required prior to commencing drilling, reworking, injection, plugging, and/or plugging and abandonment operations. That written approval is historically and currently provided in the form of a permit to conduct specific well operations based on a NOI.

20. An approval of the Department/DOG/DOGGR/CalGEM in the well record means that the Department/DOG/DOGGR/CalGEM determined that an operator of a well was compliant with all existing statutes and regulations of the State of California regarding the drilling, completion, reworking, injection, operation, plugging, and abandonment of its oil, gas, or geothermal well that were in effect at the time the work was permitted or performed.

21. An approval in a Report of Well Abandonment, later renamed Report of Well Plugging and Abandonment (sometimes referred to as a "Final Letter"), means that an operator fulfilled all the requirements of the Department/DOG/DOGGR/CalGEM that were in effect at the time the work was permitted or performed regarding that abandonment. If abandonment regulations were to change *after* a Final Letter is issued, and the operator does not, or is not, required by the Department/DOG/DOGGR/CalGEM to reenter the well or alter it in any way, the operator would remain in compliance with respect to its abandonment. Final Letters are often relied upon by developers, property owners, and local planning agencies to determine the condition

9

of a well in the process of making land-use decisions.[2]  Even though DOGGR/CalGEM advises that access to all wells be maintained, since any well may leak in the future, land-use authority rests with the local permitting agency.

### B.     Ohio Oil Company and Dow's Work on the Well

22.     From February through April 1931, Ohio Oil Company submitted a NOI to drill, test for water shut-off, and complete well "Recreation Gun Club" 10, which were all received, witnessed, and approved by the DOG.  In addition, Ohio Oil Company submitted a drilling history, core history, casing, cementing, and perforation history, and initial production history to DOG. All information provided in the record appears to be complete and consistent with applicable laws at the time.  DOG witnessed and approved all operations that were required to be witnessed and approved, demonstrating that Ohio Oil Company complied with all relevant State laws for oil well construction and operation at the time with respect to these drilling and completion activities.  No violations were recorded in the record.

23.     In November 1940, Ohio Oil Company submitted a NOI to abandon the Well and, in January 1941, Ohio Oil Company's partial abandonment was approved by DOG.  In that same year, notices to transfer the Well to Dow, convert to saltwater production, perforate the Well for saltwater production, and test for water shut-off were all received and approved by DOG, which

---

[2] Report of Well Plugging and Abandonment, or "Final Letter", formerly known as Report of Well Abandonment, is an approval of the well abandonment when it contains the statement "[a] review of the reports and records shows that the requirements of this Division, which are based on all information filed with it, have been fulfilled."  Dow and Los Angeles County received such reports/letters for the Well.  Ohio Oil Company received an approved Special Report on Operations Witnessed, which similarly demonstrates that the requirements of DOG/DOGGR related to the partial abandonment, which were based on all information filed with it, were fulfilled prior to the Well's transfer to Dow.

demonstrated that Ohio Oil Company and Dow complied with all relevant State laws for oil and gas wells at the time with respect to these activities and no violations were recorded in the record.

24.     In February 1956, Dow submitted a NOI to abandon the Well, and on February 21, 1956, DOG issued a Report on Proposed Operation approving the NOI.  A telephone memo in the well file dated March 14, 1956 describes a blowout that occurred on March 12, 1956 during the well abandonment operation, noting that "the gas was apparently coming from behind the 11 ¾" casing at 1800 feet."  On April 19, 1956, a Special Report on Operations Witnessed was issued by DOG detailing the blowout and subsequent plugging operations performed in the process of well abandonment and approving such operations.  After Dow submitted its History of Oil or Gas Well detailing the complete well abandonment, DOG issue a Report of Well Abandonment signifying DOG's requirements were fulfilled.  This demonstrates that Dow complied with all relevant State laws for oil and gas wells at the time with respect to its abandonment operations and no violations were recorded in the record.

