# EXHIBIT B

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MDR HOTELS, LLC,<br><br>                 Plaintiff,<br><br>vs.<br><br>MARATHON OIL COMPANY ; THE DOW CHEMICAL COMPANY ; AND DOES 1 through 10, inclusive,<br><br>                 Defendants. | Case No. 2:20-cv-08008-FLA (JPRx) |

## EXPERT REBUTTAL REPORT OF DANIEL DUDAK

**January 19, 2023**

## I.      Introduction and Summary

1.      I have been asked by counsel for the defendants Marathon Oil Company ("Marathon") and The Dow Chemical Company ("Dow") to review and respond to the report of Jeff S. Jordan ("Mr. Jordan"). In his report, Mr. Jordan generally concludes that former operators of well Dow RGC No. 10 ("Well"), Ohio Oil Company ("OOC") (a predecessor entity of Marathon Oil Company ("Marathon")) and Dow were responsible for blowout(s), "broaches", difficulties, delays, and additional costs that operator MDR Hotels, LLC ("MDR") experienced with the Well and delays and additional costs of MDR's construction of two hotels.  Mr. Jordan opines that both Marathon/OOC and Dow violated oil and gas laws and employed non-standard petroleum industry materials and practices in the drilling, construction, operation, and plugging of the Well.  Mr. Jordan also opines that both Marathon/OOC and Dow caused "contamination" of waters and soils and are responsible for MDR's inability to reabandon the well to current regulatory standards.

2.      In this report, I base my responses, including my opinions, on the evidence in the record, as well as my education, experience, and training (including three decades of knowledge and experience in oil and gas drilling, operations, and plugging and abandonment, as well as the state's oversight in such operations).  I also base my responses on my personal experience with many of the events that transpired while I served as deputy with the Division of Oil, Gas, and Geothermal Resources (DOGGR) and California Geologic Energy Management Division (CalGEM).  I have attached a list of materials I have considered as Appendix A to this report.  If additional documents or information are made available to me, I reserve the right to review such documents and/or information and to incorporate that additional information learned about the facts or circumstances of this matter into my analyses, conclusions, and/or opinions.  I reserve the right to update, supplement, and amend my opinions as additional information becomes available and to provide additional information and opinions.

2

3.      Mr. Jordan's report suffers from a number of flaws that fatally undermine the reliability of his conclusions.  Mr. Jordan repeatedly makes statements that are misleading, unsupported by the evidence, or contrary to it.  He fails to acknowledge MDR's own numerous failures that, in my opinion, were the cause of many, if not most, of the problems it encountered. And he improperly assesses actions taken decades ago according to *current* regulations and industry standards that simply did not exist at the time.  I detail numerous instances of these and other failures in Sections III-VI below.

## II.      Key Elements and Themes of Dispute

4.      Mr. Jordan assumes in reaching his conclusions that Marathon/OOC and Dow are responsible for the blowout and other difficulties MDR experienced in the Well.  Although he admits that oil and gas industry practices were significantly less rigorous than they are today, he goes on to criticize Marathon/OOC and Dow for actions that conformed to the industry practices at the time.  For instance, he acknowledges the common use of "stovepipe" casing, and then goes on to critique the use of stovepipe casing in the construction of the Well in 1931.

5.      Mr. Jordan repeatedly implies that Marathon/OOC and Dow "failed" to do certain things in the construction, operation, and plugging of the Well apparently due to his misunderstanding and misstating of statutes, "regulations", and/or standard industry practices employed at the time.  At the same time, he fails to acknowledge MDR's many errors.

6.      Emblematic of Mr. Jordan's apparent misunderstanding is his repeated misuse of the term "isolation" throughout the document, by implying that deeper zones, for instance, are properly "isolated" if higher zones are cemented or plugged[1].  From a regulatory perspective, a

---

[1] Cementing generally refers to cement placed in the annulus between casing and casing, or casing and hole; plugging generally refers to cement placed inside the full diameter of casing or open hole in the process of abandonment.

zone is protected, or "isolated", from fluids entering or exiting it by cementing or plugging of the same zone in addition to installing casing or other barriers.  Although Mr. Jordan uses the term "isolation" often, prior to 1974, such terminology was not used in California well construction and plugging and abandonment law and, most importantly, was not in law while Marathon/OOC and Dow operated the Well.  For instance, isolation of a freshwater zone could mean cementing of the casing/hole annulus in a production or injection well, cementing of all annuli and plugging inside casing across the zone during abandonment, or it could simply mean placing a retrievable "packer" above or below the zone to temporarily segregate it from other zones, formations, or the surface.  However, in all cases, and from a regulatory perspective, proper zonal isolation is the prevention of fluid inflow or outflow at or across the zone or zones to be isolated.  Cementing other portions of a well is not the same as zonal isolation of that particular zone.  In terms of well plugging and abandonment regulations, the fact that a freshwater zone or the surface has been cemented/plugged does not mean that a deeper uncemented oil or gas zone is "isolated", contrary to what Mr. Jordan states when describing MDR's plugging of the Well in 2019.  More importantly, isolation of a gas zone in a well only refers to that particular gas zone, and not all zones that may be present in a well, especially due to the fact that gas is more prone to migration.

7.      Mr. Jordan often refers to "regulations" that existed during the time Marathon/OOC and Dow operated the Well; however, only *statutes* were in place at the time, and oil and gas regulations were not enacted until 1974, decades after Dow plugged and abandoned the Well in 1956.  When Marathon/OOC and Dow operated the Well, the oil and gas requirements at the time were based on the statutes in place at the time which were interpreted by the state oil and gas supervisor ("supervisor"), or his deputies, and those interpretations were incorporated into specific approvals (permits) to conduct operations or approvals of operations performed.  The supervisor (or deputy) was given great latitude in the implementation of the statutes. In fact, the original

4

construction of the act in 1915 which created the Department of Petroleum and Gas, predecessor to the Division of Oil and Gas ("DOG"), laid out in Chapter 714 Section 53 the general powers of the supervisor to interpret the statutes, stating, *"[t]his act shall be* _liberally construed_ *to meet its purposes and the supervisor shall have all the powers which may be necessary to carry out the purposes of this act…"*  Eventually, after 1974, and for the first time, much more specific and prescriptive *regulations* were enacted into law to define many of the general, liberal, requirements in statute that had previously been interpreted by the supervisor and deputies and written into well approvals and permits.

8.      In a similar anachronistic fashion, Mr. Jordan makes use of terms like "freshwater" or "USDW" when referencing waters supposedly requiring "isolation" or protection during the time Marathon/OOC and Dow operated the Well.  Just as oil and gas regulations were not enacted until late in the 20th Century, neither were specific regulations of subsurface water.  The oil and gas statutes of 1929 are the first to identify certain waters requiring protection in oil and gas wells, but only applied to certain subsurface water.  Specifically, Chapter 535, Section 16, states,  *"[i]t shall be the duty of the owner or operator of any well referred to in this act, before abandoning same to use every effort and endeavor in accordance with methods approved by the supervisor, or his deputy, and under his direction, to shut off and exclude all water from entering oil or gas-bearing strata encountered in the well, and protect any* _underground water suitable for irrigation_ *from infiltration of any detrimental substances.*"  The statutes were vague in some cases and there was no definition for the terms "suitable for irrigation" or "domestic purposes", nor was there contamination criteria or cleanliness standards imposed by DOG or the state's water agencies. If, for instance, underground water suitable for irrigation or domestic purposes had been identified in the Well by DOG, state water agencies, or by local purveyors, it would have been incorporated into the drilling approval (permit) and subsequent approvals.  It is my understanding that the

5

906

supervisor interpreted the terms as waters either currently in use or likely to be used for such purposes, under advice from local water agencies or water purveyors. Similarly, if no protectable waters were included in the permit, none were identified.

9. Additionally, during the time Marathon/OOC and Dow operated the Well, "freshwater," "Base of Freshwater," and "Underground Source of Drinking Water" were not terms in the lexicon of the DOG or even state or federal water agencies. Prior to the federal Safe Drinking Water Act ("SDWA") of 1974[2], the terms Base of Freshwater ("BFW") and Underground Source of Drinking Water ("USDW") did not exist, nor were there any consistent water quality standards that identified concentrations of contaminants or pollutants in groundwater or deeper aquifers as there are today. Prior to 1974, in terms of waters, DOG's mandate was to <u>protect commercial hydrocarbon resources from infiltrating water</u>[3] which was accomplished through the primary cementing of production casing at the commercial hydrocarbon zone(s) and confirmation of water shutoff ("WSO") by means of a WSO test[4], a point Mr. Jordan's report acknowledges.[5]

10. Throughout his report, Mr. Jordan refers to Marathon/OOC and Dow's failure to cement certain hydrocarbon zones and non-hydrocarbon zone perforations in casing. Once again, Mr. Jordan misunderstands the history of oil and gas requirements in California, which have changed significantly over time. Initially DOG's primary purpose was to protect *productive* hydrocarbon zones from infiltrating water and to protect loss of hydrocarbon reservoir energy. Statutes, as interpreted by the supervisor and memorialized in approvals to conduct well operations

---

[2] https://www.epa.gov/sites/default/files/2020-05/documents/safe_drinking_water_act-title_xiv_of_public_health_service_act.pdf.

[3] 1915 Statute, Chapter 718, Sec. 3, Department of Petroleum and Gas, "*It shall be the duty of the state oil and gas supervisor so to supervise the drilling, operation and maintenance and abandonment of petroleum or gas wells in the State of California, as to prevent, as far as possible, damage to underground petroleum and gas deposits from infiltrating water and other causes and loss of petroleum and natural gas.*"

[4] 1917 Statute, Chapter 759, Sec. 15.

[5] Jordan Report at 27.

(permits), were focused on protecting productive/commercial hydrocarbon resources, not unproductive/non-commercial hydrocarbon "stringers" or "shows"[6].  Although the statute does not specifically cite "commercial" or "productive" hydrocarbon resources, at the time OOC/Marathon and Dow operated the Well, only productive zones were considered for protection from damage to and loss of the resource.  It was clear that in 1915 when oil and gas laws were enacted and at least until the statutes of 1929 and beyond, the intent of the DOG was to promote commercial production of hydrocarbons and protect hydrocarbon reservoirs.  The statutes repeatedly used terms like, *"...to protect the natural resources of petroleum and gas..."*, *"[t]his work shall be done with the view to advising the operators as to the best means of protecting the oil and gas sands..."*, *"...to protect the petroleum and gas deposits from damage..."*, and  *"...in the interest of the protection of oil or gas..."*.[7]  The gas sand(s) or show(s) in this Well was(were) not considered to be commercially productive, and there was no apparent attempt to produce it(them), which is why there were no requirements in the approval to cement/plug it(them).

### III.    Mr. Jordan Makes Statements Unsupported by or Contrary to Data or Evidence in the Record

11.    In his report, Mr. Jordan repeatedly makes statements that are unsupported by the record, or worse, directly contradicted by it.  In my opinion, these statements are so pervasive as to call his conclusions fundamentally into doubt.  In the paragraphs that follow, I examine several examples of Mr. Jordan's statements that are indefensible in light of the record in this matter.

12.    On page 9, paragraph 1, Mr. Jordan states, ***"[i]n 2017, an abandoned oil well… was discovered to be leaking natural gas and other hydrocarbons.***"  I have not located, and Mr.

---

[6] Stringers or shows are often used interchangeably by geologists to define "indications" of oil or gas in a core or cutting from a well and do not necessarily indicate production potential.  An oil stringer or show may also be referred to as a stain in the lithologic description.

[7] 1929 Statute, Chapter 531, Secs. 1, 6, 8, and 8(c).

