COX, CASTLE & NICHOLSON LLP
Perry S. Hughes (State Bar No. 167784)
Alicia N. Vaz (State Bar No. 215081)
Kevin M. Hannifan (State Bar No. 288135)
2029 Century Park East, Suite 2100
Los Angeles, California 90067-3284
Telephone: (310) 284-2200
Facsimile: (310) 284-2100
Email: phughes@coxcastle.com;
avaz@coxcastle.com;
khannifan@coxcastle.com

Attorneys for Plaintiff MDR Hotels, LLC

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MDR HOTELS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>MARATHON OIL COMPANY, an Ohio corporation; THE DOW CHEMICAL COMPANY, a Delaware corporation, and DOES 1 through 50, inclusive,<br><br>Defendant. | Case No. 2:20-cv-08008-FLA (JPRx)<br><br>Assigned to the Hon. Fernando L. Aenlle-Rocha<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:           April 14, 2023<br>Time:           1:30 p.m.<br>Place:          Courtroom 6B<br><br>(Concurrently filed with Plaintiff's; Evidentiary Objections; Plaintiff's Statement of Genuine Disputes; and Appendix of Exhibits) |

LAW OFFICES OF
**COX, CASTLE &
NICHOLSON LLP**
LOS ANGELES, CA

081006\16556765v2

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................. 1

II.    RELEVANT FACTUAL AND PROCEDURAL HISTORY ..................... 2

    A.   The Oil Rush Came to Marina del Rey In 1929. ................................ 2

    B.   Creation of the Well. ........................................................................ 2

    C.   High Pressure Gas Zones Were Known To Exist In The Area. ............ 3

    D.   California Enacted Laws To Protect Natural Resources. ..................... 4

    E.   Marathon Transferred The Oil Well To Dow. ..................................... 6

    F.   Dow Abandoned The Well. ............................................................... 8

    G.   In 2006 MDR Was Selected To Develop The Property. ....................... 9

    H.   MDR Leased The Property And Discovered The Leaking Well. ........... 9

    I.   MDR Was Required To Reabandon The Well. .................................. 10

    J.   A January 11, 2019 Well Blowout Led To An Emergency Order. ........ 11

    K.   MDR Successfully Reabandoned The Well. ...................................... 12

    L.   MDR Filed A Complaint Against Marathon And Dow. ...................... 12

III.   ARGUMENT ...................................................................................... 12

    A.   Defendants Have Not Previously Asserted An Affirmative Defense
       Based On The Statute of Repose. .................................................... 12

    B.   The Statute Of Repose Does Not Apply For A Variety Of Reasons. .... 13

       1.   The Statute Of Repose Does Not Extend To The Owner Or Tenant
          At The Time Of Improvement. ................................................ 14

       2.   Courts Have Refused To Apply The Statute of Repose When
          Statutory Duties Are At Issue. ............................................... 15

       3.   Defendants Fail To Identify A Latent Defect. ............................. 16

       4.   The Well Abandonment Performed By Dow Was Not An
          Improvement to the Property. ................................................ 17

    C.   MDR's Claim Is Properly Set Forth As A Continuing Nuisance As The
       Nuisance Has Been Abated. ............................................................ 18

    D.   The Well-Related Nuisance Was Abatable Prior To The Blowout. ...... 21

    E.   Civil Code Section 3482 Is Not Applicable Since Defendants' Actions
       Are Prohibited By Statute. .............................................................. 23

    F.   The Consent Defense Does Not Apply Here ...................................... 26

       1.   The Consent Defense Does Not Apply To Acts That Exceed The
          Scope Of The Granted Consent .............................................. 26

       2.   Consent Is Not a Defense to Public Nuisance. ........................... 27

       3.   The Consent Defense Does Not Apply To Unlawful Acts ............. 28

LAW OFFICES OF
**COX, CASTLE &
NICHOLSON LLP**
LOS ANGELES, CA

081006\16556765v2

-i-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

G.    MDR Did Not Cause The Nuisance. .......................................29

H.    Defendants' Actions Resulted In Multiple Forms Of Trespass. ...........30

I.    Defendants Again Mislead The Court Regarding A $10 Million Rent Credit. ....................................................................32

J.    The Court Has Already Ruled That Defendants' Filing Of Quiet Title Documents Do Not Release Claims Related To Their Damage To The Property. ..................................................................32

K.    Defendants Cannot Prevail on a Motion For Summary Judgment As They Fail To Address The Entire Claim. ................................37

IV.    CONCLUSION ..............................................................37

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-ii-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Buckland v. Barhart,*
778 F.2d 1386 (9th Cir. 1985)...............................................................35

*Carson Harbor Vill., Ltd. v. Unocal Corp.,*
270 F.3d 863 (9th Cir. 2001).............................................................23, 25

*Emeryville Redevelopment Agency v. Eltex Inv. Corp.,*
2004 WL 2359862 (N.D. Cal. Oct. 19, 2004)...............................27, 28

*JH Kelly, LLC v. Aecom Tech. Servs.,*
605 F. Supp. 3d 1295 (N.D. Cal. 2022) ..............................................33

*Lincoln Prop. v. Higgins,*
1993 WL 217429 (E.D. Cal. Jan. 21, 1993).........................................27

*Mortkowitz v. Texaco,*
842 F. Supp. 1232 (N.D. Cal. 1994) ...................................................27

*Nationwide Transp. Fin. v. Cass Info. Sys.,*
523 F.3d 1051 (9th Cir. 2008)..............................................................33

*Nixon-Egli Equip. Co. v. John A. Alexander,*
949 F. Supp. 1435 (Cal. C.D. 1996)....................................................15

*PMI Mortgage Ins. Co. v. Amer. Int'l Specialty Lines Ins. Co.,*
291 Fed.Appx. 40 (9th Cir. 2008).......................................................32

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.,*
442 F.3d 741, 746 n.6 (9th Cir. 2006)..................................................33

*Simmons v. Navajo Cnty., Ariz.,*
609 F.3d 1011 (9th Cir. 2010).............................................................13

*Tri-Dam v. Yick,*
2016 WL 4061348 (E.D. Cal. July 28, 2016) ...............................27, 28

*U.S. v. Brodie,*
858 F.2d 492 (9th Cir. 1988)...............................................................33

**California Cases**

*Beck Develop. Co. v. S. Pac. Transp. Co.,*
44 Cal. App. 4th 1160 (1996)..............................................................28

*Capogeannis v. Super. Ct.,*
12 Cal. App. 4th 668 (1993).........................................18, 19, 20, 21

*Cassinos v. Union Oil Co.,*
14 Cal. App. 4th 1770 (1993)..............................................................28

*City of Manhattan Beach v. Super. Ct.,*
13 Cal. 4th 232 (1996).........................................................................34

*Estate of Stephens,*
28 Cal. 4th 665 (2002).........................................................................36

*Friedman v. Pac. Outdoor Advert. Co.,*
74 Cal. App. 2d 946 (1946).................................................................27

LAW OFFICES OF
**COX, CASTLE &**
**NICHOLSON LLP**
LOS ANGELES, CA

081006\16556765v2

-iii-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

*Friends of H Street v. City of Sacramento*,
20 Cal. App. 4th 152 (1993)...................................................................24

*Gagerro v. Cnty. of San Diego*,
12 Cal. App. 4th 609 (2004)...................................................................18

*Grange Debris Box & Wrecking Co. v. Super. Ct.*,
16 Cal. App. 4th 1349 (1993), *overruled in part by Lantzy v. Centex Homes*, 31
Cal. 4th 363 (2003).............................................................................14

*In re Marriage of Gioia*,
119 Cal. App. 4th 272 (2004).................................................................35

*Jones v. Union Pac. R.R*,
19 Cal. App. 4th 1053 (2000).................................................................24

*Lantzy v. Centex Homes*,
31 Cal. 4th 363 (2003)..........................................................................14

*Mangini v. Aerojet-Gen. Corp.*,
12 Cal. 4th 1087 (1996).........................................................................36

*Mangini v. Aerojet-Gen. Corp.*,
230 Cal. App. 3d 1125 (1991)...........................................................26, 28

*Newhall Land & Farming Co. v. Super. Ct.*,
19 Cal. App. 4th 334 (1993)...................................................................28

*North Coast Bus. Park v. Nielsen Constr.*,
17 Cal. App. 4th 22 (1993).....................................................................17

*Paralift, Inc. v. Super. Ct.*,
23 Cal. App. 4th 748 (1993)...................................................................36

*San Diego Unified Sch. Dist. v. Cnty. of San Diego*,
170 Cal. App. 4th 288 (2009)............................................................15, 16

*Spaulding v. Cameron*,
38 Cal. 2d 265 (1952)............................................................................19

*Today's IV, Inc. v. Los Angeles Cnty. Metro. Trans. Auth.*,
83 Cal. App. 5th 1137 (2022)..................................................................23

*Wheeler v. Gregg*,
90 Cal. App. 2nd 348 (1949)...................................................................24

*Williams v. Moulton Niguel Water Dist.*,
22 Cal. App. 5th 1198 (2018)..................................................................23

**California Statutes**

Civ. Code § 1542 ..................................................................................36

Civ. Code § 337.1 ......................................................................14, 15, 16

Civ. Code § 337.15 ..............................................................14, 15, 16, 17

Civ. Code § 3479 ..................................................................................29

Civ. Code § 3482 ............................................................................23, 25

Pub. Res. Code § 3219 ...............................................................4, 6, 15, 25

Pub. Res. Code § 3220 ....................................................................passim

Pub. Res. Code § 3228 ....................................................................passim

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-iv-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

Pub. Res. Code § 3300 ................................................................................. 6

Pub. Util. Code § 30631 ............................................................................. 23

**Federal Rules**

Fed. R. Civ. Proc. 30(b)(6) ......................................................................... 25

Fed. R. Civ. Proc. 59 ................................................................................. 35

Fed. R. Civ. Proc. 60 ................................................................................. 35

Fed. R. Civ. Proc. 8 ................................................................................... 12

**C.D. Cal. Local Rules**

Local Rule 7-18 ......................................................................................... 35

**Treatises**

Restatement 2d of Torts § 160 .................................................................. 31

**LAW OFFICES OF**
**COX, CASTLE &**
**NICHOLSON LLP**
LOS ANGELES, CA

081006\16556765v2

–V–

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

1        Plaintiff MDR Hotels, LLC ("**MDR**") respectfully submits this

2   Memorandum of Points and Authorities in Opposition to Defendants Marathon Oil

3   Company's ("**Marathon**") and The Dow Chemical Company's ("**Dow**," and

4   together, "**Defendants**") Motion for Summary Judgment ("**Motion**").

