1   Patrick J. Foley (Bar No. 180391)
    *Patrick.Foley@lewisbrisbois.com*
2   **LEWIS BRISBOIS BISGAARD & SMITH LLP**
    633 West Fifth Street
3   Suite 4000
    Los Angeles, CA 90071
4   Telephone:   (213) 580-7914
    Facsimile:   (213) 250-7900
5
    Joel Blanchet (*Pro Hac Vice*)
6   *jblanchet@phillipslytle.com*
    Tristan D. Hujer (*Pro Hac Vice*)
7   *thujer@phillipslytle.com*
    Myles K. Bartley (*Pro Hac Vice*)
8   *mbartley@phillipslytle.com*
    **PHILLIPS LYTLE LLP**
9   One Canalside
    125 Main Street
10  Buffalo, NY 14203-288
    Telephone:   (716) 847-7050
11  Facsimile:   (716) 852-6100

12  *Attorneys for Defendant The Dow Chemical Company*

13  [Additional Counsel Listed on Next Page]

14
                    **UNITED STATES DISTRICT COURT**
15
                    **CENTRAL DISTRICT OF CALIFORNIA**
16

17  | MDR HOTELS, LLC, | Case No. 2:20-cv-08008-FLA (JPRx) |
    |---|---|
18  | Plaintiff, | The Honorable Fernando L. Aenlle-Rocha |
19  | vs. | **DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
20  | MARATHON OIL COMPANY; THE DOW CHEMICAL COMPANY; and DOES 1 through 10, inclusive, | |
21  | | |
22  | | Trial Date: TBD |
    | | Judge: Hon. Fernando L. Aenlle-Rocha |
23  | Defendants. | |
24  | | Hearing |
    | | Date: April 14, 2023 |
25  | | Time: 1:30 p.m. |
    | | Location:  Courtroom 6B |
26

27

28

---

1   LATHAM & WATKINS LLP
    Mary Rose Alexander (Bar No. 143899)
2   *mary.rose.alexander@lw.com*
    330 North Wabash Avenue, Suite 2800
3   Chicago, IL 60611
    Tel: 312.876.7700
4   Fax: 312.993.9767

5   Shannon D. Lankenau (Bar No. 294263)
    *shannon.lankenau@lw.com*
6   505 Montgomery Street, Suite 2000
    San Francisco, CA 94111
7   Tel: 415.391.0600
    Fax: 415.395.8095
8
    Michael A. Hale (Bar No. 319056)
9   *michael.hale@lw.com*
    355 South Grand Avenue, Suite 100
10  Los Angeles, CA 90071
    Tel: 213.485.1234
11  Fax: 213.891.8763

12  *Attorneys for Defendant Marathon Oil Company*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to L.R. 56-1 and Section 7(d)(i) of the Court's Initial Standing Order, Defendants Marathon Oil Company ("Marathon") and The Dow Chemical Company ("Dow," and collectively with Marathon, "Defendants") submit the following Statement of Uncontroverted Facts and Conclusions of Law in Support of their Motion for Summary Judgment.

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| **Marathon Drilled, Operated, and Partially Abandoned The Well** | |
| 1. In 1929, Recreation Gun Club ("RGC") executed a lease with A.A. Curtice authorizing "the sole and exclusive right to the [l]essee to explore, mine and operate, take, store, remove and dispose of oil, gas, casing-head gas and other hydrocarbon substances" on a parcel known as 4360 Via Marina in Marina Del Rey, California (the "Property") for a period of twenty (20) years.<br><br>Hujer Decl. Ex. 1 (Oil and Gas Lease) at 1; Underkuffler Decl. Ex. B (Underkuffler Report) at 3; Hujer Decl. Ex. 52 (Jordan Initial Report) at 9. | **Disputed in part.**<br><br>Defendants have failed to locate or produce the actual lease between RGC and A.A. Curtice. The document is not the actual lease, and instead cites references an "Oil and Gas Lease" dated February 5, 1929. Accordingly, the actual terms of the suspected lease are unknown.<br><br>Both Rule 30(b)(6) witnesses for Marathon admitted that no lease has been located.<br><br>Hughes Decl., Ex. 2 (Belew Trans.) at 29:1-30:25; Ex. 12 (Welch Trans.) at 148:5-12.<br><br>**Defendants' Counter Response:** Even though the original lease has not been located, it is undisputed that the referenced "Oil and Gas Lease" confirms that, pursuant to the original lease, "the Lessor leased, let and demised unto the Lessee with the sole and exclusive right to the Lessee to explore, mine and operate, take, store, remove and dispose of oil, gas, casing-head gas and other hydrocarbon substances" from the Property. |
| 2. In January 1930, A.A. Curtice assigned the lease and "all rights, title, and interest" to Ohio Oil Company.<br><br>Hujer Decl. Ex. 2 (Assignment) at 1-2. | Hujer Decl. Ex. 1<br>**Evidentiary Objections:**<br><br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | 602) |
| 3. Ohio Oil Company is Marathon's predecessor.[1]<br><br>ECF No. 1-2 at ¶ 3. | **Undisputed** |
| 4. Oil and gas already existed at the Property before Marathon leased the premises.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083202-03. | **Undisputed in part.**<br><br>It is unclear what is alleged regarding the existence of oil and gas being present at the Property.  MDR does not dispute that oil and gas were present at depth at the Property.  However, MDR contends that Defendants actions while at the Property resulted in oil being deposited in shallow soil, and that methane and other gases were allowed to migrate to the surface of the Property due to the actions of the Defendants.<br><br>The Defendants oil well operations would have caused oil and gas to flow from adjacent properties into the well and to the surface.<br><br>Declaration of Jeff Jordan ("Jordan Decl.")  ¶6.<br><br>**Defendants' Counter Response:**  MDR does not dispute that oil and gas were present at depth at the Property.<br><br>**Defendants' Evidentiary Objections:**<br><br>• **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Jeff Jordan, which consists of out-of-court statements, for the truth of the matters asserted therein.  *See* Fed R. Evid. 801(c).  Absent a specifically identified applicable exception, such evidence is inadmissible.<br><br>• **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence." *See* Fed. R. Evid. 401.  The cause of the presence of oil and gas at depth at |

[1] Ohio Oil will be referred to as Marathon from this point forward.

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | the Property is not relevant.  Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| 5.  In 1931, Marathon notified the California Department of Natural Resources Division of Oil and Gas of its intention to drill a well from the Property (the "Well").<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083211. | **Undisputed** |
| 6.  The California Department of Natural Resources Division of Oil and Gas later became the Division of Oil, Gas, and Geothermal Resources ("DOGGR"), which then became the California Geologic Energy Management Division.[2]<br><br>Dudak Decl. Ex. A (Dudak Initial Report) at 5-6; Hujer Decl. Ex. 52 (Jordan Initial Report) at 7. | **Undisputed** |
| 7.  DOGGR is the state entity responsible for ensuring compliance with California's laws and regulations regarding the drilling, operation, and closure of oil and gas wells in California.<br><br>Hujer Decl. Ex. 39 (Phillips Tr.) at 21:8-13; *see also* Dudak Decl. Ex. A (Dudak Initial Report) at 9; Hujer Decl. Ex. 40 (Jordan Tr.) at 183:10-16. | **Undisputed** |
| 8.  An approval by DOGGR means that DOGGR "determined that an operator of a well was compliant with all existing statutes and regulations of the State of California regarding the drilling, completion, reworking, injection, operation, plugging, and abandonment of its oil, gas, or geothermal well that were in effect at the time the work was permitted or performed."<br><br>Dudak Decl. Ex. A (Dudak Initial Report) at 9. | **Disputed**<br><br>This statement is an improper statement of law by an expert witness. *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008).  Moreover, it is a general statement meant to apply to all DOGGR approvals throughout history. As shown both in the well records for the Dow RGC 10 well, and similar wells of that vintage, DOGGR's review process was suspect.  This is best evidence by its review and approval of the blow out prevention equipment for the immediately adjacent well known at |

---

[2] The entities are one and the same and will be referred to as DOGGR henceforth.

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | International Petroleum #2.  Two days after DOGGR performed a "thorough inspection" and approving the the blow out prevention equipment and finding it "satisfactory," the well blew out for four consecutive days and caught fire. |
| | Declaration of Perry S. Hughes ("Hughes Decl.") at Ex. 15. |
| | Dudak Decl. Ex. A |
| | **Evidentiary Objections:** |
| | • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| | • Improper expert opinion *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008). |
| | **Defendants' Counter Response:** MDR's cited evidence does not establish a material dispute as to this fact.  Whether an unrelated well blew out, following DOGGR's inspection and approval of the well's blowout prevention equipment, does not undermine the fact that DOGGR's approval meant that DOGGR determined that an operator of the well was compliant with all existing statutes and regulations of the State of California at the time.  DOGGR's determination that a well is compliant with all existing statutes and regulations of the State of California does mean that the well will never blow out. |
| | **Defendants' Evidentiary Objections:** |
| | • **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence." *See* Fed. R. Evid. 401.  Exhibit 15 is a portion of the well file for the International Petroleum Well #2, an unrelated well, and is not relevant to the fact that DOGGR's approval meant that DOGGR determined that an operator of the |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | well was compliant with all existing statutes and regulations of the State of California at the time. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| 9. DOGGR approved of Marathon's proposal to drill the Well.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083210; Dudak Decl. Ex. A (Dudak Initial Report) at 10. | **Undisputed** |
| 10. In 1931, Marathon began to "explore, mine, and operate, take, store, remove and dispose of oil [and] gas" by "[d]rill[ing]," "ream[ing]," "[c]ement[ing]," "coring," and "[s]wabb[ing]" the Well.<br><br>ECF No. 1-2 at ¶ 3; Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083201-07; *see also* Hujer Decl. Ex. 52 (Jordan Initial Report) at 9. | **Undisputed** |
| 11. Marathon logged its drilling, casing, cementing, and perforation history, and its production history, and DOGGR approved of these activities.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083201-07; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 25. | **Disputed.**<br><br>While DOGGR approved proposed activities, it did not approve activities performed other than the test to confirm that water was not entering the well. MDR0083208. The records cited do not indicate that DOGGR approved any logged activities. The records do not reflect production history.<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact. MDR does not dispute that Marathon logged its proposed drilling, casing, and cementing activities, and its proposal was approved by DOGGR. Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083210. MDR also does not dispute that Marathon subsequently logged its drilling, casing, cementing, and perforation activities. *Id.* at MDR0083196-201. Such records confirm that Marathon executed its proposed drilling, casing, and cementing activities as approved by DOGGR. *Id.* |

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| 12. Marathon provided notice and DOGGR approved of Marathon's water shut-off test.<br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083208-09; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 25. | **Undisputed** |
| 13. Marathon extracted oil and operated the Well for several years.<br>Arthur Decl. Ex. A (Arthur Initial Report) at 2. | Arthur Decl. Ex. A<br>**Evidentiary Objections:**<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| 14. In January 1939, RGC extended Marathon's initial lease "for a term of thirteen (13) years from and after February 5, 1929."<br>Hujer Decl. Ex. 4 (Lease Extension) at 2. | Hujer Decl. Ex. 4<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| 15. On November 12, 1940, Marathon notified and received approval from DOGGR to abandon the Well.<br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083199-200. | **Undisputed** |
| 16. On January 3, 1941, Marathon notified DOGGR that it had plugged the oil-producing zone at approximately 3,400 feet below ground surface and that this activity had been "witnessed by R.S.M.B."<br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083197-98. | **Undisputed** |
| 17. On January 3, 1941, Marathon advised that Dow would take control of the Well to develop saltwater production.<br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083197-98. | **Disputed.**<br>The document actually says that Dow has proposed to take the well and that Marathon will notify DOGGR if the transferred to Dow.<br>**Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. Defendants' characterization of the document is accurate.  MDR0083198 |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | states that the Well was "sold to Dow Chemical Co to be used for the production of salt water." |
| 18. On January 9, 1941, DOGGR witnessed and approved Marathon's abandonment and plugging of the Well's oil-producing zone.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083196-98; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 25. | **Disputed.**<br>The document only conveys DOGGR's approval of the location and hardness of the cement plug at 3376 feet below surface.<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact. DOGGR approved of Marathon's proposal to abandon the well by filling the hole with cement from 3903 to 3376 feet. Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083199. MDR0083198 is a subsequent document prepared by DOGGR stating, "Abandonment as an oil well" and "[c]ement plug from 3906' to 3376'." Defendants stipulate to the following undisputed fact: On January 9, 1941, DOGGR witnessed and approved Marathon's abandonment and plugging of the Well from 3906' to 3376'. |
| 19. Marathon's completion, operation, and abandonment of the Well adhered to common industry practices at the time in California and more specifically in the Playa del Rey oilfield.<br><br>Arthur Decl. Ex. B (Arthur Rebuttal Report) at 25; Hujer Decl. Ex. 40 (Jordan Tr.) at 35:24-36:21 ("Q. Doesn't that article and your report, note that stove pipe was commonly used during the 1930s? … A: In the 1930's, sir. I would say it was common in the Playa Del Rey field in the early 1930's."); *id.* at 29:22-30:4 ("Q. So it seems to be that Marathon's conduct was completely in line with the overwhelming majority of industry participants in the time, that's what your research and report seems to state. Is that correct? A. I said it was similar, yes."); Hujer Decl. Ex. 53 (Jordan Rebuttal Report) at 9 ("I agree with Mr. Arthur that the well construction practices Marathon used in | **Disputed.**<br>Marathons' completion, operation and abandonment of the well did not comply with the statutory requirements in effect at the time.<br><br>Jordan Decl., Ex. 1 (Expert Report), 30-35.; Hughes Decl., Exs. 18 and 19.<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact. MDR does not dispute Defendants' uncontroverted fact that Marathon's activities related to the Well adhered to common industry practices at the time in California and more specifically in the Playa del Rey oilfield.<br><br>**Defendants' Evidentiary Objections:**<br>• **Irrelevant, Fed. R. Evid. 401, 402:** To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be |

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| 1931 were typical of the oil industry in that era in the Playa Del Rey field."). | without the evidence." *See* Fed. R. Evid. 401.  Exhibits 18 and 19 are not relevant to Defendants' uncontroverted fact that Marathon's activities related to the Well adhered to common industry practices at the time in California and more specifically in the Playa del Rey oilfield.  Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). <br>• **Misstates Evidence:**  MDR cites to Exhibits 18 and 19 and in so doing misstates the contents of the documents and what they purport to state. <br>• **Best Evidence, Fed. R. Evid. 1002:** Jeff Jordan's expert report is not the best evidence for MDR's purportedly disputed fact. <br>• **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Jeff Jordan, which consists of out-of-court statements, for the truth of the matters asserted therein.  *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  Absent a specifically identified applicable exception, such evidence is inadmissible.  *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 20. The Well's casing was typical for its time period and commonly used in the region. <br><br> Hujer Decl. Ex. 52 (Jordan Initial Report) at 27. | **Undisputed** that other wells in the Playa del Rey also used stove pipe casing. <br><br> **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact.  MDR has offered no evidence refuting that stove pipe casing was typical for the early 1930s time period in the region. |
| 21. There is no evidence that RGC or | **Undisputed** |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
| --- | --- |
| A.A. Curtice demanded the Property back, terminated the lease, or asserted any breaches of the lease.<br><br>Hujer Decl. Ex. 49 (Welch Tr.) at 32:19-33:1; *id.* at 162:13-22 (offering testimony regarding Marathon's effort to locate documents related to the lease through a title search company). | |
| 22. On July 10, 1941, Marathon executed a "Partial Release" to A.A. Curtice that "cancelled, surrendered, annulled, and held for naught" its lease assignment for the Property, including specifically the Well and the surrounding land.<br><br>Hujer Decl. Ex. 5 (Partial Release) at 1. | **Disputed.**<br><br>The cited document applies only to a limited section of area of the Property, based on the attached map, a considerable portion are not related to the Property at issue.<br><br>Hujer Decl. Ex. 5<br><br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>**Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR does not dispute that the cited document applies to the Property, including specifically the Well and the surrounding land.<br><br>**Defendants' Evidentiary Objections:**<br>• **Misstates Evidence:** MDR cites to Exhibit 5 and in so doing misstates the contents of the document and what it purports to memorialize. |
| 23. On July 10, 1941, Marathon and A.A. Curtice "release[d], surrender[ed], quitclaim[ed], and relinquish[ed] unto" RGC "all rights and titles whatsoever acquired or held by them" in the Well and the Property.<br><br>Hujer Decl. Ex. 5 (Partial Release) at 1. | **Disputed.**<br><br>The cited document applies only to a limited section of area of the Property, based on the attached map, a considerable portion are not related to the Property at issue.<br><br>Hujer Decl. Ex. 9<br><br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | (Fed. R. Evid., Rule 901(a)) |
| | • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR does not dispute that the cited document applies to the Property and the Well. |
| | **Defendants' Evidentiary Objections:** |
| | • **Misstates Evidence:** MDR cites to Exhibit 9 and in so doing misstates the contents of the document and what it purports to memorialize. |
| 24. In the July 10, 1941 partial release, Marathon made no covenant, representation, or warranty of the Property's condition to RGC. Hujer Decl. Ex. 5 (Partial Release) at 1. | Hujer Decl. Ex. 5 **Evidentiary Objections:** • Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a)) • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| 25. RGC took Marathon and A.A. Curtice's interest in the Property. Hujer Decl. Ex. 5 (Partial Release) at 1. | **Disputed.** The cited document applies only to a limited section of area of the Property, based on the attached map, a considerable portion are not related to the Property at issue. Hujer Decl. Ex. 5 **Evidentiary Objections:** • Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a)) • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR does not dispute that the cited document applies to the Property. **Defendants' Evidentiary Objections:** • **Misstates Evidence:** MDR cites to Exhibit 5 and in so doing |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| | misstates the contents of the document and what it purports to memorialize. |
| 26. On November 24, 1958, Marathon "remise[d], release[d], and forever quitclaim[ed] to COUNTY OF LOS ANGELES, a body politic and corporate, all its right, title, and interest" in the Property.<br><br>Hujer Decl. Ex. 6 (Quitclaim Deed) at 1. | **Disputed.**<br><br>The document cited applies only to interest in the leases identified in the document. It does not apply to right, title and interest in the actual "Property."<br><br>Marathon had no interest in the lease related to Dow RGC 10. It was a 13 year lease that would have expired in 1942.<br><br>Hujer Decl. Ex. 4 (Lease Extension) at 2<br><br>Hujer Decl. Ex. 6<br><br>**Evidentiary Objections:**<br><br>- Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>- Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact. MDR does not dispute that Marathon remised, released, and forever quitclaimed to Los Angeles County all its rights, title, and interest in the oil and gas lease which governed its rights, title, and interest in the Property. Marathon therefore remised, released, and forever quitclaimed to Los Angeles County any remaining interest it had in the Property (by virtue of its oil and gas lease) after Marathon "release[d], surrender[ed], quitclaim[ed], and relinquish[ed] unto" RGC "all rights and titles whatsoever acquired or held by them" in the Well and the Property. Hujer Decl. Ex. 5 (Partial Release) at 1.<br><br>**Defendants' Evidentiary Objections:**<br><br>- **Misstates Evidence:** MDR cites to Exhibits 4 and 6 and in so doing misstates the contents of the documents and what they purport to memorialize. |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| 27. In the November 24, 1958 quitclaim deed, Marathon conveyed the Property with no covenant, representation, or warranty as to the Property's condition to the County of Los Angeles (the "County").<br><br>Hujer Decl. Ex. 6 (Quitclaim Deed) at 1. | **Disputed.**<br><br>The document cited applies only to interest in the leases identified in the document.  It does not apply to right, title and interest in the actual "Property."<br><br>Marathon had no interest in the lease related to Dow RGC 10.  It was a 13 year lease that would have expired in 1942.<br><br>Hujer Decl. Ex. 4 (Lease Extension) at 2<br><br>Hujer Decl. Ex. 6<br><br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact.  MDR does not dispute that Marathon's rights, title, and interest in the Property were governed by the oil and gas lease that is the subject of the cited document.  Marathon therefore conveyed to the County any remaining interest it had in the Property (by virtue of its oil and gas lease) with no covenant, representation, or warranty as to the Property's condition.<br><br>**Defendants' Evidentiary Objections:**<br>• **Misstates Evidence:**  MDR cites to Exhibits 4 and 6 and in so doing misstates the contents of the documents and what they purport to memorialize. |
| 28. In 1958, the County took any remaining interest Marathon had in the Property.<br><br>Hujer Decl. Ex. 6 (Quitclaim Deed) at 1. | **Disputed.**<br><br>The document cited applies only to interest in the leases identified in the document.  It does not apply to right, title and interest in the actual "Property."<br><br>Hujer Decl. Ex. 6<br><br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | (Fed. R. Evid., Rule 901(a)) |
| | • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact.  MDR does not dispute that Marathon's rights, title, and interest in the Property were governed by the oil and gas lease that is the subject of the cited document.  The County therefore took any remaining interest Marathon had in the Property (by virtue of its oil and gas lease). |
| | **Defendants' Evidentiary Objections:** |
| | • **Misstates Evidence:**  MDR cites to Exhibit 5 and in so doing misstates the contents of the documents and what it purports to memorialize. |
| **Dow Modified, Operated, and Abandoned the Well** | |
| 29. On or about July 15, 1941, Dow entered into a lease with RGC and acquired the rights to the Well to produce iodine from saltwater.<br>Hujer Decl. Ex. 7 (Oil and Gas Lease). | Hujer Decl. Ex. 7<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| 30. Dow's July 1941 lease with RGC authorized it to "produc[e] oil, gas, other hydrocarbon substances, waste salt water and iodine, and tak[e], stor[e], remov[e] and dispos[e] of [the] same."<br>Hujer Decl. Ex. 7 (Oil and Gas Lease) at 1; *see also* Underkuffler Decl. Ex. A (Underkuffler Report) at 5. | Hujer Decl. Ex. 7<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| 31. The lease also allowed Dow to remove any improvements and to "pull all casing[s]" from the Well.<br>Hujer Decl. Ex. 7 (Oil and Gas Lease) at 2. | **Disputed.**<br>The lease required Dow to remove all structures and return the Property to its original condition, as of February 5, 1929, prior to the inception of the Oil and Lease with Marathon.  It also required Dow to comply with all laws of |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | the State of California. |
| | Hujer Decl. Ex. 7 |
| | **Evidentiary Objections:** |
| | • Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a)) |
| | • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR does not dispute that the lease allowed Dow to remove any improvements and to "pull all casing[s]" from the Well. |
| 32. The lease provided Dow may quitclaim the lease in its entirety and, once so quitclaimed, Dow "shall be released from all further obligations[.]" <br><br> Hujer Decl. Ex. 7 (Oil and Gas Lease) at 6. | Hujer Decl. Ex. 7 <br><br> **Evidentiary Objections:** <br><br> • Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a)) <br><br> • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| 33. On November 24, 1941, Marathon transferred its Well rights to Dow so Dow could modify the Well for brine extraction and iodine production. <br><br> Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083197-98. | **Undisputed** |
| 34. Dow notified DOGGR of its plan to perforate the Well, DOGGR approved the plan, and Dow subsequently completed the perforations. <br><br> Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083192-95. | **Disputed in part.** <br><br> MDR does not dispute that Dow notified DOGGR in 1941 about the perforations, but failed to identify those perforations fifteen years later in 1956, when it sought to abandon the well. <br><br> Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083190-91. <br><br> **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR does not dispute that Dow notified DOGGR of its plan to perforate the Well, DOGGR approved the plan, and Dow subsequently completed the perforations. Whether Dow reminded |

