UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MDR HOTELS, LLC,<br><br>               Plaintiff,<br><br>   v.<br><br>DOW CHEMICAL COMPANY, et al.,<br><br>               Defendants. | Case No. 2:20-cv-08008-FLA (JPRx)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. 124]; AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 128]** |

## <u>RULING</u>

Before the court are two motions for summary judgment ("Motions"): Plaintiff MDR Hotels, LLC's ("Plaintiff" or "MDR") Motion for Partial Summary Judgment, Dkt. 124 ("Pl. Mot."), and Defendants Dow Chemical Company ("Dow") and Marathon Oil Company's ("Marathon") (collectively, "Defendants") Motion for Summary Judgment, Dkt. 128 ("Def. Mot."). For the reasons set forth below, the court DENIES both Motions in their entirety.

///

///

1

# BACKGROUND

This matter arises from a compromised oil well (the "Well") located on the real property now located at 4360 Via Marina in Marina del Ray, California (the "Property"). The relevant, undisputed facts are as follows.

## A. Initial Development and Abandonment of the Well

In 1931, Marathon accepted the assignment of a thirteen-year oil and gas lease between non-parties Recreational Gun Club ("RGC") and A.A. Curtice. Dkt. 138 ¶ 5. That same year, Marathon notified the California Geologic Energy Management Division ("CalGEM")[1] of its intention to drill a well[2] on the Property (the "Well"), and received approval. *Id.* at 8; Dkt. 135-1 ¶ 9. Marathon then began to "explore, mine, and operate, take, store, remove, and dispose of oil [and] gas" by drilling, "coring", and "swabbing" the Well. Dkt. 135-1 ¶ 10.

On November 12, 1940, Marathon sought and received approval from CalGEM to abandon[3] the Well, and upon completion of the project, notified CalGEM it had plugged the oil-producing zone at approximately 3,400 feet below ground surface. *Id.* ¶¶ 15-16. In July 1941, Dow entered into a lease with RGC and acquired the rights to modify the Well for brine extraction and iodine production. *Id.* ¶¶ 29, 33; Dkt. 138 ¶¶ 38-39. Thereafter, Dow notified CalGEM of its plan to perforate the Well and received approval to do so. Dkt. 135-1, ¶ 34. In 1956, Dow submitted a notice of intention to abandon the well to CalGEM. Dkt. 138 ¶ 49. During the abandonment

---

[1] The California Department of Natural Resources Division of Oil and Gas later became the Division of Oil, Gas, and Geothermal Resources, which then became CalGEM. The entities are the same, and oversee and enforce California oil and gas statutes and activities. This Order refers to the agency only as CalGEM to avoid confusion.

[2] An oil well consists, in simple terms, of a deep hole with a metal pipe running down the center. Dkt. 138 ¶ 22.

[3] "Abandonment" is the process of plugging a well and otherwise rendering it out of service.

process, the Well blew out, resulting in gas, saltwater, and sand rushing to the surface. Dkt. 135-1 ¶ 36. Once the blowout settled, Dow continued its abandonment operations. *Id.* ¶ 37. On December 4, 1958, Dow transferred ownership of the Well to the County of Los Angeles (the "County"), which has been in possession of the Property since.

### B.  Plaintiff's Acquisition of the Property

In 1997, the County issued a request for proposals to develop the Property. *Id.* ¶ 62. Plaintiff won the bid and subsequently submitted a Development Plan that acknowledged the abandoned Well's presence and the need to address methane gas on the Property. *Id.* ¶¶ 63-64. On July 31, 2017, Plaintiff entered into a lease with the County to develop a hotel project on a portion of the Property, and began construction in or around September 2017. *Id.* ¶ 74; Dkt. 138 ¶ 72. Around the same time, Plaintiff claims it discovered the Well was within the footprint of its planned building and determined the Well was leaking methane.[4] Dkt. 135-1 ¶ 75.