25.     In December 1958, a NOI to abandon and report of transfer of Well from Dow to the County of Los Angeles (the "County"), along with name change, was filed with the DOG.  In April 1959, the County reabandoned the Well, and this reabandonment was approved by DOG, demonstrating that the County of Los Angeles complied with all relevant State laws for oil and gas wells at the time with respect to its reabandonment and no violations were recorded in the record.

26.     Based on my review of the documents, my experience in the industry regulating abandonments and reabandonments and reviewing historic well records, and my familiarity with historic DOGGR laws, other applicable laws, and historic DOGGR policies and procedures, it is my opinion that Marathon and Dow's construction, operation, and abandonments of the Well were proper and in compliance with all applicable statutes and regulations in effect at the time.

## V.     MDR Should Have Anticipated the Work That was Needed and the Risk of Blowout, and Ultimately Caused the Blowout

27.     MDR was the legal operator in control of the Well at the time the Well blew out in December 2018 and January 2019.[3]  A prudent and responsible operator in California understands that submittal of a NOI requires a thorough review of the well record and, if necessary based on the circumstances, review of other well records in the same area, as well as local petroleum geology and hazards.  If MDR exercised standard care when reviewing the Well file and developing its reabandonment program for the Well, it would have planned for the potential of a gas kick (uncontrolled flow of fluids from a rock strata into a well) or blowout in the well.  In fact, even putting aside the blowout history associated with the Well, the mere fact that the Well was nearly 90 years old should have alerted MDR to take extraordinary care in the reabandonment because wells of this vintage typically have casing and cement that has degraded over time.  The surfacing of gas and fluids near the wellbore and the approximately ten other gas kicks and lost circulation events (where more well control fluid is exiting the well into a permeable rock strata downhole than can be replaced at the surface) prior to January 11, 2019 were strong indicators that the well reabandonment plan and blowout prevention equipment ("BOPE") installation should have been a primary concern and modified appropriately before proceeding with additional downhole operations.  Additionally, a prudent and responsible operator, contractor, or consultant in oil and gas understands that both an appropriate well control plan and BOPE are crucial to the safety of the well, personnel, and the environment.  A BOPE not only includes the surface equipment (i.e. pipe rams, blind rams, annular preventer, internal blowout preventer, control valves, etc.) but it also includes a competent anchor casing cemented in the wellbore and able to withstand the

---

[3] MDR took responsibility for the Well by filing all the appropriate documents including a bond and NOI to conduct reabandonment operations.

maximum anticipated well pressures.[3]   The Well's permitted BOPE system pressure rating requirement was 2000 psi.  PRC section 3219 states ***"Any person engaged in operating any oil or gas well wherein high pressure gas is known to exist, and any person drilling for oil or gas in any district where the pressure of oil or gas is unknown shall equip the well with casings of sufficient strength, and with such other safety devices as may be necessary, in accordance with methods approved by the supervisor, and shall use every effort and endeavor effectually to prevent blowouts, explosions, and fires."***   Prior to beginning well operations and after encountering multiple gas kicks and lost circulations, MDR should have evaluated the casing in the Well to assure it was competent to provide protection from blowouts.  In my opinion, the casing MDR was using as the anchor string was inadequate to hold the pressure that the BOPE system was required to withstand.  Had MDR employed standard BOPE tests prior to commencing downhole operations, it should have found that, while the BOPE stack attached to the casing may have been operable, the casing on which it was attached (the anchor string) was not competent.

28.     MDR, not Marathon or Dow, caused the blowouts of the Well in 2018 and 2019. MDR failed to do *all* of the following:

   a.   to account for, or take seriously, the past history of blowouts in the Well and in other wells in the nearby area;

   b.   to account for the geology and history of methane seepage in the area;

   c.   to maintain crew readiness for blowouts;

   d.   to reassess its blowout prevention plan after it identified gas breaching the surface around the well in December 2018;

   e.   to employ the use of an internal blowout preventer ("IBOP"), which is essentially a check valve to prevent backflow up the work string (a tubular conduit used to convey well tools downhole and provide a flow path for fluids to surface) after a

kick;

    f.    to have appropriate well control fluid in the wellbore, which in turn contributed to a loss of fluid in a lost circulation zone, causing gas-charged fluids to enter the wellbore which initiated the kick;

    g.    to properly manage the rise of gas inside the wellbore resulting in the loss of control at the surface; and

    h.    to properly install the pipe safety valve on the work string to control the flow of fluids.