Jordan has not pointed to, anything in the record which indicates the Well was leaking "other hydrocarbons" and which would support Mr. Jordan's statement.  Indeed, the mere presence of other hydrocarbons on the site can be the result of illegal dumping or drainage from adjacent or nearby sites and is not direct evidence the Well was leaking other hydrocarbons.

13.    In the same paragraph, Mr. Jordan states "***Dow plugged and abandoned (P&A'd) the well in April 1956, experiencing a blowout during its abandonment operations which resulted in the uncontrolled release of natural gas, oil, and drilling fluids onto the surface of the property and into the atmosphere****.*"  This statement is directly contradicted by the DOG Memorandum of Telephone or Personal Communication[8], dated March 14, 1956, which states, "*the well was blowing marsh gas, salt water and sand at an undetermined rate…*"  The record contains no report of oil or drilling fluids in the blowout of 1956.  Indeed, MDR's own abandonment "expert," InterAct, contradicts Mr. Jordan in reporting that the "*…cement above the oil zone . . . has effectively isolated and protected the oil zone for 60 years; no evidence of oil migration has been observed in the DOW RGC 10 well*."[9]  In addition, there are no other records I am aware of, or that Mr. Jordan points to, which indicate the Well blew out oil at any time between 1931 and 2019.

14.    On page 10, paragraph 2, Mr. Jordan writes, "***Marathon did not document whether all water overlying and underlying oil-bearing strata were shut off as required by the California statutes.***"  On pages 76 and 77 of the Well Record,[10] however, the productive hydrocarbon zone was noted as having been tested successfully for water shutoff (WSO) by Marathon/OOC and witnessed by DOG.  This documentation directly contradicts Mr. Jordan's statement, as an

---

[8] DOG Memorandum of Telephone or Personal Communication, March 14, 1956 (MDR0083189).

[9] InterAct letter to MDR, Feb. 14, 2019 at 6 (MDR0063005).

[10] Well Record – 03713798_2019-01-18_DATA.pdf P76, P77.

approved WSO is confirmation that the operator has employed approved methods to "…*shut off all water overlying or underlying the oil or gas-bearing strata, and to effectually prevent any water from penetrating such oil or gas-bearing strata*."[11]  In fact, the same productive hydrocarbon zone was tested again for WSO on April 15, 1941 by Dow, and that second WSO test was also successful.  As the *Special Report of Operations Witnessed* stated, "*THE OPERATIONS AS WITNESSED AND REPORTED ARE APPROVED AS INDICATING THAT the 11-3/4" casing is water tight.*"[12]

15.     On page 10, paragraph 2 of his report, Mr. Jordan states that "***Marathon also did not isolate the shallow, high-pressure gas zones with competent steel casing and cement which <u>resulted in contamination of water zones</u>, well integrity failures, gas leaking to surface, and subsequent blowouts.***"  In the next paragraph, he states that Dow "***failed to isolate shallow, permeable water zones above the known hydrocarbon zones to prevent <u>contaminating the freshwater zones</u> and prevent pathways for hydrocarbons to escape to the surface soil and atmosphere….*"**  Contrary to Mr. Jordan's assertion/implication, the anomalous gas-bearing formation(s) in the Well is (are) not considered "high-pressure"[13] and was (were) never developed for commercial production; therefore, it (they) was (were) not required to be cemented at the time Marathon/OOC and Dow operated the Well.  DOG's requirement at the time the Well was drilled was only to cement the casing of the productive oil zone(s) to prevent water infiltration and fill the remainder of the casing annulus with mud.  This is evident from the Report on Proposed Operations

---

[11] 1917 Statute, Chapter 759, Sec. 15.

[12] Well Record - 03713798_2019-01-18_DATA.pdf P69, P83.

[13] While gas is inferred to be present in "shallow" formations known to exist in the deeper Pico formation, it is a misrepresentation to refer to such gas formations as "high-pressure".  API Technical Report 1PER15K-1 Protocol for Verification and Validation of High-Pressure High-Temperature Equipment defines a high-pressure well as having pressure greater than 15,000 psi [103 MPa].  Based upon a shut-in pressure of 300 psi after the Well blew out and allowing for a fluid density of 8.4 ppg as reported by MDR, the formation pressure at 2,200 feet (based upon observations in the drilling report by Marathon/OOC) would be no more than 1,300 psi.  This pressure is only slightly above the standard hydrostatic pressure of approximately 950 psi, but in no case considered high-pressure.

of March 2, 1931, that states, *"[t]he column of mud fluid back of the 11 ¾" casing shall be maintained to the surface for at least 30 days after cementing this casing.*"  In addition, DOG approvals did not require Marathon/OOC to cement any gas zone(s). Further, in my review of the record, I found no evidence of "contamination of water zones", including freshwater zones, related to this well from 1931 to present.  In fact, in addition to the oil production zone, the inside of the 11 ¾ inch casing and all annular spaces were filled with cement from at least 625 to 556 feet, effectively creating a barrier to prevent hydrocarbons *"to escape to the surface...."*[14]  Again, Mr. Jordan's statement is contrary to the record.

16.    On page 11, paragraph 3, Mr. Jordan writes, ***"[d]uring Dow's P&A of the Dow RGC #10 well in 1956, they left significant metal junk in the hole. The junk Dow left inside the production casing was not expected by MDR when they re-entered the well in 2018 to re-abandon it because it was not documented in the well history file. When Dow P&A'd the well in 1956, California state statutes and DOGGR required the condition of the well be fully documented, including the presence of any junk left in the hole (as well as the status of all perforations of the casing - see above). The junk Dow left in the hole in 1956 severely increased the difficulty and costs of MDR's re-abandonment operations in 2018/2019."***  Mr. Jordan's statement here is misleading.  Although there is documentation of a small 5-foot section of 4 ¾ inch tubing with 5 ¼ inch collar in the Well recovered by MDR,[15] the documentation contains no indication *who* left that junk in the Well or *when* it was left.

17.    Indeed, based on the significant gaps in MDR's daily reports and inconsistencies with its own history, combined with the multiple failures of MDR and its contractors, it is my opinion that it is just as likely that *MDR* lost that section of tubing in the Well during cleanout and

---

[14] Well Record - 03713798_2019-01-18_DATA.pdf P59.

[15] Ex C - Jordan - Reported Dow Fish Recovery by MDR.

plugging operations.  Additionally, Mr. Jordan's characterization of the 5-foot section of junk as being "significant" and that it "severely" increased the difficulty and costs of MDR's abandonment (9 days of 12-hour workdays) is curious and perplexing in light of his failure to mention the significance and severity of MDR's known failures, which included the dropping of 1,492 feet of tubing, heavyweight drill collars, and drill bit into the Well.  This not only caused 8 ½ weeks (24-hour workdays) of delays and costs in fishing operations alone, but ultimately led to MDR's inability to complete the cleanout, plugging, and proper abandonment of the Well, as it could not recover the last 275 feet of junk in the Well, as admitted by Mr. Jordan[16].

18.      On pages 23-24 of his report, Mr. Jordan purports to opine on the probable cause of eight wells that suffered blowouts in the Playa Del Rey field[17], including the Well.  He attempts to attribute all of the blowouts to the "high-pressure" Pico gas sand, contrary to his own "Documented Blowouts" table in his report, and even though most of the wells were exposed to both the Pico and deeper Repetto formations.  One well[18] was only open to the deeper Repetto formation and another well[19] was located in a completely different geologic structure of the Playa del Rey field.

19.      Mr. Jordan attempts to infer Marathon/OOC did not learn from the previous blowouts, of which only four occurred prior to the Well being drilled, and only one, "R.G.C." 8, was operated by Marathon/OOC, whereby it can be assumed Marathon/OOC had access to the blowout records.  Mr. Jordan also claims "R.G.C." 8 blew out from the shallower Pico gas sands, when a simple review of the well records shows the well was only open to the much deeper Repetto

---

[16] Jan. 13, 2023, J. Jordan Rough Dep. Tr. at 88.

[17] Jordan Table 4-1 Documented Blowouts Playa del Rey P183.

[18] Well Record 03713811_2011-09-27_DATA, P29-33.

[19] Well Record 03714087_2005-08_DATA.

11

oil zone.  He also stated in his deposition[20] and in other documents that comparison of neutron logs from this well appears to show a gas sand between 1,500 and 1,600 feet.  The original drilling and completion history of "R.G.C." 8 indicates that the well was drilled and cased with 8 5/8" casing from surface to 3,359' and was being bailed to 900 feet and swabbed to 1,200 feet respectively inside the casing when the blowouts occurred.  The only "open" part of the well that could have allowed gas into the well at this time besides the surface, would have been at 3,359 feet since there were no holes or perforations in the casing between 1,500 and 1,600 feet, nor anywhere else in the casing.  Additionally, Mr. Jordan should know that running a neutron log many decades after a well was originally drilled in which there is an uncemented annulus throughout most of the length of the casing and a known gas zone much deeper in the well, will likely result in gas readings on the log much higher in the wellbore than the source of the gas, since gas tends to migrate upwards in uncemented annuli and collect in high-permeability sands, which exist in the Pico and shallower formations.  Similarly, Mr. Jordan fails to recognize that the subject Well did not blowout during drilling operations in 1931; rather, it experienced its blowout 25 years later during an attempted casing recovery operation as part of the Well abandonment.  Based on the fact that gas was identified in the well at 2,200 feet and deeper during the drilling of the Well in 1931 but blew out decades later in much higher locations in the wellbore, is consistent with migration of gas over time to shallower locations in the Well.  It is also important to note that casing recovery efforts, many unsuccessful, were commonplace during well abandonments until well into the 1970's, and were not prohibited by DOG.  Mr. Jordan's conclusion is unsupported by the evidence he cites.

20.     On page 26, paragraph 3, Mr. Jordan states, "*[t]he surface casing of the Dow RGC #10 well did not have cement behind it above 391 ft (probably much lower when considering*

---

[20] Jan. 13, 2023, J. Jordan Rough Dep. Tr. at 128.

*hole washout - see below discussion). This allowed external fluids to attack the casing over time,*

*likely leading to severe corrosion in multiple areas on the production casing and surface casing*

*which contributed to the loss of well integrity. This resulted in the release of natural gas*

*throughout the history of the well and in blowouts during the well abandonment efforts of 1956*

*and 2018/2019.*" Mr. Jordan's statement here is complete conjecture, and he does not provide *any*

substantive evidence to support these conclusions.

### IV.     Mr. Jordan Makes Misleading Statements, Fails to Address MDR's Mistakes, and Applies Modern Industry Standards to Historic Operations

21.     It is my opinion that many of Mr. Jordan's statements in his report are premised on

an account of facts that is misleading or entirely incorrect.   In addition, Mr. Jordan generally

ignores MDR's own failures, which in my view are the primary cause of the costs and delays of

which MDR complains.   Mr. Jordan's report also frequently applies modern industry standards to

evaluate historic actions taken by Marathon/OOC, Dow, and others.   In my opinion, historical

operations in the oil and gas industry can only be fairly (and realistically) evaluated by one familiar

with the relevant practices that were standard at the time.   If Mr. Jordan has such familiarity, it is

not evident from his report.   In any event, his application of modern standards to historic operations

considerably undermines the reliability of his conclusions.

22.     On page 9, paragraph 1, Mr. Jordan states, *"[t]he abandoned well was discovered*

*to be leaking during MDR's construction operations to build a new hotel on the property in*

*September 2017."* This statement is misleading.   In fact, there were multiple indications of a

leaking well in the vicinity of the actual Well location more than a decade prior to MDR's

construction operations to build a new hotel on the property in 2017.[21]  Thus, MDR was aware, or should have been aware, of the Well and its condition before construction on the hotel began.  In addition, MDR had similar warnings that the old oil well on the property would have to be reabandoned.[22]  Further, MDR originally intended to build the hotel over the Well without bringing it up to current abandonment standards.[23]  And, contrary to PRC sec 3208.1, MDR failed to complete DOGGR's Construction Site Well Review ("CSWR") before beginning construction on the hotel and reabandonment operations on the Well and also failed to notify DOGGR promptly when it discovered the Well was leaking, as required by law.[24] [25]  These events reveal Mr. Jordan's account to be incorrect, and are clear indications that protecting health, safety, and the environment were not top priorities for MDR.