5   **I.      INTRODUCTION**

6        Defendants offer an interesting dichotomy in the asserted defenses raised in

7   their Motion. In one breath they assert that the abandoned well is such an

8   unmitigated disaster, that it can never be abated and, therefore, must be considered

9   a permanent nuisance. Yet, in the next breath, they claim that the well should be

10  viewed as an "improvement" left to help upgrade the Property, and therefore they

11  should be protected by a statute of repose. Defendants, however, ignore that the

12  issues related to the oil well ***have*** been abated. The hotel development is completed

13  and operational. To the extent that MDR was unable to complete the planned re-

14  abandonment and address issues at depth, that was only due to the 2019 blowout.

15  Prior to that, the issues were abatable and MDR was in the process of abating them.

16  It is illogical to think that prior to 2019, the well was a continuing nuisance, but

17  suddenly became a permanent nuisance dating back to 1956, due to an event that

18  happened in 2019.

19       Defendants' reliance on the statute of repose is equally flawed – and

20  surprising given that it was not asserted in either Defendants' answer to the

21  Complaint. First, as the owner of the well, and tenant on the property, neither

22  Marathon nor Dow fall into the protected class of parties (contractors) for the

23  statute of repose. In fact, the statutes specifically ban owners and tenants from

24  asserting the defense. Additionally, courts reviewing the statute of repose have

25  declined to extend the protection when, as in this case, statutory violations are

26  asserted. MDR has asserted that Defendants failed to comply with the requirements

27  in the Public Resources Code when constructing and abandoning the well. These

28  violations also invalidate Defendants' claims that their actions were "expressly

LAW OFFICES OF
**COX, CASTLE &
NICHOLSON LLP**
LOS ANGELES, CA

081006\16556765v2

-1-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

authorized by law" or were subject to consent under a lease. Quite the opposite. The lease required Dow to comply with all laws and return the Property to its original (pre-Marathon) condition. As described below, California's Public Resource Code clearly required the isolation of oil and gas-bearing zones from water zones. Such isolation was never a feature of this well.

Lastly, the Defendants have again raised an issue seeking protection based on quiet title documents recorded years after their operations. The Court already ruled on this matter, determining that the deeds did not act as a release of claims. While Defendants now have hired a law professor to voice their claims, such "expert opinion" testimony is impermissible and must be excluded.

## II.    RELEVANT FACTUAL AND PROCEDURAL HISTORY

### A.    The Oil Rush Came to Marina del Rey In 1929.

The oil rush began in Los Angeles, in an area that would later become Marina del Rey, when Marathon[1] struck oil in a well in December 1929. Separate Statement of Genuine Disputes ("**SSGD**") 1. In less than a year, over 50 wells were drilled in the area, and the oil field known as the Playa del Rey field was quickly the 6th most productive field in the state. SSGD 2. But that production came at a cost. Historians report that the previously fashionable and promising residential area was now "noisy, smelly, ugly and dangerous." SSGD 3. Moreover, "oil waste was constantly being dumped into the canal and lagoon" and at least one explosion was known to have destroyed a well. SSGD 4.

### B.    Creation of the Well.

In 1930, Marathon accepted the assignment of a thirteen-year "oil and gas lease" between a landowner, the Recreation Gun Club ("**RGC**"), and an unrelated party, A.A. Cutice. SSGD 5. A copy of the actual "Oil and Gas Lease" assigned to Marathon has not been located. SSGD 6.[2]   Marathon subsequently filed a notice of

---

[1]  Formerly known as the Ohio Oil Company.
[2]  On January 21, 1939, Marathon recorded of an extension of the lease, extending the term from ten to thirteen years – with a new termination date in 1952.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                              -2-                PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
                                                                 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
                                                                 CASE NO. 2:20-CV-08008-FLA (JPRX)

intent to drill an oil well – now known as the "Dow RGC 10" well – on the real property located at 4360 Via Marina in Marina del Rey, California ("**Property**"), and began the installation of the oil well on March 17, 1931. SSGD 8.

Beginning at 2,200 ft. below ground surface ("**bgs**"), Marathon took core samples of the soil in the hole being drilled for the oil well. SSGD 9. The initial samples taken at 2,200 ft. bgs showed the presence of natural gas. SSGD 10. Well records further indicate that core samples from 2,200 to 3,082 ft. bgs showed obvious signs of natural gas, including gas bubbles, ignitability and pressure. SSGD 11. Oil was first identified in sand material beginning 3,331 ft. bgs, and extended down to 3,906 ft. bgs. SSGD 12.

An oil well basically consists of a deep hole with a metal casing (pipe) running down the middle. The space between the casing and the soil is called the "annulus" space.  SSGD 22. In this well, the main casing was an 11¾ inch casing, surrounded by an annulus spacing of approximately three (3) inches. SSGD 23. The annulus space is typically sealed at the bottom and at sensitive layers (oil, gas and water) with cement. Marathon constructed the Dow RGC 10 well with cement running up the annulus space from the bottom (3,906 ft. bgs), up the side to 2,686 ft. bgs. SSGD 25. Notably, the cement in the annulus space did not extend to 2,200 ft. bgs where gas was found during drilling. SSGD 26.

### C.   High Pressure Gas Zones Were Known To Exist In The Area.

By the time Marathon drilled Dow RGC 10 it was familiar with the potential for high pressure gas zones in the area. SSGD 13. According to CalGEM records, when Marathon installed the first of the RGC wells, RGC 1, in 1929, the well produced 1,500,000 cubic feet of gas per day. SSGD 14. Moreover, blowouts and explosions were a common occurrence during the drilling of the wells in the area. SSGD 15. At least six wells within 650 feet of Dow RGC 10 experienced blowouts in the six months prior to Marathon drilling Dow RGC 10. SSGD 17. Marathon had experienced at least one blowout on its nearby well, RGC 8, just three months

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                    -3-                    PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

before. SSGD 16. Similarly, the International Petroleum Well #2, located immediately adjacent to DOW RGC 10, blew out for <u>four days</u>, catching fire and damaging the rig. SSGD 18. Notably, the blowout happened just two days after CalGEM conducted a "thorough investigation" of the blowout prevention equipment and found it to be "satisfactory." SSGD 19. In 1931, in a "Summary of Operations in the California Oil Fields," CalGEM identified the presence of "high pressure gas" in the Play del Rey oil field, specifically between 2500 and 3000 ft. bgs. SSGD 20. In 1951, Marathon performed an analysis of the potential gas reserves in the RGC wells, and concluded that a potential "1 billion cubic feet or better" of natural gas may exist at shallow depths, less than 2,000 ft. bgs, that could offer a "rapid payout" to Marathon. SSGD 21.[3]

### D.   California Enacted Laws To Protect Natural Resources.

From a geologic perspective, natural gas is a critical element to the production of crude oil. Natural gas applies pressure to the oil, causing it to be produced from the oil well. SSGD 27.  Accordingly, the California Legislature instituted various statutes in the early 1900s to protect gas-bearing zones from being wasted, deeming it unlawful to waste natural gas.

As early as 1915, California laws required oil wells to be constructed with sufficient metal casing and to shut off water from entering oil- and gas-bearing zones. SSGD 29. In 1939, California enacted numerous statutes designed to continue the then-existing requirements related to the construction, operation and abandonment of oil wells, **which still exist today**. Most notably, was the inclusion of the following in the Public Resources Code:

> **Section 3219:**  "Any person engaged in operating any oil
>
> and gas well wherein high pressure gas is known to exist,

---

[3] This is the exact same depth that Marathon and Dow left open and unprotected. Notably, Defendants' experts, Danial Arthur and Daniel Dudak, both concluded that the statutes cited by MDR in this matter do not apply to the Dow RGC 10, claiming that the gas was neither "high pressure" or "commercially viable." Neither qualifier exists in the statutes.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                    -4-                    PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

and any person drilling for oil or gas in any district where
the pressure of oil or gas is unknown shall equip the well
with casings of sufficient strength, and with such other
safety devices as may be necessary, in accordance with
methods approved by the supervisor, and shall use every
effort and endeavor effectually to prevent blowouts,
explosions, and fires."

**Section 3220:** "The owner or operator of any well on
lands producing or reasonably presumed to contain oil or
gas shall properly case it with water-tight and adequate
casing, in accordance with methods approved by the
supervisor or the district deputy, and shall, under his
direction, shut off all water overlying and underlying oil-
bearing or gas-bearing strata and prevent any water from
penetrating such strata. The owner or operator shall also
use every effort and endeavor to shut out detrimental
substances from strata containing water suitable for
irrigation or domestic purposes and from surface water
suitable for such purposes, and to prevent the infiltration
of detrimental substances into such strata and into such
surface water."

**Section 3228:** "Before abandoning any well in
accordance with methods approved by the supervisor or
the district deputy, and under his direction, the owner or
operator shall shut off and exclude all water from entering
oil-bearing or gas-bearing strata encountered in the well
and shall use every effort and endeavor to protect any
underground or surface water suitable for irrigation or

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                    -5-                    PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

1    domestic purposes from the infiltration or addition of any

2    detrimental substances."