14

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | DOGGR *fifteen years later* about the perforations that DOGGR already approved in April 1941 has no bearing on whether Dow notified DOGGR of its plan to perforate the Well and whether DOGGR approved that plan. MDR0083193.  Furthermore, Dow's perforations were documented in the records provided to DOGGR and in DOGGR's own report.  *See* Hujer Decl. Ex. 3 at MDR0083193-94. |
| 35. In 1956, Dow plugged and abandoned the Well following DOGGR's approval.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083190-91. | **Disputed in part.**<br><br>In 1956, Dow engaged contractor, Gordan Graham, to abandon the well.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083189-90<br><br>Dow's abandonment of the well did not comply with the statutory requirements in effect at the time.<br><br>Jordan Decl., Ex. 1 (Expert Report), 37-39. Ex. 2 (Rebuttal Report), 8-11 and 23-26; Hughes Decl., Exs. 18 and 19.<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact.  MDR does not dispute that in 1956, Dow plugged and abandoned the Well following DOGGR's approval.  The fact that Dow engaged a contractor to abandon the Well is irrelevant to Defendants' uncontroverted fact.  Further, MDR's contention that Dow's abandonment of the Well did not comply with the statutory requirements in effect at the time is immaterial to Defendants' uncontroverted fact.<br><br>**Defendants' Evidentiary Objections:**<br>• **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence."  *See* Fed. R. Evid. 401.  Exhibits 18 and 19 are not relevant to Defendants' uncontroverted fact that Dow plugged and abandoned the Well following DOGGR's approval. |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").<br>• **Misstates Evidence:** MDR cites to Exhibits 18 and 19 and in so doing misstates the contents of the documents and what they purport to state.<br>• **Best Evidence, Fed. R. Evid. 1002:** Jeff Jordan's expert reports are not the best evidence for MDR's purportedly disputed fact.<br>• **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Jeff Jordan, which consists of out-of-court statements, for the truth of the matters asserted therein. *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Absent a specifically identified applicable exception, such evidence is inadmissible. *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 36. During the Well's abandonment, on March 12, 1956, the Well blew out, resulting in gas, saltwater, and sand blowing-out to the surface.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083186-89. | **Undisputed** |
| 37. The 1956 blowout eventually "bridged off" and the abandonment operations continued.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083187. | **Undisputed** |
| 38. In 1956, Dow notified DOGGR of the blowout, and DOGGR observed and approved of Dow's actions to address it.<br><br>Hujer Decl. Ex. 3 (Historical Well | **Disputed.**<br><br>The records do not indicate that Dow, or its contractor Mr. Graham, notified DOGGR of the blowout. Instead it appears that DOGGR learned of the |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| Records) at MDR0083185-MDR0083189. | blowout by inspecting the Property. |
| | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083189 |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. Defendants do not dispute that the records do not indicate when specifically Dow notified DOGGR of the blowout. However, DOGGR required that Dow notify DOGGR to witness "the placing of and the location and hardness of each cement plug." Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083188. Thus, DOGGR was notified by Dow to witness the abandonment on March 12, 1956 and while there, DOGGR observed and approved Dow's actions to address the blowout. |
| 39. Upon Dow's completion of its reabandonment in 1956, DOGGR concluded Dow's actions "fulfilled" the "requirements of this Division." Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083185. | **Disputed.** Dow's contractor had failed to properly characterize the nature of the casing, failing to identify 600 feet of perforations in the casing the stretch from the oil-bearing zone at 3,330 to the gas-bearing zone at 3,016. Also, Dow's contractor had represented that the casing was "W.S.O" or watertight, when clearly it was not. Additionally, it failed to identify junk left in the well. |
| | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083191. |
| | Jordan Decl. Ex. 1 (Expert Report), 37-39; Ex. 2 (Rebuttal Report), 8-11 and 23-26 |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. Defendants' characterization of the document cited is accurate. Whether Dow properly characterized the casing, represented that the casing was watertight, or identified junk in the well is immaterial to DOGGR's conclusion that Dow's reabandonment "fulfilled" the "requirements of this Division." |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | **Defendants' Evidentiary Objections:** |
| | • **Irrelevant, Fed. R. Evid. 401, 402:** To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence." *See* Fed. R. Evid. 401. The evidence MDR offers is not relevant to Defendants' uncontroverted fact that Dow plugged and abandoned the Well following DOGGR's approval. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| | • **Best Evidence, Fed. R. Evid. 1002:** Jeff Jordan's expert reports are not the best evidence for MDR's purportedly disputed fact. |
| | • **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Jeff Jordan, which consists of out-of-court statements, for the truth of the matters asserted therein. *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Absent a specifically identified applicable exception, such evidence is inadmissible. *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 40. Dow informed DOGGR of its "[p]erforat[ing]," "plug[ging]," "cement[ing]," and "test[ing]" for saltwater production.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083188-95; Dudak Decl. Ex. A (Dudak Initial Report) at 11. | **Undisputed in part.**<br><br>MDR does not dispute that Dow notified DOGGR of the perforations in 1941. However, it failed to bring those conditions to DOGGR's attention in 1956 when if proposed the re-abandonment, choosing to only identify perforations made by Marathon that it had cemented. Instead, it represented that the well was "W.S.O" or watertight. |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | Notably, DOGGR does not appear to realize the perforations exist, as DOGGR did not identify them in is approval. |
| | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083191. |
| | Jordan Decl. Ex. 1 (Expert Report), 37-39; Ex. 2 (Rebuttal Report), 8-11 and 23-26 |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. Whether Dow reminded DOGGR *fifteen years later* about the perforations that DOGGR already approved in April 1941 has no bearing on the fact that Dow informed DOGGR of its activities. Furthermore, Dow's perforations were documented in the records provided to DOGGR and in DOGGR's own report. *See* Hujer Decl. Ex. 3 at MDR0083193-94. |
| | **Defendants' Evidentiary Objections:** |
| | • **Irrelevant, Fed. R. Evid. 401, 402:** To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence." *See* Fed. R. Evid. 401. The evidence MDR offers is not relevant to Defendants' uncontroverted fact that Dow informed DOGGR of its activities. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| | • **Best Evidence, Fed. R. Evid. 1002:** Jeff Jordan's expert reports are not the best evidence for MDR's purportedly disputed fact. |
| | • **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Jeff Jordan, which consists of out-of-court statements, for the truth of the matters asserted therein. *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | matter asserted").  Absent a specifically identified applicable exception, such evidence is inadmissible.  *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 41. Dow later informed DOGGR of its abandonment, water shut-off tests, and transfer of the Well to the County, and DOGGR witnessed and approved of these activities.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083185-88. | **Undisputed in part.**<br><br>MDR does not dispute that Dow notified DOGGR of the perforations in 1941. However, it failed to bring those conditions to DOGGR's attention in 1956 when if proposed the re-abandonment, choosing to only identify perforations made by Marathon that it had cemented.  Instead, it represented that the well was "W.S.O" or watertight. Notably, DOGGR does not appear to realize the perforations exist, as DOGGR did not identify them in its approval.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083191.<br><br>Jordan Decl. Ex. 1 (Expert Report), 37-39; Ex. 2 (Rebuttal Report), 8-11 and 23-26<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact.  Whether Dow reminded DOGGR *fifteen years later* about the perforations that DOGGR already approved in April 1941 has no bearing on the fact that Dow informed DOGGR of its abandonment, water shut-off tests, and transfer of the Well, and that DOGGR approved those activities. Furthermore, Dow's perforations were documented in the records provided to DOGGR and in DOGGR's own report. *See* Hujer Decl. Ex. 3 at MDR0083193-94.<br><br>**Defendants' Evidentiary Objections:**<br>• **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or |

20

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | less probable than it would be without the evidence." *See* Fed. R. Evid. 401.  The evidence MDR offers is not relevant to Defendants' uncontroverted fact that Dow informed DOGGR of its activities and DOGGR approved those activities.  Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). <br> • **Best Evidence, Fed. R. Evid. 1002:** Jeff Jordan's expert reports are not the best evidence for MDR's purportedly disputed fact. <br> • **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Jeff Jordan, which consists of out-of-court statements, for the truth of the matters asserted therein.  *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  Absent a specifically identified applicable exception, such evidence is inadmissible.  *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 42. Dow's filings with DOGGR show it recorded shots and plugs. <br><br> Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083185-96. | **Undisputed** |
| 43. Dow's notice to abandon, dated February 15, 1956, described the condition of the Well. <br><br> Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083190-91. | **Disputed.** <br><br> Dow and its contractor failed to bring conditions to DOGGR's attention in 1956 when if proposed the re-abandonment, choosing to only identify perforations made by Marathon that it had cemented.  Instead, it represented that the well was "W.S.O" or watertight.  Notably, DOGGR does not appear to realize the perforations exist, as DOGGR |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | did not identify them in its approval. |
| | Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083191. |
| | Jordan Decl. Ex. 1 (Expert Report), 37-39 |
| | **Defendants' Counter Response:** MDR's response ignores the Court's Order taking judicial notice of the Well file, establishing that DOGGR knew what was in the file, including Dow's disclosure to DOGGR of all of the perforations.  Dkt. 54 at 4-5.  But even if DOGGR did not know when it approved Dow's abandonment plan, the information is immaterial, as the Well file show DOGGR was (again) informed of the perforations when the County abandoned the Well in 1958, and it still did not require any action to be taken regarding those perforations. |
| | **Defendants' Evidentiary Objections:** |
| | • **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence."  *See* Fed. R. Evid. 401.  Whether the 1956 notice of intention to abandon explicitly included reference to the perforations is not relevant to whether Dow's notice described the condition of the Well and whether DOGGR was already on notice regarding the perforations.  Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| | • **Best Evidence, Fed. R. Evid. 1002:** Jeff Jordan's expert report is not the best evidence for MDR's purportedly disputed fact. |
| | • **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Jeff Jordan, which consists of out-of-court statements, for the truth of the matters asserted therein. *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Absent a specifically identified applicable exception, such evidence is inadmissible. *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 44. In 1961, Dow "REMISE[D], RELEASE[D], AND QUITCLAIM[ED]" its interest in the Well and the Property to the County.<br><br>Hujer Decl. Ex. 9 (Corporation Quitclaim Deed) at 1. | **Disputed in part.**<br><br>MDR does not dispute the Dow filed a document containing those words. However, there is no evidence that Dow had any valid interest in the Property as of 1961. There is no evidence that the Oil & Gas Lease was ever extended beyond the 1942 termination date.<br><br>Hujer Decl. Ex. 9<br><br>**Evidentiary Objections:**<br><br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>**Defendants' Counter Response:**<br>MDR's response is irrelevant. Dow's quitclaim deed both ensured any interests it had in the quitclaimed property was conveyed and fulfilled its requirement under its lease to obtain its release. Hujer Decl. Ex. 7 at ¶ 6. |
| 45. In 1961, Dow conveyed the Property with no covenant, representation, or warranty as to the Property's condition to the County.<br><br>Hujer Decl. Ex. 9 (Corporation Quitclaim Deed) 1-3. | **Disputed.**<br><br>There is no evidence that Dow had any valid interest in the Property as of 1961. There is no evidence that the Oil & Gas Lease was ever extended beyond the 1942 termination date.<br><br>Hujer Decl. Ex. 9<br><br>**Evidentiary Objections:**<br><br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a)) |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| | • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| | **Defendants' Counter Response:** MDR's response is irrelevant. Dow's quitclaim deed both ensured any interests it had in the quitclaimed property was conveyed and fulfilled its requirement under its lease to obtain its release. Hujer Decl. Ex. 7 at ¶ 6. |
| 46. The County took Dow's interest in the Property.<br><br>Hujer Decl. Ex. 9 (Corporation Quitclaim Deed) at 4. | **Disputed.**<br><br>There is no evidence that Dow had any valid interest in the Property as of 1961. There is no evidence that the Oil & Gas Lease was ever extended beyond the 1942 termination date.<br><br>**Evidentiary Objections:**<br><br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br><br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>**Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. In addition, MDR's response is irrelevant. Dow's quitclaim deed both ensured any interests it had in the quitclaimed property was conveyed and fulfilled its requirement under its lease to obtain its release. Hujer Decl. Ex. 7 at ¶ 6. |
| 47. Within the oil and gas industry, a lessee's surrender of an oil and gas lease by quitclaim deed releases the executing lessee from any further involvement in or responsibility for the condition of the property.<br><br>Underkuffler Decl. Ex. A (Underkuffler Report) at 9. | **Disputed.**<br><br>This does not include a statement of fact, but instead a declaration of a conclusion of law by Defendants expert. This is addressed in MDR's Opposition.<br><br>Underkuffler Decl. Ex. A (Underkuffler Report) at 9<br><br>**Evidentiary Objections:**<br><br>• Improper Expert Opinion regarding a legal conclusion (*Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008)<br><br>**Defendants' Counter Response:** |

24

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
|  | MDR's response does not establish a material dispute as to this fact.  MDR offers no evidence to rebut Defendants' expert opinion regarding the historic understanding within the oil and gas industry as to the purpose and intended effect of quitclaim deeds. |
| 48. Standard practice dictates that an assessment of the parties' compliance with their leases is conducted at the time a quitclaim deed is accepted.<br><br>Underkuffler Decl. Ex. A (Underkuffler Report) at 5. | **Disputed.**<br><br>This does not include a statement of fact, but instead a declaration of a conclusion of law by Defendants expert.  This is addressed in MDR's Opposition.<br><br>Underkuffler Decl. Ex. A (Underkuffler Report) at 5<br><br>**Evidentiary Objections:**<br><br>• Improper Expert Opinion regarding a legal conclusion (*Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008)<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact.  MDR offers no evidence to rebut Defendants' expert opinion regarding the historic understanding within the oil and gas industry as to the purpose and intended effect of quitclaim deeds. |
| 49. Unless a breach was asserted by the lessor, acceptance of a quitclaim deed accomplishes conveyance of title and possession of the property to the lessor in an "as-is" condition.<br><br>Underkuffler Decl. Ex. A (Underkuffler Report) at 11. | **Disputed.**<br><br>This does not include a statement of fact, but instead a declaration of a conclusion of law by Defendants expert. This is addressed in MDR's Opposition.<br><br>Underkuffler Decl. Ex. A (Underkuffler Report) at 11<br><br>**Evidentiary Objections:**<br><br>• Improper Expert Opinion regarding a legal conclusion (*Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008)<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact.  MDR offers no evidence to rebut Defendants' |

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| | expert opinion regarding the historic understanding within the oil and gas industry as to the purpose and intended effect of quitclaim deeds. |
| 50. A quitclaim transfer in the oil and gas industry is understood to be an "as-is" transfer, with no representations made about the condition of the property, including the leasing operations and activities performed thereon.<br><br>Underkuffler Decl. Ex. A (Underkuffler Report) at 9-10. | **Disputed.**<br><br>This does not include a statement of fact, but instead a declaration of a conclusion of law by Defendants expert. This is addressed in MDR's Opposition.<br><br>Underkuffler Decl. Ex. A (Underkuffler Report) at 11<br><br>**Evidentiary Objections:**<br><br>• Improper Expert Opinion regarding a legal conclusion (*Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008)<br><br>**Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR offers no evidence to rebut Defendants' expert opinion regarding the historic understanding within the oil and gas industry as to the purpose and intended effect of quitclaim deeds. |
| 51. A subsequent lessee inherits no rights or obligations established by oil and gas leases that were previously surrendered by quitclaim deeds.<br><br>Underkuffler Decl. Ex. A (Underkuffler Report) at 14. | **Disputed.**<br><br>This does not include a statement of fact, but instead a declaration of a conclusion of law by Defendants expert.<br><br>**Evidentiary Objections:**<br><br>• Improper Expert Opinion regarding a legal conclusion (*Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051 (9th Cir. 2008)<br><br>**Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR offers no evidence to rebut Defendants' expert opinion regarding the historic understanding within the oil and gas industry as to the purpose and intended effect of quitclaim deeds. |