### C.  Plaintiff's Reabandonment of the Well

In April 2018, Plaintiff submitted a proposal to CalGEM to reabandon the Well. *Id.* ¶ 76. CalGEM approved the plan contingent upon MDR's reabandonment plan meeting certain conditions, including isolation of the top of the uppermost hydrocarbon zone. *Id.* ¶ 78. Because Plaintiff had no experience in the field, it hired well contractors to complete the reabandonment. *Id.* ¶ 80-81. During the reabandonment process, the Well sustained multiple "gas kicks and surface breaches," considered to be indicators of well integrity issues, before ultimately blowing out twice on December 25, 2018, and January 11, 2019. *Id.* ¶ 84. The two blowouts are the only such occurrences on record since 1959, though Plaintiff states these records

---

[4] Plaintiff alleges it previously understood the Well was located adjacent to the street and planned its hotel development accordingly, but later discovered the Well was within the planned footprint of the development, under the planned parking garage. Dkt. 138 ¶¶ 70, 74.

3

do not include the "general leaking of methane which was recorded and known." *Id.* ¶ 85.

On January 18, 2019, CalGEM issued Emergency Order No. 1143 requiring Plaintiff to take certain measures to complete the reabandonment process to prevent resulting danger from the Well's condition. *Id.* ¶ 86. Plaintiff later represented that material had become stuck in the Well, at approximately 1,500 feet, which prevented its contractors from reaching the top of the upper-most hydrocarbon zone, in compliance with CalGEM's requirements. *Id.* ¶¶ 87-88. Plaintiff's contractors testified it would have been unsafe to isolate the upper hydrocarbon zone by drilling the Well beyond the stuck material. *Id.* ¶ 89. Plaintiff, therefore, left the material in the Well and claims to have abandoned the Well at a depth of approximately 2,027 feet. *Id.* ¶¶ 90-91.

In March 2020, CalGEM issued a letter finding Plaintiff's plugging and reabandonment failed to comply with various regulations, including multiple provisions of the California Public Resources Code ("PRC"). The Los Angeles County Department of Public Health agreed a post-abandonment methane gas monitoring plan was critical. Dkt. 129, Ex. 33; *Id.* ¶¶ 92, 104. On December 29, 2020, however, the State Oil and Gas supervisor executed an Amended Emergency Order and Satisfaction, finding Plaintiff had "satisfied Emergency Remedial Order No. 1143 … by acting in accordance of the alternate programs…" Dkt. 138 ¶ 104; Dkt. 135-2, Ex. 17. The Amended Order stated, upon information and belief, that the well control challenges were the "result of wellbore integrity issues related to the original abandonment." Dkt. 138 ¶ 105; Dkt. 135-2, Ex. 17.

### D. Procedural History

Plaintiff commenced this action on July 31, 2020, asserting causes of action for negligence, continuing public and private nuisance, permanent public and private nuisance, and trespass. Dkt. 1-2 ("Compl."). Specifically, the Complaint alleges Defendants negligently installed casing and failed to install concrete and cement,

"which caused and/or contributed to surface migration of gasses and blowouts." *Id.* ¶ 17. Plaintiff claims the Well is a nuisance and a trespass. Compl.

On November 2, 2020, Defendants moved to dismiss the Complaint. Dkt. 36. The court dismissed Plaintiff's negligence and permanent nuisance claims, finding those claims were barred by the statute of limitations because the County "knew or had reason to suspect Plaintiff's claims regarding the alleged 'improper construction, use, maintenance, and abandonment of the [W]ell' at least as of 1959." *Id.* at 9. Thus, Plaintiff's only remaining claims are for trespass and continuing public and private nuisance.

Plaintiff filed its Motion on February 17, 2023. Dkt. 124. Defendants oppose the Motion, Dkt. 126 ("Def. Opp."), and filed their own Motion on March 10, 2023, Dkt. 128. Plaintiff opposes Defendants' Motion. Dkt. 135 ("Pl. Opp."). On April 10, 2023, the court found both matters appropriate for resolution without oral argument and vacated the hearings set for April 14, 2023. Dkt. 83; *see* Fed. R. Civ. P. 78(b); Local Rule 7-15.