## A.    Construction on Properties That May Contain Oil or Gas Wells

29.    The primary laws applicable to an operator and developer who, in 2017, identified a well abandoned in 1959 on or near where it proposed to build a hotel and parking garage, is PRC section 3208.1(b)(1), (b)(2), and (b)(3). Section 3208.1(b)(1) states, *"[t]he supervisor finds that the operator plugged and abandoned the well in conformity with the requirements of this division in effect at the time of the plugging and abandonment and that the well in its current condition presents no immediate danger to life, health, and property but requires additional work solely because the owner of the property on which the well is located proposes construction on the property that would prevent or impede access to the well for purposes of remedying a currently perceived future problem. In this situation, the owner of the property on which the well is located shall obtain all rights necessary to reabandon the well and be responsible for the reabandonment."* Section 3208.1(b)(2) states, *"[t]he supervisor finds that the operator plugged and abandoned the well in conformity with the requirements of this division in effect at the time of the plugging and abandonment and that construction over or near the well preventing or impeding access to it was begun on or after January 1, 1988, and the property owner, developer, or local agency permitting the construction failed either to obtain an opinion from the supervisor or district deputy as to*

14

*whether the previously abandoned well is required to be reabandoned or to follow the advice of the supervisor or district deputy not to undertake the construction. In this situation, the person or entity causing the construction over or near the well shall be responsible for the reabandonment."* And Section 3208.1(b)(3) states, *"[t]he supervisor finds that the operator plugged and abandoned the well in conformity with the requirements of this division in effect at the time of the plugging and abandonment and after that time someone other than the operator or an affiliate of the operator disturbed the integrity of the abandonment in the course of developing the property, and the supervisor is able to determine based on credible evidence, including circumstantial evidence, the party or parties responsible for disturbing the integrity of the abandonment. In this situation, the party or parties responsible for disturbing the integrity of the abandonment shall be responsible for the reabandonment."* These statutes, as they pertain to the Well, did not change from 2017 to 2019. It is my opinion that MDR had ample opportunity to consider these statutes and review the well file to determine the difficulty of abandoning the well to current standards.

**B.      MDR Chose to Acquire the Rights to the Well and Reabandon the Well**

30.      The Construction Site Well Review ("CSWR") program within DOGGR/CalGEM gives operators, developers, land use agencies, and others an opportunity to request an opinion from DOGGR/CalGEM regarding development on land containing oil, gas, or geothermal wells. In addition to providing an operator with the current status of each well and what is deficient in terms of current abandonment requirements for each well that is recorded on a given property, the CSWR letter also states that DOGGR/CalGEM *does not* recommend that access to *any* well be impeded. MDR initiated the CSWR process with DOGGR in 2017, but it is unclear whether it completed the process prior to initiating work on the Well. A draft CSWR letter to MDR dated July 15, 2019, however, indicates that the CSWR process was not completed at the time reabandonment of the Well was initiated.

15

31.     MDR knew the well was leaking prior to acquiring the rights to reenter the well and performing a reabandonment.  MDR's contractor Methane Specialists identified the well as leaking on September 18, 2017, with gas levels recorded as 1% LEL (Lower Explosive Limit).  And MDR did not obtain its permit to reabandon the Well until June 5, 2018.  Despite this knowledge, MDR chose to take the responsibility under State law to bring the well up to current abandonment standards, which included drilling out previously placed cement plugs, repairing any casing damage, cleaning out the well to the anomalous gas zone that was responsible for multiple historic blowouts, and proceeding to the lowest uncemented zones in the well to reabandon from that point to the surface.  Since MDR accepted this responsibility, its obligation was to ensure that adequate resources were available and at the ready, including blowout prevention experts and equipment, geologists and petroleum engineers who understood the subsurface environment, including methane hazards, and rig crews that were appropriately trained and certified in well control, including blowout prevention.