23.     On page 10, paragraph 3, Mr. Jordan states, *"it [Dow] did not leave competent barriers in and/or outside the casings of the wellbore to prevent hydrocarbons from breaching the surface."*  This statement is incorrect.  The barriers which were placed inside and outside the casings of the wellbore between 1931 and 1959 were consistent with standard oilfield practice at the time and were approved by DOG.  Specifically, annular and internal cement plugs were placed

---

[21] *See, e.g.*, Ex. 411 (Aug. 23, 2006 Methane Specialists Methane Site Assessment Report, methane leaks detected on the property); Ex. 329 (Mar. 2008 Draft Environmental Impact Report, noting report "did find measurable quantities of VOCs or methane in the soils of the project site."); Ex. 54 (May 3, 2008 Methane Specialists letter notes that "elevated methane levels" have been recorded.); Ex. 409 (Feb. 3, 2012 W. Pangelinan email discusses "methane buildup" and the need for "special construction"); Exs. 412-13 (Mar 2, 2012 W. Pangelinan email notes "methane concentrations up to 100%"); Ex. 414 (Sept. 9, 2012 W. Pangelinan email notes "methane mitigation cost will apparently have a big impact on our construction number").

[22] *See, e.g.*, Ex. 328 (Nov. 30, 2006 Leighton Phase 1 indicating that "the oil well should be located, leak tested and re-abandoned in accordance with" DOGGR); Ex. 54 (May 3, 2008 Methane Specialists letter to Woodfin's Mark Rousseau reflecting report notes that well may have to be "reabandoned."); Ex. 459 (Sept. 4, 2015 I. Waldman email chain discussing need to get a permit to re-abandon the oil well on the property); Exs. 50-51 (Oct. 13, 2015 email with Addendum to EIR attached, noting "re-abandonment of an existing oil well . . . would be required . . ."); Ex. 458 (May 9, 2016 B. Chaney email and attachment with timeline showing need to "Re-abandon Oil Well").

[23] Well Record - 03713798_2019-01-18_DATA.pdf P48.

[24] 2017 Leak Test Notification DOGGR 2019 email.pdf.

[25] CCR Chapter 4 Subchapter 1 Article 3 sec 1722(i).

14

below 556 feet and 786 feet, which were considered sufficient at the time to prevent migration of hydrocarbons to the surface.[26]   In fact, there was no record of hydrocarbon leakage at the conclusion of well abandonments in 1956 and 1959.  Moreover, there is no record of leakage definitively attributable to the Well between 1959 and 2017.  In addition, Mr. Jordan provides no comment on or analysis regarding the impact the County's reabandonment may have had on any leaks from the Well.

24.     In the same paragraph, Mr. Jordan writes, "*[a]fter concluding its P&A operations in 1956, Dow left the Dow RGC #10 well in a condition of severely compromised well integrity. The compromised well integrity created by Dow's P&A operations in 1956 made it extremely difficult, if not impossible, to re-enter and properly P&A the well to isolate all hydrocarbon zones and protect shallow, permeable water zones.*"  And on page 15, paragraph 1, he states that "*the production casing was intentionally cut and pulled apart in several places at shallow depths. This compromised the well's integrity and immediately after the first cut at 887 ft, the well experienced a blowout*."  These statements are misleading because the plugging and abandonment of the Well in 1956 and 1959 were consistent with industry standards at the time and complied with the requirements of the DOG.  Cutting/shooting and pulling of casing, even partially, was also a standard practice and specifically authorized by DOG and was eventually memorialized into regulation in 1974 under section 1723.1.[27]  Except for the blowout in 1956, there was no documentation of hydrocarbon migration out of identified zones or contamination of waters (fresh or brine) until MDR began developing the property in 2017.  In general, all plugged

---

[26] Well Record - 03713798_2019-01-18_DATA.pdf P59.

[27] CCR Supplement Register 1974 No 7 – Title 14 DOG.pdf - 1723.1. Recovery of Casing, P5 ("*Recovery of Casing. (a) Approval to recover all casing possible, except surface casing, will be given in the abandonment of wells and in depleted areas if no oil or gas has been cased off behind the casing. In depleted areas, wells may be stripped of casing where the oil zone can be plugged.*").  The section was later repealed.

and abandoned wells are difficult to re-enter, not only due to cement inside casing, but also due to parted casing, damaged casing, deterioration, junk, etc., and an experienced and prudent operator would take those factors that into account when re-entering an abandoned well.  Not only was MDR ill-prepared to re-enter this well, its actions and inactions were a cascading series of failures which led to the delays in the cleanout of the Well and the ultimate failure to plug and abandon the Well to current standards.  By contrast, <u>Dow's efforts to shoot (or cut) and recover casing from the Well were consistent with industry standards, not prohibited by DOG, and DOG approved Dow's abandonment.</u>

25.     On page 11, paragraph 4, Mr. Jordan states, *"1) Marathon's construction of the well in 1931 and Dow's abandonment in 1956 resulted in compromised well integrity of the casing strings that allowed gas influx into the wellbore through corrosion holes, and manmade perforations and cuts; and 2) insufficient placement and lack of cement barriers during Dow's abandonment in 1956 allowed gas from both deep and shallow intervals to enter the wellbore and led to lost circulation problems*."  Mr. Jordan's statement here overlooks that Marathon/OOC's construction of the Well in 1931 and Dow's abandonment in 1956 were consistent with standard oilfield practice as well as state law.  Drilling, well construction, "manmade" perforations and cuts, and plugging and abandonment operations were approved by DOG and most operations were witnessed by DOG.  Although Mr. Jordan mentions "corrosion holes," I have seen <u>no evidence of actual corrosion</u> in this Well and his testimony that Fig. 6-5 shows such corrosion[28] is unpersuasive; it is not evident from my review of the photograph.  Dow's placement of cement in the Well in 1956 was consistent with standard industry practices and state law at the time.  There is <u>no evidence</u> that Dow's abandonment allowed gas from both deep and

---

[28] Jan. 13, 2023, J. Jordan Rough Dep. Tr. at 42.

shallow intervals to enter the wellbore or that the blowout in 1956 "*led to lost circulation problems*" by MDR in 2018/2019.

26.     Mr. Jordan writes on page 12, paragraph 1, "*[t]he failure by Marathon and Dow to isolate the hydrocarbon-bearing intervals including both the original oil producing zone and the shallow, high-pressure gas zone, combined with the loss of well integrity, led to serious operational difficulties during MDR's reabandonment of the well. MDR overcame these difficulties despite gas influx into the wellbore and lost circulation problems causing well control incidents. MDR was able to plug and abandon the well, successfully isolating and protecting the shallow freshwater sands, as well as effectively sealing the well so that no hydrocarbons will come to surface via the wellbore*."   As stated previously, Marathon/OOC properly completed the oil producing zone in the Well.  The gas-bearing formations above the oil producing zone were <u>not required</u> to be cemented (or isolated) at the time Marathon/OOC completed the oil producing zone.

27.     Although the condition of the Well nearly 60 years after Dow's abandonment of it was typical of a well drilled in the 1930s and plugged and abandoned in the 1950s, the "serious operational difficulties" during MDR's reabandonment of the Well were almost entirely the result of MDR's lack of planning, execution, due diligence, and standard care, including but not limited to:

  a.  Insistence on developing a property which contained a well not in compliance with current abandonment standards and with a blowout history;

  b.  Insistence on building directly over the Well rather than taking the advice of DOGGR to not impede access to the Well;

  c.  Failure to act upon DOGGR's early advice to bring the well up to current standards (MDR originally proposed to cut down casing and install vent cone only);

  d.  Failure to retain a competent, knowledgeable, and experienced consultant early in the process to advise on well planning and abandonment—Methane Specialists was plainly out of its depth;

17

918

e.  Failure to complete the Construction Site Well Review (CSWR) process before beginning site construction and work on the Well;

f.  Failure to properly plan for well re-entry, well control, and well integrity issues;

g.  Failure to properly train and certify well personnel in well control;

h.  Failure to employ proper well control procedures and equipment for a potentially high-risk well environment, including:

    i.  Lack of proper fluid monitoring equipment and procedures;

    ii.  Lack of trip tank to maintain fluid column in well;[29]

    iii.  Lack of internal blowout preventer (IBOP) or drill string check valve;

    iv.  Improper use of safety valve—it should have been installed on bottom joint of one stand of tubing; and

    v.  Improper BOP (blowout preventer) anchor string(s);

i.  Failure to upgrade BOPE (blowout preventer equipment) even <u>after</u> multiple well-control incidents;

j.  Failure to run blowout prevention drills each week as specified in the original program and DOGGR permit[30];

k.  Failure to attempt "washover"[31] between the 11 ¾ inch casing and 18 ⅝ inch and installation of 12 ¾ inch or larger casing to establish a more competent anchor string for the BOPE and to facilitate proper repair of 11 ¾ inch casing, cleanout, and abandonment of Well;

l.  Permanent installation of small-diameter, non-API grade, 7 inch casing inside 11 ¾ inch production casing, which was restrictive and prevented the proper repairs of the 11 ¾ inch casing and the required cleanout, junk recovery, and abandonment of the Well;

m.  Failure to properly maintain well control fluid and inappropriately reducing the "weight" of fluid which created an unstable wellbore environment, including loss of circulation, drop of hydrostatic head, and influx of gas into the Well which flowed to surface, resulting in a blowout;

n.  Failure to properly install safety valve in work string during blowout, leading to the intentional dropping of the work string into the well, creating a significant obstruction

---

[29] Arthur Report Page 39, Sec "Continuous Fill Tripping Method".

[30] Well Record – Permit No. 7000607, dated 6/5/2018, requirement 2 - (03713798_2019-01-18_DATA.pdf) P13.

[31] "Washover" is a method of removing cement and debris from the outside of casing using larger-diameter pipe with a cutting surface at the tip or rim of the pipe which is used to free the casing of adhesion to the wellbore or larger diameter casing and allow for 1) easier cutting and recovery the casing, 2) recementing the annulus of the casing, or 3) installation of larger diameter casing over the smaller diameter casing that is washed over.

(fish) in the well consisting of 1,452 feet of 2 7/8 inch tubing, heavyweight drill collars, and drill bit;

o.  Failure to recover several hundred feet of fish it lost in the Well, the result of which, in addition to the improper installation of 7 inch casing, made further cleanout and plugging attempts extremely difficult to nearly impossible;

p.  Failure to plug the anomalous gas at ~2,200 feet and other required zones below the fish as the current regulations required.

In my opinion, MDR's cascading failures which led to the relatively moderate blowout combined with its intentional dropping of the work string into the Well, and its inability to remove that junk due to inappropriate casing it cemented in the well at the surface were the primary reasons MDR was unable to reabandon the Well to current standards.  MDR's poor planning and complete disregard for the well record, well history, advice of DOGGR, and reports from its own contractors, combined with the improper cementing of a restrictive 7 inch casing and loss of a significant section of irretrievable work string in the Well resulted in DOGGR/CalGEM's non-approval of abandonment.