3    **Section 3300:** "The unreasonable waste of natural gas by

4    act, omission, sufferance, insistence of the lessor, lessee,

5    or operator of any land containing oil or gas or both,

6    whether before or after the removal of gasoline from the

7    gas, is opposed to the public interest and unlawful. The

8    blowing, release or escape of gas into the air shall be

9    prima facia evidence of unreasonable waste."

10   Since their enactment in 1939, Sections 3219, 3220, and 3300 have undergone only

11   minor grammatical changes, but the intent has remained the same: operators of oil

12   wells are required to isolate water layers from oil- and gas-bearing strata. SSGD 31.

13   The reason for such isolation is simple. Water flowing into oil and gas zones will

14   compromise those natural resources. SSGD 36. Additionally, oil and gas flowing

15   into water zones will contaminate and destroy the water resources. SSGD 37.

16   Accordingly, the requirements to use casing of proper strength, as well as the

17   requirement to shut off and isolate oil- and gas-bearing zones from water zones,

18   that are presently set forth in the Public Resource Code, <u>were in place at the time</u>

19   <u>Marathon and Dow operated the oil well</u>. While the statutes were enacted after the

20   construction of the well, it is clear from the wording of the statutes that they applied

21   to existing wells, including Dow RGC 10. While regulations were implemented in

22   the years that followed that provided details about the methods to isolate the

23   protected zones, <u>the underlying requirement to isolate and shut off water from gas</u>

24   <u>and oil zones has existed since at least 1915</u>.

25   **E.      Marathon Transferred The Oil Well To Dow.**

26   After a decade of use for oil production, on July 10, 1941, Marathon sold the

27   oil well to Dow and Dow entered an Oil and Gas Lease with RGC ("**Dow Oil &**

28   **Gas Lease**"). SSGD 38 & 39. The Dow Oil & Gas Lease specifically required Dow

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                    -6-                    PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

to (i) "carry on all operations on the [Property] in a careful and workmanlike manner and in accordance with the laws of the State of California; and (ii) "remove all structures and foreign matter and [] leave the premises in substantially the same condition as existed on the 5th day of February 1929." SSGD 40 & 41.

Before transferring the well to Dow (about a decade after it was constructed), Marathon filled the perforated oil production pipe, below 3,400 ft. bgs with cement, but took no action to isolate or shut off the gas layer at 2,200 ft. SSGD 42. No structure or barrier existed in the well to keep gas from traveling up the annulus to the surface. SSGD 43. When questioned on this subject, neither Marathon's Rule 30(b)(6) witness, Michael Welch, nor its expert, Daniel Dudak, could identify any structural barrier to prevent gas from migrating to the surface. SSGD 43. Moreover, well records indicate that in 1956, the well blew out with gas coming from a depth of 1,800 ft. bgs and escaping from the annulus space <u>outside</u> the 11¾ inch casing. SSGD 44.

On April 14, 1941, Dow performed a test to confirm that the 11¾ casing was watertight and that water from outside the casing was not getting into the interior of casing.[4] SSGD 45. After confirming that the casing was watertight, on April 16, 1941, Dow began a long series of actions to perforate the 11¾ casing to allow saltwater to enter the casing. SSGD 46. Between April 16 and October 11, 1941, Dow cut at least 657 perforations in the casing, ranging from 3,341 to 3,076 ft. bgs, to filter saltwater for the production of iodine. SSGD 47. To put that into context, Dow cut a hole into the casing and surrounding cement every six inches for approximately the length of a football field, opening the wellbore to a mixture of hydrocarbons and saltwater. These perforations ranged from the known oil-bearing zone at 3,330 ft. bgs and the gas-bearing zone that ranged down to 3,086 ft. bgs. SSGD 48.

---

[4] Notably this testing does not confirm the isolation of gas and oil zones from water zones. Those zones remained in communication with each other through the annulus spacing. It is only to test if water is entering the production casing.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                                   -7-                   PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

In 1956, Dow submitted a Notice of Intention to Abandon Well to CalGEM. SSGD 49. As part of the notice, Dow was required to describe the current condition of the well. In that description, Dow *only* identified the original perforations in the 6⅝ inch production liner (3,423-3,903 ft. bgs) that Marathon had plugged with cement, but omitted the 657 perforations performed by Dow on the 11¾ inch casing. SSGD 51. Instead, Dow indicated that the 11¾ inch casing was "W.S.O.", a commonly used abbreviation to note that a casing had passed a "water shutoff" test and was watertight. SSGD 52. In fact, the casing was anything but watertight. It had been perforated over 657 times and used to produce saltwater, with perforations in both the oil and gas-bearing zones. SSGD 53. CalGEM approved the planned abandonment based on Dow's representations, echoing that that the 11 ¾ inch casing was "W.S.O." or watertight. SSGD 55. Clearly CalGEM was not aware of the numerous perforations thru the sensitive geologic layers, or it would have identified the cuts in the casing in its own description of the well.

### F.     Dow Abandoned The Well.

On or before March 12, 1956, Dow engaged contractor, Gordon Graham to begin an attempt to abandon the oil well. SSGD 54. To recover the valuable metal used in the casing, Mr. Graham attempted to cut and pull the casing from the ground at a depth of 887 ft. bgs. SSGD 56. After pulling the casing up 4 feet, the well experienced a blowout. SSGD 57. Based on observations of CalGEM recorded in the well record, the gas was coming from "behind the 11¾ in. casing at a depth of 1800." SSGD 58. This blowout lasted 36 hours. SSGD 59. After multiple failed attempts to cut and pull the casing, Mr. Graham cut the casing at 40 ft. bgs and removed the top 40 ft. of casing from the surface, leaving only thin "stove pipe" casing at the surface. SSGD 60. CalGEM issued an approval of the abandonment of the well. However, at the time of the abandonment, the casing had been left perforated at the base and exposed to the constant influx of oil and gas, as well as corrosive saltwater. SSGD 61. More importantly, the gas zone known to exist at

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-8-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

2,200 ft. bgs (and below) was left open to the annulus space surrounding the 11¾ inch casing, free to flow to water layers and surface. SSGD 62.

### G.    In 2006 MDR Was Selected To Develop The Property.

In 2006, MDR's predecessor entity commenced negotiations with the County of Los Angeles (the current owner) to develop the Property. Over time, the planned development, and the amount of land to be leased changed significantly. SSGD 63. At the inception of the negotiations, a high-rise condo complex was planned with parking on an adjacent lot. SSGD 65. But the size of the property to be leased was reduced to accommodate wetlands, and the planned development changed to a hotel complex, featuring 2 hotels and a restaurant. SSGD 66.

While MDR was first led to believe the Dow RGC 10 well was located off the Property, it soon became aware of the potential that the oil well may be located on the Property. Accordingly, in 2008, MDR engaged a contractor, Methane Specialists, to conduct a magnetometer survey of the Property to locate the well. SSGD 68. The report concluded that the oil well was immediately adjacent to the road stating, "The instrument's response was unequivocal, resulting in very high confidence that here the well was positively located to within +/- 1 foot." SSGD 69. Understanding that the well was located immediately adjacent to the street, MDR planned its hotel development accordingly. SSGD 70. Prior to signing the lease with the County, MDR conducted a <u>second</u> magnetometer survey, which again confirmed the location of the well near the boundary of the Property. SSGD 71.

### H.    MDR Leased The Property And Discovered The Leaking Well.

After entering the lease in July 2017, MDR instructed Methane Specialists to physically locate the Dow RGC 10 well. The well was located on September 7, 2017, within the planned footprint of the development, under the planned parking garage. SSGD 74. On October 2, 2017, Methane Specialists examined the condition of the well and determined it to be leaking methane and surrounded by viscous fluids—described as "thicker than water." SSGD 75. CalGEM confirmed that if the

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-9-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

1   well was leaking, MDR would be required to re-abandon the well. SSGD 76.

2          With the assistance of and recommendation from Methane Specialist, MDR

3   engaged InterACT PMTI ("**InterACT**") to perform the well abandonment. SSGD

4   77. InterACT is experienced in working on, and abandoning, oil wells in Southern

5   California. SSGD 78. On April 27, 2018, MDR submitted a Notice of Intent to re-

6   abandon the well. SSGD 79. On June 5, 2018, CalGEM approved the Notice, and

7   issue a permit to abandon the well that included the following requirements:

8          "9. The operator shall isolate the following zones:

9                  a. The Base of Freshwater at 700' +/- [bgs]

10                 b. The [Underground Source of Drinking Water] at

11                    1512' +/- [bgs]

12                 c. Top of the upper most hydrocarbon zone at 2200'

13                    +/- [bgs]

14                 d. Top of the Upper [oil-bearing] zone at 3330' +/-"

15  SSGD 80 & 81. As evidenced by this requirement, it was known and understood by

16  both CalGEM and MDR, prior to MDR initiating the re-abandonment efforts, that

17  Dow and Marathon had failed to shut off or isolate the water layers from the oil-

18  bearing zone at 3,330 ft. bgs and from the gas-bearing zone at 2,200 ft. bgs.[5] SSGD

19  82. With cement in the annulus (the space between the casing pipe and the earth)

20  only ranging from the base of the well at 3,423 ft. up to 2,686 ft. bgs, neither Dow

21  nor Marathon had shut off the hydrocarbon or gas zone at 2,200 ft. bgs. SSGD 83.