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| **LA County Reabandoned the Well With DOGGR Approval** ||
| 52. On December 1, 1958, RGC conveyed the Property, and all related rights, title, and interest therein, to the County.<br><br>Hujer Decl. Ex. 10 (Quitclaim Deed). | Hujer Decl. Ex. 10<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| 53. On December 4, 1958, Dow transferred ownership of the Well to the County.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083183. | **Undisputed but irrelevant.** |
| 54. The County filed a Notice of Intention to Abandon Well with DOGGR, which was approved on January 2, 1959.<br><br>ECF No. 1-2 at ¶ 4; Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083181-84. | **Undisputed but irrelevant.** |
| 55. On April 7, 1959, the County reabandoned the Well.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083180. | **Undisputed but irrelevant.** |
| 56. DOGGR witnessed and approved the County's reabandonment, finding the County fulfilled DOGGR's requirements of the division at that time.<br><br>Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083178-79. | **Undisputed but irrelevant.** |
| 57. At the time of the 1959 reabandonment, there was "no mention of leakage [] identified."<br><br>Dudak Decl. Ex. B (Dudak Rebuttal Report) at 23. | **Undisputed but irrelevant.** |
| 58. The County has owned the Property since 1958.<br><br>ECF No. 1-2 at ¶ 2. | **Undisputed but irrelevant.** |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| **The Historical Facts Are Fully Set Forth in Public Records** ||
| 59. The publicly available Well file describes the Well's history.<br><br>Hujer Decl. Ex. 3 (Historical Well Records); Hujer Decl. Ex. 39 (Phillips Tr.) at 42:9-15. | **Disputed in part.**<br><br>While it is undisputed that the DOGGR's well file includes records related to the well's history, the well was operational for over twenty-five years, and the complete records related to the operation and production of the well are not included in the well file.<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact.  MDR concedes that the Well file includes records related to the Well's history. MDR has further conceded that "all of the facts giving rise to the issues related to the well are contained in the well records."  ECF No. 135-1 at 46.  MDR offers no evidence for its contention that the complete records are not included in the Well file. |
| 60. The Well file details Marathon's, Dow's, and the County's Well-related actions, DOGGR's approvals and observations of those actions, and the Well's condition and status from 1931 to 1959.<br><br>Hujer Decl. Ex. 3 (Historical Well Records). | **Disputed in part.**<br><br>While it is undisputed that the DOGGR's well file includes records related to the well's history, the well was operational for over twenty-five years, and the complete records related to the operation and production of the well are not included in the well file.<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact.  MDR concedes that the Well file includes records related to the Well's history. MDR has further conceded that "all of the facts giving rise to the issues related to the well are contained in the well records."  ECF No. 135-1 at 46.  MDR offers no evidence for its contention that the complete records are not included in the Well file. |
| 61. The Well did not blow out and there were no reports of issues of structural integrity issues after the County reabandoned it in 1959 and before MDR began its work. | **Disputed.**<br><br>When MDR's contractors located the well in September, 2017, it was tested and determined to be leaking methane and a "viscous liquid" at or near the |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| Hujer Decl. Ex. 40 (Jordan Tr.) at 39:2-18; *id.* at 152:3-19; *id.* at 174:17-21: *id.* at 194:15-19; *see* Hujer Decl. Ex. 52 (Jordan Initial Report) at 15. | beginning of construction of the MDR project. |
| | Methane testing performed in 2006 revealed 100% methane in soil vapor adjacent to the Dow RGC 10 well. |
| | Hughes Decl., Ex. 3 (Conahan Trans.) at 206:2-15. Ex. 4 (Field Report of Leak Testing). |
| | Hujer Decl., Ex. 18 at 3 (Test Results Section) |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact.  MDR's evidence does not refute the fact that the Well did not blow out and there were no reports of structural integrity issues after the County reabandoned the Well in 1959 and before MDR began its construction on the Property.  MDR's evidence concedes the same by demonstrating that the Well was determined to be leaking methane "at or near the beginning of construction of the MDR project."  Further, MDR offers no evidence that the Well caused any methane leakage prior to September 2017.  MDR's evidence only supports that the source of the methane was potentially from oil wells both on and nearby the Property.   Hujer Decl., Ex. 18 at 3 (Test Results Section). |
| | **Defendants' Evidentiary Objections:** |
| | • **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence." *See* Fed. R. Evid. 401.  MDR's evidence that the Well was determined to be leaking methane and a "viscous liquid" at or near the beginning of construction of the MDR project is irrelevant to whether the Well did not blow out and there were no reports of issues of structural integrity issues after the County reabandoned it in 1959 and before MDR began its work.  Fed. R. |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | Evid. 402 ("Irrelevant evidence is not admissible."). |
| | • **Misstates Evidence:** MDR purports to summarize the contents of Exhibit 18 and in so doing misstates the contents of the document and what it purports to memorialize. |
| | • **Lack of Authentication, Fed. R. Evid. 901:** Hughes Decl., Exhibit 4 purports to be a field inspection report dated September 18, 2017. However, because MDR submitted only a declaration from its counsel in this matter regarding the document rather than declarations from anyone with any direct knowledge of that field report, no authentication of the document has been provided, and the document is inadmissible. Fed R. Evid. 901. |
| **MDR Leased the Property "As Is" Despite Known Conditions** | |
| 62. In 1997, the County issued a request for proposal to develop the Property.<br><br>Hujer Decl. Ex. 42 (Hardage Tr.) at 47:2-7. | **Undisputed but irrelevant.** |
| 63. MDR Hotels, LLC ("MDR"), a private real estate developer, won a bid to develop the Property.<br><br>Hujer Decl. Ex. 42 (Hardage Tr.) at 36:6-12; *id.* at 47:8-10. | **Undisputed but irrelevant.** |
| 64. In October 2013, MDR submitted a Development Plan that explicitly acknowledged an abandoned oil well's presence and the need to address methane gas on the Property.<br><br>Hujer Decl. Ex. 11 (Lease Agreement) at § 5.1, Exhibit B to the Lease at B3. | **Undisputed but irrelevant.**<br>Hujer Decl., Ex. 11.<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br>• Lack of Relevancy (Fed. R. Evid., Rule 401) |

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| 65. MDR was informed, from Phase I and Phase II reports and correspondence from its contractors, that the Well would need to be "reabandoned," or brought into compliance with current statutes and regulations, before MDR developed the Property.<br><br>Hujer Decl. Ex. 14 (Phase I Environmental Site Assessment Report 2006) at E-3; *id.* at §§ 3.3, 4.4,; Hujer Decl. Ex. 12 (Proposed Items to Discuss with Beaches and Harbors, sent on March 2, 2012 from Bill Pangelinan) at 3; Hujer Decl. Ex. 41 (Pangelinan Tr.) at 82:13-82:23; *id.* at 91:20-24.; Hujer Decl. Ex. 20 (May 3, 2008 letter from Methane Specialists, addressed to Mark Rousseau) at 1. | **Undisputed but irrelevant.**<br>Hujer Decl., Exs. 12, 14, 20 and 41.<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br>• Lack of Relevancy (Fed. R. Evid., Rule 401) |
| 66. These reports also warned of soil contamination on the Property due to the County's prior dredging of the marina and use of contaminated hydraulic fill to create Marina Del Rey.<br><br>Hujer Decl. Ex. 13 (Phase I Site Assessment 1996) at 4-7; Hujer Decl. Ex. 14 (Phase I Environmental Site Assessment Report 2006) at E-3; *id.* at §§ 3.3, 4.4; Hujer Decl. Ex. 16 (Geotechnical Design Report by Shannon & Wilson) at § 7.2; Hujer Decl. Ex. 17 (Subsurface Investigation Report) at §§ 2.2, 4.2. | **Undisputed but irrelevant.**<br>Hujer Decl. Exs. 13, 14, 16 and 17.<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br>• Lack of Relevancy (Fed. R. Evid., Rule 401) |
| 67. MDR also commissioned surveys of the Property to assess for potential methane issues, which confirmed the presence of methane gas and hydrocarbon impacted soil on the Property.<br><br>Hujer Decl. Ex. 13 (Phase I Site Assessment 1996) at 1-7; Hujer Decl. Ex. 35 (Phase II Site Assessment 1996) at 1-9; Hujer Decl. Ex. 14 (Phase I Environmental Site Assessment Report 2006) at E-3; *id.* at §§ 3.3, 4.4; Hujer Decl. Ex. 41 (Pangelinan Tr.) at 82:24-83:10; *id.* at 87:5-13; *id.* at 91:24-92:10; | **Disputed and irrelevant.**<br>While MDR does not dispute that it engaged Methane Specialists to perform a methane investigation, none of the reports ever identified elevated levels of petroleum hydrocarbons that would require special disposal. Prior to the commencement of construction, MDR's soil contractor had the Property randomly sampled down to ten feet. Those samples did not reveal any elevated levels of hazardous materials, and the soil was deemed appropriate for unrestricted fill. |

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| Hujer Decl. Ex. 20 (May 3, 2008 letter from Methane Specialists, addressed to Mark Rousseau) at 1; Hujer Decl. Ex. 18 (Methane Site Assessment Report); *see also* Hujer Decl. Ex. 51 (Conahan Tr.) at 32:23-33:15 (identifying Methane Site Assessment Report). | Many of the reports cited by Defendants were not commissioned for MDR. Declaration of Hyrum Madsen ("Madsen Decl.")  ¶6 and Ex. 3 (Salem Engineering Report). Hujer Ex. 13, 14, 18, and 20 **Evidentiary Objections:** • Hearsay (Fed. R. Evid., Rule 801) • Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a)) • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) • Lack of Relevancy (Fed. R. Evid., Rule 401) **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact and is belied by the reports themselves.  For example, the Phase I Site Assessment from 1996 specifically concluded that "the subject site presents a moderate level of risk in terms of the potential presence of significant contamination problems resulting from hazardous materials, including petroleum hydrocarbons."  Hujer Decl. Ex. 13 (Phase I Site Assessment 1996) at 7. Also, while MDR did not commission the 1996 and 2006 Phase I and II site assessments, it is undisputed that MDR was aware of these reports prior to leasing the Property in 2017.  Hujer Decl. Ex. 41 (Pangelinan Tr.) at 186:19-187:3. **Defendants' Evidentiary Objections:** • **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence."  *See* Fed. R. Evid. 401.  Whether MDR 's reports "identified elevated levels of petroleum hydrocarbon that would require special disposal" is irrelevant to whether the reports |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | confirmed the presence of methane gas and hydrocarbon impacted soil on the Property. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| | • **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Hyrum Madsen, which consists of out-of-court statements, for the truth of the matters asserted therein. *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Absent a specifically identified applicable exception, such evidence is inadmissible. *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| | • **Lack of Foundation/Personal Information, Fed. R. Evid. 602:** "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Hyrum Madsen started working at MDR in 2019, and thus does not have personal knowledge of activities and reports pre-dating his employment. |
| 68. Bill Pangelinan was a consultant hired by MDR to oversee the project during three separate intervals of time from 2011 to 2021.<br><br>Hujer Decl. Ex. 41 (Pangelinan Tr.) at 37:7-11; *id.* at 45:4-46:6. | **Disputed in part, but irrelevant.**<br><br>MDR does not dispute that Mr. Pangelinan was hired to work on the project. However, the cited testimony indicates only that he oversaw certain elements like budgeting and due diligence. He did not testify that he oversaw the entire project.<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| | material dispute as to this fact.  MDR does not dispute that Mr. Pangelinan oversaw certain elements of the project during three separate intervals from 2011 to 2021. |
| 69. Bill Pangelinan considered the Property a "known dirty site."<br><br>Hujer Decl. Ex. 15 (September 13, 2012 Email from Bill Pangelinan to Sam Hardage). | Hujer Decl. Ex. 15<br><br>**Evidentiary Objections:**<br><br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br><br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>• Lack of Relevancy (Fed. R. Evid., Rule 401) |
| 70. MDR leased the Property from the County "as is."<br><br>Hujer Decl. Ex. 11 (Lease Agreement) §§ 1.2.1 and 15.4.1 | Hujer Decl. Ex. 11<br><br>**Evidentiary Objections:**<br><br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br><br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>• Lack of Relevancy (Fed. R. Evid., Rule 401) |
| 71. When MDR leased the Property, MDR was aware of reports indicating the Property's historical use as an oil field and the County's placement of contaminated hydraulic fill from the neighboring lagoon on the Property.<br><br>Hujer Decl. Ex. 12 (Proposed Items to Discuss with Beaches and Harbors, sent on March 2, 2012 from Bill Pangelinan) at 3; Hujer Decl. Ex. 41 (Pangelinan Tr.) at 186:24-187:3 ("And MDR entered into this provision knowing that petroleum hydrocarbons had been detected in the hydraulic fill on the property? [Objection] A.  Yes."). | **Disputed in part but irrelevant**<br><br>MDR does not dispute that it was aware the Property was historically used as an oil field and contained hydraulic file. Defendants fail to provide any evidence that hydraulic fill was contaminated or that it came from neighboring lagoon.<br><br>Hujer Decl. Ex. 12<br><br>**Evidentiary Objections:**<br><br>• Hearsay (Fed. R. Evid., Rule 801)<br><br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br><br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>• Lack of Relevancy (Fed. R. Evid., Rule 401)<br><br>**Defendants' Counter Response:** |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | MDR's response does not establish a material dispute as to this fact. Defendants' evidence demonstrates that when MDR leased the Property, MDR was aware of reports indicating that the Property was developed by placing hydraulic fill dredged during the initial development of Marina del Rey, the entire area.  Further, the evidence reflects that petroleum hydrocarbon-impacted soil was discovered on the Property.  Hujer Decl. Ex. 12 (Proposed Items to Discuss with Beaches and Harbors, sent on March 2, 2012 from Bill Pangelinan) at 3; Hujer Decl. Ex. 41 (Pangelinan Tr.) at 1867:5-188:12. |
| 72. As of December 23, 2013, MDR acknowledged that it was "responsible for all costs of any necessary environmental site remediation." Hujer Decl. Ex. 36 (Summary of Terms) at 4. | Hujer Decl. Ex. 36 **Evidentiary Objections:** <ul><li>Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))</li><li>Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)</li><li>Lack of Relevancy (Fed. R. Evid., Rule 401)</li></ul> |
| 73. MDR obtained a $10 million rent credit to cover "extras," such as any costs MDR incurred to address problems on the Property. Hujer Decl. Ex. 37 (September 2, 2014 Email from Bruce Leidenberger to Sam Hardage); Hujer Decl. Ex. 38 (Spreadsheet titled "Marina Del Rey," dated September 2, 2014); Hujer Decl. Ex. 41 (Pangelinan Tr.) at 187:24-192:10. | **Disputed and irrelevant.** MDR did not receive any rent credit related to the oil well or environmental issues associated with the property.  The County specifically refused to provide any credit related to that issue. Hughes Decl. Ex. 10 (Pangelinan Trans) at 112:1-113:16 and 158:3-160:21. Hujer Decl., Exs. 37 and 38. **Evidentiary Objections:** <ul><li>Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))</li><li>Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)</li><li>Lack of Relevancy (Fed. R. Evid., Rule 401)</li></ul> **Defendants' Counter Response:**  MDR has provided no evidence to indicate that |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | "extras" did not include the oil well and environmental issues associated with the Property. |
| | **Defendants' Evidentiary Objections:** |
| | • **Misstates Evidence:** The portion of William Pangelinan's deposition testimony cited by MDR does not stand for the proposition MDR cites it for. |
| **MDR Failed to Properly Plan to Reabandon The Well** | |
| 74. MDR began construction on the Property around September 2017.<br><br>Hujer Decl. Ex. 52 (Jordan Initial Report) at 9. | **Undisputed but irrelevant.** |
| 75. In fall 2017 MDR claims it "discovered" the Well was within the footprint of its planned building and assessed that it was leaking methane.<br><br>ECF No. 1-2 at ¶¶ 5, 6. | **Undisputed.** |
| 76. In April 2018, MDR then submitted a proposal to reabandon the Well to the County and DOGGR.<br><br>ECF No. 1-2 at ¶ 10; Hujer Decl. Ex. 32 (June 5, 2018 Letter from DOGGR to MDR) at 1. | **Undisputed.** |
| 77. On April 27, 2018, DOGGR approved MDR's notice of intention to reabandon provided that certain conditions were met.<br><br>ECF No. 1-2 at ¶ 10; Hujer Decl. Ex. 32 (June 5, 2018 Letter from DOGGR to MDR) at 1-4. | **Disputed in part.**<br><br>DOGGR's approval was dated June 5, 2018, not April 27, 2018.<br><br>**Defendants' Counter Response:** Defendants stipulate that DOGRR received the notice of intention on April 27, 2018, and approved it on June 5, 2018. |
| 78. DOGGR required MDR to "isolate the following zones: (a) "The Base of Freshwater at 700'±"; (b) "The USDW [Underground Source of Drinking Water] at 1512'±"; (c) "Top of the upper most hydrocarbon zone at 2200'±; and (d) "Top of the Upper zone at 3300'±."<br><br>Hujer Decl. Ex. 32 (June 5, 2018 Letter from DOGGR to MDR) at 3; *see also* | **Undisputed.** |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| Hujer Decl. Ex. 52 (Jordan Initial Report) at 15, 42. | |
| 79. DOGGR stated that "[f]ailure to achieve zonal isolation may have a negative impact on current and future operations." <br><br> Hujer Decl. Ex. 32 (June 5, 2018 Letter from DOGGR to MDR) at 3. | **Undisputed.** |
| 80. MDR had no experience reabandoning a decades-old well. <br><br> Hujer Decl. Ex. 42 (Hardage Tr.) at 203:10-12 ("I'm not an oil expert.  I never had to deal with an oil well before."); Hujer Decl. Ex. 50 (Madsen Tr.) at 70:15-20 (Q: "Do you know whether MDR had ever developed a property with an abandoned oil well?" A: "Not that I'm aware of, no."  Q: "Do you know whether MDR had ever developed a property on an old oil field before?"  A:  "Not that I'm aware of, no."). | **Undisputed.** |
| 81. MDR failed to consult a well-abandonment specialist or a contractor with experience reabandoning a nearly 90-year-old well during the planning phases of its project. <br><br> Hujer Decl. Ex. 41 (Pangelinan Tr.) at 105:10-14; *id.* at 130:13-16; Hujer Decl. Ex. 21 (February 22, 2018 Email between Methane Specialists and DOGGR) at CALGEM00011970. | **Disputed.** <br><br> MDR engaged InterACT to plan and oversee the well abandonment.  Interact also retained California Well Services to perform the rig work.  Both contractors are experienced contractors with significant experience abandoning wells. <br><br> Hughes Decl. Ex. 3 (Conahan Trans) 104:13-19; Ex. 9 (Lerma Trans) 30:14-18 and 40:4-45:10. Guiliani Decl. ¶2 and Ex.1 <br><br> Defendants mischaracterize the testimony of Mr. Pangelinan.  He is testifying about what had taken place – to his knowledge – as of 2012, five years before the signing of the ground lease with the County. <br><br> Hujer Decl., Ex. 21. <br><br> **Evidentiary Objections:** <br><br> • Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a)) <br><br> • Lack of Foundation/Personal Information (Fed. R. Evid., |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | 602) |
| | • Lack of Relevancy (Fed. R. Evid., Rule 401) |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR ignores that Defendants' uncontroverted fact relates to "the planning phases of its project." MDR's own evidence confirms that it took MDR "a little while to hire [InterAct]." Furthermore, Defendants' evidence demonstrates that in 2014, when MDR was preparing for the project's budget, no oil well abandonment consultant had been retained. In February 2018, Methane Specialists was requesting guidance from DOGGR because MDR did not have the reabandonment experience, nor had it consulted with a well-abandonment specialist by that time. MDR has not filed or served the Giuliani Declaration, or any exhibits to that declaration, that MDR relies on to defeat this uncontroverted fact. Defendants reserve the right to move to strike or amend their responses should the Court allow MDR to file a late declaration. |
| | **Defendants' Evidentiary Objections:** |
| | • **Misstates Evidence:** The cited testimony of Chris Conahan and Val Lerma testimony does not include any testimony that InterAct is experienced in abandoning wells. |
| | • **Failure to Submit Declaration and Exhibits Relied Upon:** MDR has not filed or served any document titled, "Giuliani Declaration," or any exhibits related thereto. As such, Defendants object to MDR's reliance on this declaration and the exhibit purportedly attached to it for this purported statement of additional genuine dispute. In addition, to the extent MDR attempts to introduce a declaration from Michael Giuliani, Defendants object to that |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | declaration and any exhibits attached to it as hearsay. Defendants note that while MDR is apparently working with Mr. Giuliani, MDR has refused to provide Mr. Giuliani's contact information to Defendants or make him available for a deposition.  Defendants reserve the right to move to strike any belated filing of declaration(s) and/or exhibit(s), including the purported declaration of Michael Giuliani and any exhibits thereto, and/or to amend their responses and/or objections should MDR file such additional declaration(s) and/or exhibit(s) after its now-expired deadline for doing so. |
| 82. MDR hired a well reabandonment contractor without familiarity or experience with California's oil well abandonment standards and was ill-suited to provide correct advice on reabandoning the Well during the planning phase.<br><br>Hujer Decl. Ex. 21 (February 22, 2018 Email between Methane Specialists and DOGGR) at CALGEM00011968; Hujer Decl. Ex. 43 (Dudak Tr.) at 74:6-10. | **Disputed.**<br><br>MDR engaged InterACT to plan and oversee the well abandonment.  Interact also retained California Well Services to perform the rig work.  Both contractors are experienced contractors with significant experience abandoning wells.<br><br>Hughes Decl. Ex. 3 (Conahan Trans) 104:13-19; Ex. 9 (Lerma Trans) 30:14-18 and 40:4-45:10. Guiliani Decl. ¶2 and Ex.1<br><br>Defendants' expert, Mr. Dudak only testifies about the experience of MDR's consultant, Methane Specialists. Methane Specialists was engaged to designed and construct the methane barrier for the project.  They were not the abandonment contractor.<br><br>Hujer Decl., Ex. 21.<br><br>**Evidentiary Objections:**<br><br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br><br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>• Lack of Relevancy (Fed. R. Evid., Rule 401)<br><br>**Defendants' Counter Response:** |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | MDR's response does not establish a material dispute as to this fact. MDR ignores that Defendants' uncontroverted fact relates to "the planning phases of its project." MDR's own evidence confirms that it took MDR "a little while to hire [InterAct]." Furthermore, Defendants' evidence demonstrates that in 2014, when MDR was preparing for the project's budget, no oil well abandonment consultant had been retained. In February 2018, Methane Specialists was requesting guidance from DOGGR because MDR did not have the reabandonment experience, nor had it consulted with a well-abandonment specialist by that time. MDR has not filed or served the Giuliani Declaration, or any exhibits to that declaration, that MDR relies on to defeat this uncontroverted fact. Defendants reserve the right to move to strike or amend their responses should the Court allow MDR to file a late declaration. **Defendants' Evidentiary Objections:** • **Misstates Evidence:** The cited testimony of Chris Conahan and Val Lerma testimony does not include any testimony that InterAct is experienced in abandoning wells. • **Failure to Submit Declaration and Exhibits Relied Upon:** MDR has not filed or served any document titled, "Giuliani Declaration," or any exhibits related thereto. As such, Defendants object to MDR's reliance on this declaration and the exhibit purportedly attached to it for this purported statement of additional genuine dispute. In addition, to the extent MDR attempts to introduce a declaration from Michael Giuliani, Defendants object to that declaration and any exhibits attached to it as hearsay. Defendants note that while MDR is apparently working with Mr. Giuliani, MDR has refused to |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | provide Mr. Giuliani's contact information to Defendants or make him available for a deposition.  Defendants reserve the right to move to strike any belated filing of declaration(s) and/or exhibit(s), including the purported declaration of Michael Giuliani and any exhibits thereto, and/or to amend their responses and/or objections should MDR file such additional declaration(s) and/or exhibit(s) after its now-expired deadline for doing so. |
| 83. After starting reabandonment, MDR's contractor proceeded with the project despite signs of a potential.<br><br>ECF No. 1-2 at ¶¶ 11-14; Arthur Decl. Ex. A (Arthur Initial Report) at 23-27. | **Disputed.**<br><br>The statement of fact is incomplete.<br><br>Assuming Defendants are referring to a "potential problem" or "potential blow out," MDR responds as follows:<br><br>MDR made repeated efforts to alert CalGEM to issues with the well and ask that it modify the abandonment plan. Counsel for MDR personally met with CalGEM in December, 2018, to request that it approve a modification.  Those requests were denied and CalGEM required that MDR continue to the base of the well to isolate gas and oil zones left open by Marathon and Dow.<br><br>On the morning of the blow out, Interact emailed CalGEM and again requested permission to modify the abandonment plan due to concerns about the dangers related to the integrity of the well.<br><br>Hughes Decl. ¶7.; Giuliani Decl. ¶¶7-14<br><br>Arthur Decl., Ex. A.<br><br>**Evidentiary Objections:**<br><br>- Hersay (Fed. R. Evid., Rule 801)<br>- Lack of Relevancy (Fed. R. Evid., Rule 401)<br><br>**Defendants' Counter Response:**<br>Defendants inadvertently omitted the word "blowout."  The uncontroverted fact should read "After starting reabandonment, MDR's contractor proceeded with the project despite signs |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | of a potential blowout."  MDR's response does not establish a material dispute as to this fact.  With the exception of offering the entire expert report of J. Daniel Arthur, MDR offers no evidence to dispute this fact.  MDR has not filed or served the Giuliani Declaration, or any exhibits to that declaration, that MDR relies on to defeat this uncontroverted fact.  Defendants reserve the right to move to strike or amend their responses should the Court allow MDR to file a late declaration.