## EVIDENTIARY OBJECTIONS

On a motion for summary judgment, the parties may only object to evidence if it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The parties advance several objections to the evidence submitted by their counterparts in connection with the Motion. Dkts. 135-1, 138. The parties object to evidence submitted on grounds including irrelevance, lack of foundation, improper expert qualification, and hearsay. While the parties' objections may be cognizable at trial, on a motion for summary judgment, the court is concerned only with the admissibility of the relevant <u>facts</u> at trial, and not the <u>form</u> of these facts as presented in the motions. *See* Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment ("Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the

pretrial setting."); *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56.").

Thus, to the extent the court relies upon evidence to which the parties object, the objections are OVERRULED. To the extent the court does not, the objections are DENIED as moot.

## DISCUSSION

I. **Legal Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the opposing party must then set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248-49. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). Inferences may be drawn from underlying facts that are either not in dispute or that may be resolved at trial in favor of the nonmoving party, but only if they are "rational" or "reasonable" and otherwise permissible under the governing substantive law. *Id.* The court must view all evidence and justifiable inferences "in the light most favorable to the nonmoving party." *Id.* at 630-31. However, a party cannot defeat summary judgment based solely on the allegations or denials of the pleadings, conclusory statements, or unsupported conjecture. *Hernandez v. Spacelabs Med.*, Inc., 343 F.3d 1107, 1112 (9th Cir. 2003); *see also FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

"After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f).

**II. Analysis**

Plaintiff seeks partial judgment as to the Complaint's second cause of action for continuing nuisance. *See* Pl. Mot. Defendants seek summary judgment against all of Plaintiff's claims. *See* Def. Mot. The court addresses each Motion in turn.

**A.    Plaintiff's Motion for Partial Summary Judgment**

Plaintiff seeks summary judgment on the Complaint's second cause of action for continuing public nuisance on the grounds that the Well constitutes a per se public nuisance under PRC § 3250 ("§ 3250"). Pl. Mot. 4. Under California law, a nuisance

7

is "[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code § 3479. "The concept of a nuisance per se arises when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular object or substance, activity, or circumstance, to be a nuisance." *Beck Dev. Co. v. Southern Pacific Transportation Co.*, 44 Cal. App. 4th 1160, 1206 (1996).

Plaintiff cites to § 3250 in support of its argument, which states:

> The Legislature hereby finds and declares that hazardous and certain idle-deserted oil and gas wells and hazardous and deserted facilities, as defined in this article, are public nuisances and that it is essential, in order to protect life, health, and natural resources that those oil and gas wells and facilities be abandoned, reabandoned, produced, or otherwise remedied to mitigate, minimize, or eliminate their danger to life, health, and natural resources.

The provision further defines a hazardous well as "an oil and gas well determined by the supervisor to be a potential danger to life, health, or natural resources and for which there is no operator determined by the supervisor to be responsible for its plugging and abandonment under Section 3237." PRC § 3251(d).

Section 3251.5(a) further expands this definition by providing:
> Notwithstanding Section 3251, a well shall be deemed a hazardous well if it has been determined by the supervisor to pose a present danger to life, health, or natural resources and has been abandoned in accordance with the requirements of the division in effect at the time of the abandonment 15 or more years before the date of the supervisor's determination that it poses such a danger.

Plaintiff points to Emergency Order No. 1143, dated January 18, 2019, in which CalGEM ordered Plaintiff to perform remedial work based on concerns about the Well's structural integrity. Dkt. 129, Ex. 22. Plaintiff premises its Motion on the fact that the Emergency Order states the Well posed an immediate threat to "life, health, property, and natural resources," and that implementation of the Order was

8

"necessary to prevent damage to life, health, property, and natural resources." *Id.* at 2-3.