32.     Once MDR identified the Well's location, and submitted a NOI to reabandon the Well, the following steps (abbreviated) were legally required under the permit issued to MDR to bring the Well up to current standards.  As detailed directly below, the vast majority of these steps were missed or improperly taken by MDR:

  a.  "BOPE installation, as defined by DOGGR's publication No. MO7." – It is my opinion the original BOPE installation was inadequate because the blowout preventer stack was installed on casing (anchor string) that was tied to old, damaged casing.  A BOPE system *includes* a competent anchor string that can withstand the minimum pressure rating of the approved BOPE, which is 2000 psi.  It is my opinion that the anchor string would likely not withstand a pressure of 2000 psi due to its condition.

16

888

b.  "A pipe safety valve must be suitable for all pipe in use…" – It is my opinion that the pipe safety valve was either inoperable, improperly stored for use in a blowout, or was not properly installed on the work string during the blowout.  It is also possible that the pipe safety valve was operable, but the rig crew did not know how to use it successfully.

c.  "Blowout prevention practice drills are conducted at least weekly and recorded on the tour sheet" – Weekly practice drills were either not performed or not recorded on the tour sheets on a weekly basis.

d.  "Hole fluid of a quality and sufficient quantity to control all subsurface conditions in order to prevent blowouts shall be used." – It is my opinion that, while hole fluid of a quality and sufficient quantity to control subsurface conditions may have been on site, it was not used as it should have been used to control the lost circulation event that precipitated the blowout.  In my opinion, from the documents I have reviewed, it appeared that fresh water or a fluid of similar density and viscosity was being used to control a lost circulation zone.  This is contrary to what a competent operator or contractor would use in such situations.

e.  "All portions of the well not plugged with cement are filled with inert mud fluid having a minimum density of 72 lbs/cf and a minimum gel shear strength of 25 lbs/100 sq ft." – Since MDR was unable to complete the abandonment, it is unknown whether the remainder of the well is filled with the required mud.

f.  Well cleaned out to 3376 feet. – Not completed.

g.  Running of cement bond log from 3376 feet to surface. – Not completed.

h.  "Upper Zone" cement plug from 3376 feet to 2936 feet. – Not completed.

i.  Saltwater zone cement plug from 3341 feet to 3076 feet – Not completed.

17

j.   Upper hydrocarbon (gas) zone from 2200 feet to 2100 feet – Not completed.

k.   "Junk" dropped in hole and left unrecovered from 1577 feet to 1302 feet.

l.   Cement squeeze from 1462 feet to 1562 feet. – Completed

m.   Cement squeeze from 625 feet to 765 feet. – Completed.

n.   Cement plug at surface from 50 feet to 5 feet. – Completed.

o.   Installation of casing riser through parking garage. – Completed.

p.   Installation of methane monitoring system. – Unknown.

### C.   MDR Failed to Take into Account, or to Take Seriously, the Past History of Blowouts in the Well, and in Other Wells in the Area, And Failed to Take Seriously the January 11, 2019 Blowout

33.   MDR's statements and actions demonstrate that it was either unaware of, or unconcerned with, previous blowouts in the Well and previous blowouts in other wells in the area. The fact that MDR witnessed gas breaching near the Well in December 2018 and did not reassess its blowout prevention or reabandonment plans demonstrates that it was either unaware of, or unconcerned with, the potential hazard the Well could become if MDR did not proceed carefully and professionally (which it ultimately did not).

34.   In addition, shortly after the blowout of January 11, 2019, while the Well was unstable and had significant shut-in pressure at the surface, indicating that it remained a serious hazard and a threat to life, health, property, and natural resources, DOGGR's Southern District staff alerted its local management that MDR still was not taking the Well situation seriously.  Staff indicated that MDR was planning to "shut in" the well at night because MDR did not want to receive complaints from neighbors coming home from work.  Hearing this, DOGGR management called for a teleconference with MDR and its contractor.   During the meeting, DOGGR management asked MDR what its plans were over the next 24 to 48 hours to control the well. MDR indicated that it was drafting a plan, but that the rig crew would be "shutting down"

18

operations at night to "get rest" and so the crew would not disturb local residents during the night.