28.    Additionally, in my opinion, MDR left the Well in a far more compromised state than it was before MDR touched it and, as a result, the Well remains a permanent heightened risk into the future.  Not only did MDR show complete disregard for the Well from the start, but it did so right up until the end of its operations, when it attempted to ignore the advice of DOGGR to install a wellhead riser[32] on the Well in order to protect its own staff and visitors from a well that it failed to abandon properly[33] and which posed a greater risk to the public and the environment than a well abandoned to current standards.  In contrast, the drilling operations by Marathon/OOC in 1931 through the plugging and abandonment operations by Dow in 1956 were completed in conformance with standard industry practices and DOG requirements at the time.  The former

---

[32] Exhibit_0192_2019_CalGEMDenialAltWellAccessPlan_ChrisConahan_192.

[33] 2020.3.11 ltr MDR_not approved DOW RGC10.

operators of the Well, including Marathon/OOC and Dow, are not responsible for MDR's multiple failures, including its failure to reabandon the Well properly.  Any purported damages MDR incurred could have been avoided if it had done what a prudent operator would have done in preplanning for the reabandonment and followed appropriate protocols when re-entering this vintage well.

29.     On page 12, paragraph 3, Mr. Jordan writes, "*[t]he hydrocarbon contaminated soil surrounding the Dow RGC #10 well was a result of produced oil and water storage in tanks on location as well as oil, water and gas separation and processing operations on the well location while owned and operated by Marathon. Multiple oil storage tanks as well as oil, water, and gas pipelines and separation equipment were utilized onsite… [i]n addition, as evidenced by gas observed bubbling from the well prior to re-entry in 2018, it is likely that hydrocarbon leakage from the well contributed to the contaminated soil after the well integrity was compromised during Dow's 1956 P&A attempt.*"  On page 19, paragraph 2, Mr. Jordan states, "*[o]il spills were common on well locations in the Playa Del Rey of the Well field and usually no effort was made to contain oil, gas, saltwater and drilling muds blowing out from a well. In addition, oil storage tanks on location were prone to leaks and spills. Soil on the well locations was contaminated with oil and other* <u>*toxic*</u> *chemicals that remain to this day….*"  I have seen no evidence—and Mr. Jordan does not cite any—that the source of that oil waste was definitively from onsite oil and water storage tanks, water and gas separation, processing operations, or the Well itself.   In addition, Mr. Jordan's narrow focus on Defendants prevented him from considering any other source for the contamination, including but not limited to the County's placement of contaminated fill, dredged from the neighboring lagoons and canals, to create the marina.  Additionally, Crude

oil is not considered by the state of California, nor the federal government, as a "toxic"[34] material, even though it may contain minor or trace elements or compounds that may be toxic to human health or the environment if extracted and concentrated through refining.

30.　　On page 16, paragraph 1 Mr. Jordan states, "*[d]uring the January 2019 blowout, the well was quickly controlled and killed. The January 2019 well control incident resulted in DOGGR issuing Emergency Order to Perform Remedial Work No. 1143, which mandated a Root Cause Analysis of the blowout incident be performed [3]. In addition, professional well control experts were contracted to help supervise and advise onsite during subsequent operations and to provide engineering support in regard to maintaining well control, all at MDR's expense*." The statement "*the well was quickly controlled and killed*" is highly inaccurate at best. The blowout at the surface was stopped only when MDR's crew failed to employ standard kick control/blowout procedures and intentionally dropped the entire work string into the Well. However, DOGGR staff and even MDR's own consultant understood that the well was not "killed" until surface pressure on the Well was 0 psi, which did not occur until four days later. There remained a dangerous situation with significant pressure at the wellhead meaning that the kick was still "live." DOGGR staff understood that a subsurface blowout was a real possibility, and it would not be satisfied until the wellhead pressure was brought to 0 psi. In fact, after the blowout, during my first emergency meeting with other managers of the Southern District office and MDR with its consultant, one of the consultant's representatives, in frustration over MDR's stated desire to continue normal, "daylight" operations and send the rig crew home in the evenings, stated that the well was "*...a ticking time bomb!*"[35] Mr. Jordan mentions that "*well-control experts were*

---

[34] CRWQCB Technical Reference Document "Characterization and Reuse of Petroleum Hydrocarbon Impacted Soil as Inert Waste" Oct 20, 2006, and Ch 3.2 CAL/OSHA, Subchapter 1, Article 5 § 339 - "The Hazardous Substances List.

[35] Personal recollection of meeting.

*contracted to help supervise and advise onsite during subsequent operations and to provide engineering support in regard to maintaining well control[36]"*; however, MDR experienced <u>approximately ten</u> well-control incidents prior to the blowout of January 11, 2019, including the blowout on or about December 25, 2018.[37]  It is my opinion that MDR is solely responsible for the eventual outcome of the Well's condition and status.

31.    A competent and prudent operator would also have anticipated problems in the preplanning of the reabandonment of this Well, based on well-documented reports of its blowout history, age, and casing record.  After failing to plan for the reabandonment properly, MDR had several opportunities to stop work on the Well after the first, second, or third kick, and to contract with a professional well control expert to provide engineering supporting in order to maintain well control and to prevent a blowout at the surface.  At the very least, MDR could have had a well control expert standing by on-site to assist the rig crew when the blowout occurred, so that it would have not dropped the work string into the Well – an improper action that resulted in lengthy delays and the inability of MDR to complete the proper cleanout, plugging, and reabandonment of the Well. But MDR failed at every turn.  It is my opinion, which is based in part on dealing with hundreds of similar construction developments on old oil field leases, that MDR failed to act what a competent and prudent operator would act on such a well, and failed to devote appropriate and necessary resources up front to abandon the Well properly.

32.    On page 20, paragraph 3, Mr. Jordan states, *"[t]he shallow, high-pressure gas sand (or sands) encountered during the drilling of wells in the Playa Del Rey field were the gas source for multiple blowouts on wells in the vicinity of the Dow RGC #10 well and on the Dow RGC #10 well itself."*  While gas is <u>inferred</u> to be present in "shallow" formations and known to be

---

[36] Jordan at 16.

[37] Dudak EX RPT at 12.

present in the deeper Pico formation, it is a misrepresentation to refer to any of the gas sands or zones in the Well as "high-pressure."  API Technical Report 1PER15K-1 Protocol for Verification and Validation of High-Pressure High-Temperature Equipment defines a high-pressure well as having pressure greater than 15,000 psi [103 MPa].  Based upon a shut-in pressure of 300 psi after the well blew out and allowing for a fluid density of 8.4 ppg as reported by MDR, the formation pressure at 2,200 feet (based upon observations in the drilling report by Marathon/OOC) would be no more than 1,300 psi.  This pressure is only slightly above the standard hydrostatic pressure of approximately 950 psi, but in no case is it considered high-pressure.  The mere fact that the Well blew out does not mean that the gas zone(s) were high-pressure; only that they were above normal hydrostatic pressure.

33.     On page 25, paragraph 3, Mr. Jordan states, "*[w]ell integrity is defined as the ability of a well to maintain isolation of geologic formations and prevent the escape or migration of natural gas or fluids, including oil, between formations or to the surface…industry standard is that wellbore integrity must be maintained by barriers throughout the life of the well including after any well interventions, introductions of produced fluids or foreign fluid or materials, completions, workovers, re-purposing of the well, gas injection and withdrawal operations, or plug and abandonments*."  In multiple places throughout his report, Mr. Jordan has criticized Dow for attempting to cut and recover the 11 ¾ inch casing, which he claims compromised the integrity of the well.  He ignores that Dow did place and squeeze cement at the locations where the casing was cut, thereby reestablishing well integrity, which is consistent with his statement *"the industry standard is that wellbore integrity must be maintained by barriers throughout the life of the well including after any well interventions…."*  Dow's efforts in 1956 did appear to stop any leakage from the Well at the conclusion of the Well abandonment.  Indeed, no mention of leakage was identified when Los Angeles County reabandoned the well in 1959.  Mr. Jordan also fails to

23

924

recognize that his statements about maintaining well integrity is binding upon MDR during its operations *"including after any well interventions, introductions of produced fluids or foreign fluid or materials, completions, workovers, re-purposing of the well, gas injection and withdrawal operations, or **plug and abandonments….**"* (emphasis added). MDR drilled through the barriers established by Dow during the initial abandonment of the well, but rather than repair the Well intervals it found compromised, MDR chose to continue to drill ahead, leaving the Well integrity compromised above the area they were working, even while experiencing well control issues at the compromised areas.

34.     On page 32, paragraph 1, Mr. Jordan states, ***"the lack of cement behind the production casing across from the high-pressure gas sands in the Pico formation from 1,500-2,500 ft means the gas sands were not isolated from other permeable zones or even to the surface. The lack of isolation of these sands from the primary cement job on the 11-3/4" production casing would result in multiple blowouts over the life of this well. Marathon should have known these high-pressure gas sands needed to be isolated by cement behind steel casing. The cores gave positive indication of the gas in the Pico formation sands. And multiple offset wells experienced blowouts from these Pico sands at similar depths prior to the date that the 11-3/4 production casing was set and cemented on the Dow RGC #10 well."*** Marathon/OOC did not experience a blowout nor did it report any well control issues during the drilling of the Well. The majority of the operators with wells that experienced blowouts in the vicinity of the gas formation did not perform excess cementing during the primary cementing of casing, nor during plugging and abandonment of the wells. Additionally, cementing casing across the gas formations (or gas shows) was not a requirement of DOG at the time because the gas formations (or shows) were not considered commercially productive.

35.     On page 37, paragraph 1, Mr. Jordan states, *"The failure to cement the surface casing properly results in exposure to ground water that corrodes the surface casing and then corrodes the production casing adding to the loss of well integrity. This was especially hazardous for the Dow RGC #10 well because the shallow, high-pressure gas sands below the surface casing were not isolated with cement and thus a loss of well integrity increased the likelihood of uncontrolled releases of natural gas into permeable water zones and to surface, which in fact did occur."* Mr. Jordan's statement about corrosion of the surface and production casings is not based on evidence and is pure speculation.  I have not seen documented evidence of corrosion of either casing or cement in this Well and Mr. Jordan offers none.  The only evidence to suggest the production casing was compromised was the known gaps in the record documenting Dow's attempts to cut and recover the 11 ¾" casing in 1956.  Mr. Jordan states as *"fact"* gas migration occurred without sufficient evidence to validate it.  In fact, all of the Well's casing and annuli were plugged with cement above the gas sands from 566 feet to the cavity shot at 625 feet and approximately 800 feet to the cavity shot at 887 feet.  The only geologic formation that appears to have been exposed to the gas sands was characterized by the drilling report as sticky and sandy shale.[38]

36.     On page 39, paragraph 2, Mr. Jordan states, *"Neither the BFW at 700 ft nor the USDW at 1,331 ft were isolated. There were no cement plugs set across those intervals, no cement behind the 11-3/4" casing at those depths, and the surface casing did not cover those zones."* Mr. Jordan repeatedly states that Dow did not plug the BFW and USDW; however, as discussed above, he fails to acknowledge that the BFW and USDW were not part of the regulatory lexicon in 1956, and the depths identified for the BFW and USDW were only chosen by MDR

---

[38] Exhibit 0007 (MDR0083202) and (MDR0083205).

when it submitted its NOI in 2018.[39]  As stated previously, based upon PRC 3228, in 1956, there

were no waters identified in the Well that required protection or "isolation."  The well was plugged

and abandoned in compliance with laws administered by DOG in 1956, and as verified by the

Report of Well Abandonment issued by DOG to Dow on April 27, 1956.