22  **I.     MDR Was Required To Reabandon The Well.**

23         MDR began the reabandonment of the well on August 6, 2018. SSGD 84.

24  Almost instantly, MDR saw signs that gas from below was leaking to the surface.

25  InterACT was constantly dealing with gas kicks from the subsurface as it attempted

26  to reenter the well. SSGD 85. Despite numerous requests to modify the re-

27  _____
[5] These layers were established by the core samples taken by Marathon. Gas was
28  detected in the shallowest core sample at 2,200 ft. bgs, and oil sands were detected
    in the core sample taken at 3,330 ft. bgs. SSGD 11.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA          081006\16556765v2          -10-          PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

abandonment plan, CalGEM insisted that oil and gas zones must be isolated to protect water layers above. SSGD 86.

On December 24, 2018, the well experienced a blowout when work at the Property had ceased for the Christmas holiday. SSGD 87. Following that blowout, MDR's contractor again requested that CalGEM approve a modified abandonment plan that did not require abandonment to 3,375 ft. bgs. SSGD 88. Again, CalGEM insisted that MDR continue with the planned re-abandonment. SSGD 89. MDR's contractor continued to experience gas kicks almost daily through the remainder of December and early January. SSGD 90.

**J.     A January 11, 2019 Well Blowout Led To An Emergency Order.**

On the morning of January 11, 2019, MDR's contractor experienced various gas kicks and emailed CalGEM noting the condition and again asked that CalGEM reconsider its position regarding a modification to the planned abandonment. SSGD 91. Later that day MDR's contractor experienced a blowout consisting mostly of natural gas up a drill string (a long metal tube, approximately four inches in diameter) that was being used to work towards the bottom of the well. SSGD 92. The end of the drill string was believed to be at a depth of 1,492 ft. bgs when gas blew up the drill string with significant pressure. SSGD 93. The source of the gas was believed to be below the end of the drill string at 1,492 ft. bgs. SSGD 94. Attempts by the rig crew to screw on a safety valve on the end of the drill string at the surface were unsuccessful due to the pressure of the gas coming up the drill string. SSGD 95. Ultimately, the drill string was released into the well to stop the blowout. In total, the blowout lasted approximately 10 minutes. SSGD 96. Fortunately, the blowout did not result in any damage to life or property. SSGD 97.

CalGEM issued Emergency Order No. 1143 requiring MDR to perform around-the-clock remedial work on the well. SSGD 98. From the time of the January blowout (even before the Order), MDR's contractor watched over the well, 24 hours a day until CalGEM authorized the watch to cease. SSGD 99.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-11-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

### K.   MDR Successfully Reabandoned The Well.

While the purposely dropped drill string (metal tubing) was successful in stopping the blowout, the contractor was unable to retrieve the entire drill string from the well. SSGD 100. The presence of the drill string in the wellbore at depth made further attempts to reach the bottom of the well impractical. SSGD 101. Accordingly, MDR proposed a series of cement barriers at depth to isolate the hydrocarbon zones from the water zones and surface above. The two-phased approach was reviewed and approved by CalGEM. SSGD 102.

On December 29, 2020, the State Oil and Gas Supervisor executed an Amended Emergency Order and Satisfaction "finding that [MDR] satisfied Emergency Remedial Order No. 1143 . . . by acting in accordance of the alternate programs 'Dow RGC 10, Two Stage Program to Cement through the Fish' and 'Dow RGC 10 Abandonment Program above the Fish' submitted to CalGEM on March 18, 2019 and March 26, 2019, respectively." SSGD 104. The Amended Order noted that the well control challenges were the "result of wellbore integrity issues related to the original abandonment." SSGD 105.

### L.   MDR Filed A Complaint Against Marathon And Dow.

MDR filed a state court complaint in July 2020 alleging causes of action for negligence, continuing and permanent public and private nuisances, and trespass against Marathon and Dow based on Defendants' creation, modification and/or attempted abandonments of the Dow RGC 10 well. MDR's claims for nuisance and trespass stem from both the dangerous well left by Defendants, but also petroleum-impacted dirt that MDR was required to excavate and haul to a landfill.

## III.   ARGUMENT

### A.   Defendants Have Not Previously Asserted An Affirmative Defense Based On The Statute of Repose.

Federal Rule of Civil Procedure 8(c)(1) requires parties to state all affirmative defenses in their answer to the Complaint. Specifically, courts have held

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-12-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

that parties must plead their affirmative defenses with specificity or factual
particularity to give the plaintiff "fair notice" of the defense. *Simmons v. Navajo
Cnty., Ariz.*, 609 F.3d 1011, 1023 (9th Cir. 2010). Prior to raising the statute of
repose in their Motion, Defendants had not asserted an affirmative defense based on
a statute of repose for construction defects in either their answers or otherwise.
SSGD 111. Except for discovery related to well records withheld by Marathon,
discovery in this matter concluded almost a year ago, on May 31, 2022. SSGD 113.
Defendants have known they intended to file their Motion since at least August 12,
2022, when they moved for leave to file multiple summary judgment motions.
SSGD 114. Notably, Defendants have not asked for leave to amend their responsive
pleadings to include the affirmative defense either.

Failure to timely identify the affirmative defense prejudices MDR's ability to
respond to the claim. As discussed below, the statute of repose is meant only to
protect the **contractor** that performed the allegedly defective work. However,
Defendants' failure to raise the statute of repose before filing their Motion on the
last possible day, precluded MDR from properly investigating or conducting
discovery on the issue.[6]

### B.    The Statute Of Repose Does Not Apply For A Variety Of Reasons.

The statute of repose related to construction defects does not apply to this
matter for a variety of reasons. First, the statute of repose expressly excludes
owners and <u>tenants</u> that controlled the property at the time of the improvement from

---

[6] The well file indicates that Dow hired contractors: H. Hilsinger, who performed
the perforations to the well casing in 1941, and Gordon Graham, who performed the
well abandonment in 1956. SSGD 54. Mr. Hilsinger appears to be affiliated with an
entity called "The Dow Chemical Company, Contractors," not the Dow defendant,
and Mr. Graham does not appear to have a relationship with any Dow entity.
However, because the statute of repose has never been raised before, MDR has not
had a chance to conduct discovery on the relationship of these individuals to the
Dow defendant, or to evaluate Marathon's unsubstantiated claim that it was the
contractor who performed the work.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                            -13-             PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
                                                             DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
                                                             CASE NO. 2:20-CV-08008-FLA (JPRX)

its protections (even if also acting as the contractor). Second, courts have held that the statute of repose does not apply when the alleged grievance involves a statutory obligation. Third, the alleged defect is not latent. And lastly, Dow only attempted to abandon the well but did not "improve" the Property by constructing the well.

### 1. The Statute Of Repose Does Not Extend To The Owner Or Tenant At The Time Of Improvement.

Defendants' reliance on Civil Code sections 337.15 and 337.1 is misplaced. First, owners and tenants are not listed in the protected class of parties under either statute. Moreover, both statutes make it abundantly clear that owners and tenants are not protected, <u>expressly</u> stating that the statute of repose may not be asserted by the owner or tenant in control of the improvement at the time it becomes the proximate cause of the injury at issue. *See* Civ. Code §§ 337.15(d) and 337.1(c). This issue is discussed at length in *Grange Debris Box & Wrecking Co. v. Super. Ct.*, 16 Cal. App. 4th 1349, 1356 (1993), *overruled on other grounds by Lantzy v. Centex Homes*, 31 Cal. 4th 363 (2003) (owner of property at time of improvement barred from asserting statute of repose under Section 337.15(e)). Although Defendants cite to *Grange*, they ignore that the *Grange* court was specifically examining whether the <u>contractor</u> was precluded from asserting the statute of repose <u>given that the former owner was precluded</u>. In *Grange*, the current owner sued the former owner who had owned the property at the time Grange Debris had performed work at the site. The court concluded that former owner, as the owner at the time of the improvement was <u>not protected by Section 337.15</u>, but that Grange Debris, as the contractor, could still assert the protection. *Id.*; *see also Lantzy*, 31 Cal. 4th at 374 ("[T]he purpose of section 337.15 is to protect contractors and other professionals and tradespeople in the construction industry from perpetual exposure to liability for their work. The statute reflects a legitimate concern that 'expanding concepts of liability could imperil the construction industry unless a statute of limitations was enacted.'" (citations omitted)).

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-14-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

Similarly, in *Nixon-Egli Equip. Co. v. John A. Alexander*, 949 F. Supp. 1435, 1146 (Cal. C.D. 1996) the court held that "a party who possessed the disputed property at the time of the alleged defect is barred from ever asserting the 10 year statute." In *Nixon-Egli*, the current owner pursued a claim related to oil contamination related to oil fields that had been left behind during the grading process associated with the commercial development of the property. The former owner, like Defendants here, tried to claim that it was both the owner and the contractor and therefore should be able to avail itself of the protection afforded by Section 337.15. The court declined, stating "Defendant's response is illogical. . . . The fact that [defendant] may be able to escape liability as a general contractor does not immunize them from liability as an owner." (Emphasis added.)

Here, Defendants admit that they were the tenants under the oil and gas leases, operating the Dow RGC 10 well. It is during their tenancy, when they controlled the Property and well, that the dangerous condition (an open pathway for gas and water to flow vertically beneath the Property) was created which caused the injury to the Property that MDR was forced to abate. As the tenants controlling the Property and the Dow RGC 10 well when the defect was created, Defendants are precluded from asserting the protections afforded by Sections 337.15 and 337.1.

### 2. Courts Have Refused To Apply The Statute of Repose When Statutory Duties Are At Issue.

Defendants try to characterize MDR's claim as a mere defect in design or construction. It is much more than that. MDR alleges that Defendants failed to comply with the statutory obligations to shut off and isolate oil, gas and water layers, as required under the Public Resources Code sections 3219, 3220 and 3228.