**Defendants' Evidentiary Objections:**

- **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Perry Hughes, which consists of out-of-court statements, for the truth of the matters asserted therein.  *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  Absent a specifically identified applicable exception, such evidence is inadmissible.  *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion).

- **Failure to Submit Declaration and Exhibits Relied Upon:** MDR has not filed or served any document titled, "Giuliani Declaration," or any exhibits related thereto.  As such, Defendants object to MDR's reliance on this declaration and the exhibit purportedly attached to it for this purported statement of additional genuine dispute.  In addition, to the extent MDR attempts to introduce a declaration from Michael Giuliani, Defendants object to that declaration and any exhibits |

42

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | attached to it as hearsay. Defendants note that while MDR is apparently working with Mr. Giuliani, MDR has refused to provide Mr. Giuliani's contact information to Defendants or make him available for a deposition.  Defendants reserve the right to move to strike any belated filing of declaration(s) and/or exhibit(s), including the purported declaration of Michael Giuliani and any exhibits thereto, and/or to amend their responses and/or objections should MDR file such additional declaration(s) and/or exhibit(s) after its now-expired deadline for doing so. |
| 84. During the reabandonment, the Well sustained multiple gas kicks and surface breaches—all indications of potential well integrity issues—before blowing out on December 25, 2018, and again, on January 11, 2019.<br><br>ECF No. 1-2 at ¶ 14; Hujer Decl. Ex. 52 (Jordan Initial Report) at 9, 15; Arthur Decl. Ex. A (Arthur Initial Report) at 23-27. | **Undisputed.** |
| 85. The two blowouts that occurred while MDR was operating and reabandoning the Well were the only two blowouts that occurred in the Well since 1959.<br><br>Hujer Decl. Ex. 52 (Jordan Initial Report) at 15 ("[T]here is no record of leakage definitively attributable to the Well between 1959 and 2017."); Dudak Decl. Ex. A (Dudak Initial Report) at 12 ("MDR was the legal operator in control of the Well at the time the Well blew out in December 2018 and January 2019."). | **Undisputed in part.**<br><br>MDR does not dispute that there were no recorded blowouts of the well between 1959 and the start of work on the well in 2018.  This does not include general leaking of methane which was recorded and known.<br><br>Hujer Decl., Ex. 18; Hughes Decl., ¶¶ 3 and 4.<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact.  MDR does not dispute that the two blowouts that occurred while MDR was operating and reabandoning the Well were the only two blowouts that occurred in the Well since 1959.<br><br>**Defendants' Evidentiary Objections:** |

43

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
|  | • **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Perry Hughes, which consists of out-of-court statements, for the truth of the matters asserted therein. *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Absent a specifically identified applicable exception, such evidence is inadmissible. *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). <br><br> • **Irrelevant, Fed. R. Evid. 401, 402:** To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence." *See* Fed. R. Evid. 401. Whether general leaking of methane was known or unknown is not relevant to Defendants' uncontroverted fact that the two blowouts that occurred while MDR was operating and reabandoning the Well were the only two blowouts that occurred in the Well since 1959. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| 86. On January 18, 2019, DOGGR issued an Emergency Order No. 1143 requiring MDR to take certain measures to complete the reabandonment. <br><br> Hujer Decl. Ex. 22 (DOGGR Emergency Order). | **Undisputed.** |
| 87. Following the January 2019 blowout, MDR represented that "fish" became stuck in the well at approximately | **Undisputed.** |

44

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| 1,450 to 1,550 feet. Hujer Decl. Ex. 23 (February 2019 Presentation) at 1; Hujer Decl. Ex. 44 (Scheet Tr.) at 65:9-67:7; Hujer Decl. Ex. 40 (Jordan Tr.) at 90:13-21. | |
| 88. MDR claimed the "fish" prevented its contractors from reaching the top of the upper-most hydrocarbon zone at approximately 2,200 feet in compliance with DOGGR requirements. Hujer Decl. Ex. 45 (Lerma Tr.) at 112:4-8 (Q: "The bottom line is InterAct was never able to remove the fish from the well; is that right?  A: Not completely, correct."); id. at 200:11-201:11 ("In order to comply with DOGGR current regulations, we would have to remove the fish from the wellbore, which we were unable to do."); Hujer Decl. Ex. 46 (Hale Tr.) at 113:8-114:1 ("once the tools were identified that they could not be removed from the well, there – there was, you know, not many options left to abandon that well, from what I understood"); Hujer Decl. Ex. 47 (Geisinger Tr.) at 95:22-96:3 (MDR took the position that the Well could not be fully abandoned to the full depth of the well because "[t]here was a[n] object stuck in the well that they were not able to retrieve"); Hujer Decl. Ex. 40 (Jordan Tr.) at 92:16-21 ("A. MDR was unable to comply with the stipulations on the permit DOGGR issued to plug and abandon the well.  Q. Because of the junk in the well?  A. Yes."). | **Undisputed.** |
| 89. MDR's contractors and experts testified it would have been impossible or too risky to isolate the upper hydrocarbon gas zone by drilling the Well beyond the stuck "fish." Hujer Decl. 44 (Scheet Tr.) at 265:8-26 (testifying "if operations wanted to . . . continue and go deeper after fish recovery, I think that's when Wild Well | **Undisputed.** |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| would have drawn a line" and "would not want to be on location during the degradation of that event"); *id.* at 185:12-23 (testifying that "continuing deeper into the well with fishing operations had a higher degree of operational risk than abandoning at or [] around the current depth"); *id.* at 137:1-15 (testifying that "Wild Well would not want to be on location or associated with the project if they felt that what they were doing would have a high likelihood of leading to a blowout" and abandoning at deeper depths "was a very high risk with very little reward"); *id.* at 130:20-131:8 (one of MDR's well abandonment contractors testifying continued drilling could have affected wellbore integrity and led to another blowout); *id.* at 185:12-23 (testifying that "continuing deeper into the well with fishing operations had a higher degree of operational risk than abandoning at or [] around the current depth"); Hujer Decl. Ex. 41 (Pangelinan Tr.) at 221:19-222:10 ("I was told that if we go down any further or continued to go down any further, that it would be a much higher risk[.]"); Hujer Decl. Ex. 24 (February 14, 2019 InterAct Letter) at 4 (stating "[a]ny other methods of fishing are considered high risk, possibly resulting in additional pipe being left in the hole and reducing the effectiveness of an abandonment from the current depth or inadvertently sidetracking the well"); Hujer Decl. Ex. 25 (February 17, 2019 Email Chain) at MDR0070103-04 (stating the same); Hujer Decl. Ex. 26 (March 13, 2019 Presentation Outline from Interact) at LACDBH0021034 (proposing halting reabandonment efforts at 1617' because "[o]nly high risk fishing options remain" and the proposed abandonment at 1617' was "[t]he best and only viable option for this well bore."); Hujer Decl. Ex. 53 (Jordan Rebuttal Report) at 26 ("MDR was unable to comply . . . because it was impossible due to the wrecked condition of the wellbore that had severely compromised integrity and | |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| significant metal junk in the hole."). | |
| 90. MDR left "fish" in the Well, leaving it without "the ability to isolate anything below" and "allow[ing] gas to migrate up wherever the gas was coming in." <br><br> Hujer Decl. Ex. 39 (Phillips Tr.) at 194:21-195:3; Hujer Decl. Ex. 27 (Root Cause Analysis) at MDR0003866. | **Undisputed.** |
| 91. MDR claims to have abandoned the Well at a depth of approximately 2,027 ft. <br><br> Hujer Decl. Ex. 52 (Jordan Initial Report) at 48. | **Undisputed.** |
| <div align="center">**MDR's Incomplete Reabandonment Did Not Comply with Applicable Regulations and the Well Remains Unsafe and at an Elevated Risk for Future Gas Releases**</div> | |
| 92. DOGGR found MDR's plugging and reabandonment failed to comply with numerous regulations, including California Public Resources Code ("PRC") §§ 3208 and 3228, and California Code of Regulations §§ 1723(a) and 1723.1(b), because MDR failed to place cement plugs across the following zones as required by its own June 5, 2018 permit: (1) upper hydrocarbon (gas) zone at 2,200'±; (2) saltwater zone located between 3,076' and 3,341'; and (3) "upper zone" (oil) located at 3,330'±. <br><br> Hujer Decl. Ex. 33 (March 11, 2020 Letter from DOGGR) at 1-3; Hujer Decl. Ex. 53 (Jordan Rebuttal Report) at 19 ("It is true that the DOGGR disapproved of the P&A by MDR because it did not meet the stipulations that required plugging . . . from 3,076 ft to 3,341 ft and setting a plug across the shallow gas zone at approximately 2,200 ft."); *see also* Hujer Decl. Ex. 40 (Jordan Tr.) at 182:8-17 ("Q. You acknowledge that MDR did not abandon the well to current DOGGR standards? A. Yes. Q. Is it also your opinion that MDR was unable to completely isolate | **Undisputed.** |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| the upper hydrocarbons zone from 1,500 to 2,500 feet? A. Outside the casing, yes."). | |
| 93. DOGGR found that "MDR left junk (drill bit and drill collars) in the well from 1302' to 1577'± preventing proper plugging and abandonment of hydrocarbon zones." <br><br> Hujer Decl. 33 (March 11, 2020 Letter from DOGGR) at 2; Hujer Decl. Ex. 40 (Jordan Tr.) at 92:6-10 ("Q. After MDR left the junk in the well during its reabandonment operations in 2019, was MDR able to plug all the lower hydrocarbons zones in the well as required by its permit and state regulations?  A. No."). | **Undisputed.** |
| 94. DOGGR concluded that "the [W]ell is not plugged and abandoned to usual current standards, has a history of uncontrolled gas releases including the blowout that occurred during the most recent plugging and abandonment attempt,  and remains an elevated risk for future gas releases." <br><br> Hujer Decl. Ex. 31 (June 13, 2019 DOGGR Letter) at 2. | **Disputed in part.** <br><br> MDR does not dispute that the document contains the quoted language.  However, MDR has monitored the well for over three years and there is no evidence of any leaks or gas or liquids flowing to surface. <br><br> Madsen Decl.  ¶11 <br><br> Hujer Decl. Ex. 31 <br><br> **Evidentiary Objections:** <br><br> • Hearsay (Fed. R. Evid., Rule 801) <br> • Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a)) <br> • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) <br><br> **Defendants' Counter Response:** <br> MDR's response does not establish a material dispute as to this fact.  It is undisputed that the cited evidence contains the quoted language, which speaks for itself.  Whether there has been evidence of leaks or gas or liquids in the last three years has no bearing on the fact that DOGGR concluded that the Well remains at an elevated risk of future gas releases. <br><br> **Defendants' Evidentiary Objections:** |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | • **Irrelevant, Fed. R. Evid. 401, 402:** To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence." *See* Fed. R. Evid. 401. Whether MDR has monitored the Well for over three years and whether there is evidence of any leaks or gas or liquids flowing to surface is irrelevant to DOGGR's conclusion. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| | • **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Hyrum Madsen, which consists of out-of-court statements, for the truth of the matters asserted therein. *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Absent a specifically identified applicable exception, such evidence is inadmissible. *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 95. In 2022, DOGGR stated it "continues to be DOGGR's position that the [W]ell remains at an elevated risk for future gas releases" and the still-unsealed gas pathways present a "future risk" that the Well could "begin leaking gas or other liquid in the future." <br><br> Hujer Decl. Ex. 48 (Vasconcellos Tr.) at 139:9-13; *id.* at 132:10-19. | **Disputed in part.** <br><br> MDR does not dispute that Mr. Vasconcellas testified as quoted. However, MDR has monitored the well for over three years and there is no evidence of any leaks or gas or liquids flowing to surface. <br><br> Madsen Decl. ¶11 <br><br> **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. It is undisputed that the cited evidence contains the quoted language, which |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | speaks for itself.  Whether there has been evidence of leaks or gas or liquids in the last three years has no bearing on the fact that DOGGR concluded that the Well remains at an elevated risk of future gas releases. |
| | **Defendants' Evidentiary Objections:** |
| | - **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence."  *See* Fed. R. Evid. 401.  Whether MDR has monitored the Well for over three years and whether there is evidence of any leaks or gas or liquids flowing to surface is irrelevant to DOGGR's conclusion.  Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| | - **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Hyrum Madsen, which consists of out-of-court statements, for the truth of the matters asserted therein.  *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  Absent a specifically identified applicable exception, such evidence is inadmissible.  *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 96. The Los Angeles County Department of Public Health stated MDR's well abandonment was "non-compliant with state standards" and "gas migration pathways at depth were not sealed[.]" | Hujer Decl. Ex. 28 |
| | **Evidentiary Objections:** |
| | - Hearsay (Fed. R. Evid., Rule 801) |
| | - Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a)) |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| Hujer Decl. Ex. 28 (April 11, 2019 Email) at MDR0071334. | • Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| 97. DOGGR had "serious concerns about development of structures in proximity to th[e] Well" and "strongly recommend[ed]" no structures be built atop or in proximity of the Well, noting "[t]his is especially true with respect to well 'Dow R.G.C.' 10, considering the gas blowout history of the well, the failure to seal the [W]ell at the upper hydrocarbon gas zone, and the [W]ell's proximity to sensitive receptors, including the public."<br><br>Hujer Decl. Ex. 48 (Vasconcellos Tr.) at 132:10-19; Hujer Decl. Ex. 34 (January 30, 2019 DOGGR Letter) at 2; Hujer Decl. Ex. 39 (Phillips Tr.) at 201:18-22 (Q: "So DOGGR had previously informed MDR and its contractors that it strongly recommended against placing any structure atop a well or preventing access to the well? Do you remember that?" A: "That is correct."). | **Undisputed in part.**<br>MDR does not dispute that DOGGR expressed concerns about structures over the well. As such, MDR constructed a casing riser so that nothing sits above the well. The well can be accessed from the ground surface via the casing riser.<br><br>Madsen Decl. ¶11.<br><br>**Defendants' Counter Response:**<br>MDR's response does not establish a material dispute as to this fact. It is undisputed that the cited evidence contains the quoted language, which speaks for itself.<br><br>**Defendants' Evidentiary Objections:**<br>• **Irrelevant, Fed. R. Evid. 401, 402:** To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence." *See* Fed. R. Evid. 401. MDR's construction of a well riser and its accessibility is irrelevant to whether DOGGR stated the quoted language. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").<br><br>• **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Hyrum Madsen, which consists of out-of-court statements, for the truth of the matters asserted therein. *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Absent a specifically identified applicable exception, such evidence is inadmissible. *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 98. DOGGR "perceive[d] a future risk that the [W]ell could begin leaking gas or other liquid in the future" or "that there was [] or could be a problem in the future."<br><br>Hujer Decl. Ex. 48 (Vasconcellos Tr.) at 132:16-19; Hujer Decl. Ex. 46 (Hale Tr.) at 144:19-25. | **Undisputed.** |
| 99. Despite DOGGR's recommendations, MDR proceeded with its plan to build a parking structure on top of the Well.<br><br>Hujer Decl. Ex. 33 (March 11, 2020 DOGGR Letter) at 3. | Hujer Decl. Ex. 33<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br>• Lack of Relevancy (Fed. R. Evid., Rule 401) |
| 100.   DOGGR required MDR to "install[] a casing riser on the [W]ell to allow access to the [W]ell in the event remedial operations become necessary in the future" and "develop a monitoring program for the [W]ell to detect future leakage."<br><br>Hujer Decl. Ex. 33 (March 11, 2020 DOGGR Letter) at 3. | Hujer Decl. Ex. 33<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br>• Lack of Relevancy (Fed. R. Evid., Rule 401) |
| 101.   DOGGR instructed MDR that the casing riser was necessary "to allow access to the [W]ell to remedy a currently perceived future problem" because "the [Well] is not plugged and abandoned to usual current standards, has a history of uncontrolled gas releases including the blowout that occurred during the most recent plugging and abandonment attempt, and remains an elevated risk for future gas releases." | Hujer Decl. Ex. 31<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| Hujer Decl. Ex. 31 (June 13, 2019 DOGGR Letter) at 2. | |
| 102.  As a result of DOGGR's recommendations, MDR agreed to install the casing riser and develop a permanent monitoring program.<br><br>Hujer Decl. Ex. 33 (March 11, 2020 DOGGR Letter) at 3 ("Although construction on the parking structure and hotel was not complete at the date of this letter, based on information provided to CalGEM, MDR and Hartage has installed a casing riser on the well in the event remedial operations become necessary in the future.  CalGEM further recommends MDR\Har[d]age\ County of Los Angeles, Department of Beaches and Harbors, develop a monitoring program for the well to detect future leakage."); Hujer Decl. Ex. 42 (Hardage Tr.) at 176:1-4 ("Well, the hotel's built.  The document says CalGEM recommends that we develop a monitoring program for the well to detect future leakage, so we did that."); *id.* at 229:12-14 (Q:  "What are you still doing regarding work on the well?"  A:  "The well is going to be monitored forever."); Hujer Decl. Ex. 50 (Madsen Tr.) at 140:23-141:1 ("And then after that, through the whole process, ultimately we ended up with a different type of oil well riser and different stack of how to - - how to mitigate - - or a different plan.  Not altogether, but a different plan and different details for that methane mitigation."); Hujer Decl. Ex. 39 (Phillips Tr.) at 139:23-140:2; *id.* at 201:18-22. | Hujer Decl. Ex. 33<br>**Evidentiary Objections:**<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602) |
| 103.  MDR's principal, Samuel Hardage, stated, "the [W]ell is going to be monitored forever" to detect leakage of methane gas from the Well.<br><br>Hujer Decl. Ex. 42 (Hardage Tr.) at 229:14. | **Undisputed.** |
| 104.  The Los Angeles County | **Undisputed in part.** |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| Department of Public Health agreed a post-abandonment methane gas monitoring plan was "critical" because gas migration pathways were not sealed.<br><br>Hujer Decl. Ex. 28 (April 11, 2019 Email) at MDR0071334. | MDR does not dispute that the County sent an email stating that a gas monitoring plan was critical.  MDR disputes that gas migration pathways were not sealed.  MDR has monitored the well for three years and there is no evidence of leaks or migrating methane above background levels.<br><br>Madsen Decl. ¶8 and ¶11<br><br>Hujer Decl. Ex. 28<br><br>**Evidentiary Objections:**<br><br>• Hearsay (Fed. R. Evid., Rule 801)<br>• Failure to Properly Authenticate (Fed. R. Evid., Rule 901(a))<br>• Lack of Foundation/Personal Information (Fed. R. Evid., Rule 602)<br><br>**Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact.  It is undisputed that the cited evidence contains the quoted language, which speaks for itself.  Furthermore, MDR does not dispute that it is the Los Angeles County Department of Public Health's position that the "[p]otential gas migration pathways at depth were not sealed."  Hujer Decl. Ex. 28 at MDR0071334.<br><br>**Defendants' Evidentiary Objections:**<br><br>• **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence."  *See* Fed. R. Evid. 401.  Whether MDR disagrees with the County's statement, has monitored the Well for over three years, and whether there is evidence of leaks or migrating methane is irrelevant to whether LA County took the position it took, which MDR does not dispute.  Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | • **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Hyrum Madsen, which consists of out-of-court statements, for the truth of the matters asserted therein. *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Absent a specifically identified applicable exception, such evidence is inadmissible. *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| 105.  Wells not approved to the State's current standards pose a higher risk of leaking and potential damage to life, health, property, and natural resources than those abandoned to current standards.<br><br>Dudak Decl. Ex. A (Dudak Initial Report) at 23. | **Disputed in part.**<br><br>Defendants assert a very generic statement by their expert witness. In theory, MDR does not dispute that wells with improper abandonment may pose a higher risk. However, the well at issue was abandoned by MDR with a process approved by DOGGR, using multiple layers of cement. Access is not limited to the well, and may be accessed by the casing riser open at ground surface, allowing a drill rig to access the well. In the three years of monitoring the well since the abandonment, there is no evidence of leak or risk of future blow out.<br><br>Guiliani Decl. ¶16 and Ex. 9;<br><br>Madsen Decl. ¶8 and ¶11.<br><br>**Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR does not dispute that wells not approved to the State's current standards pose a higher risk of leaking and potential damage to life, health, property, and natural resources than those abandoned to current standards. MDR has not filed or served the Guiliani Declaration, or |