The Emergency Order, however, does not rely on or reference §§ 3251 or 3251.5. Instead, CalGEM determined, in its order, that "[MDR's] subsequent actions to the uncontrolled release of January 11, 2019, have not been consistent with the actions required to properly control the well and protect life, health, property, and natural resources." *Id.* at 6. Further, CalGEM wrote MDR's "proposals for maintaining well control and proceeding with re-abandonment were determined to be insufficient to protect life, health, property, and natural resources." *Id.* at 3. CalGEM, thus, took issue with MDR's current operation of the Well and ordered MDR to take action to protect the public and prevent further damage, expressly relying on PRC §§ 3013, 3106, 3224, 3226, which authorize CalGEM to "issue an order that directs the Operator [MDR] to take any actions that the Supervisor deems necessary to protect life, health, property, or natural resources." *Id.*

Accordingly, the court finds a genuine dispute of material fact exists as to whether the Well was a continuing public nuisance and denies Plaintiff's Motion.

## B. Defendants' Motion for Summary Judgment

Defendants assert "multiple independently sufficient reasons" supposedly demonstrating their entitlement to judgment as to all of Plaintiff's claims, namely: (i) California's statute of repose bars MDR from recovery; (ii) Plaintiff's Well-related claims are permanent, rather than continuing, nuisance and trespass, and are thus time-barred; (iii) Plaintiff fails to establish Defendants lacked consent; (iv) Plaintiff's nuisance claims fail because Defendants' conduct was expressly authorized by statutory authority; (v) Plaintiff's trespass claim fails because Defendants did not cause any detrimental substance to enter Plaintiff's property; and (vi) Defendants transferred the Property via quitclaim deed, thus extinguishing their obligations relating to the Property and Well. Def. Mot. 10. The court addresses each argument in turn.

### a. Statute of Repose

Defendants claim California's statute of repose precludes Plaintiff's claims. Def. Mot. 20-23. The relevant statute, Cal. Civ. Proc. § 337.15(a), provides:

> No action may be brought to recover damages from any person . . . who develops real property or performs . . . construction of an improvement to real property more than 10 years after the substantial completion of the development or improvement for . . . [a]ny latent deficiency in the design, specification, surveying, planning, supervision, or observation of construction or construction of an improvement[.]

Plaintiff counters that Defendants fail to address the statute's "control exception," which provides:

> The limitation prescribed by this section shall not be asserted by way of defense by any person in actual possession or the control, as owner, tenant or otherwise, of such an improvement, at the time any deficiency in the improvement constitutes the proximate cause for which it is proposed to bring an action.

*Id.* § 337.15(e). Defendants respond the exception is inapplicable as courts have interpreted the phrase "at the time any deficiency in the improvement constitutes the proximate cause for which it is proposed to bring the action," to mean ownership at the time of accident, rather than construction. Dkt. 136 at 9-11. The court agrees with Plaintiff.

As an initial matter, the purpose of the statute "is to protect contractors and other professionals and tradespeople in the construction industry from perpetual exposure to liability for their work." *Lantzy, v. Centex Homes*, 31 Cal. 4th 363, 374 (2003). California courts have consistently held that contractors and developers are not considered "owners" for purposes of the exception, because such an interpretation "would defeat the intent of the statute" since "[a]ll contractors, developers, etc. are in control of the project at some stage of its development." *Eden v. Van Tine*, 83 Cal. App. 3d 879, 886 (1978).

But where an entity is both an owner and a developer, it cannot summarily evade liability under the statute of repose by claiming it is a protected developer or contractor. *See Nixon-Egli Equipment Co. v. John A. Alexander Co.*, 949 F. Supp. 1435 (C.D. Cal. 1996). *Nixon-Egli Equipment Co.* is particularly instructive in this regard. There, defendants had previously purchased the land in question, prepared it for commercial development by grading and filling various parcels, and eventually leased and then sold the land to plaintiff. *Id.* at 1438. Plaintiff later brought claims similar to those in this action alleging defendants' allegedly negligent grading and filling. *Id.* When moving for summary judgment, defendants sought the same relief as here, arguing plaintiff's claims were time-barred since "more than 10 years had passed since the allegedly defective grading was done[.]" *Id.* at 1446. The court rejected defendants' contentions, instead holding it "illogical" for defendants to argue "they were both an owner and a general contractor at the time the allegedly defective work was done[.]" *Id.* The fact that defendants "may be able to escape liability as a general contractor does not immunize them from liability as an owner." *Id.* Similarly, here, it is undisputed Defendants leased the land, and arguably assumed the role of developer in drilling and abandoning the well. Such dual status, however, is insufficient to rid Defendants of their status as owners or lessees of the land, and cannot immunize them from liability. Accordingly, the court finds the control exception to the statute of repose applies to Defendants, and they may not assert the statute to preclude Plaintiff's claims.