MDR also indicated that the County would not allow the rig crew to work between certain hours

or on weekends.  In response, DOGGR management pressed further to prompt MDR to take the

situation more seriously, but MDR's focus was on noise complaints and staffing, not with

remediating the still dangerous and potentially explosive situation at the Well.  MDR's lack of

focus appeared to frustrate even MDR's contractor, whose employee exclaimed loudly over the

phone, "this well is a ticking time bomb!"  At the conclusion of this meeting, DOGGR management

determined it had no confidence in MDR's lack of seriousness about the situation, prompting

DOGGR to issue its Emergency Order.

35.     A prudent and responsible operator would have thoroughly reviewed the available

public well records and other easily accessible studies online and would have sought out available

publications and/or experts to ensure it was not exposing itself or others to harm.[4]  A prudent and

responsible operator also would have paused its work and reassessed its reabandonment and

blowout prevention plans after experiencing a gas leak near the Well in December 2018, even if it

did not have confirmation that the source of the gas was the Well.  MDR did not do these things,

and did not act as a prudent and responsible operator.

### D.     MDR Failed to Take into Account the Geology and History of Methane Seepage in the Area

36.     Any oil and gas operator, contractor, or consultant working in any region of the

State should understand the basic fundamentals of subsurface geology, petroleum engineering, and

potential hazards of the area in which they are working.  Not to do so, as it is referred to in the

industry, is to "drive blind" when drilling or reentering a well.  Pressurized hydrocarbon zones are

---

[4] Even a cursory review of the publicly available Well file would have revealed the Well's prior
history, including the prior blowout.

commonly-known and -documented in the LA Basin. Some of these zones are discontinuous methane lenses or "pockets" and are abundant on the west side of the Basin, especially in the vicinity of Playa del Rey and Marina del Rey, which is where the Well is located. In fact, due to the known threat of flowing wells in proximity to populated areas, DOGGR/CalGEM developed enhanced blowout prevention equipment requirements delineated in its MO7 publication that operators have utilized to design their blowout prevention plans for many decades. A prudent and responsible operator, contractor, or consultant working on oil and gas wells in the LA Basin should be aware of methane gas hazards and should have all available resources to prevent a blowout. MDR failed to act as a prudent and responsible operator by failing to take into account the geology and history of the Playa del Rey area in preparing for its reabandonment operations.

**E.     MDR Failed to (i) Ensure Rig Crew Readiness for Blowouts, (ii) Reassess its Blowout Prevention Plan after it Identified Gas Breaching the Surface Around the Well, and (iii) Have Appropriate Equipment and Materials on Site to Control a Blowout (IBOP, adequate mud)**

37.     If MDR exercised standard care when reviewing the well file and developing its reabandonment program for the Well, it would have planned for the potential of a gas kick or blowout in the Well. In fact, even without the history of blowouts, the mere fact that the Well was nearly 90 years old should have alerted the operator to take extraordinary care in the reabandonment because wells of this vintage typically have casing and cement that has degraded over time. The surfacing of gas near the Well and the ten other gas kicks and lost circulation events prior to January 11, 2019 were strong indicators that the Well reabandonment plan and BOPE installation should have been of primary concern and modified appropriately before proceeding with downhole operations. Additionally, a prudent operator, contractor, or consultant in oil and gas understands that a BOPE includes a competent anchor casing, which is also cemented in place.