37.     On page 29, paragraph 5, Mr. Jordan writes, "*[t]he Dow RGC #10 well had a

*calculated estimated top of cement (ETOC) of 2,686 ft behind the production casing.  However,*

*this does not account for any hole washout that occurred while drilling the production hole.*

*Like all of the 1930s wells drilled in Playa Del Rey, no open hole caliper tools (run on electric*

*wireline) were run in the well to diagnose the hole washout.  However, open hole logs were run*

*on an offset well, the Covington #1 (API # 04-037-26999), drilled in 2008…It showed that the*

*hole was washed out enough that the average diameter was over 25% larger than the hole size*

*drilled [24].  Assuming a 25% hole washout was present on the Dow RGC #10 production hole*

*(probably underestimated based on the drilling techniques during the 1930s), the cement top*

*behind the production casing would be only 3,059 ft.*"  Mr. Jordan applies information obtained

from a caliper log run during the drilling of a new well in 2008 in Playa del Rey to equate how

much excess cement should have been used by Marathon/OOC in 1931.  Caliper logging was not

commercially available until 1938.  It is not reasonable to expect Marathon/OOC to know what a

future test might reveal about unknown well conditions in 1931, much less a future test 77 years

later; however, it is reasonable to expect that MDR would and should have applied that current

knowledge to its present-day operations when evaluating the condition of the Well prior to entering

it.  This is indicative of Mr. Jordan's methodology.  He often applies standard practices and laws

---

[39] The inexact nature of these USDW determinations is highlighted by MDR's own changes to the purported USDW
depth.  *Compare* Ex. 4 (MDR's 2018 well reabandonment application, selecting USDW at 1512") *with* Jordan
Report, Fig. 6-7 (indicating USDW at 1,331").

developed years or decades after the Well was drilled, plugged, and abandoned to those operations

performed over 70 years ago.

## V.      Summary of Incorrect or Improper References to Regulated Activities

38.      Mr. Jordan's report appears to assume that from 1931 through 1958, oil and gas

well operators, like Marathon/OOC and Dow, were subject to the same drilling, operating, and

plugging and abandonment requirements as operators today.    This oversight significantly

undermines the reliability of Mr. Jordan's report.  What Mr. Jordan fails to understand (or simply

ignores) is that California oil and gas laws and requirements (or policies, rules, and regulations)

have changed significantly since Marathon/OOC drilled the Well in 1931.   During the time

Marathon/OOC and Dow operated the Well, oil and gas regulations (CCR Title 14, Division 2,

Chapter 4) had not yet been established in California.  Instead, requirements for drilling, operating,

plugging, and abandoning, were interpreted by the supervisor from the statutes and memorialized

by rules and policies that were written into approvals (or "permits", such as the Report of Proposed

Operations) issued by the supervisor or district deputy. Operator compliance with the requirements

of the supervisor or district deputy were captured in DOG reports, such as the Report of Operations,

Special Report of Operations Witnessed, and Report of Abandonment. In addition, it is my opinion

based on my review of the record that Marathon/OOC and Dow employed common and standard

industry practices of the time in drilling, setting casing, operating, and plugging and abandoning

the Well, an opinion with which Mr. Jordan also agrees.[40]

39.      In addition to misunderstanding specific oil and gas drilling, operating, plugging

and abandonment requirements, Mr. Jordan misstates terminology and requirements for

---

[40] Jordan Report at 27.

groundwater protection throughout his report. After the California legislature created DOG/DOGGR/CalGEM's predecessor, the Department of Petroleum and Gas, in 1915, the agency's first mandates were to protect productive oil and gas reservoirs from infiltrating water which could damage those reservoirs, resulting in loss of recoverable reserves, and to enact requirements to prevent offset operators from drilling into adjacent operators' mineral reserves. DOG eventually began coordinating with other agencies to protect subsurface waters that could be potentially impacted by oil and gas operations and by wells that penetrated aquifers. The first effort by DOG to identify and protect aquifers was captured in the state's oil and gas statutes of 1929. In particular, Chapter 53, Section 16 stated, *"[i]t shall be the duty of the owner or operator of any well referred to in this act, <u>before abandoning same</u> to use every effort and endeavor in accordance with methods approved by the supervisor, or his deputy, and under his direction, to shut off and exclude all water from entering oil or gas-bearing strata encountered in the well, and protect any underground water suitable for irrigation from infiltration of any detrimental substances."* However, the statute was vague and there were no enforceable standards which defined "water suitable for irrigation." Outside of DOG/DOGGR, the first legislation dealing with water in California occurred in 1949 by the establishment of the state's first water agency. The first meaningful regulation of groundwater resources in oil and gas regions did not begin to take shape until 1974, when the federal government, under 42 USC § 300f et seq., enacted the Safe Drinking Water Act (SDWA) and in 1983 when 40 CFR § 144.3 outlined the criteria and definition

of Underground Source of Drinking Water (USDW).[41]  When DOG created its first regulations[42] in 1974, it recognized that the fresh-saltwater interface needed to be protected in oil and gas wells. In California regulation and in common industry language, the terms "fresh-saltwater interface" and "Base of Freshwater" (BFW) were used interchangeably.  Since 1974 and until recently, DOG/DOGGR/CalGEM typically identified the fresh-saltwater interface, or BFW, and later the USDW, from SP logs and water quality data provided by the Regional Water Quality Control Boards.

## VI.    Mr. Jordan's Incorrect Use or Misunderstanding of California Oil and Gas Statutes, Regulations, and Requirements

40.    Throughout his report, Mr. Jordan states or implies that Marathon/OOC and Dow violated California oil and gas statutes, regulations, and requirements in a manner that suggests he lacks a fundamental understanding of relevant statutes, regulations, and requirements and their application, which in turn invalidates a number of his conclusions as discussed further below.

41.    On page 9, paragraph 2, Mr. Jordan states that "***Marathon did not originally construct the well to ensure isolation of known hydrocarbon zones above the main oil producing zone of the Repetto formation.  It also did not construct the well to ensure isolation of the shallow, permeable, freshwater zones above the hydrocarbon zones***."  In 1931, there was no requirement to cement unproductive, non-commercial hydrocarbon zones or shows and DOG/DOGGR did not even begin to require cementing or plugging of hydrocarbon shows until

---

[41] *See* 40 CFR § 144.3 ("Underground source of drinking water (USDW) means an aquifer or its portion
(a)(1) Which supplies any public water system; or
(2) Which contains a sufficient quantity of ground water to supply a public water system; and
(i) Currently supplies drinking water for human consumption; or
(ii) Contains fewer than 10,000 mg/l total dissolved solids; and
(b) Which is not an exempted aquifer.
USDW means 'underground source of drinking water.'").
[42] CCR Supplement Register 1974 No 7 – Title 14 DOG.

the 1990s.  There were no "freshwater zones" identified in the Well nor in the area when the Well

was drilled in 1931.  In 1929, language to protect water suitable for irrigation first appeared in the

oil and gas statutes[43], although none were identified in this Well.  It is also very unlikely that such

waters were identified in this area very close to the ocean since saltwater intrusion along low-lying

coastal areas of Southern California was, and still is, common.  Had there been water identified as

suitable for irrigation, farming, or domestic purposes in this Well, it would have been captured in

the approval to drill or in other approvals.  The record confirms that it was not. In terms of

"freshwater," California water agencies had not even begun using the term or setting standards on

freshwater aquifers until the 1970s.  Mr. Jordan's statement is misleading because although

Marathon/OOC did originally construct the Well to ensure shutoff of the productive hydrocarbon

zone by casing and cementing it and by performing an approved WSO,[44] there were no

requirements at the time to cement or perform WSO on any other hydrocarbon zones or shows.

Marathon/OOC and Dow were in <u>full compliance</u> with oil and gas statutes and all requirements of

DOG pertaining to productive hydrocarbon zone cementing and WSO over the course of their

ownership and operation of the Well.

42.     On page 10, paragraph 2, Mr. Jordan states that ***"Marathon violated California***

***Statutes and Regulations in effect at the time they drilled and completed the Dow RGC #10 well***

***in 1931.  The statutes regarding the duty imposed on well operators and drillers state that a firm***

***or corporation that is engaged in operating an oil or gas well where the pressure of the oil or***

***gas is unknown shall equip the well with sufficient strength casing and other safety devices as***

***necessary and use every effort and endeavor to prevent blowouts, explosions, and fires."***  Mr.

Jordan implies that Marathon/OOC did not equip the Well with sufficient strength casing;

---

[43] 1929 Statutes, Chapter 535, Sec.16.

[44] Well Record – 03713798_2019-01-18_DATA.pdf P76, P77.

however, the casing design and program was consistent with common and standard industry practice at the time and was approved by DOG.  In fact, as Mr. Jordan admits in his report,[45] most of the wells in the Playa Del Rey field and elsewhere in the LA Basin employed similar drilling and completion practices.  Additionally, the March 2, 1931 Report of Proposed Operations states that mud fluid and blowout prevention equipment (safety devices) must be provided at all times.  The Well record reflects that Marathon/OOC did **not** violate California statutes or "regulations," but rather complied with California statutes and requirements at the time they drilled and completed the Well in 1931.

43.     On page 10, paragraph 2, Mr. Jordan states that **"*Marathon did not set sufficient strength casing prior to drilling into overpressured hydrocarbon zones because they used riveted stovepipe (a thin-walled sheet metal) as surface casing set at only 686 ft that had no pressure integrity and little cement behind it.*"**  Mr. Jordan contradicts his own statements by referring to the common use of stovepipe casing, such as on page 27, paragraph 1, where he states, *"in the Playa Del Rey field, most of the wells that were drilled in the early 1930s used riveted stovepipe as surface casing [22],"* or *"[t]he use of stovepipe for surface casing in oil and gas wells was mostly discontinued in the 1930s,"* and *"[t]hen surface casing was installed that usually consisted of double-walled stovepipe of approximately 18" diameter, welded or banded together in 4 foot sections."*  Mr. Jordan even cites a paper which describes the use of stovepipe in California as a standard industry practice at the time.[46]:  *"*Not only was riveted stovepipe commonly used for surface casing well into the 1930s, but it was also not prohibited by the supervisor or district deputy, and was specifically approved for use in this well.  Additionally, the 18 inch stovepipe

---

[45] Jordan Report at 27.

[46] Jordan Report at 27 (citing Schwalen, H.C., 1924. The Stovepipe or California Method of Well Drilling as Practiced in Arizona. Master of Science Thesis in Civil Engineering, College of Mines and Engineering, University of Arizona, pp. 3-37).

casing was set <u>before</u> (and above) the gas show which was identified in cores at approximately 2,200 feet.  Regardless, the 1956 blowout occurred during the recovery attempt of the 11 ¾ inch casing; however, it did not occur as a result of any pressure integrity or cementing issues with the 18 inch casing, which Mr. Jordan admitted in his deposition was sufficiently strong.[47]  Also, records do not indicate that Marathon/OOC experienced well control issues, including blowout, during the <u>drilling</u> or operation of the well.[48]

44.     On page 10, paragraph 2, Mr. Jordan writes that **"*Marathon also did not isolate the shallow, high-pressure gas zones with competent steel casing and cement which resulted in contamination of water zones, well integrity failures, gas leaking to surface, and subsequent blowouts."*** No blowout or kicks occurred during Marathon/OOC's drilling or at any time Marathon/OOC operated the Well.[49]  It identified gas shows[50] in the Well and cemented 11 ¾ inch 54 pound per foot casing in the Well, which is considered competent with a rated collapse pressure of approximately 2,000 psi and rated burst pressure of approximately 3,000 psi. The gas shows were not considered "high-pressure" and also not considered as productive, as the casing was not perforated for production opposite the shows.  The anomalous gas zone(s) or show(s) in this well is (are) not considered "high-pressure" and was (were) never developed for commercial production; therefore, it(they) were not required to be cemented during Marathon/OOC or Dow's operation of the Well.  DOG's requirement at the time the Well was drilled was only to cement the productive oil zone to prevent water infiltration and fill the remainder of the annulus with mud. The Report on Proposed Operations of March 2, 1931, 4th Requirement states, *"[t]he column of*

---

[47] Jan. 13, 2023, J. Jordan Rough Dep. Tr. at 179.