A similar issue came before the court in *San Diego Unified Sch. Dist. v. Cnty. of San Diego*, 170 Cal. App. 4th 288, 310-11 (2009). In that case, the school district sought to recover damages related to a landfill previously operated by the County of San Diego. The school district claimed that the landfill was operated by the County

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-15-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

in violation of the Porter-Cologne Water Quality Control Act. Though the trial court initially granted summary judgment based on Section 337.15, the appellate court reversed given the alleged failures to comply with the statutes. In doing so, the appellate court stated, "The Legislature's goal in enacting section 337.15 was identified as 'setting an outside limit to protect contractors from extended liability.' This is not a goal that can be implement here by upholding this grant of summary judgment to the County because the District also made . . . allegations of statutory duties of the County as an operator . . ." *Id.* (citation omitted).

As explained above, MDR claims that Defendants failed to construct, operate and abandon the well in compliance with various sections of the Public Resources Code. <u>This is not a claim based on an accidental mistake or defect. The well was left as Defendants intended to leave it. This is not a mere error when making an affirmative act, it is a complete failure to take a legally required act – to shut off and isolate the sensitive geologic layers.</u> As the operators of the well, Defendants were expected to understand the legal requirements of operating and abandoning such a well. Section 337.15 is designed to protect contractors who make innocent mistakes in design and construction who are not well equipped to insure against claims indefinitely. That is not the case here. Corporations such as Defendants are expected to be properly insured and able to account for their actions into the future. Accordingly, the Court should not extend the statute of repose in this matter.

### 3.    Defendants Fail To Identify A Latent Defect.

Because they cannot assert the statute of repose defense as a tenant under either statute, Defendants appear to try to characterize themselves as "developers" of the Property, in an attempt to fall under a class of persons protected by Section 337.15(a) (but notably not Section 337.1 which does not list developers as a protected party). Although the statute does not define "developer" and it is unlikely that either Defendant could be classified as such as the term is used in its ordinary sense, it is clear that for Section 337.15 to apply there must be a latent defect. A

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-16-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

"latent defect" is one that is not apparent from a reasonable inspection. *North Coast Bus. Park v. Nielsen Constr.*, 17 Cal. App. 4th 22, 27 (1993). This Court, when ruling on the Defendants' Motion to Dismiss, has already opined that "the County knew or had reason to suspect Plaintiff's claims regarding the alleged "improper construction, use, maintenance and abandonment of the well" at least as of 1959. Defendants fail to identify any "latent" or unknown aspect of the well that was not contained in the well record. All of the cuts, perforations, open spaces and pathways for gas to migrate that are at issue in this case are contained in the well files. Given the lack of a showing of a latent defect Section 337.15 does not apply.

### 4.    The Well Abandonment Performed By Dow Was Not An Improvement to the Property.

Sections 337.15 and 337.1 by their expressed terms only apply to "improvements" to land. Dow's failure to properly abandon the Dow RGC 10 well was not an improvement. It was a failed attempt to salvage the metal casing. As referenced above, Dow's Oil and Gas Lease required it to remove the casing and return the Property to its original condition. The details Dow's abandonment plan were simple – "shoot and pull as much 11-3/4 [inch] casing as possible, and place a 20 [foot] cement plug on the stub." Dow was trying to salvage the valuable metal casing. It actions had nothing to do with "improving" the Property.

The first attempt to cut and pull the casing was done at 887 ft. bgs. The casing was pulled up 4 feet, when the well blew out. The blowout lasted over <u>36 hours</u>. The casing was then cut at 542 feet, but again could not be pulled loose. Then Dow's contractor cut it at 310 ft. bgs and pulled it up 20 feet, but could not remove the casing. Finally, the casing was cut at 40 ft. bgs, and pulled up from that depth. The random sections of cut and perforated casing were left in the ground, in a condition that violated the clear and obvious standard of Public Resources Code section 3228. In no sense of the word, is the jumbled mess of casing left in the ground an "improvement" to the Property. It did nothing to foster or promote the

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-17-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

future use or development of the Property. Instead, it was scrap metal left junked and abandoned below ground.

Defendants point to the analysis of "improvement" in the matter *Gagerro v. Cnty. of San Diego*, 12 Cal. App. 4th 609, 615-16 (2004). However, that holding points to tangible advances or improvements like subdivisions, grading of streets and installations of curbs and gutters, ultimately concluding that the action or item must be something that makes the property "more valuable." *Id.* Nothing about Dow's abandonment of the well made or was intended to make the Property more valuable. It was meant only as an attempt to salvage the metal casing, and conclude Dow's obligations as the operator of the well. The well, in its abandoned state, had no useful purpose, obstructed development and provided a pathway for hydrocarbons to move to the surface – all in violation of legal requirements. It is impossible to consider the "abandoned" well an improvement to the Property. As such the statute of repose should not apply to Dow for this additional reason.

### C.   MDR's Claim Is Properly Set Forth As A Continuing Nuisance As The Nuisance Has Been Abated.

As identified in Defendants' Motion, generally speaking, the determinative factor when distinguishing between a claim for permanent nuisance and continuing nuisance is whether the nuisance can be abated. In this matter, that analysis should be easy as the well ***has been abated*** in the form of a re-abandonment utilizing methods approved by CalGEM. MDR was allowed to move forward and complete its planned construction of the hotel project. There is no longer any impact to MDR's use and enjoyment of the Property, nor is there a continued threat to the public or its water resources.

As set forth in *Capogeannis v. Super. Ct.*, 12 Cal. App. 4th 668, 677 (1993), "The great weight of California authority has articulated the basic distinction between permanent and continuing nuisances in broad terms of whether the nuisance can be discontinued, or abated, 'at any time.'" *Id.* If the nuisance can be

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-18-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

abated at any time, it is deemed a continuing nuisance. *Id.* The court noted that not even that standard can be mechanically applied. *Id.* Further, the preference is "for finding a *continuing* nuisance, both to protect the plaintiff from "contingencies" such as unforeseen future injury and the statute of limitations itself." *Id.* at 678 (emphasis in original). In matters where "the distinction between permanent and continuing nuisance is close or doubtful the plaintiff will be permitted to elect the theory to pursue." *Id.* at 679, *citing Spaulding v. Cameron*, 38 Cal. 2d 265 (1952). Lastly, the court in *Capogeannis* expounded on the overriding policy consideration for the preference for finding a continuing nuisance: "Such a finding will tend to encourage private abatement, and perhaps monetary cooperation in abatement efforts, if only to limit successive lawsuits." *Id.* at 682. The fact that abatement may take time and "may never be wholly successful" should not prevent a finding of a continuing nuisance. *Id.* Courts look to what the public agencies view as the appropriate form of abatement and at the nuisance from the perspective of the plaintiff. *Id.* at 683.

Defendants dedicate considerable effort trying to compare the well to other structures that courts have found to be permanent and unable to abate. However, unlike those structures, the necessary abatement of the below-ground well was not the removal of the structure. DOGGR never asked MDR to abate the well by removing it. All that was required to abate the nuisance caused by the well was to fill the open annulus spaces surrounding the well left by Defendants with cement, thereby preventing hydrocarbons from migrating upwards. That type of nuisance is considerably different than a building, a sewer or a railroad that permanently and significantly impairs the use and enjoyment of the property, and cannot be abated without the removal of the tangible structure.

In the matter presently before the Court, MDR has abated the nuisance. With the oversight and approval of CalGEM and the County of Los Angeles, MDR completed the re-abandonment of the well such that the Underground Source of

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-19-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

Drinking Water at 1,300 f.t bgs, the Base of Freshwater at 700 ft. bgs, and the surface are now isolated and protected by numerous layers of cement pushed through perforations in the casing into the earth, filling the annulus space outside the casing. Following the January 2019 blowout, MDR's contractor worked with CalGEM to develop a two-phased approach to abandoning the well. SSGD 102. The process was approved by CalGEM and the County of Los Angeles. SSGD 103. CalGEM cited this two-phased approach when it issued the Amended Emergency Order, noting that the Order had been satisfied. SSGD 104. Admittedly, the abandonment does not completely comply with all existing regulations. Those regulations require that the cement be pushed into the oil layer at 3,300 ft. and gas layer at 2,200 ft. While such action was planned and possible prior to the blowout, reaching those depths was no longer feasible after the blowout due to the drill string falling into the hole and blocking further attempts to reach depth. SSGD 101.

At the request of CalGEM, MDR constructed the parking garage such that a casing riser sits above the well, allowing future access to the well if necessary. SSGD 106. The re-abatement by MDR was approved by the County of Los Angeles, and Building and Safety issued a Final Certificate of Occupancy for the Property. SSGD 107. The hotel property has been operational since October 2020, and is not impacted by the well or any methane gases emanating from the well. SSGD 108. As a safety measure, MDR installed a leak detection system and regularly checks the well for leaks. To date, there has been no evidence of any leak of methane or other natural gas from the well. SSGD 109.

As noted in the holding in *Capogeannis*, there is an overriding policy interest to find a continuing nuisance to promote the abatement and remediation of nuisances to recycle and reuse impacted land. *Id.* To that end, it would be counterproductive to conclude that the inability to completely remediate or the need for future monitoring is evidence of a permanent nuisance. Rarely, is a contaminated site remediated back to its original state. Often, some small amount of

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-20-

PLAINTIFF'S MEMO OF P&As IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

contaminant is either knowingly, or accidentally, left behind. Further, as environmental agencies grow more conservative about possible indoor air considerations, very often the remediation of contaminated sites includes a vapor barrier beneath the residential or commercial development, coupled with a monitoring and reporting obligation. These tools are critical to the redevelopment of previously developed sites with contamination, which are commonly referred to as "brownfields." MDR's Property is a perfect example. The Property is a valuable parcel abutting the marina in Marina del Rey which had remained undeveloped for over 60 years since being used as an oil field. It would be detrimental to the future development of brownfields in California if the Court were to conclude that the possibility that the continued existence of any portion of the alleged nuisance or any ongoing need to monitor the situation following abatement were considered evidence of a permanent nuisance. It will discourage developers from attempting to remediate and abate the contamination (or dangerous oil wells) if they fear that they will be precluded from seeking recovery from the party that caused the contamination due to a statute of limitations associated with a permanent nuisance.