55

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | any exhibits to that declaration, that MDR relies on to defeat this uncontroverted fact.  Defendants reserve the right to move to strike or amend their responses should the Court allow MDR to file a late declaration. |
| | **Defendants' Evidentiary Objections:** |
| | • **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence."  *See* Fed. R. Evid. 401.  Whether MDR has monitored the Well for over three years and whether there has been evidence of leaks or a "risk of future blow out" in those three years is irrelevant to whether wells not approved to the State's current standards pose a higher risk of leaking and potential damage to life, health, property, and natural resources than those abandoned to current standards. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| | • **Hearsay, Fed. R. Evid. 802:** MDR purports to offer the declaration of Hyrum Madsen, which consists of out-of-court statements, for the truth of the matters asserted therein.  *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  Absent a specifically identified applicable exception, such evidence is inadmissible.  *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| | • **Failure to Submit Declaration and Exhibits Relied Upon:** MDR |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | has not filed or served any document titled, "Giuliani Declaration," or any exhibits related thereto.  As such, Defendants object to MDR's reliance on this declaration and the exhibit purportedly attached to it for this purported statement of additional genuine dispute.  In addition, to the extent MDR attempts to introduce a declaration from Michael Giuliani, Defendants object to that declaration and any exhibits attached to it as hearsay.  Defendants note that while MDR is apparently working with Mr. Giuliani, MDR has refused to provide Mr. Giuliani's contact information to Defendants or make him available for a deposition.  Defendants reserve the right to move to strike any belated filing of declaration(s) and/or exhibit(s), including the purported declaration of Michael Giuliani and any exhibits thereto, and/or to amend their responses and/or objections should MDR file such additional declaration(s) and/or exhibit(s) after its now-expired deadline for doing so. |
| 106.  Wells in which access is impeded, and are not abandoned to current standards, pose an even higher risk to life, health, property, and natural resources, due to their immediate proximity to structures and the time, cost, and complexity of tearing down impediments to the wells and rigging up well servicing equipment to remediate the wells should they begin leaking.<br><br>Dudak Decl. Ex. A (Dudak Initial Report) at 23. | **Disputed in part.**<br><br>Defendants assert a very generic statement by their expert witness.  In theory, MDR does not dispute that wells with limited access and improper abandonment may pose a higher risk.  However, the well at issue was abandoned by MDR with a process approved by DOGGR, using multiple layers of cement.  Access is not limited to the well, and may be accessed by the casing riser open at ground surface, allowing a drill rig to access the well. In the three years of monitoring the well since the abandonment, there is no evidence of leak or risk of future blow out.<br><br>Guiliani Decl. ¶16 and Ex. 9; |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | Madsen Decl. ¶8 and ¶11. |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact.  MDR does not dispute that wells in which access is impeded, and are not abandoned to current standards, pose an even higher risk to life, health, property, and natural resources, due to their immediate proximity to structures and the time, cost, and complexity of tearing down impediments to the wells and rigging up well servicing equipment to remediate the wells should they begin leaking.  MDR has not filed or served the Giuliani Declaration, or any exhibits to that declaration, that MDR relies on to defeat this uncontroverted fact.  Defendants reserve the right to move to strike or amend their responses should the Court allow MDR to file a late declaration. |
| | **Defendants' Evidentiary Objections:** |
| | • **Irrelevant, Fed. R. Evid. 401, 402:**  To be legally relevant, the proffered evidence must have a "tendency to make a fact more or less probable than it would be without the evidence."  *See* Fed. R. Evid. 401.  Whether the process used to abandon the Well was "approved," whether multiple layers of cement were used, whether access is limited, whether MDR has monitored the Well for over three years, and whether there has been evidence of leaks or a "risk of future blow out" in those three years is irrelevant to whether wells in which access is impeded, and are not abandoned to current standards, pose an even higher risk to life, health, property, and natural resources.  Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). |
| | • **Hearsay, Fed. R. Evid. 802:**  MDR purports to offer the declaration of Hyrum Madsen, |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | which consists of out-of-court statements, for the truth of the matters asserted therein.  *See* Fed R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  Absent a specifically identified applicable exception, such evidence is inadmissible.  *See* Fed. R. Evid. 802; *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002) (affirming decision to exclude hearsay evidence in deciding a summary judgment motion). |
| | • **Failure to Submit Declaration and Exhibits Relied Upon:** MDR has not filed or served any document titled, "Giuliani Declaration," or any exhibits related thereto.  As such, Defendants object to MDR's reliance on this declaration and the exhibit purportedly attached to it for this purported statement of additional genuine dispute.  In addition, to the extent MDR attempts to introduce a declaration from Michael Giuliani, Defendants object to that declaration and any exhibits attached to it as hearsay. Defendants note that while MDR is apparently working with Mr. Giuliani, MDR has refused to provide Mr. Giuliani's contact information to Defendants or make him available for a deposition.  Defendants reserve the right to move to strike any belated filing of declaration(s) and/or exhibit(s), including the purported declaration of Michael Giuliani and any exhibits thereto, and/or to amend their responses and/or objections should MDR file such additional declaration(s) and/or exhibit(s) after its now- |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | expired deadline for doing so. |
| **MDR Filed This Action Against Marathon and Dow** | |
| 107.  In its July 31, 2020 complaint ("Complaint"), MDR alleges causes of action for negligence, continuing public nuisance, continuing private nuisance, permanent public nuisance, permanent private nuisance, and trespass.<br><br>ECF No. 1-2 at 6-11. | **Undisputed.** |
| 108.  The Complaint alleges Defendants negligently "[i]nstall[ed] a stove pipe casing," "[f]ail[ed] to install concrete around the surface casing to ground level" and "around the production casing throughout and above the hydrocarbon production zone," "[f]ail[ed] to cement the well above the salt water zone," "[f]ail[ed] to install cement into the annulus of the casing at and above the 2,200 foot level, which provided further paths for gas to migrate," and "fail[ed] to account for the porous nature of the riveted stovepipe . . . which caused and/or contributed to surface migration of gasses and blowouts."<br><br>ECF No. 1-2 at ¶ 17. | **Undisputed.** |
| 109.  MDR has admitted that the Well presents a heightened risk for future gas release.<br><br>ECF No. 38 at 25. | **Undisputed.** |
| 110.  MDR has argued that the Well is a nuisance and a trespass, and that the Well is a "structure."<br><br>Hujer Decl. Ex. 29 (MDR First Interrog. Resp.) at Responses 4-5; ECF No. 38 at 13, 21. | **Undisputed.** |
| 111.  MDR has agreed that "[t]here was no evidence of the defects prior to MDR coming to the Property."<br><br>ECF No. 38 at 9. | **Disputed in part.**<br><br>While MDR has asserted that it was not aware of the issues related to the well, stating "MDR did not have prior knowledge" the Court has already ruled that the County knew or should have |

| Defendants' Original Uncontroverted Facts and Evidence | Plaintiff's Response and Defendants' Counter Response |
|---|---|
| | know about the condition of the well. Additionally, all of the facts giving rise to the issues related to the well are contained in the well records. |
| | Hujer Decl. Ex. 3 (Well Records). |
| | ECF 54 at 9. |
| | **Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. It is undisputed that the cited document contains the quoted language, which speaks for itself. |
| 112. MDR claims its damages were caused by defects in the Well's construction, and in subsequent construction work to abandon the Well, specifically by perforating the production casing, failing to isolate oil- and gas-bearing zones and salt water zones, fracturing and breaching the casing, and failing to place cement in the casing's annulus.<br><br>*See* ECF No. 1-2 at ¶ 17; Hujer Decl. Ex. 30 (MDR Third Interrog. Resp.) at Responses 15-16. | **Disputed.**<br><br>MDR's responses do not use the word "defect." Instead, MDR's cites specific intentional acts done by Defendants in violation of the Public Resources Code, citing details and applicable statutes.<br><br>Hujer Decl. Ex. 30.<br><br>**Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact. MDR's own complaint alleges that "defective condition of the well" caused "overwhelming amounts of gas … during re-abandonment work." *See* ECF No. 1-2 at ¶ 13. |
| 113. MDR has asserted Defendants violated various Public Resource Code Provisions, including: for Marathon, ch. 535, §§ 3 & 16 (1929), and ch. 791 §§ 15 & 18 (1931); for Dow, ch. 93, §§ 3213, 3228, 3229, and 3501 (1939).<br><br>Hujer Decl. Ex. 52 (Jordan Initial Report) at 8-11; Hujer Decl. Ex. 30 (MDR Third Interrog. Resp.) at Responses 15-16. | **Undisputed.** |
| **The Court Dismissed MDR's Negligence and Permanent Nuisance Claims** | |
| 114. On November 2, 2020, Defendants moved to dismiss MDR's Complaint on several grounds.<br><br>ECF No. 36. | **Undisputed.** |

| **Defendants' Original Uncontroverted Facts and Evidence** | **Plaintiff's Response and Defendants' Counter Response** |
|---|---|
| 115.  The Court dismissed MDR's negligence and permanent nuisance claims because such claims are barred by the statute of limitations, finding "the County [] knew or had reason to suspect Plaintiff's claims regarding the alleged 'improper construction, use, maintenance and abandonment of the [W]ell" at least as of 1959."<br><br>ECF No. 54 at 9. | **Undisputed.** |
| 116.  The Court has taken judicial notice that Dow informed DOGGR that it was perforating the Well and that DOGGR knew that.<br><br>ECF No. 54 at 5. | **Disputed.**<br><br>The Court ruled that it would take judicial notice that the well records exist. It did not take judicial notice of what DOGGR knew or the timing of its knowledge.<br><br>ECF No. 54 at 5.<br><br>**Defendants' Counter Response:** MDR's response does not establish a material dispute as to this fact.  The Court specifically stated, "There is no dispute these are documents contained within DOGGR's records, and the [C]ourt will take judicial notice of the existence and legal effect of these documents."  ECF No. 54 at 5.  It is undisputed that Dow informed DOGGR in 1941 regarding its perforations to the Well, and thus, DOGGR knew of the perforations.  SSUF 34; Hujer Decl. Ex. 3 (Historical Well Records) at MDR0083193-95. |

| **Plaintiff's Statement of Additional Genuine Disputes** | **Defendants' Response** |
|---|---|
| **Defendants Constructed, Operated and Abandoned The Dow RGC 10 Well In Violation of California Public Resources Codes sections 3219, 3220 and 3228** ||
| 1.      The oil rush began in Los Angeles, in an area that would later become Marina del Rey in 1929, when Marathon struck oil in a well in December 1929<br><br>Declaration of Perry S. Hughes ("Hughes Decl."), Ex. 8 ("The Discovery of Oil"), at 1. | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Foundation/Personal Information/Authentication (Fed. R. Evid. 602, 901)<br>• Hearsay (Fed. R. Evid. 801)<br>• Misstates Evidence |
| 2.      In less than a year, over fifty (50) wells were drilled in the area, and the oil field known as the Playa del Rey field was quickly the 6th most productive field in the state.<br><br>Hughes Decl., Ex. 8, at 1. | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Foundation/Personal Information/Authentication (Fed. R. Evid. 602, 901)<br>• Hearsay (Fed. R. Evid. 801)<br>• Misstates Evidence |
| 3.      Historians report that the previously fashionable and promising residential area was now "noisy, smelly, ugly and dangerous."<br><br>Hughes Decl., Ex. 8, at 1. | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Foundation/Personal Information/Authentication (Fed. R. Evid. 602, 901)<br>• Hearsay (Fed. R. Evid. 801)<br>• Misstates Evidence<br>• Prejudicial (Fed. R. Evid. 403) |
| 4.      Historians record that in the 1930s "oil waste was constantly being dumped into the canal and lagoon" | **Disputed but irrelevant.** |

| | |
|---|---|
| and at least one explosion was known to have destroyed a well.<br><br>Hughes Decl., Ex. 8, at 1. | **Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Foundation/Personal Information/Authentication (Fed. R. Evid. 602, 901)<br>• Hearsay (Fed. R. Evid. 801)<br>• Misstates Evidence<br>• Prejudicial (Fed. R. Evid. 403) |
| 5. In 1930 Marathon accepted the assignment of a thirteen-year "oil and gas lease" dated February 5, 1929, between a landowner, the Recreation Gun Club ("RGC") and an unrelated party, A.A. Cutice.<br><br>Declaration of Tristan Hujer ("Hujer Decl."), Ex. 2 | **Undisputed.** |
| 6. A copy of the actual "Oil and Gas Lease" assigned to Marathon has not been located.<br><br>Hughes Decl., Ex. 2 (Belew Trans.) at 30:23-25; Ex. 12 (Welch Trans.) at 148:5-12. | **Undisputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 7. When deposed on the subject of Marathon's interest in the subject property, Marathon's Rule 30(b)(6) witnesses had no knowledge of the lease and Marathon's rights under the lease, and had never seen the recorded documents.<br><br>Hughes Decl., Ex. 2 (Belew Trans.) at 29:1-30:25; Ex. 12<br><br>(Welch Trans.) at 148:5-12. | **Undisputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 8. On February 19, 1931, Marathon filed a notice of intent to drill an oil well—now known as the "Dow RGC 10" well—on the real property located at 4360 Via Marina in Marina del Rey, California (the "Property"), and began the installation of the oil well on March 17, 1931.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083211 | **Disputed in part.** It is undisputed Marathon's predecessor filed the notice of intent on Feb. 19, 1931, the Well is now known as RGC 10, and installation began around March 1931. But it is disputed that the property was located at 4360 Via Marina, Marina Del Rey, CA, as such modern property designations were not used at that time.<br><br>**Evidentiary Objections:**<br>• Misstates Evidence |