### b. Permanent Nuisance

Defendants next argue that, assuming the Well is a nuisance or trespass, it should be classified as a permanent nuisance, thus time-barring Plaintiff's claims under the statute of limitations, consistent with this court's April 20, 2021 Order. Mot. 23; *see* Dkt. 54 at 9-10 (granting Defendants' Motion to Dismiss fourth and fifth causes of action for permanent public and private nuisance based on statute of limitations, but allowing claims for continuing public and private nuisance to remain).

Whether a nuisance is permanent or continuing hinges on whether it can be discontinued or abated. *See Mangini v. Aerojet-General Corp.*, 12 Cal. 4th 1087, 1093 (1996). Because "virtually everything can be said to be abatable if all other considerations are disregarded," the abatement inquiry focuses on "feasible means of, and alternatives to, abatement, the time and expense involved, legitimate competing interests, and the benefits and detriments to be gained by abatement or suffered if abatement is denied." *Beck Dev. Co.*, 44 Cal. App. 4th at 1220.

Defendants claim the Well is a permanent nuisance because Plaintiff "could not reabandon the Well pursuant to current [CalGEM] regulations," and "admits that due to [material] stuck in the wellbore … reabandonment of the Well … to enable the isolation of the upper hydrocarbon gas zone … was impracticable, unsafe, risky, and cost prohibitive." Def. Mot. 25.[5] Plaintiff rejects this argument, alleging instead that, to the extent it was unable to complete the planned reabandonment, it was only due to the 2019 blowout and not any previous hindrance. Pl. Opp. 7. Prior to the 2019 blowout, Plaintiff claims the Well's issues were abatable and Plaintiff was in the process of abating them. *Id.*

The court finds genuine disputes of material fact exist as to whether the Well is a continuing or permanent nuisance as it is not discernable, based on the undisputed facts and evidence in the record, whether the Well was ever repairable, or became unrepairable due to Plaintiff's faulty reabandonment efforts. Evidence that CalGEM approved Plaintiff's reabandonment plan, *see* Dkt. 138 ¶¶ 76-77, for example, would tend to establish the Well could have been repaired, and only became unrepairable because of Plaintiff's contractor's poor workmanship. *Id.* ¶ 84. Alternatively,

---

[5] Defendants misstate Plaintiff's concessions, as Plaintiff did not admit reabandonment would be cost prohibitive. Plaintiff did admit various materials prevented its contractors from reaching the top of the upper-most hydrocarbon zone in compliance with CalGEM requirements, and that its contractors testified that drilling beyond the stuck material would have posed an unacceptable risk of another blowout. Dkt. 138 ¶¶ 86-90.

Plaintiff's admission that it was impossible to isolate the upper hydrocarbon gas zone, thus allowing gas to migrate up, may establish the Well was unrepairable as material stuck within prevented Plaintiff's contractor from drilling further safely. *See id.* ¶¶ 88-90. Whether the Well is a continuing or permanent nuisance, therefore, presents questions of fact that cannot be resolved on summary judgment.

Moreover, California case law provides a preference "for finding a continuing nuisance, both to protect the plaintiff from 'contingencies' such as unforeseen future injury and the statute of limitations itself," and where "the distinction between permanent and continuing nuisance is close or doubtful the plaintiff will be permitted to elect the theory to pursue." *Capogeannis v. Superior Court*, 12 Cal. App. 4th 668, 678-79 (1993). Accordingly, the court declines to grant summary judgment on this ground.