38.     MDR should have restored casing integrity as it reentered the Well.  In addition, MDR's near continuous milling (i.e., cutting) operations inside the 11 ¾" steel casing likely ground away significant portions of metal, thereby weakening the casing further.  Had MDR employed standard BOPE tests prior to commencing downhole operations, it should have found that, while the BOPE stack attached to the casing may have been operable, the casing on which it was attached (anchor string) was not competent.  A simple pressure test of the entire BOPE system from the BOP at the surface to the shoe (the cemented bottom) of the anchor string would have confirmed whether or not the BOPE was adequate for reabandonment operations.  A competent and prudent operator or contractor would have demonstrated and recorded a pressure test of the BOPE prior to downhole operations.  There are no indications that MDR performed such a test.

39.     Testimony in the case and the Root Cause Analysis performed by Exponent indicates that the rig crew failed to properly install the pipe safety valve to the work string during the blowout.  This was not an especially "strong" blowout as evidenced in the video, and with proper training the rig crew should have been able to attach it to the work string and close the valve; however, sound oil field practice dictates that an Internal Blow Out Preventer (IBOP) should be run on the work string in wells that have a heightened risk of blowouts.  It is my opinion that the rig crew should have been operating with an IBOP on the work string, but all indications suggest that MDR had not installed an IBOP and it was thus not available to the rig crew.

40.     On November 11, 2018, the MDR rig crew experienced their first gas kick on the Well at a depth of 165 feet.  On December 5, 2018, the MDR rig crew lost fluid circulation in the Well while cleaning the Well out at a depth of 836'.  On December 20, 2018, the MDR rig crew again lost circulation at a depth of 986'.  All of these events are cases of well control issues and should have resulted in a reevaluation of MDR's well control program for adequacy.

21

41.     Sometime between December 24 and 26, 2018, while the Well was unattended, it blew out through surface ruptures, spilling a reported 35 barrels of mud and solids.  When the rig crew returned to the Well on December 26, 2018, they not only observed the remains of the blowout, but also observed pressure on the Well, indicating a gas buildup.  CCR section 1722(i) states, ***"[b]lowouts, fires, serious accidents, and significant gas or water leaks resulting from or associated with an oil or gas drilling or producing operation, or related facility, shall be promptly reported to the appropriate Division district office."***  There is no indication that MDR issued prompt notice with respect to this blowout.  Furthermore, it is not permissible to close-in a well and leave it unattended when it is unstable (i.e., flowing or building pressure) and cannot be completely shut-in without open annuli or unsealed surface breached.  The Well here was not stable, having experienced at least three kicks or lost circulation episodes, and a surface breach on December 20, 2018, and thus MDR should not have left the Well unattended.

42.     On January 7, 2019, MDR's rig crew reentered the Well with its work string, at which time they started encountering gas.  Between January 8 and 10, 2019, the rig crew encountered multiple kicks which resulted in gas pressurizing the Well and causing fluid flow.  On January 11, 2019, the Well took another kick as the crew was attempting to arrest a lost circulation problem in the well.

43.     It is my opinion that MDR's improper use of well control fluid, or "mud", and most likely the withdrawing of the work string too quickly, resulting in "swabbing" (suction), initiated the kicks; however, either one of those factors alone could have resulted in a kick and loss of well control.  Based on materials I have reviewed, it appears MDR's contractor was using fresh water in the Well to control a highly permeable, lost circulation zone, which runs contrary to common logic in well control scenarios.  It is my opinion that the use of improper well control fluid (lacking in weight, viscosity, and lost circulation material, or LCM, additives) led to migration and growth

of a gas bubble from a lost circulation zone in the Well and that the rig crew was unable to slowly circulate the gas out of the Well.  Once the gas reached the surface and the blowout occurred, MDR's failure to properly employ standard blowout prevention measures resulted in the rig crew dropping the work string into the wellbore, further complicating, delaying, and ultimately, prohibiting the complete reabandonment of the Well.

44.     Dropping a work string into a well during a blowout is a "last resort" effort which is further evidence that the rig crew was inexperienced, untrained, and/or unprepared for a gas kick or blowout.  The unpreparedness of the rig crew is also evidenced in the derrickman's delayed escape from the derrick of the rig about 60 feet in the air (which may be viewed here: https://youtu.be/DW_-DTvtgy8).  In this one minute and 56 second video, which shows only a limited period after the blowout starts, the derrickman tried to escape from the rig.  By the end of the video, and even though it is nearly two minutes long, the derrickman still did not complete his escape.  Had the rig crew employed proper blowout procedures, he would have been on the ground in seconds.