[48] Well Record - 03713798_2019-01-18_DATA.pdf P62, P83, P85.

[49] Well Record - 03713798_2019-01-18_DATA.pdf P83-86.

[50] Well Record - 03713798_2019-01-18_DATA.pdf CORE RECORD OF OIL OR GAS WELL P81, P82.

*mud fluid back of the 11 ¾" casing shall be maintained to the surface for at least 30 days after*
*cementing this casing."*[51]  There is also no record of "contamination of water zones" at any time
in the history of the Well.  <u>All operations Marathon/OOC performed in the drilling and completion</u>
<u>of the Well were in full compliance with DOG requirements at the time and were standard practice</u>
<u>at the time.</u>[52]

45.      On page 10, paragraph 3, Mr. Jordan states that *"[t]he Dow Chemical Company*
*did not properly plug and abandon the Dow RGC #10 well in 1956 because it: 1) failed to plug*
*several hundred feet of holes in the production casing directly above the original oil producing*
*zone of the Repetto formation; 2) failed to plug perforations in the production casing that were*
*in an oil-saturated sand in the Repetto formation; 3) failed to isolate the known hydrocarbon*
*zones above the original oil producing zone of the Repetto formation…"*, and page 15, paragraph
1 - *"[i]n 1956, the well was plugged and abandoned by Dow. However, during the 1956 P&A,*
*the hundreds of feet of perforations that Dow shot in the production casing immediately above*
*the oil producing perforations for saltwater production were left open and not plugged."*  My
review of the record confirms that Dow properly plugged and abandoned the Well in 1956 in full
compliance with the law.  There was no requirement in 1956 to cement/plug perforations for water
production, and so their omission was immaterial and irrelevant.  Additionally, there were no
requirements to cement/plug holes or perforations above or below the productive oil zone, as
reflected in the Well approvals.  Cementing of unproductive oil shows or stringers and
unproductive gas shows as well as holes and perforations in casing above or below productive
hydrocarbon zones did not become a requirement until very late in the 20th Century, many decades
after Marathon/OOC and Dow operated the Well and after oil and gas regulations were enacted in

---

[51] Exhibit 0007 (MDR0083210).

[52] Expert Report of J. Daniel Arthur P.E., SPEC P10 Sec 3.5.

1974.   The known hydrocarbon shows, including perforated zones, above the original oil producing zone of the Repetto formation were not developed for commercial hydrocarbon production and therefore were <u>not required</u> to be cemented.   The perforations that Dow added in 1941 were for saltwater production and saltwater was not considered a protected water to be cemented/plugged in any well.   Oil shows/stringers are documented in the record from 3,331 to 3,363 feet ("*Oil sand, shale and sticky shale*") and from 3,394 to 3,426 feet ( "*Shale and oil sand*"). A cement plug extends across the oil producing zone from 3,376 to 3,906 feet and perforations for saltwater production are from 3,076 to 3,376 feet.[53]   Putting aside the absence of any facts to support the claim that the lack of detail concerning perforations in the salt water zone was intentional, because the oil shows/stringers were not considered productive by Marathon/OOC in 1931 or at any time during Marathon/OOC's operation of the Well, it is also unreasonable to assume Dow would intentionally attempt to produce oil from them when Dow was producing water to extract iodine.   Any oil in the water produced for iodine extraction would simply be a nuisance that would require significant effort to separate out.   Also, the technology for producing high water-cut oil – Enhanced Oil Recovery (EOR)  – was not even proposed until the early 1970s.[54] In addition, there is no record of Dow commercially producing oil from the Well.   <u>Dow did properly plug and abandon the Well in 1956 in full compliance with DOG requirements</u>.[55]

46.   On page 11, paragraph 1, Mr. Jordan writes: "***Even though the California regulatory agency at the time, the California Conservation Department's Division of Oil & Gas (DOGGR) approved Dow's 1956 P&A of the Dow RGC #10 well, Dow did not comply with***

---

[53] Missing sections of core in core records are common as not all rock formations are conducive to coring and soft "poorly-consolidated" rock is often "unrecovered" in the core barrel.

[54] EOR History - https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3866386/pdf/rsta20120320.pdf.

[55] The argument that DOGGR would have required Dow to cement the perforations if they were included on Dow's abandonment notice is undercut by DOGGR's decision three years later approving the County's abandonment.  There, the perforations were included in the County's notice and DOGGR did not require them to be cemented.

*existing California state statutes and regulations in place at the time of that P&A.  This is based on provisions of the California Public Resource Code in effect at the time, which clearly stated that the operator of a well must protect any underground water suitable for irrigation or domestic purposes from the infiltration of any detrimental substances.*"  As previously stated, requirements of the supervisor or district deputy were documented in approvals to conduct well operations, and documented in operations that were witnessed and completed by the operator. There were no definitions or standards for waters "suitable for irrigation or domestic purposes," but these terms were interpreted by DOG as waters either currently in use, or likely to be used for such purposes.  If there were waters identified as suitable for irrigation or domestic purposes, they would have been identified on the approvals to conduct well operations.  <u>Dow did fully comply with existing California state statutes and regulations in place at the time of the 1956 P&A.</u>

47.     On page 11, paragraph 1, Mr. Jordan writes, "*[t]he Public Resource Code also stated that upon abandonment of a well, the operator must cap the well so as to prevent the escape of natural gas into the atmosphere. Dow failed to do either during the 1956 P&A*."  Dow <u>did</u> cement/plug the Well to prevent the escape of natural gas, and there is no record of leakage of natural gas from the Well between 1956 and MDR's acquisition of the Well in 2017.  DOG also approved Dow's operations in 1956.

48.     On page 21, paragraph 3, Mr. Jordan again misstates DOG requirements:  "*Yet, these high-pressure gas sands were not isolated from other permeable zones including those containing fresh water at shallow depths either during the initial well construction or during the 1956 plug and abandonment of the Dow RGC #10 well*."  Between 1931, when the well was drilled, through plugging and abandonment in 1956, the gas sands were not productive and therefore not required to be cemented/plugged.  All operations from 1931 through 1959 predate establishment of "fresh water" regulation in DOG and state and federal water agencies by several

35

decades.  Additionally, the record demonstrates that neither the supervisor nor the district deputy had identified any water suitable for irrigation or domestic purposes in this Well and that <u>both Marathon/OOC and Dow complied with the statute and the requirements</u> in the approvals to conduct well operations.

49.     On page 21, paragraph 3 of Mr. Jordan's report, he writes*, "[t]he failure to isolate these high-pressure gas sands and protect the shallow freshwater zones resulted in contamination of the freshwater zones with hydrocarbons, <u>wastage of natural gas</u>, environmental damage caused by blowouts, and compromised well integrity that jeopardized the public safety. This violated California statutes and regulations in force at the time as well as violating California statutes and regulations in force today."*  Mr. Jordan's claims regarding "isolation" of gas sands and contamination of "freshwater" zones have already been addressed. With respect to his claim of "environmental damage caused by blowouts," Mr. Jordan is once again speculating without evidence. The 1956 blowout fluid consisted of "*marsh gas, salt water and sand*" as referenced in DOG's Memorandum of Telephone or Personal Conversation, dated March 14, 1956.[56]  The well was located in what was essentially a saltwater marsh area at the time, and there was no indication that environmental damage occurred.   Additionally, very few environmental laws existed at the time, none of which were identified as being violated.  There is also no evidence that the blowout itself resulted in compromised well integrity.  Mr. Jordan fails to appreciate that the statute's reference to "wastage of natural gas" is intended to protect oil resources.  Chapter 535, Section 8b of the 1929 statute states, *"[t]he unreasonable waste of natural gas by the act, omission, sufferance or insistence of the lessor, lessee or operator of any land containing oil or gas, or both, <u>whether before or after the removal of gasoline from such natural</u>*

---

[56] Well Record - 03713798_2019-01-18_DATA.pdf P63.

*gas, is hereby declared to be opposed to the public interest and is hereby prohibited and declared to be unlawful. The blowing, release or escape of natural gas into the air shall be prima facie evidence of unreasonable waste.*" From the time this Well was drilled in the early 1930s, through its abandonment in the late 1950s, associated[57] natural gas was considered to be a nuisance for many oil operators and was considered waste. Oil wells in the early days of the oil boom did not require pumping units to bring the oil to the surface—it was reservoir energy from the "gas cap" over the reservoir and the gas entrained in the oil that was the driving force for most production. Many operators of the time did not understand the mechanics or geology of oil and gas reservoirs; rather, they simply understood that they could drill a well and oil would flow. However, some companies began to study and understand the science and engineering behind petroleum production and realized that the removal and "wastage" of gas also removed the free motive force that was lifting their oil to the surface. Since most oil fields (and shared reservoirs) were being produced by multiple, disconnected companies and individuals, it only took a few rogue operators that did not understand or care about the value of natural gas as a drive mechanism to "blow off" excessive amounts of gas in the production of their wells, essentially depleting the energy of the field for other operators. The "public interest" in the early days of oil production was not air or water quality, but rather maintaining the flow of cheap hydrocarbons to heat homes, power factories, and drive vehicles. It was this public interest as well as the interest of some mineral interest owners that likely led to the unreasonable waste statute and many other statutes which were enacted not to penalize or to discourage operators in the exploration or production of oil, but to preserve the hydrocarbon resources in the state for efficient and effective development. In fact, a particular excerpt from the 1929 oil and gas statutes, specifically Chapter 535, sec 8(c), conveys

---

[57] "Associated gas" is natural gas that is entrained in, and produced from, oil deposits.

37

how the state at the time viewed unreasonable waste of gas to be in the interest of protecting the interests of owners, operators, or other persons from waste of hydrocarbon resources, and not in the interest of protecting waters or the atmosphere from leakage of those resources: "*Whenever the state oil and gas supervisor shall find that it is in the interest of protection of oil and gas from unreasonable waste, it is declared to be lawful for the lessor, lessee, operator, or other persons, firms and corporations owning or controlling royalty or other interests in the separate properties of the same producing or prospective oil or gas field, to enter, with approval of the state oil and gas supervisor, into agreements for the purpose of... providing for the return of natural gas into the subsurface of the earth for the purpose of storage or repressuring of an oil or gas field...*"

From a reservoir engineering perspective, today as well as in 1929, maintaining reservoir pressure in an oil or gas field is(was) critical in the effective and efficient production of those hydrocarbon resources.  Another key indicator in the language of the unreasonable waste law is, "… *whether before or after the removal of gasoline from such natural gas*," which refers to a very specific oil production and processing technique, not an unintended loss of well control during drilling and/or plugging operations.  When viewing the statutes outside of the context of the time they were enacted, it is easy to see how Mr. Jordan may have misinterpreted this law and other laws.

Finally, the notion that Dow's 1956 actions "violated California statutes and regulations in force today" is unsupported by any citation or authority.  I am unaware of any retroactive application of a California statute or regulation that would subject Dow (or Marathon/OOC) to liability.

50.     On page 26, paragraph 1, Mr. Jordan states, **"[t]hus, a cement sheath behind the steel casing is necessary to prevent oil and gas from leaking out of the Upper and Lower Playa Del Rey hydrocarbon reservoirs and the shallow gas zone at approximately 1,500-2,500 ft into**

*shallower zones, or even to surface*." What Mr. Jordan here describes was not a requirement or standard practice at the time the well was drilled or plugged and abandoned.