### D. The Well-Related Nuisance Was Abatable Prior To The Blowout.

Defendants contend that because MDR did not completely re-abandon the DOW RGC 10 well, the Court should not consider it abatable and that MDR's claim should therefore be considered a permanent nuisance. However, the condition that prevented the complete re-abandonment did not exist until January 2019. The standard set forth in *Capogeannis* for determining whether a nuisance is abatable "at any time." *Capogeannis, supra*, 12 Cal. App. 4th at 677. There is no serious debate about the fact that the well issues could have been abated prior to the January 11, 2019 blowout.

First, <u>Defendants</u> could have abated the issue when they constructed and abandoned the well years ago. Rather than leave the annulus spacing open for the migration of gas and water, they could have filled those spaces with cement. They

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-21-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

did not. Instead, Dow attempted to rip the casing from the ground, exacerbating the condition. But even then, Dow could have isolated the layers containing high pressured gas using cement. It did not.

Second, prior to the blowout in January 2019, CalGEM, including Defendants' expert Daniel Dudak, was requiring MDR to continue with the re-abandonment of the well to a depth of 3,375 ft. bgs. However, during the blowout, a large section of drill string was dropped into the well to stop the blowout. While the quick action was successful in stopping the blowout, it resulted in a portion of the drill string being irretrievable at the bottom of the well. SSGD 100. Despite best efforts, MDR's contractors were unable to remove the drill string and in the process additional equipment became stuck and lost in the well. SSGD 100. Ultimately, CalGEM agreed that it was too risky to try to work through the lost equipment, and approved a modified abandonment plan that required MDR to isolate beneath the water layer known as Underground Source of Drinking Water, shutting it off from the hydrocarbon layers beneath it. The approved plan ultimately required multiple layers of cement pushed thru perforations in the casing to seal off the annulus space surrounding the oil well. SSGD 102.

But for the blowout on January 11, 2019, MDR's would have ultimately completed the abandonment to the complete depth of the well, sealing both the oil zone at 3,330 ft. and the gas zone at 2,200 ft. – both left open by Defendants. Prior to blowout, the issues related to the well were abatable and were on target to be abated. As such, the nuisance issues related to the well were unquestionably a continuing nuisance as of January 11, 2019. There is no legal support for the conclusion that an abatable continuing nuisance suddenly becomes a permanent nuisance with a statute of limitations reverting back decades if the abatement actions somehow prevent the complete abatement. Again, such a ruling would discourage parties from engaging in the act of abating the nuisance. At worst, it would mean that the applicable statute of limitations would begin to run at the time

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-22-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

the abatement because unreasonable or impossible. Here that would be January 11, 2019. As such, MDR's inability to complete the original re-abandonment plan following the blowout should not cause its claim to be considered a permanent nuisance barred by statute of limitations.

### E.   Civil Code Section 3482 Is Not Applicable Since Defendants' Actions Are Prohibited By Statute.

As noted by Defendants, Civil Code Section 3482 states that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance." Section 3482 is not applicable in this matter for two reasons. First, Defendants have not cited any statute that expressly authorizes the activity at issue – the failure to make an oil well safe by sealing oil and gas zones surrounding the well. Irrespective of the issues of sealing the well, Defendants fail to cite anything that expressly authorizes even the installation of oil wells. Second, in this matter, MDR affirmatively asserts that Defendants violated the statutes that "expressly" regulate the activity of operating an oil well.

Each of the cases cited by Defendants include a statute or ordinance that specifically authorizes the offending activity. In *Today's IV, Inc. v. Los Angeles Cnty. Metro. Trans. Auth.* 83 Cal. App. 5th 1137 (2022), the court relied on Public Utilities Code section 30631, which states that the transportation district could construct the offending rail line. *Id.* at 1180. In *Williams v. Moulton Niguel Water Dist.*, 22 Cal. App. 5th 1198, 1205 (2018), the court compared water quality to a "comprehensive regulatory scheme" established by California's State Water Resources Control Board for water quality to determine if the water was in compliance. *Id.* at 1204. In *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 888 (9th Cir. 2001), the court examined specific storm water discharge requirements set forth in a permit issued authorizing the discharging of impacted water under the Clean Water Act and a National Pollutant Discharge Elimination System (NPDES) permit. Lastly, in *Wheeler v. Gregg*, 90 Cal. App. 2nd 348

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-23-

PLAINTIFF'S MEMO OF P&As IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

1  (1949), the court examined the use of a property for quarry purposes to extract rock

2  and gravel in compliance with a conditional use permit provided by the City

3  Council. Defendants do not cite to any specific statute or administrative permit that

4  authorizes the existence of an oil well that fails to isolate and protect oil, gas and

5  water layers beneath the surface. There is none.

6        Even if the Defendants could cite to a statute or permit that authorized the

7  installation of an oil well, that would be insufficient to qualify under the protection

8  of Section 3482. As noted by the Court of Appeal in *Jones v. Union Pac. R.R.*, 19

9  Cal. App. 4th 1053, 1067-68 (2000), "Even though acts authorized by statute

10  cannot give rise to nuisance liability, "the *manner* in which those acts are

11  performed may constitute a nuisance." (emphasis in original, *citing Friends of H*

12  *Street v. City of Sacramento*, 20 Cal. App. 4th 152, 160 (1993)). Additionally, the

13  court in *Friends of H Street* stated that "The Supreme Court has "consistently

14  applied a narrow construction to section 3482 and to the principle therein

15  embodied." *Id.* It further added that:

16          A statutory sanction cannot be pleaded in justification of

17          acts which by the general rules of law constitute a

18          nuisance, unless the acts complained of are authorized by

19          the express terms of the statute under which the

20          justification is made, or by the plainest and most

21          necessary implication from the powers expressly

22          conferred, so that it can be fairly stated that the legislature

23          contemplated the doing of the very act which occasions

24          the injury. (Citation omitted.)

25  As set forth above, Public Resources Code sections 3220 and 3228 specifically

26  require that an operator of a well must specifically isolate oil and gas layers from

27  the intrusion of <u>any</u> water, and must also protect beneficial water sources from

28  detrimental substances (such as petroleum hydrocarbons and saltwater). At the very

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-24-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

least, in order to avail themselves of the protections of Section 3482, Defendants must establish that they complied with those protective statutes. They have not. Moreover, when questioned about what actions were done with respect to the oil well to provide the required protections, Marathon's Rule 30(b)(6) witness, Michael Welch, and Defendants' expert, Danial Dudak, were unable to identify anything other than drilling mud that was placed in the annulus of the well in 1931 to shut off and isolate the sensitive geologic layers. And, well records show that gas was blowing out from a depth of 1,800 ft. bgs from <u>outside</u> the 11¾ casing.

Unlike any of the cases relied upon by Defendants, MDR alleges actual violations of the applicable statutes that governed the existence of wells. In crafting its opinion, the court in *Carson Harbor*, specifically noted that the plaintiff submitted no evidence of a violation of the permits or other laws related to the discharge. *Carson Harbor, supra*, 270 F.3d at. 887. The clear take away from the court's consideration of this fact is that if plaintiff had presented such evidence, Section 3482 would not provide protection. Here, MDR cites numerous violations at the basis for its nuisance and trespass claims. MDR contends that Defendants failed to comply with Public Resource Code sections 3220 and 3228 by failing to shut off the oil-bearing and gas-bearing strata from the water layers above. Instead, the annulus between the casing and the earth surrounding the well was left open for gas and water to migrate freely, presenting both a source of contamination for the water, but also a lack of isolation of the gas-bearing zones and resulting in potential surface expression of gas. Public Resources Code section 3219 required the operator to take "every effort" to prevent blowouts, explosions and fires. The Defendants failure to isolate the gas-bearing zone fell short of this requirement.

Notably, it is these same sensitive geologic layers that CalGEM insisted that MDR seek to isolate as part of its abandonment. There have been no material changes in the controlling statutes related to this issue of isolating and shutting off oil, gas and water since the early 1930s. One cannot conclude that statutes that were

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-25-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

the basis of CalGEMs re-abandonment requirement of MDR to isolate geologic layers in 2018, were somehow "expressly authorizing" Defendants to leave those same layers open and free to flow throughout the wellbore.

### F. The Consent Defense Does Not Apply Here

Defendants' reliance on a theory of consent is also misplaced.

#### 1. The Consent Defense Does Not Apply To Acts That Exceed The Scope Of The Granted Consent.

Other than a recording on title that a lease between RGC and A.A. Cutice had been entered on February 5, 1929, and then assigned to Marathon, Marathon has not produced an actual controlling lease. SSGD 6. In fact, when deposed on the subject of Marathon's interest in the subject property, Marathon's Rule 30(b)(6) witness had no knowledge of the lease or Marathon's rights under the lease, and had never seen the recorded documents. SSGD 7.

In contrast, a lease related to Dow's tenancy on the Property does appear to be recorded on title. However, Defendants' claim of consent cannot be based on the Dow Oil & Gas Lease as it clearly requires Dow to (i) "carry on all operations on the [Property] in a careful and workmanlike manner and in accordance with the laws of the State of California and (ii) "remove all structures and foreign matter and [] leave the premises in substantially the same condition as existed on the 5th day of February 1929. SSGD 40 & 41. The failure to comply with these clearly defined lease requirements is the heart of this matter. MDR's primary allegations is Defendants' failure to construct, operate and abandon the well in a careful manner and in accordance with the Public Resource Code. Moreover, there can be no dispute that Dow did not return the Property to its original condition.