| | |
|---|---|
| 9.   Beginning at 2,200 ft. below ground surface ("bgs"), Marathon took core samples of the soil in the hole being drilled for the oil well.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083202-07 | **Undisputed.** |
| 10.   The initial samples taken at 2,200 ft. bgs showed the presence of natural gas.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083205 | **Disputed.** Core records only indicate gas "shows," *i.e.*, unproductive gas, in the well bore. *See, e.g.*, Arthur Decl. Ex. B (Arthur Rebuttal Report) at 4-5, 8, 9, 19, 20, 27-28; Dudak Decl. Ex. B (Dudak Rebuttal Report) at 6-7, 24, 32, 33-34. |
| 11.   Well records further indicate that core samples from 2,200 to 3,082 ft. bgs showed obvious signs of natural gas, including gas bubbles, ignitability, and pressure.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083205-06; Hughes Decl., Ex. 1 (Arthur Trans.) at 198:14-18. | **Disputed.** Core records only indicate gas "shows," *i.e.*, unproductive gas, in the well bore. *See, e.g.*, Arthur Decl. Ex. B (Arthur Rebuttal Report) at 4-5, 8, 9, 19, 20, 27-28; Dudak Decl. Ex. B (Dudak Rebuttal Report) at 6-7, 24, 32, 33-34.<br><br>**Evidentiary Objections:**<br><br>• Misstates Evidence |
| 12.   Oil was first identified in sand beginning 3,331 ft. bgs, and extended down to 3,906 ft. bgs.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083202-03 | **Disputed.** Core records only indicate unproductive oil "shows," were found at 3,331 bgs. and productive oil was found at deeper depths.  Dudak Decl. Ex. B (Dudak Rebuttal Report) at 34; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 14-15, 16.<br><br>**Evidentiary Objections:**<br><br>• Misstates Evidence |
| 13.   By the time Marathon drilled Dow RGC 10 it was familiar with the potential for high pressure gas zones in the area.<br><br>Hughes Decl., Ex. 13 (Summary of Operations, California Oil Fields) at 6 & 13; Declaration of Jeff Jordan ("Jordan Decl."), Ex. 1 (Expert Report), at 18-24 | **Disputed but irrelevant.** There is no indication that the Well at issue contained a "high pressure gas zone." Bartley Decl. Ex. 6 (Dudak Tr.) at 213-14; Dudak Decl. Ex. B (Dudak Rebuttal Report) at 9, 11, 17, 21, 22-23, 24; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 2, 11.  In addition, the assertion that these zones were "in the area" is vague and should be excluded.<br><br>**Evidentiary Objections:**<br><br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802) |

| | |
|---|---|
| | • Lack of Authentication (Fed. R. Evid. 901) |
| 14. According to CalGEM records, when Marathon installed the first of the RGC wells, RGC 1, in 1929, the well produced 1,500,000 cubic feet of gas per day.<br><br>Hughes Decl., Ex. 13 (Summary of Operations, California Oil Fields) at 6 & 13; Jordan Decl., Ex. 1 (Expert Report), at 18-24 | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Authentication (Fed. R. Evid. 901)<br>• Hearsay (Fed. R. Evid. 801)<br>• Prejudicial (Fed. R. Evid. 403) |
| 15. Blow outs and explosions were a common occurrence at the time Marathon drilled the Dow RGC 10 well.<br><br>Hughes Decl., Ex. 13 (Summary of Operations, California Oil Fields) at 6 & 13; Jordan Decl., Ex. 1 (Expert Report), at 18-24, and 126. | **Disputed but irrelevant.**<br><br>Dudak Decl. Ex. B (Dudak Rebuttal Report) at 11-12, 22-23, 24, 32-33.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Authentication (Fed. R. Evid. 901)<br>• Hearsay (Fed. R. Evid. 801)<br>• Prejudicial (Fed. R. Evid. 403) |
| 16. Marathon had experienced at least one blowout on its adjacent well, RGC 8, just three months before.<br><br>Jordan Decl., Ex. 1 (Expert Report), at 23-24 | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Best Evidence (Fed. R. Evid. 1002)<br>• Hearsay (Fed. R. Evid. 801)<br>• Prejudicial (Fed. R. Evid. 403) |
| 17. At least six wells within 650 feet of Dow RGC 10 experience blowouts in the six months prior to Marathon drilling the well.<br><br>Jordan Decl., Ex. 1 (Expert Report), at 23-24, and 126. | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Best Evidence (Fed. R. Evid. 1002)<br>• Hearsay (Fed. R. Evid. 801) |

| | |
|---|---|
| | • Prejudicial (Fed. R. Evid. 403) |
| 18. Just months before Marathon installed the well, the International Petroleum Well #2, located immediately adjacent to DOW RGC 10, blew out for four days, catching fire and damaging the rig.<br><br>Hughes Decl., Ex. 15 (Portion of Well File for the International Petroleum Well #2) at 1. | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Foundation/Personal Information/Authentication (Fed. R. Evid. 602, 901)<br>• Prejudicial (Fed. R. Evid. 403) |
| 19. The blowout happened just two days after CalGEM conducted a "thorough investigation" of the blow out prevention equipment and found it to be "satisfactory."<br><br>Hughes Decl., Ex. 15 (Portion of Well File for the International Petroleum Well #2) at 3. | **Disputed but irrelevant.** Misstates the document, as it reports the "equipment as installed at the time of this investigation to be satisfactory."<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Foundation/Personal Information/Authentication (Fed. R. Evid. 602, 901)<br>• Prejudicial (Fed. R. Evid. 403)<br>• Rule of Completeness (Fed. R. Evid. 106) |
| 20. In 1931, in a "Summary of Operations in the California Oil Fields," CalGEM identified the presence of "high pressure gas" in the Play del Rey oil field, specifically between 2500 and 3000 ft. bgs.<br><br>Hughes Decl., Ex. 13 (Summary of Operations, California Oil Fields) at 13 | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Authentication (Fed. R. Evid. 901)<br>• Rule of Completeness (Fed. R. Evid. 106) |
| 21. In 1951, Marathon performed an analysis of the potential gas reserved in the RGC wells, and concluded that a potential "1 billion cubic feet or better" of natural gas may exist at "about 2000 level" that could offer a "rapid payout" to Marathon.<br><br>Hughes Decl., Ex. 14 (Review of Recreation Gun Club Lease) at 5 | **Disputed but irrelevant.** Aside from being irrelevant, this assertion ignores the rest of the story; i.e., that despite the rosy projections in this memo, the estimates were wrong, the gas field turned out to be commercially unproductive, and the field was neither developed nor ever produced gas. Bartley Decl. Ex. 6 (Dudak Tr.) at 134-35. Even MDR's own supposed oil and gas expert, Jeff Jordan, admitted that "gas zones in the Pico formation" had never been developed. Hujer Decl. Ex. 40 (Jordan Tr.) at 66-67. |

| | |
|---|---|
| | **Evidentiary Objections:** <br> • Irrelevant (Fed. R. Evid. 401, 402) <br> • Rule of Completeness (Fed. R. Evid. 106) <br> • Prejudicial (Fed. R. Evid. 403) |
| 22.  An oil well basically consists of a deep hole with a metal casing (pipe) running down the middle. <br> Jordan Decl., Ex. 1 (Expert Report), at 130-133. | **Undisputed.** <br> **Evidentiary Objections:** <br> • Hearsay (Fed. R. Evid. 802) |
| 23.  The space between the casing and the soil is called the "annulus" space. In this well, the main casing was an 11 ¾ inch casing, surrounded by an annulus spacing of approximately three (3) inches. <br> Hughes Decl., Ex. 12 (Welch Trans.) at 97:5-10; Hujer Decl., Ex. 3 (Well Records) at MDR0083208. | **Undisputed.** |
| 24.  The annulus space is typically sealed at the bottom and at sensitive layers (oil, gas and water) with cement. <br> Jordan Decl., Ex. 1 (Expert Report), at 130-133. | **Disputed but irrelevant.**  MDR's statement assumes all wells have been sealed in the same manner over time.  In the 1930s and 1940s, it was not typical for the annular space to be filled with cement, cement plugs were only required across productive hydrocarbon zones, on top of the casing stub and at the surface, and the manner in which the Well was sealed was consistent with the requirements of the time.  Dudak Decl. Ex. A (Dudak Initial Report) at 8; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 2; Bartley Decl., Ex. 5 (Jordan Tr.) at 39-40 (Q: And it appears that the RGC 10 well was in line with those other wells; is that fair?  A: The RGC 10 well did not bring cement up into the surface casing. Q: Just like other wells you looked at in the area during that time?  A: . . . In that era.  Yes."); *see also*, Jordan Decl., Ex. 1 (Jordan Report), at 36 ("On most wells, the primary cement job of the production casing did not bring cement up high enough in the annulus behind the casing to cover them."). <br> **Evidentiary Objections:** <br> • Irrelevant (Fed. R. Evid. 401, 402) |

| | | |
|---|---|---|
| | | • Hearsay (Fed. R. Evid. 802) |
| | 25. Marathon constructed the RGC 10 well with cement running up the annulus space from the bottom (3,906 ft. bgs), up the side to 2,686 ft. bgs.<br><br>Hughes Decl., Ex. 12 (Welch Trans.) at 42:7-14; Jordan Decl., Ex. 1 (Expert Report), at 26. | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802)<br>• Best Evidence (Fed. R. Evid. 1002) |
| | 26. Notably, the cement in the annulus space did not extend to 2,200 ft bgs where gas was found during drilling.<br><br>Hughes Decl., Ex. 12 (Welch Trans.) at 42:7-14; Jordan Decl., Ex. 1 (Expert Report), at 26.; Ex. 2 (Rebuttal Report), 8-11 and 23-26. | **Disputed but irrelevant.** Core records only indicate unproductive gas "shows" were found at 2,200 bgs. In the 1930s and 1940s, it was not typical for the annular space to be filled with cement. Cement plugs were only required across productive hydrocarbon zones, on top of the casing stub and at the surface, and the manner in which the Well was sealed was consistent with the requirements of the time. Dudak Decl. Ex. A (Dudak Initial Report) at 8; Dudak Decl. Ex. B (Dudak Rebuttal Report) at 6-7, 24, 32, 33-34; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 2, 4-5, 8, 9, 19, 20, 27-28; Bartley Decl., Ex. 5 (Jordan Tr.) at 39-40 (Q: And it appears that the RGC 10 well was in line with those other wells; is that fair? A: The RGC 10 well did not bring cement up into the surface casing. Q: Just like other wells you looked at in the area during that time? A: . . . In that era. Yes."); *see also*, Jordan Decl., Ex. 1 (Jordan Report), at 36 ("On most wells, the primary cement job of the production casing did not bring cement up high enough in the annulus behind the casing to cover them.").<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802)<br>• Best Evidence (Fed. R. Evid. 1002) |
| | 27. From a geologic perspective, natural gas is a critical element to the production of crude oil. | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |

| | |
|---|---|
| Hughes Decl., Ex. 6 (Dudak Trans.) at 238:23-239:1 | • Misstates Evidence |
| 28. Natural gas applies pressure to the oil, causing it to be produced from the oil well.<br><br>Hughes Decl., Ex. 6 (Dudak Trans.) at 238:23-239:1 | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence |
| 29. As early as 1915, California laws required oil wells to be constructed with sufficient metal casing and to shut off water from entering oil- and gas-bearing zones.<br><br>Hughes Decl., Ex. 18 (Section 15 of Chapter 748 of the Statutes of California) | **Disputed in part.** Statutes in place in 1915 were subject to broad interpretation by the state oil and gas supervisor. It was not until the 1970s that regulations were put in place to define statutory requirements. Dudak Decl. Ex. B (Dudak Rebuttal Report) at 4-5; Bartley Decl. Ex. 6 (Dudak Tr.) at 131.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence<br>• Best Evidence (Fed. R. Evid. 1002) |
| 30. In 1939, California renewed its statutes regarding oil wells, and enacted numerous sections in the Public Resources Code designed to continue the then-existing requirements related to the construction, operation, and abandonment of oil wells.<br><br>Hughes Decl., Ex. 19 (1939 Public Resources Code Sections 3219, 3220, 3228 and) | **Disputed in part.** The use of the word "requirements" is misleading as California's historical oil and gas statutes were open to broad interpretation by permit-issuing officials and were unaccompanied by interpreting regulations until the 1970s. Dudak Decl. Ex. B (Dudak Rebuttal Report) at ¶ 7; Bartley Decl. Ex. 6 (Dudak Tr.) 224-25.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Best Evidence (Fed. R. Evid. 1002) |
| 31. Since their enactment in 1939, Sections 3219, 3220, and 3300 have undergone only minor grammatical changes, but the intent remains the same: operators of oil wells are required isolate water layers from oil and gas-bearing strata.<br><br>Hughes Decl., Ex. 19 (1939 Public Resources Code Sections 3219, 3220, 3228 and) | **Disputed in part.** The statute's intent was not to require specific actions by well owners or operators, but to respond to the intersection between the oil and gas industry and population growth with respect to public health, safety, property, and the environment. Dudak Decl. Ex. A (Dudak Initial Report) at 6, ¶ 12.<br><br>Further, the statement ignores that at the time Marathon and Dow operated the well, "[i]solation of shallow water bearing zones from hydrocarbon |

| | |
|---|---|
| | infiltration was not a requisite legal obligation for oil well operators." Arthur Decl. Ex. B (Arthur Rebuttal Report) at 8; Bartley Decl., Ex. 5 (Jordan Tr.) at 27:8-12 (Q: So I guess we can agree that the term "isolate" is not in the statute?  A: It says shut off.  Q: That's not isolate.  Did we agree on that?  A: That is correct."). **Evidentiary Objections:** <ul><li>Irrelevant (Fed. R. Evid. 401, 402)</li><li>Best Evidence (Fed. R. Evid. 1002)</li><li>Misstates Evidence</li></ul> |
| 32.  As of 1939, Public Resource Code section 3220 required operators of wells "presumed to contain oil or gas" to "shut off all water overlying and underlying oil-bearing or gas bearing strata and prevent any water from penetrating such strata." Hughes Decl., Ex. 19 (1939 Public Resources Code Section 3220) | **Disputed in part.** Statement mischaracterizes the statute.  Section 3220 of the 1939 Public Resources Code sets forth that operators of wells shall apply a "water-tight and adequate metal casing, *in accordance with methods approved by the supervisor or the district deputy, and shall under his direction, shut off all water* overlying and underlying oil- bearing or gas-bearing strata . . ."  Dudak Decl. Ex. A (Dudak Initial Report) at 6, ¶ 12, quoting 1939 Public Resource Code Section 3220. **Evidentiary Objections:** <ul><li>Irrelevant (Fed. R. Evid. 401, 402)</li><li>Rule of Completeness (Fed. R. Evid. 106)</li></ul> |
| 33.  As of 1939, Public Resource Code section 3220 required operators of wells "presumed to contain oil or gas" to "to use every effort and endeavor to shut out detrimental substance from strata contain water suitable for irrigation or domestic purposes." Hughes Decl., Ex. 19 (1939 Public Resources Code Section 3220) | **Disputed in part.**  Statement mischaracterizes the statute.  Section 3220 of the 1939 Public Resources Code sets forth that operators of wells shall apply a "water-tight and adequate metal casing, *in accordance with methods approved by the supervisor or the district deputy, and shall under his direction, shut off all water* overlying and underlying oil- bearing or gas-bearing strata . . ."  Dudak Decl. Ex. A (Dudak Initial Report) at 6, ¶ 12, quoting 1939 Public Resource Code Section 3220. **Evidentiary Objections:** |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| | • Irrelevant (Fed. R. Evid. 401, 402)<br>• Rule of Completeness (Fed. R. Evid. 106) |
| 34.  As of 1939, Public Resource Code section 3228 required operators of wells "shut off and exclude all water from entering oil- bearing or gas-bearing strata encountered in the well" before abandoning the well.<br><br>Hughes Decl., Ex. 19 (1939 Public Resources Code Section 3228) | **Disputed in part.**  Statement mischaracterizes the statute.  Section 3228 of the 1939 Public Resources Code sets forth that operators of wells shall act, "*in accordance with methods approved by the supervisor or the district deputy, and shall under his direction . . .*" Hughes Decl., Ex. 19 (1939 Public Resources Code Section 3228).  And the evidence is undisputed Defendants acted with DOGGR's approval.  *See* SUF11-12, 15-18, 34-43.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Rule of Completeness (Fed. R. Evid. 106) |
| 35.  As of 1939, Public Resource Code section 3228 required operators of wells "to protect any underground or surface water suitable for irrigation or domestic purposes from infiltration or addition of any detrimental substances."<br><br>Hughes Decl., Ex. 19 (1939 Public Resources Code Section 3228) | **Disputed in part.**  Statement mischaracterizes the statute.  Section 3228 of the 1939 Public Resources Code sets forth that operators of wells shall act, "*in accordance with methods approved by the supervisor or the district deputy, and shall under his direction . . .*" Hughes Decl., Ex. 19 (1939 Public Resources Code Section 3228).  And the evidence is undisputed Defendants acted with DOGGR's approval.  *See* SUF11-12, 15-18, 34-43.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Rule of Completeness (Fed. R. Evid. 106) |
| 36.  Water flowing into oil and gas zones will compromise those natural resources.<br><br>Hughes Decl., Ex. 6 (Dudak Trans.) at 238:23-239:1 | **Disputed but irrelevant.**  This statement is a gross generalization.  There is no evidence of water "compromising" any natural resources.  Dudak Decl. Ex. B (Dudak Rebuttal Report) at 10, ¶ 15.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence |

| | |
|---|---|
| 37. Additionally, oil and gas flowing into water zones are detrimental to water resources.<br><br>Hughes Decl., Ex. 11 (Phillips Trans.) at 319:2-15 | **Disputed but irrelevant.** This statement is a gross generalization. There is no evidence of water "compromising" any natural resources. Dudak Decl. Ex. B (Dudak Rebuttal Report) at 10, ¶ 15. In addition, it misstates Phillips' testimony. Mr. Phillips testified that saltwater flowing into freshwater may be detrimental. Hujer Decl., Ex. 11 (Phillips Tr.) at 319.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence |
| 38. After a decade of use for oil production, on July 10, 1941, Marathon sold the oil well to Dow.<br><br>Hujer Decl., Ex. 8 | **Undisputed.**<br><br>**Evidentiary Objections:**<br>• Misstates Evidence |
| 39. Dow entered an Oil and Gas Lease with Recreational Gun Club on July 15, 1914 ("Dow Oil & Gas Lease").<br><br>Hujer Decl., Ex. 7 (Dow Oil & Gas Lease) | **Undisputed.** |
| 40. The Dow Oil & Gas Lease specifically requires Dow to "carry on all operations on the [Property] in a careful and workmanlike manner and in accordance with the laws of the State of California."<br><br>Hujer Decl., Ex. 7, ¶3 | **Disputed in part.** MDR's response is incomplete and fails to note the lack of any complaint, citation, or other critique of Dow's operations while it leased the property or assertion of any supposed violation of California law. *See, e.g.,* SUF 39, 49.<br><br>**Evidentiary Objections:**<br>• Rule of Completeness (Fed. R. Evid. 106) |
| 41. The Dow Oil & Gas Lease specifically requires Dow to "remove all structures and foreign matter and shall leave the premises in substantially the same condition as existed on the 5th day of February 1929.<br><br>Hujer Decl., Ex. 7, ¶8 | **Disputed in part.** MDR's response is incomplete and fails to include the rest of that section. In addition, it fails to note the lack of any complaint, or other critique of Dow's operations while it leased the property by any owner or lessor. *See, e.g.,* SUF 47-49.<br><br>**Evidentiary Objections:**<br>• Rule of Completeness (Fed. R. Evid. 106) |
| 42. Before transferring the well to Dow, Marathon filled the perforated oil production pipe, below 3,400 ft. bgs | **Disputed in part.** MDR's response is incomplete and fails to note that there was no obligation for Marathon to isolate |