### c.  Consent

Where "an owner of property seeks damages for creation of a nuisance by a prior lessee, the lessee has a defense that his use of the property was lawful and authorized by the lease; i.e., his use of the property was undertaken with the *consent* of the owner." *Mangini*, 230 Cal. App. 3d at 1138 (emphasis in original). Defendants contend they are entitled to judgment because they had consent to construct, operate, and abandon the well under the lease agreement, and because their actions were lawful. Def. Mot. 28. Plaintiff counters the consent defense does not apply as it does not extend to acts that exceed the scope of the granted consent. Pl. Opp. 32.

The parties have been unable to locate Marathon's lease, *see* Dkt. 138 ¶ 6, and the only relevant language in Dow's lease requires it to "carry on all operations on the [Property] in a careful and workmanlike manner and in accordance with the laws of the State of California." *Id.* ¶ 40. Accordingly, Defendants have not put forth sufficient undisputed evidence warranting entry of summary judgment on this ground as a genuine dispute of material fact exists as to whether Defendants exceeded the scope of the lessor's consent.

### d. Cal. Code Civ. Proc. § 3482

Defendants further argue Plaintiff's claims fail as a matter of law, pursuant to Cal. Code Civ. Proc. § 3482, which states: "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance."

It is undisputed CalGEM expressly authorized Defendants to drill, abandon, and reabandon the Well. Simply acting pursuant to such a mandate, however, does not absolve Defendants of all liability, as "[e]ven though acts authorized by statute cannot give rise to nuisance liability, the *manner* in which those acts are performed may constitute a nuisance." *Jones v. Union Pac. R. R.*, 19 Cal. App. 4th 1053, 1067-68 (2000) (internal quotations omitted) (emphasis added). If a trier of fact ultimately determines the Well is a public nuisance caused by Defendants' actions, Defendants may not be relieved of liability simply because they received permission to drill and abandon the Well, but did so negligently.

The cases Defendants rely on do not support their position. In *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 888 (9th Cir. 2001), the court upheld a grant of summary judgment where the permit at issue specifically authorized "discharge of storm water containing pollutants" – the complained of nuisance. In *Wheeler v. Gregg*, 90 Cal. App. 2d 348, 370 (1949), the court affirmed summary judgment where the city issued defendant a permit to excavate land and plaintiffs sued to void the permit and enjoin the excavation. Here, Plaintiff does not question or seek to invalidate CalGEM's grant of authority to Defendants. Instead, it challenges the manner in which Defendants carried out their authorized actions, which, Plaintiff alleges, resulted in a nuisance that was neither authorized nor contemplated by CalGEM.

Accordingly, the court declines to grant summary judgment on this ground.

### e. Trespass

Defendants argue Plaintiff cannot prove a trespass because it has not demonstrated "either Defendant placed oil or gas onto the Property, or failed to

14

remove any such oil or gas." Def. Mot. 35. In support, Defendants assert only that "it is undisputed the oil and gas *pre-existed* Defendants' leases." Def. Mot. 35-36 (citing Dkt. 138 ¶ 4) (emphasis in original). Plaintiff counters that although it is undisputed oil and gas "were present at depth at the Property," Defendants' actions "resulted in…methane and other gases…migrat[ing] to the surface of the Property." Dkt. 138 ¶ 4.

Viewing the evidence in the light most favorable to the non-moving party, the court finds Defendants have not met their burden and declines to grant summary judgment on this ground.

### f. Quitclaim Deeds

Defendants lastly argue their transfer of the Property via quitclaim deeds extinguished "all their obligations related to the Property and the activities thereon." Def. Mot. 36. As Plaintiff notes, this court previously considered and rejected this argument. *See* Dkt. 54 (denying motion to dismiss based on same argument). Accordingly, summary judgment on this ground is denied.

### **CONCLUSION**

For the foregoing reasons, the court DENIES Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment in their entirety.

IT IS SO ORDERED.

Dated: January 5, 2024

FERNANDO L. AENLLE-ROCHA
United States District Judge