## VI.    MDR Was Not Able To and Did Not Finally Abandon the Well, Which Now Cannot Be Reasonably Abandoned to Current Standards

### A.    Implications of DOGGR/CalGEM Not Approving an Abandonment

45.     An abandonment that has been deemed "Not Approved" by DOGGR/CalGEM on a Report of Well Plugging and Abandonment means that the well does not meet the State's rigorous plugging and abandonment standards at the time of abandonment.  Wells not approved to the State's current standards pose a higher risk of leaking and potential damage to life, health, property, and natural resources than those abandoned to current standards.  DOGGR/CalGEM does not recommend any well be built over or have access impeded, including wells abandoned to, or exceeding, current standards.  Wells in which access is impeded, and are not abandoned to current

standards, pose an even higher risk to life, health, property, and natural resources, due to their immediate proximity to structures and the time, cost, and complexity of tearing down impediments to the wells and rigging up well servicing equipment to remediate the wells should they begin leaking.

**B.** **MDR Did Not Fully Reabandon the Well and DOGGR Did Not Approve the Reabandonment**

46.    DOGGR did not approve the reabandonment because MDR did not satisfy the conditions of its permit to conduct well operations, and, at the time the Final Letter of Abandonment was signed, the Well was not consistent with current standards.

47.    Based on the obstructions in the wellbore, primarily the work string and drilling assembly ("fish") which was dropped into the wellbore during the blowout, and the cement around and below the drilling assembly, combined with the condition of the casing, it is my opinion that the Well could not be reasonably reabandoned to current standards and that further attempts to retrieve the fish had the potential of severely compromising what was already an old, compromised casing.


_____

DANIEL DUDAK
November 22, 2022

## APPENDIX A: EXPERIENCE AND EDUCATION

### Daniel Dudak

Daniel Dudak is principal and co-owner of Dudak, McCullough, and Evans Environmental, LLC.  His over 35 years of experience in regulation, oversight, inspection, permitting, enforcement, regulation and policy development, land resource management, and geology, provides unique expertise in navigating the complex world of residential, commercial, and governmental development in oil and gas fields.  His consultation services allow property owners, developers, government agencies, transportation authorities, and others to make more informed decisions with respect to land use when developing within oil and gas fields and/or near oil and gas wells.  His services also include full evaluation of oil, gas, and geothermal wells to comply with current California law, including abandonment.

As District Deputy (CEA) of the California Geologic Energy Management Division ("CalGEM", formerly the Division of Oil, Gas, and Geothermal Resources, or "DOGGR"), Mr. Dudak managed over 90 engineers, geologists, and support staff in the state's Southern District, which includes Los Angeles, Orange, Riverside, San Bernardino, Inyo, Imperial, and San Diego counties.  He regularly provided regulatory information and advice to high-level federal, state, and local officials engaged in oil, gas, and geothermal issues. He often collaborated with federal partners such as Lawrence Livermore and Sandia national laboratories, the Environmental Protection Agency, and United States Geological Survey, who provided specialized support to DOGGR/CalGEM to solve complex oil and gas issues.  He was a major player in a multi-year internal audit of DOGGR's Class II Underground Injection Control program which was the basis for the organization's Renewal Plan of 2015, which modernized and strengthened oil, gas, and geothermal regulation.

With the California State Lands Commission, Mr. Dudak managed the geothermal program for lands it held in Imperial Valley and at The Geysers Geothermal Field, the most productive geothermal resource in the world.  He managed natural gas production on state lands and was technical lead for investigations of methane gas seepage on state-owned land adjacent to the Playa Vista development near Marina del Rey and Playa del Rey.

In the private sector, Mr. Dudak was engaged primarily in core and lithologic analysis of rocks from exploratory and development oil, gas, and geothermal wells, as well as geomechanical and fluid flow analysis of rocks, soils, and human-made construction materials.