51.     Mr. Jordan writes on page 26, paragraph 2, *"[t]o ensure the production casing is a competent barrier throughout the life cycle of a well, it is important to obtain a good bond with cement behind the casing from its total depth to surface, or at least to above the surface casing shoe depth (inside the surface casing).  This assumes that the surface casing is itself cemented to surface, which is required by all state regulatory agencies, including California's DOGGR*." Mr. Jordan continuously refers to the ideal concept of cementing the annular space of all casings from bottom to surface, even though currently there is no such requirement for production casing, and in 1931, no specific requirement for cementing of casing beyond that necessary to shut off productive oil or gas zones.  At the same time, Mr. Jordan failed to address that MDR never planned, nor attempted, to cement the well casings to his proposed standard.  Indeed, MDR's plan was to only perform the minimum work required by law, and it made multiple efforts to get permission from CalGEM to do even less.  The DOGGR regulation to cement surface casing from its bottom to surface is a modern requirement put in place many decades after the Marathon/OOC and Dow controlled the well.

52.     On page 34, paragraph 4, Mr. Jordan states, *"in 1935, the state of California named Marathon, among others, in a complaint in which the state alleged violations of California statutes regarding the unreasonable waste of natural gas in the Playa Del Rey field.*" What Mr. Jordan references were <u>alleged</u> violations related to "intentional" waste of produced gas unrelated to the subject Well in this action and unrelated to the circumstances of the blowout in the Well.  It is my understanding, and Mr. Jordan acknowledged as much in his testimony,[58] that a complaint

---

[58] Jan. 13, 2023, J. Jordan Rough Dep. Tr. at 157.

is simply allegations, and does not constitute any type of findings by any regulatory agency, court, or other body.

53.     On page 35, paragraph 5, Mr. Jordan writes, *"[a]lthough gas produced from the Dow RGC #10 well was not specifically identified in the Complaint, this demonstrates that Marathon and other producers were not abiding by California laws in the 1930s, during the producing life of the Dow RGC #10 well."* This statement is misleading. Gas was not "produced" from the subject Well; it was lost in an uncontrolled blowout. Moreover, if the subject Well was not specifically identified in the complaint, then the complaint is entirely irrelevant to Mr. Jordan's report. Further, as mentioned, a complaint simply contains allegations, and not a determination that Marathon/OOC or other producers were not abiding by any laws.

54.     On page 23, paragraph 3, Mr. Jordan states, *"[i]n 1957, interest in developing the land in the Venice area of the field increased due to the growing population in the Los Angeles area and the fact that many if not most of the oil wells in that area were abandoned. Plans also started to be developed to include a harbor to be used for recreational purposes. Some of the P&A'd wells still had the remains of the casing sticking up above or close to ground level. The wells that were P&A'd prior to the 1960s did not adequately isolate the oil producing zones or protect the shallow water sands from invasion. In 1958, the County of Los Angeles started acquiring the rights to many wells in the Venice area of the Playa Del Rey field in order to abandon (or re-abandon) these wells with the intent to ensure that construction of new buildings would be safe and unhindered. Although these re-abandonments were approved by DOGGR, some of the work done on the wells did not entail re-entering the casing below a few hundred feet. Thus, these wells still had hydrocarbon zones that were not isolated even after the 1959 re-abandonments."* Mr. Jordan again makes implications that are simply incorrect. In 1959, there had not been any significant changes in the law as it relates to plugging of the productive

40

hydrocarbon and water sources.  Although the plugging and abandonment condition of wells in

1959 may not be compliant with today's law, the wells were still in compliance with the standards

of law in place in 1959.  Importantly, the state does not consider well operators to be out of

compliance today because their actions decades ago would not comply with current requirements.

      55.     On page 27, paragraph 3, Mr. Jordan writes, *"[i]n the 1930s, DOGGR used to*

*require "water shutoff tests" (WSOs) after operators set and cemented the production casing.*

*These tests were supposed to determine if the potential hydrocarbon producing zone was isolated*

*from a water zone above it.  The objective was to prevent the water zone from invading the*

*hydrocarbon zone which would result in waste of the resource because it could not be*

*economically produced if the zone was flooded with water.  For the WSO, the shoe (bottom) of*

*the casing was drilled out a few feet to expose the hydrocarbon-bearing formation.  The drilling*

*fluid inside the casing was then swabbed out to a certain level. The well was then observed for*

*water entry up the casing.  If there was water entry it meant that the production casing was not*

*cemented sufficiently to achieve isolation of a hydrocarbon zone from a water zone.  DOGGR*

*might then require the operator to perform remedial cementing to achieve isolation.  Note that*

*such WSO tests could only confirm that a few feet below the production casing shoe, the oil*

*producing zone was not in communication with a water bearing zone.  It did not test whether*

*other hydrocarbon zones up hole were isolated from shallow fresh or saltwater permeable zones.*

*These WSO tests were discontinued by DOGGR decades ago."*  Mr. Jordan incorrectly states that

DOGGR discontinued the use of WSO testing decades ago.  DOGGR/CalGEM still requires WSO

testing on a case-by-case basis.[59]  Because technology has advanced, there are now multiple types

of WSO testing that can be performed, including a form of swab test.

---

[59] CCRs section 1722.3 (d) ("Production casing. This casing shall be cemented and, when required by the Division,
    tested for fluid shutoff above the zone or zones to be produced.").

56.     On page 33, paragraph 1, Mr. Jordan writes, **"*Marathon violated California Statutes and Regulations that were in place at the time it drilled and completed the Dow RGC #10 well in 1931. The 1929 California Statute, Chapter 535, Section 16 (as amended) which was in effect during the drilling and completion of the Dow RGC #10 well states:*"**

> **"*It shall be the duty of the owner or operator of any well referred to in this act, before abandoning same to use every effort and endeavor…to shut off and exclude all water from entering oil or gas-bearing strata encountered in the well, and protect any underground water suitable for irrigation from infiltration of any detrimental substances.*""**

Again, Mr. Jordan gets it wrong.  In fact, Marathon/OOC did not violate Section 16 of the 1929 statute.[60]  Section 16 only referred to the <u>abandonment</u> of wells, <u>not the drilling of new wells</u>.  Oil and gas-bearing strata requiring shutoff of all waters was interpreted by DOG to only be in reference to oil and gas zones capable of commercial production.  Moreover, there were no waters encountered in the Well that were in use, or likely could be used, for irrigation, and there were no apparent farm lands within close proximity to the well.

57.     On page 33, paragraph 2, Mr. Jordan writes, **"*The 1929 California Statute, Chapter 535, Section 18 (as amended) which was in effect during the drilling and completion of the Dow RGC #10 well states:*"**

> **"*It shall be the duty of the owner and operator of any well referred to in this act to keep a careful and accurate log and…show the depth at which oil-bearing strata are encountered, the depth and character of same, and whether all water overlying and underlying such oil-bearing strata was successfully and permanently shut off…*" "**

Marathon/OOC did not violate Section 18, either.  Marathon/OOC kept and filed a log and history of its drilling and completion operations.  A successful WSO test was performed on April 8, 1931, and approved by DOG on April 15, 1931,[61] demonstrating the oil-bearing strata was shut off from

---

[60] 1939 PRC DOGGR P9.

[61] Well Record - 03713798_2019-01-18_DATA.pdf P76.

water as required.  Mr. Jordan omitted the complete statement as it pertains to water shutoff:
"*whether all water overlying and underlying such oil-bearing strata was successfully and permanently shut off so as to prevent the percolation or penetration into such oil-bearing strata…*"
The WSO test confirmed water was not entering the oil zone.

58.     On page 33, paragraph 3, Mr. Jordan writes, ***"The 1931 California Statute, Chapter 790, Section 15 (as amended) states:***

> ***"The owner and operator of any well now drilled or drilling, or that hereafter be drilled or drilling, in the State of California on lands producing or reasonably presumed to contain petroleum or gas shall properly case such well or wells with water-tight and adequate metal casing, and in accordance with methods approved by the supervisor and under his direction, shut off all water overlying and underlying oil-bearing or gas-bearing strata. [text is missing from this statute:  "and prevent any water from penetrating such oil-bearing or gas strata."] Such owner or operator shall likewise use every effort and endeavor to shut out from strata containing water suitable for irrigation or domestic purposes and from surface water suitable for such purposes, substances detrimental thereto, and to prevent the infiltration of such substances into the strata containing water suitable for irrigation or domestic purposes and into such surface water"***

Contrary to Mr. Jordan's assertion, Marathon/OOC cannot have violated Section 15 because the law[62] was not effective until August 14, 1931, <u>after</u> the Well was drilled and completed.  The Well <u>was properly cased</u> for the standards in use at the time it was drilled and, as set forth in the statute, it was "in accordance with methods approved by the supervisor."  The commercially productive oil-bearing zone <u>was tested and approved for water shutoff</u>.  Moreover, the missing text makes clear that the statute's purpose was to protect, in this case, oil-bearing zones from water contamination.  Finally, even if this section did apply, there was no violation, as there were <u>neither waters identified</u> that were suitable for irrigation or domestic purposes, nor were there any surface waters suitable for such purposes.

---

[62] 1931 PRC DOGGR P4 Sec 15.

59.     On page 33, paragraph 4, Mr. Jordan writes, **"Marathon did not shut off and document whether all water overlying and underlying oil or gas-bearing strata was shut off as required by the California statutes. The statutes cited above imply that the BFW and USDW are required to be isolated."**  As stated previously, Marathon/OOC <u>did</u> document that the productive oil zone was properly shut off from overlying waters, as demonstrated in DOG reports approved April 15, 1931, and April 29, 1941.  The Statutes of 1929 and 1931 <u>do not</u> imply that the BFW and USDW[63] require isolation because such waters and terms were not defined until after 1974, when regulations were developed to require protection of such waters.

60.     On page 34, paragraph 1, Mr. Jordan writes, **"In addition, Marathon violated California statutes regarding the duty imposed on well operators and drillers to equip the well with sufficient strength casing and other safety devices as necessary and prevent blowouts, explosions and fires. The 1929 California Statute, Chapter 535, Section 3 (as amended) which was in effect during the drilling and completion of the Dow RGC #10 well states:**

> **"It shall be the duty of any, firm or corporation engaged in operating any petroleum or gas well in this state wherein high pressure gas is known to exist, and any person, firm or corporation drilling for petroleum or gas in any district in this state where the pressure of petroleum or gas is unknown, to equip any such well with casings of sufficient strength, and such other safety devices as may be necessary…and to use every effort and endeavor to effactually prevent blow-outs, explosions, and fires." "**

Marathon/OOC did not violate Section 3 of the Statute, as referenced above.  There was no blowout or any other loss of well control event identified in the well records during drilling and completion of the Well.  The DOG Report on Proposed Operations, dated March 2, 1931, requires blowout prevention equipment be provided, and there is no indication that equipment was not available.  The use of stovepipe casing was standard for the time, and the 11 ¾ inch, 54 pound per foot casing was more than adequate with a rated collapse pressure of ~ 2000 psi and rated burst pressure of ~

---

[63] CCR Supplement Register 1974 No 7 - Title 14 DOG and CFR-2014-title40-vol23-part144.

3000 psi.  I have seen no indication Marathon/OOC knew the gas sand encountered in some other wells extended into the horizon of the Well prior to its drilling.

61.      On page 35, paragraph 1, Mr. Jordan states, "*Marathon proposed to P&A the well in November of 1940.  It filed a Notice of Intention to Abandon Well with DOGGR which proposed setting a cement plug from 3,376 ft to 3,903 ft (20 ft above the top of the 6-5/8" slotted liner to the bottom), removing the 11-3/4" casing from 0-666 ft, then placing a 20 ft cement plug in the surface casing from 646 ft to 666 ft, and "cap" the top of the well [29].  Note that the actions proposed by Marathon to P&A the well would not have satisfied the California statutes described above.*"  Mr. Jordan's statement is incorrect.  Public Resources Code (PRC) Section 3228, effective September 19, 1939, states that *"[b]efore abandoning any well in accordance with methods approved by the supervisor or the district deputy, and under his direction, the owner or operator shall shut off and exclude all water from entering oil-bearing or gas-bearing strata encountered in the well and shall use every effort and endeavor to protect any underground or surface water suitable for irrigation or domestic purposes from the infiltration or addition of any detrimental substances."*  As previously stated, the commercially productive oil-bearing zone had been tested and approved for water shutoff and no waters had been identified as suitable for irrigation or domestic purposes.  The methods used were approved.  The protective cement plug placed across the productive oil zone perforations was required at the time; however, the plug inside the 18 inch stovepipe casing opposite annular cement and the plug at surface exceeded the requirements as stated in PRC Section 3228.