Defendants' alleged actions violated their leases and thus exceeded the scope of lessor RGC's consent. A defendant cannot assert the consent defense where it has exceeded the scope of its consent. *Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125, 1141-42 (1991) (*Mangini I*); *see Mortkowitz v. Texaco*, 842 F. Supp.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                    -26-                    PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

1232, 1241-42 (N.D. Cal. 1994) ("As a general rule, consent is a defense to claims
of trespass and nuisance. [Citation.] In this case, however, there is no evidence that
[plaintiffs] specifically consented to Texaco's use of the leaking pipeline, despite
their general consent to the use of the property as a service station"); *see also
Lincoln Prop. v. Higgins*, 1993 WL 217429, at *25 (E.D. Cal. Jan. 21, 1993) (dry
cleaners had property owner's consent to conduct dry-cleaning operations on
property, but its "lease provisions d[id] not establish [the owner's] consent to the
dry cleaners' disposal of PCE [on the property]. In fact, the leases also required the
dry cleaners to conduct their businesses 'in accordance with law and valid
regulations,' which they apparently did not do"). Accordingly, merely having
consent to use the Property for oil production (and it is unclear exactly what
consent Marathon had) does not equate to consent to have a poorly constructed and
improperly abandoned well that allows hydrocarbons to flow to the surface.

### 2.     Consent Is Not a Defense to Public Nuisance.

Even if the Defendants could show that the prior owner consented to the
dangerous oil well being left on the Property – they cannot – that would not be
sufficient to preclude MDR's claim for public nuisance. "[C]onsent is not a defense
to public nuisance." *Tri-Dam v. Yick*, 2016 WL 4061348, at *3 (E.D. Cal. July 28,
2016); *see Friedman v. Pac. Outdoor Advert. Co.*, 74 Cal. App. 2d 946, 952-53
(1946) ("[e]ven though a person may waive the benefit of a law enacted for his own
benefit an ordinance enacted for the public good cannot be contravened by private
agreement"); *Emeryville Redevelopment Agency v. Eltex Inv. Corp.*, 2004 WL
2359862, at *6 (N.D. Cal. Oct. 19, 2004)("While the claim for private nuisance is
defeated by the consent defense, this order agrees with plaintiff that the public-
nuisance claim survives"). As set forth in MDR's Motion for Partial Summary
Judgment, the dangerous well should be considered a public nuisance per se. Those
issues are argued more fully in that motion and incorporated by reference.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                    -27-                    PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

### 3. The Consent Defense Does Not Apply To Unlawful Acts.

Similarly, Defendants cannot rely on the consent defense because their creation, modification and abandonment of Dow RGC 10 violated multiple laws in effect at the time. The consent defense "is applicable only to lawful activities." *Id.* (citing *Cassinos v. Union Oil Co.*, 14 Cal. App. 4th 1770, 1778 (1993)). The consent defense requires that the "use of the property was lawful and was authorized" by the property owner. *Newhall Land & Farming Co. v. Super. Ct.*, 19 Cal. App. 4th 334, 344-45 (1993); *see also Lincoln Prop.*, *supra*, 1993 WL 217429, at *25 (defendants could not rely on consent defense where lease required them to conduct their businesses "'in accordance with law and valid regulations,'" which defendants did not do); *Beck Develop. Co. v. S. Pac. Transp. Co.*, 44 Cal. App. 4th 1160, 1215 (1996) (noting the court's consent discussion in *Mangini I* "presupposed that the defendant acted lawfully in conducting the consensual activities that gave rise to the claim of nuisance"); *Tri-Dam*, *supra*, 2016 WL 4061348, at *3 ("Here the nuisance clearly arises from violation of [a] Municipal Code. Consent does not operate as a defense").

As stated throughout this Opposition, MDR contends that Defendants' failure to shut off water layers from gas and oil-bearing zones violated the Public Resources Code which remain essentially unchanged since they were enacted in 1939. In a nutshell, MDR alleges that Marathon failed to shut off the gas-bearing zone around 2,200 ft. Upon transferring the well, Dow cut over 650 perforations in the 11¾ casing in zones where both oil (3,331 ft. bgs) and gas (3,081 ft. bgs) had been identified in core samples. At the time of its abandonment, Dow's contractor failed to disclose the perforations or the fact that they were in sensitive geologic zones. Moreover, Dow's contractor failed to shut off and isolate the oil, gas and water zones. Having failed to comply with contemporaneous, governing law when drilling and abandoning Dow RCG 10, Defendants cannot invoke the consent defense to shirk liability for the public nuisance they created.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-28-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

### G.     MDR Did Not Cause The Nuisance.

In an interesting twist, Defendants try to blame MDR for the presence of the leaking dangerous well. Obviously, MDR did not install the well or leave it with hundreds of perforations and an open annulus allowing gases to flow from deep within the earth. That was the Defendants. Defendants claim that MDR somehow caused the nuisance because it discovered the problem, and then attempted to remedy the problem in order to develop hotels on previously undeveloped property along the marina in Marina del Rey.

Civil Code section 3479 defines a nuisance as "[a]nything which is injurious to health, including, but not limited to, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . ." Defendants' characterization of the nuisance is somewhat one dimensional, focused only on the potential for blowouts. However, the nuisance caused by the oil well existed on many levels. At the surface, the compromised well was leaking explosive methane to the surface. Moreover, in order to MDR to develop the Property, MDR first had to re-abandon the dangerous well, thereby incurring millions of dollars in direct costs and delay damages. This alone constituted a nuisance on Civil Code section 3479.

On a separate level, CalGEM was concerned that the historic failure to shut off and isolate the oil, gas and water layers that was allowing hydrocarbons to flow into protected water layers beneath the Property. Accordingly, when MDR issued a plan to re-abandon the well in 2018, CalGEM instructed MDR to drill down to the bottom of the well and isolate the oil, gas and water layers that Defendants had not previously isolated. Obviously, MDR did not cause this nuisance.

In 2006, long before MDR leased the property, an MDR-related entity, Woodfin Suites, engaged Methane Specialist to perform soil gas sampling of the property. Soil gas sampling showed that shallow soil gases were comprised of 100% explosive methane at ten ft. bgs. SSGD 116. **The highest levels of methane**

**were detected in the area that would later be determined to be the location of the well**. SSGD 117.Methane Specialists concluded that the high level of methane was likely coming from the Dow RGC 10 well. Over a decade later, after entering the lease with the County on July 31, 2017, MDR instructed Methane Specialist to locate and test the well for leaks. On September 18, 2017, the well was located, tested and revealed to be leaking methane, and the soil surrounding the well head appeared to be covered with a "viscous fluid" leaking from the well. DOGGR specifically informed Methane Specialists that if the well was found to be leaking, it would need to be re-abandoned. SSGD 119.

Obviously, MDR did not cause or create these issues, or the nuisance associated with them. Instead, MDR sought to remedy the issues caused by the compromised structural integrity of the old well.

### H.    Defendants' Actions Resulted In Multiple Forms Of Trespass.

As stated above, Dow's Oil and Gas Lease required Dow to return the Property to its original condition, as of February 5, 1929, before any oil operations began. Not only did this require the removal and safe/proper abandonment of the oil well, it required the removal of any oil-impacted soil left behind by Defendants' historic operations. Without citing any supportive authority, Defendants assert that a claim of trespass cannot be based on their actions to create a pathway for the migration of oil and gas, or the deposit of oil wastes at the surface.

MDR alleges in its Complaint that Defendants left behind petroleum-impacted soil that MDR was forced to excavate and dispose of at a landfill facility – Defendants' Motion fails to address this part of the claim. Additionally, MDR contends that Defendants left behind a well that allowed "methane gas to escape from the well and vent to the surface." Defendants fail to offer any evidence or argue that they are not responsible for the petroleum-impacted soil left at the surface. There is no legal support for their claim that a trespass claim can be based crude oil removed oil from 3,400 ft. bgs and left at the surface. The Dow Oil and

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                -30-                PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

Gas Lease specifically addressed this issue and required Dow to return the Property to its original condition. This would include removing petroleum that Defendants pulled up from over a half mile below the surface. As set forth in *Mangini I*, a continuing trespass claim can be maintained against a former tenant when the tenant "(a) wrongfully deposited hazardous waste on the property and (b) failed to clean it up as the lease required." *Mangini I*, *supra*, 230 Cal. App. 3d at 1141-42. There is no exclusion for waste that originated from far below the Property in its original state, nor is there any justifiable reason to exclude such actions from a claim for trespass.

The *Mangini I* court quoted section 160 of the Restatement Second of Torts, stating, "A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor or his predecessor in legal interest has placed on the land (a) with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated. . . ." *Id.* As noted, MDR's claims stem from the well and the contaminated soil. Independently, both are a proper basis for a claim of trespass. It makes no matter that the waste left behind, or gases left to migrate to the surface through the porous oil well, originated deep below the property surface.

Lastly, Defendants' claim is based on the concept that the oil and gas that impact the Property originated only from the Property. The very nature of the oil well is that it extracts oil and gas that moves freely beneath the surface. Oil and gas are free to flow at levels below ground. SSGD 124. Given that the well was located adjacent to the boundary of the Property, it would have pulled – and continue to pull – gas and oil from adjacent land. As such, it is very likely that the gas and oil that impacts the Property originated offsite and migrated to the Property due to the presence of the well. SSGD 125.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-31-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

**I.      Defendants Again Mislead The Court Regarding A $10 Million Rent Credit.**

In what seems to be continued effort to mislead or prejudice the Court, the Defendants again make an unfounded assertion in their Motion that MDR received a $10 million credit related to the oil well and its abandonment. As already set forth in MDR's Reply to Defendants' Opposition to MDR's Motion for Partial Summary Judgment, Defendants are well aware that whatever rent credit MDR received from the County was unrelated to the oil well. <u>The County refused to provide any credit or rent reduction related to the oil well or any potential environmental condition related to the property</u>. SSGD 126.