| | |
|---|---|
| with cement. However, it took no action to isolate or shut off the gas layer at 2,200 ft.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083195 | unproductive gas shows in the Well. *See, e.g.*, Arthur Decl. Ex. B (Arthur Rebuttal Report) at 4-5, 8, 9, 19, 20, 27-28; Dudak Decl. Ex. B (Dudak Rebuttal Report) at 6-7, 24, 29-30, 32, 33-34; SUF 47-49; *see also*, Jordan Decl., Ex. 1 (Jordan Report), at 36 ("On most wells, the primary cement job of the production casing did not bring cement up high enough in the annulus behind the casing to cover them.").<br><br>**Evidentiary Objections:**<br>• Misstates Evidence |
| 43. At the time Marathon transferred the well to Dow there was no structure or barrier existed in the well to keep gas from traveling up the annulus to the surface.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083186-201; Jordan Decl., Ex. 1, 30-35; Ex. 2 (Rebuttal Report), 8-11 and 23-26; Declaration of Michael Giuliani ("Giuliani Decl.) Ex. 4.; Hughes Decl. Ex. 6 (Dudak Trans.) at 239:14-243:3 and Ex. 12 (Welch Trans.) at 89:25-112:14 | **Disputed in part.** MDR's response is incomplete and fails to note that there was no obligation for Marathon to isolate unproductive gas shows in the Well. *See, e.g.*, Arthur Decl. Ex. B (Arthur Rebuttal Report) at 4-5, 8, 9, 19, 20, 27-28; Dudak Decl. Ex. B (Dudak Rebuttal Report) at 6-7, 24, 29-30, 32, 33-34; *see, e.g.*, SUF 47-49; see also Jordan Decl., Ex. 1 (Jordan Report), at 26 ("most of the well at Playa Del Rey drilled in the 1930s had no cement behind the production casing above approximately 2,100 ft.").<br><br>**Evidentiary Objections:**<br>• Misstates Evidence<br>• Failure to Submit Declaration and Exhibit Relied Upon<br>• Hearsay (Fed. R. Evid. 802) |
| 44. Well records indicate that in 1956, the well blew out with gas coming from a depth of 1,800 ft. bgs, and that was escaping from the space <u>outside</u> the 11 ¾ inch casing.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083186-89 | **Disputed in part.** MDR's response is incomplete.  In fact, the Well records do not indicate the depth from where the gas is escaping or how the engineer on site would make that determination. Instead, its suggests  it was "apparently coming from behind the 11-3/4" casing at a depth of 1800'." Hujer Decl., Ex. 3 (Well Records) at MDR0083189.<br><br>**Evidentiary Objections:**<br>• Misstates Evidence |
| 45. On April 14, 1941, Dow performed a test to confirm that the 11¾ casing was watertight and that water from | **Undisputed.** |

| | |
|---|---|
| outside the casing was not getting into the interior of casing.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083192 | |
| 46. After confirming that the casing was watertight, on April 16, 1941, Dow began a long series of actions to perforate the 11 ¾ casing to allow saltwater to enter the casing<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083193-94 | **Disputed in part.** MDR's response is incomplete.  Dow's perforation of the casing took place in three steps: on April 16, 1941; May 5, 1941; and between October 6-11, 1941.<br><br>**Evidentiary Objections:**<br> • Misstates Evidence |
| 47. Between April 16 and October 11, 1941, Dow cut at least 657 perforations in the casing, ranging from 3,341 to 3,076 ft. bgs, in order to filter saltwater for the production of iodine.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083193-94 | **Undisputed.**<br>**Evidentiary Objections:**<br> • Misstates Evidence |
| 48. These perforations ranged from the known oil-bearing zone at 3,300 ft bgs and the gas-bearing zone that ranged down to 3,086.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083193-94; Hughes Decl., Ex. 1 (Arthur Trans.) at 198:14-18 | **Disputed in part.** MDR's response is incomplete.  Dow's perforations took place in saltwater zones with a minor overlap in unproductive oil and gas shows.  But both the Well records, and MDR's own abandonment "experts" concluded "for 60 years; no evidence of oil migration has been observed" and the "salt water zone . . . contained no hydrocarbons and is blocked from contaminating fresh water sources."  Arthur Decl. Ex. B (Arthur Rebuttal Report) at 21-22.<br><br>**Evidentiary Objections:**<br> • Misstates Evidence |
| 49. In 1956, Dow submitted a Notice of Intention to Abandon Well to CalGEM.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083193-94 | **Undisputed.** |
| 50. As part of the Notice, Dow was required to describe the current condition of the well.<br><br>Jordan Decl., Ex. 1 (Expert Report), at 37-39, and 56. | **Disputed in part.** MDR's response is incomplete.  Dow was required to describe the material conditions of the Well; which it did.  DOGGR concluded Dow fulfilled all of DOGGR's requirements.  SUF 39. |

| | |
|---|---|
| | **Evidentiary Objections:** <br> • Irrelevant (Fed. R. Evid. 401, 402) <br> • Hearsay (Fed. R. Evid. 802) |
| 51. In that description, Dow only identified the original perforations in the 6 ⅝ inch production liner (3,423-3,903 ft. bgs) that Marathon had plugged with cement, but failed to identify the 657 perforations performed by Dow on the 11 ¾ inch casing. <br><br> Hujer Decl., Ex. 3 (Well Records) at MDR0083187-90; <br> Jordan Decl., Ex. 1 (Expert Report), at 37-39, and 56. | **Disputed in part.** MDR's response is incomplete. Dow was required to describe the material conditions of the Well; which it did. DOGGR concluded Dow fulfilled all of DOGGR's requirements. SUF 39; Arthur Decl. Ex. B (Arthur Rebuttal Report) at 21-22. <br><br> **Evidentiary Objections:** <br> • Irrelevant (Fed. R. Evid. 401, 402) <br> • Misstates Evidence <br> • Hearsay (Fed. R. Evid. 802) |
| 52. Dow indicated that the 11¾ inch casing was "W.S.O." – or watertight. <br><br> Hujer Decl., Ex. 3 (Well Records) at MDR0083191 | **Disputed in part.** MDR's response is incomplete. Dow's description of the 11-3/4" casing remained unchanged from the time it performed the water shut off test in 1941 to ensure water was not interfering with the oil producing zone. Hujer Decl., Ex. 3 (Well Records) at MDR0083191-93. <br><br> **Evidentiary Objections:** <br> • Irrelevant (Fed. R. Evid. 401, 402) |
| 53. At the time of abandonment the casing had been perforated over 657 times and used for the production of saltwater. <br><br> Hujer Decl., Ex. 3 (Well Records) at MDR0083193-94 | **Disputed in part.** MDR's response is incomplete. At the time of Dow's abandonment, the Well had been perforated and used for saltwater production. Hujer Decl., Ex. 3 (Well Records) at MDR0083185-95. <br><br> **Evidentiary Objections:** <br> • Irrelevant (Fed. R. Evid. 401, 402) |
| 54. On or before March 12, 1956, Dow engaged contractor, Gordon Graham to began an attempt to abandon the oil well <br><br> Hujer Decl., Ex. 3 (Well Records) at MDR0083189-91 | **Undisputed but irrelevant.** <br> **Evidentiary Objections:** <br> • Irrelevant (Fed. R. Evid. 401, 402) |
| 55. CalGEM approved the planned abandonment based on Dow's representations, echoing that that the | **Undisputed.** |

76

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 11 ¾ inch casing was "W.S.O." or watertight.<br>Hujer Decl., Ex. 3 (Well Records) at MDR0083190 | **Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 56.  In an effort to recover the valuable metal used in the casing, Mr. Graham attempted to cut and pull the casing from the ground at a depth of 887 ft. bgs.<br>Hujer Decl., Ex. 3 (Well Records) at MDR0083186-91 | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence |
| 57.  After pulling the casing up four (4) feet, the well experienced a blowout.<br>Hujer Decl., Ex. 3 (Well Records) at MDR0083186-91 | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 58.  Based on observations of CalGEM recorded in the well record, the gas was coming from "behind the 11 ¾ in. casing at a depth of 1800."<br>Hujer Decl., Ex. 3 (Well Records) at MDR0083189 | **Disputed in part but irrelevant.** MDR's response is incomplete.  In fact, the Well records do not indicate the depth from where the gas is escaping or how the engineer on site would make that determination.  Instead, its suggests it was "apparently coming from behind the 11-3/4" casing at a depth of 1800'."  Hujer Decl., Ex. 3 (Well Records) at MDR0083189.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Rule of Completeness (Fed. R. Evid. 106) |
| 59.  This blowout lasted thirty- six (36) hours.<br>Hujer Decl., Ex. 3 (Well Records) at MDR0083189 | **Disputed in part but irrelevant.**  The Well records indicate the blowout began at 3:10 p.m. on March 12, 1956 and stopped 35 hours and 50 minutes later, at 3:00 a.m., March 14, 1956. Hujer Decl., Ex. 3 (Well Records) at MDR0083189.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 60.  After multiple failed attempts to cut and pull the casing, Mr. Graham cut the casing at 40 ft. bgs and removed the top 40 ft. of casing from the surface, leaving only thin "stove pipe" casing at the surface. | **Disputed in part but irrelevant.**  The Well records indicate casing was pulled up twice (at 887' and 542') without success, and at 290' and 40' with success.  Hujer Decl., Ex. 3 (Well Records) at MDR0083187-88.<br><br>**Evidentiary Objections:** |

| | |
|---|---|
| Hujer Decl., Ex. 3 (Well Records) at MDR0083186-91 | • Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence |
| 61. At the time of the abandonment in 1956, the casing had been left perforated at the base and exposed to the constant influx of oil and gas, as well as corrosive saltwater.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083186-91 | **Disputed but irrelevant.** MDR's response is incomplete. Dow's perforations took place in saltwater zones with a minor overlap in unproductive oil and gas shows. But both the Well records, and MDR's own abandonment "experts" concluded "for 60 years; no evidence of oil migration has been observed" and the "salt water zone . . . contained no hydrocarbons and is blocked from contaminating fresh water sources." Arthur Decl. Ex. B (Arthur Rebuttal Report) at 21-22.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence |
| 62. At the time of the abandonment 1956, the gas zone known to exist at, and below, 2,200 ft. bgs (and below) was left open to the annulus space surrounding the 11 ¾ inch casing, free to flow to water layers and surface.<br><br>Hujer Decl., Ex. 3 (Well Records) at MDR0083186-91 | **Disputed but irrelevant.** The Well had various cement and wooden plugs placed in it, in addition to drilling mud. Hujer Decl., Ex. 3 (Well Records) at MDR0083186-88; Bartley Decl. Ex. 6 (Dudak Tr.) at 241; Bartley Decl. Ex. 7 (Arthur Tr.) at 203-04.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence |
| 63. In 2006, MDR's predecessor entity entered into a term sheet with the County of Los Angeles to develop the Property<br><br>Declaration of Hyrum Madsen ("Madsen Decl.") at ¶3. | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 64. Over time, the planned development and the amount of land to be leased changed significantly.<br><br>Madsen Decl. at ¶3. | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. |

| | |
|---|---|
| | 602) |
| 65.  At the inception of the negotiations, a high-rise condo complex was planned with parking on an adjacent lot.<br>Madsen Decl. at ¶3. | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 66.  The size of the Property was reduced to accommodate wetlands on a portion of the site, and the planned development changed to a hotel complex, featuring two hotels and a restaurant in the middle.<br>Madsen Decl. at ¶3. | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 67.  While MDR was first lead to believe the oil well was located off the Property, it soon became aware of the potential that the oil well may be located on the Property.<br>Madsen Decl. at ¶4. | **Disputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 68.  Accordingly, in 2008, MDR engaged its contractor Methane Specialists to conduct a survey of the Property to locate the well using a magnetometer.<br>Madsen Decl. at ¶4. | **Undisputed.**<br>**Evidentiary Objections:**<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 69.  The report concluded that the oil well was immediately adjacent to the road, stating "The instrument's response was unequivocal, resulting in very high confidence that here the well was positively located to within +/- 1 foot."<br>Madsen Decl. at ¶4, and Ex. 1. | **Disputed in part.** Defendants agree the quoted language appears in the report, but disagree with MDR's characterization that the report "concluded that the oil well was immediately adjacent to the road." It did not.  Madsen Decl., Ex. 1.<br>**Evidentiary Objections:**<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |

| | |
|---|---|
| 70.   Understanding that the well was located immediately adjacent to the street, MDR planned its hotel development accordingly.<br><br>Madsen Decl. at ¶4, and Ex. 1. | **Disputed in part.** The report does not support MDR's characterization that the "well was located adjacent to the street." It was not.  Madsen Decl., Ex. 1.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 71.   In 2017, prior to signing the ground lease with the County, MDR conducted a second magnetometer survey, which confirmed the location of the well near the boundary of the Property.<br><br>Madsen Decl. at ¶4, and Ex. 2. | **Disputed in part.** The report does not support MDR's characterization that the "location of the well [was] near the boundary of the Property."  It was not. Madsen Decl., Ex. 1.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 72.   On July 31, 2017, MDR entered a lease with the County to develop a hotel project on a portion of the Property.<br><br>Hujer Decl., Ex. 11 | **Undisputed.** |
| 73.   Upon entering the Lease, MDR instructed Methane Specialists to physically locate the Dow RGC 10 well.<br><br>Madsen Decl. at ¶5. | **Disputed.** First, paragraph 5 of Madsen's declaration does not make this assertion.  Even if MDR intended to cite to paragraph 4, it also fails to support this assertion for several reasons: (1) it does not state MDR "instructed Methane Specialists" to take any action after July 31, 2017; (2) even if it is implied MDR instructed Methane Specialists to retain Subsurface Surveys to perform a geophysical investigation, the Subsurface Surveys report is dated April 2, 2017, months before MDR entered into its July 31, 2017 lease; and (3) a geophysical survey does not result in "physically locat[ing] an object, and any maps produced by Subsurface Surveys are not "of engineering quality (i.e., measure and mapped by a licensed land surveyor)."  Madsen Decl. at ¶¶ 4-5, & Ex. 2. |

|  | **Evidentiary Objections:**<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
|---|---|
| 74. The well was located on September 7, 2017, within the planned footprint of the development, under the planned parking garage<br>Madsen Decl. at ¶5. | **Undisputed.**<br>**Evidentiary Objections:**<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 75. On October 2, 2017, Methane Specialists examined the condition of the well and determined to be leaking methane and surrounded by viscous fluids—described as being "thicker than water."<br>Hughes Decl., Ex. 3 (Conohan Trans.) at 101:10-104-1, and Ex. 4 (Field Inspection Report) | **Undisputed.**<br>**Evidentiary Objections:**<br>• Lack of Authentication (Fed. R. Evid. 901) |
| 76. On October 31, 2017, CalGEM confirmed to Methane Specialists that if the well was leaking, MDR would be required to re-abandon the well.<br>Hughes Decl., Ex. 5.; Ex. 3 (Conohan Trans.) at 101:10-104 | **Disputed in part but irrelevant.** While CalGEM noted to Methane Specialists that, hypothetically, if a well was leaking, it would have to be reabandoned, MDR did not inform CalGEM that the Well was leaking. *See, e.g.*, Bartley Decl. Ex. 6 (Dudak Tr.) at 126, 162, 175.<br>**Evidentiary Objections:**<br>• Misstates Evidence |
| 77. With the assistance of and recommendation from Methane Specialist, MDR engaged InterACT PMTI ("InterACT") to perform the well abandonment.<br>Madsen Decl. at ¶7. | **Undisputed.**<br>**Evidentiary Objections:**<br>• Hearsay (Fed. R. Evid. 802)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 78. InterACT is well experienced working on and abandoning oil wells in Southern California.<br>Hughes Decl., Ex. 9 (Lerma Trans.) at 40:4-45:10; Giuliani Decl. ¶2, Ex. 1. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact. First, while Ms. Lerma may be a competent petroleum engineer, MDR has provided no evidence of her involvement on this well abandonment. Second, while MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11. |

| | |
|---|---|
| | **Evidentiary Objections:**<br>• Misstates Evidence<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 79. On April 27, 2018, MDR submitted a Notice of Intent to re- abandon the well.<br>Giuliani Decl. ¶4, Exs. 3-5. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact.  While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants.  *See* Dkt. No. 51 (Initial Standing Order) at 10-11. |
| 80. On June 5, 2018, CalGEM approved the Notice, and issue a permit to abandon the well.<br>Giuliani Decl. ¶5, Ex. 6. | **Disputed.**  MDR has failed to offer competent evidence to support its asserted fact.  While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants.  *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 81. CalGEM's permit specifically included the following requirements: The operator shall isolate the following zones: a. The Base of Freshwast at 700 +/-[bgs]; b. The [Underground Source of Drinking Water] at 1512 [bgs]; c. Top of the upper most hydrocarbon zone at 2200" +/- [bgs]; and d. Top of the Upper [oil-bearing] zone 3330' +/-"<br>Giuliani Decl. ¶5, Ex. 6. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact.  While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants.  *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 82. It was known and understood by both CalGEM and MDR, prior to MDR initiating the re-abandonment efforts, that Dow and Marathon had failed to shut off or isolate the water layers from the oil-bearing zone at 3,330 ft. bgs and from the gas-bearing zone at 2,200 ft. bgs.<br>Hughes Decl., Ex. 11 (Phillips Tran.) at 280:17-20; Giuliani Decl. ¶5, Ex. 6. | **Disputed.** MDR's response is incorrect and it has failed to offer competent evidence to support its asserted fact.  The response is incorrect because the steps Dow and Marathon took to shut off water and gas were disclosed to, witnessed by, and approved by DOGGR at the time Defendants took them.  *See* SUF11-12, 15-18, 34-43.  Moreover, Mr. Phillips testified, on DOGGR's behalf, that there was nothing in the Well file to indicate Defendants violated any law, regulation, or statute in place at the time of Defendants' operation and abandonment of the Well.  Phillips Tr. at |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| | 112-14.  Finally, while MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants.  *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Misstates Evidence<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 83.  With cement in the annulus (the space between the casing pipe and the earth) only ranging from the base of the well at 3,423 ft. up to 2,686 ft. bgs, neither Dow nor Marathon had shut off the hydrocarbon or gas zone at 2200 ft. bgs<br><br>Hughes Decl., Ex. 11 (Phillips Tran.) at 277:21-280:11; Giuliani Decl. ¶5, Ex. 6. | **Disputed.** MDR's response is incorrect and it has failed to offer competent evidence to support its asserted fact.  The response is incorrect because the steps Dow and Marathon took to shut off water and gas were disclosed to, witnessed by, and approved by DOGGR at the time Defendants took them.  *See* SUF11-12, 15-18, 34-43.  Moreover, the Phillips testimony offered does not support an assertion that Dow or Marathon were obligated in the 1930-1950s to take action other than what was approved by DOGGR in the Well file.  Finally, while MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants.  *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Best Evidence (Fed. R. Civ. P. 1002)<br>• Misstates Evidence<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 84.  MDR began the reabandonment of the well on August 6, 2018.<br><br>Giuliani Decl. ¶6, Ex. 7 (Daily Work History) at 150. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact.  While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants.  *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |

| | |
|---|---|
| 85. Almost instantly, MDR saw signs that gas from below was leaking to the surface. InterACT was constantly dealing with gas kicks from the subsurface as it attempted to reenter the well<br><br>Giuliani Decl. ¶7, Ex. 7 (Daily Work History) at 150-162. | **Disputed in part.** Defendants do not dispute that MDR experienced gas kicks and surface breaches.  But MDR has failed to offer competent evidence to support any other asserted fact.  While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants.  *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 86. Despite numerous requests to modify the re-abandonment plan, CalGEM insisted that oil and gas zones must be isolated to protect water layers above.<br><br>Giuliani Decl. ¶9. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact.  While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 87. On December 24, 2018, after the well had been shut in and, the well experienced a blow out during the night when work at the Property had ceased for the Christmas holiday.<br><br>Giuliani Decl. ¶11; Ex. 7 (Daily Work History) at 160. | **Undisputed.**<br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 88. Following the Christmas blow out, MDR's contractor met with CalGEM at the Property and again requested that CalGEM approve a modified abandonment plan that did not require abandonment to 3,375 ft. bgs.<br><br>Giuliani Decl. ¶12; Ex. 7 (Daily Work History) at 160. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact.  While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 89. Following the Christmas blow out CalGEM still insisted that MDR continue with the planned re-abandonment. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact.  While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11. |

| | |
|---|---|
| Giuliani Decl. ¶12; Ex. 7 (Daily Work History) at 160. | **Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 90. MDR's contractor continued to experience gas kicks almost daily through the remainder of December, 2018 and early January, 2019.<br>Giuliani Decl. ¶13; Ex. 7 (Daily Work History) at 160-62. | **Undisputed.**<br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 91. On the morning of January 11, 2019, MDR's contractor experienced various gas kicks and emailed CalGEM noting the condition and again asking that CalGEM reconsider its position regarding a modification to the planned abandonment.<br>Giuliani Decl. ¶13; Ex. 8. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact. While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 92. Later on January 11, 2019, MDR's contractor experienced a blowout consisting mostly of natural gas up a drill string (a long metal tube, approximately four inches in diameter) that was being used to work towards the bottom of the well.<br>Giuliani Decl. ¶14; Ex. 7 at 162. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact. While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 93. The end of the drill string was believed to be at a depth of 1,492 ft. bgs when gas blew up the drill string with significant pressure.<br>Giuliani Decl. ¶14; Ex. 7 at 162. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact. While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 94. The source of the gas was believed to be below the end of the drill string at 1,492 ft. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact. While MDR refers to a "Giuliani Declaration," it failed to |

| | |
|---|---|
| Giuliani Decl. ¶14; Ex. 7 at 162. | provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 95. Attempts by the rig crew to screw on a safety valve on the end of the drill string at the surface were unsuccessful due to the pressure of the gas coming up the drill string.<br>Giuliani Decl. ¶14; Ex. 7 at 162. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact. While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 96. The drill string was released into the well to stop the blow out. In total, the blow out lasted approximately 10 minutes.<br>Giuliani Decl. ¶14; Ex. 7 at 162. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact. While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 97. The blow out did not result in any damage to life or property.<br>Giuliani Decl. ¶14. | **Undisputed.**<br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 98. On January 18, 2019, CalGEM issued Emergency Order No. 1143 requiring MDR to perform around-the-clock remedial work on Dow RGC 10.<br>Hughes Decl., Ex. | **Undisputed.**<br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon |
| 99. From the time of the blow out (before the Order), MDR's contractor maintained watch over the well, twenty-hours a day, and did not discontinue this program until allowed by CalGEM. | **Disputed.** MDR has failed to offer competent evidence to support its asserted fact. While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11. Moreover, |

| | |
|---|---|
| Giuliani Decl. ¶15; Ex. 7 at 162-176. | MDR opposed providing round-the-clock monitoring of the Well and did not do so until ordered to do so by DOGGR. Bartley Decl. Ex. 6_(Dudak Tr.) at 58-62. |
| 100. InterACT was unable to retrieve the entire drill string from the well.<br><br>Giuliani ¶16; Jordan Decl., Ex. 1 (Expert Report) at 45-48 | **Undisputed.**<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon<br>• Hearsay (Fed. R. Evid. 802) |
| 101. The presence of the drill string (often referred to as the "fish") in the wellbore at depth made further attempts to reach the bottom of the well impractical.<br><br>Giuliani ¶16; Jordan Decl., Ex. 1 (Expert Report) at 45-48 | **Disputed in part.** Because MDR failed to control the Well, MDR dropped the drill string into the Well during the blowout. After doing it, MDR was later unable to remove several hundred feet of the string. This, combined with its other errors, complicated its later plugging attempts. Dudak Decl. Ex. B (Dudak Rebuttal Report) at ¶ 27; Bartley Decl. Ex. 6_(Dudak Tr.) 109. MDR has failed to offer competent evidence to support its other asserted facts. While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon<br>• Hearsay (Fed. R. Evid. 802) |
| 102. In order to abandon the well following the blow out, MDR proposed a series of cement barriers at depth to isolate the oil and gas zones from the water zones and surface above. The two-phased approach was reviewed and approved by CalGEM.<br><br>Giuliani ¶16, Ex.9; Jordan Decl., Ex. 1 (Expert Report) at 45-48 | **Disputed in part.** Because MDR was unable to abandon the Well to DOGGR standards, it proposed an alternate abandonment proposal. While DOGGR allowed MDR to proceed with the alternative abandonment, it found MDR's plugging and abandonment did not comply with its requirements. SUF 92.<br><br>MDR has failed to offer competent evidence to support its other asserted facts. While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants. *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:** |

| | |
|---|---|
| | • Failure to Submit Declaration and Exhibits Relied Upon |
| | • Improper Expert Testimony (Fed. R. Evid. 702) |
| | • Legal Conclusion (Fed. R. Evid. 701) |
| | • Hearsay (Fed. R. Evid. 802) |
| 103. The process was approved by CalGEM and the County of Los Angeles.<br><br>Giuliani ¶16, Ex.9; Jordan Decl., Ex. 1 (Expert Report) at 45-48 | **Disputed in part.** Because MDR was unable to abandon the Well to DOGGR standards, it proposed an alternate abandonment proposal.  While DOGGR allowed MDR to proceed with the alternative abandonment, it found MDR's plugging and abandonment did not comply with its requirements.  SUF 92.<br><br>MDR has failed to offer competent evidence to support its other asserted facts.  While MDR refers to a "Giuliani Declaration," it failed to provide it, or any supposed exhibits to it, to Defendants.  *See* Dkt. No. 51 (Initial Standing Order) at 10-11.<br><br>**Evidentiary Objections:**<br>• Failure to Submit Declaration and Exhibits Relied Upon<br>• Misstates Evidence<br>• Improper Expert Testimony (Fed. R. Evid. 702)<br>• Legal Conclusion (Fed. R. Evid. 701)<br>• Hearsay (Fed. R. Evid. 802) |
| 104. On December 29, 2020, the State Oil and Gas Supervisor executed an Amended Emergency Order and Satisfaction "finding that [MDR] satisfied Emergency Remedial Order No. 1143 . . . by acting in accordance of the alternate programs 'Dow RGC 10, Two Stage Program to Cement through the Fish' and 'Dow RGC 10 Abandonment Program above the Fish' submitted to CalGEM on March 18, 2019 and March 26, 2019, respectively."<br><br>Hughes Decl. Ex. 17 | **Disputed in part but irrelevant.** This Order came after DOGGR's initial finding that MDR's plugging and reabandonment failed to comply with numerous regulations, including California Public Resources Code ("PRC") §§ 3208 and 3228, and California Code of Regulations §§ 1723(a) and 1723.1(b), because MDR failed to place cement plugs across the following zones as required by its own June 5, 2018 permit: (1) upper hydrocarbon (gas) zone at 2,200'±; (2) saltwater zone located between 3,076' and 3,341'; and (3) "upper zone" (oil) located at 3,330'±.  Hujer Decl. Ex. 33 (March 11, 2020 Letter from DOGGR) |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| | at 1-3; Hujer Decl. Ex. 53 (Jordan Rebuttal Report) at 19 ("It is true that the DOGGR disapproved of the P&A by MDR because it did not meet the stipulations that required plugging . . . from 3,076 ft to 3,341 ft and setting a plug across the shallow gas zone at approximately 2,200 ft."); *see also* Hujer Decl. Ex. 40 (Jordan Tr.) at 182 ("Q. You acknowledge that MDR did not abandon the well to current DOGGR standards? A. Yes."  Moreover, Defendants were not party to the administrative proceeding that culminated in issuance of the order.  *See* Dkt. No. 126 at 17 n.10.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Rule of Completeness (Fed. R. Evid. 106)<br>• Lack of Authentication (Fed. R. Evid. 901)<br>• Hearsay (Fed. R. Evid. 802) |
| 105. The Amended Order noted that the well control challenges were the "result of wellbore integrity issues related to the original abandonment."<br><br>Hughes Decl. Ex. 17 | **Disputed but irrelevant.**  The Amended Order based its statement regarding wellbore integrity "on information and belief."  Hughes Decl. Ex. 17. Defendants were not party to the administrative proceeding that culminated in issuance of the order.  *See* Dkt. No. 126 at 17 n.10.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Rule of Completeness (Fed. R. Evid. 106)<br>• Lack of Authentication (Fed. R. Evid. 901)<br>• Hearsay (Fed. R. Evid. 802) |
| 106. At the request of CalGEM, MDR constructed the parking garage such that a casing riser sits above the well, allowing future access to the well if necessary. | **Disputed but irrelevant.** DOGGR had "serious concerns about development of structures in proximity to th[e] Well" and "strongly recommend[ed]" no structures be built atop or in proximity of the Well, noting "[t]his is especially true with respect to well 'Dow R.G.C.' 10." |

89

| | |
|---|---|
| Madsen Decl. ¶8. | Hujer Decl. Ex. 48  (Vasconcellos Tr.) at 132:10-19; Hujer Decl. Ex. 34 (January 30, 2019 DOGGR Letter) at 2; Hujer Decl. Ex. 39 (Phillips Tr.) at 201 (Q: "So DOGGR had previously informed MDR and its contractors that it strongly recommended against placing any structure atop a well or preventing access to the well?  Do you remember that?"  A:  "That is correct."). |
| | DOGGR instructed MDR that a casing riser was necessary to allow access to the Well to remedy a currently perceived future problem "because "the [Well] is not plugged and abandoned to usual current standards, has a history of uncontrolled gas releases including the blowout that occurred during the most recent plugging and abandonment attempt, and remains an elevated risk for future gas releases."  Hujer Decl. Ex. 31 (June 13, 2019 DOGGR Letter) at 2. |
| | **Evidentiary Objections:** |
| | • Irrelevant (Fed. R. Evid. 401, 402) |
| | • Hearsay (Fed. R. Evid. 802) |
| 107. The re-abatement by MDR was approved by the County of Los Angeles, and Building and Safety issued a Final Certificate of Occupancy for the property.<br><br>Madsen Decl. ¶9. | **Disputed in part but irrelevant.** The Los Angeles County Department of Public Health also agreed that a post-abandonment methane gas monitoring plan was "critical" because gas migration pathways were not sealed. Hujer Decl. Ex. 28 (April 11, 2019 Email) at MDR0071334.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Legal Conclusion (Fed. R. Evid. 701)<br>• Hearsay (Fed. R. Evid. 802) |
| 108. The hotel property has been operational since October 2020, and is not impacted by the well or any methane gases emanating from the well.<br><br>Madsen Decl. ¶10. | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802) |

| | |
|---|---|
| 109. As a safety measure, MDR installed a leak detection system and regularly checks the well for leaks.<br><br>Madsen Decl. ¶11. | **Disputed in part but irrelevant:** MDR installed a leak detection system upon CalGEM's recommendation. Hujer Decl. Ex. 33 (March 11, 2020 DOGGR Letter) at 3 CalGEM further recommends MDR\Har[d]age\ County of Los Angeles, Department of Beaches and Harbors, develop a monitoring program for the well to detect future leakage.")<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802) |
| 110. To date, there has been no evidence of any leak of methane or other natural gas from the well.<br><br>Madsen Decl. ¶11.; Hughes Decl. Ex. 6 (Dudak Trans.) at 187:17-19 | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Hearsay (Fed. R. Evid. 802)<br>• Misstates Evidence |
| 111. Prior to raising the statute of repose in their Motion, Defendants had not asserted an affirmative defense based on a statute of repose.<br><br>ECF 57, 58.<br><br>Hughes Decl. ¶19. | **Disputed but irrelevant.** Defendants affirmatively pled that MDR's claims were untimely. Dkt No. 57 at 11; Dkt No. 58 at 11.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence (Fed. R. Evid. 802) |
| 112. Neither Marathon nor Dow include an affirmative defense related to the statute of repose related to construction defects in their Answers to the Complaint.<br><br>ECF 57, 58<br><br>Hughes Decl. ¶19. | **Disputed but irrelevant.** Defendants affirmatively pled that MDR's claims were untimely. Dkt No. 57 at 11; Dkt No. 58 at 11.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence |
| 113. With the exception of discovery related to well records withheld by Marathon, discovery in this matter concluded almost a year ago, May 31, 2022.<br><br>ECF 74 | **Undisputed but irrelevant.**<br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 114. Defendants have known they intended to file their Motion since at | **Undisputed but irrelevant.** |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| least August 12, 2022, when they filed a motion for leave to file multiple motions for summary judgment.<br><br>ECF 106 | **Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Lack of Foundation/Personal Information (Fed. R. Evid. 602) |
| 115. At no point was an affirmative defense based on the statute of repose informally raised between counsel.<br><br>Hughes Decl. ¶19. | **Disputed but irrelevant.** Defendants affirmatively pled that MDR's claims were untimely. Dkt No. 57 at 11; Dkt No. 58 at 11.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 116. Soil gas sampling done in 2006 showed that shallow soil gases were comprised of 100% explosive methane at ten feet below ground surface.<br><br>Hujer Decl. Ex. 18 at 4 (Test Results) | **Disputed in part.** The methane concentrations were "as high as 100" and ranged in readings from non-detect to 100% methane. Hujer Decl. Ex. 18 at 4.<br><br>**Evidentiary Objections:**<br>• Misstates Evidence |
| 117. The highest levels of methane were detected in 2006 in the area that would later be determined to be the location of the well.<br><br>Hujer Decl. Ex. 18 at 4 (Test Results) | **Disputed in part.** Methane Specialists' conclusion was the "source of the high methane concentration readings is believed to be caused by oil wells on or nearby the subject site." Hujer Decl. Ex. 18 at 4.<br><br>**Evidentiary Objections:**<br>• Misstates Evidence |
| 118. In 2006, Methane Specialists concluded that the high level of methane were likely coming from the Dow RGC 10 well<br><br>Hujer Decl. Ex. 18 at 4 (Test Results) | **Disputed in part.** Methane Specialists' conclusion was the "source of the high methane concentration readings is believed to be caused by oil wells on or nearby the subject site." Hujer Decl. Ex. 18 at 4.<br><br>**Evidentiary Objections:**<br>• Misstates Evidence |
| 119. On September 18, 2017, Methane Specialists located and tested the well. It was revealed to be leaking methane, and the soil surrounding the well head appeared to be covered with a "viscous fluid" leaking from the well.<br><br>Hughes Decl. Ex. 4 | **Undisputed.**<br>**Evidentiary Objections:**<br>• Lack of Authentication |

| | |
|---|---|
| 120. DOGGR specifically informed Methane Specialists that if the well was found to be leaking, it would need to be re-abandoned.<br><br>Hughes Decl. Ex. 5 | **Disputed in part but irrelevant.** While DOGGR noted to Methane Specialists that, hypothetically, if a well was leaking, it would have to be reabandoned, MDR did not inform DOGGR that the Well was leaking. *See, e.g.*, Bartley Decl. Ex. 6_(Dudak Tr.) at 126, 162, 175.<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 121. A contractor by the name of H. Hilsinger performed the perforations to the well casing in 1941.<br><br>Hujer Decl., Ex 3 at MDR0083194 | **Undisputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 122. Mr. Hilsinger was affiliated with an entity called "The Dow Chemical Company, Contractors."<br><br>Hujer Decl., Ex 3 at MDR0083192-05 | **Undisputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402) |
| 123. Gordon Graham was an independent contractor.<br><br>Hujer Decl., Ex 3 at MDR0083186 | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Irrelevant (Fed. R. Evid. 401, 402)<br>• Misstates Evidence |
| 124. Oil and gas are free to flow at levels below ground.<br><br>Jordan Decl. ¶6 | **Disputed but irrelevant.**<br><br>**Evidentiary Objections:**<br>• Hearsay (Fed. R. Evid. 802) |
| 125. It is very likely that the gas and oil that impact the Property originated offsite and migrated to the Property due to the presence of the well.<br><br>Jordan Decl. ¶6 | **Disputed.** This statement in Mr. Jordan's declaration completely contradicts the opinions he offers in his expert report regarding the source of on-site contamination.<br><br>**Evidentiary Objections:**<br>• Hearsay (Fed. R. Evid. 802)<br>• Improper Expert Testimony (Fed. R. Evid. 702(b)) |
| 126. The County refused to provide any credit or rent reduction related to the oil well or any potential environmental condition related to the property. | **Disputed.** Mr. Pangelinan admitted on Defendant's questioning that MDR received "extras," from the County to cover costs, which included costs for "oil well abandonment, the methane mitigation, and the soil remediation." SUF 73. When further asked if these |

93

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| Hughes Decl. Ex. 10 (Pangelinan Trans.) at 112:1-113:16 and 158:3-160:21 | items were included in the "extras," he testified that "I don't recall . . . but if that's what . . . [our financial consultant] wanted, we probably had to do it."). His lack of recollection, accompanied by the contemporaneous email and spreadsheet detailing the credit, is more than enough evidence for this Court to find MDR received the $10 million credit. SUF 73.<br><br>**Evidentiary Objections:**<br>• Best Evidence (Fed. R. Evid. 1002) |

Dated: March 31, 2023

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By:  */s/ Patrick J. Foley*
Patrick J. Foley
Attorneys for Defendant
*The Dow Chemical Company*

**PHILLIPS LYTLE LLP**

By:  */s/ Tristan D. Hujer*
Joel A. Blanchet (*Pro Hac Vice*)
Tristan D. Hujer (*Pro Hac Vice*)
Myles K. Bartley (*Pro Hac Vice*)
Attorneys for Defendant
*The Dow Chemical Company*

**LATHAM & WATKINS LLP**

By:  */s/ Mary Rose Alexander*
Mary Rose Alexander
Shannon D. Lankenau
Michael A. Hale
Attorneys for Defendant
*Marathon Oil Company*

## __ATTESTATION__

Pursuant to Local Rule 5-4.3.4(a)(2)(I), I, Tristan D. Hujer, attest under penalty of perjury that I have obtained concurrence and authorization from the other signatories to affix their electronic signatures to this filing.

Dated: March 31, 2023

**PHILLIPS LYTLE LLP**

By */s/ Tristan D. Hujer*

Tristan D. Hujer