### Education

Illinois State University
B.S., Geology, 1983

**Employment**

Dudak, McCullough, and Evans Environmental, LLC, Long Beach, CA
2021-present, Founder and Co-owner

California Geologic Energy Management Division (formerly DOGGR), Southern District
(formerly District 1), Cypress and Long Beach, CA
2012-2020, District Deputy (CEA)
2011-2012, Supervising Oil and Gas Engineer, Underground Injection Control
1988-2000, Energy and Mineral Resources Engineer

California State Lands Commission, Mineral Resources Management Division, Long Beach, CA
2000-2011, Associate Mineral Resources Engineer

Earth Technology Corporation, Environmental Geomechanics Laboratory, Huntington Beach,
CA
1988, Laboratory Supervisor, Staff Geotechnical Engineer

Petroleum Testing Service, Inc., Santa Fe Springs and Bakersfield, CA
1984-1988, Senior Laboratory Technologist and Geologist

**APPENDIX B: MATERIALS CONSIDERED**

- Civil Minutes – Case No. 2:20-cv-08008-FLA, April 20, 2021
- Defendants' Memorandum of Points & Authorities in Support of Motion for Partial Summary Judgement, Filed August 8, 2022
- ECF 104 2022.07.08 Order Granting Joint Stip to Continue Dates
- Dow RGC 10 Well History – 03713798, January 18, 2019
- Daily Report Interact Dow RGC-10
- CalGEM WellSTAR Database
- Statutes of California, 1939
- Statutes of California, 1915
- California Statutes and Regulations for Conservation of Oil, Gas, and Geothermal Resources, January 2022
- CalGEM Well Finder Database
- Dow RGC 10 Blowout Video and Derrickman's Delayed Escape
  https://youtu.be/DW_-DTvtgy8
- California Oil and Gas Fields, Volume II – Southern, Central Coastal, and Offshore, 1992
- Exponent – Root Cause Analysis of the RGC 10 Well Blowouts, June 7, 2019
- Deposition of Chris Phillips – Day 1
- Deposition of Chris Phillips – Day 2
- Deposition of Val Lerma
- Deposition of Brun Hilbert
- Deposition of Randy Moskal
- Deposition of Aaron G Scheet
- Deposition of Michel Vasconcellos
- Deposition of Chris Conahan
- Exhibit 0042
- Exhibit 0007
- Exhibit 0009
- Exhibit 0010
- Exhibit 0025
- Exhibit 0026
- Exhibit 0032
- Exhibit 0042
- Exhibit 0046
- Exhibit 0053
- Exhibit 0054
- Exhibit 0066
- Exhibit 0123
- Exhibit 0129
- Exhibit 0132
- Exhibit 0133
- Exhibit 0192
- Exhibit 0260

- Exhibit 0263
- Exhibit 0264
- Exhibit 0265
- Exhibit 0315
- Exhibit 0316
- Exhibit 0317
- Exhibit 0318
- Exhibit 0319
- Exhibit 0320
- Exhibit 0321
- Exhibit 0322
- Exhibit 0323
- Exhibit 0324
- Exhibit 0325
- Exhibit 0326
- Exhibit 0327
- Exhibit 0328
- Exhibit 0329
- Exhibit 0330
- DOC email: Grace Brandt to Chris McCullough 6/21/2019 6:50AM
- CalGEM Report of Plugging and Abandonment, Dow RGC 10 March 11, 2020
- Department of Conservation, Division of Oil and Gas Publication No. M07
- API Recommended Practice for Well Control RP 59, Second Addition May 2006
- Methane Assessment Report, Methane Specialists, August 23, 2006
- Methane Gas Districts Map, LA Bureau of Engineering, 2004
- Subsurface Geochemical Assessment of Methane Gas Occurrences, Playa Vista Development, Exploration Technologies, April 17, 2000
- Geology of Los Angeles, Environmental & Engineering Geoscience, Volume 13, No. 2, May 2007
- Experience and Education – Daniel Dudak