62.      On page 35, paragraph 1, Mr. Jordan writes, "*It is assumed that Dow produced saltwater from the well, but no records of saltwater production were located in the DOGGR database.  There is also no record of oil production during the time Dow operated the well.  Interestingly, the bottom 10 ft of the perforated zone, 3,331-3,341 ft, is described as an oil sand*

*in the DOGGR record of formations penetrated during the drilling of the well which was submitted by Marathon in 1931."* But water production for non-oil field use was not within DOG's oversight, and as such, Dow was not required to report to DOG any water production data. The WSO test report as approved on April 15, 1931 notes that no oil was present in the water sample and no oil is noted in the fluid sample in the approved April 29, 1941 report. It can be assumed that the oil show noted in the 1931 drilling report was unproductive and therefore did not require plugging.

63.     On page 37, paragraph 2, Mr. Jordan states, *"Dow proposed to DOGGR to P&A the Dow RGC #10 well in 1956. However, the Notice of Intention to Abandon Well submitted by Dow on February 15, 1956, did not provide an accurate description of the present condition of the well as required by DOGGR. The notice omitted the open perforations in the production casing from 3,076 ft to 3,341 ft. And the same document proposed to P&A the well without plugging off those perforations which consisted of 657 holes over 265 ft of production casing [35]. This was a significant omission because DOGGR approved the proposal without requiring that Dow plug the open perforations in the production casing [36], which would have been contrary to DOGGR policy and in violation of California Public Resource Code regarding P&As in force at the time."* In 1956, the absence of plugging the perforation from 3,076 to 3,341 feet was neither contrary to DOG policy, nor a violation of the PRC. Nor did Dow's failure to list the perforations from 3,076 to 3,341 feet hold any significance or bearing on the requirements DOG listed in its Report on Proposed Operations dated February 21, 1956. The controlling law in 1956 was PRC section 3228 which only required to *"…shut off and exclude all water from entering oil-bearing or gas-bearing strata encountered in the well and shall use every effort and endeavor to protect any underground or surface water suitable for irrigation or domestic purposes from the infiltration or addition of any detrimental substances."* As was typical of that time, DOG only

46

required a cement plug across the productive oil zone perforations, with no specific requirement for cement above the perforations and/or across unproductive shows of oil or gas. Because the perforations at 3,076 to 3,341 feet were added after the productive oil zone perforations were plugged, and only for the purpose of producing salt water, which is unregulated by DOG, there was no requirement to plug these perforations. And, as stated above, Dow's methods were approved by the supervisor.

## VII.  Conclusions

64.    Mr. Jordan has attempted to blame MDR's failures during their efforts to reabandon the Well on Marathon/OOC's and Dow's ownership of the Well 75 to 85 years earlier. Mr. Jordan has done this through statements of facts in a misleading or incorrect fashion, unsupported evidence, inappropriate application of California law, application of his ideal modern well standards to operations performed more than half a century ago, and faulty definitions. He also fails to hold MDR accountable for its disregard of known well hazards, neglect of modern well analysis tools, and proclivity for cost-based decision bias.

65.    MDR's poor planning and complete disregard for the well record, well history, blowout history of the oil field, advice of DOGGR, and reports from its own contractors, resulted in a series of cascading failures culminating in the eventual blowout of the well, loss of drill string of which a 275 foot portion became junk left in the Well, and inability to plug and abandon the Well in compliance with California law.

66.    MDR's failure to promptly notify DOGGR of its discovery of the Well's leakage in September 2017 was one example of its demonstrated indifference to the law.

67.    MDR's failure to complete documents pertaining to the CSWR program prior to beginning construction assured its liability for the Well under PRC Section 3208.1. To paraphrase PRC 3208.1, the responsibility to plug and abandon a well falls upon the property owner,

developer, or any other person who causes construction over, or impedes access to, a well, and fails to seek or heed the advice of the supervisor prior to beginning construction. MDR began its construction of the hotel on parcel 9U before DOGGR/CalGEM could complete its review of the Well for the purposes of PRC 3208.1 compliance.

68.    Finally, it is my opinion that MDR is solely and entirely responsible for its own actions, including additional costs and delays related to its reabandonment operations, and the current condition and status of the Well. Conversely, Marathon/OOC and Dow were in full compliance with state oil and gas law and industry standards in effect at the time they were legally responsible for the Well and are not responsible for the actions of MDR nor the current condition or status of the Well.

Respectfully,

_____
DANIEL DUDAK
January 19, 2023

**APPENDIX A: MATERIALS CONSIDERED**

- Ex. C - APEXPE Expert Report MDR vs Marathon & Dow 11-21-22
- Civil Minutes – Case No. 2:20-cv-08008-FLA, April 20, 2021
- Defendants' Memorandum of Points & Authorities in Support of Motion for Partial Summary Judgement, Filed August 8, 2022
- ECF 104 2022.07.08 Order Granting Joint Stip to Continue Dates
- Dow RGC 10 Well History – 03713798, January 18, 2019
- Daily Report Interact Dow RGC-10
- CalGEM WellSTAR Database
- Statutes of California, 1939
- Statutes of California, 1915
- California Statutes and Regulations for Conservation of Oil, Gas, and Geothermal Resources, January 2022
- CalGEM Well Finder Database
- Dow RGC 10 Blowout Video and Derrickman's Delayed Escape https://youtu.be/DW_-DTvtgy8
- California Oil and Gas Fields, Volume II – Southern, Central Coastal, and Offshore, 1992
- Exponent – Root Cause Analysis of the RGC 10 Well Blowouts, June 7, 2019
- Deposition of Chris Phillips – Day 1
- Deposition of Chris Phillips – Day 2
- Deposition of Val Lerma
- Deposition of Brun Hilbert
- Deposition of Randy Moskal
- Deposition of Aaron G Scheet
- Deposition of Michel Vasconcellos
- Deposition of Chris Conahan
- Exhibit 0007
- Exhibit 0009
- Exhibit 0010
- Exhibit 0025
- Exhibit 0026
- Exhibit 0032
- Exhibit 0042
- Exhibit 0046
- Exhibit 0053
- Exhibit 0054
- Exhibit 0066
- Exhibit 0123
- Exhibit 0129
- Exhibit 0132
- Exhibit 0133
- Exhibit 0260
- Exhibit 0263

- Exhibit 0264
- Exhibit 0265
- Exhibit 0315
- Exhibit 0316
- Exhibit 0317
- Exhibit 0318
- Exhibit 0319
- Exhibit 0320
- Exhibit 0321
- Exhibit 0322
- Exhibit 0323
- Exhibit 0324
- Exhibit 0325
- Exhibit 0326
- Exhibit 0327
- Exhibit 0328
- Exhibit 0329
- Exhibit 0330
- DOC email: Grace Brandt to Chris McCullough 6/21/2019 6:50AM
- CalGEM Report of Plugging and Abandonment, Dow RGC 10 March 11, 2020
- Department of Conservation, Division of Oil and Gas Publication No. M07
- API Recommended Practice for Well Control RP 59, Second Addition May 2006
- Methane Assessment Report, Methane Specialists, August 23, 2006
- Methane Gas Districts Map, LA Bureau of Engineering, 2004
- Subsurface Geochemical Assessment of Methane Gas Occurrences, Playa Vista Development, Exploration Technologies, April 17, 2000
- Geology of Los Angeles, Environmental & Engineering Geoscience, Volume 13, No. 2, May 2007
- Experience and Education – Daniel Dudak
- 409 SamuelAHardageVolII_MDR0219634.pdf
- 411 SamuelAHardageVolII.pdf
- 412 SamuelAHardageVolII_MDR0456179.pdf
- 413 WilliamPangelinanVolumeI_MDR0456180.pdf
- 1915 PRC DOGGR.pdf
- 1917 PRC DOGGR.pdf
- 1919 PRC DOGGR.pdf
- 1921 PRC DOGGR.pdf
- 1929 PRC DOGGR.pdf
- 1931 PRC DOGGR.pdf
- 1939 PRC DOGGR.pdf
- 1939 PRC DOGGR-TABLET-6GQVTNS4.pdf
- 1974 PRC DOGGR.pdf
- 1976 PRC DOGGR 3008 and 3403.pdf
- 1976 PRC DOGGR 3201-3202_3227_3235 and 3722.pdf
- 1976 PRC DOGGR 3204 and 3722.pdf
- 1988 PRC DOGGR.pdf

50

- 2011 CCR California Code of Regulations.pdf
- 2014 California Code of Regulations Outline.pdf
- 2014 PRC California Laws for Conservation of Petroleum and Gas.pdf
- 2020.3.11 ltr MDR_not approved DOW RGC10.pdf
- 2022 PRC and Regulation - CalGEM.pdf
- 03713781_1975-01-13_DATA.pdf
- 03713798_2019-01-18_DATA.pdf
- 03713811_2011-09-27_DATA.pdf
- 03713954_1946-11-25_DATA.pdf
- 03714087_2005-08_DATA Seep Study.pdf
- 03714087_2005-08_DATA.pdf
- 03714218_1973-12-18_DATA.pdf
- 03714227_1977-03-28_DATA.pdf
- 03714240_1974-11-06_DATA.pdf
- AnaLog Services on Caliper History.pdf
- CA CCR Title 14 Reg 2006 No 52.pdf
- Casing Diagram - Work History - CJM.xlsx
- CCR Supplement Register 1974 No 7 - Title 14 DOG.pdf
- CFR-2014-title40-vol23-part144.pdf
- CRWQCB - Petroleum Waste.pdf
- DAILY REPORT INTERACT DOW RGC-10.xls
- DOGGR MO7 Well Control.pdf
- Dow_RGC_10_Blowout_RCA_Report_6-7-2019 CM comments.pdf
- Ex C - Jordan - Reported Dow Fish Recovery by MDR.pdf
- Exhibit_0192_2019_CalGEMDenialAltWellAccessPlan_ChrisConahan_192.pdf
- Exhibit_0414 - 14 MDR0447889-C_2012_MDR_CountyDirtySiteDiscussion
- Exhibit_0458 - 23 LDBGR00012661-63-C_2016_MDR_Development_Schedule_and_Discussion
- Exhibit_0459 - LDBGR00011602-07-C_2015_MDR_DevelopmentPlan_and_CountyLeaseDiscussion
- FMAX-II-PR-01-Field-Running-rev16.pdf
- Goggle 11-2018 MDR Site Image.pdf
- JeffJordan_Deposition_Rough - 2023-01-17.pdf
- Jordan Table 4-1 Documented Blowouts Playa del Rey.pdf
- Logging-History.pdf
- Porter-Cologne Water Quality Control Act.pdf
- PRC CCCOGP 1931.pdf
- PRC IOGCC 1931.pdf
- PRC Natural Resources Dept 1939.pdf
- PRC Oil and Gas Conservation Commission 1939.pdf
- Primacy MOA_EPA_UIC_1982.pdf
- State Water Resources Control Board Resolution No 88-63.pdf
- RegionalGeochemicalAssessment-PV.pdf
- SubsurfaceGeochemicalAssessment-PV.pdf
- 59_e2_R2018
- 73f54b91-2117-4fdd-bedc-63e3a7998e7d_Dow RGC 10 DOGGR History - Riser.pdf
- Dudak Ex Rpt.pdf