Other than to prejudice the Court, there is no rational basis to claim that MDR received such a credit. Even if such a credit did exist – it did not – it would have no bearing on the matters at issue in Defendants' Motion. Given that this is the second time that Defendants have tried to squeeze this false narrative into their pleadings, it seems obvious that Defendants are unconcerned with limiting their defenses to those based in facts and truth.

**J.      The Court Has Already Ruled That Defendants' Filing Of Quiet Title Documents Do Not Release Claims Related To Their Damage To The Property.**

Although already considered and rejected by this Court, Defendants' final argument is that the quitclaim deeds executed in 1941 by Marathon, and in 1961 by Dow, somehow released Defendants from all liability in connection with the oil well and Defendants' operations. Defendants' contention is not based on any legal authority. Instead, it is based on the purported expert opinion of a Cornell University Law School professor, Laura Underkuffler.

As an initial matter, an expert is not permitted to opine on the legal effect or interpretation of a lease or a deed; that is solely a duty of the Court. *PMI Mortgage Ins. Co. v. Amer. Int'l Specialty Lines Ins. Co.*, 291 Fed.Appx. 40, 41 (9th Cir. 2008) (concluding that expert testimony the interpretation of a contract is "an

**LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP**
LOS ANGELES, CA

081006\16556765v2

-32-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

ultimate question of law upon which the opinion of an expert may not be given.");

*JH Kelly, LLC v. Aecom Tech. Servs.*, 605 F. Supp. 3d 1295 (N.D. Cal. 2022)

(declining to consider an expert's testimony on the interpretation of a contract

which it described as an "attorney argument dressed up as expert opinion").

Therefore, the opinion of an expert on the law is irrelevant and "a judge's special

knowledge is presumed to be sufficient." *U.S. v. Brodie*, 858 F.2d 492, 496-97 (9th

Cir. 1988) (citation omitted).

Professor Underkuffler has no specific expertise or experience in oil well

leases, quitclaim deeds or California law.[7] Her expertise is based almost exclusively

on her years of teaching property law at various law schools. Irrespective of

whether her credentials qualify her to render an opinion in this case, her opinion

must be disregarded because it is based entirely on her application of the law to,

and interpretation of various historical documents recorded against the property that

relate to the oil well at issue. *See* Ex. A to Underkuffler Declaration submitted with

Motion, ¶ 8; *see also id.*, Section II (summarizing her opinions based on her

knowledge of "American real estate law" and "American property law"). This is

precisely the type of "expert opinion" that may not be considered, and it should,

therefore, be disregarded entirely by this Court.

Moreover, here, Professor Underkuffler's legal conclusions "not only

invade[] the province of the trial judge, but constitute[] erroneous statements of

law." *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008)

(emphasis added). Indeed, this Court has already considered and rejected this

argument by Defendants. *See* Minute Order dated April 20, 2021, at 11, Dkt. No.

54.[8] In their Motion to Dismiss, Defendants already argued that the "quitclaim

---

[7] Professor Underkuffler has never practiced law in California and is not a California licensed attorney and has spent the vast majority of her career in academia.

[8] MDR requests that the Court take judicial notice of its Minute Order. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-33-

PLAINTIFF'S MEMO OF P&As IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

deeds released [Marathon] of all potential liability for the Property." *Id.* In denying the Motion to Dismiss on this ground, this Court correctly opined:

> Furthermore, "'release, remise and quitclaim' are the words commonly used in simple quitclaim deeds." *City of Manhattan Beach v. Superior Ct.*, 13 Cal. 4th 232, 239 (1996). Yet, "[d]eeds are to be construed like any other contract and the intent of parties arrived at by a consideration of the whole instrument and not of detached clauses." *Id.* at 240. <u>Neither of the referenced quitclaim deeds offer any "as is" language or other type of release of liability</u>. Dkt. 36-8 (RJN Ex. 5); Dkt. 36-13 (RJN Ex. 10). These quitclaim deeds only "release, surrender, quit-claim and relinquish . . . all rights and titles whatsoever acquired or held by [Marathon] under said lease. . . ." Dkt. 36-8 (RJN Ex. 5) at 22; *see also* Dkt. 36-13 (RJN Ex. 10) at 44-45 (containing similar language). Moreover, Marathon does not identify any provision of the quitclaim deeds that would establish that Recreation Gun Club or the County's acceptance of the deeds would constitute consent to or excuse of the alleged negligence, nuisance, and trespass. The submitted releases only state Ohio Oil releases, surrenders, quitclaims, and relinquishes "all rights and titles" under the lease to Recreation Gun Club and the County. Dkt. 36-8 (RJN Ex. 5); Dkt. 36-13 (RJN Ex. 10). <u>These instruments do not contain any language that can be read to release the lessor's potential tort claims against Marathon or that impose any condition upon the lessor's acceptance of the return of rights</u>. *See id.* Thus, Marathon's execution of these quitclaim deeds is insufficient to extinguish Plaintiff's claims . . .

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-34-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

(Emphasis added.)

The evidence reviewed by the Court in 2021 is the ***exact same*** evidence that has been submitted by Defendants in connection with this Motion.[9] The surrender clause simply permits the lessee to terminate a lease in whole or in part by surrender and relieve itself of future rental payments, exploration or other obligations imposed by the lease. Similarly, the quitclaim deeds passed to the owner whatever real property interest the lessee held at the time of execution of the deed, if any, without any representation that there is any such interest. *In re Marriage of Gioia*, 119 Cal. App. 4th 272, 280-81 (2004). Both operate to release the lessee from future contractual obligations and return the lessee's property interest. However, neither the leases nor the quitclaim deeds contain any language that releases the lessees/grantors, *i.e.*, Marathon and Dow, from liability for future nuisance or trespass claims, makes any representation regarding the condition of the property or suggests that the lessor was taking the risk of any potential liability by

---

[9] This argument is in effect a disguised motion for reconsideration that should be rejected. Local Rule 7-18 provides the grounds upon which a motion for reconsideration may be made:

> "(a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered. No motion for reconsideration may in any manner repeat any oral or written argument made in support of, or in opposition to, the original motion."

*See also* Fed. R. Civ. Proc. 59(e) & 60(b). None of these factors have been met. Nor is there good cause for Defendants to reargue this issue when it has already been rejected by the Court. Courts routinely deny motions for reconsideration when the motion presents "no arguments that had not already been raised" and it should be denied here. *Buckland v. Barhart*, 778 F.2d 1386, 1388 (9th Cir. 1985).

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-35-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

accepting the property back "as is." The plain language of the documents cannot under any circumstance be read to reach the conclusion Professor Underkuffler advances. *See Estate of Stephens*, 28 Cal. 4th 665 (2002) ("A deed is a written instrument conveying or transferring the title to real property; it is an executed conveyance and operates as a present transfer of the real property. As a deed is 'an executed contract, it is subject to the rules applicable to contracts.'" (citations omitted)).

Similarly, Professor Underkuffler's opinion seeks to unilaterally convert a simple **contractual** release and relinquishment into a blanket release of all **tort** liability in favor of Defendants. But a release must be clear and unambiguous. *See, e.g.*, *Paralift, Inc. v. Super. Ct.*, 23 Cal. App. 4th 748, 755 (1993) ("For [a release] to be valid and enforceable, a written release exculpating a tortfeasor from liability for future negligence or misconduct must be clear, unambiguous and explicit in expressing the intent of the parties. If a tortfeasor is to be released from such liability the language used must be clear, explicit and comprehensible in each of its essential details." (citations omitted)); *see also Mangini v. Aerojet-Gen. Corp*. 12 Cal. 4th 1087, 1094 (1996) (A "release of all claims" is not enforceable when there is a disparity of information and the releasing party cannot properly evaluate the long-term harm.). Furthermore, even if the language could somehow be read to encompass all tort liability, which it cannot, in California, "[a] general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release . . ." Civ. Code § 1542. There is no evidence – nor is it that case – that in accepting the quitclaim deeds, RGC somehow waived the Section 1542 protection in connection with unknown future tort claims. There is simply no tort release here.

Professor Underkuffler's opinion – which is not supported by any legal authority – is inconsistent with the rules of interpretation in California and appears to be entirely made up. Specifically, she impermissibly reads "as-is" language and

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2

-36-

PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)

liability releases into the documents and offers an interpretation to which the documents are not reasonably susceptible.

### K.   Defendants Cannot Prevail on a Motion For Summary Judgment As They Fail To Address The Entire Claim.

As referenced above, MDR's claims are not limited to the claims for the re-abandonment of the well. MDR's nuisance and trespass claims also stem from the petroleum-impacted soil left by Defendants on the Property that caused MDR to incur significant expenses related to the disposal of the soil. As Defendants have failed to meet their burden to show that they cannot be liable, the Court cannot grant summary judgment on those issues and, therefore, cannot grant Defendants' Motion seeking summary judgment in this case.

## IV.   CONCLUSION

For the numerous reasons set forth above, the Court should deny Defendants' Motion. Defendants are not the class of parties intended to be protected by the statute of repose, nor is the improper abandonment in violation of statutory requirements a mere defect in an improvement. Moreover, the dangers that were once related to the well are now abated. There is no evidence of any continued leaks of methane from the well. MDR is enjoying and using the Property as it intended. To the extent that issues 3,000 ft. bgs cannot be abated, that is only a result of a blowout that occurred in 2019. That incident should not change the complexion of the claim or the applicable statute of limitations. Accordingly, the Court should allow MDR to move forward to trial with its claims intact.

DATED:     March 24, 2023                    COX, CASTLE & NICHOLSON LLP


By: _____
Perry S. Hughes
Alicia N. Vaz
Kevin M. Hannifan
Attorneys for Plaintiff
MDR Hotels, LLC

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

081006\16556765v2                    -37-                    PLAINTIFF'S MEMO OF P&AS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:20-CV-08008-FLA (JPRX)